DAVID B. GOLUBCHIK (SBN 185520)
EVE H. KARASIK (SBN 155356)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: dbg@lnbyb.com, ehk@lnbyb.com, jyo@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>ANNA'S LINENS, INC.,<br><br>        Debtor. | Case No. 8:15-bk-13008-TA<br><br>Chapter 11<br><br>**EMERGENCY MOTION BY DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (A) AUTHORIZING ASSUMPTION OF AGENCY AGREEMENT; (B) AUTHORIZING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO BANKRUPTCY CODE SECTIONS 363(B) AND (F); (C) APPROVING THE STORE CLOSING SALE GUIDELINES; (D) AUTHORIZING THE DEBTOR TO ABANDON; AND (E) AUTHORIZING LEASE REJECTION PROCEDURES WITH RESPECT TO THE CLOSING STORES PURSUANT TO SECTION 365; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[Declaration of J.E. Rick Bunka Filed Concurrently Herewith]**<br><br>DATE:    June 16, 2015<br>TIME:    2:00 p.m.<br>PLACE:  Courtroom 5B<br>          411 West Fourth Street<br>          Santa Ana, California |

# TABLE OF CONTENTS

**SUMMARY** ................................................................................................................ 1

**ADDITIONAL INFORMATION** ............................................................................. 3

**MEMORANDUM OF POINTS AND AUTHORITIES** ........................................... 6

**I.    STATEMENT OF FACTS** ............................................................................. 6

    **A.    General Background** ........................................................................ 6

    **B.    Events Leading To The Filing Of The Debtor's Chapter 11
Bankruptcy Case And Anticipated Exit Strategy** ........................... 7

    **C.    The Agency Agreement Solicitation Process** .................................. 9

    **D.    The Agency Agreement** .................................................................. 13

    **E.    Rejection of Leases for Closing Stores and Procedures Related
Thereto** ........................................................................................... 18

**II.    DISCUSSION** ............................................................................................. 19

    **A.    Section 365 of the Bankruptcy code Authorized the Debtor to Assume
the Agency Agreement as an Exercise of the Debtor's Sound Business
Judgment** ......................................................................................... 19

    **B.    The Court Should Authorize the Debtor To Conduct the Sale
Pursuant to the Sale Guidelines** ................................................... 22

    **C.    The Sale Of The Inventory Should Be Free And Clear Of Liens** ............... 24

    **D.    The Agent Should Be Afforded The Protections of Bankruptcy Code
Section 363(m)** ............................................................................... 25

    **E.    The Court Should Approve The Sales Guidelines And Invalidate Any
Lease Restrictions And State Or Local Law That May Impact
Negatively On The Debtors' Ability To Conduct Sale** ................... 26

        **1.    The Court Should Approve The Sales Guidelines And
Invalidate Any Lease Restrictions And State Or Local Law
That May Impact Negatively On The Debtor's Ability To
Conduct Sale** ........................................................................ 26

        **2.    The Certain State And Local Requirements That Do Not
Implicate Applicable General Laws Should Be Waived** ................... 29

i

**F.**     **The Debtor Should be Granted Authority to Abandon Unsold Property Following Sale** ............................................................................ 32

**G.**     **The Proposed Lease Rejection Procedures Should be Approved** .............. 33

**H.**     **Other Relief Requested** ............................................................................ 34

**I.**      **Necessity for Immediate Relief and Effectiveness of the Order**.................. 35

**J.**     **Notice of the Hearing is Reasonable Under the Circumstances and Scheduling of Final Hearing** ....................................................................... 36

**III.**     **CONCLUSION**.............................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nevada (In re Baker & Drake, Inc.)*
35 F.3d 1348 (9th Cir. 1994) ...................................................................................30

*California State Bd. Of Equalization v. Goggin*
191 F.2d 726 (9th Cir. 1951) ..................................................................................30

*Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*
722 F.2d 1063 (2d Cir. 1983) ...........................................................................22, 35

*Comm'l Fin. Ltd. v Hawaii Dimensions, Inc. (In re Hawaii Dimensions, Inc.)*
47 B.R. 425 (D.Haw.1985) ......................................................................................19

*Durkin v. Benedor Corp. (In re G.I. Indus., Inc.)*
204 F.3d 1276 (9th Cir.2000) ..................................................................................19

*Hanover Ins. Co. v. Tyco Indus., Inc.*
500 F.2d 654 (3d Cir. 1974)....................................................................................32

*Hargrave v. Township of Pemberton (In re Tabone, Inc.)*
175 B.R. 855 (Bank. D.N.J. 1994)...........................................................................25

*In re Abbotts Dairies of Pennsylvania, Inc.*
788 F.2d 143 (3d Cir. 1986)........................................................................22, 25, 35

*In re Ames Dept. Stores, Inc. (Ames I)*
136 B.R. 357 (Bankr. S.D.N.Y. 1992)..........................................................22, 23, 26

*In re Blockbuster Inc.*
Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) ...................................31

*In re Borne Chemical Co., Inc.* (Bankr. D.N.J. 1984) ..................................................30

*In re Central Fla. Metal Fabrication, Inc.*
190 B.R. 119 (Bankr.N.D.Fla.1995) ........................................................................19

*In re Chipwich, Inc.*
54 B.R. 427 (Bankr.S.D.N.Y.1985)..........................................................................19

*In re Continental Country Club, Inc.*
114 B.R. 763 (Bankr.M.D.Fla.1990) .......................................................................19

*In re Delaware and Hudson Ry. Co.*
124 B.R. 169 (D. Del. 1991).....................................................................................22

*In re Enron Corp.*
   Case No. 01-16034, 2003 WL 21755006 (Bankr. S.D.N.Y. July 28, 2003) ..........................25

*In re Ewell*
   958 F.2d 276 (9th Cir. 1992) .................................................................................................25

*In re FCX, Inc.*
   60 B.R. 405 (E.D.N.C. 1986).................................................................................................19

*In re Finlay Enters., Inc.*
   Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) ...............................................31

*In re Fred's Dollar Showrooms of Hernando, Inc.*
   44 B.R. 491 (Bankr. N.D. Miss. 1984) ...................................................................................28

*In re General Bearing Corp.*
   136 R.R. 361, 363-64 (Bankr. S.D.N.Y. 1992)......................................................................24

*In re Grossinger's Assoc.*
   184 B.R. 429 (Bankr. S.D.N.Y. 1995)...................................................................................32

*In re Gucci*
   *193 B.R. 411 (S.D.N.Y.1996)* .............................................................................................19

*In re Hermann Sporting Goods Inc.*
   Case No. 93-1529 (Bankr. D.N.J. Apr. 7, 1993)....................................................................22

*In re Huntington, Ltd.*
   654 F.2d 578 (9th Cir. 1981) .................................................................................................22

In *re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*
   77 B.R. 15 (Bankr. E.D. Pa. 1987) ........................................................................................25

*In re Joshua Slocum, Ltd.*
   99 B.R. 250 (Bankr. E.D. Pa. 1989), vacated on other grounds, 922 F.2d 1081 (3rd
   Cir. 1990) ...............................................................................................................................28

*In re Klein Sleep Products, Inc.*
   78 F.3d 18 (2d. Cir.1996) ......................................................................................................19

*In re Linens Holding Co.*
   Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008)...............................................................29

*In re Lisbon Shops, Inc.*
   24 B.R. 693 (Bankr. E.D. Pa. 1982) .................................................................................27, 28

*In re Martin (Myers v. Martin)*
   91 F.3d 389 (3d Cir. 1996).................................................................................................22, 35

*In re Prime Motors Inns*
   124 B.R. 378 (Bankr.S.D.Fla.1991) ..................................................................20, 33

*In re Qintex Entertainment, Inc.*
   950 F.2d 1492 (9th Cir. 1991). Bankruptcy..............................................................22

*In re R.H. Macy & Co.*
   170 B.R. 69 (Bank. S.D.N.Y. 1994) ........................................................................27

*In re Rawson Food Services, Inc.*
   61 B.R. 207 (Bankr. M.D. Fla. 1986) .....................................................................28

*In re Shenango Group, Inc.*
   186 B.R. 623 (Bankr. W.D. Pa, 1995) ....................................................................30

*In re Steve & Barry's Manhattan LLC*
   Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) .................................31

*In re Tobago Bay Trading Co.*
   112 B.R. 463 (Bankr. N.D. Ga. 1990) ...............................................................27, 28

*In re Walter*
   83 B.R. 14, 19-20 (9th Cir. BAP 1988) .............................................................23, 22

*In re Winn's Showrooms*
   177 B.R. 253 (Bankr. W.D. Tex. 1995) ...................................................................28

*In re Woodward & Lothrop Holdings*
   No. 94 B 40222 (SNB) (Bankr. S.D.N.Y. Aug. 16, 1995) ......................................22

*In re Zany Brainy, Inc., et al.*
   Case No. 01-1749 (MFW) (D. Del. October 11, 2002) ...........................................22

*NLRB v. Bildisco & Bildisco*
   465 U.S. 513 (1984).................................................................................................33

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*
   4 F.3d 1095 (2d Cir. 1993).......................................................................................33

*Sharon Steel Corp. v. National Fuel Gas Distribution Corp. (In re Sharon Steel Corp.)*
   872 F.2d 36 (3d Cir. 1989).......................................................................................33

*Summit Land Co. v. Allen (In re Summit Land Co.)*
   13 B.R. 310 (Bankr.D.Utah 1981) ...........................................................................20

*Titusville Country Club v. Pennbank (In re Titusville Country Club)*
   128 B.R. 396 (Bankr. W.D. Pa. 1991) ...............................................................23, 25

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*
 72 B.R. 845 (Bankr. W.D. Pa. 1987) ...................................................................33

**OTHER CASES**

*In re Krause's Custom Crafted Furniture Corp., et al.*
 Case No. SA 01-16360-JB ...........................................................................23

*In re Store of Knowledge Inc., et al.*
 Case No. LA 01-19181-EC ...........................................................................23

**FEDERAL STATUTES**

11 U.S.C. § 105(a) ...........................................................................................31

11 U.S.C. § 363 ...........................................................................1, 22, 24, 26, 31

11 U.S.C. § 363(b) ...................................................................................1, 22, 25

11 U.S.C. § 363(f) ....................................................................................1, 24, 25

11 U.S.C. § 363(m) ......................................................................................25, 26

11 U.S.C. § 365 .......................................................................................1, 3, 19, 33

11 U.S.C. § 365(a) .....................................................................................19, 33

11 U.S.C. § 365(b) ...........................................................................................27

11 U.S.C. § 554(a) ...........................................................................................32

11 U.S.C. § 1107 ....................................................................................6, 19, 33

11 U.S.C. § 1108 .................................................................................................6

28 U.S.C. § 959 ................................................................................................30

**OTHER STATUTES**

UCC § 9-102(a)(64) ..........................................................................................18

**FEDERAL RULES**

Fed.R.Bankr.P. 6003 ...............................................................................4, 35, 37

Fed.R.Bankr.P. 6004(a) ............................................................................4, 35, 37

Fed.R.Bankr.P. 6004(h) ............................................................................4, 36, 37

Fed.R.Bankr.P. 9075-1 ........................................................................................1

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, SALUS CAPITAL, THE LENDERS, THE DEBTOR'S TWENTY LARGEST UNSECURED CREDITORS AND OTHER PARTIES IN INTEREST:**

## SUMMARY

Anna's Linens, Inc., the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (collectively referred to herein as "Anna's or the "Debtor"), hereby moves, on an emergency basis by this motion (the "Motion") under Local Bankruptcy Rule 9075-1, and pursuant to sections 363 and 365 of chapter 11 of title 11 of the United States Code §§ 101, et seq. (the "Bankruptcy Code") for the entry of interim  and final orders (respectively, the "Interim Order" and the "Approval Order," collectively, the "Orders") attached hereto as Exhibits "A" and "B":

(1)  upon entry of the Interim Order, during the period between the Sale Commencement Date and the entry of the Approval Order (the "Interim Sale Period"), (A) authorizing the Agent to continue to sell the Debtor's Merchandise (as defined in the Agency Agreement), Owned FF&E (as defined in the Agency Agreement), and Additional Agent Merchandise (as defined in the Agency Agreement) free and clear of all liens, claims, and encumbrances pursuant to Bankruptcy Code Sections 363(b) and 363(f)  through the conduct of the Sale as a "going out of business sale", "store closing", "sale on everything", "everything must go", "inventory liquidation" or similar themed sale, in accordance with terms of (i) that certain Agency Agreement (attached hereto as Exhibit "C") entered into prepetition between the Debtor and the joint venture comprising Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent"   or "Hilco/GB"); (ii)   the Interim Order; (iii) the sale guidelines annexed hereto as Exhibit "D" (the "Sale Guidelines"); and (iv) Applicable General Laws, but  without complying with applicable Liquidation Sale Laws or the terms of Store

1

1   Leases,[1] pending a final hearing on the Debtor's request for authority to assume the Agency

2   Agreement and (B) authorizing and directing the payment of certain bid protections to a joint

3   venture comprised of Tiger Capital Group, LLC and Yellen Partners, LLC ("Tiger/Yellen"),

4   which served as the stalking horse agent (the "Tiger/Yellen Stalking Horse") during the Debtor's

5   prepetition sale process, and a break-up fee to Great American Group, LLC ("Great American").[2]

6        (2)     upon entry of the Interim Order, authorizing the Debtor to assume the Agency

7   Agreement and continue to conduct the Sale as contemplated by the Agency Agreement, the Sale

8   Guidelines and the Approval Order approving the terms of the Agency Agreement;[3]

9        (3)     approving the Sale Guidelines and authorizing  the Debtor to continue to conduct

10  the Sale (i) waiving compliance with any provision in any of the Debtor's leases or related

11  contracts restricting the Sale (the "Contractual Restrictions"), (ii)  exempting the Debtor form

12  state and local wage requirements for Sale (the "Fast Pay Laws") and (iii) exempting the Debtor

13  from complying with applicable state and local statutes, rules, regulations, or ordinances or any

14  license or other requirements in respect of "going out of business", "store closing", "sale on

15  everything",  "everything must go", "inventory liquidation" or similarly themed sales (including,

16  without limitation, laws restricting safe, professional and non-deceptive, customary advertising

17  such as signs, banners, posting of signage, use of sign walkers solely in connection with the Sale

18  and including ordinances establishing license or permit requirements, waiting periods, time

19

20  ---

[1]  Capitalized terms used but not defined herein have the meanings set forth in the Agency
Agreement attached as Exhibit "C" to this Motion.

21  [2]  The Debtor continues in its efforts to pursue and negotiate a definitive asset purchase

22  agreement with DW Partners, and therefore, in lieu of assuming the Agency Agreement,
enter into a going concern transaction with DW Partners, Inc. (the "Going Concern

23  Transaction"), prior to June 19, 2015, which is the deadline fixed by the Debtor (with the
consent of the Administrative Agent (as defined below) and the [Joint Venture]) with DW

24  Partners.  Any Going Concern Transaction and the related approval process  is subject to
Administrative Agent's consent and approval, and the Administrative Agent has reserved all

25  of its rights with respect thereto.  The Debtor anticipates that the Going Concern Transaction
shall also contemplate the continued closure of some number of the Debtors' Stores, and thus

26  even with a Going Concern Transaction, the relief requested in connection with the Agency
Agreement (as modified to contemplate the Going Concern Transaction and resulting lesser

27  number of closing Stores and other related matters) will continue to be sought with respect to
such closing Stores.

28

limits or bulk sale restrictions that would otherwise apply to the Sale, but excluding those designed to protect public health and safety (collectively, together with the Fast Pay Laws, the "Liquidation Sale Laws");

(4)    authorizing the Debtor to abandon at the applicable Stores any unsold Owned FF&E that is not sold through the Sale; and

(5)    pursuant to Bankruptcy Code section 365, approving the lease rejection procedures with respect to the stores the Debtor elect to close (the "Closing Stores") and the form of the proposed notice of rejection to be delivered to the landlords of the Closing Stores substantially in the form attached as Exhibit "E."

## ADDITIONAL INFORMATION

This Motion is based on this Motion and Exhibits thereto, the supporting Memorandum of Points and Authorities, the Declaration of J.E. Rick Bunka, the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor has served a notice of hearing on the Motion, which contains a website address which any party can visit and obtain a copy of the Motion, upon (i) the U.S. Trustee, (ii) all creditors asserting liens upon or security interests in the property sought to be sold through the Sale, (iii) the twenty largest unsecured creditors, (iv) all parties requesting special notice, (v) the landlords of the Closing Stores, (vi) the attorney generals for the states in which the Closing Stores are located , (vii) the consumer protection agencies for the states and counties in which the Closing Stores are located and the (viii) and the State and local taxing authorities with jurisdiction where the Closing Stores are located via overnight mail. Hard copies of this Motion are available upon request to the Debtor's proposed counsel whose contact information is located on the upper-left hand corner of this Motion.

**WHEREFORE**, the Debtor respectfully requests that the Court enter (A) the Interim Order: (i) affirming the adequacy of the notice given; (ii) authorizing the Debtor to assume the Agency Agreement;  (iii) authorizing the Debtor to continue to conduct the Sale during the

3

Interim Sale Period, free and clear of all liens, claims and interests encumbering the Merchandise and the Owned FF&E (with all such liens, claims and interests attaching only to the Guaranteed Amount, amounts reimbursed to the Debtor as Expenses, the Sharing Amount (if any), and any other amounts payable to the Debtor under the Agency Agreement) with the same validity, and priority that such liens, claims, encumbrances, or interests had against the Sale Assets, subject to the Agency Agreement, the Sale Guidelines and the Interim Order; (iv) approving the Sale Guidelines and authorizing the Debtor to conduct the Sale during the Interim Sale Period notwithstanding the terms of and without compliance with Contractual Restrictions and Liquidation Sale Laws; (v) authorizing and directing the payment of certain bid protections to the Tiger/Yellen Stalking Horse and Great American; (vi) scheduling a final hearing on the motion to assume no later than June 30, 2015; (vii) approving the waiver of Bankruptcy Rule 6004(a) and 6004 (h) and finding there is cause for an exception to Bankruptcy Rule 6003; and (vii) granting such other and further relief as the Court deems just and proper; and (B) a final Approval Order: (i) affirming the adequacy of the notice given; (ii) authorizing the Debtor to assume the Agency Agreement and  to continue to conduct the Sale for the remainder of the Sale Term, free and clear of all liens, claims and interests encumbering the Merchandise and the Owned FF&E (with all such liens, claims and interests attaching only to the Guaranteed Amount, amounts reimbursed to the Debtor as Expenses, the Sharing Amount (if any), and any other amounts payable to the Debtor under the Agency Agreement), subject to the Agency Agreement, the Sale Guidelines and the Approval Order; (iii) approving the Sale Guidelines and authorizing the Debtor to conduct the Sale for the remainder of the Sale Term notwithstanding the terms of and without compliance with, Contractual Restrictions and  Liquidation Sale Laws; (iv) authorizing the Debtor to abandon in place Owned FF&E not sold in the Sale; (v) approving the lease rejection procedures and the form of the notice of rejection of leases relative to the Closing Stores; (vi) approving the waiver of Bankruptcy Rule 6004(a) and 6004 (h) and finding there is cause for an exception to Bankruptcy Rule 6003; and  (vi) granting such other and further relief as the Court deems just and proper.

Dated:  June 15, 2015                          ANNA'S LINENS, INC.


By:___/s/ Eve H. Karasik_____
DAVID B. GOLUBCHIK
EVE H. KARASIK
JULIET Y. OH
LEVENE, NEALE, BENDER, YOO
& BRILL L.L.P.
Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**A.    Background.**

Anna's Linens, Inc., a Delaware corporation and the debtor and debtor-in-possession herein (the "Debtor"), filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on June 14, 2015 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a leading specialty retailer offering high quality and stylish home textiles, furnishings, and décor at attractive prices.  The Debtor is headquartered in Costa Mesa, California, operates a chain of 261 company owned retail stores throughout 19 states in the United States (including Puerto Rico and Washington, D.C.), generates over $300 million in annual revenue, and employs a workforce of over 2,500.

Over the last 25 years, the Debtor has built its store base through a clustering approach in key markets, including Los Angeles, Dallas, Chicago, Miami and Houston.  The Debtor has three distribution centers to support its nationwide presence in Fontana, California, Coppell, Texas, and Charlotte, North Carolina.  The Debtor leases its distribution centers, which are operated by third-party logistics providers.

The Debtor employs a flexible small-box retail strategy with approximately 9,500 square foot stores with a focus on price, value, and expert customer service.  The Debtor's stores are typically located in high traffic strip centers in the heart of local neighborhoods that the stores are servicing. The Debtor also has developed an e-commerce platform that provides customers across the country with access to the Debtor's full merchandise assortment. The Debtor's model enables it to compete well with traditional self-service big box home retailers and discounters.

The Debtor targets a large and growing segment of the United States population that values fashion, brand names and customer service, but is seeking high value and attractive price points.  Merchandise is selected to appeal to its core customer base and is focused on domestic items such

1  as bed linens, bath items, kitchen textiles, window drapes, and furniture covers, and certain home

2  furnishing categories.

3  **B.      Events Leading To The Filing Of The Debtor's Chapter 11 Bankruptcy Case And**

4  **Anticipated Exit Strategy.**

5      The Debtor opened its first store in 1987, and by 2013, it had 309 stores.  Beginning in

6  2011, the Debtor started experiencing significant financial and operational challenges.  The Debtor

7  was unsuccessful in some of its new markets such as Puerto Rico and St. Louis, and overbuilt

8  otherwise healthy markets in response to its new television marketing.  In addition, the Debtor's

9  core demographic changed as Generation X and Millennials replaced Baby Boomers as the

10  primary home furnishing shoppers.  Merchandise did not resonate with the new shoppers, and aged

11  and unfashionable inventory remained in the stores reaching a high of $380,000 per store by fiscal

12  year 2013.  The Debtor's shift to "Every Day Low Prices" from promotions and in-store discounts

13  as well as new expensive television advertising strategy did not attract customers.

14      The over expansion and excess inventory led to increased indebtedness and, ultimately, a

15  default with the Debtor's long-time lender, Union Bank.  In order to refinance the Debtor's

16  obligations to Union Bank, the Debtor entered into a Credit Agreement with Salus Capital

17  Partners, LLC, as Administrative Agent (in such capacity, the "Administrative Agent") and the

18  lenders party thereto (the "Lenders" and together with Salus, the "Secured Parties") for an $80

19  million line of credit on July 18, 2014 (the "Credit Agreement").

20      On March 30, 2015 the Debtor notified the Administrative Agent of a Default or Event of

21  Default for failure to maintain a specified Operating Expenditures to Gross Margin Dollars Ratio

22  associated with the Credit Agreement.  On April 29, 2015, the Administrative Agent delivered to

23  the Debtor a notice of Events of Default and Reservations of Rights based on the existing

24  defaults under the Credit Agreement.   After negotiation between the Debtor and the

25  Administrative Agent, the Administrative Agent and Lenders agreed to waive such Events of

26  Default and, on May 13, 2015, Administrative Agent delivered to the Debtor the "First

27  Amendment and Waiver to the Credit Agreement" (the "First Amendment"). The First

28  Amendment provided  a waiver of the Specific Defaults (as defined therein) and provided certain

7

consents under amendments to the Credit Agreement including, without limitation, (i) increased availability through removal of an availability block, (ii) a requirement for the Debtor to deliver and abide by a Cash Flow Budget, (iii) an agreement by the Debtor to place specific milestones on activities with several projects that were already underway  and (iv) payment of certain fees and expenses.

Over the resulting weeks, the Debtor's merchandise vendors significantly reduced delivery of anticipated merchandise resulting in an additional default of the Credit Agreement. As a result of the Credit Agreement defaults, and the inability of the Debtor to affect the Capital Transaction prepetition, the Debtor determined it was necessary to commence the Chapter 11 Case.

Prepetition, the Debtor engaged in a process whereby simultaneously the Debtor negotiated with its largest vendors to convert certain trade payables into long term Junior Secured Notes Payables to create additional long term liquidity and, through its investment banker Wunderlich Securities, Inc. ("Wunderlich"), it pursued additional outside investments to recapitalize its balance sheet.  Wunderlich undertook a broad process in search of additional capital that included contacting over 200 investors and institutions. Wunderlich's efforts resulted in the receipt of multiple written indications of interest from potential acquirers and investors, including a Letter of Intent (the "LOI") from DW Partners, LP ("DW Partners"). The Debtor, in consultation with its advisers, determined that the DW Partners' LOI was the highest and best received. The Debtor and DW Partners are currently in the process of negotiating a definitive asset purchase agreement for a going concern transaction (the "Going Concern Transaction" and the "Going Concern APA").  Under the terms of the Agency Agreement executed by the Debtor on June 11, 2015, the Debtor has until Friday, June 19, 2015 to execute the Going Concern APA. If the Debtor enters into the Going Concern Transaction by the deadline, then the Debtor intends to go forward with a Bankruptcy Code section 363 sale and auction process with DW Partners as the stalking horse purchaser. The Debtor is using best efforts to achieve a transaction that will preserve the Debtor's business operations, which will preserve jobs of thousands of employees, going forward customer for the Debtor's vendors and the Debtor's continuing support of the local communities in which the Debtor's stores operate.

As required by the First Amendment, the Debtor has also engaged in a process to identify and select a stalking horse bidder for the possible sale and/or liquidation of the business should the Going Concern Transaction fail.    The Debtor's efforts to retain a liquidator resulted in the execution of the Stalking Horse Agency Agreement with a joint venture comprised of Tiger Capital Group ("Tiger") and Yellen Partners, LLC ("Yellen" together with Tiger, "Tiger/Yellen Stalking Horse"), which included a guarantee from Tiger/Yellen Stalking Horse that the Debtor would receive 93.5% of the aggregate Cost Value of the Merchandise (terms as defined in the Stalking Horse Agency Agreement), subject to certain adjustments, Further, as a result of the default, an auction was held on June 9, 2015 and June 10, 2015 at which the Tiger/Yellen Stalking Horse was outbid by a group formed by Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Agent" or "Hilco/GB"), which included an increase in the guarantee to 111% of the Cost Value of the Merchandise with a Merchandise Threshold (terms as defined in the Agency Agreement, defined below) of not less than $61.5 million and not more than $67 million, subject to certain adjustments. The Debtor and the Agent, with the approval of the Administrative Agent, signed the Agency Agreement (the "Agency Agreement") on June 11, 2015.

The Debtor and the Agent agreed that if the Going Concern APA is executed, the Agency Agreement will convert to an equity transaction for a lesser number of stores, allowing the company to pursue an alternative exit strategy for the Chapter 11 Case. If the Debtor enters into the Going Concern Transaction by the deadline, then the Debtor will pursue a sale of substantially all of its assets pursuant to Bankruptcy Code section 363. If the Debtor does not enter into the Going Concern Transaction, then the Debtor will conduct store closing sales pursuant to the Agency Agreement.

**C.    The Agency Agreement Solicitation Process.**

The Debtor distributed a request for proposal to each of the national liquidation firms, pursuant to which the Debtor solicited bids to serve as the Debtor's agent to conduct a "going out of business", "store closing' or similar themed sale at the Debtor's retail store locations, with each such bid to be submitted based upon a form agency agreement that was acceptable to the Debtor, the Administrative Agent and the Lenders (the "Request for Proposal").  The Debtor

received three bids in response to its Request for Proposal, following which, the Debtor, in consultation with the Administrative Agent and the Lenders, negotiated the terms of an Agency Agreement, dated June 5, 2015, with Tiger/Yellen Stalking Horse which Agency Agreement served as the "stalking horse" against which all bids submitted at the subsequent auction would be measured (the "Stalking Horse Agency Agreement"). The Stalking Horse Agency Agreement provided for (i) a guaranteed recovery of 93.5% of the aggregate Cost Value of the Merchandise (the "Stalking Horse Guaranteed Amount"), with a Merchandise Threshold of not less than $61.5 million (terms as defined in the Agency Agreement), subject to certain adjustments; plus (ii) a potential sharing recovery from the Proceeds of the Sale of Merchandise and Additional Agent Merchandise, pursuant to a sharing formula set forth in the Stalking Horse Agency Agreement, after recovery by the Agent of the Guaranteed Amount, Expenses, and the Agent's Fee (as each such term is defined in the Stalking Horse Agency Agreement; plus (iii) 80% of the proceeds from the sale of Owned FF&E (net of sales taxes); plus (iv) 80% of the sale proceeds from the sale of certain of the Debtor's owned inventory (defined in the Stalking Horse Agency Agreement as "Merchant Consignment Goods") that does not otherwise constitute "Merchandise" under the Agency Agreement. At the conclusion of a two day auction that was held on June 9 and 10, 2015 (the "Auction")[4] the joint venture comprising the Agent was the successful bidder, with a final bid of (i) a guaranteed recovery of 111% of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount") with a Merchandise Threshold of not less than $61.5 million (terms as defined in the Agency Agreement), subject to certain adjustments; plus (ii) the same potential sharing recovery from the Proceeds of the Sale of Merchandise and Additional Agent Merchandise as provided for in the Stalking Horse Agency Agreement; plus (iii) the same 80% share of the sale proceeds from the sale of Merchant Consignment Goods; plus (iv) the Agent retained the right to sell the Owned FF&E in the Stores, Distribution Centers

---

[4] In addition to the Tiger/Yellen Stalking Horse and the Hilco/GB joint venture, there were two other bidding groups, namely: (i) Great American; and (ii) SB Capital Group, LLC. These four bidding groups represent all of the national liquidation firms with the logistical and financial resources necessary to conduct a sale of this size.

and the Corporate Office, bore all of the expenses in connection with such disposition and retained all of the proceeds from the sale of the Owned FF&E.  The Debtor and the Agent with approval of the Administrative Agent and the Lenders signed the Agency Agreement on June 11, 2015 and the Sale commenced on June 12, 2015.

In consideration of the time, effort and commitment expended by  the Tiger/Yellen Stalking Horse in negotiating the Stalking Horse Agency Agreement and the identification and quantification of the assets of the Debtors, as well the service rendered by the Stalking Horse in providing a floor and agreed terms for bids at the Auction as a stalking-horse bidder, subject to certain limitations not at issue here, Section 16.11 of the Stalking Horse Agency Agreement provided:

    (i)    the Tiger/Yellen Stalking Horse would be provided with a break-up fee of $650,000, plus an expense reimbursement of up to $350,000 for reasonable fees and expenses of its legal, accounting and financial advisors and the out-of-pocket costs and expenses incurred by the Stalking Horse in connection with conducting due diligence and the negotiation, documentation and implementation of the Stalking Horse Agency Agreement and the transactions contemplated thereby (collectively, the "Bid Protections") in the event that the Stalking Horse was not the successful bidder at the ;

    (ii)    the Initial Overbid at the Auction had to be for an amount not less than the sum of (x) the Stalking Horse Guaranteed Amount; (y) the Bid Protections, plus (z) an amount equal to 1.5% of the aggregate Cost Value of the Merchandise; and

    (iii)    each competing bidder at the Auction had to agree to reimburse any signage costs incurred by the Tiger/Yellen Stalking Horse prior to the Auction, in an amount not to exceed $2,900 per store if the Tiger/Yellen Stalking Horse was overbid at the auction and under certain other circumstances  as described in the Stalking Horse Agreement. [5]

A work fee in the amount of $200,000 paid by the Debtor to the Tiger/Yellen Stalking Horse

---

[5]  Due to the timing between the execution of the Stalking Horse Agency Agreement and the commencement of the Auction, no additional signage costs were incurred by the Tiger/Yellen Stalking Horse and thus there is no reimbursement obligation by the Agent to the Tiger/Yellen Stalking Horse in connection with the Signage Costs.  However, as set forth in Section 11.1(w) of the Stalking Horse Agency Agreement and the Agency Agreement, the Debtor purchased the initial signage necessary for the sale during the Interim Sale Period in an amount equal to $500 per Store.  Upon entry of the Approval Order, the Agent shall reimburse the Debtor for such signage costs as an Expense of the Sale.

concurrently with the entrance into the Stalking Horse Agency Agreement would be applied to the Bid Protections if the Tiger/Yellen Stalking Horse was not the successful bidder at the Auction.  Under the original terms of the Stalking Horse Agency Agreement, the Bid Protections were payable by the successful bidder in the sale process for the Debtor's assets (or, if there was no such successful bidder or such successful bidder failed to make timely payment, the Debtor) within one business day of the earlier of (i) the completion of an auction at which the Stalking Horse was not designated the successful bidder or (ii) the termination of this Agreement (subject to certain limitations not at issue here).  The Tiger/Yellen Stalking Horse's claims against the Debtor in respect of the Bid Protections are secured by security interests in and liens upon certain of the Debtor's assets as set forth in Section 16.11(d) of the Stalking Horse Agency Agreement.

At the outset of the Auction, following questions and concerns expressed by each of the bidding groups, certain clarifications/modifications were made to the Stalking Horse Agency Agreement by the Debtor (in consultation with Administrative Agent and the Secured Parties) and the Tiger/Yellen Stalking Horse, including a modification to the timing of the payment of the Bid Protections, which was changed from the first business day after the Sale Commencement Date, to the earlier of (i) on the Payment Date (which is the day after entry of the Approval Order) by the "successful bidder" from the Retaining Initial Guaranty Payment; or (ii) absent the Approval Order, two business days after June 30, 2015 (the outside date for entry of a final approval order as contemplated by the Stalking Horse Agency Agreement) and (B) an agreement by the Administrative Agent in the event that the Debtor does not have sufficient funds (after accounting for all other claims, if any, the Debtor is required to pay before paying the Bid Protections) to remit the remaining amount of the Bid Protections to the Tiger/Yellen Stalking Horse, to advance any shortfall amount (up to a maximum of the remaining amount of the Bid Protections and the Great American Break-up Fee) to the Debtor under the Existing Credit Facility or the DIP Facility (each as defined in the Stalking Horse Agency Agreement), with the Debtor to remit such amounts to the Tiger/Yellen Stalking Horse.

In addition to the Bid Protections payable to the Tiger/Yellen Stalking Horse during the Auction, in consideration of increasing the bid from 97.5% to 103%, Great American Group

requested that it be paid a $250,000 break-up fee (the "Great American Break-Up Fee") to be paid by the Debtor from the DIP Financing, or alternatively by the Lenders, as an advance under the Credit Agreement.    Given that the resulting bid served as an increase of more than $4,100,000 above the bid of the preceding bidder, both the Debtor and the Administrative Agent and the Secured Parties agreed to the Great American Break-Up Fee.  The bidding continued and culminated with the Hilco/GB joint venture being named the successful bidder at the Auction with the bid described above.  Accordingly, the Tiger/Yellen Stalking Horse and Great American were determined to be entitled to payment of the Bid Protections in accordance with the payment provisions described above.  A copy of the transcript of the Auction is attached as Exhibit "F" to this Motion (the "Auction Transcript").

The Administrative Agent and the Secured Parties were actively involved in the Stalking Horse Agency Agreement negotiations and the selection of Tiger/Yellen Stalking Horse as the stalking horse. The Administrative Agent and the Secured Lenders were also an active participant at the Auction and have approved the Agency Agreement with the Hilco/GB joint venture.

**D.    The Agency Agreement.**

The significant terms of the Agency Agreement are set forth in the chart below. If any of the terms and provisions in the summary are inconsistent with the Agency Agreement, the Agency Agreement will control. The Debtor believes that the terms of the Agency Agreement are typical, customary and reasonable.

| **Merchandise:** | Merchandise means all new, first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant, customarily sold to customers in the ordinary course of Merchant's business and located in the Stores on the Sale Commencement Date (or, with respect to Returned Merchandise, Distribution Center Merchandise and In-Transit Merchandise, received at the Stores by the dates specified in this Agreement), including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the |

| | Sale Commencement Date; (iii) Distribution Center Merchandise and In-Transit Merchandise received in the Stores on or before the date that is thirty (30) days after Agent's delivery to Merchant of Agent's written direction of allocation of such Distribution Center Merchandise and/or In-Transit Merchandise to the Stores  (the "Merchandise Receipt Deadline"); (iv) E-Commerce Merchandise located in the E-Commerce Location; and (vi) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto.  Notwithstanding the foregoing, "Merchandise" shall not include (A) goods that belong to sublessees, licensees, or concessionaires of Merchant; (B) goods held by Merchant on memo, on consignment, or as bailee; (C) Excluded Defective Merchandise; (D) Additional Agent Merchandise; (E) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Stores; (F) goods sold through Merchant's website prior to the Sale Commencement Date, but for which Merchant has not completed the processing and/or shipping the subject goods as of the Sale Commencement Date; (G) if applicable, Distribution Center Merchandise that is not received at the Stores on or before the Merchandise Receipt Deadline; and/or (H) In-Transit Merchandise that is not received at the Stores on or before to the Merchandise Receipt Deadline. |
|---|---|
| **Guaranteed Amount:** | Provided the Interim Order is entered no later than June 18, 2015 and the Approval Order by June 30, 2015, as a guaranty of Agent's performance hereunder, in addition to the payment of Expenses (as provided for in Section 4.1 hereof), Agent guarantees that Merchant shall receive an amount (the "Guaranteed Amount") equal to one hundred and eleven percent (111%) (the "Guaranty Percentage") of the aggregate Cost Value of Merchandise included in the Sale. |
| **Sale of Owned FF&E:** | With respect to any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking owned by Merchant and located at the Stores, the Distribution Centers, and Merchant's corporate offices (collectively, the "Owned FF&E"), Agent shall have the sole and exclusive right to sell or otherwise dispose of the Owned FF&E for Agent's sole and exclusive benefit.  Agent shall be responsible for all costs and expenses associated with the sale or other disposition of Owned FF&E and all proceeds realized from the sale or other disposition of the Owned FF&E |

14

| | |
|---|---|
| | shall be retained by Agent for its sole account. |
| **Expenses of Sale:** | From and after the Sale Commencement Date, Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7(a) of the Agency Agreement, based upon invoices and other documentation reasonably satisfactory to Merchant and Agent. |
| **Inventory Taking:** | For purposes of calculating the aggregate Cost Value and Retail Price of the Merchandise as reflected on Merchant's books and records, commencing on the day immediately following the date of entry of the Interim Order, Merchant and Agent shall cause to be taken a SKU-level and Retail Price physical inventory (collectively, the "Inventory Taking") of the Merchandise located in ninety (90) Stores, with forty-five (45) such Stores to be selected by Merchant, in consultation with the Lender Representative, and the remaining forty-five (45) Stores to be selected by Agent in its sole discretion (collectively, the "Initial Test Stores"). Subject to the availability of the Inventory Taking Service, Merchant and Agent shall use commercially reasonable efforts to complete the Inventory Taking in each Store no later than fifteen (15) days after the entry of the Interim Order (the date of the Inventory Taking at each Test Store being the "Inventory Date" for such Test Store).   Following the completion of the Inventory Taking at the Initial Test Stores, the Debtor (in consultation with Salus and the Lenders) and the Agent shall calculate an average Variance of such count results to the Debtor's books and records, and shall apply such Variance to by Store inventory numbers per the Debtor's books and records; provided however, in the event that the Variance is greater than 5%, the Debtor and the Agent shall have the right to count an additional 10 stores. |
| **Additional Agent Merchandise:** | Agent shall be entitled to include in the Sale supplemental merchandise procured by Agent which is of like kind, and no lesser quality to the Merchandise located in the Stores ("Additional Agent Merchandise").   Agent agrees that Additional Agent Merchandise, if any, shall be procured from either Merchant's existing vendors ("Existing Vendors") or third party vendors who are not Existing Vendors ("Third Party Vendors") that sell merchandise of |

15

| | |
|---|---|
| | like kind, and no lesser quality to the Merchandise. Agent shall be responsible for payment of the costs associated with procuring any Additional Agent Merchandise and all costs and expenses related to, or incurred in connection with, the marketing and sale of the Additional Agent Merchandise, as an Expense of the Sale.  Agent further agrees that if it elects to include Additional Agent Merchandise and desires to utilize the Distribution Centers for the receipt, processing, handling and distribution of such Additional Agent Merchandise, then Agent shall negotiate such usage with the third party operators of such Distribution Centers and Agent shall be responsible for all costs and expenses incurred in connection with such usage as an Expense of the Sale. The proceeds from the Sale of the Additional Agent Merchandise shall be included as "Proceeds" for purposes of calculating any additional Sharing Recovery to the Debtor. |
| **Sale Term:** | The Sale shall commence at each of the Stores on the first business day after execution of this Agreement, but in no event later than June 12, 2015 (the "<u>Sale Commencement Date</u>").   Agent shall complete the Sale and vacate the premises of each Store in favor of Merchant or its representative or assignee on or before September 30, 2015 (the "<u>Sale Termination Date</u>"). The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "<u>Sale Term</u>".  The Sale Termination Date as to any Store may be (a) extended by mutual written agreement of Merchant, in consultation with the Lender Representative, and Agent or (b) accelerated by Agent, in which case Agent shall provide Merchant (who shall forward such notice to the Lender Representative) with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "<u>Vacate Notice</u>").  If Agent fails to provide Merchant with timely notice of an acceleration of the Sale Termination Date for a Store, Agent shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice. |
| **Sale Guidelines:** | The Sale Guidelines are attached to the Agency Agreement as Exhibit 8.1. |
| **Returns of Merchandise:** | During the period from the Sale Commencement Date through and including the date that is thirty days after the date on which Merchant commences a Chapter 11 case (the "<u>Pre-Sale Merchandise Return Period</u>), Agent shall |

16

| | |
|---|---|
| | accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "Returned Merchandise"). Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise. |
| **Gift Cards/Merchandise Credit:** | During the period from the Sale Commencement Date through and including the date that is (30) days following the date on which Merchant commences a Chapter 11 case, Agent shall accept Merchant's gift cards and honor merchandise credits or similar Merchant-issued credit amounts, and/or Anna's branded coupons or customer rewards (such as "Anna's Bucks:") issued prior to the Sale Commencement Date, in each case in accordance with their terms in effect at the time of issuance. Merchant shall reimburse Agent in cash for gift cards, merchandise credits and other similar Merchant-issued credit amounts redeemed during such period, as part of the weekly sale reconciliation provided for in Section 8.7(a) of the Agency Agreement. |
| **Letter of Credit/Security Interests:** | To secure payment of the balance of any unpaid portion of the Guaranteed Amount, the Sharing Amount (if any), Expenses and other amounts due to Merchant hereunder, on the second business day following the entry of the Approval Order, Agent shall deliver to Lender Representative, as Merchant's designee, an irrevocable standby letter of credit, substantially in the form of Exhibit 3.3(g) attached hereto (the "Letter of Credit"), in an original stated amount equal to the aggregate of (x) twenty percent (20%) of the Estimated Guaranteed Amount, *plus* (y) fifty percent (50%) of the estimated aggregate Cost Value of the In-Transit Merchandise, *plus* (z) three (3) weeks' estimated Expenses. In consideration of and subject to payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to the Lender Representative, as Merchant's designee, Merchant hereby grants to Agent first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) the Owned FF&E and the proceeds |

| | |
|---|---|
| | realized from the sale or other disposition of Owned FF&E; (vi) Agent's percentage share of Proceeds in excess of the Sharing Threshold, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "<u>Agent Collateral</u>"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder. |
| **Termination Fee, Break-Up Fee(s); Expense Reimbursement(s):** | As set forth above, pursuant to the Stalking Horse Agency Agreement, Tiger/Yellen is entitled to the Bid Protections ($650,000 break-up fee, plus up to $350,000 in documented out of pocket expenses).  In addition, as reflected in the transcript of the Auction, Great American is entitled to receive the Great American Break-Up Fee in the amount of $250,000. |

Pursuant to the Agency Agreement, the Debtor commenced the Sale in a "soft sale" mode as of June 12, 2015 at which time the sales were conducted in some of the Debtor's Stores and in compliance with the Agency Agreement, Sale Guidelines and all Contractual Restrictions, Liquidation Sale Laws, and Applicable General Laws.[6] During the period between entry of the Interim Order and the Approval Order and after entry of the Approval Order through the termination of the sale, the Debtor will conduct the Sale in compliance with the Agency Agreement, Sale Guidelines and Applicable General Laws.

**E.      Rejection of Leases for Closing Stores and Procedures Related Thereto.**

The Debtor also seeks approval of an orderly process to reject the leases of the Closing Stores (the "Leases").   Specifically, the Debtor proposes to serve, by overnight mail, each affected landlord with a notice (the "Rejection Notice"), substantially in the form attached as Exhibit "E" to the this Motion, and that the rejection of any such lease shall become effective upon the 3rd business day following the service of the Rejection Notice to the affected landlord

---

[6]    Applicable General Laws is defined in the Agency Agreement and the Interim Order to mean laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising.

18

(the "<u>Effective Date of Rejection</u>"). The Debtor reserves the right not to reject all of the Leases, and, therefore, not to issue Rejection Notices for all of the Closing Stores so that the Debtor may, subject to further Court order, assume and assign the Lease on terms advantageous to the Debtor's estate.

**II.**

**DISCUSSION**

**A.      Section 365 of the Bankruptcy Code Authorized the Debtor to Assume the**

**Agency Agreement as an Exercise of the Debtor's Sound Business Judgment.**

Sections 365(a) and 1107(a) of the Bankruptcy Code authorize a debtor in possession, "subject to the Court's approval, [to] assume or reject any executory contract or unexpired lease of the debtor."  A debtor in possession may assume or reject leases for the benefit of the estate*.  In re Klein Sleep Products, Inc.*, 78 F.3d 18, 25 (2d. Cir.1996); *In re Central Fla. Metal Fabrication, Inc.*, 190 B.R. 119, 124 (Bankr.N.D.Fla.1995); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y.1996).   In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to determine whether it would be beneficial to the estate to assume it.  *Durkin v. Benedor Corp. (In re G.I. Indus., Inc.)*, 204 F.3d 1276, 1282 (9th Cir.2000) (bankruptcy court applies the business judgment rule to evaluate assumption or rejection decisions); *In re Continental Country Club, Inc.,* 114 B.R. 763, 767 (Bankr.M.D.Fla.1990); see also *In re Gucci*, 193 B.R. at 415.

A debtor in possession satisfies the "business judgment" test when it decides, in good faith, that the assumption or rejection may benefit the estate.  *In re FCX, Inc.,* 60 B.R. 405, 411 (E.D.N.C. 1986); *In re Chipwich, Inc.*, 54 B.R. 427, 430-31 (Bankr.S.D.N.Y.1985); *Comm'l Fin. Ltd. v Hawaii Dimensions, Inc. (In re Hawaii Dimensions, Inc.)*, 47 B.R. 425, 427 (D.Haw.1985) (bankruptcy courts generally approve the debtor in possession's decision on assumption or rejection absent a showing of bad faith, abuse of discretion, or a clear demonstration that the assumption or rejection will not benefit the estate or its creditors). *In re FCX, Inc.*, 60 S.R. at 411-12; *In re Chipwich,* 54 B.R. at 430-31.  The business judgment standard requires that the court follow the business judgment of the debtor unless that judgment

1  is the product of bad faith, whim, or caprice. *In re Prime Motors Inns*, 124 B.R. 378, 381

2  (Bankr.S.D.Fla.1991), *citing Lubrizol Enterprises v. Richmond Metal Finishers,* 756 F.2d 1043,

3  1047 (4th Cir.1985), *cert. denied*, 475 U.S. 1057 (1986).

4      In *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310 (Bankr.D.Utah

5  1981), the bankruptcy court explained why deference is given to the debtor in possession's

6  decision to assume or reject an executory contract or unexpired lease:

7          [Court approval under section 365(a),] if required, except in
         extraordinary situations, should be granted as a matter of course.
8          To begin, this rule places responsibility for administering the estate
         with the trustee (debtor in possession), not the court, and therefore
9          furthers the policy of judicial independence considered vital by the
         authors of the Code.  Second, this rule expedites the administration
10         of estates, another goal of the Bankruptcy Reform Act. Third, the
         rule encourages rehabilitation by permitting the replacement of
11         marginal with profitable business arrangements. Fourth, the rule is
         supported by pre-Code cases in this Circuit.

12

13  Id. at 315 (emphasis added).

14      The Debtor, in the exercise of its sound business judgment and in consultation with its

15  advisors and secured lender, have determined that assumption of the Agency Agreement, is in

16  the best interests of the estate because it will allow the Debtor to conduct the Sale of the

17  Merchandise, the Merchant Consignment Goods, the Owned FF&E, and the Additional Agent

18  Merchandise.  The Sale commenced prepetition and, in order to maximize the return from these

19  sales, the Sale must continue uninterrupted.  Furthermore, the Agent has agreed to a Guaranteed

20  Amount of 111% of the Cost Value of the Merchandise to be sold which is based on the amount

21  of inventory.   Given the Merchandise Threshold of $61.5 to $67 million, there should be

22  recoveries from the liquidation process beyond the claim of the secured lender for other

23  creditors.[7]  The sooner the Debtor is able to assume the Agency Agreement, the larger the

24

25  [7]   The Debtor notes that under the current structure, subject to entry of the Approval Order on
      or before June 30, 2015, the Agent shall be responsible for the Expenses of the Sale from
26     and after the Sale Commencement Date of June 12, 2015.  Given this structure, the Agent
      will be reimbursing the Debtor for Occupancy Expenses for the month of June, thereby
27     facilitating payment of the stub rent for the month of June, which the Debtor estimates to
      be approximately $1.5 million.

28

Guaranteed Amount will be payable to the Debtors by the Agent. Moreover, the Auction, through its competitive bidding process, ensured that the Agent was chosen in good faith and that the terms and conditions of the Agency Agreement are fair and reasonable, and represents the highest and best offer for the Merchandise and Owned FF&E. In light of the foregoing, the Debtor submits that the assumption of the Agency Agreement represents a reasonable exercise of the Debtor's business judgment, is in the best interest of its estate, and should be approved.

The Debtor, in the exercise of its sound business judgment and in consultation with its advisors, Administrative Agent, and Secured Parties, has also determined that the payment of the Bid Protections to the Tiger/Yellen Stalking Horse in an aggregate amount not to exceed $1 million (which is approximately 1.6% of the Stalking Horse Guaranteed Amount, assuming an aggregate Cost Value of Merchandise of $66.5 million), plus the Great American Break-Up Fee of $250,000 (which is less than .25% of the guaranteed amount to be paid under Great American's bid of 103%) is in the best interests of the estate,  The Debtor's agreement to pay the Bid Protections to the Tiger/Yellen Stalking Horse was a condition to Tiger/Yellen Stalking Horse's willingness to enter into the Stalking Horse Agency Agreement, which provided a floor for bidding at the Auction, as well as a structure for such bids.  Additionally, agreement by the Debtor to pay the Great American Break-Up Fee payable to Great American was a necessary condition to Great American's willingness to substantially increase its bid during the Auction as described above.  Based on the floor and structure provided by the Stalking Horse Agency Agreement and taking into account the substantial increase in bidding by Great American, the Debtor conducted a successful auction which should result in substantial recoveries to creditors other than the Debtor's secured lender after payment of the Bid Protections and the Great American Break-Up Fee.  In light of the foregoing, the Debtor submits that the payment of the Bid Protections and the Great American Break-Up Fee represents a reasonable exercise of the Debtor's business judgment, is in the best interest of its estate, and should be approved and directed.

///

///

**B.    The Court Should Authorize the Debtor To Conduct the Sale Pursuant to the Sale Guidelines.**

Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b); see also *In re Ames Dept. Stores, Inc. (Ames I)*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by section 363(b)).

To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some articulated business justification." See, e.g., *In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991*); Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith).  *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision).

In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale.  *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); In re Walter, 83 B.R. 14, 19-20 (9th Cir. BAP 1988).  The Ninth Circuit has also held that section 363 allows sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing.  *In re Qintex Entertainment, Inc.,* 950 F.2d 1492 (9th Cir. 1991).    Bankruptcy courts in this district and other jurisdictions often have approved similar requests by debtors to conduct store closing sales, finding that such relief is entirely consistent with the applicable provisions of the Bankruptcy Code.  See, e.g., *In re Zany Brainy, Inc.*, et al., Case No. 01-1749 (MFW) (D. Del. October 11, 2002) (Judge Robinson) (order authorizing, among other things, agent to conduct store closing sales and approving procedures for rejection of leases); *In re Woodward & Lothrop Holdings*, No. 94 B 40222 (SNB) (Bankr. S.D.N.Y. Aug. 16, 1995) (order authorizing, among other things, agent to conduct store closing sales and sell debtors' interests in personal property); *In re Hermann Sporting Goods*

*Inc.*, No. 93-1529 (Bankr. D.N.J. Apr. 7, 1993) (order authorizing debtors to close certain stores, conduct going-out-of-business sales, employ and retain a liquidator and other related relief); see also In re Ames Dept. Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992); *In re Krause's Custom Crafted Furniture Corp., et al.*, Case No. SA 01-16360-JB; *In re Store of Knowledge Inc., et al.*, Case No. LA 01-19181-EC.

In determining whether a sale satisfies the business judgment standard, courts have held: (1) that there be a sound business reason for the sale; (2) that accurate and reasonable notice of the sale be given to interested persons; (3) that the sale yield an adequate price (i.e., one that is fair and reasonable); and (4) that the parties to the sale have acted in good faith.  *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); see also, *In re Walter*, 83 B.R. at 19-20.

More than adequate business justification exists to support conducting the Sale and conducting, through the Agent, the proposed Sale for the sale of the Sale Assets.  As stated above, the Debtor, in consultation with its advisors and secured  lender, concluded that it was in the best interests of the Debtor and its stakeholders to conduct store closures and going out of business sales if the Debtor is unable to enter into a Going Concern Transaction by June 19, 2015. Due to its financial and operational challenges, the Debtor could not continue operations and satisfy its obligations to its secured creditors and other parties in interest. Moreover, the amount of the guarantee provided by the Agent should result in recoveries for creditors other than the secured lenders. The Debtor also determined that time is of the essence to preserve and maximize the value of its assets and to minimize its expenses.  Accordingly, the Debtor has determined, in the exercise of its business judgment, that liquidating the Merchandise and Owned FF&E at the Closing Stores and Distribution Centers, is the best means of maximizing the recovery from the Debtor's assets for the benefit of the estate and the estate's creditors absent a Going Concern Transaction.  Based on the applicable precedent, the Court should authorize the Debtor to do so immediately upon entry of the Interim Order to enable the estate to recover as much as possible from the Sale.

///

## C.    The Sale Of The Inventory Should Be Free And Clear Of Liens.

To facilitate the Sale, the Debtor requests authorization to sell the Merchandise and Owned FF&E free and clear of any and all liens, claims, encumbrances and interests which may be asserted.    Pursuant to Bankruptcy Code section 363(f), a debtor in possession may sell property under section 363 of the Bankruptcy Code "free and clear of any interest in such property of an entity other than the estate" only if one of the following conditions is satisfied:

1.    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2.    such entity consents;

3.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4.    such interest is in bona fide dispute; or

5.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *In re General Bearing Corp.*, 136 R.R. 361, 363-64 (Bankr. S.D.N.Y. 1992) (listing requirements).    The Debtor believes that in connection with the sale of the inventory through the Sale, one or more of the Bankruptcy Code section 363(f) requirements will be satisfied.

As far as the Debtor is aware, the Administrative Agent and the Lenders is the only creditor which asserts a security interest in all of the Debtor's Merchandise and Owned FF&E, and the Administrative Agent and the Lenders has consented to the Sale  and particularly, to the sale of the Merchandise and FF&E free and clear of liens, claims and encumbrances, with all such obligations to attach to the Guaranteed Amount, Expense reimbursement, the Sharing Amount (if any), or other amounts due to the Debtor from the Agent under the Agency Agreement (the "Transaction Consideration Due to Debtor") with the same validity, and priority that such liens, claims, encumbrances, or interests had against the Sale Assets.

Although the Debtor does not believe that there are any other creditors with valid, enforceable and perfected liens on the Merchandise and Owned FF&E that is being sold during

1    the Sale, to the extent there are creditors holding such liens, their liens will attach to the portion

2    of the Transaction Consideration due to the Debtor attributable to the Merchandise and Owned

3    FF&E, with the same validity and priority as their pre-petition liens upon the Merchandise and

4    Owned FF&E.  Thus, these creditors will not be prejudiced by the Sale.

5         Furthermore, parties in interest will have received notice of the Motion and will be given

6    sufficient opportunity to object to the relief requested.  Any such any entity that does not object

7    to the sale will be deemed to have consented.  See *Hargrave v. Township of Pemberton (In re*

8    *Tabone, Inc.),* 175 B.R. 855, 858 (Bank. D.N.J. 1994) (finding that failure to object to sale after

9    receiving notice of such sale constitutes consent and satisfies section 363(f)); *see also In re*

10   *Enron Corp.*, No. 01-16034, 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. July 28, 2003) (order

11   deeming all parties who did not object to proposed sale to have consented under section

12   363(f)(2)).

13        Based on the foregoing, the Debtor requests that it be authorized to sell the Merchandise

14   and Owned FF&E at the Sale free and clear of any liens, claims, encumbrances, or other interests

15   that may exist, with all obligations of any lienholder to attach to the proceeds of the Sale with the

16   same validity, and priority that such liens, claims, encumbrances, or interests had against the

17   assets.

18   **D.    The Agent Should Be Afforded The Protections of Bankruptcy Code**

19   **Section 363(m).**

20        Although Bankruptcy Code section 363(b) does not explicitly require good faith, courts

21   have also required that a sale be made in good faith.  *In re Ewell*, 958 F.2d 276 (9th Cir. 1992);

22   *In re Abbotts Dairies of Pennsylvania,* 788 F.2d 143 (3d Cir. 1986); *In re Titusville Country*

23   *Club*, 128 B.R. 396 (Bankr. W.D. Pa. 1991).  Courts have followed equitable principles of a

24   good faith purchaser being one who purchases in good faith and for fair value.  *Ewell*, 958 F.2d

25   at 281.  Good faith may be shown by an absence of fraud or collusion between the seller and

26   purchaser or the absence of any attempt to take grossly unfair advantage of other bidders.  Id.

27   The "good faith" requirement "focuses principally on the element of special treatment of the

28   Debtors' insiders in the sale transaction."  In *re Industrial Valley Refrigeration and Air*

1  *Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

2      As discussed above, the selection of the Agent and the terms and conditions of the

3  Agency Agreement were the product of arm's length, good faith negotiations after an extensive

4  and highly competitive bidding process.  Based on the foregoing, the Debtor requests that the

5  Court determine that the Agent is a good faith purchaser entitled to protections of section 363(m)

6  of the Bankruptcy Code. Furthermore, the assets that will be sold as part of the Sale will not be

7  sold to the Debtor's insiders.  Thus, the Sale will not unfairly benefit insiders or any particular

8  constituency in these cases.  There is no fraud or collusion or any attempt to take unfair

9  advantage of another through the Sale.  Accordingly, the Debtor requests that the Agent be

10  afforded the protections of Bankruptcy Code section 363(m).

11  **E.**      **The Court Should Approve The Sales Guidelines And Invalidate Any Lease**

12          **Restrictions And State Or Local Law That May Impact Negatively On The**

13          **Debtors' Ability To Conduct Sale.**

14      The Sale Guidelines formulated by the Debtor, a copy of which is attached to this

15  Motion, were designed to protect consumers and create the least amount of burden on the

16  Debtor's lessors during the Sale, while at the same time maximizing the recovery to the estate.

17  The Debtor requests that the Court authorize the Debtor to conduct the Sale pursuant to the terms

18  of the Sale Guidelines, regardless of any contrary lease provisions or state or local law.  The

19  Debtor believes that the Sale Guidelines are based upon similar guidelines approved in other

20  chapter 11 retail cases in the Ninth Circuit.

21      **1.**      **The Court Should Approve The Sales Guidelines And Invalidate Any**

22          **Lease Restrictions And State Or Local Law That May Impact**

23          **Negatively On The Debtor's Ability To Conduct Sale.**

24      Some of the Leases relating to the Closing Stores may contain clauses that restrict or

25  prohibit the Debtor from conducting the Sale.  Such provisions have been deemed unenforceable

26  in other chapter 11 cases as impermissible restraint on a debtor's ability to maximize the value of

27  its assets under Bankruptcy Code section 363.  *See In re Ames Dept. Showrooms, Inc.* 136 B.R.

28  357, 359 (Bankr. S.D.N.Y. 1992) (enforcement or anti-going-out-of business sale would

contravene overriding federal policy requiring Debtors to maximize assets); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (anti-going-out-of-business sale clause in lease is unenforceable); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Pa. 1982).

Store closing or liquidation sales, such as the sales described herein, are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently authorized by courts, despite lease provisions purporting to forbid such sales in the ordinary course of business. *See In re R.H. Macy & Co.*, 170 B.R. 69, 77 (Bank. S.D.N.Y. 1994) (stating that Showroom closing or liquidation sales are routine in retail chapter 11 cases). In addition, although Bankruptcy Code section 365(d)(3) requires that the Debtor timely perform all lease obligations, the provisions of the section expressly except from this requirement provisions relating to the insolvency and financial condition of the debtors as set forth in Bankruptcy Code section 365(b)(2). *Tobago Bay Trading Co.*, 112 B.R. at 467.

In *Ames Dept. Showrooms*, the lessor opposed the debtor's proposed going-out-of-business sale based on a lease provision prohibiting such sales. The court in that case rejected the lessor's argument, stating:

> to enforce the anti-GOB sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress . . . Section 363(e) reserves for bankruptcy courts the discretion to condition the time, place and manner of Phase I GOB Sale, thereby providing adequate safeguards to protect shopping center landlords and their other tenants, while allowing the Trustee to fulfill its fiduciary obligations.

*Id*. at 359.

Similarly, in *Tobago Bay Trading Co.*, a lessor argued that the debtor's liquidation sale violated a lease provision prohibiting "going-out-of-business, auction, distress, fire or bankruptcy or similar sale." The court in *Tobago Bay Trading Co.*, however, refused to enforce the lease provision finding that "[w]here provisions of an unexpired lease conflict with these policies [to facilitate the debtor's reorganization and maximize the returns for the benefit of creditors] to prevent or hinder reorganization, the court may find such provisions to be unenforceable." *Id*.

Here, the Sale Guidelines provide adequate safeguards to protect the Debtor's Closing

1    Stores' lessors while at the same time permitting the Debtor to fulfill their fiduciary obligations

2    to obtain the greatest recovery for the bankruptcy estate.    The Debtor believes that similar

3    guidelines have been used in other liquidating retail chapter 11 cases.

4        The Debtor believes that the lessors cannot prove that any real economic harm will result

5    from the non-enforcement of any lease provisions purporting to prohibit the Sale.  On the other

6    hand, the Debtor has provided evidence demonstrating that the Sale are in the best interest of the

7    bankruptcy estates.  Indeed, the Sale may actually benefit the lessors.  See *Lisbon Shops*, 24 B.R.

8    at 695 ("[a]s a result of the continued operation of the debtor's Showrooms and the advertising in

9    connection with the sale to the public, the other shopping center tenants will benefit from the

10    anticipated increased customer traffic.").    In any event, even if the lessors could establish

11    economic harm from the proposed Sale, bankruptcy courts have recognized these concerns are

12    outweighed by the more important goal of protecting the estates and all their creditors.

13    Accordingly, in *Tobago Bay Trading Co.*, the court held:

14        Here, as in most cases, the prohibition of a bankruptcy or similar
15        sale would result in onerous and burdensome costs to an already
        financially distressed debtor's estate by requiring removal of assets
16        to an off-site location.  Further, the debtor's estate would lose the
        benefit of the market that it had developed.  The potential harm
17        and injury to creditors and to the debtor's estate is substantially
        greater than the potential harm to the objectors.
18

19    *Id*. at 467.    See also *In re Winn's Showrooms*, 177 B.R. 253 (Bankr. W.D. Tex. 1995)

20    (authorizing liquidation sale of assets conditioned on adequate protection of secured creditors

21    lien); *In re Joshua Slocum, Ltd.*, 99 B.R. 250, 259 (Bankr. E.D. Pa. 1989), vacated on other

22    grounds, 922 F.2d 1081 (3rd Cir. 1990) ("fire sale" provision held unenforceable where landlord

23    failed to establish provision was material, or that its breach economically jeopardized him or his

24    other tenants.); *In re Rawson Food Services, Inc.*, 61 B.R. 207, 208 (Bankr. M.D. Fla. 1986)

25    (noting that court had previously approved liquidation sale of substantially all assets based on

26    finding it would attain greatest return to the estate); *In re Fred's Dollar Showrooms of Hernando,

27    Inc.*, 44 B.R. 491 (Bankr. N.D. Miss. 1984) (authorizing liquidation sales based on finding it

28    would maximize return to the estate).

**2.    The Certain State And Local Requirements That Do Not Implicate Applicable General Laws Should Be Waived.**

Many states in which the Debtor operates have laws and regulations that require the Debtor to pay an employee substantially contemporaneously with his or her termination.  In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated.  The nature of the Sale contemplated by this Motion will result in a substantial number of employees being terminated during the Sale.  The Debtor's  payroll systems may be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

While the Debtor intends to pay their terminated employees as expeditiously as possible, the requirements imposed by these state laws and regulations are unworkable in light of these extraordinary circumstances.  If the Debtor is required to comply with these state laws and regulations, their efforts to wind down their operations and mitigate unnecessary payroll costs will be hampered.  Indeed, if forced to comply, the Debtor will face the choice of (a) having to incur the costs of keeping employees employed after the conclusion of the Sale while payroll is being prepared, or (b) staging terminations to the detriment of the Debtor's estate.  Both of these options will provide no benefit to the Debtor's estate and will only increase the administrative costs of conducting the Sale.  Accordingly, the Debtor respectfully submits that in this instance, the wage requirements are at odds with the underlying policies of the Bankruptcy Code and therefore the Debtor should be granted relief from these requirements.  See *In re Linens Holding Co.,* Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (waiving "fast pay" laws and regulations in connection with approval of store closing sales).

The Closing Stores are located in 19 different states (including Washington D.C. and Puerto Rico) and numerous municipalities.  Certain state statutes and local ordinances in which the Closing Stores are located may have licensing or permit requirements, statutory or regulatory waiting periods, signage restrictions, and/or time limits which would normally affect the conduct of liquidation or other similar closing sales.  Some localities also have statutes or regulations requiring creditor notification before bulk sales are conducted.  In the context of a chapter 11

29

1  case such as this, however, where creditors are given notice of the proposed Sale in advance, as

2  well as an opportunity to be heard before this Court, the application of such statutes and

3  regulations would be redundant and unnecessary.  The Debtor's ability to conduct the Sale

4  within the time-frame contemplated is premised upon their ability to conduct the sales in an

5  orderly manner, without the need to comply with such regulations.  Accordingly, the Debtor

6  believes such requirements should be waived for the limited purpose of conducting the Sale.

7      Courts have held that section 959(b) of title 28 of the United States Code (which

8  generally provides that a debtor in possession shall manage and operate property in its possession

9  according to the laws of the state in which such property is situated) does not apply to debtors or

10  their agents liquidating assets.  *See e.g., California State Bd. Of Equalization v. Goggin*, 191

11  F.2d 726, 730 (9th Cir. 1951) (28 U.S.C. § 28 959 does not apply to transactions that are in the

12  nature of a liquidation), cert. denied, 342 U.S. 909 (1952); *see also, In re Borne Chemical Co.,*

13  *Inc.*, (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 28 U.S.C. section 959(b) is applicable only

14  where the property is being managed or operated for the purpose of continuing operations).

15  Here, the Sale will be of limited duration, all advertising will fairly describe the Sale and no

16  aspect of the relief sought is intended to alter Applicable General L, including laws or

17  regulations affecting public safety.  Accordingly, section 959(b) of Title 28 should not apply to

18  the Sale since the Debtor will be ceasing its operations at the Closing Stores with the knowledge

19  and oversight of their creditors and this Court.

20      Moreover, bankruptcy courts have recognized that federal bankruptcy law preempts state

21  and local laws which contravene the underlying policies of the Bankruptcy Code.  *See e.g., In re*

22  *Shenango Group, Inc.*, 186 B.R. 623, 628 (Bankr. W.D. Pa, 1995) ("Trustees and Debtors-in-

23  possession have unique fiduciary and legal obligations pursuant to the Bankruptcy Code . . .[A]

24  state statute cannot place burdens on them where the result would contradict the priorities

25  established by the Federal Bankruptcy Code.").  While preemption of state law is not always

26  appropriate, it is appropriate where, as here, the only state or local laws involved concern

27  economic regulation rather than the protection of public health and safety.  *See Baker & Drake,*

28  *Inc. v. Pub. Serv. Comm'n of Nevada (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353-54 (9th

1    Cir. 1994).  In addition, pursuant to section 105(a) of the Bankruptcy Code, the Court has the

2    authority to permit the Sale to proceed notwithstanding contrary Liquidation Sale Laws.

3    In addition, section 363 of the Bankruptcy Code, which requires debtors to operate their

4    businesses in a way that maximizes recoveries for creditors, will be severely undermined if the

5    Court does not provide for a waiver of state and local statutes and regulations establishing

6    licensing or permitting requirements, waiting periods, time limits or bulk sale restrictions that

7    would otherwise apply to the Sale.  See *In re Blockbuster Inc.*, Case No. 10-14997 (BRL)

8    (Bankr. S.D.N.Y. Jan. 20, 2011) (authorizing the debtors to conduct store closing sales

9    notwithstanding federal, state, and local laws governing the conduct of store closing and

10   liquidation sales); *In re Finlay Enters., Inc.*, Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept.

11   25, 2009) (authorizing debtors to conduct "going out of business" sales "without the necessity of

12   compliance" with certain "going out of business" laws); *In re Steve & Barry's Manhattan LLC*,

13   Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) (authorizing store closing sales

14   without requiring compliance with laws affecting store closing or liquidation sales).

15   Importantly, the requested waiver is narrowly tailored to facilitate the successful conduct

16   of the Sale.  The Debtor does not seek a general waiver of all state and local requirements which

17   would otherwise apply to the Sale.  Rather, the requested waiver is restricted as follows: (a) the

18   Debtor is requesting that this Court authorize the Debtor to conduct the Sale without the

19   necessity of, and the delay associated with obtaining various state licenses or permits, observing

20   state and local waiting periods or time limits and/or satisfying any additional requirements with

21   respect to advertising, conducting the Sale as a store closing or similar type sale; and (b)

22   similarly, the Debtor requests that bulk sale laws to the extent applicable, be waived, as creditors

23   are protected by the notice provided hereunder and the jurisdiction of this Court.  The Debtor

24   fully intends to be bound by and comply with remaining statutes and regulations, such as health

25   and safety laws.  The Sale and the requested waiver are scheduled for a discrete period of time,

26   and the Sale will be conducted in accordance with the Sale Guidelines, which are subject to

27   review by creditor representatives and approval by this Court.

28   The Debtor also requests that no other person or entity including, but not limited to, any

1   lessor or federal, state or local agency, department or governmental authority, be allowed to take

2   any action to prevent, interfere with, or otherwise hinder consummation of the Sale, or the

3   advertising and promotion (including through the posting of signs) of such Sale in the manner set

4   forth in the Sale Guidelines.

5   　　　　Accordingly, the Debtor requests this Court to authorize it to conduct the Sale in

6   accordance with the Agency Agreement and the Sale Guidelines, including, without limitation,

7   waiving and eliminating any requirement of having to obtain various state licenses or comply

8   with specific wage requirements, observe state and local waiting periods or time limits, and/or

9   satisfy any additional requirements in connection therewith with respect to advertising and

10   conducting the sale as a store closing or similar type sale.

11   **F.      The Debtor Should be Granted Authority to Abandon Unsold Property**

12   　　　　**Following Sale.**

13   　　　　Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, the

14   trustee, and therefore the debtor in possession, "may abandon any property of the estate that is

15   burdensome to the estate or that is of inconsequential value and benefit to the estate."  See

16   *Hanover Ins. Co. v. Tyco Indus., Inc.,* 500 F.2d 654, 657 (3d Cir. 1974) (a trustee "may abandon

17   his claim to any asset, including a cause of action, he deems less valuable than the cost of

18   asserting that claim"); *In re Grossinger's Assoc.,* 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995).

19   　　　　To the extent that the Agent does not sell any remaining Merchandise or Owned FF&E

20   upon the conclusion of the Sale, the Debtor requests that it be authorized to abandon same

21   without incurring liability to any person or entity.  The Debtor submits that if it is unable to sell

22   or dispose of any such assets following the Sale, it would be costly and burdensome to the estate

23   to retain them.  In the event of such abandonment, the Debtor requests that the applicable

24   landlord be authorized to dispose of such property without any liability to any individual or

25   entity that may claim an interest in such abandoned property and that such abandonment be

26   without prejudice to any landlord's right to assert any claims based on such abandonment and

27   without prejudice to right of the Debtor or other party-in-interest to object thereto.

28

1    **G.    The Proposed Lease Rejection Procedures Should be Approved.**

2        The Debtor seeks the approval of an orderly process to reject the Leases, if necessary.

3    The Debtor proposes to serve each affected landlord with a Notice substantially in the form

4    annexed to this Motion as Exhibit "E," if and when, the Debtor determines that it is advisable

5    and in the best interests of their estates to reject a Lease.  The Debtor reserves the right not to

6    reject the Leases, and, therefore, not to issue such Notice.

7        Section 365(a), in conjunction with Section 1107(a), of the Bankruptcy Code provides

8    that a debtor in possession, "subject to the court's approval, may assume or reject any executory

9    contract or unexpired lease of the debtor."  11 U.S.C. § 365(a) and 1107(a).   As noted by the

10   United States Court of Appeals for the Second Circuit, "[t]he purpose behind allowing the

11   assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to

12   use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"

13   *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095,

14   1098 (2d Cir. 1993) (quoting 2 Collier on Bankruptcy ¶ 365.01[1] (15th ed. 1993)).

15       The standard governing motions to assume or reject an executory contract or lease

16   pursuant to section 365 of the Bankruptcy Code is the business judgment test, which requires a

17   showing that the proposed course of action will benefit the estate.  *See Sharon Steel Corp. v.*

18   *National Fuel Gas Distribution Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989);

19   see also *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Wheeling-Pittsburgh Steel*

20   *Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845 (Bankr.

21   W.D. Pa. 1987).  Generally, courts defer to a debtor in possession's business judgment to assume

22   or reject an executory contract or lease.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525

23   (1984); Wheeling-Pittsburgh Steel, 82 B.R. at 829.  Moreover, the business judgment standard

24   requires that the court follow the business judgment of the debtor unless that judgment is the

25   product of bad faith, whim, or caprice.  *In re Prime Motors Inns*, 124 B.R. 378, 381 (Bankr.

26   S.D.Fla. 1991), citing *Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1047

27   (4th Cir. 1985), cert. denied, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

28       The Debtor is of the belief that the proposed lease rejection procedures will streamline

the Debtor's ability to reject idle, or at or above market Leases that provide little or no benefit to the Debtor's estate.  In addition, these procedures will allow the estate to market the Leases to the greatest extent possible under the circumstances.  Moreover, procedures for prompt rejection will give affected landlords a greater opportunity to mitigate their damages by facilitating prompt remarketing of the rejected Leases by landlords to other potential tenants.  Furthermore, the landlords will not be prejudiced by the proposed lease rejection procedures as, by serving this Motion on all landlords of the Closing Stores, the Debtors are currently giving notice to the landlords of the likelihood that the Leases will be rejected. Accordingly, the Court should approve the procedures.

**H.    Other Relief Requested.**

The Agency Agreement includes other requested relief to be included in the Interim Order and Approval Order including that:

1.    The terms of this Agreement shall be binding on any trustee appointed for the Debtor under any provision of the Bankruptcy Code, whether the Bankruptcy Case of the Merchant is proceeding under Chapter 7 or Chapter 11 of the Bankruptcy Code (the "Trustee"); any such Trustee shall be authorized  to operate the business of the Debtor to the fullest extent necessary to permit compliance with the terms of this Agreement; and the Agent and any such Trustee shall be authorized to perform under this Agreement upon the appointment of a Trustee without the need for further order of the Bankruptcy Court.

2.    The application of any automatic stay of enforcement of the Interim Order and the Approval Order is waived.

3.    Through and including completion of the Final Reconciliation, Agent shall be entitled to be heard on all issues in the Debtor's bankruptcy case related to the Agency Agreement or the transactions contemplated thereby.

4.    In the event Merchant or Lender Representative notifies Agent of its intention to draw on the Letter of Credit, Agent shall be entitled to an emergency hearing by the Bankruptcy Court sufficient to determine whether such draw is permitted under the terms of the Agency Agreement prior to the occurrence of such draw.

5.      The Debtor also seeks approval to pay (i) to the Tiger/Yellen Stalking Horse, the Bid Protections in an aggregate amount not to exceed $1 million as set forth in the Stalking Horse Agency Agreement and (ii) to Great American, the Great American Break-Up Fee of $250,000 that the Debtor and the Administrative Agent and the Lenders agreed to pay at the Auction.  The Stalking Horse provided a floor for bidding at the Auction, as well as a structure for such bids.  Great American sparked the Auction by moving the initial bidding rapidly from the initial 93.5% guarantee to a 103% guarantee. Absent the actions of the Tiger/Yellen Stalking Horse and Great American, it is questionable whether the guarantee would have been at 111% at the close of the Auction. The Debtor has articulated the requisite business justification under Bankruptcy Code section 363(c) for authority to pay the Bid Protections to the Tiger/Yellen Stalking Horse and the Great American Break-Up Fee to Great American.

See, e.g., *In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991*); Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).

**I.      Necessity for Immediate Relief and Effectiveness of the Order.**

Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition grant  . . . (b) a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ."  For the reasons discussed herein, if the Debtor is not able to continue  the Sale and lease rejection procedures as soon as possible after the Court approves this Motion, it will incur significant administrative expenses as a result of the delay that will reduced the recoveries to be received by creditors and the estate. In particular, if the Debtor does not receive the Interim Order by June 18, 2015, the 111% guarantee from the Agent is reduced by 1.5% per day after June 18, 2015 that the Interim Order is not entered.

Likewise, to implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order

1    authorizing use sale, or lease of property under Bankruptcy Rule 6004(h), to the extent those

2    rules are applicable.  The Debtor has limited resources and is continually accruing administrative

3    expenses, so to require the Debtor to wait an extra ten days before starting the liquidation would

4    place a large burden on the bankruptcy estates.

5    **J.    Notice of the Hearing is Reasonable Under the Circumstances and**

6    **Scheduling of Final Hearing.**

7    The Debtor believes that it has provided adequate notice of this Motion, appropriate

8    disclosure of its terms and an opportunity to be heard and object to all interested parties.

9    Concurrently with the filing of this Motion, the Debtor served by <u>overnight delivery</u> a notice of

10   hearing on the Motion, which contains a website address which any party can visit and obtain a

11   copy of the Motion on the Administrative Agent and the Lenders and counsel for the

12   Administrative Agent and the Lenders, all other secured creditors, the Debtor's twenty largest

13   unsecured creditors, the Office of the United States Trustee, parties requesting special notice, all

14   of the lessors of the Closing Stores, all federal, state and local taxing authorities, all applicable

15   county and state consumer protection agencies and the attorney generals for the states in which

16   the Closing Stores are located.  The Debtor submits that such notice is more than adequate under

17   the circumstances.

18   The Debtor further respectfully request that the Court schedule the Final Hearing on the

19   Motion on or before June 30. 2015 and authorize them to mail copies of the signed Interim

20   Order, which fixes the time, date and manner for the filing of objections, to the Notice Parties.

21   Under the Agency Agreement, the Final Order must be entered on or prior to June 30, 2015 in

22   order for the Debtors to receive the Transaction Consideration Due Debtor under the Agency

23   Agreement.  The Debtor thus requests that the Court consider such notice of the Final Hearing to

24   be sufficient notice.

25   **III.**

26   **CONCLUSION**

27   For all of the reasons set forth above, the Debtor respectfully requests that the Court enter

28   (A) the Interim Order: (i) affirming the adequacy of the notice given; (ii) authorizing the Debtor

to assume the Agency Agreement; (iii) authorizing the Debtor to continue the Sale during the Interim Sale Period, free and clear of all liens, claims and interests, subject to the Agency Agreement, the Sale Guidelines and the Interim Order; (iv) approving the Sale Guidelines and authorizing the Debtor to conduct the Sale during the Interim Sale Period without compliance with the Contractual Restrictions and the Liquidation Sale Laws; (v) authorizing and directing the payment of certain protections to the Tiger/Yellen Stalking Horse and Great American; (vi)scheduling a final hearing on the motion to assume no later than June 30, 2015; (vii) approving the waiver of Bankruptcy Rule 6004(a) and 6004 (h) and finding there is cause for an exception to Bankruptcy Rule 6003; and (vii) granting such other and further relief as the Court deems just and proper; and (B) a final Approval Order: (i) affirming the adequacy of the notice given; (ii) authorizing the Debtor to assume the Agency Agreement and to continue to conduct the Sale for the remainder of the Sale Term, free and clear of all liens, claims and interests, subject to the Agency Agreement, the Sale Guidelines and the Approval Order; (iii) approving the Sale Guidelines and authorizing the Debtor to conduct the Sale for the remainder of the Sale Term notwithstanding the terms of, and without compliance with, Contractual Restrictions and Liquidation Sale Laws; (iv) authorizing the Debtor to abandon in place the Owned FF&E not sold in the Sale; (v) approving the lease rejection procedures and the form of the notice of rejection of leases relative to the Closing Stores; (vi) approving the waiver of Bankruptcy Rule 6004(a) and 6004 (h) and finding there is cause for an exception to Bankruptcy Rule 6003; and (vii) granting such other and further relief as the Court deems just and proper.

Dated:  June 15, 2015                    ANNA'S LINENS, INC.


By:   *Eve H. Karasik*
     DAVID B. GOLUBCHIK
     EVE H. KARASIK
     JULIET Y. OH
     LEVENE, NEALE, BENDER, YOO
     & BRILL L.L.P.
     Proposed Attorneys for Chapter 11 Debtors
     and Debtors in Possession

**EXHIBIT "A"**

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF [_____]

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ANNA'S LINENS, INC.,[1] | ) | Case No. 15-[_____] |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtor. | ) | |
| | ) | Re. Docket No. [__] |

**INTERIM ORDER AUTHORIZING THE DEBTOR AND THE AGENT TO CONTINUE TO PERFRM UNDER THE AGENCY AGREEMENT, PENDING FINAL HEARING ON DEBTOR'S EXPEDITED MOTION FOR ENTYR OF AN ORDER AUTHORIZING AND APPROVING THE ASSUMPTION OF THAT CERTAIN AGENCY AGREEMENT WITH THE JOINT VENTURE OF HILCO MERCHANT RESOURCES, LLC AND GORDON BROTHERS RETAIL PARTNERS, LLC IN CONNECTION WITH THE CONDUCTION OF "GOING-OUT-OF-BUSINESS SALES", "STORE CLOSING SALES" AND SIMILAR THEMED SALES; AND GRANTING RELATED RELIEF[2]**

Upon consideration of the [SALE MOTION] (the "<u>Motion</u>");[2] and it appearing that the relief requested is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the interim relief sought in the Motion having been given and it appearing that no other notice of the interim relief sought in the Motion need be given; and the Debtor and a joint venture among

---

[1] The last four digits of the Debtor's tax identification number are [_____].Debtor's

[2] Note:  Title of order to match motion.

[2] All capitalized terms not otherwise defined in this Interim Order have the meaning ascribed to them in the Motion or in the Agency Agreement.

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent") having

agreed upon terms and conditions for the Agent to act as the Debtor's exclusive agent to conduct

sales (the "Sale") of certain of the Debtor's assets consisting of the  Merchandise, Merchant

Consignment Goods and certain Owned FF&E (collectively the "Assets"), and certain Additional

Agent Merchandise, which terms and conditions are set forth in that certain Agency Agreement,

by and between the Agent and Debtor, which is attached hereto as Exhibit A (the "Agency

Agreement"); and the transaction represented by the Agency Agreement having been determined

to be the highest and best offer for the Assets; and the Sale having commenced on June 12, 2015;

and the Agency Agreement requiring its interim approval by the Court no later than June [18],

2015, to facilitate the continued conduct and advertising of the Sale of the Assets and the

Additional Agent Merchandise during the interim period pending the Final Hearing and entry of

an Approval Order (the ("Interim Sale Assets"); and the Court having scheduled a hearing on

June ___, 2015, at ___ _.m. (the "Final Hearing") for entry of an order approving the Debtor's

assumption of the Agency Agreement on a final basis (the "Approval Order"); and a hearing

having been held on June [__], 2015 (the "Interim Sale Hearing"), to consider the relief

requested in the Motion and approval of the Agency Agreement on an interim basis; and

appearances of all interested parties having been noted on the record of the Interim Sale Hearing;

and upon the Declarations of [_____] and upon all of the proceedings had before the Court

(including but not limited to the testimony and other evidence proffered or adduced at the

Interim Sale Hearing); and the Court having found and determined that the interim relief sought

in the Motion with respect to the Interim Sale Assets is in the best interests of the Debtor, its

2

estate, its creditors, and all parties in interest and that the legal and factual bases set forth in the

Motion establish good, sufficient and just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is hereby

### FOUND AND DETERMINED THAT:[3]

**A.**     **Jurisdiction:**  This Court has jurisdiction to consider the Motion (as to the

interim relief sought) and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.

The Debtor's request for approval of entry into the Agency Agreement, and the transactions

contemplated thereby, on an interim basis is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A),

(D), (N) and (O).

**B.**     **Venue:**  Venue of these cases in this district is proper pursuant to 28 U.S.C. §

1409(a).

**C.**     **Statutory Predicates:**  The statutory predicates for the approval of the Agency

Agreement and transactions contemplated on an interim basis therein are sections 105, 363, 364

and 554 of the Bankruptcy Code, Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Local Rule 6004-1.

**D.**     **Notice:**  Proper, timely, adequate and sufficient notice of the Motion and the

Interim Sale Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of

---

[3]  The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, and 6004.  No other or further notice is required.

E.        **Opportunity to be Heard:**  In light of exigent circumstances, a reasonable opportunity to object or be heard regarding the interim relief requested in the Motion and the transactions pursuant thereto has been afforded to all interested persons and entities, including, without limitation, the following: (i) the Office of the United States Trustee for the District of [_____], (ii) counsel to the Lender, (iii) the Office of the United States Attorney for the District of [_____], (iv) all parties who are known to assert any lien, claim, interest or encumbrance in or upon any of the Interim Sale Assets, (v) all lessors of leases for the Stores, (vi) all applicable federal, state, and local taxing authorities having jurisdiction over any Store or Distribution Center or any of the Interim Sale Assets or Additional Agent Merchandise, including, without limitation, the Internal Revenue Service (collectively, the "Taxing Authorities"), (vii) all governmental entities known by the Debtor to have an interest in regulating the Sale, (viii) the state attorney general in each state in which the Debtor operates a Store or Distribution Center, (ix) all county and state consumer protection agencies in any county or state where the Debtor operates a Store or Distribution Center, ((xi) the Agent and (xii) all other applicable parties in interest((i) through (xii) collectively, the "Notice Parties").  In light of the exigent timing described in the Motion, the limited relief being provided pursuant to this Interim Order, and the availability of a further opportunity for any party to object at the Final Hearing to any relief provided herein, notice of the Motion was sufficient and reasonable.

Objections, if any, to the granting of the interim relief sought in the Motion have been withdrawn or resolved and, to the extent not withdrawn or resolved, are hereby overruled.

F.      **Marketing Process:**  As demonstrated by: (i) the [_____] Declaration, (ii) the testimony and other evidence proffered or adduced at the Interim Sale Hearing and (iii) the representations of counsel made on the record at the Interim Sale Hearing, the Debtor retained [WUNDERLICH] as investment bank and have thoroughly marketed the Interim Sale Assets and have conducted the bidding solicitation fairly and conducted a pre-bankruptcy auction among national liquidators to produce the highest and best bid, with adequate opportunity for parties that either expressed an interest in acquiring or liquidating the Interim Sale Assets, or who the Debtor believed may have had an interest in acquiring or liquidating the Interim Sale Assets, to submit competing bids.   The Debtor has conducted the marketing and sale process as set forth in and in accordance with the Motion.

G.      **Business Judgment:**  The Debtor's decision to (i) enter into the Agency Agreement, and (ii) perform under and make payments required by the Agency Agreement during the period commencing June 4, 2015 and ending upon the entry of the Approval Order (the "Interim Sale Period"), is a reasonable exercise of the Debtor's sound business judgment consistent with its fiduciary duties and is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest.  The Debtor and the Agent have respectively negotiated and undertaken their roles leading to the Sale and entry into the Agency Agreement in a diligent, non-collusive, fair and good faith manner.  The Debtor has articulated good and sufficient

reasons for the interim approval of the Agency Agreement and the continued conduct of the Sale

during the Interim Sale Period.

**H.        Highest and Best Offer:**  The Agency Agreement attached hereto as **Exhibit A**,

including the form and total consideration to be realized by the Debtor pursuant to the Agency

Agreement, (i) is the highest and best offer received by the Debtor for the Assets, (ii) is fair and

reasonable, and (iii) is in the best interests of the Debtor, its estate, its creditors and all other

parties in interest.  There is no legal or equitable reason to delay entry into the Agency

Agreement, and the transactions contemplated therein, including, without limitation, the Sale.

**I.        Personally Identifiable Information:**  The transactions contemplated by the

Agency Agreement do not include the sale or lease of personally identifiable information, as

defined in section 101(41A) of the Bankruptcy Code ("Personally Identifiable Information") (or

assets containing personally identifiable information).

**J.        Time of the Essence:**  Time is of the essence in the Debtor's continuation of the

sale of the Interim Sale Assets and the Additional Agent Merchandise during the Interim Sale

Period.  The Debtor's estate, creditors and interested parties will suffer immediate and

irreparable harm if the Debtor is not authorized to immediately go out of business, close its retail

stores and permit the Agent to continue the Sale at the Stores and through the E-Commerce

Platform and/or have the Agent market the Interim Sale Assets and the Additional Agent

Merchandise pursuant to the Agency Agreement without interruption.  Based on the record of the

Interim Sale Hearing and the [_____] Declaration and for the reasons stated on the record at

the Interim Sale Hearing, the continuation of the Sale and the marketing of the Interim Sale

6

Assets and the inclusion of Additional Agent Merchandise during the Interim Sale Period, each

in accordance with the terms of the Agency Agreement and this Interim Order, must be approved

on an interim basis as soon as possible following entry of this Interim Order, but in no event later

than June [__], 2015, to maximize the value that the Agent may realize from the Sale, and the

value that the Debtor may realize from entering into the Agency Agreement.  Accordingly, (i)

the requirements of Bankruptcy Rule 6003 are satisfied and granting the relief requested in the

Motion on an interim basis is necessary to avoid immediate and irreparable harm; and (ii) cause

exists to lift the stay to the extent necessary, as contemplated by Bankruptcy Rules 4001(a) and

6004(h) and permit the immediate effectiveness of this Interim Order.

     **K.**        **Sale Free and Clear:**  The Debtor is the sole and lawful owner of the Interim

Sale Assets (other than the Additional Agent Merchandise).  The Interim Sale Assets (other than

the Additional Agent Merchandise) constitute property of the Debtor's estate and title thereto is

vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.  A

sale of the Interim Sale Assets and the Additional Agent Merchandise during the Interim Sale

Period other than one free and clear, to the greatest extent allowed by law, of liens, claims,

encumbrances, defenses (it being understood that the Interim Sale Assets shall not be sold free

and clear of any defenses that do not constitute interests in the assets for purposes of section

363(f) of the Bankruptcy Code), rights of setoff and interests of any kind, including, without

limitation, security interests of whatever kind or nature, mortgages, conditional sales or title

retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments,

preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments,

orders and decrees of any court or foreign or domestic governmental entity, taxes (including

foreign, state, local and ad valorem taxes), licenses, covenants, restrictions, indentures,

instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or

exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other

liabilities, obligations, causes of action, contract rights and claims, in each case, of any kind or

nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy

Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or

inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or

unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent,

material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable

(collectively, "Encumbrances") and without the protections of this Interim Order would hinder

the Debtor's ability to obtain the consideration provided for in the Agency Agreement for all of

the Interim Sale Assets and, thus, would impact materially and adversely the value that the

Debtor's estate would be able to obtain for the sale of such Interim Sale Assets.  But for the

protections afforded to the Agent under the Bankruptcy Code and this Interim Order, the Agent

would not have offered to pay the consideration contemplated in the Agency Agreement.  In

addition, each entity with an Encumbrance upon the Interim Sale Assets and the Additional

Agent Merchandise, (i) has consented to the Sale and the sale and disposition of the Interim Sale

Assets and the Additional Agent Merchandise during the Interim Sale Period in the manner

contemplated by the Agency Agreement and this Interim Order or is deemed to have consented

to the Sale and the sale and disposition of the Interim Sale Assets and the Additional Agent

8

Merchandise in the manner contemplated by the Agency Agreement and this Interim Order, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances who did not object, or who withdrew their objections, to the Motion are deemed to have consented to the sale of the Interim Sale Assets and the Additional Agent Merchandise during the Interim Sale Period pursuant to section 363(f)(2) of the Bankruptcy Code.  Therefore, interim approval of the continuation of the sale of the Interim Sale Assets and the Additional Agent Merchandise during the Interim Sale Period pursuant to the terms of the Agency Agreement and the consummation of the Sale and the other transactions contemplated thereby free and clear of Encumbrances is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtor's estate, its creditors and other parties in interest.

L.    **Arms-length Sale:**  The consideration to be paid by the Agent under the Agency Agreement was negotiated at arm's-length and constitutes reasonably equivalent value and fair and adequate consideration for the right to serve as the Debtor's exclusive agent to conduct the Sale of the Assets and the other rights granted to the Agent by the Agency Agreement and this Order under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the laws of all applicable jurisdictions, including, without limitation, the United States, any state, territory, possession thereof or the District of Columbia.  The terms and conditions set forth in the Agency Agreement are fair and reasonable under these circumstances

and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtor or its creditors under any applicable laws.

**M.**     **Good Faith:**  Based upon the evidence presented at the Interim Sale Hearing, the Court finds, on an interim basis that the Debtor, its management, its board of directors and its employees, agents and representatives, and the Agent, its members and its officers, directors, employees, agents and representatives, actively participated in the bidding process and acted in good faith.  The Agency Agreement between the Agent and the Debtor was negotiated and entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.  With respect to all sales made and Expenses paid during the Interim Sale Period, the Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code if this Interim Order is reversed, modified, amended or vacated on appeal or by a subsequent order of this Court or any other court..  The Debtor was free to deal with any other party interested in buying or selling on behalf of the Debtor's estate some or all of the Assets.  Neither the Debtor nor the Agent has engaged in any conduct that would cause or permit the Sale, the Agency Agreement, or any related action or the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of the Bankruptcy Code.  The Agent has not violated section 363(n) of the Bankruptcy Code by any action or inaction and the transactions approved by this Order are not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.  Specifically, the Agent has not acted in a collusive manner with any person nor was it controlled by any agreement among bidders.  The Agent's prospective performance and

10

payment of amounts owing under the Agency Agreement during the Interim Sale Period are in good faith and for valid business purposes and uses.

**N.**     **Insider Status:**  The Agent is not an "insider" or "affiliate" of the Debtor as those terms are defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling stockholders exists between the Agent and the Debtor.

**O.**     **Corporate Authority:**  Subject to the entry of this Interim Order, the Debtor (i) has full corporate or other power to execute, deliver and perform its obligations under the Agency Agreement and all other transactions contemplated thereby, and entry into the Agency Agreement has been duly and validly authorized by all necessary corporate or similar action, (ii) has all of the corporate or other power and authority necessary to consummate the transactions contemplated by the Agency Agreement, and (iii) has taken all actions necessary to authorize and approve the Agency Agreement and the transactions contemplated thereby.  No consents or approvals, other than those expressly provided for herein or in the Agency Agreement, are required for the Debtor to consummate such transactions.

**P.**     **No Successor Liability:**  No sale, transfer or other disposition of the Interim Sale Assets or Additional Agent Merchandise during the Interim Sale Period pursuant to the Agency Agreement or entry into the Agency Agreement will subject the Agent to any liability for claims, obligations or Encumbrances asserted against the Debtor or the Debtor's interests in such Interim Sale Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product

11

line, de facto merger or substantial continuity or similar theories.  The Agent is not a successor to

the Debtor or its estate.

Q.    **Approval Order:**  This Interim Order shall constitute the Interim Approval Order

as contemplated by the Agency Agreement.

**NOW,  THEREFORE,  IT  IS  HEREBY  ORDERED,  ADJUDGED  AND**

**DECREED THAT:**

**A.    Motion Granted, Objections Overruled**

1.    The relief requested in the Motion is granted on an interim basis with respect to

the Interim Sale Assets and the Additional Agent Merchandise as set forth herein, and subject to

the rights of any parties in interest to be heard at the Final Hearing with respect to the relief

requested in the Motion, to the extent provided herein.  Nothing in this Interim Order is intended

to affect any rights of any governmental unit to enforce any law affecting the Debtor's conduct

of the sale prior to the Petition Date.

**B.    <u>Interim Approval of Agency Agreement</u>**

2.    The Agency Agreement is approved on an interim basis pursuant to sections 105

and 363 of the Bankruptcy Code.  During the Interim Sale Period,  the Debtor is hereby

authorized to continue performance under and to make all payments required by the Agency

Agreement as and when due thereunder,and empowered on an interim basis to continue to

perform under the Agency Agreement, and the Agency Agreement (and each of the transactions

contemplated therein) is hereby approved in its entirety and is incorporated herein by reference.

The failure to include specifically any particular provision of the Agency Agreement in this

Interim Order shall not diminish or impair the effectiveness of such provisions during the Interim

Period and the provisions of this Interim Order, it being the intent of the Court that, unless

provided otherwise in this Interim Order, the Agency Agreement and all of its provisions,

payments and transactions, be authorized and approved on an interim basis in their entirety.

Likewise, all of the provisions of this Interim Order are nonseverable and mutually dependent.

3.    All amounts payable to the Agent under the Agency Agreement during the

Interim Sale Period shall be payable to the Agent without the need for any application of the

Agent therefor or any further order of the Court.

4.    During the Interim Sale Period, subject to the provisions of this Interim Order, the

Debtor and the Agent are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the

Bankruptcy Code, to conduct the Sale, consummate the sale of the Interim Sale Assets and the

Additional Agent Merchandise and take all actions reasonably related thereto or arising in

connection therewith (including, without limitation, promoting the sale as a "going out of

business", "store closing", "sale on everything", "everything must go", "inventory liquidation"

or a similar themed sale), in each case in accordance with the Agency Agreement and (a) the sale

guidelines (the "GOB Sale Guidelines") attached hereto as **Exhibit B**, which GOB Sale

Guidelines are hereby approved in their entirety or (b) as otherwise agreed in writing by the

Agent and any landlord upon consultation with the Debtor.

5.    During the Interim Sale Period, the Agent, on behalf of the Debtor, is hereby

authorized to sell the Interim Sale Assets and the Additional Agent Merchandise and otherwise

13

market and advertise the sale or other disposition of the other Assets and Additional Agent

Merchandise.

6.    Upon entry of this Interim Order, pursuant to section 363(b) of the Bankruptcy

Code, during the Interim Sale Period, and subject to the provisions of this Interim Order, the

Debtor, the Agent, and each of their respective officers, employees and agents are hereby

authorized to execute such documents and to take any and all such actions as may be necessary

or desirable to carry out the Sale, consummate the sale of the Interim Sale Assets and the

Additional Agent Merchandise and effectuate or implement the Agency Agreement and each of

the transactions and related actions contemplated or set forth therein (including, without

limitation, the Sale of the Interim Sale Assets and the Additional Agent Merchandise).  Scott

Gladstone, the Debtor's President and Chief Executive Officer, is specifically authorized to act

on behalf of the Debtor in connection with the Sale and the other transactions contemplated by

the Agency Agreement and no other consents or approvals are necessary or required for the

Debtor to carry out the Sale, consummate the sale of the Interim Sale Assets and the Additional

Agent Merchandise and effectuate the Agency Agreement and each of the transactions and

related actions contemplated or set forth therein during the Interim Sale Period.

**C.    Order Binding**

7.    This Interim Order shall be binding upon and shall govern the acts of all entities,

including, without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state and local officials, and all other

14

persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to the Interim Sale Assets

or the Additional Agent Merchandise.

8.      During the Interim Sale Period, this Interim Order and the terms and provisions of

the Agency Agreement shall be binding on all of the Debtor's creditors (whether known or

unknown), the Debtor, the Agent, and their respective affiliates, successors and assigns, and any

affected third parties including, but not limited to, all persons asserting an interest in the Interim

Sale Assets or the Additional Agent Merchandise during the Interim Sale Period,

notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under

any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee,

party, entity or other fiduciary, such terms and provisions likewise shall be binding.  The

provisions of this Interim Order and the terms and provisions of the Agency Agreement, and any

actions taken pursuant hereto or thereto shall survive the entry of any order which may be

entered confirming or consummating any plan(s) or reorganization or liquidation of the Debtor

or converting the Debtor's case from chapter 11 to chapter 7, and the terms and provisions of the

Agency Agreement, as well as the rights and interests granted pursuant to this Interim Order and

the Agency Agreement, shall continue in these or any superseding cases and shall be binding

upon the Debtor, the Agent and their respective successors and permitted assigns, including any

trustee or other fiduciary hereafter appointed as a legal representative of the Debtor under

chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed in this case shall be and

hereby is authorized to operate the business of the Debtor to the fullest extent necessary to permit

compliance with the terms of this Interim Order and the Agency Agreement, and the Agent and

any such trustee shall be and hereby are authorized to perform under the Agency Agreement

upon the appointment of the trustee without the need for further order of this Court.

**D.    Good Faith.**

9.    Entry into the Agency Agreement was undertaken by the parties thereto in good

faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and Agent shall

be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Interim

Order is reversed, modified, amended or vacated on appeal or by a subsequent order of this Court

or any other court.  The reversal, modification, amendment or vacatur on appeal or by a

subsequent order of this Court or any other court of the authorization provided herein to continue

the Sale pursuant to the Agency Agreement and consummate the transactions contemplated

thereby shall not affect the validity of such transactions (including, without limitation, the Sale or

the liens or priority authorized or created under the Agency Agreement or this Interim Order),

unless such authorization is duly stayed pending such appeal.  The Agent is entitled to all of the

benefits and protections afforded by sections 363(m) and 364(e) of the Bankruptcy Code.  The

transactions contemplated by the Agency Agreement are not subject to avoidance pursuant to

section 363(n) of the Bankruptcy Code.

**E.    Conduct of the Sale**

10.    Except as otherwise provided in the Agency Agreement or this Interim Order, and

subject to the terms thereof and hereof, pursuant to section 363(f) of the Bankruptcy Code, the

Agent shall be authorized during the Interim Sale Period to sell the Interim Sale Assets and the

Additional Agent Merchandise pursuant to the terms of the Agency Agreement, free and clear of

any and all Encumbrances, including, without limitation, the liens and security interests, as the

same may have been amended from time to time, of the Lender, whether arising by agreement,

any statute or otherwise and whether arising before, on or after the date on which these chapter

11 cases were commenced, with any presently existing Encumbrances encumbering all or any

portion of the Interim Sale Assets, the Proceeds or any proceeds of the foregoing attaching only

to the Guaranteed Amount and other amounts payable by the Agent to the Debtor under the

Agency Agreement, with the same validity, priority, force and effect as the same had with

respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or

setoffs that may exist.

11.    If any person or entity that has filed financing statements, mortgages, construction

or mechanic's liens, lis pendens or other documents or agreement evidencing liens on or interests

in the Interim Sale Assets shall not have delivered to the Debtor, in proper form for filing and

executed by the appropriate parties, termination statements, instruments of satisfaction, or

releases of any Encumbrances which the person or entity has with respect to the Interim Sale

Assets, each such person or entity is hereby directed to deliver all such statements, instruments

and releases and the Debtor and the Agent are hereby authorized to execute and file such

statements, instruments, releases and other documents on behalf of the person or entity asserting

the same and the Agent is authorized to file a copy of this Order which, upon filing, shall be

conclusive evidence of the release and termination of such interest.  Each and every federal, state

17

and local governmental unit is hereby directed to accept any and all documents and instruments necessary or appropriate to give effect to the Sale and related transactions.

12.     All entities that are presently in possession of some or all of the Assets in which the Debtor holds an interest that are or may be subject to the Agency Agreement hereby are directed to surrender possession of such Assets to the Agent.

13.     During the Interim Sale Period, Agent shall be granted a limited royalty free license and right to use the trademarks, trade names, logos, customer lists, websites, URL, social media, mailing lists and email lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agency Agreement.

14.     During the Interim Sale Period, unless otherwise ordered by the Court, all newspapers and other advertising media in which the Sale may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtor and the Agent to conduct the sale of the Interim Sale Assets and the Additional Agent Merchandise pursuant to the Agency Agreement and to consummate the transactions contemplated therein, including, without limitation, to conduct and advertise the Sale in the manner contemplated by the Agency Agreement, including, without limitation, conducting and advertising of the Sale (at the contractual rates charged to the Debtor prior to the Petition Date) in accordance with the Agency Agreement, the GOB Sale Guidelines, and this Interim Order.  Agent shall be authorized to include Additional Agent Merchandise in the Sale.

18

15.     Any amounts owed by the Debtor to Agent under the Agency Agreement shall be granted the status of superpriority claims pursuant to section 364(c) of Bankruptcy Code senior to all other superpriority claims, including, without limitation to the superpriority claims of the Lender; provided that until the Debtor receives payment in full of the Guaranteed Amount and any other amounts due to the Debtor under the Agency Agreement and Agent delivers the Letter of Credit, any superpriority claim granted to Agent shall be junior and subordinate in all respects to the claims of the Lender but solely to the extent of the amount of the unpaid portion of the Guaranteed Amount, Expenses, and such other amounts due to the Debtor under the Agency Agreement.

16.     Nothing in this Interim Order or the Agency Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order or in the Agency Agreement shall in any way diminish the obligations of the Debtor to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code.  Nothing herein shall be construed to be a determination that the Agent is an operator with respect to any environmental law or regulation.  Moreover, the sale of the Interim Sale Assets shall not be exempt from, and the Agent shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws,

19

including consumer laws regulating deceptive practices and false advertising (collectively,

"Applicable General Laws").  Nothing in this Interim Order or the Agency Agreement shall alter

or affect the Debtor's and Agent's obligations to comply with all applicable federal safety laws

and regulations.  Nothing in this Interim Order shall be deemed to bar any Governmental Unit

(as defined in section 101(27) of the Bankruptcy Code) from enforcing Applicable General Laws

in the applicable non-bankruptcy forum, subject to the Debtor's or the Agent's right to assert in

that forum or before this Court that any such laws are not in fact Applicable General Laws or that

such enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise,

pursuant to Paragraph [__] hereunder.  Notwithstanding any other provision in this Interim

Order, no party waives any rights to argue any position with respect to whether the conduct was

in compliance with this Interim Order and/or any applicable law, or that enforcement of such

applicable law is preempted by the Bankruptcy Code.  Nothing in this Interim Order shall be

deemed to have made any rulings on any such issues.

   17. Disputes between Government Units and the Debtor or the Agent.  To the extent

that the Sale is subject to any federal, state or local statute, ordinance, or rule, or licensing

requirement that is not an Applicable General Law, but instead is directed at regulating "going

out of business," "store closing," "sale on everything," "everything must go," "inventory

liquidation" or similar inventory liquidation sales, or bulk sale laws (each a "GOB Law," and

together, the "GOB Laws"),  with GOB Laws restricting safe, professional and non-deceptive,

customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely

in connection with the Sale and including ordinances establishing license or permit requirements,

20

waiting periods, time limits or bulk sale restrictions that would otherwise apply to the Sale

hereinafter referred to collectively, as "Liquidation Laws", the following provisions shall apply:

a.    Provided that the Sale is conducted in accordance with the terms of

this Interim Order, the Agency Agreement and the GOB Sale Guidelines, and in light of the

provisions in the laws of many Governmental Units that exempt court-ordered sales from their

provisions, the Debtor shall be presumed to be in compliance with any GOB Laws and

Liquidation Laws and, subject to Paragraphs [_____] of this Interim Order, are authorized to

take such actions as may be necessary and appropriate to implement the Agency Agreement, to

conduct the Sale and to advertise, post signs and banners and otherwise promote the Sale as a

"going out of business," "store closing," "sale on everything," "everything must go," or similarly

themed sale (including, without limitation, by means of media advertising, interior and exterior

banners, A-frames, and similar signage and the use of sign walkers and street signage) without

further consent of any person, in each case in accordance with the terms of this Interim Order,

the Agency Agreement, the GOB Sale Guidelines or as otherwise agreed in writing by the Agent

and any landlord without the necessity of further showing compliance with any such GOB Laws

and Liquidation Laws.

b.    Within three (3) business days of entry of this Interim Order, the

Debtor shall serve copies of this Interim Order, the Agency Agreement and the Sale Guidelines

via e-mail, facsimile or regular mail, on: (i) the Attorney General's office for each state where

the Sale will be held, (ii) the county consumer protection agency or similar agency for each

21

county where the Sale will be held, and  (iii) the division of consumer protection for each state where the Sale will be held.

    c.  To the extent there is a dispute arising from or relating to the Sale, this Order, the Agency Agreement, or the GOB Sale Guidelines, which dispute relates to any GOB Laws or Liquidation Laws (a "<u>Reserved Dispute</u>"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within fifteen (15) days following service of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute to counsel for the Debtor and counsel for the Agent at the addresses set forth in the Agency Agreement so as to ensure delivery thereof within one (1) business day thereafter.  If the Debtor, the Agent and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "<u>Dispute Resolution Motion</u>").

    d.  In the event a Dispute Resolution Motion is filed, nothing in this Order shall preclude the Debtor, the Agent or other interested party from asserting (i) that the provisions of any GOB Laws and/or Liquidation Laws are preempted by the Bankruptcy Code or (ii) that neither the terms of this Order, nor the Debtor or the Agent's conduct pursuant to this Order, violates such GOB Laws and/or Liquidation Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with the Debtor's or the Agent's ability to conduct or to continue to conduct the Sale pursuant to this Order and the Agency Agreement, absent further order of this Court.  The Governmental Unit

shall be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Laws or the lack of any preemption of such GOB Laws and/or Liquidation Laws by the Bankruptcy Code.  Nothing in this Order shall constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

> e.     If, at any time, a dispute arises between the Debtor and/or the Agent and a Governmental Unit as to whether a particular law is a GOB Law and/or Liquidation Law, and subject to any provisions contained in this Order related to GOB Laws and/or Liquidation Laws, then any party to that dispute may utilize the provisions of Subparagraphs (b) through (d) hereunder by serving a notice to the other party and proceeding thereunder in accordance with those Paragraphs.  Any determination with respect to whether a particular law is a GOB Law and/or Liquidation Law shall be made de novo.

18.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the Sale, to the extent that, during the Interim Sale Period, disputes arise during the course of the Sale regarding laws regulating the use of sign-walkers and banner advertising and the Debtor and the Agent are unable to resolve the matter consensually with the Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (i) the Final Hearing or (ii) within two (2) business days of such request.  This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

19.     To the extent that the Debtor is subject to any state "fast pay" laws in connection with the Sale, then the Debtor shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of (a) the Debtor's next regularly scheduled payroll and (b) seven (7) calendar days following the termination date of the relevant employee.

20.     Except as expressly provided in the Agency Agreement, during the Interim Sale Period, the sale of the Interim Sale Assets and the Additional Agent Merchandise shall be conducted by the Debtor and the Agent notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sale, the rejection of leases, abandonment of assets or "going dark" or similar provisions. The Agent and landlords of the Stores in consultation with the Debtor are authorized to enter into separate agreements and/or side letters ("Side Letters") between themselves modifying the GOB Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs [_____] (provided that in no event shall such Side Letters impose additional costs, expense or liability upon the Debtor without the prior written consent of the Debtor). In the event of any conflict between the GOB Sale Guidelines and any Side Letter, the terms of such Side Letter shall control. In the event of a dispute regarding the Guidelines or any Side Letter, counsel for the Debtor, the applicable landlord, and the Agent shall meet and confer to resolve the dispute. In the event that the parties are unable to resolve the dispute, any party seeking relief may request a prompt hearing before the Court to resolve such dispute.

21.     Except as expressly provided for herein or in the GOB Sale Guidelines, and

except with respect to any Governmental Unit (as to which Paragraphs [_____] shall apply), no

person or entity, including but not limited to any utility company, Internet service provider,

website service or hosting provider, landlord, licensor, creditor or other interested party or any

person acting for or on behalf of the foregoing shall take any action to directly or indirectly

prevent, interfere with, impede or otherwise hinder consummation of the Sale or the other

transactions contemplated by the Agency Agreement, or the advertising and promotion

(including the posting of signs and exterior banners or the use of signwalkers) of such Sale or the

other transactions contemplated by the Agency Agreement, and all such parties and persons of

every nature and description, including landlords, licensors, creditors, utility companies, Internet

service providers, website service or hosting providers and other interested parties and all those

acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way

with, or otherwise impeding, the conduct or advertising and promotion (including the posting of

signs and exterior banners or the use of sign-walkers) of the Sale and the other transactions

contemplated by the Agency Agreement and/or (ii) instituting any action or proceeding in any

court or administrative body seeking an order or judgment against, among others, the Debtor, the

Agent, or the landlords at the Stores and Distribution Centers that might in any way directly or

indirectly impede, obstruct or otherwise interfere with or adversely affect the conduct or

advertising and promotion (including the posting of signs and exterior banners or the use of sign-

walkers) of the Sale and the other transactions contemplated by the Agency Agreement or other

liquidation sales at the Stores and Distribution Centers and/or seek to recover damages for

25

breach(es) of covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

22.    During the Interim Sale Period, the Agent shall have the right to use the Stores and the Distribution Centers and all related services, furniture, fixtures, equipment and other assets of the Debtor for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the GOB Sale Guidelines, this Interim Order and any Side Letters.

23.    The Agent shall be permitted to include in the Sale Additional Agent Merchandise in accordance with the terms and provisions of the Agency Agreement.  Any transactions relating to the Additional Agent Merchandise during the Interim Sale Period are, shall be construed as, and are acknowledged by the Debtor to be a true consignment from Agent to the Debtor under Article 9 of the Uniform Commercial Code in effect in the State of New York (the "UCC").  Agent is hereby granted a first priority security interest in (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise proceeds, which security interest shall be deemed perfected pursuant to this Interim Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtor as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise proceeds).

26

24.     During the Interim Sale Period applicable to any Store or Distribution Center and for purposes of conducting the Sale at such Store or Distribution Center, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, such Store or Distribution Center and the assets currently located at such Store or Distribution Center, in each case subject to the extent of Debtor's rights and entitlement to use the same, and the services provided at such Store or Distribution Center to the extent the Debtor is entitled to such services; and the Debtor shall not assign, reject or otherwise terminate any lease relating to any such Store or Distribution Center, or vacate any such Store or Distribution Center, where such assignment, rejection, termination or vacatur, would have an effective date prior to the applicable Sale Termination Date or Vacate Date (or with respect to a Distribution Center, date of cessation of Agent's use) for such Store or Distribution Center.

25.     To the extent Agent is owed any amounts in respect of overfunding in respect of the Guaranteed Amount (including, without limitation, the Adjustment Amount), the Debtor is unable to or otherwise for any reason fails to reimburse such amount and the Lender have received such amount, the Lender shall, within two (2) business days after written request by Agent disgorge and remit to Agent the portion, if any, of such amount that is undisputed or that has been determined to be owing to Agent by the Court.

26.     Nothing in this Interim Order shall (a) alter or affect the Debtor's obligations to comply with section 365(d)(3) of the Bankruptcy Code or (b) alter or modify the rights of any lessor or other counterparty to a lease with the Debtor to file an appropriate motion or otherwise seek appropriate relief if the Debtor fails to comply with section 365(d)(3) of the Bankruptcy

27

Code; provided that the conduct of the Sale in accordance with the Sale Guidelines shall not be a violation of section 365(d)(3) of the Bankruptcy Code.

27.    Pursuant to section 554(a) of the Bankruptcy Code, during the Interim Sale Period, the Debtor and the Agent, as applicable, are permitted to abandon property of the Debtor's estates (including, without limitation, Merchant Consignment Goods and Owned FF&E) in accordance with the terms and provisions of the Agency Agreement, without the Debtor or the Agent incurring liability to any person or entity; *provided, however*, that, unless the Agent otherwise consents, the Debtor may only abandon property located in any Store or Distribution Center on or after the applicable Vacate Date (or, with respect to a Distribution Center, the date of Agent's cessation of use of such Distribution Center).  In the event of any such abandonment, all applicable landlords shall be authorized to dispose of such property without any liability to any individual or entity that may claim an interest in such abandoned property, and such abandonment shall be without prejudice to any landlord's right to assert any claim based on such abandonment and without prejudice to the Debtor or other party in interest to object thereto.

28.    Agent shall accept the Debtor's gift cards and honor merchandise credits or similar Debtor-issued credit amounts issued prior to the Sale Commencement Date in accordance with Section 8.6 of the Agency Agreement, and the Debtor shall reimburse Agent for such amounts during the weekly sale reconciliation provided for and subject to the limitations set forth in Sections 8.6 and 8.7 of the Agency Agreement.

29.    Agent shall accept returns of merchandise sold by the Debtor prior to the Sale

Commencement Date pursuant to the provisions of Section 8.5 of the Agency Agreement,

provided that such return is otherwise in compliance with the Debtor's return policies in effect as

of the date such item was purchased, and the Debtor shall reimburse Agent for such amounts

during the weekly sale reconciliation provided for and subject to the limitations set forth in

Section 8.7 of the Agency Agreement.

30.    During the Interim Sale Period, all state and federal laws relating to implied

warranties for latent defects shall be complied with and are not superseded by the sale of said

goods or the use of the terms "as is" or "final sales." During the Interim Sale Period, the Debtor

and/or the Agent shall accept return of any goods purchased during the Sale that contain a defect

which the lay consumer could not reasonably determine was defective by visual inspection prior

to purchase for a full refund, provided that the consumer must return the merchandise within

twenty-one (21) days of their purchase, the consumer must provide a receipt, and the asserted

defect must in fact be a "latent" defect.  Subject to the terms of the Agency Agreement, during

the Interim Sale Period, the Debtor shall promptly reimburse Agent in cash for any refunds

Agent is required to issue to customers in respect of any goods purchased during the Sale that

contain such a latent defect.

31.    Except as expressly provided for in the Agency Agreement, nothing in this

Interim Order or the Agency Agreement, and none of the Agent's actions taken in respect of the

Sale, the sale of the Interim Sale Assets and the Additional Agent Merchandise or the other

transactions contemplated by the Agency Agreement during the Interim Sale Period shall be

deemed to constitute an assumption by the Agent of any of the Debtor's obligations relating to any of the Debtor's employees. Moreover, the Agent shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

32.    The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the collection, reporting and payment of any and all sales taxes is the legal responsibility of the Debtor. Subject to the terms of the Agency Agreement, the Debtor is directed to remit all taxes arising from the Sale to the applicable Taxing Authorities as and when due, provided that in the case of a bona fide dispute the Debtor is only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the Taxing Authority. For the avoidance of doubt, sales taxes collected and held in trust by the Debtor shall not be used to pay any creditor or any other party, other than the Taxing Authority for which the sales taxes are collected. The Agent shall collect, remit to the Debtor, and account for sales taxes as and to the extent provided in the Agency Agreement. This Interim Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under State law.

33.    Subject to the terms set forth in the Agency Agreement, the Debtor and/or the Agent (as the case may be) are authorized and empowered to transfer the Interim Sale Assets and the Additional Agent Merchandise among the Stores and the Distribution Centers. The Agent is

30

authorized to sell the Debtor's owned furniture, fixtures and equipment and abandon the same, in

each case, as provided for and in accordance with the terms of the Agency Agreement.

**F.      Other Rights of Agent**

34.      During the Interim Sale Period, Agent shall be under no obligation to make any

payments from its own funds (including but not limited to the Initial Guaranty Payment) in the

performance of its obligations under the Agency Agreement.

35.      The Debtor are authorized to execute such documents and take all other actions as

may be necessary to release any Encumbrances of any kind against the Interim Sale Assets as

such Encumbrances may have been recorded or may otherwise exist, in accordance with the

terms of this Order. Any Encumbrances of any kind asserted under laws, rules, regulations or

governmental or court orders imposing a stamp, transfer tax or similar tax arising from the

transfer of the Interim Sale Assets to the Agent shall be filed against the Debtor's estate and shall

not be asserted against the Agent.  The Agent has not assumed or otherwise become obligated,

liable or responsible for any Encumbrances against the Debtor, regardless of whether any such

Encumbrance is contingent or not, arises at law or in equity or otherwise, is existing on the date

hereof or arises thereafter, and relates to or arises out of the Debtor's business, the Assets, any

excluded assets or otherwise (including, without limitation, any Encumbrances (x) based on any

successor or transferee liability theory or (y) relating to the pre-petition or post-petition operation

of the Debtor's business, the Assets or the use of the Assets).  In particular, the Agent (A) shall

have no successor liability whatsoever with respect to any Encumbrances of any nature that may

exist against the Debtor (or any predecessor or affiliate of the Debtor), (B) shall not be, or be

31

deemed to be, (i) a successor-in-interest or within the meaning of any law, rule, regulation or

theory, including any revenue, pension, labor, ERISA, bulk transfer, products liability, tax,

environmental, antitrust, product line, de facto merger, substantial continuity, successor or

transferee liability or similar law, rule regulation or theory or (ii) a joint employer, co-employer

or successor employer with the Debtor, (C) shall have no obligations to pay the Debtor's wages,

bonuses, commissions, severance pay, vacation pay, continuation of coverage under COBRA,

claims arising out of employment and termination of employment, WARN Act claims (if any),

pension, welfare, retiree medical coverage, fringe benefits or any other benefits or payments of

any kind to employees of the Debtor, including pursuant to any collective bargaining agreement,

employee pension plan, or otherwise and (D) shall have no liability under fast pay laws with

respect to any employees of the Debtor.  Pursuant to sections 105(a) and 363 of the Bankruptcy

Code, and unless otherwise explicitly provided for in this Interim Order or the Agency

Agreement, all persons, Governmental Units (as defined in sections 101(27) and 101(41) of the

Bankruptcy Code and including their administrative agencies, departments, and officials

(including officials maintaining any authority relating to environmental, labor or health and

safety laws)) and other entities (including (I) all parties holding any Encumbrances against the

Debtor, its estate or its assets and (II) the Debtor's employees and former employees) are hereby

enjoined from taking any action (including (a) asserting or prosecuting any Encumbrance or

commencing or continuing in any manner any action or other proceeding of any kind) that seeks

to impose liability or any other Encumbrance upon (or collect, offset or recover against) the

Agent, any affiliate, successor or assign thereof, or the Assets or the Additional Agent

32

Merchandise by reason of Agent's retention pursuant to the Agency Agreement and this Order or

the Agent's disposition of the Assets and/or the Additional Agent Merchandise pursuant to the

Agency Agreement and this Order, for any Encumbrance of any kind that may be asserted

against the Debtor, the Debtor's business, the Assets, any excluded assets or otherwise (as such

Encumbrances exist immediately prior to the closing), including the Encumbrances described in

the preceding sentences of this Paragraph [__].

36.    The provisions of this Interim Order shall be self-executing, and neither the

Debtor nor the Agent shall be required to execute or file releases, termination statements,

assignments, consents, or other instruments in order to effectuate, consummate and implement

the provisions of this Interim Order.  However, the Debtor and the Agent and each of their

respective officers, employees and agents are hereby authorized and empowered to take all

actions and execute and deliver any and all documents and instruments that either the Debtor or

the Agent deem necessary or appropriate to implement and effectuate the terms of the Agency

Agreement and  this Interim Order.

37.    The Agent shall not be obligated to (i) continue or maintain in effect, or assume

any liability in respect of any employee pension, welfare, fringe benefit or any other benefit plan,

trust arrangement or other agreement to which the Debtor is a party or has any responsibility

therefor, including, without limitation, medical, welfare and pension benefits payable after

retirement or other termination of employment, or (ii) assume any responsibility as a fiduciary,

plan sponsor or otherwise, for making any contribution to, or in respect of the funding,

investment or administration of any employee pension plan or the termination of any such plan.

### G.    Other Provisions

38.    The Agent shall not be liable for any claims against the Debtor, and the Debtor shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agency Agreement.  The Agent shall have no successor liability whatsoever with respect to any Encumbrances or claims of any nature that may exist against the Debtor, except as expressly set forth in the Agency Agreement.

39.    The Agent is a party in interest and Agent shall be entitled to be heard on all issues in the Bankruptcy Case related to the Agency Agreement or the transactions contemplated thereby.

40.    The Agency Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court, but such changes may not affect the provisions applicable to Governmental Units in paragraph [_____] of this Interim Order.

41.    Except with respect to any Governmental Unit (as to which the provisions of Paragraphs [_____] of this Interim Order shall apply), during the Interim Sale Period, this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Interim Order or the Agency Agreement, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtor, the landlords and/or the Agent for protection from interference with the Sale during the Interim Sale Period or

the other transactions contemplated by the Agency Agreement, (iii) any other disputes related to the Sale or the other transactions contemplated by the Agency Agreement during the Interim Sale Period or the enforcement of the Agency Agreement during the Interim Sale Period, and (iv) to protect the Debtor and/or the Agent against any assertions of Encumbrances during the Interim Sale Period. No such parties or person shall take any action against the Debtor, the Agent, the landlords at the Stores or the Sale or the other transactions contemplated by the Agency Agreement until this Court has resolved such dispute. This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

42. Notwithstanding Bankruptcy Rules 4001 and 6004, or any other law that would serve to stay or limit the immediate effect of this Interim Order, this Interim Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtor and the Agent are free to perform under the Agency Agreement at any time, subject to the terms of the Agency Agreement. For the avoidance of doubt, during the Interim Sale Period, the Debtor are not subject to any stay in the implementation of the transactions contemplated by the Agency Agreement.

43. During the Interim Sale Period, any and all bulk sale laws, to the extent applicable, are hereby waived since creditors are protected by the notice provided by the Sale Motion and the jurisdiction of the Court.

44.　　This Interim Order constitutes an authorization of the conduct of the Sale during the Interim Sale Period and the Debtor's and the Agent's conduct in connection herewith.

45.　　To the extent that anything contained in this Interim Order explicitly conflicts with a provision in the Agency Agreement or the GOB Sale Guidelines, this Interim Order shall govern and control.

46.　　In the event Merchant or Lender notifies Agent of its intention to draw on the Letter of Credit, Agent shall be entitled to an emergency hearing by this Court sufficient to determine whether such draw is permitted under the terms of the Agency Agreement prior to the occurrence of such draw.

47.　　During the Interim Sale Period, the Agent and the other Agent Indemnified Parties shall be indemnified and held harmless in accordance with the terms of the Agency Agreement.

48.　　Pursuant to the terms of that certain stalking horse agency agreement, dated as of June 5, 2015 (the "Stalking Horse Agency Agreement"), among the Debtor, a joint venture comprised of Tiger Capital Group, LLC and Yellen Partners, LLC (such joint venture, collectively, the "Stalking Horse") and the other parties thereto, as modified on the record at the auction conducted on June 9, 2015 and June 10, 2015 (the "Auction"), which agreement served as the basis upon which the bids at the Auction were based, the Stalking Horse is entitled to receive (i) a breakup fee equal to $650,000 (the "Break-Up Fee") *plus* (ii) reimbursement for the reasonable fees and expenses of its legal, accounting and financial advisors and the out-of-pocket costs and expenses incurred by the Stalking Horse in connection with conducting due diligence

36

and the negotiation, documentation and implementation of the Stalking Horse Agency

Agreement and the transactions contemplated thereby in an amount not to exceed $350,000 (the

"Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections").  The

Work Fee (as defined in the Stalking Horse Agency Agreement) already received by the Stalking

Horse shall be applied against the Bid Protections.  The Bid Protections shall be paid (in

accordance with instructions provided by the Stalking Horse to the Debtor and Agent) no later

than the earlier of (1) the Payment Date or (2) two (2) business days after June 30, 2015.  In the

event that the Approval Order (as defined in the Agency Agreement) is entered prior to the Bid

Protections becoming due and payable, Agent shall remit an amount equal to the excess of the

Bid Protections over the Work Fee (the "Outstanding Bid Protection Amount") to the Stalking

Horse from the Remaining Initial Guaranty Payment (with the balance of such Remaining Initial

Guaranty Payment to be remitted to the Debtor).  If Agent does not make such payment to the

Stalking Horse upon the Bid Protections becoming due and payable or if the Bid Protections

become due and payable prior to the entry of the Approval Order, the Debtor shall promptly

remit the Outstanding Bid Protection Amount to the Stalking Horse; provided, however, in the

event that the Debtor does not have sufficient funds (after accounting for all other claims, if any,

the Debtor is required to pay before paying the Bid Protections) to remit the full amount of the

Outstanding Bid Protection Amount to the Stalking Horse, the Lender agrees to advance any

shortfall amount (up to a maximum of the Outstanding Bid Protection Amount) to the Debtor

under the Existing Credit Facility or the DIP Facility (each as defined in the Stalking Horse

Agency Agreement), and the Debtor shall remit such amounts to the Stalking Horse.

37

49.     The Final Hearing will be held before this Court on June __, 2015 at __:__ __.m.

(PT).

50.     Any objections to the continuation of the sale following the Interim Sale Hearing

or to the approval of the Motion and the relief requested therein on a final basis shall be filed

with this Court no later than ___ noon (PT) on _____, 2015, and on the (a) Notice Parties;

(b) any party which has filed prior to such date a request for notices under Bankruptcy Rule 2002

with this Court; and (c) counsel for any statutory committee.


Dated:  June ___, 2015

_____
Honorable [_____]
United States Bankruptcy Judge

**EXHIBIT "B"**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF [_____]

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ANNA'S LINENS, INC.,[1] | ) | Case No. 15-[_____] |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtor. | ) | |
| | ) | Re. Docket No. [__] |

**ORDER AUTHORIZING THE DEBTOR AND THE AGENT TO ASSUME THE
AGENCY AGREEMENT AND TO CONTINUE TO PERFRM UNDER THE AGENCY
AGREEMENT AND GRANTING RELATED RELIEF[2]**

Upon consideration of the [SALE MOTION] (the "Motion");[2] and it appearing

that the relief requested is in the best interests of the Debtor, its estate, its creditors, and other

parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334; and it appearing that consideration of the Motion and the relief

requested therein is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the

relief sought in the Motion having been given and it appearing that no other notice of the relief

sought in the Motion need be given; and the Debtor and a joint venture among Hilco Merchant

Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent") having agreed upon

terms and conditions for the Agent to act as the Debtor's exclusive agent to conduct sales (the

"Sale") of certain of the Debtor's assets consisting of the  Merchandise, Merchant Consignment

---

[1] The last four digits of the Debtor's tax identification number are [_____].Debtor's

[2] Note:  Title of order to match motion.

[2] All capitalized terms not otherwise defined in this Order have the meaning ascribed to them in the Motion or in the
Agency Agreement.

Goods and certain Owned FF&E (collectively the "Assets"), and certain Additional Agent

Merchandise, which terms and conditions are set forth in that certain Agency Agreement, by and

between the Agent and Debtor, which is attached hereto as Exhibit A (the "Agency

Agreement"); and the transaction represented by the Agency Agreement having been determined

to be the highest and best offer for the Assets; and the Sale having commenced on June [TBD],

2015; and the Court having held a hearing on June [TBD], 2015 to consider entry of an order

approving the Agency Agreement and the transactions contemplated thereby on an interim basis

(the "Interim Sale Hearing"); and the Court having entered its [INTERIM APPROVAL ORDER]

(the "Interim Approval Order") on June [TBD], 2015; and the Agency Agreement requiring its

final approval by the Court and assumption by the Debtor no later than June 30, 2015, to

facilitate the continued conduct and advertising of the Sale of the Assets and the Additional

Agent Merchandise; and a hearing having been held on June [__], 2015 (the "Sale Hearing"), to

consider the relief requested in the Motion and final approval and assumption of the Agency

Agreement; and appearances of all interested parties having been noted on the record of the Sale

Hearing; and upon the Declarations of [_____] and upon all of the proceedings had before the

Court (including but not limited to the testimony and other evidence proffered or adduced at the

Interim Sale Hearing and the Sale Hearing); and the Court having found and determined that the

relief sought in the Motion is in the best interests of the Debtor, its estate, its creditors, and all

parties in interest and that the legal and factual bases set forth in the Motion establish good,

sufficient and just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:[3]

**A.**    **Jurisdiction:**  This Court has jurisdiction to consider the Motion and the relief

requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  The Debtor's request for approval of

entry into, and assumption of, the Agency Agreement, and the transactions contemplated thereby

is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), (N) and (O).

**B.**    **Venue:**  Venue of these cases in this district is proper pursuant to 28 U.S.C. §

1409(a).

**C.**    **Statutory Predicates:**  The statutory predicates for the approval of the Agency

Agreement and transactions contemplated therein are sections 105, 363, 364, 365 and 554 of the

Bankruptcy Code, Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Local Rule 6004-1.

**D.**    **Notice:**  Proper, timely, adequate and sufficient notice of the Motion and the Sale

Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the

Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, and 6004.  No other or further notice is

required.

**E.**    **Opportunity to be Heard:**  A reasonable opportunity to object or be heard

regarding the relief requested in the Motion and the transactions pursuant thereto has been

afforded to all interested persons and entities, including, without limitation, the following: (i) the

---

[3]   The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and
conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy
Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed,
and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

Office of the United States Trustee for the District of [_____], (ii) counsel to the Lender, (iii)

the Office of the United States Attorney for the District of [_____], (iv) all parties who are

known to assert any lien, claim, interest or encumbrance in or upon any of the Assets, (v) all

lessors of leases for the Stores, (vi) all applicable federal, state, and local taxing authorities

having jurisdiction over any Store or Distribution Center or any of the Assets or Additional

Agent Merchandise, including, without limitation, the Internal Revenue Service (collectively, the

"Taxing Authorities"), (vii) all governmental entities known by the Debtor to have an interest in

regulating the Sale, (viii) the state attorney general in each state in which the Debtor operates a

Store or Distribution Center, (ix) all county and state consumer protection agencies in any county

or state where the Debtor operates a Store or Distribution Center, ((xi) the Agent and (xii) all

other applicable parties in interest((i) through (xii) collectively, the "Notice Parties").

Objections, if any, to the granting of the relief sought in the Motion have been withdrawn or

resolved and, to the extent not withdrawn or resolved, are hereby overruled.

  **F.**  **Marketing Process:** As demonstrated by: (i) the [_____] Declaration, (ii) the

testimony and other evidence proffered or adduced at the Interim Sale Hearing and/or the Sale

Hearing and (iii) the representations of counsel made on the record at the Interim Sale Hearing

and/or the Sale Hearing, the Debtor retained [WUNDERLICH] as investment bank and have

thoroughly marketed the Assets and have conducted the bidding solicitation fairly and conducted

a pre-bankruptcy auction among national liquidators to produce the highest and best bid, with

adequate opportunity for parties that either expressed an interest in acquiring or liquidating the

Assets, or who the Debtor believed may have had an interest in acquiring or liquidating the

Assets, to submit competing bids.   The Debtor has conducted the marketing and sale process as set forth in and in accordance with the Motion.

**G.**    **Business Judgment:**  The Debtor's decision to (i) enter into and assume the Agency Agreement, and (ii) perform under and make payments required by the Agency Agreement is a reasonable exercise of the Debtor's sound business judgment consistent with its fiduciary duties and is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest.  The Debtor and the Agent have respectively negotiated and undertaken their roles leading to the Sale and entry into and assumption of the Agency Agreement in a diligent, non-collusive, fair and good faith manner.  The Debtor has articulated good and sufficient reasons for the approval and assumption of the Agency Agreement and the continued conduct of the Sale.

**H.**    **Highest and Best Offer:**  The Agency Agreement attached hereto as **Exhibit A**, including the form and total consideration to be realized by the Debtor pursuant to the Agency Agreement, (i) is the highest and best offer received by the Debtor for the Assets, (ii) is fair and reasonable, and (iii) is in the best interests of the Debtor, its estate, its creditors and all other parties in interest.  There is no legal or equitable reason to delay entry into the Agency Agreement, and the transactions contemplated therein, including, without limitation, the Sale.

**I.**    **Personally Identifiable Information:**  The transactions contemplated by the Agency Agreement do not include the sale or lease of personally identifiable information, as defined in section 101(41A) of the Bankruptcy Code ("Personally Identifiable Information") (or assets containing personally identifiable information).

**J.**        **Time of the Essence:**  Time is of the essence in the Debtor's continuation of the

sale of the Assets and the Additional Agent Merchandise.  Based on the record of the Interim

Sale Hearing and the Sale Hearing and the [_____] Declaration and for the reasons stated on

the record at the Interim Sale Hearing and the Sale Hearing, the continuation of the Sale and the

marketing of the Assets and the inclusion of Additional Agent Merchandise, each in accordance

with the terms of the Agency Agreement and this Order, must be approved as soon as possible

following entry of this Order, but in no event later than June [__], 2015, to maximize the value

that the Agent may realize from the Sale, and the value that the Debtor may realize from entering

into the Agency Agreement.  Accordingly, (i) the requirements of Bankruptcy Rule 6003 are

satisfied and granting the relief requested in the Motion is necessary to avoid immediate and

irreparable harm; and (ii) cause exists to lift the stay to the extent necessary, as contemplated by

Bankruptcy Rules 4001(a) and 6004(h) and permit the immediate effectiveness of this Order.

**K.**        **Sale Free and Clear:**  The Debtor is the sole and lawful owner of the Assets.

The Assets constitute property of the Debtor's estate and title thereto is vested in the Debtor's

estate within the meaning of section 541(a) of the Bankruptcy Code.  A sale of the Assets and the

Additional Agent Merchandise other than one free and clear, to the greatest extent allowed by

law, of liens, claims, encumbrances, defenses (it being understood that the Assets shall not be

sold free and clear of any defenses that do not constitute interests in the assets for purposes of

section 363(f) of the Bankruptcy Code), rights of setoff and interests of any kind, including,

without limitation, security interests of whatever kind or nature, mortgages, conditional sales or

title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances,

6

assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery,

judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes

(including foreign, state, local and ad valorem taxes), licenses, covenants, restrictions,

indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution,

indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter

ego and other liabilities, obligations, causes of action, contract rights and claims, in each case, of

any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the

Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or

unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or

unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent

or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured,

legal or equitable (collectively, "Encumbrances") and without the protections of this Order

would hinder the Debtor's ability to obtain the consideration provided for in the Agency

Agreement and, thus, would impact materially and adversely the value that the Debtor's estate

would be able to obtain for the sale of such Assets.  But for the protections afforded to the Agent

under the Bankruptcy Code and this Order, the Agent would not have offered to pay the

consideration contemplated in the Agency Agreement.  In addition, each entity with an

Encumbrance upon the Assets and the Additional Agent Merchandise, (i) has consented to the

Sale and the sale and disposition of the Assets and the Additional Agent Merchandise in the

manner contemplated by the Agency Agreement and this Order or is deemed to have consented

to the Sale and the sale and disposition of the Assets and the Additional Agent Merchandise in

7

the manner contemplated by the Agency Agreement and this Order, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances who did not object, or who withdrew their objections, to the Motion are deemed to have consented to the sale of the Assets and the Additional Agent Merchandise pursuant to section 363(f)(2) of the Bankruptcy Code.  Therefore, approval of the continuation of the sale of the Assets and the Additional Agent Merchandise pursuant to the terms of the Agency Agreement and the consummation of the Sale and the other transactions contemplated thereby free and clear of Encumbrances is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtor's estate, its creditors and other parties in interest.

L.    **Arms-length Sale:** The consideration to be paid by the Agent under the Agency Agreement was negotiated at arm's-length and constitutes reasonably equivalent value and fair and adequate consideration for the right to serve as the Debtor's exclusive agent to conduct the Sale of the Assets and the other rights granted to the Agent by the Agency Agreement and this Order under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the laws of all applicable jurisdictions, including, without limitation, the United States, any state, territory, possession thereof or the District of Columbia.  The terms and conditions set forth in the Agency Agreement are fair and reasonable under these circumstances

and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying
or defrauding the Debtor or its creditors under any applicable laws.

**M.**     **Good Faith:**  Based upon the evidence presented at the Interim Sale Hearing and
the Sale Hearing, the Court finds that the Debtor, its management, its board of directors and its
employees, agents and representatives, and the Agent, its members and its officers, directors,
employees, agents and representatives, actively participated in the bidding process and acted in
good faith.  The Agency Agreement between the Agent and the Debtor was negotiated and
entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as
that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.  The Agent shall be
protected by sections 363(m) and 364(e) of the Bankruptcy Code if this Order is reversed,
modified, amended or vacated on appeal or by a subsequent order of this Court or any other
court..  The Debtor was free to deal with any other party interested in buying or selling on behalf
of the Debtor's estate some or all of the Assets.  Neither the Debtor nor the Agent has engaged in
any conduct that would cause or permit the Sale, the Agency Agreement, or any related action or
the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy
Code, or that would prevent the application of sections 363(m) or 364(e) of the Bankruptcy
Code.  The Agent has not violated section 363(n) of the Bankruptcy Code by any action or
inaction and the transactions approved by this Order are not subject to avoidance pursuant to
section 363(n) of the Bankruptcy Code.  Specifically, the Agent has not acted in a collusive
manner with any person nor was it controlled by any agreement among bidders.  The Agent's

prospective performance and payment of amounts owing under the Agency Agreement are in good faith and for valid business purposes and uses.

**N.**      **Insider Status:** The Agent is not an "insider" or "affiliate" of the Debtor as those terms are defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling stockholders exists between the Agent and the Debtor.

**O.**      **Security Interests:** The liens provided for in the Agency Agreement and this Order to secure the obligations of the Debtor under the Agency Agreement to the Agent are necessary to induce the Agent to agree to terms for the Agency Agreement that maximize value for the Debtor's estate. The absence of such protections would impact materially and adversely the value available to the Debtor in the liquidation of their stores in partnership with a liquidation agent. But for the protections afforded to the Agent under the Bankruptcy Code, this Order, and the Agency Agreement, the Agent would not have agreed to pay the Debtor the compensation provided for under the Agency Agreement. In addition, the Lender which holds a security interest in the property to which the Agent's security interests attach, has consented to the security interests provided for in the Agency Agreement, subject to the satisfaction of the conditions set forth in the Agency Agreement and in Paragraph [__] of this Order.

**P.**      **Corporate Authority:** Subject to the entry of this Order, the Debtor (i) has full corporate or other power to execute, deliver and perform its obligations under the Agency Agreement and all other transactions contemplated thereby (including without limitation reaching an agreement and resolution regarding the final reconciliation contemplated by the Agency Agreement), and entry into the Agency Agreement has been duly and validly authorized

by all necessary corporate or similar action, (ii) has all of the corporate or other power and

authority necessary to consummate the transactions contemplated by the Agency Agreement, and

(iii) has taken all actions necessary to authorize and approve the Agency Agreement and the

transactions contemplated thereby.  No consents or approvals, other than those expressly

provided for herein or in the Agency Agreement, are required for the Debtor to consummate such

transactions.

      **Q.**      **No Successor Liability:**  No sale, transfer or other disposition of the Assets or

Additional Agent Merchandise pursuant to the Agency Agreement or entry into the Agency

Agreement will subject the Agent to any liability for claims, obligations or Encumbrances

asserted against the Debtor or the Debtor's interests in such Assets by reason of such transfer

under any laws, including, without limitation, any bulk-transfer laws or any theory of successor

or transferee liability, antitrust, environmental, product line, de facto merger or substantial

continuity or similar theories.  The Agent is not a successor to the Debtor or its estate.

      **R.**      **No Sub Rosa Plan:**  Entry into and assumption of the Agency Agreement and the

transactions contemplated thereby neither impermissibly restructures the rights of the Debtor's

creditors, nor impermissibly dictates the terms of a liquidating plan of reorganization for the

Debtor.  Entry into and assumption of the Agency Agreement does not constitute a sub rosa

chapter 11 plan.

      **S.**      **Approval Order:**  This Order shall constitute the Approval Order as

contemplated by the Agency Agreement.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

A.     **Motion Granted, Objections Overruled**

1.     The relief requested in the Motion is granted as set forth herein.

2.     Any remaining objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections are overruled in all respects and denied.

B.     **Approval and Assumption of Agency Agreement**

3.     The Agency Agreement is approved and assumed by the Debtorpursuant to sections 105, 363 and 365 of the Bankruptcy Code.  The Debtor is hereby authorized to continue performance under and to make all payments required by the Agency Agreement as and when due thereunder,and empowered to continue to perform under the Agency Agreement, and the Agency Agreement (and each of the transactions contemplated therein (including without limitation, reaching an agreement and resolution regarding the final reconciliation contemplated by the Agency Agreement, which agreement and resolution shall be binding on all parties (including (without limitation) the Debtor, the Creditors' Committee, the Lender, any successor chapter 7 or chapter 11 trustee, and all other parties in interest) without further order of the Court)) is hereby approved in its entirety and is incorporated herein by reference.  The failure to include specifically any particular provision of the Agency Agreement in this Order shall not diminish or impair the effectiveness of such provisions and the provisions of this Order, it being the intent of the Court that, unless provided otherwise in this Order, the Agency Agreement and

all of its provisions, payments and transactions, be authorized and approved in their entirety.

Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

4.      The Debtor is authorized, pursuant to sections 105 and 363 of the Bankruptcy

Code and solely in accordance with the Agency Agreement, to retain the Agent to conduct the

Sale and to sell the Assets and the Additional Agent Merchandise in the manner contemplated by

the Agency Agreement.

5.      All amounts payable to the Agent under the Agency Agreement shall be payable

to the Agent without the need for any application of the Agent therefor or any further order of the

Court.

6.      Subject to the provisions of this Order, the Debtor and the Agent are hereby

authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the

Sale, consummate the sale of the Assets and the Additional Agent Merchandise and take all

actions reasonably related thereto or arising in connection therewith (including, without

limitation, promoting the sale as a "going out of business", "store closing", "sale on everything",

"everything must go", "inventory liquidation" or a similar themed sale), in each case in

accordance with the Agency Agreement and (a) the sale guidelines (the "GOB Sale Guidelines")

attached hereto as **Exhibit B**, which GOB Sale Guidelines are hereby approved in their entirety

or (b) as otherwise agreed in writing by the Agent and any landlord upon consultation with the

Debtor.

7.      Pursuant to section 363(b) of the Bankruptcy Code, and subject to the provisions

of this Order, the Debtor, the Agent, and each of their respective officers, employees and agents

13

are hereby authorized to execute such documents and to take any and all such actions as may be necessary or desirable to carry out the Sale, consummate the sale of the Assets and the Additional Agent Merchandise and effectuate or implement the Agency Agreement and each of the transactions and related actions contemplated or set forth therein (including, without limitation, the Sale of the Assets and the Additional Agent Merchandise). Scott Gladstone, the Debtor's President and Chief Executive Officer, is specifically authorized to act on behalf of the Debtor in connection with the Sale and the other transactions contemplated by the Agency Agreement and no other consents or approvals are necessary or required for the Debtor to carry out the Sale, consummate the sale of the Assets and the Additional Agent Merchandise and effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein.

**C.      Order Binding**

8.      This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets or the Additional Agent Merchandise.

9.       This Order and the terms and provisions of the Agency Agreement shall be

binding on all of the Debtor's creditors (whether known or unknown), the Debtor, the Agent, and

their respective affiliates, successors and assigns, and any affected third parties including, but not

limited to, all persons asserting an interest in the Assets or the Additional Agent Merchandise,

notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under

any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee,

party, entity or other fiduciary, such terms and provisions likewise shall be binding.  The

provisions of this Order and the terms and provisions of the Agency Agreement, and any actions

taken pursuant hereto or thereto shall survive the entry of any order which may be entered

confirming or consummating any plan(s) or reorganization or liquidation of the Debtor or

converting the Debtor's case from chapter 11 to chapter 7, and the terms and provisions of the

Agency Agreement, as well as the rights and interests granted pursuant to this Order and the

Agency Agreement, shall continue in these or any superseding cases and shall be binding upon

the Debtor, the Agent and their respective successors and permitted assigns, including any

trustee or other fiduciary hereafter appointed as a legal representative of the Debtor under

chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed in this case shall be and

hereby is authorized to operate the business of the Debtor to the fullest extent necessary to permit

compliance with the terms of this Order and the Agency Agreement, and the Agent and any such

trustee shall be and hereby are authorized to perform under the Agency Agreement upon the

appointment of the trustee without the need for further order of this Court.

**D.       Good Faith.**

10.     Entry into the Agency Agreement was undertaken by the parties thereto in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order is reversed, modified, amended or vacated on appeal or by a subsequent order of this Court or any other court.  The reversal, modification, amendment or vacatur on appeal or by a subsequent order of this Court or any other court of the authorization provided herein to continue the Sale pursuant to the Agency Agreement and consummate the transactions contemplated thereby shall not affect the validity of such transactions (including, without limitation, the Sale or the liens or priority authorized or created under the Agency Agreement or this Order), unless such authorization is duly stayed pending such appeal.  The Agent is entitled to all of the benefits and protections afforded by sections 363(m) and 364(e) of the Bankruptcy Code.  The transactions contemplated by the Agency Agreement are not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

**E.      Conduct of the Sale**

11.     Except as otherwise provided in the Agency Agreement or this Order, and subject to the terms thereof and hereof, pursuant to section 363(f) of the Bankruptcy Code, the Agent shall be authorized to sell the Assets and the Additional Agent Merchandise pursuant to the terms of the Agency Agreement, free and clear of any and all Encumbrances, including, without limitation, the liens and security interests, as the same may have been amended from time to time, of the Lender, whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which these chapter 11 cases were commenced, with any presently

16

existing Encumbrances encumbering all or any portion of the Assets, the Proceeds or any

proceeds of the foregoing attaching only to the Guaranteed Amount and, subject to Agent's liens

granted pursuant to the Agency Agreement and this Order, other amounts payable by the Agent

to the Debtor under the Agency Agreement, with the same validity, priority, force and effect as

the same had with respect to the assets at issue, subject to any and all defenses, claims and/or

counterclaims or setoffs that may exist.  For the sake of clarity, however, nothing in this

paragraph is intended to diminish the liens in favor of the Agent, as reflected in the Agency

Agreement and this Order, that attach to, among other things, the Proceeds of the Sale.

12.     If any person or entity that has filed financing statements, mortgages, construction

or mechanic's liens, lis pendens or other documents or agreement evidencing liens on or interests

in the Assets shall not have delivered to the Debtor, in proper form for filing and executed by the

appropriate parties, termination statements, instruments of satisfaction, or releases of any

Encumbrances which the person or entity has with respect to the Assets, each such person or

entity is hereby directed to deliver all such statements, instruments and releases and the Debtor

and the Agent are hereby authorized to execute and file such statements, instruments, releases

and other documents on behalf of the person or entity asserting the same and the Agent is

authorized to file a copy of this Order which, upon filing, shall be conclusive evidence of the

release and termination of such interest.  Each and every federal, state and local governmental

unit is hereby directed to accept any and all documents and instruments necessary or appropriate

to give effect to the Sale and related transactions.

13.     All entities that are presently in possession of some or all of the Assets in which the Debtor holds an interest that are or may be subject to the Agency Agreement hereby are directed to surrender possession of such Assets to the Agent.

14.     During the Sale Term, Agent shall be granted a limited royalty free license and right to use the trademarks, trade names, logos, customer lists, websites, URL, social media, mailing lists and email lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agency Agreement.

15.     Unless otherwise ordered by the Court, all newspapers and other advertising media in which the Sale may be advertised and all landlords are directed to accept this Order as binding authority so as to authorize the Debtor and the Agent to conduct the sale of the Assets and the Additional Agent Merchandise pursuant to the Agency Agreement and to consummate the transactions contemplated therein, including, without limitation, to conduct and advertise the Sale in the manner contemplated by the Agency Agreement, including, without limitation, conducting and advertising of the Sale (at the contractual rates charged to the Debtor prior to the Petition Date) in accordance with the Agency Agreement, the GOB Sale Guidelines, and this Order.  Agent shall be authorized to include Additional Agent Merchandise in the Sale.

16.     Any amounts owed by the Debtor to Agent under the Agency Agreement shall be granted the status of superpriority claims pursuant to section 364(c) of Bankruptcy Code senior to all other superpriority claims, including, without limitation to the superpriority claims of the Lender; provided that until the Debtor receives payment in full of the Guaranteed Amount and

18

any other amounts due to the Debtor under the Agency Agreement and Agent delivers the Letter of Credit, any superpriority claim granted to Agent shall be junior and subordinate in all respects to the claims of the Lender but solely to the extent of the amount of the unpaid portion of the Guaranteed Amount, Expenses, and such other amounts due to the Debtor under the Agency Agreement.

17.    Nothing in this Order or the Agency Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or in the Agency Agreement shall in any way diminish the obligations of the Debtor to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code.  Nothing herein shall be construed to be a determination that the Agent is an operator with respect to any environmental law or regulation.  Moreover, the sale of the Assets shall not be exempt from, and the Agent shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "Applicable General Laws").  Nothing in this Order or the Agency Agreement shall alter or affect the Debtor's and Agent's obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Order shall be deemed to bar any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code)

19

from enforcing Applicable General Laws in the applicable non-bankruptcy forum, subject to the

Debtor's or the Agent's right to assert in that forum or before this Court that any such laws are

not in fact Applicable General Laws or that such enforcement is impermissible under the

Bankruptcy Code, this Order, or otherwise, pursuant to Paragraph [__] hereunder.

Notwithstanding any other provision in this Order, no party waives any rights to argue any

position with respect to whether the conduct was in compliance with this Order and/or any

applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.

Nothing in this Order shall be deemed to have made any rulings on any such issues.

18.      <u>Disputes between Government Units and the Debtor or the Agent</u>.  To the extent

that the Sale is subject to any federal, state or local statute, ordinance, or rule, or licensing

requirement that is not an Applicable General Law, but instead is directed at regulating "going

out of business," "store closing," "sale on everything," "everything must go," "inventory

liquidation" or similar inventory liquidation sales, or bulk sale laws (each a "<u>GOB Law</u>," and

together, the "<u>GOB Laws</u>"),  with GOB Laws restricting safe, professional and non-deceptive,

customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely

in connection with the Sale and including ordinances establishing license or permit requirements,

waiting periods, time limits or bulk sale restrictions that would otherwise apply to the Sale

hereinafter referred to collectively, as "<u>Liquidation Laws</u>", the following provisions shall apply:

a.      Provided that the Sale is conducted in accordance with the terms of

this Order, the Agency Agreement and the GOB Sale Guidelines, and in light of the provisions in

the laws of many Governmental Units that exempt court-ordered sales from their provisions, the

Debtor shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and,

subject to Paragraphs [_____] of this Order, are authorized to take such actions as may be

necessary and appropriate to implement the Agency Agreement, to conduct the Sale and to

advertise, post signs and banners and otherwise promote the Sale as a "going out of business,"

"store closing," "sale on everything," "everything must go," or similarly themed sale (including,

without limitation, by means of media advertising, interior and exterior banners, A-frames, and

similar signage and the use of sign walkers and street signage) without further consent of any

person, in each case in accordance with the terms of this Order, the Agency Agreement, the GOB

Sale Guidelines or as otherwise agreed in writing by the Agent and any landlord without the

necessity of further showing compliance with any such GOB Laws and Liquidation Laws.

   b.  Within three (3) business days of entry of this Order, the Debtor

shall serve copies of this Order, the Agency Agreement and the Sale Guidelines via e-mail,

facsimile or regular mail, on: (i) the Attorney General's office for each state where the Sale will

be held, (ii) the county consumer protection agency or similar agency for each county where the

Sale will be held, and (iii) the division of consumer protection for each state where the Sale will

be held.

   c.  To the extent there is a dispute arising from or relating to the Sale,

this Order, the Agency Agreement, or the GOB Sale Guidelines, which dispute relates to any

GOB Laws or Liquidation Laws (a "Reserved Dispute"), the Court shall retain exclusive

jurisdiction to resolve the Reserved Dispute. Any time within fifteen (15) days following service

of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving

written notice of such Reserved Dispute to counsel for the Debtor and counsel for the Agent at

the addresses set forth in the Agency Agreement so as to ensure delivery thereof within one (1)

business day thereafter.  If the Debtor, the Agent and the Governmental Unit are unable to

resolve the Reserved Dispute within fifteen (15) days of service of the notice, the aggrieved party

may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a

"Dispute Resolution Motion").

        d.      In the event a Dispute Resolution Motion is filed, nothing in this

Order shall preclude the Debtor, the Agent or other interested party from asserting (i) that the

provisions of any GOB Laws and/or Liquidation Laws are preempted by the Bankruptcy Code or

(ii) that neither the terms of this Order, nor the Debtor or the Agent's conduct pursuant to this

Order, violates such GOB Laws and/or Liquidation Laws.  Filing a Dispute Resolution Motion as

set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with

the Debtor's or the Agent's ability to conduct or to continue to conduct the Sale pursuant to this

Order and the Agency Agreement, absent further order of this Court.  The Governmental Unit

shall be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with

respect to the requirements of its Liquidation Laws or the lack of any preemption of such GOB

Laws and/or Liquidation Laws by the Bankruptcy Code.  Nothing in this Order shall constitute a

ruling with respect to any issues to be raised in any Dispute Resolution Motion.

        e.      If, at any time, a dispute arises between the Debtor and/or the

Agent and a Governmental Unit as to whether a particular law is a GOB Law and/or Liquidation

Law, and subject to any provisions contained in this Order related to GOB Laws and/or

22

Liquidation Laws, then any party to that dispute may utilize the provisions of Subparagraphs (b)

through (d) hereunder by serving a notice to the other party and proceeding thereunder in

accordance with those Paragraphs.  Any determination with respect to whether a particular law is

a GOB Law and/or Liquidation Law shall be made de novo.

19.    Notwithstanding anything herein to the contrary, and in view of the importance of

the use of sign-walkers, banners, and other advertising to the Sale, to the extent that disputes

arise during the course of the Sale regarding laws regulating the use of sign-walkers and banner

advertising and the Debtor and the Agent are unable to resolve the matter consensually with the

Governmental Unit, any party may request an immediate telephonic hearing with this Court

pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially

within two (2) business days of such request.  This scheduling shall not be deemed to preclude

additional hearings for the presentation of evidence or arguments as necessary.

20.    To the extent that the Debtor is subject to any state "fast pay" laws in connection

with the Sale, then the Debtor shall be presumed to be in compliance with such laws to the

extent, in applicable states, such payroll payments are made by the later of (a) the Debtor's next

regularly scheduled payroll and (b) seven (7) calendar days following the termination date of the

relevant employee.

21.    Except as expressly provided in the Agency Agreement, the sale of the Assets and

the Additional Agent Merchandise shall be conducted by the Debtor and the Agent

notwithstanding any restrictive provision of any lease, sublease or other agreement relative to

occupancy affecting or purporting to restrict the conduct of the Sale, the rejection of leases,

23

abandonment of assets or "going dark" or similar provisions.  The Agent and landlords of the

Stores in consultation with the Debtor are authorized to enter into separate agreements and/or

side letters ("Side Letters") between themselves modifying the GOB Sale Guidelines without

further order of the Court, and such Side Letters shall be binding as among the Agent and any

such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs

[_____] (provided that in no event shall such Side Letters impose additional costs, expense or

liability upon the Debtor without the prior written consent of the Debtor).  In the event of any

conflict between the GOB Sale Guidelines and any Side Letter, the terms of such Side Letter

shall control.  In the event of a dispute regarding the Guidelines or any Side Letter, counsel for

the Debtor, the applicable landlord, and the Agent shall meet and confer to resolve the dispute.

In the event that the parties are unable to resolve the dispute, any party seeking relief may

request a prompt hearing before the Court to resolve such dispute.

22.    Except as expressly provided for herein or in the GOB Sale Guidelines, and

except with respect to any Governmental Unit (as to which Paragraphs [_____] shall apply), no

person or entity, including but not limited to any utility company, Internet service provider,

website service or hosting provider, landlord, licensor, creditor or other interested party or any

person acting for or on behalf of the foregoing shall take any action to directly or indirectly

prevent, interfere with, impede or otherwise hinder consummation of the Sale or the other

transactions contemplated by the Agency Agreement, or the advertising and promotion

(including the posting of signs and exterior banners or the use of signwalkers) of such Sale or the

other transactions contemplated by the Agency Agreement, and all such parties and persons of

every nature and description, including landlords, licensors, creditors, utility companies, Internet

service providers, website service or hosting providers and other interested parties and all those

acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way

with, or otherwise impeding, the conduct or advertising and promotion (including the posting of

signs and exterior banners or the use of sign-walkers) of the Sale and the other transactions

contemplated by the Agency Agreement and/or (ii) instituting any action or proceeding in any

court or administrative body seeking an order or judgment against, among others, the Debtor, the

Agent, or the landlords at the Stores and Distribution Centers that might in any way directly or

indirectly impede, obstruct or otherwise interfere with or adversely affect the conduct or

advertising and promotion (including the posting of signs and exterior banners or the use of sign-

walkers) of the Sale and the other transactions contemplated by the Agency Agreement or other

liquidation sales at the Stores and Distribution Centers and/or seek to recover damages for

breach(es) of covenants or provisions in any lease, sublease or license based upon any relief

authorized herein.

23.     The Agent shall have the right to use the Stores and the Distribution Centers and

all related services, furniture, fixtures, equipment and other assets of the Debtor for the purpose

of conducting the Sale, free of any interference from any entity or person, subject to compliance

with the GOB Sale Guidelines, this Order and any Side Letters.

24.     The Agent shall be permitted to include in the Sale Additional Agent Merchandise

in accordance with the terms and provisions of the Agency Agreement.  Any transactions

relating to the Additional Agent Merchandise are, shall be construed as, and are acknowledged

by the Debtor to be a true consignment from Agent to the Debtor under Article 9 of the Uniform

Commercial Code in effect in the State of New York (the "UCC").  Agent is hereby granted a

first priority security interest in (i) the Additional Agent Merchandise and (ii) the Additional

Agent Merchandise proceeds, which security interest shall be deemed perfected pursuant to this

Order without the requirement of filing UCC financing statements or providing notifications to

any prior secured parties (provided that Agent is hereby authorized to deliver any notices and file

any financing statements and amendments thereof under the applicable UCC identifying Agent's

interest in the Additional Agent Merchandise (and any proceeds from the sale thereof) as

consigned goods thereunder and the Debtor as the consignee therefor, and Agent's security

interest in such Additional Agent Merchandise and Additional Agent Merchandise proceeds).

     25.    During the Sale Term applicable to any Store or Distribution Center and for

purposes of conducting the Sale at such Store or Distribution Center, Agent shall have the right

to the unencumbered use and occupancy of, and peaceful and quiet possession of, such Store or

Distribution Center and the assets currently located at such Store or Distribution Center, in each

case subject to the extent of Debtor's rights and entitlement to use the same, and the services

provided at such Store or Distribution Center to the extent the Debtor is entitled to such services;

and the Debtor shall not assign, reject or otherwise terminate any lease relating to any such Store

or Distribution Center, or vacate any such Store or Distribution Center, where such assignment,

rejection, termination or vacatur, would have an effective date prior to the applicable Sale

Termination Date or Vacate Date (or with respect to a Distribution Center, date of cessation of

Agent's use) for such Store or Distribution Center.

26

26.     To the extent Agent is owed any amounts in respect of overfunding in respect of

the Guaranteed Amount (including, without limitation, the Adjustment Amount), the Debtor is

unable to or otherwise for any reason fails to reimburse such amount and the Lender have

received such amount, the Lender shall, within two (2) business days after written request by

Agent disgorge and remit to Agent the portion, if any, of such amount that is undisputed or that

has been determined to be owing to Agent by the Court.

27.     Nothing in the Agency Agreement or this Order shall (a) alter or affect the

Debtor's obligations to comply with section 365(d)(3) of the Bankruptcy Code or (b) alter or

modify the rights of any lessor or other counterparty to a lease with the Debtor to file an

appropriate motion or otherwise seek appropriate relief if the Debtor fails to comply with section

365(d)(3) of the Bankruptcy Code; provided that the conduct of the Sale in accordance with the

Sale Guidelines shall not be a violation of section 365(d)(3) of the Bankruptcy Code.

28.     Pursuant to section 554(a) of the Bankruptcy Code, the Debtor and the Agent, as

applicable, are permitted to abandon property of the Debtor's estates (including, without

limitation, Merchant Consignment Goods and Owned FF&E) in accordance with the terms and

provisions of the Agency Agreement, without the Debtor or the Agent incurring liability to any

person or entity; *provided, however*, that, unless the Agent otherwise consents, the Debtor may

only abandon property located in any Store or Distribution Center on or after the applicable

Vacate Date (or, with respect to a Distribution Center, the date of Agent's cessation of use of

such Distribution Center).  In the event of any such abandonment, all applicable landlords shall

be authorized to dispose of such property without any liability to any individual or entity that

may claim an interest in such abandoned property, and such abandonment shall be without prejudice to any landlord's right to assert any claim based on such abandonment and without prejudice to the Debtor or other party in interest to object thereto.

29.     Agent shall accept the Debtor's gift cards and honor merchandise credits or similar Debtor-issued credit amounts issued prior to the Sale Commencement Date in accordance with Section 8.6 of the Agency Agreement, and the Debtor shall reimburse Agent for such amounts during the weekly sale reconciliation provided for and subject to the limitations set forth in Sections 8.6 and 8.7 of the Agency Agreement.

30.     Agent shall accept returns of merchandise sold by the Debtor prior to the Sale Commencement Date pursuant to the provisions of Section 8.5 of the Agency Agreement, provided that such return is otherwise in compliance with the Debtor's return policies in effect as of the date such item was purchased, and the Debtor shall reimburse Agent for such amounts during the weekly sale reconciliation provided for and subject to the limitations set forth in Section 8.7 of the Agency Agreement.

31.     All state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales." The Debtor and/or the Agent shall accept return of any goods purchased during the Sale that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within twenty-one (21) days of their purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.  Subject to the terms of the

28

Agency Agreement, during the Sale Period, the Debtor shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any goods purchased during the Sale that contain such a latent defect.

32.    Except as expressly provided for in the Agency Agreement, nothing in this Order or the Agency Agreement, and none of the Agent's actions taken in respect of the Sale, the sale of the Assets and the Additional Agent Merchandise or the other transactions contemplated by the Agency Agreement shall be deemed to constitute an assumption by the Agent of any of the Debtor's obligations relating to any of the Debtor's employees.  Moreover, the Agent shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

33.    The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the collection, reporting and payment of any and all sales taxes is the legal responsibility of the Debtor.  Subject to the terms of the Agency Agreement, the Debtor is directed to remit all taxes arising from the Sale to the applicable Taxing Authorities as and when due, provided that in the case of a bona fide dispute the Debtor is only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the Taxing Authority.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtor shall not be used to pay any creditor or any other party, other than the Taxing Authority for which the sales taxes are collected.  The Agent shall collect, remit to the Debtor, and account for sales taxes as and to the extent provided in the Agency Agreement.  This Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law, and does

29

not constitute a declaratory judgment with respect to any party's liability for taxes under State law.

34.    Subject to the terms set forth in the Agency Agreement, the Debtor and/or the Agent (as the case may be) are authorized and empowered to transfer the Assets and the Additional Agent Merchandise among the Stores and the Distribution Centers.  The Agent is authorized to sell the Debtor's owned furniture, fixtures and equipment and abandon the same, in each case, as provided for and in accordance with the terms of the Agency Agreement.

**F.    Other Rights of Agent**

35.    Pursuant to Section 364(d) of the Bankruptcy Code, the Agent shall have, effective upon payment by the Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to the Lender Representative, a valid, duly perfected first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon:  (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 of the Agency Agreement; (v) the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E; (vi) Agent's percentage share of Proceeds in excess of the Sharing Threshold, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of the Debtor to the Agent under the Agency Agreement.  For the avoidance of doubt, the Agent Collateral shall not include the Guaranteed

30

Amount, or any other amount payable by the Agent to the Debtors under the Agency Agreement or any proceeds thereof.  Upon entry of this Order, payment of the Initial Guaranty Payment and delivery of the Letter of Credit to the Lender Representative, the security interest granted to the Agent pursuant to the Agency Agreement and hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.  Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Lender and the Debtor), the Agent's security interests and liens in the Agent Collateral created under the Agency Agreement and hereunder are (i) validly created, (ii) perfected, and (iii) senior to all other liens and security interests, provided, however, that (x) until the Debtor receives payment in full of the Guaranteed Amount, the Expenses, and such other amounts due to the Debtor hereunder, the security interest granted to Agent under the Agency Agreement and hereunder shall be junior and subordinate in all respects to the security interests of the Lender (including without limitation any pre-petition or post-petition liens granted to Lender securing the Existing Credit Facility or any DIP Facility and adequate protection liens in favor of Lender) in the Agent Collateral, but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, the Expenses, and such other amounts due to the Debtor under the Agency Agreement, and (y) upon payment in full of the Guaranteed Amount, the Expenses, and such other amounts due to the Debtors under the Agency Agreement, any security interest or lien of the Lender in the Agent Collateral (including without limitation any pre-petition or post-petition liens granted to Lender securing the Existing Credit Facility or any DIP Facility and adequate protection liens in favor of Lender) and the carve out for professionals in the

31

Bankruptcy Case, shall each be junior and subordinate in all respects to the security interest and

liens of the Agent in the Agent Collateral.  The Debtor shall cooperate with the Agent with

respect to all filings (including, without limitation, UCC-1 financing statements) and other

actions to the extent reasonably requested by the Agent in connection with the security interests

and liens granted under the Agency Agreement. The Debtor will not sell, grant, assign or transfer

any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other

than in favor of the Agent and the Lender.  In the event of a Default by the Debtor hereunder, in

any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in

addition to all other rights and remedies, the rights and remedies of a secured party under the

UCC.

36.      The Debtor are authorized to execute such documents and take all other actions as

may be necessary to release any Encumbrances of any kind against the Assets as such

Encumbrances may have been recorded or may otherwise exist, in accordance with the terms of

this Order. Any Encumbrances of any kind asserted under laws, rules, regulations or

governmental or court orders imposing a stamp, transfer tax or similar tax arising from the

transfer of the Assets to the Agent shall be filed against the Debtor's estate and shall not be

asserted against the Agent.  The Agent has not assumed or otherwise become obligated, liable or

responsible for any Encumbrances against the Debtor, regardless of whether any such

Encumbrance is contingent or not, arises at law or in equity or otherwise, is existing on the date

hereof or arises thereafter, and relates to or arises out of the Debtor's business, the Assets, any

excluded assets or otherwise (including, without limitation, any Encumbrances (x) based on any

successor or transferee liability theory or (y) relating to the pre-petition or post-petition operation

of the Debtor's business, the Assets or the use of the Assets). In particular, the Agent (A) shall

have no successor liability whatsoever with respect to any Encumbrances of any nature that may

exist against the Debtor (or any predecessor or affiliate of the Debtor), (B) shall not be, or be

deemed to be, (i) a successor-in-interest or within the meaning of any law, rule, regulation or

theory, including any revenue, pension, labor, ERISA, bulk transfer, products liability, tax,

environmental, antitrust, product line, de facto merger, substantial continuity, successor or

transferee liability or similar law, rule regulation or theory or (ii) a joint employer, co-employer

or successor employer with the Debtor, (C) shall have no obligations to pay the Debtor's wages,

bonuses, commissions, severance pay, vacation pay, continuation of coverage under COBRA,

claims arising out of employment and termination of employment, WARN Act claims (if any),

pension, welfare, retiree medical coverage, fringe benefits or any other benefits or payments of

any kind to employees of the Debtor, including pursuant to any collective bargaining agreement,

employee pension plan, or otherwise and (D) shall have no liability under fast pay laws with

respect to any employees of the Debtor. Pursuant to sections 105(a) and 363 of the Bankruptcy

Code, and unless otherwise explicitly provided for in this Order or the Agency Agreement, all

persons, Governmental Units (as defined in sections 101(27) and 101(41) of the Bankruptcy

Code and including their administrative agencies, departments, and officials (including officials

maintaining any authority relating to environmental, labor or health and safety laws)) and other

entities (including (I) all parties holding any Encumbrances against the Debtor, its estate or its

assets and (II) the Debtor's employees and former employees) are hereby enjoined from taking

any action (including (a) asserting or prosecuting any Encumbrance or commencing or

continuing in any manner any action or other proceeding of any kind) that seeks to impose

liability or any other Encumbrance upon (or collect, offset or recover against) the Agent, any

affiliate, successor or assign thereof, or the Assets or the Additional Agent Merchandise by

reason of Agent's retention pursuant to the Agency Agreement and this Order or the Agent's

disposition of the Assets and/or the Additional Agent Merchandise pursuant to the Agency

Agreement and this Order, for any Encumbrance of any kind that may be asserted against the

Debtor, the Debtor's business, the Assets, any excluded assets or otherwise (as such

Encumbrances exist immediately prior to the closing), including the Encumbrances described in

the preceding sentences of this Paragraph [__].

37.    The provisions of this Order shall be self-executing, and neither the Debtor nor

the Agent shall be required to execute or file releases, termination statements, assignments,

consents, or other instruments in order to effectuate, consummate and implement the provisions

of this Order.  However, the Debtor and the Agent and each of their respective officers,

employees and agents are hereby authorized and empowered to take all actions and execute and

deliver any and all documents and instruments that either the Debtor or the Agent deem

necessary or appropriate to implement and effectuate the terms of the Agency Agreement and

this Order.

38.    The Agent shall not be obligated to (i) continue or maintain in effect, or assume

any liability in respect of any employee pension, welfare, fringe benefit or any other benefit plan,

trust arrangement or other agreement to which the Debtor is a party or has any responsibility

34

therefor, including, without limitation, medical, welfare and pension benefits payable after

retirement or other termination of employment, or (ii) assume any responsibility as a fiduciary,

plan sponsor or otherwise, for making any contribution to, or in respect of the funding,

investment or administration of any employee pension plan or the termination of any such plan;

provided however that nothing in this Paragraph [__] shall abrogate any of the Agent's

obligations to pay any Expenses in accordance with the terms of the Agency Agreement.

**G.    Other Provisions**

39.    The Agent shall not be liable for any claims against the Debtor, and the Debtor

shall not be liable for any claims against Agent, in each case, other than as expressly provided

for in the Agency Agreement.  The Agent shall have no successor liability whatsoever with

respect to any Encumbrances or claims of any nature that may exist against the Debtor, except as

expressly set forth in the Agency Agreement.

40.    The Agent is a party in interest and Agent shall be entitled to be heard on all

issues in the Bankruptcy Case related to the Agency Agreement or the transactions contemplated

thereby.

41.    Nothing contained in any plan confirmed in the Debtors' chapter 11 cases or any

order of this Court confirming such plan or in any other order in this chapter 11 cases (including

any order entered after any conversion of this case to a case under chapter 7 of the Bankruptcy

Code) shall alter, conflict with, or derogate from, the provisions of the Agency Agreement or the

terms of this Order.

35

42.    The Agency Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court, but such changes may not affect the provisions applicable to Governmental Units in paragraph [_____] of this Order.

43.    Except with respect to any Governmental Unit (as to which the provisions of Paragraphs [_____] of this Order shall apply) this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Order or the Agency Agreement, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtor, the landlords and/or the Agent for protection from interference with the Sale or the other transactions contemplated by the Agency Agreement, (iii) any other disputes related to the Sale or the other transactions contemplated by the Agency Agreement or the enforcement of the Agency Agreement , and (iv) to protect the Debtor and/or the Agent against any assertions of Encumbrances.  No such parties or person shall take any action against the Debtor, the Agent, the landlords at the Stores or the Sale or the other transactions contemplated by the Agency Agreement until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

44.    Notwithstanding Bankruptcy Rules 4001 and 6004, or any other law that would serve to stay or limit the immediate effect of this Order, this Order shall be effective and

enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtor and the Agent are free to perform under the Agency Agreement at any time, subject to the terms of the Agency Agreement.  For the avoidance of doubt, the Debtor are not subject to any stay in the implementation of the transactions contemplated by the Agency Agreement.

45.     Any and all bulk sale laws, to the extent applicable, are hereby waived since creditors are protected by the notice provided by the Sale Motion and the jurisdiction of the Court.

46.     This Order constitutes an authorization of the conduct of the Sale and the Debtor's and the Agent's conduct in connection herewith.

47.     To the extent that anything contained in this Order explicitly conflicts with a provision in the Agency Agreement or the GOB Sale Guidelines, this Order shall govern and control.

48.     In the event Merchant or Lender notifies Agent of its intention to draw on the Letter of Credit, Agent shall be entitled to an emergency hearing by this Court sufficient to determine whether such draw is permitted under the terms of the Agency Agreement prior to the occurrence of such draw.

49.     The Agent and the other Agent Indemnified Parties shall be indemnified and held harmless in accordance with the terms of the Agency Agreement.

Dated:  June ___, 2015

_____
Honorable [_____]

37

_____
United States Bankruptcy Judge

**EXHIBIT "C"**

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is entered into as of this 10th day of June, 2015, by and between and ANNA'S LINENS, INC., a Delaware corporation with a principal place of business at 3550 Hyland Avenue, Costa Mesa, CA 92662 (collectively, the "Merchant") and a joint venture comprising HILCO MERCHANT RESOURCES, LLC and GORDON BROTHERS RETAIL PARTNERS, LLC (collectively, the "Agent", and collectively with Merchant, the "Parties").

## RECITALS

WHEREAS, Merchant operates certain retail store locations in the United States and desires that Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's retail store location(s) identified on Exhibit A-1 attached hereto (each individually a "Store", and collectively  the "Stores") and the Merchant's third party logistic distribution centers identified on Exhibit A-2 attached hereto (each individually a "Distribution Center" and collectively, the "Distribution Centers") through the Stores, and subject to the exercise the E-Commerce Platform Election provided for in Section 8.10 below, through the Merchant's E-Commerce Platform (as defined below), and (b) selling all of the Owned FF&E (as hereinafter defined) located in the Stores and, subject to Merchant's election set forth in Section 15 hereof, the Distribution Centers and Merchant's corporate offices, by means of a "going out of business", "store closing", "sale on everything", "everything must go", "inventory liquidation" or similarly themed sale (in each case as further described below, the "Sale").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Definitions and Exhibits

1.1    Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Additional Agent Merchandise | Section 8.9 |
| Additional Taxes and Penalties | Section 8.3(a) |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(b) (ii) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent's Fee | Section 3.1(b) |
| Agent Claim | Section 12.5 |
| Agent Collateral | Section 16.11(a) |
| Agent Indemnified Parties | Section 8.3(a) |

Agreement                                   Preamble
Applicable General Laws                     Section 2(c)
Approval Order                              Section 2(b)
Bankruptcy Code                             Section 2(b)
Bankruptcy Court                            Section 2(b)
Benefits Cap                                Section 4.1(c)
Bid Protections                             Section 16.12(b)
Bidding Procedures Order                    Section 10.1(b)
Break-Up Fee                                Section 16.12(b)
Central Services                            Section 4.1
Stores                                      Preamble
Committee                                   Section 3.1
Competing Bid                               Section 16.12(a)
Cost Factor                                 Section 3.1(d)
Cost Factor Threshold                       Section 3.1(d)
Cost File                                   Section 5.3(a)
Cost Value                                  Section 5.3(a)
Defective Merchandise                       Section 5.2(b)
Designated Deposit Accounts                 Section 3.3(b)(i)
Distribution Center                         Recitals
Distribution Center Merchandise             Section 5.2(b)
Distribution Center Services                Section 4.1
E-Commerce Expense Reimbursement            Section 8.10
E-Commerce Platform                         Section 8.10
Estimated Guaranteed Amount                 Section 3.3(a)
Events of Default                           Section 14
Excluded Benefits                           Section 4.1
Excluded Defective Merchandise              Section 5.2(b)
Excluded Pricing Adjustments                Section 3.1(c)(ii)
Existing Vendors                            Section 8.9(a)
Expenses                                    Section 4.1
Expense Reimbursement                       Section 16.12(b)
Final Inventory Report                      Section 3.3(a)
Final Reconciliation                        Section 8.7(b)(i)
Final Reconciliation Settlement Date        Section 8.7(b)(i)
Force Majeure Event                         Section 8.8
Gross Rings                                 Section 5.3(b)(iii)
Gross Rings Period                          Section 5.3(b)(iii)
Guaranteed Amount                           Section 3.1
Guaranty Percentage                         Section 3.1
Hazardous Materials                         Section 15(d)
In-Transit Merchandise                      Section 5.2(b)
In-Transit Receipt Deadline                 Section 5.2(b)
Interim Guaranty Installments               Section 3.3(a)
Initial Guaranty Payment                    Section 3.3(a)
Interim Sale Period                         Section 2(c)

Interim Sale Period Expenses          Section 3.3(a)
Interim Sale Proceeds                 Section 3.3(a)
Inventory Date                        Section 5.1
Inventory Reconciliation Date         Section 3.3(a)
Inventory Taking                      Section 5.1
Inventory Taking Instructions         Section 5.1
Inventory Taking Service              Section 5.1
Lender                                Section 3.3(f)
Letter of Credit                      Section 3.3(g)
Liquidation Sale Laws                 Section 2(b)(v)
Lowest Location Price                 Section 3.1(c)(i)
Membership Program Discount           Section 8.6(b)
Merchandise                           Section 5.2(a)
Merchandise Receipt Deadline          Section 5.2(a)
Merchandise Ceiling                   Section 3.1(c)
Merchandise Threshold                 Section 3.1(c)
Merchant                              Preamble
Merchant's Designated Account         Section 3.3(a)
Merchant Consignment Goods            Section 5.4
Merchant Indemnified Parties          Section 8.3(a)
Non-CAM Trash Removal Charges         Section 4.1
Occupancy Expenses                    Section 4.1(a)
Owned FF&E                            Section 15(a)
Parties                               Preamble
Payment Date                          Section 3.3(a)
POS                                   Section 3.1(c)(i)
Per Store Lowest Price                Section 5.3(a)
Prevailing Discount Adjustment        Section 5.3(b)(iii)
Proceeds                              Section 3.3(b)
Remaining Merchandise                 Section 3.2
Retail Price                          Section 5.3(a)(ii)
Retained Employee                     Section 9.1
Retention Bonus                       Section 9.4
Returned Merchandise                  Section 8.5
Sale                                  Recitals
Sale Commencement Date                Section 6.1
Sale Guidelines                       Section 8.1(h)
Sale Term                             Section 6.1
Sale Termination Date                 Section 6.1
Sales Taxes                           Section 8.3(a)
Sales Tax Account                     Section 8.3(a)
Sharing Amount                        Section 3.1(b)
Sharing Threshold                     Section 3.1(b)
Shipping Variance                     Section 5.1(e)
Shipping Variance Response            Section 5.1(e)
Signage Costs                         Section 16.11(a)

3

| Store(s) | Recitals |
| Third Party | Section 4.1 |
| Third Party Vendors | Section 8.9(a) |
| UCC | Section 8.9(c) |
| Unapplied Interim Sale Proceeds | Section 3.3(a) |
| Vacate Date | Section 6.2 |
| WARN Act | Section 9.1 |

1.2    <u>Exhibits</u>.  The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section Reference | Description |
|---|---|---|
| Exhibit A-1 | Recitals | Stores |
| Exhibit A-2 | Recitals | Distribution Centers |
| Exhibit 3.1(c) | Section 3.1(c) | Merchandise Threshold Adjustment |
| Exhibit 3.1(d) | Section 3.1(d) | Cost Factor Adjustment |
| Exhibit 3.3(a) | Section 3.3(a) | Merchant's Designated Account |
| Exhibit 3.3(h) | Section 3.3(h) | Form of Letter of Credit |
| Exhibit 4.1(a) | Section 4.1(a) | Store Occupancy Expense Schedule |
| Exhibit 5.1(a) | Section 5.1 | Inventory Taking Instructions |
| Exhibit 5.2(b)(1) | Section 5.2(b)(1) | Distribution Center Merchandise |
| Exhibit 5.2(b)(2) | Section 5.2(b)(1) | E-Commerce Merchandise |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 10.1(c) | Section 10.1(c) | Form of Approval Order |
| Exhibit 11.1(d) | Section 11.1(c) | Pre-Existing Liens |
| Exhibit 11.1 (k) | Section 11.1(k) | Merchant's Promotions Since April 1, 2015 |
| Exhibit 11.1(l) | Section 11.1(l) | Pending Matters |
| Exhibit 11.1 (o) | Section 11.1(o) | Extraordinary POS Activity |
| Exhibit 11.1(q) | Section 11.1(q) | Store Leases Expiring During Sale Term |

<u>Section 2</u>.    <u>Appointment of Agent/Liquidation Sale Laws/Approval Order</u>

(a)    <u>Appointment of Agent</u>.  Effective on the date hereof, but subject to the terms hereof and the entry of the Approval Order, Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of Merchant's Owned FF&E at the Stores, the Distribution Centers, and the corporate offices, in accordance with the terms and conditions of this Agreement.

(b)    <u>Potential Bankruptcy/Approval Order</u>. Merchant intends to seek protection under Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") by commencing a Chapter 11 case in either the United States Bankruptcy Court for the District of Delaware or the United States Bankruptcy Court for the Central District of California (such court, the "<u>Bankruptcy Court</u>"). Contemporaneously with the filing of any such voluntary petition, Merchant shall file a motion

4

(the "Expedited Assumption Motion") with the Bankruptcy Court seeking entry of (1) an order on an expedited basis authorizing and approving the assumption of this Agreement pursuant to section 365 of the Bankruptcy Code and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof (the "Approval Order"); and (2) an interim order authorizing Merchant to continue to conduct the Sale pursuant to the terms of this Agreement (including, without limitation, by reimbursing Agent, from the Proceeds of the Sale, for Expenses incurred by Agent) and to promote the Sale as a "going out of business", "store closing", "sale on everything", "everything must go", "inventory liquidation" or similarly themed sale pending the hearing on the Expedited Assumption Motion (the "Interim Approval Order"). In the event an involuntary petition is filed against Merchant prior to Merchant filing a voluntary petition, no later than two (2) business days after the filing of such involuntary petition, Merchant shall (x) exercise its right under the Bankruptcy Code to convert such filing to one under Chapter 11 of the Bankruptcy Code (to the extent such involuntary petition was filed under Chapter 7 of the Bankruptcy Code) and consent to entry of an order for relief under Chapter 11 of the Bankruptcy Code and (y) file the Expedited Assumption Motion.

(c)    During the period between the Sale Commencement Date and the entry of the Interim Approval Order (the "Pre-Order Sale Period"), the Agent shall be authorized to conduct the Sale as a "going out of business" and/or "store closing", "sale on everything", "everything must go", "inventory liquidation" or similarly themed sale, in accordance with the terms of this Agreement, the Sale Guidelines, and in compliance with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), including all Liquidation Sales Laws, and the terms of the non-residential real property leases for the Stores (collectively, the "Store Leases"). For the purposes of this Agreement (and the Interim Approval Order and the Approval Order), "Liquidation Sales Laws" includes the applicable laws, rules and regulations in respect of "going out of business", "store closing", "sale on everything", "everything must go", "inventory liquidation" or similarly themed sales (including, without limitation, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, use of sign walkers solely in connection with the Sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply to the Sale, but excluding those designed to protect public health and safety).

(d)    During the period between entry of the Interim Approval Order and the entry of the Approval Order (such period, together with the Pre-Order Sale Period, the "Interim Sale Period"), the Agent shall be authorized to conduct the Sale as a "going out of business sale", "store closing", "sale on everything", "everything must go", "inventory liquidation" or similar themed sale, in accordance with the terms of this Agreement, the Interim Approval Order and the Sale Guidelines (as such Sale Guidelines may be modified and approved by the Bankruptcy Court) and with Applicable General Laws, but without complying with applicable Liquidation Sale Laws or the terms of the Store Leases.

5

(e)    Upon entry of the Approval Order, Agent shall be authorized to conduct the Sale in accordance with the terms of this Agreement, the Approval Order and the Sale Guidelines (as such Sale Guidelines may be modified and approved by the Bankruptcy Court) and with Applicable General Laws, but without complying with applicable Liquidation Sale Laws or the terms of the Store Leases.  The Interim Approval Order shall be in substantially the form annexed hereto as <u>Exhibit 2(e)(i)</u> and the Approval Order shall be in substantially the form annexed hereto as <u>Exhibit 2(e)(ii)</u>, and, in each case, shall otherwise be reasonably satisfactory to Merchant and Agent, and provide, <u>inter</u> <u>alia</u>, that:

(i)    Merchant is authorized and directed to assume this Agreement and this Agreement (and each of the transactions contemplated hereby) is approved in its entirety;

(ii)    Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby;

(iii)    Agent shall be entitled to sell all Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and Owned FF&E hereunder free and clear of all liens, claims, interests or encumbrances thereon (including, without limitation, any liens in favor of the Lender under the Existing Credit Facility, any DIP Facility or otherwise), with any presently existing liens, claims, interests or encumbrances encumbering all or any portion of the Merchandise, the Additional Agent Merchandise, Merchant Consignment Goods, Owned FF&E, the Proceeds or any proceeds of the foregoing attaching only to the Guaranteed Amount, and other amounts to be received by Merchant under this Agreement;

(iv)    Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order with respect to the Assets;

(v)    Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "going out of business", "store closing" "sale on everything",  "everything must go", "inventory liquidation" or similarly themed sale (including, without limitation, by means of media advertising, interior and exterior banners, A-frames, and similar signage and the use of sign walkers) without further consent of any person, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court), without compliance with the Liquidation Sale Laws", subject to compliance with the Sale Guidelines and the Interim Approval Order or the Approval Order, as applicable;

(vi)    Agent shall be granted a limited royalty-free license and right to use until the Sale Termination Date the trademarks, trade names, logos, customer lists, website, URL, mailing lists and email lists relating to and used in connection with the operation of the Stores and the E-Commerce Platform solely for the purposes of advertising the Sale,

selling Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and Owned FF&E, and otherwise conducting the Sale in accordance with the terms of this Agreement;

(vii)  all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Interim Approval Order or Approval Order (as applicable) as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement;

(viii) all utilities, landlords, creditors, internet service providers, website hosting and servicing providers and other services providers, and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct or advertising of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or otherwise impedes the conduct or advertising of the Sale;

(ix)  the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement;

(x)  Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement;

(xi)  Agent shall be authorized to include Additional Agent Merchandise in the Sale;

(xii)  subject to Agent having satisfied its obligations to tender payment of the Initial Guaranty Payment and to deliver the Letter of Credit, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to Section 364(c) of Bankruptcy Code senior to all other superpriority claims, including, without limitation, to the superpriority claims of the Lender (under the Existing Credit Facility, any DIP Facility or otherwise); provided that until the Merchant receives payment in full of the Guaranteed Amount, the Sharing Amount (if any), Expenses, and any other amounts payable to Merchant hereunder, any superpriority claim granted to Agent hereunder shall be junior and subordinate in all respects to the superpriority claims of Lender under the Existing Credit Facility and any DIP Facility but solely to the extent of the amount of the unpaid portion of the Guaranteed Amount and Expenses, and all other amounts payable to Merchant hereunder;

(xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16.11 hereof without the necessity of filing financing statements to perfect the security interests;

(xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted;

7

(xv) Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest;

(xvi) this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and that Agent is entitled to the protection of Section 363(m) of the Bankruptcy Code;

(xvii) Agent's performance under this Agreement will be, and payment of the Guaranteed Amount, and the Sharing Amount, if any, under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xviii) this Agreement is approved pursuant to Section 363 of the Bankruptcy Code; and

(xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Sections 363(m) and 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(xx) (A) the terms of this Agreement shall be binding on any trustee appointed for the Merchant under any provision of the Bankruptcy Code, whether the Bankruptcy Case of the Merchant is proceeding under Chapter 7 or Chapter 11 of the Bankruptcy Code (the "Trustee"); (B) any such Trustee shall be authorized  to operate the business of Merchant to the fullest extent necessary to permit compliance with the terms of this Agreement; and (C) Agent and any such Trustee shall be authorized to perform under this Agreement upon the appointment of a Trustee without the need for further order of the Bankruptcy Court;

(xxi) the application of any automatic stay of enforcement of the Interim Approval Order and the Approval Order is waived;

(xxii) through and including completion of the Final Reconciliation, Agent shall be entitled to be heard on all issues in the Bankruptcy Case related to this Agreement or the transactions contemplated thereby;

(xxiv) nothing contained in this Agreement and none of Agent's actions taken in respect of this Agreement or the transactions contemplated hereby shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees (except for Agent's obligations to pay Expenses), nor shall Agent

become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees;

(xxv) in the event Merchant or Lender Representative notifies Agent of its intention to draw on the Letter of Credit, Agent shall be entitled to an emergency hearing by the Bankruptcy Court sufficient to determine whether such draw is permitted under the terms of this Agreement prior to the occurrence of such draw;

(xxvi) during the Sale Term applicable to any Store and for purposes of conducting the Sale at such Store, (A) Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, such Store and the assets currently located at such Store, in each case subject to the extent of Merchant's rights and entitlement to use the same, and the services provided at such Store to the extent Merchant is entitled to such services and (B) Merchant shall not assign, reject, terminate or vacate any lease relating to any such Store where such assignment, rejection, termination or vacatur would have an effective date on or prior to the applicable Sale Termination Date or Vacate Date for such Store; and

(xxvii) to the extent Agent is owed any amounts in respect of overfunding of the Guaranteed Amount (including, without limitation, the Adjustment Amount), Merchant is unable to or otherwise for any reason fails to reimburse such amount and the Lender or any other lender under the Existing Credit Facility or any DIP Facility has received such amount, the Lender, shall within two (2) business days after written request by Agent disgorge and remit to Agent the portion, if any, of such amount that is undisputed or that has been determined to be owing to Agent by the Bankruptcy Court.

(f)     Authority.  Except as otherwise specifically provided in this Agreement, Agent shall have no authority, and shall not represent that it has any authority, to enter into any contract, agreement, or other arrangement or take any other action by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent.

Section 3.     Guaranteed Amount and Other Payments

3.1     Payments to Merchant and Agent.

(a)     As a guaranty of Agent's performance hereunder, in addition to the payment of Expenses (as provided for in Section 4.1 hereof), Agent guarantees that Merchant shall receive an amount (the "Guaranteed Amount") equal to One Hundred and Eleven Percent (111.0%) (the "Guaranty Percentage") of the aggregate Cost Value of Merchandise included in the Sale. The Guaranteed Amount will be calculated based upon the product of (x) the Guaranty Percentage, *multiplied by* (y) the aggregate Cost Value of the Merchandise included in the Sale, as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking after written verification and reconciliation thereof by Merchant, in consultation with the Lender Representative, and Agent, (B) the aggregate Cost Value of the Distribution Center Merchandise included in the Sale, (C) the aggregate Cost Value of Merchandise sold during the Gross Rings

Period (as adjusted for shrinkage per this Agreement), (D) the aggregate Cost Value of In-Transit Merchandise included in the Sale, and (E) the aggregate Cost Value of Returned Merchandise (in the case of the foregoing clauses (B) through (E), not otherwise included in the Inventory Taking or the calculation of the aggregate Cost Value of the Merchandise included in the Sale). Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

(b)    To the extent that Proceeds of the Sale exceed the sum of (x) the Guaranteed Amount, plus (y) all Expenses of the Sale, plus (z) an amount equal to the sum of (i) five percent (5%) of the aggregate Cost Value of the Merchandise included in the Sale and (ii) five percent (5%) of the aggregate Proceeds attributable to the sale of Additional Agent Merchandise included in the Sale (the amount set forth in (z) being defined as the "Agent's Fee"; and the sum of (x), (y) and (z) being defined as the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Merchant (Merchant's share of Proceeds beyond the Sharing Threshold is the "Sharing Amount") and fifty percent (50%) to Agent. Agent shall pay the Sharing Amount, if any, to Merchant (or its designee), on the first business day after the completion of the Final Reconciliation conducted pursuant to Section 8.7(b) and shall remit such payment to the Merchant's Designated Account.

(c)    The Guaranty Percentage has been fixed based upon the Merchant's representation that (i) the aggregate Cost Value of the Merchandise is not less than $61.5 million (the "Merchandise Threshold") and not greater than $67.0 million (the "Merchandise Ceiling"); provided, that, solely for purposes of determining whether the aggregate Cost Value of the Merchandise included in the Sale is less than the applicable Merchandise Threshold or greater than the Merchandise Ceiling, no adjustment shall be made to the Cost Value of any item of Merchandise to account for the effect of any Prevailing Discount Adjustment with respect to Distribution Center Merchandise, In-Transit Merchandise and/or Returned Merchandise, or Excluded Pricing Adjustment. To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than the Merchandise Threshold or greater than the Merchandise Ceiling, then such deviation shall not constitute a breach of any representation or warranty contained herein or an Event of Default hereunder; provided, however, that the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) attached hereto. Any adjustment to the Guaranty Percentage provided for under this Section 3.1(c) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, but not limited to, any adjustment provided for under Sections 3.1(d) and (e) hereof.

(d)    The Guaranty Percentage has also been fixed based upon the assumption that the aggregate Cost Value of the Merchandise (as defined in Section 5.3 hereof) included in the Sale as a percentage of the aggregate Retail Price of the Merchandise (as defined in Section 5.3 hereof) included in the Sale (without taking into account (i) any Prevailing Discount Adjustment applied to Distribution Center Merchandise, In-Transit Merchandise and/or Returned Merchandise, (ii) any Excluded Price Adjustments or (iii) any Shrink Provision otherwise applied to Merchandise sold during the Gross Rings Period) (the "Cost Factor") shall be no greater than 38.7% (the "Cost Factor Threshold").  In the event that the actual Cost Factor for the Merchandise is greater than the Cost Factor Threshold, then such deviation shall not constitute a

10

breach of any representation or warranty contained herein or an Event of Default hereunder; provided, however, that the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(d) attached hereto. Any adjustment to the Guaranty Percentage provided for under this Section 3.1(d) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, but not limited to, any adjustment provided for under Sections 3.1(c) and (e) hereof.

(e)     Merchant shall use reasonable best efforts to cause the Bankruptcy Court to enter the Interim Approval Order and the Approval Order as soon as possible following commencement of a Chapter 11 case.  In the event that Merchant is unable to obtain the entry of an Interim Approval Order satisfying the requirements of this Agreement on or prior to June 18, 2015, then such failure shall not be an event of default under this Agreement, but the Guaranty Percentage shall be adjusted in accordance with the per diem adjustment schedule set forth on Exhibit 3.1(e) annexed hereto.  Any adjustment to the Guaranty Percentage provided for in the preceding sentence shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, but not limited to, any adjustment provided for under Sections 3.1(c) and (d)  hereof.  In the event Merchant is unable to obtain the entry of an Approval Order satisfying the requirements of this Agreement by June 30, 2015, unless otherwise agreed between Agent and Merchant (with the consent of the Lender Representative), this Agency Agreement shall convert to a consulting agreement, pursuant to which (i) Agent shall no longer be obligated to pay the Guaranteed Amount or reimburse Merchant for the Expenses of the Sale; (ii) Agent shall be entitled to receive a consulting fee in an amount equal to two and one-half percent (2.5%) of the aggregate Proceeds from the Sale (other than Proceeds arising from the sale of Additional Agent Merchandise) measured from the Sale Commencement Date; plus (y) a consulting fee in an amount equal to five percent (5.0%) of the aggregate Proceeds from the sale of Additional Agent Merchandise measured from the Sale Commencement Date; plus (z) reimbursement of out-of-pocket Expenses incurred by Agent since the Sale Commencement Date, in accordance with a budget to be agreed to between the parties (which budget shall include, without limitation, all Expenses relating to Additional Agent Merchandise actually incurred by Agent), to the extent not previously reimbursed by Merchant from the Proceeds of the Sale.

(f)     To ensure accurate sales audit functions, as well as accurate calculations of the Sharing Amount, if any, Agent shall use Merchant's existing point-of-sale system for recording all sales of Merchandise (including any sales of Additional Agent Merchandise) in the Stores.

3.2     Payments to Agent.  Subject to Agent's obligation to pay in full the Guaranteed Amount, the Sharing Amount (if any), and all Expenses, Agent shall be entitled to retain any remaining Proceeds (inclusive of the Agent's Fee). Provided that no Event of Default has occurred and continues to exist on the part of Agent, all Merchandise and Additional Agent Merchandise remaining at the conclusion of the Sale ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims, interests and encumbrances of any kind or nature (including, without limitation, any liens in favor of the Lender under the Existing Credit Facility, any DIP Facility or otherwise); provided, however, the proceeds realized upon a sale or other disposition of the Remaining Merchandise shall constitute Proceeds hereunder for

11

purposes of, *inter alia*, calculating the Sharing Amount (if any) due Merchant. Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo.

3.3    Time of Payments; Proceeds; Control of Proceeds

(a)    During the Interim Sale Period, as part of each weekly reconciliation as provided for in Section 8.7(a), Merchant shall collect all of the Proceeds (the "Interim Sale Proceeds"), which shall be applied as follows: (x) first, to the payment of Expenses incurred and payable during the Interim Sale Period (collectively, the "Interim Sale Period Expenses"), and (y) all remaining Interim Sale Proceeds after payment of Interim Sale Period Expenses (the "Unapplied Interim Sale Proceeds") shall be retained and applied by Merchant against the Guaranteed Amount (collectively, the "Interim Guaranty Installments") until the earlier of (i) receipt by Merchant of the Estimated Guaranteed Amount, or (ii) entry of the Approval Order. On the first business day after entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount equal to the difference between ((i) eighty percent (80%) of the Estimated Guaranteed Amount (as defined below) (the "Initial Guaranty Payment"), and (B) the aggregate amount of the Interim Guaranty Installments received and retained by Merchant through such date (such differential being referred to as the "Remaining Initial Guaranty Payment"). The Estimated Guaranteed Amount shall be calculated as the product of (1) the Guaranty Percentage *multiplied by* (2) the estimated aggregate Cost Value of the Merchandise to be included in the Sale (excluding any amounts attributable to In-Transit Merchandise, if applicable) as reflected on Merchant's books and records at the close of business on the last business day immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount"). On the Payment Date, the Remaining Initial Guaranty Payment shall be made by wire transfer of immediately available funds as follows: (i) the Outstanding Bid Protection Amounts (as provided for in Section 16.11(a)) shall be remitted to the Stalking Horse, to the account designated by the Stalking Horse; and (ii)(x) the Remaining Initial Guaranty Payment, less (y) the Outstanding Bid Protection Amounts paid to the Stalking Horse shall be remitted the Merchant, to the account designated on Exhibit 3.3(a) attached hereto (the "Merchant's Designated Account"). The balance of the Guaranteed Amount (including any amounts attributable to In-Transit Merchandise not otherwise paid for), shall be paid by Agent by wire transfer of immediately available funds to the Merchant's Designated Account on the earlier of: (aa) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise based on Merchant's books and records, as adjusted for the results of the Inventory Taking in accordance with the terms of Section 5.1, following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by Merchant, in consultation with the Lender Representative, and Agent (the "Final Inventory Report") and (bb) the date that is thirty (30) days after the Sale Commencement Date (in the case of (bb) above, Agent shall tender payment of the undisputed portion only on account of any remaining portion of the Guaranteed Amount). In the event of a dispute as to the calculation of any portion of the Guaranteed Amount, such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof, and Agent's failure to pay such balance (if there is no dispute as to any portion of the Guaranteed Amount) or undisputed portion thereof (if there is a dispute as to any portion of the Guaranteed Amount) shall entitle the Merchant and the Lender

12

Representative (individually or collectively) to draw upon the Letter of Credit in accordance with Section 3.3(g) hereof to the extent of such balance or undisputed portion, as applicable.  In the event that the Initial Guaranty Payment is either less than or exceeds the Guaranteed Amount, as applicable, Agent or Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the Initial Guaranty Payment.

For purposes of this Agreement, "Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Merchandise made under this Agreement, all service revenue received by Merchant from the Stores, in each case during the Sale Term and exclusive of Sales Taxes; (ii) the total amount (in dollars) of all sales of Additional Agent Merchandise (exclusive of Sales Taxes); (iii) all proceeds of Merchant's or Agent's insurance for loss or damage to Merchandise or Additional Agent Merchandise arising from events occurring during the Sale Term; (iv) all amounts received from customers or other third parties on account of postage, overnight delivery or other shipping charges related to the delivery of Merchandise and Additional Agent Merchandise; and (v) any and all proceeds received by Agent from the disposition of Remaining Merchandise. For the avoidance of doubt: (1) proceeds from the sales at the Stores for periods prior to the Sale Commencement Date and/or from sales through the E-Commerce Platform prior to the exercise of the E-Commerce Platform Election (regardless of whether such sale is processed by Merchant prior to or after the Sale Commencement Date); (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 hereof; (3) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring prior to the Sale Commencement Date; (4) proceeds from the sale or other disposition of Owned FF&E; and (5) payments made by Agent on account of the Guaranteed Amount, the Sharing Amount (if any), Expenses, and the Letter of Credit, shall, in each case, not constitute "Proceeds" hereunder.

(b)    Following the earlier of (i) payment of the Guaranteed Amount in full, or (ii) entry of the Approval Order, all Proceeds shall be controlled by Agent in the manner provided for below:

(i)    Prior to the date Agent establishes the Agency Accounts (see clause (ii) below), all Proceeds (including credit card Proceeds) and proceeds of the sale of Merchant Consignment Goods and Owned FF&E shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Stores, which accounts shall be designated for the deposit of Proceeds and proceeds of the sale of Merchant Consignment Goods and Owned FF&E (including all cash, credit card payments, checks and similar items of payment, deposits and any other amounts contemplated by this Agreement), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). Subject to the provisions of Section 16.11 hereof, the Approval Order shall provide (a) that Merchant grants to Agent a first priority security interest in and lien upon each Designated Deposit Account to the extent of any Proceeds and any other amounts payable to Agent deposited therein, and (b) for turnover to Agent of any such Proceeds (and any other amounts payable to Agent deposited therein) in accordance with the terms and provisions of this Agreement and the Approval Order, as applicable. If, notwithstanding the provisions of this Section, Merchant or Lender receives or otherwise has dominion over or control of any Proceeds, or other amounts due to Agent (including proceeds from the sale of Merchant

13

Consignment Goods and Owned FF&E), Merchant and Lender shall hold the same and other amounts in trust for Agent, and shall not deposit such Proceeds or other amounts due Agent hereunder in any account except a Designated Deposit Account or as otherwise instructed by Agent. Until such time as Agent establishes the Agency Accounts (see clause (ii) below), Merchant, Agent and Lender shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement that are deposited into the Designated Deposit Accounts.

(ii)        After payment of the Initial Guaranty Payment and delivery of the Letter of Credit, Agent may establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement (including, without limitation, proceeds of the sale of Merchant Consignment Goods and Owned FF&E), and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Account.  The Agency Accounts shall be dedicated solely to the deposit of Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement, and the distribution of amounts payable hereunder; provided that, in the event (a) Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, and (b) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds and/or other amounts payable to Agent under this Agreement, then Merchant and Agent shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation and remittance to Agent, of all Proceeds (including credit card Proceeds) and other such amounts. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to the Agency Accounts; provided that, in the event Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, Merchant shall deliver to Agent copies of all bank statements and other information relating to such accounts to enable Agent to track and trace deposited funds that constitute Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(iii)        Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, and Merchant identification number(s) and existing bank accounts for credit card Proceeds solely for purposes of the Sale, and for processing transactions relating to Merchant Consignment Goods and Owned FF&E.  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures.  Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale

14

Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds (and proceeds from Merchant Consignment Goods and Owned FF&E) for Agent's own account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to Merchandise and Additional Agent Merchandise sold during the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, (i) any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received, prior to, during or after the Sale Term or (ii) any holdbacks against credit card Proceeds implemented by any applicable credit card company.

(iv)    Commencing on the first business day following the Payment Date, and continuing on each business day thereafter, Merchant shall promptly pay to Agent by wire transfer of immediately available funds all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales) and proceeds from the sale of Merchant Consignment Goods and Owned FF&E that are deposited into the Designated Deposit Accounts for the prior day.  Agent shall, within a reasonable period of time after the date of each such payment by Merchant, notify Merchant and Lender Representative of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of any undisputed shortfall.

(c)    Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after two (2) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after two (2) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(d)    All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later than 2:00 p.m. (prevailing Eastern Time) on the date that such payment is due; provided, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (prevailing Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

(e)    [Intentionally Omitted.]

(f)    If, and to the extent, the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder (as determined pursuant to the express terms of this Agreement) and such funding or payment cannot be recovered by Agent from Merchant under Section 3.3(a) or Section 3.3(c) by means of an offset or otherwise, then Merchant agrees (or if Merchant shall be unable to or otherwise for any reason fails to, and Lender, on behalf of itself and/or any other

15

lender under the Existing Credit Facility or any DIP Facility, has received any funds in respect of such overfunding, the Lender agrees) to reimburse such overfunded amount to Agent within two (2) business days of written demand thereof by Agent.  For purposes of this Agreement, (i) "Existing Credit Facility" shall mean that certain Credit Agreement, dated as of July 18, 2014, by and among Merchant, the lenders from time to time party thereto and Salus Capital Partners, LLC, as administrative agent and collateral agent (the "Existing Facility Agent"), as such agreement may be amended, supplemented or otherwise modified and together with any and all additional agreements entered into in connection with the credit facility established thereby, (ii) "DIP Facility" shall mean any debtor-in-possession financing facility entered into by Merchant, Lender (or any entity comprising Lender) and the other entities party thereto, (iii) "Lender Representative" shall mean Salus Capital Partners, LLC, as representative for itself and each other entity comprising Lender and (iv) "Lender" shall mean, jointly, severally and collectively, the Existing Facility Agent and each of Salus Capital Partners, LLC, Salus CLO 2012-1, Ltd. and DCP Linens Lender, LLC, as lenders or agents under the Existing Credit Facility and/or any DIP Facility, in each case together with their successors and assigns; provided, however, that wherever, pursuant to the terms of this Agreement, Lender may be subject to any liability to any person, DCP Linens Lender, LLC (but not any other entity comprising Lender) shall be liable only for a pro rata portion of such liability based on the outstanding principal amount of loans under the Existing Credit Facility or the relevant DIP Facility, as applicable, held by DCP Linens Lender, LLC.

(g)    Guaranty Security.    To secure payment of the balance of any unpaid portion of the Guaranteed Amount, the Sharing Amount (if any), Expenses and other amounts due to Merchant hereunder, on the second business day following the entry of the Approval Order, Agent shall deliver to Lender Representative, as Merchant's designee, an irrevocable standby letter of credit, substantially in the form of Exhibit 3.3(g) attached hereto (the "Letter of Credit"), in an original stated amount equal to the aggregate of (x) twenty percent (20%) of the Estimated Guaranteed Amount, plus (y) fifty percent (50%) of the estimated aggregate Cost Value of the In-Transit Merchandise, plus (z) three (3) weeks' estimated Expenses. The Letter of Credit shall name Merchant and Lender Representative, as Merchant's designee, as co-beneficiaries. The Letter of Credit shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant and Lender Representative.  In the event that Agent fails to timely pay any undisputed amount hereunder in respect of the Guaranteed Amount, the Sharing Amount (if any), and/or Expenses and/or other undisputed amounts due by Agent to Merchant, as required under this Agreement, Merchant and/or Lender Representative, as Merchant's designee, shall be entitled to draw on the Letter of Credit to fund such undisputed amount or obligation after five (5) business days' written notice to Agent. Lender Representative, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount; provided, however, until the Final Reconciliation has been completed, under no circumstances shall the face amount of the Letter of Credit be reduced to an amount less than two (2) weeks' estimated Expenses (and Merchant and Lender Representative shall cooperate with respect to each such request). The Letter of Credit shall expire no earlier than sixty (60) days after the Sale Termination Date; provided that, if, as of the tenth (10th) business day prior to the scheduled expiration date of the Letter of Credit, there remains any unresolved dispute as to the Guaranteed Amount, the Sharing Amount, and/or Expenses and/or other amounts due to Merchant by Agent under this Agreement, Agent shall cause the expiration date

16

of the Letter of Credit to be extended for successive thirty (30) day intervals (or such other longer duration as Merchant, Lender Representative, and Agent may agree) until the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount, the Sharing Amount, Expenses and/or other amounts due to Merchant by Agent, have been paid to Merchant. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the expiration date of the Letter of Credit (as may have been extended previously), Merchant and Lender Representative shall have the right to make a drawing under the Letter of Credit in an amount equal to the amount(s) Merchant asserts are then owing to Merchant. After completion of the Final Reconciliation and payment in full of all amounts owing by Agent (including but not limited to the Guaranteed Amount, the Sharing Amount, if any, and Expenses), Merchant and Lender Representative shall surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated. Upon Lender's receipt of payment in full of its claims against the Merchant, Lender Representative shall promptly deliver the Letter of Credit to Merchant and take all reasonable steps necessary to remove itself as a named co-beneficiary thereunder.  Notwithstanding anything to the contrary herein or otherwise, neither Merchant nor Lender Representative may draw on the Letter of Credit if Merchant and/or Lender is in material default of any of their respective obligations under this Agreement.

(h)    Contemporaneously with the execution of this Agreement, Lender, on Merchant's behalf, shall pay to Agent an amount equal to $200,000 as an expense advance (the "Expense Advance") in consideration of Agent's substantial efforts in relation to negotiating, drafting and finalizing this Agreement and to secure payment of Expenses. During the first Weekly Sale Reconciliation following entry of the Approval Order, Merchant shall be reimbursed or credited by Agent for the Expense Advance against Expenses that are incurred by Agent.

Section 4.    Expenses of the Sale

4.1    Expenses.  Subject to the entry of the Approval Order by June 30, 2015, Agent shall be unconditionally responsible for all Expenses, which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent or Merchant may review or audit the Expenses at any time.  Effective from and after the Payment Date, Agent shall be obligated to pre-fund (i) any payroll-related expenses consistent with Merchant's customary payroll funding practices and timing and (ii) an amount equal to seven (7) days per diem as Occupancy Expenses for the Stores weekly in advance.  As used herein, "Expenses" shall mean the Store-level (and where expressly applicable, Distribution Center-level) operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)    (i) actual Occupancy Expenses for the Stores on a per Store per diem basis in an amount up to the per Store per diem amount set forth on Exhibit 4.1(a) hereto for all Stores in which the Sale has not been terminated on such date, *plus* (ii) the portion of any percentage rent obligations allocable to the sale of Merchandise and Additional Merchandise during the Sale to the extent set forth on Exhibit 4.1(a), (in each case as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1);

(b)    actual wages and commissions for all Store-level Retained Employees

17

used in conducting the Sale for actual days/hours worked during the Sale Term; <u>provided</u> <u>that</u>, Agent shall only be obligated to pay 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the wages for Retained Employees used during the Inventory Taking;

(c)    actual amounts payable by Merchant for benefits (including payroll taxes, FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) for Store-level Retained Employees used in the Sale, in an amount up to nineteen percent (19.0%) of base payroll (including commissions) for all such Store-Level Retained Employees (the "<u>Benefits Cap</u>");

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    regardless of whether incurred prior to the Sale Commencement Date, all costs and expenses associated with Agent's on-site supervision of the Stores and the Distribution Centers, including but not limited to any and all fees, wages, bonuses, deferred compensation, taxes, and third party payroll costs and expenses of Agent's field personnel, travel to, from or between the Stores and the Distribution Centers, and all out-of-pocket and commercially reasonable expenses relating thereto;

(f)    regardless of whether incurred prior to the Sale Commencement Date, the costs and expenses associated with all signage, banners, sign walkers, and interior and exterior signs that are produced for the Sale (inclusive of the Signage Costs provided for in Section 11.1(w);

(g)    regardless of whether incurred prior to the Sale Commencement Date, promotional costs including, without limitation, email blasts, television, and any other advertising and/or direct mail attributable to the Sale and ordered or requested by Agent;

(h)    the costs and expenses of obtaining additional supplies used at the Stores and the Distribution Centers as may be required by Agent in the conduct of the Sale;

(i)    [intentionally omitted;]

(j)    actual costs and expenses of postage/overnight delivery/courier charges to and from or among the Stores to the extent relating to the Sale (including relating to the delivery of Merchandise to customers);

(k)    credit card and bank card fees, chargebacks, and discounts attributable to the Sale at the Stores and the E-Commerce Platform to the extent Merchant and Agent exercise the E-Commerce Platform Election;

(l)    any and all costs of moving, transferring, or consolidating Merchandise and Additional Agent Merchandise between and among the Stores;

18

(m)    a pro rata portion for the Sale Term of Merchant's premiums in respect of general liability, casualty, property, inventory, and other insurance policies attributable to the Merchandise and the Stores;

(n)    third-party payroll processing fees for the Stores;

(o)    armored car service and security personnel;

(p)    actual cost of Agent's capital (from and after payment of the Remaining Initial Guaranty Payment), reasonable and documented legal expenses (regardless of whether incurred prior to the Sale Commencement Date) in connection with the negotiation, entrance into and performance under this Agreement and the transactions contemplated hereby and any disputes arising therefrom, letter of credit fees and insurance (as provided in Section 12.4 hereof);

(q)    local, leased line, satellite broadband connections and long distance telephone (including network connection charges such as T-1 lines) expenses incurred in the conduct of the Sale;

(r)    [intentionally omitted];

(s)    Agent's  50% of the third party fees and costs of the Inventory Taking;

(t)    Central Service Expenses in an amount equal to $25,000 per week (pro-rated for partial weeks) for the Sale Term (payable to Merchant) in respect of the cost of Merchant providing Central Services in accordance with Section 8.1 hereof;

(u)    Store cash thefts and other Store cash shortfalls in registers;

(v)    to the extent Agent elects to operate the E-Commerce Platform pursuant to Section 8.10 below, the actual costs and expenses associated with operating the E-Commerce Platform;

(w)    [intentionally omitted];

(x)    actual Distribution Center Expenses on a per Distribution Center per diem basis in an amount not to exceed the per Distribution Center per diem amount set forth on Exhibit 4.1(x); provided that Distribution Center Expenses solely attributable to Additional Agent Merchandise shall not be subject to such cap;

(y)    [intentionally omitted];

(z)    any and all costs incurred in connection with the inclusion and or sale of Additional Agent Merchandise in the Sale, including, but not limited to the costs acquisition, picking, ticketing, moving, shipping, transferring, or consolidating Additional Agent Merchandise from the vendor and/or Distribution Centers to the Stores;

19

(aa)    costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale;

(bb)    all costs and expenses incurred by Agent in order to comply with Applicable General Laws and, unless and until entry of the Approval Order, Liquidation Sale Laws; and

(cc)    the actual costs and expenses of Agent providing such additional services as the Agent reasonably deems appropriate for the Sale.

"Expenses" shall not include: (i) Central Service Expenses in excess of the amount set forth in Section 4.1(s); (ii) Excluded Benefits; (iii) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Section 4.1(a); (iv) Distribution Center Expenses in excess of amounts provided for in Sections 4.1(x); or (vii) any costs, expenses or liabilities arising during the Sale Term, other than the Expenses listed above or as otherwise expressly provided for in this Agreement.  All costs or expenses related to the Sale not included as Expenses (or otherwise designated as an obligation of the Agent) shall be paid by Merchant promptly when due during the Sale Term.  Notwithstanding anything to the contrary herein, (x) to the extent that any Expense listed in Section 4.1 is also included on Exhibit 4.1(a), then Exhibit 4.1(a) shall control and such Expense shall not be double counted. Except as provided in this Section 4.1, no Expenses shall be paid with respect to any distribution center/warehouses other than the Distribution Center Expenses.  Notwithstanding anything herein to the contrary, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses and Distribution Center Expenses) with respect to any Store after the earlier of (x) the applicable Vacate Date for such Store (or, if later than such Vacate Date and solely with respect to Occupancy Expenses, the Final Rent Date for such Store) and (y) the Sale Termination Date.

As used herein, the following terms have the following meanings:

"Central Service Expenses" means costs and expenses for Merchant's Central Services.

"Central Services" means those Merchant central administrative services necessary for the conduct and support of the Sale, including, but not limited to, use or and access to Merchant's: (i) inventory control system, (ii) payroll system, (iii ) accounting system, (iv) office facilities, (v) central MIS and POS services, (vi) cash reconciliation, (vii) central administrative services and personnel to process and perform sales audit, banking, and other normal course administrative services customarily provided to or for the benefit of operating the Distribution Centers and/or the Stores, (viii) such other central office services reasonably necessary (in the reasonable judgment of Agent) for the Sale, (ix) use by Agent reasonably sized offices located at Merchant's central office facility to effect the Sale, and (x) hosting and maintaining Merchant's website.

"Distribution Center Expenses" means actual expenses incurred by Merchant in connection with the Distribution Center Services.

20

"Distribution Center Services" means those services customarily performed by the operator of the Distribution Centers in the ordinary course of business and in the course of receiving and distributing goods and supplies to the Stores, including, but not limited to, (i) the handling, receiving, in-take, storage, ticketing and processing of any Merchandise, Distribution Center Merchandise, In-Transit Merchandise or Additional Agent Merchandise at the Distribution Centers; (ii) any required supplies in connection with the foregoing; (iii) any Central Services required to operate and maintain communications with the Distribution Centers during the Sale Term applicable thereto; and (iv) moving, transferring, or consolidating Merchandise or Additional Agent Merchandise between the Distribution Centers and the Stores.

"Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions, and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

"Occupancy Expenses" means rent, percentage rent, common-area maintenance, landlord promotional fees, real estate and use taxes, merchant association dues and charges, HVAC, utilities, telecom/telephone charges, point-of-sale systems maintenance, store security systems, routine repairs and maintenance, taxes and licenses, trash removal (to the extent excluded as a fixed charge component of lease obligation), snow removal, and ordinary course third-party cleanings, pest control services, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(a) attached hereto and in an amount up to the specific amounts set forth on Exhibit 4.1(a) attached hereto and calculated in accordance with Section 4.1(a), plus any percentage rent obligations incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales during the Sale Term of Merchandise and Additional Agent Merchandise included in the Sale.  Merchant and Agent agree that Exhibit 4.1(a) shall specify the actual applicable percentage and any applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s).  Merchant and Agent further agree that in the event Exhibit 4.1(a) does not specify the actual applicable percentage and/or the applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s), Agent shall have no obligation to pay percentage rent other than as set forth on Exhibit 4.1(a).  Notwithstanding anything to the contrary set forth in this Agreement, Merchant and Agent further agree that to the extent that, in connection with the conduct of the Sale and/or Agent's vacating of the Stores (but not in connection with the disposition of any unsold Owned FF&E or other non-Merchandise assets being abandoned or otherwise disposed of by Merchant), Merchant incurs additional trash removal charges at a Store, other than the fixed charge component of Merchant's lease obligation for a particular Store provided for on Exhibit 4.1(a)  (the "Non-CAM Trash Removal Charges"), such Non-CAM Trash Removal Charges shall be paid by Agent as an Expense of the Sale, in addition to any trash removal charges as may be set forth in Exhibit 4.1(a) hereof.

"Third-party" means, with reference to any Expenses, a party that is not affiliated with or related to Merchant.

21

4.2    Payment of Expenses.  From and after the Sale Commencement Date, Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7(a) below, based upon invoices and other documentation reasonably satisfactory to Merchant and Agent.

Section 5.    Inventory Valuation; Merchandise.

5.1    Inventory Taking.    (a)    Subject to the provisions of this paragraph, the parties have agreed to use the books and records of Merchant as of the Sale Commencement Date, to determine the aggregate Cost Value and Retail Price of the Merchandise located in the Stores on the Sale Commencement Date in accordance with this Agreement.  In order to test the validity of the aggregate Cost Value and Retail Price of the Merchandise as reflected on Merchant's books and records, commencing on the day immediately following the date of entry of the Interim Approval Order, Merchant and Agent shall cause to be taken a SKU-level and Retail Price physical inventory (collectively, the "Inventory Taking") of the Merchandise located in ninety (90) Stores, with forty-five (45) such Stores to be selected by Merchant, in consultation with the Lender Representative, and the remaining forty-five (45) Stores to be selected by Agent in its sole discretion (collectively, the "Initial Test Stores"). Subject to the availability of the Inventory Taking Service, Merchant and Agent shall use commercially reasonable efforts to complete the Inventory Taking in each Store no later than fifteen (15) days after the entry of the Interim Approval Order (the date of the Inventory Taking at each Test Store being the "Inventory Date" for such Test Store).  Merchant and Agent shall jointly employ RGIS or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking in the Test Stores.  The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed upon by Merchant (in consultation with the Lender Representative) and Agent and made a part of this Agreement as Exhibit 5.1(a) (the "Inventory Taking Instructions").  As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service.  The balance of such fees and expenses shall be paid by Merchant.  Except as provided in the immediately preceding sentence, Merchant and Agent shall each bear their respective costs and expenses related to the Inventory Taking; provided that, Agent shall be obligated to pay fifty percent (50%) of the payroll and related benefit costs (subject to the Benefits Cap) for Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining fifty percent (50%) of the payroll and related benefit costs for Retained Employees used during the Inventory Taking. Merchant, Agent, and Lender Representative shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the Inventory Taking in each of the Test Stores, the applicable Test Store shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking has been completed, as agreed by Merchant and Agent.  The Inventory Taking shall not take place on Saturdays, Sundays or federal holidays.  Merchant and Agent further agree that until the Inventory Taking

22

in each particular Test Store is complete, neither Merchant nor Agent shall (i) transfer any Merchandise to or from that Test Store (other than Distribution Center Merchandise and In-Transit Merchandise that is distinctly tagged or otherwise marked as such or recorded in Agent's transfer log), (ii) deliver any Additional Agent Merchandise to such Test Store (unless distinctly tagged or otherwise marked as such or recorded in Agent's transfer log), (iii) move Merchandise within or about the Test Stores so as to make any such items unavailable for counting as part of the Inventory Taking, or (iv) remove or add any Merchant hang tags, price tickets, inventory control tags, or other indicia of pricing affixed to or related to any Merchandise. Merchant (in consultation with the Lender Representative) and Agent shall use their reasonable best efforts to reconcile the Inventory Taking (including, but not limited to, the determination of the aggregate Cost Value of the Merchandise), within ten (10) days after its completion. In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following completion of the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof).

(b)     The results of the Inventory Taking at the Test Stores (the "Test Store Results") shall be used to determine any adjustment as may be required to the calculation of the aggregate Cost Value of the Merchandise located in the Stores on a cumulative basis on the Sale Commencement Date, based upon:

(i)     for purposes of calculating the aggregate Cost Value and Retail Price of the Merchandise at the Test Stores, the actual Test Store Results for the Inventoried Stores; and

(ii)     for purposes of calculating the aggregate Cost Value and Retail Price of the Merchandise at the Stores that do not constitute Test Stores (the "Non-Inventoried Stores"), an average variance (the "Variance") derived from a comparison of the actual Test Store Results at the Test Stores to the Cost Value and Retail Price of the Merchandise at the Inventoried Stores as reflected on the Merchant's books and records as of the Sale Commencement Date (calculated on a "roll-forward" basis to reflect Gross Rings plus any shrink adjustment provided for herein) (the "Adjusted Book Inventory"), which Variance shall be applied to adjust the Adjusted Book Inventory of the Merchandise located at the Non-Inventoried Stores.

(c)     In the event that the Variance derived from the Test Store Results at the Initial Test Stores is greater than five percent (5%)] of the current Cost Value or Retail Price of the Merchandise in the Initial Test Stores, then either Merchant, in consultation with the Lender Representative, or Agent shall have the right to require an Inventory Taking (the "Additional Inventory Taking") at ten (10) additional Stores, with five (5) such Stores to be selected by Merchant, in consultation with the Lender Representative, and the remaining five (5) Stores to be selected by Agent in its sole discretion (the "Additional Test Stores" and, together with the Initial Test Stores, the "Test Stores"), to establish whether an adjustment to the Variance is required, with the costs and fees associated with the Additional Inventory Taking, to be paid by the party requesting such Additional Inventory Taking.

23

(d)    Merchant, the Lender Representative and Agent agree that they will, and agree to cause their respective representatives to, cooperate and assist in the preparation and the calculation of the aggregate Cost Value and Retail Price of the Merchandise included in the Sale, including, without limitation, the making available to the extent necessary of books, records, work papers and personnel.

(e)    Distribution Center Merchandise and In-Transit Merchandise received at a Store (with respect to the Test Stores, after the Inventory Date for such Test Store) shall be counted and reconciled within five (5) business days after receipt of such goods in the Stores in accordance with the procedures set forth below ("Reconciled Merchandise Receipts").  Absent prior notification and agreement of Merchant, failure to report within such five (5) business day period any variance between the received shipment from the applicable shipping documents (each a "Shipping Variance"), shall result in such receipts being deemed confirmed received consistent with the applicable shipping documents. Merchant shall have five (5) business days to verify a timely issued Shipping Variance (each a "Shipping Variance Response"), and absent prior notification and agreement of Agent, failure to respond to an asserted Shipping Variance within such five (5) business day period shall result in such Shipping Variance being deemed valid. If Merchant timely issues a Shipping Variance Response that disputes the asserted Shipping Variance, Merchant and Agent shall cooperate with each other to verify and resolve such dispute; provided that, in the event Merchant and Agent are unable to resolve such dispute within ten (10) business days  from Agent's receipt of a Shipping Variance Response from Merchant (or such greater period as Merchant and Agent may mutually agree), such dispute shall be resolved in the manner provided for resolution of disputes under Section 8.7(b)(ii) hereof. Distribution Center Merchandise and/or In-Transit Merchandise (where applicable) received at a Test Store prior to the Inventory Date for such Test Store shall be counted as part of the Inventory Taking or, to the extent sold prior to the Inventory Taking at such location, using Gross Rings.

5.2    Merchandise Subject to this Agreement.

(a)    For purposes of this Agreement, including but not limited to the calculation of the Guaranteed Amount, "Merchandise" means all new, first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant, customarily sold to customers in the ordinary course of Merchant's business and located in the Stores on the Sale Commencement Date (or, with respect to Returned Merchandise, Distribution Center Merchandise and In-Transit Merchandise, received at the Stores by the dates specified in this Agreement), including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date; (iii) Distribution Center Merchandise and In-Transit Merchandise received in the Stores on or before the date that is thirty (30) days after Agent's delivery to Merchant of Agent's written direction of allocation of such Distribution Center Merchandise and/or In-Transit Merchandise to the Stores    (the "Merchandise Receipt Deadline"); (iv) E-Commerce Merchandise located in the E-Commerce Location; and (vi) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto.  Notwithstanding the foregoing, "Merchandise" shall not include (A) goods that belong to sublessees, licensees, or concessionaires of Merchant; (B) goods held by Merchant on memo, on consignment, or as bailee; (C) Excluded Defective

Merchandise; (D) Additional Agent Merchandise; (E) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Stores; (F) goods sold through Merchant's website prior to the Sale Commencement Date, but for which Merchant has not completed the processing and/or shipping the subject goods as of the Sale Commencement Date; (G) if applicable, Distribution Center Merchandise that is not received at the Stores on or before the Merchandise Receipt Deadline; and/or (H) In-Transit Merchandise that is not received at the Stores on or before to the Merchandise Receipt Deadline.

(b)    As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise identified and agreed upon by Merchant and Agent during the Inventory Taking (with each party acting reasonably) as defective in that it is damaged, defective, scratched, soiled, ripped, torn, stained, faded, discolored, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mis-mated or near-sized, parts, items typically sold as a set which are incomplete, gift with purchase items, or otherwise affected by other similar defects rendering it not first quality.

"Distribution Center Merchandise" means those items of inventory identified on Exhibit 5.2(b)(1) that are located in the Distribution Centers (other than the E-Commerce Location) on the Sale Commencement Date.  Agent and Merchant shall cooperate with one another and mutually agree upon an allocation schedule or allocation schedules of Distribution Center Merchandise after the date of this Agreement in light of the circumstances of the Sale, including (without limitation) Store capacity, the Merchandise Receipt Deadline, and balance of the Sale Term remaining, with each party acting reasonably (the "Merchandise Allocation Schedule").

"E-Commerce Merchandise" means those items of inventory identified on Exhibit 5.2(b)(2) that are located in the E-Commerce Location on the Sale Commencement Date, which have been ear-marked and/or ticketed in the ordinary course of business for sale through the E-Commerce Platform.

"Excluded Defective Merchandise" means (a) any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used or sold for its intended purpose, (b) any item of Defective Merchandise for which the parties cannot mutually agree upon a Cost Value and (c) inventory of any kind or nature, wherever located, that was, is or becomes during the Sale Term subject to a bona fide, credible, written claim of trademark (or other intellectual property) infringement by any third party.  Sample merchandise and merchandise on display in the Stores shall be deemed to be Excluded Defective Merchandise.  Excluded Defective Merchandise located in the Stores shall be identified and counted during the Inventory Taking and thereafter removed from the sales floor and segregated. To the extent that goods in the Distribution Centers or in transit to the Stores constitute Excluded Defective Merchandise and such goods arrive at the Stores despite Merchant's covenant not to ship such goods to the Stores, such goods shall be identified during

25

the Inventory Taking or, to the extent such goods arrive in a Store after the Inventory Date for such Store, such goods shall be reasonably identified by Agent within five (5) business days of receipt of at such Store and thereafter removed from the sales floor and/or segregated.

"In-Transit Merchandise" means items of inventory identified on Exhibit 5.2(b)(3) that are purchased by Merchant prior to the date of this Agreement, which goods are either (a) subject to an order which cannot be cancelled by Merchant as of the date of this Agreement, and/or (b) already in transit to Merchant from the vendor as of the Sale Commencement Date, and in each case are subject of a Letter of Credit issued for the account of Merchant or for which title has already passed to Merchant.  Agent and Merchant shall cooperate and mutually agree upon an allocation schedule for In-Transit Merchandise in light of the circumstances of the Sale, including (without limitation) Store capacity, the Merchandise Receipt Deadline, and balance of the Sale Term remaining, with each party acting reasonably.

5.3    Valuation.

(a)    For purposes of this Agreement:

(i)    "Cost Value" shall mean, with respect to each item of Merchandise, on an SKU, by location basis, the lower of (x) the cost of such item, as reflected on Merchant's inventory cost file entitled "Inventory by SKU by Location.xlsx" as delivered by Merchant as of May 27, 2015 (together with all updated files received on or prior to the Sale Commencement Date, the "Cost File) or (y) the Retail Price of such item.

(ii)    "Retail Price" means, with respect to each item of Merchandise, determined on an SKU basis as of the Sale Commencement Date, the lowest of the lowest ticketed price, file price (as reflected on the Cost File), marked price, shelf price, hang-tag price, stickered price, PLU price, or other hard-marked price, excluding, however, all Excluded Price Adjustments.  For purposes of calculating Retail Price, if an item of Merchandise of the same SKU has more than one ticketed price, file price (as reflected on the Cost File), marked price, shelf price, hang-tag price, stickered price, PLU price, or other hard-marked price, or if multiple items of the same SKU have different ticketed, file (as reflected on the Cost File), marked, shelf, hang-tag, stickered, PLU, or other hard-marked prices and such pricing does not otherwise qualify as an Excluded Price Adjustment, the lowest ticketed price, file price (as reflect on the Cost File), marked price, shelf price, hang-tag price, stickered price, PLU price, or other hard-marked price on any such item shall prevail for such item or for all such items within the same SKU, as the case may be, that are located within the same location (as the case may be, the "Lowest Location Price"), unless it is reasonably determined by Merchant and Agent that the applicable Lowest Location Price was mismarked, normal course markdowns had not been reflected or taken, or such item was priced because it was damaged or marked as "as is," in which case the correct price shall control; provided, however, in determining the Lowest Location Price with respect to any item of Merchandise at a Store or Distribution Center, the Lowest Location Price shall be determined based upon the lowest Retail Price for such item on a per location basis.  No adjustment to Retail Price shall be made with respect to different Retail Prices for items located in different locations.

(iii)    "Excluded Price Adjustments" means the following discounts

26

or price adjustments offered by the Merchant by any means: (i) point of sale discounts or similar adjustments regardless of duration; (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) adjustments for Display Merchandise, damaged, defective or "as-is" items; (vi) coupons (Merchant's or competitors') or similar type coupons/promotions, "groupons", catalog, website, or circular prices, or "buy one get one" type discounts, or similar type discounts or promotions; (vii) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (viii) obvious ticketing or marking errors; (ix) instant (in-store) or mail in rebates; or (x) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations; or (xi) adjustments for the age of an item of Merchandise.

(b)      Anything in Section 5.3(a) to the contrary notwithstanding, Merchant and Agent further agree as follows:

(i)      The Cost Value and Retail Price of any item of Distribution Center Merchandise and In-Transit Merchandise that is not received at a Store as of the date thirty (30) days following Agent's delivery of the allocation to Merchant (the "Prevailing Discount Adjustment Date") (e.g., goods arriving in the Stores after the Sale Commencement Date  but before Merchandise Receipt Deadline) shall be the otherwise applicable Cost Value and Retail Price of such item (determined in accordance with Section 5.3(a) above), *multiplied by* the inverse of the prevailing Sale discount in effect on the date such item arrives in the Store (the "Prevailing Discount Adjustment").   No later than two (2) business days after the Sale Commencement Date, Agent shall deliver an allocation and schedule of Distribution Center Merchandise and In-Transit Merchandise using commercially reasonable and good faith efforts to allocate and schedule shipments of Distribution Center Merchandise and In-Transit Merchandise from the Distribution Centers to the Stores so as to minimize, where practicable (i.e., giving due consideration to the needs and capacity of the Stores) the effect of the Prevailing Discount Adjustment;

(ii)      Defective Merchandise shall be valued by mutual agreement of the parties.  If the parties are unable to so agree, or if an item is determined to be Excluded Defective Merchandise, such goods shall be excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder, including, without limitation, calculation of the Guaranteed Amount and Proceeds;

(iii)      Excluded Pricing Adjustments shall not be taken into account in determining the Cost Value of any item of Merchandise.  If the Sale commences prior to the completion of the Inventory Taking at any Store, then for the period from the Sale Commencement Date until the Inventory Date for such Store (the "Gross Rings Period"), Agent and Merchant shall jointly keep (x) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings") and (y) cash reports of sales within such Store to determine the actual Cost Value of the Merchandise sold by SKU.  All such records and reports shall be made available to Merchant, Agent and Lender Representative during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included in Merchandise using the actual Cost Value of the Merchandise sold plus one percent (1%) shrink provision (the "Shrink Provision").

27

5.4    Excluded Goods.  Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder and shall remove, at Merchant's expense, such goods from the Stores prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable. If Merchant so elects at the beginning of the Sale Term, Agent shall accept those goods not included as "Merchandise" hereunder and as identified by Merchant for sale (including for these purposes, at Merchant's election, any Distribution Center Merchandise that does not arrive in the Stores on or prior to the Merchandise Receipt Deadline and/or In-Transit Merchandise that does not arrive in the Stores on or prior to the Merchandise Receipt Deadline) as "Merchant Consignment Goods".  Merchant Consignment Goods shall be sold at prices mutually agreed upon by Merchant and Agent.  Agent shall retain twenty percent (20%) of the sale price (less applicable Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive eighty percent (80%) of the sale price (less applicable Sales Taxes) in respect of sales of Merchant Consignment Goods. Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly reconciliation by Merchant and Agent pursuant to Section 8.7(a) below.  Except as expressly provided in this Section 5.4, Agent shall have no cost, expense, or responsibility in connection with any goods not included in Merchandise, including but not limited to sales commissions and percentage rent.

5.5    Distribution Center Services.

(a)    On and after the Sale Commencement Date, Agent shall be responsible for allocating and designating the shipment of the Distribution Center Merchandise and In-Transit Merchandise to the Stores. Notwithstanding anything to the contrary herein, except as provided in Section 4.1(x), Agent shall not be responsible to pay any cost or expenses associated with the operation of the Distribution Centers.

(b)    Agent's obligation to pay Distribution Center Expenses in accordance with Section 4.1(x) shall be limited to the period commencing on the Sale Commencement Date and concluding on the earliest to occur of (i) the Sale Termination Date or (ii) the date the last of the Distribution Center Merchandise and/or In-Transit Merchandise has been removed from such location.

Section 6.    Sale Term.

6.1    Term.  The Sale shall commence at each of the Stores on the first business day after execution of this Agreement, but in no event later than June 12, 2015 (the "Sale Commencement Date").  Agent shall complete the Sale and vacate the premises of each Store in favor of Merchant or its representative or assignee on or before September 30, 2015 (the "Sale Termination Date").  The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "Sale Term".  The Sale Termination Date as to any Store may be (a) extended by mutual written agreement of Merchant, in consultation with the Lender Representative, and Agent or (b) accelerated by Agent, in which case Agent shall provide Merchant (who shall forward such notice to the Lender Representative) with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice").  If Agent fails to provide

28

Merchant with timely notice of an acceleration of the Sale Termination Date for a Store, Agent shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice.

6.2     Vacating the Stores. Subject to the terms of Section 6.1 hereof, Agent shall provide Merchant with not less than seven (7) days' advance written notice of its intention to vacate any Store prior to the Sale Termination Date (as to each such Store, the "Vacate Date"). On the Vacate Date, Agent shall vacate such Store in favor of Merchant or its representatives or assignee, (subject to Agent's right to abandonment of unsold items of Owned FF&E) remove all Remaining Merchandise (including any unsold Additional Agent Merchandise) from the Store, and leave such Store in "broom clean" condition (ordinary wear and tear excepted) subject to the right to abandon, neatly in place, any unsold Owned FF&E. Agent's obligations to pay Occupancy Expenses (but no other Expenses) for any Store subject to Vacate Notice shall continue until the later of (a) the applicable Vacate Date for such Store and (b) the 15th day of the calendar month in which the Vacate Date for such Store occurs (the "Final Rent Date"); provided that Agent shall not have any obligation to pay any Expenses other than Occupancy Expenses with respect to any Store following the applicable Vacate Date for each Store. All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores, to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent. Any reference in this Section 6 to vacating the Stores means vacating the Stores in favor of Merchant, its representatives, or assignee and shall not mean vacating possession or disclaimer of lease in favor of the landlord or owner of the Store. Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent, or licensee thereof) to any Store during the Sale Term, ordinary wear and tear excepted. Agent shall have the right to abandon in place any asset (other than Remaining Merchandise) of Merchant (including, without limitation, any unsold Owned FF&E).

Section 7.     [Intentionally Omitted]

Section 8.     Conduct of the Sale.

8.1     Rights of Agent and Merchant.  Subject to entry of the Interim Approval Order and the Approval Order, as applicable, and subject to the terms of the Sale Guidelines, Agent shall be permitted to conduct a "going out of business", "store closing", "sale on everything", "everything must go", "inventory liquidation" or similarly themed sale at the Stores throughout the Sale Term.  Agent shall conduct the Sale in the name and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Interim Approval Order and/or Approval Order, all governing laws and applicable leases to which Merchant is a party. Agent shall conduct the Sale in accordance with the Sale Guidelines annexed hereto as Exhibit 8.1 and approved by the Interim Approval Order and/or Approval Order (as and when applicable), whether by in-store promotion, media advertising, or other promotional materials; provided however any such advertising using Merchant's e-commerce site shall be done in conjunction with efforts of Merchant's retained professionals that are marketing Merchant's trademarks and intellectual property.  Merchant and the Lender Representative shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business, so long as Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also

29

have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency. In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the following rights, limited by the Sale Guidelines:

(a)    except as otherwise provided in the Interim Approval Order and/or Approval Order (as and when applicable), to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages, or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws; provided, however, to the extent that Agent extends the hours of operation at one or more of the Stores beyond the hours historically operated by Merchant, which results in additional utilities charges and increased Occupancy Expenses in excess of the average utilities charges and Occupancy Expenses for such Stores over the twelve (12) months preceding the Sale Commencement Date, Agent shall reimburse Merchant the amounts, if any, of such additional costs and such additional costs shall constitute Expenses;

(b)    to use without charge during the Sale Term (except where otherwise designated as an Expense pursuant to Section 4.1 hereof), (i) all furniture, fixtures and equipment, (ii) bank accounts, (iii) Store-level (and to the extent available, corporate) computer hardware and software, (iv) customer lists, mailing lists, email lists, website and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data), (v) existing supplies located at the Stores, (vi) intangible assets (including Merchant's names, logos, and tax identification numbers), (vii) Stores' and Distribution Centers' keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores and the Distribution Centers, and (viii) any other assets of Merchant located at the Stores or the Distribution Centers (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and return to Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)    subject to Agent's payment (if applicable) in accordance with Sections 4.1(t) above in respect of Central Services, Merchant agrees and covenants that it shall be responsible for performing and providing to Agent such Central Services necessary or incident to the conduct of the Sale, including, but not limited to, use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house; provided, however, that, in the event Agent expressly requests Merchant to provide Central Services other than those normally provided to the Stores and/or the Distribution Centers relating to the sale of Merchandise (or Additional Agent Merchandise) by Merchant in the ordinary course of business and as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)    to establish Sale prices and implement advertising, signage (including A-

30

frame, interior and exterior banners and signs and sign walkers), and promotional programs consistent with the sale theme described herein, and as otherwise provided in the Interim Approval Order and the Approval Order (as and when applicable) and the Sale Guidelines (including, without limitation, by means of media advertising, A-frame, interior and exterior banners and signs, use of sign walkers and similar signage).

(e)    once the Inventory Taking is complete at both the transferring Store and the receiving Store, to transfer Merchandise between and among the Stores;

(f)    to transfer Merchandise from the Distribution Center to the Stores, and between and among the  Stores; provided, however Merchant and Agent shall mutually agree upon a methodology for tracking the shipments and receipts of Distribution Center Merchandise and In-Transit Merchandise in the Stores;

(g)    to use until the Sale Termination Date the trademarks, trade names, logos, customer lists, website, URL, mailing lists and email lists relating to and used in connection with the operation of the Stores and (assuming that the E-Commerce Election is made) the E-Commerce Platform solely for the purposes of advertising the Sale, selling Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and Owned FF&E, and otherwise conducting the Sale in accordance with the terms of this Agreement;

(h)    to supplement the Merchandise at the Stores with Additional Agent Merchandise in accordance with Section 8.9 hereof; and

(i)    to conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1 (the "Sale Guidelines").

8.2    Terms of Sales to Customers.  Subject to Agent's compliance with applicable law (as determined with reference to the Interim Approval Order and the Approval Order, as and when applicable), all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers. All sales will be made only for cash or nationally recognized credit and debit cards.  During the period between the Sale Commencement Date and the entry of the Interim Sale Order, Agent shall accept or honor (according to their terms) employee discounts, non-Anna's coupons, or "groupons",or other non-Anna's branded customer loyalty programs, rewards or other discounts that were in effect immediately prior to the Sale Commencement Date (collectively, the "Pre-Sale Customer Rewards Programs") and Merchant shall reimburse Agent in cash for discounts amounts incurred in connection with honoring or accepting such Pre-Sale Customer Rewards Programs during such period as part of the weekly sale reconciliation provided for in Section 8.7(a). From and after the entry of the Interim Approval Order, Agent shall not honor or accept any Pre-Sale Customer Rewards Program.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term, so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

8.3    <u>Sales Taxes</u>.  (a)  During the Sale Term, all sales, excise, gross receipts, and other taxes attributable to sales of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E (except to the extent such sales are exempt) as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E and collected in trust for Merchant at time of sale and deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "<u>Sales Taxes Account</u>"). If Agent does not timely remit Sales Taxes to Merchant, Merchant shall be permitted to draw on the Letter of Credit in the full amount of Sales Taxes collected by Agent in the preceding week in accordance with Section 3.3(g).  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Notwithstanding anything to the contrary herein, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "<u>Additional Taxes and Penalties</u>").  Merchant and Lender Representative will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  Agent shall add Sales Tax to the sales price of all Additional Agent Merchandise sold and Sales Taxes attributable to the sales of Additional Agent Merchandise shall be collected and deposited into the Sales Tax Account.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant and its respective officers, directors, employees, agents and independent contractors (collectively, "<u>Merchant Indemnified Parties</u>") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties (including but not limited to all Additional Taxes and Penalties) that Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and remit them to Merchant and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, the Lender, any taxing authority, or any other party, and Merchant (and Lender to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent and its officers, directors, employees, agents and Supervisors (collectively, "<u>Agent Indemnified Parties</u>") from and against all claims, demands, assessments, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.

(b)    Without limiting the generality of Section 8.3(a) hereof, the Parties agree that because Agent will conduct the Sale solely as agent for Merchant, the various payments that this Agreement contemplates (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4    <u>Supplies</u>.    Agent shall have the right to use all existing supplies necessary to conduct the Sale (<u>e.g.</u>, boxes, bags, and twine, but not gift certificates, rain checks, merchandise credits, or the like) located at the Stores and the Distribution Centers, if any, at no charge to Agent.  In the event that additional supplies are required in any of the Stores during the Sale Term, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; <u>provided</u>, <u>however</u>, that if reasonably requested by Agent, Merchant shall assist Agent in obtaining supplies, at Agent's expense, from Merchant's vendors at Merchant's usual and customary costs for such supplies.  Merchant does not warrant that Merchant's existing supplies as of the Sale Commencement Date are adequate for purposes of the Sale.

8.5    <u>Returns of Merchandise</u>.    During the period from the Sale Commencement Date through and including the date that is thirty days after the date on which Merchant commences a Chapter 11 case (the "<u>Pre-Sale Merchandise Return Period</u>), Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "<u>Returned Merchandise</u>"). Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise. To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise hereunder, and for purposes of the calculation of the Guaranteed Amount and calculation of the Cost Factor hereunder shall be valued as follows: (i) to the extent that such item of Returned Merchandise is received on or before the Prevailing Discount Adjustment Date, at the Cost Value and Retail Price provided for above applicable to such item; and (ii) to the extent that such item of Returned Merchandise is received after the Prevailing Discount Adjustment Date but before expiration of the Pre-Sale Merchandise Return Period, at a value equal to the  product of (x) the applicable Cost Value and Retail Price attributable to such item as provided for above, *multiplied* by (y) the Prevailing Discount Adjustment applicable to such item.  Subject to Merchant's reimbursement to Agent of the amount of any store credit or refund granted for any such Returned Merchandise, the aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly. If the Returned Merchandise is not first quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Cost Value attributable thereto; <u>provided</u> that, in the event Merchant and Agent cannot agree on the Cost Value to be attributed to any particular item(s) of Returned Merchandise, then such item(s) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder. Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the weekly Sale reconciliation pursuant to Section 8.7(a) hereof.  Any increases in payment on account of the Guaranteed

33

Amount as a result of Returned Merchandise shall be paid by Agent as part of the weekly Sale reconciliation provided for under Section 8.7(a) hereof.

    8.6.    <u>Gift Cards; Merchandise Credits; Membership Program</u>.

        During the period from the Sale Commencement Date through and including the date that is (30) days following the date on which Merchant commences a Chapter 11 case, Agent shall accept Merchant's gift cards and honor merchandise credits or similar Merchant-issued credit amounts, and/or Anna's branded coupons or customer rewards (such as "Anna's Bucks:") issued prior to the Sale Commencement Date, in each case in accordance with their terms in effect at the time of issuance.  Merchant shall reimburse Agent in cash for gift cards, merchandise credits and other similar Merchant-issued credit amounts redeemed during such period, as part of the weekly sale reconciliation provided for in Section 8.7(a).

    8.7.    <u>Sale Reconciliation</u>.

        (a)    <u>Weekly Reconciliation</u>.  On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Merchant (in consultation with Lender Representative) and Agent shall cooperate to reconcile Proceeds that have been collected, Expenses, Gross Rings, sales of Merchant Consignment Goods and Owned FF&E and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (<u>i.e.</u>, Sunday through Saturday), pursuant to procedures agreed upon by Merchant (in consultation with Lender Representative) and Agent.  On a weekly basis, Agent shall also provide Merchant (and a copy to Lender Representative) with a report (in electronic format acceptable to Merchant) of all shipments of Additional Agent Merchandise to the Stores and/or Distribution Centers and sales of Additional Agent Merchandise, which report shall detail by Store, at a minimum, gross and net sales and type of items sold. To ensure accurate sales audit functions, as well as accurate calculations of the Sharing Amount, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores.

        (b)    <u>Final Reconciliation</u>.

        (i)    Within thirty (30) days after the Sale Termination Date applicable to the last Store in which the Sale is concluded, Merchant (in consultation with the Lender Representative) and Agent shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, proceeds of Merchant Consignment Goods and Owned FF&E, Expenses, and any other accountings required hereunder (the "<u>Final Reconciliation</u>"). Within five (5) days after completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent (the "<u>Final Reconciliation Settlement Date</u>").  In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of the Parties or as determined in the manner prescribed in Section 8.7(b)(ii) hereof.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant (in consultation with the Lender Representative) and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes, Expenses, and other Sale-

related items to review and audit such records.

(ii)    In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.  In the event of a dispute as to (x) or (y) above, Agent shall extend the Letter of Credit in accordance with the provisions of Sections 3.4 or 4.2(b) hereof, as applicable.  If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the applicable expiration date (as may have been extended previously), Merchant and/or Lender Representative shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the undisputed amounts Merchant asserts are then owing to Merchant in accordance with the terms of Section 3.3(g).

8.8    Force Majeure.  If any casualty, act of war or terrorism, or act of God prevents the conduct of business in the ordinary course at any Store for a period in excess of five (5) consecutive days (a "Force Majeure Event"), such Store and the Merchandise located at such Store  shall be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale that is not the subject of insurance proceeds or consolidated by Agent into another Store(s) and, to the extent Agent has paid the Guaranteed Amount, Merchant (or Lender, to the extent Lender has received such amount(s)), to the extent such insurance proceeds are actually received, shall reimburse Agent for the amount by which the Guaranteed Amount is so reduced prior to the end of the Sale Term.  If a Store is eliminated from the Sale due to a Force Majeure Event, Agent will use its commercially reasonable efforts to transfer therefrom all Merchandise that is not the subject of insurance proceeds and include such Merchandise in the Sale at other Stores.

8.9    Additional Agent Merchandise.

(a)    Agent shall be entitled to include in the Sale supplemental merchandise procured by Agent which is of like kind, and no lesser quality to the Merchandise located in the Stores ("Additional Agent Merchandise").  Agent agrees that Additional Agent Merchandise, if any, shall be procured from either Merchant's existing vendors ("Existing Vendors") or third party vendors who are not Existing Vendors ("Third Party Vendors") that sell merchandise of like kind, and no lesser quality to the Merchandise. Agent shall be responsible for payment of the costs associated with procuring any Additional Agent Merchandise and all costs and expenses related to, or incurred in connection with, the marketing and sale of the Additional Agent Merchandise, as an Expense of the Sale.  Agent further agrees that if it elects to include Additional Agent Merchandise and desires to utilize the Distribution Centers for the receipt, processing, handling and distribution of such Additional Agent Merchandise, then Agent shall negotiate such usage with the third party operators of such Distribution Centers and Agent shall be responsible for all costs and expenses incurred in connection with such usage as an Expense

35

of the Sale.

(b)     The Additional Agent Merchandise shall be at all times subject to the control of Agent, and Merchant and Lender shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the Additional Agent Merchandise.   If requested by Agent, Merchant shall, at Agent's expense as an Expense, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)     Any transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant.   Merchant acknowledges, and the Interim Approval Order and Approval Order (as and when applicable) shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC").   Agent is hereby granted a first priority security interest in (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise proceeds, which security interest Agent shall be authorized to perfect prior to entry of the Approval Order, but which security interest shall, if not sooner perfected, be deemed perfected pursuant to the Interim Approval Order and the Approval Order (as and when applicable) without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise (and any proceeds from the sale thereof) as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise proceeds).   The Lender hereby consents to the inclusion of the proceeds of the sale of Additional Agent Merchandise as "Proceeds" hereunder.

(d)     In order to distinguish the Additional Agent Merchandise from the Merchandise located in the Stores, Agent shall affix distinctive tags and/or other identifying markings on all items of Additional Agent Merchandise, which shall enable Merchant and Agent to distinguish sales of the Additional Agent Merchandise from sales of the Merchandise. Additionally, Agent shall provide signage in the Stores and, to the extent applicable, the E-Commerce Platform notifying customers that the Additional Agent Merchandise has been included in the Sale.

8.10   E-Commerce Platform.    No later than one business day after the Sale Commencement Date, Agent shall have the right to elect to include Merchant's e-commerce based E-Commerce platform (the "E-Commerce Platform") and conduct the Sale using the E-Commerce Platform for purposes of selling Merchandise and Additional Agent Merchandise in the Sale (the "E-Commerce Platform Election") effective as of the Sale Commencement Date; or (ii) the first day following the exercise of such election.    Upon such exercise, and in addition to, and without limiting, any other provision of this Agreement, Merchant hereby grants Agent a royalty-free sub-license (exclusive during the Sale Term) to use Merchant's E-Commerce Platform to fulfill customer orders for purchases/sales of Merchandise and Additional Agent Merchandise (in Agent's capacity as Agent hereunder).    All proceeds of such sales of

Merchandise and Additional Agent Merchandise shall constitute Proceeds under this Agreement. Merchant shall provide Agent with all customary operations, systems, and services associated with the performance, operation and functionality of the E-Commerce Platform and the fulfillment of sales therefrom; provided, however, that Agent shall reimburse Merchant, as an Expense, all amounts incurred by Merchant in connection with such E-Commerce Platform and any Distribution Center Expense incurred in connection with continued usage of such E-Commerce Location for the storage, processing and shipping of the E-Commerce Merchandise and Additional Agent Merchandise to the consumers.  Merchant and Agent shall mutually agree on the date and procedures required to complete the Inventory Taking of the E-Commerce Merchandise at the E-Commerce Location.  Agent shall provide Merchant with no less than five (5) business days notices of its intention to discontinue use of the E-Commerce Platform.  Upon Agent's termination of use of the E-Commerce Platform, (i) Agent shall have the sole obligation to transfer any remaining E-Commerce Merchandise to the Stores, and such transfers shall not be subject to the Merchandise Receipt Deadline or Prevailing Discount Adjustment and (ii) Agent's obligation to pay E-Commerce Platform Expenses shall cease; provided, however, that, if Agent continues the Sale at the Stores after the date on which Agent terminates using the E-Commerce Platform as a sales platform to fulfill customer orders, Merchant shall, as a Central Service and at no cost or expense to Agent (other than as part of Central Service Expenses), maintain the E-Commerce Platform with limited functionality for the limited purposes of advertising and promoting the Sale at the Stores, periodically updating such advertising and promotions, and maintaining and updating the Store locator function.  If Agent exercises the option to use the E-Commerce Platform as a sales platform to fulfill customer orders, in addition to the foregoing, Agent shall provide Merchant with written notice of such election no later than the Sale Commencement Date and Agent and Merchant hereby agree to the following:  (i) all Merchandise sold through the E-Commerce Platform shall be counted based on shipments to customers; (ii) Merchant and Agent shall mutually agree upon an allocation of Merchandise to be sold using the E-Commerce Platform, which Merchandise shall not be subject to the requirement to arrive at the Stores by the Receipt Deadline; (iii) Agent shall be authorized to sell Additional Agent Goods through the E-Commerce Platform; and (iv) the Parties may implement such other processes, procedures, and agreements as may be necessary or appropriate for the efficient and continued operation of the E-Commerce Platform.  In the event Agent elects not to exercise its rights to use the E-Commerce Platform as a sales platform to fulfill customer orders, Merchant agrees that neither Merchant nor any other person or entity shall complete any sale of goods for Merchant's or any other person's or entity's account utilizing the E-Commerce Platform during the Sale Term, Merchant shall otherwise comply with Merchant's obligations under this Agreement in respect of the E-Commerce Platform, and Merchant shall, as a Central Service and at no cost or expense to Agent (other than as part of Central Service Expenses), maintain the E-Commerce Platform with limited functionality for the limited purposes of advertising and promoting the Sale at the Stores, periodically updating such advertising and promotions, and maintaining and updating the Store locator function.

Section 9.      Employee Matters.

9.1      Merchant's Employees.    Subject to the applicable provisions of the Interim Approval Order and Approval Order (as and when applicable) and any other provisions in this Agreement relating to employees, Agent may use Merchant's Store employees in the conduct of

the Sale to the extent Agent deems expedient, and Agent may select and, with Merchant, schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such Store employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.  Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.  Merchant and Agent agree that except to the extent that wages, payroll taxes, benefits, and other costs relating to the employment of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims, and other termination-type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

9.2    Termination of Employees by Merchant.  Agent may in its discretion stop using any Retained Employee at any time during the Sale.   In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for termination "for cause" (such as dishonesty, fraud, or breach of employee duties), in which case the seven (7) day notice period shall not apply; provided, however, that Agent shall promptly notify Merchant of the basis for such "cause".  During the Sale Term, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld). Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's treatment of such Retained Employees.

9.3    Payroll Matters.  Subject to Section 4.1 hereof, during the Sale Term Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.

9.4    Employee Retention Bonuses.   Agent shall pay, as an Expense hereunder, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable) up to a maximum of approximately ten percent (10%) of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause", as Agent shall determine in its sole discretion.  The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its discretion, and shall be processed through Merchant's payroll system. Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within three (3) business days after the Sale Commencement Date.  Agent

38

shall not utilize the Retention Bonus as a mechanism to encourage Retained Employees to act contrary to Merchant's best interests.

<u>Section 10</u>.    <u>Conditions Precedent</u>.

10.1    <u>Conditions to Agent's Obligations</u>.  The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(a)    All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)    No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement (including, without limitation, the Sale);

(c)    The Lender shall have executed this Agreement in the space provided therefor;

(d)    No later than five (5) business days after the voluntary commencement of the Bankruptcy Cases (or not later than five (5) business days after the conversion of any involuntary bankruptcy case filed with respect to Merchant to a voluntary case under chapter 11 of the Bankruptcy Code), Merchant shall have filed a motion ("<u>Lease Extension Motion</u>") with the Bankruptcy Court seeking issuance of an order, pursuant to Section 365(d) (4) of the Bankruptcy Code, <u>inter</u> <u>alia</u>, extending the Merchant's time to assume or reject the leases for the Stores to a date not sooner that the applicable Sale Termination Date;

(e)    Notwithstanding anything in this Agreement or any Agency Document to the contrary, the enforceability of this Agreement is subject in all respects to Agent's express written approval and acceptance of any Exhibit or Agency Document not fully executed by the parties and attached hereto; and

(f)    Entry of the Interim Approval Order and Approval Order subject to the terms of Section 3.1(f).

10.2    <u>Conditions to Merchant's Obligations</u>. The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(a)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date; and

39

(b)    Notwithstanding anything in this Agreement or any Agency Document to the contrary, the enforceability of this Agreement is subject in all respects to Merchant's express written approval and acceptance of any Exhibit or Agency Document not fully executed by the parties and attached hereto.

Section 11.    Representations, Warranties and Covenants.

11.1    Merchant's Representations, Warranties, and Covenants.    Merchant hereby represents, warrants, and covenants in favor of Agent as follows:

(a)    Merchant (i) is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to own, lease, and operate its assets and properties and to carry on its business as presently conducted and to grant the rights intended to be granted herein as provided herein (it being understood that, from and after the date on which Merchant commences a Chapter 11 case, this representation shall be subject to the entry of the Interim Approval Order and/or the Approval Order); and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which each Distribution Center and each Store is/are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Merchant has the right, power, and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations hereunder. Merchant has taken and, in the event of a bankruptcy filing shall take, all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale (other than the entry of the Interim Approval Order and/or Approval Order following the commencement of the Merchant's Chapter 11 case). Each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid, and binding obligation of Merchant, enforceable in accordance with its terms. Except as provided in this Agreement, no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party that has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder (it being understood that, from and after the date on which Merchant commences a Chapter 11 case, this representation shall be subject to the entry of the Interim Approval Order and/or the Approval Order). Other than for any consent as shall be obtained prior to the Sale Commencement Date, no contract or other agreement to which Merchant is a party or by which Merchant is otherwise

40

bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement (it being understood that, from and after the date on which Merchant commences a Chapter 11 case, this representation shall be subject to the entry of the Interim Approval Order and/or the Approval Order).

(c)    As of the date of this Agreement, Merchant has continued normal replenishment of Merchandise and supplies in and to the Stores, and shall continue to do so until at least the date of filing its bankruptcy case.

(d)    Merchant (i) except as set forth on Exhibit 11.1(d), owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise, Merchant Consignment Goods and Owned FF&E free and clear of all liens, claims, and encumbrances of any nature; provided that, upon entry of the Interim Approval Order, the liens identified in Exhibit 11.1(d) shall attach to the Guaranteed Amount, the Sharing Amount, if any, and such other amounts due Merchant hereunder in the same extent and priority that such liens had in the Merchandise and Owned FF&E; and (ii) Merchant shall not create, incur, assume, or suffer to exist any security interest, lien, or other charge or encumbrance upon or with respect to any of the Merchandise, Merchant Consignment Goods, Owned FF&E or the Proceeds, in each case, except for (x) such pre-existing liens and security interests as shall have been disclosed by Merchant to Agent and identified in Exhibit 11.1(d) hereof, and (y) following the commencement of the Bankruptcy Cases, post-petition liens in the Merchandise and Proceeds in favor of a lender securing any debtor in possession financing provided by the lender and/or adequate protection liens granted in favor of the lender, which liens and security interests shall attach only to the Guaranteed Amount, the Sharing Amount, Expenses and any other amounts payable to Merchant hereunder.

(e)    Merchant has maintained its pricing files, including without limitation, the Cost File, in the ordinary course of business, and prices charged to the public for goods (whether in-store, by advertisement, online, or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns, advertised sales, and other customary in-store, online, promotional or clearance activities).  Each pricing file, including (without limitation) the Cost File, is true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods and does not include or reflect Excluded Pricing Adjustments and all such files were updated on or about May 27, 2015 to reflect the current selling price for such items of Merchandise.  All pricing files and records relative to the Merchandise have been made available to Agent.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(f)    Merchant shall ticket or mark all items of inventory received at the Stores prior to the Sale Commencement Date in a manner consistent with similar Merchandise located

41

at the Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(g)  To the best of Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state, and local product safety laws, rules, and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.  Merchant owns or possesses all right, title and interest in and to all material permits, licenses, franchises, orders, consents, authorizations, registrations, certificates, variances, exceptions, approvals and similar rights obtained from governments and governmental agencies relating to the Stores or the operations conducted at the Stores, and all deposits or bonds in connection therewith (collectively, the "Permits") that are necessary to own and operate the Stores, including, without limitation, all Permits  required under any federal, state or local law relating to public health and safety, employee health and safety, pollution or protection of the environment, other than in each case failures to so own or possess all right, title and interest that would not prevent or materially impair the Merchant's consummation of the transactions contemplated by this Agreement.  The Merchant is in compliance with the terms and conditions of such material Permits and has received no notices (nor does it have any knowledge of any threatened notice) that it is in violation of any of the terms or conditions of such Permits, except for any noncompliance or violation that would not prevent or materially impair the Merchant's consummation of the transactions contemplated by this Agreement.  Merchant has conducted and continues to conduct its business, in all material respects, in accordance with all applicable laws and governmental orders applicable to Merchant or any of its assets or properties, and to the best of its knowledge Merchant is not in material violation of any such law or governmental order, including, without limitation, any law, now in effect, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, labor, health, safety or hazardous materials, except for any noncompliance or violation that would not prevent or materially impair the Merchant's consummation of the transactions contemplated by this Agreement.

(h)  Agent shall have the right during the Sale Term to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores. Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair (at its own expense, except as expressly set forth herein) all cash registers, heating systems, air conditioning systems, elevators, escalators, alarm systems and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores.  Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(i)  Merchant has paid and shall continue to pay until entry of an order for relief under the Bankruptcy Code, and, subject to the Approval Order, Merchant shall continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Stores' employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

42

(j)     Supplies have not been, since May 1, 2015, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

(k)     Since May 1, 2015, Merchant (i) has not (and shall not, up to the Sale Commencement Date) marked up or raised the price of any items of Merchandise, (ii) has not reduced the price of any items of Merchandise, (iii) has sold inventory during such period at customary prices consistent with the ordinary course of business, and has not offered any promotions or discounts or promoted or advertised any sales or in-store promotions (including POS promotions) to the public other than as described on Exhibit 11.1(k) (in all cases whether or not consistent with Merchant's ordinary course of business consistent with historic periods) and (iv) has not removed or altered any tickets or any indicia of clearance merchandise or POS promotion.

(l)     As of the date of this Agreement and except for the matters set forth on Exhibit 11.1(l), no action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Merchant or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, which questions the validity of this Agreement or that, if adversely determined, would adversely affect the conduct of the Sale in any material respect.

(m)     Merchant is not a party to any collective bargaining agreements with its employees. No labor unions represent Merchant's employees at any Store. There are currently no strikes, work stoppages, or other labor disturbances affecting any Distribution Center or any Store, or Merchant's central office facilities.

(n)     Since May 1, 2015, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(o)     Since May 1, 2015, Merchant has operated, and, except as provided herein (including as described in Section 11.1(c)), through the Sale Commencement Date, Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business and not offering any promotions or discounts or promoting or advertising any sales or in-store promotions (including POS promotions) to the public other than an as described on Exhibit 11.1(k) (in all cases whether or not consistent with Merchant's ordinary course of business consistent with historic periods); (ii) not returning inventory, supplies, fixtures, furniture or equipment to vendors and not transferring inventory, supplies, fixtures, furniture or equipment out of or to the Stores; or (iii) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; subject in each case to the Merchant's filing of the Bankruptcy Cases. Since May 1, 2015, Merchant has not transferred, and will not transfer, any inventory to or from

43

any of Merchant's retail locations other than the Stores and the Distribution Centers from or to any Store or Distribution Center; provided, however, that, solely with respect to the retail locations listed on Exhibit 11.1(o) (the "Self-Liquidating Locations"), Merchant may transfer (at Merchant's sole expense) inventory remaining at such retail locations as of June 15, 2015 (the "Residual Sale Inventory"), to the Stores in accordance with an allocation to be reasonably agreed by Merchant (in consultation with the Lender Representative) and Agent; provided further that (1) any Residual Sale Inventory delivered to a Store shall be held separately and shall not be unpacked at the receiving Store until after completion of the Inventory Taking (if any) at such Store, (2) Residual Sale Inventory shall not constitute Merchandise and (3) any Residual Sale Inventory delivered to a Store shall be deemed to be Merchant Consignment Goods and shall be sold in accordance with Section 5.4, on a "first-in, first-out" basis with respect to the Merchandise located at such Store.

(p)     To Merchant's knowledge, formed after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(q)     Except as identified on Exhibit 11.1(p), no Store lease or similar occupancy agreement has expired, nor shall expire at any time until the conclusion of the Sale Term in such Store (by its terms or otherwise).

(r)     Merchant has not since May 1, 2015 knowingly shipped any Excluded Defective Merchandise from the Distribution Centers to the Stores.  Merchant will not knowingly ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Centers to the Stores.

(s)     Merchant shall not, prior to the Sale Commencement Date, offer any promotions or discounts at the Stores except as detailed on Exhibit 11.1(k).  Merchant acknowledges and agrees that, on or after the Sale Commencement Date, it shall not offer any promotions or discounts at the Stores.

(t)     To the extent that the Bankruptcy Cases shall be commenced, Merchant shall use its good faith best efforts to prosecute the Lease Extension Motion and obtain the relief contemplated thereby.

(u)     Merchant agrees and covenants that it shall retain sufficient funds, or make other arrangements satisfactory to Merchant and Agent, to enable Merchant to fully satisfy and perform its obligations under this Agreement and Merchant shall use those funds to fully satisfy and perform its obligations under this Agreement.

(v)     As of the Sale Commencement Date, the mix of goods as to type (e.g., clearance or regular) and as to category shall in all material respects be consistent with the respective levels and mixes set forth on Exhibit 11.1(v).

(w)    Merchant agrees that it shall acquire at its own expense, and cause to be delivered to the Stores prior to the Sale Commencement Date, signage, banners and sign walkers as set forth on Exhibit 11.1(w); provided that, to the extent that Agent is the successful bidder and the Approval Order is entered, the actual costs and expenses of such acquisition and delivery of signage, banners and sign walkers shall constitute an Expense for which Agent shall reimburse Merchant in accordance with Section 4.2.

(x)    No investigation or due diligence conducted by Agent shall limit, modify or negate any of the foregoing representations or warranties.

(y)    Notwithstanding anything to contrary set forth herein, to the extent that Merchant's conduct of self-liquidation sales at the Self-Liquidating Locations, or the inventory located thereat, would render a representation or warranty of Merchant in this Section 11.1 untrue, the conduct of the Self-Liquidation Sale shall be deemed a carve-out from any such representation or warranty, and shall not trigger a default with respect thereto; provided, however, that this Section 11.1(y) shall not establish a carve-out with respect to any transfer of any inventory to or from any of Merchant's retail locations other than the Stores and the Distribution Centers from or to any Store or Distribution Center.

11.2    Agent's Representations, Warranties and Covenants.    Agent hereby represents, warrants, and covenants in favor of Merchant as follows:

(a)    Agent (i) is a limited liability company duly and validly existing and in good standing under the laws of the state of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)    Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid, and binding obligation of Agent enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforceability is consider in a proceeding in equity or at law). No court order or decree of any federal, provincial, state, or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

45

(c)    No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 12.    Insurance.

12.1    Merchant's Liability Insurance.  Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall use best efforts to cause Agent to be named an additional insured with respect to all such policies.    Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal, or material change.  In the event of a claim under any such policies, (a) Merchant shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent such claim arises from or relates to the alleged acts or omissions of Merchant or its employees (other than Retained Employees), agents (other than Agent's employees), or independent contractors (other than Agent and Supervisors hired by Agent in conjunction with the Sale) and (b) Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts (which amounts shall constitute Expenses) to the extent such claim arises from or relates to the alleged acts or omissions of Agent or its employees, agents, or independent contractors, including Retained Employees.

12.2    Merchant's Casualty Insurance.  Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft, and extended coverage casualty insurance covering the Merchandise (and, if requested, the Additional Agent Merchandise) in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise, and shall use best efforts to cause Agent to be named an additional insured with respect to all such policies. In the event of a loss to the Merchandise or Additional Agent Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise or Additional Agent Merchandise (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal, or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date (as may be extended from time to time as set forth herein) without Agent's prior written consent.

46

12.3   <u>Worker's Compensation Insurance</u>.   Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4   <u>Agent's Insurance</u>.   As an Expense of the Sale, Agent shall maintain throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent such claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or Supervisors.

12.5   <u>Risk of Loss</u>.   Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Agent shall not be deemed to be a successor employer.  Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claims arises directly from the acts or omissions of Agent, or its supervisors, agents, independent contractors or employees located at the Stores (an "<u>Agent Claim</u>").   In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

<u>Section 13</u>.   <u>Indemnification</u>.

13.1   <u>Merchant Indemnification</u>.   Merchant shall indemnify and hold Agent and each Agent Indemnified Party harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

47

(a)     Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)     any failure of Merchant to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)     subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)     any consumer warranty or products liability claims relating to Merchandise and/or Additional Agent Merchandise;

(e)     any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act);

(f)     any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; and

(g)     the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent), or representatives.

The indemnification obligations set forth in this Section 13.1 shall be in addition to (and shall not limit) any other indemnification obligations of Merchant set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

13.2    Agent Indemnification.    Agent shall jointly and severally indemnify and hold harmless Merchant and the Merchant Indemnified Parties from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Merchant resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Agent):

(a)     Agent's material breach of or failure to comply with any Safety Laws or any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)     any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, Supervisors, or other officers, directors, or representatives of Agent;

48

(c)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)    any Agent Claims;

(e)    any Additional Taxes and Penalties arising out of Agent's failure to collect and/or remit to Merchant correct amounts of Sales Taxes (including any such failure resulting from Agent's use of any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale);

(h)    the gross negligence, willful misconduct, or fraud of Agent or any of its officers, directors, employees, agents, or representatives; and

(i)    any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Merchandise.

The indemnification obligations set forth in this Section 13.2 shall be in addition to (and shall not limit) any other indemnification obligations of Agent set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

Section 14.    Defaults.

The following shall constitute "Events of Default" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)    Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term;

(c)    [Intentionally omitted;]

(d)    The filing of a motion by any party to covert or the conversion of the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint or the appointment of a chapter 11 trustee;  or

(e)    Subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at any Store or the E-Commerce Platform or the Distribution Centers for any reason other than (i) an Event of Default by Agent or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party (in the case of (a) or (b) above, or the Agent in the case of (c), (d), or (e) above) may, in its discretion, elect to terminate this

Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not effected by the defaulting party.

Section 15.     Fixtures.

(a)     With respect to any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking owned by Merchant and located at the Stores, the Distribution Centers, and Merchant's corporate offices (collectively, the "Owned FF&E"), Agent shall have the sole and exclusive right to sell or otherwise dispose of the Owned FF&E for Agent's sole and exclusive benefit. Agent shall be responsible for all costs and expenses associated with the sale or other disposition of Owned FF&E and all proceeds realized from the sale or other disposition of the Owned FF&E shall be retained by Agent for its sole account; provided, however, that, notwithstanding the foregoing, Agent shall not be responsible for payment of costs or expenses associated with the use or occupancy of the Stores, the Distribution Centers or the corporate offices (except in each case to the extent such costs or expenses are expressly included in section 4.1 of this Agreement), all of which Merchant covenants to pay such that Agent shall have the benefit of selling the Owned FF&E from such locations; provided further however, it is understood that Agent's right to dispose of the Owned FF&E in the Stores and the Distribution Centers shall only be in effect during the Sale Term, and with respect to the Owned FF&E in the corporate offices shall be subject to the time  period and provisions provided for in Section 15(e) hereof.

(b)     Anything in this Agreement to the contrary notwithstanding, Agent shall be authorized to abandon any and all unsold Owned FF&E (and all other furniture, fixtures, and equipment at the Stores, Distribution Centers and corporate offices) in place without any cost or liability to Agent. Agent shall have no responsibility whatsoever with respect to furniture, fixtures, and equipment located at the Stores, Distribution Centers and/or corporate offices which are not owned by Merchant.

(c)     Merchant hereby represents to Agent that: (i) all Owned FF&E may be sold by Agent on Merchant's behalf, free and clear of all claims, liens and encumbrances of any kind; and (ii) all such Owned FF&E is devoid of Hazardous Materials.

(d)     Anything in this Agreement to the contrary notwithstanding, Agent will not have any obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any Hazardous Materials that may be located at the Stores, Distribution Centers and/or Merchant's corporate offices or otherwise. Agent shall have no liability to any party for any environmental action brought: (i) that is related to the storage, handling, treatment, disposition, generation, or transportation of Hazardous Materials, or (ii) in connection with any remedial actions associated therewith or the Stores, Distribution Centers and/or Merchant's corporate offices. Merchant (and not Agent) shall be solely responsible to remove from the Stores, Distribution Centers and Merchant's corporate offices all Hazardous Materials. For purposes of this Agreement, the term "Hazardous Materials" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and

50

Liability Act of 1980, as amended, 42 U.S.C.A. 9601(14), as a "hazardous substance", (ii) the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste", or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public  health  or welfare or  to the environment or as otherwise requiring special handling, collection,  storage, treatment, disposal, or transportation.

(e)    In respect of the sale of Owned FF&E at or from the corporate offices, the effective date of any such sale of Owned FF&E shall not become effective until Merchant has discontinued use of such Owned FF&E.  From time to time, Merchant shall cooperate with Agent to identify Owned FF&E at the corporate offices for which Merchant has discontinued use or will discontinue use in the then near future.  Once Merchant has discontinued the use of all or substantially all Owned FF&E, Merchant and Agent shall mutually agree upon a reasonably period of time during which the Agent may complete remaining sales of Owned FF&E and the corporate offices and provide purchasers thereof with reasonable access to remove such purchased Owned FF&E.

Section 16.    Miscellaneous.

16.1    Notices.    All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by e-mail, and/or a recognized overnight delivery service, as follows:

If to Agent:

Gordon Brothers Retail Partners, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn:   Michael Chartock
Tel:     617.210.7116
Email: mchartock@gordonbrothers.com

-and-

Hilco Merchant Resources, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attn:   Ian S. Fredericks
Tel:     847.418.2075
Email: ifredericks@hilcotrading.com

With a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn:   Joshua A. Sussberg
Tel:     212.446.4829
Email: Joshua.sussberg@kirkland.com

If to Merchant:

Anna's Linens, Inc.
3550 Hyland Avenue
Costa Mesa, CA  92662
Attn: Scott Gladstone
Email: scott.gladstone@annaslinens.com

With a copy to (which shall not constitute notice):

Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd.
Suite 1700
Los Angeles, CA  90067
Attn: Eve Karasik, Esq.
Email: ehk@lnbyb.com
Facsimile: 310.229.1244

If to Lender Representative:

Salus Capital Partners, LLC
197 First Avenue, Suite 250
Needham Heights, MA 02494
Attn:    Kyle C. Shonak
Tel:    617.420.2663
Email:  kshonak@saluscapital.com

With a copy to (which shall not constitute notice):

Greenberg Traurig, LLP
One International Place
Boston, MA 02110
Attn:   Jeffrey M. Wolf, Esq.
Tel:    617.310.6041
Email: wolfje@gtlaw.com

16.2    <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles thereof.  The parties hereto agree that from and after the commencement of the Bankruptcy Cases, the Bankruptcy Court (and the District Court and Circuit Court of Appeal with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3    <u>Entire Agreement</u>.    This Agreement, the Exhibits hereto, and the Agency Documents (subject, in each instance, to the Approval Order as and where applicable) contain the entire agreement between the Parties with respect to the transactions contemplated hereby and supersede and cancel all prior agreements, including but not limited to all proposals, letters of intent, or representations, written or oral, with respect thereto.

16.4    <u>Amendments</u>.  This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of the Merchant and Agent;

53

provided, however, that no modification may be made to this Agreement without the express consent of the Lender Representative.

16.5    No Waiver.  No party's consent to or waiver of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of Agent and Merchant, including but not limited to any chapter 11 or chapter 7 trustee.  No party to this Agreement shall be permitted to assign its obligations under this Agreement; provided that any entity comprising Agent may assign its right to receive payments under this Agreement collaterally to its lender as security.

16.7    Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile or other electronic means, and such facsimile or electronic signature shall be treated as an original signature hereunder.

16.8    Section Headings.  The headings of Sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    Survival.  All representations, warranties, covenants and agreements made herein shall be continuing, shall be considered to have been relied upon by the Parties and shall survive the execution, delivery, and performance of this Agreement.  The provisions of Sections 3.3(c) 3.3(f), Article 13 and this Article 16 shall survive the termination of this Agreement; provided that Section 16.10 of this Agreement shall not survive the termination of this Agreement if such termination is caused by Merchant's delivery of a Termination Notice in accordance with Section 16.11(a).

16.10    Agent's Security Interest.

(a)    In consideration of and subject to payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to the Lender Representative, as Merchant's designee, Merchant hereby grants to Agent first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E; (vi) Agent's percentage share of Proceeds in excess of the Sharing Threshold, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and

performance of all obligations of Merchant to Agent hereunder. Upon entry of the Approval Order, but subject to payment of the Initial Guaranty Payment on the Payment Date, and delivery of the Letter of Credit to the Lender Representative, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)     Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Lender and Merchant), the Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, provided, however, that (x) until the Merchant receives payment in full of the Guaranteed Amount, the Additional Agent Merchandise Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E, and such other amounts due to Merchant hereunder, the security interest granted to Agent hereunder shall be junior and subordinate in all respects to the security interests of Lender in the Agent Collateral (including without limitation any pre-petition or post-petition liens granted to Lender securing the Existing Credit Facility or any DIP Facility and adequate protection liens in favor of Lender) but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E, and such other amounts due to Merchant hereunder, and (y) upon payment in full of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E, and such other amounts due to Merchant hereunder, any security interest or lien of the Lender in the Agent Collateral (including without limitation any pre-petition or post-petition liens granted to Lender securing the Existing Credit Facility or any DIP Facility and adequate protection liens in favor of Lender) shall be junior and subordinate in all respects to the security interest and liens of Agent in the Agent Collateral.  Merchant and Lender shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(c)     Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(d)     In the event of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC.

16.11 Termination Fee, Break-Up Fee(s); Expense Reimbursement(s).

(a)     Pursuant to the terms of that certain stalking horse agency agreement between the joint venture comprised of Tiger Capital Group, LLC and Yellen Partners, LLC (collectively the "Stalking Horse") and the Merchant (the "Stalking Horse Agency Agreement"), which agreement served as the basis upon which the bids at the auction conducted on June 9,

55

2015 and June 10, 2015 (the "Auction") were based, as the unsuccessful bidder at the Auction, the Stalking Horse is entitled to the following:

(i)        in the event that Merchant timely delivers a Termination Notice (as defined in the Stalking Horse Agreement) to the Agent and the Stalking Horse, terminating this Agreement prior to the expiration of the Early Termination Time, on the basis that the Merchant is not proceeding with the liquidation/closure of a substantial number of the Stores or the business, Merchant shall pay a termination fee to the Stalking Horse in the amount of $100,000 (the "Termination Fee") (in addition to the Work Fee, as defined in the Stalking Horse Agreement) to cover the Stalking Horse's expenses to date, and Merchant shall pay the Termination Fee to the Stalking Horse in immediately available funds in accordance with instructions provided by the Stalking Horse to Merchant within one business day following the delivery of a Termination Notice by Merchant; provided however, in the event that Merchant terminates this Agreement and proceeds with a transaction that contemplates the liquidation/closure of a substantial number of the Stores or the business, and the Stalking Horse is not serving as the agent or consultant in connection with such liquidation/closures, then Merchant shall tender payment of the Bid Protections to the Stalking Horse in the time and manner provided for in Section 16.11(a)(ii) hereof.

(ii)        If Merchant does not timely delivery a Termination Notice to the Agent and Stalking Horse, then the Stalking Horse is entitled to receive, (i) the breakup fee equal to $650,000 (the "Break-Up Fee"); plus (ii) the reasonable fees and expenses of legal, accounting and financial advisors and out of pocket costs and expenses incurred by Stalking Horse in connection with conducting due diligence and the negotiation, documentation and implementation of the Stalking Horse Agency Agreement and the transactions contemplated thereby in an amount not to exceed $350,000 (the "Expense Reimbursement" and together with the Break-Up Fee, the   "Bid Protections"), as provided for in the Stalking Horse Agency Agreement, which Bid Protections shall be paid as follows: (x) no later than two (2) business days after the earlier of: (1) the Payment Date, in which case an amount equal to the Bid Protections less the Work Fee (the "Outstanding Bid Protection Amount") shall be remitted by the Agent to the Stalking Horse from the Remaining Initial Guaranty Payment (with the balance of such Remaining Initial Guaranty Payment to be remitted to the Merchant's Designated Account as provided for in Section 3.3(a) hereof; or (2) in the event that the Approval Order is not entered by June 30, 2015 and the Sale is converted to a fee arrangement as provided for in Section 3.1(e) hereof, in which case the Merchant shall remit the Outstanding Bid Protection Amount to the Stalking Horse; provided however, in the event that Merchant does not have sufficient funds to remit the full amount Outstanding Bid Protection Amount to the Stalking Horse, the Lender agrees to advance any shortfall amount (up to a maximum of the Outstanding Bid Protection Amount) to Merchant under the Existing Credit Facility or the DIP Facility, and Merchant shall advance such amounts to the Stalking Horse.

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**HILCO MERCHANT RESOURCES, LLC**

By: _____

        Name:_____

        Title: _____

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____

        Name:_____

        Title: _____

**MERCHANT:**

**ANNA'S LINENS, INC.**

By: _____

        Name:  Scott Gladstone

        Title:    Chief Executive Officer and President

**THE PROVISIONS OF THIS AGREEMENT
ARE HEREBY CONSENTED AND AGREED TO,
INCLUDING SECTIONS 3.2, 3.3, 4.1, 8.3, 8.7, 8.8, 8.9, 15, 16.2, 16.4, 16.10 and 16.11:**

**SALUS CAPITAL PARTNERS, LLC**,
As Lender

By: _____
　　　　Name:  Kyle Shonak
　　　　Title:   Co-President

**SALUS CLO 2012-1, LTD.**,
As Lender

By: _____
　　　　Name:
　　　　Title:

**DCP LINENS LENDER, LLC**,
As Lender

By: _____
　　　　Name:
　　　　Title:

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**HILCO MERCHANT RESOURCES, LLC**

By: _____
    Name: Ian Fredericks
    Title: VP & Assistant General Counsel, Managing Member

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____
    Name:_____
    Title: _____

**MERCHANT:**

**ANNA'S LINENS, INC.**

By: _____
    Name:  Scott Gladstone
    Title:   Chief Executive Officer and President

[Signature Page to Agency Agreement]

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**HILCO MERCHANT RESOURCES, LLC**

By: _____
    Name: _____
    Title: _____

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____
    Name: _Richard Edwards_
    Title: _Co-President - Retail_

**MERCHANT:**

**ANNA'S LINENS, INC.**

By: _____
    Name:  Scott Gladstone
    Title:    Chief Executive Officer and President

[Signature Page to Agency Agreement]

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**HILCO MERCHANT RESOURCES, LLC**

By: _____
         Name: _____
         Title: _____

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____
         Name: _____
         Title: _____

**MERCHANT:**

**ANNA'S LINENS, INC.**

By: _____
         Name:  Scott Gladstone
         Title:  Chief Executive Office and President

[Signature Page to Agency Agreement]

**THE PROVISIONS OF THIS AGREEMENT
ARE HEREBY CONSENTED AND AGREED TO,
INCLUDING SECTIONS 3.2, 3.3, 4.1, 8.3, 8.7, 8.8, 8.9, 15, 16.2, 16.4, 16.10 and 16.11:**

**SALUS CAPITAL PARTNERS, LLC,**
As Lender

By: _____
        Name: Kyle Shonak
        Title:  Co-President

**SALUS CLO 2012-1, LTD.,**
As Lender

By: _____
        Name:
        Title:

**DCP LINENS LENDER, LLC,**
As Lender

By: _____
        Name:
        Title:

[Signature Page to Agency Agreement]

**THE PROVISIONS OF THIS AGREEMENT
ARE HEREBY CONSENTED AND AGREED TO,
INCLUDING SECTIONS 3.2, 3.3, 4.1, 8.3, 8.7, 8.8, 8.9, 15, 16.2, 16.4, 16.10 and 16.11:**

**SALUS CAPITAL PARTNERS, LLC,**
As Lender

By: _____

      Name:  Kyle Shonak
      Title:   Co-President

**SALUS CLO 2012-1, LTD.,**
As Lender

By: _____

      Name:  Kyle Shonak
      Title:   Co-President

**DCP LINENS LENDER, LLC,**
As Lender

By: _____

      Name:
      Title:

[Signature Page to Agency Agreement]

**THE PROVISIONS OF THIS AGREEMENT
ARE HEREBY CONSENTED AND AGREED TO,
INCLUDING SECTIONS 3.2, 3.3, 4.1, 8.3, 8.7, 8.8, 8.9, 15, 16.2, 16.4, 16.10 and 16.11:**

**SALUS CAPITAL PARTNERS, LLC,**
As Lender

By: _____
      Name: Kyle Shonak
      Title:   Co-President

**SALUS CLO 2012-1, LTD.,**
As Lender

By: _____
      Name:
      Title:

**DCP LINENS LENDER, LLC,**
As Lender

By: _____
      Name:
      Title:

[Signature Page to Agency Agreement]

Exhibit A-1

(List of Stores)

| # | Anna's Store Name | Street | City | ST | Zip Code | Phone # |
|---|---|---|---|---|---|---|
| 1 | WEST COVINA, CA | 420 PLAZA DR. | WEST COVINA | CA | 91790 | (626) 960-7796 |
| 3 | MONTEBELLO, CA | 2401 VIA CAMPO | MONTEBELLO | CA | 90640 | (323) 728-3716 |
| 4 | LYNWOOD, CA | 3170 IMPERIAL HWY, #E | LYNWOOD | CA | 90262 | (310) 639-3304 |
| 5 | INGLEWOOD, CA | 11328 CRENSHAW BLVD. | INGLEWOOD | CA | 90303 | (323) 754-8854 |
| 6 | ALHAMBRA, CA | 846 E. VALLEY BLVD. | ALHAMBRA | CA | 91801 | (626) 943-2953 |
| 8 | SOUTH GATE, CA | 4845 Firestone | SOUTH GATE | CA | 90280 | (323) 771-2244 |
| 10 | CORONA, CA | 585 N. MCKINLEY ST. | CORONA | CA | 92879 | (951) 808-9154 |
| 19 | LONG BEACH TOWNE CENTER, CA | 7460 E. CARSON ST. | LONG BEACH | CA | 90808 | (562) 429-5194 |
| 20 | NORTH LONG BEACH, CA | 2185 E. SOUTH ST. | LONG BEACH | CA | 90805 | (562) 423-2880 |
| 21 | TORRANCE, CA | 851 W. SEPULVEDA BLVD. | TORRANCE | CA | 90502 | (310) 835-8730 |
| 22 | ANAHEIM PLAZA, CA | 586 N. EUCLID ST. | ANAHEIM | CA | 92801 | (714) 808-6751 |
| 23 | CULVER CITY, CA | 11000 JEFFERSON BLVD. | CULVER CITY | CA | 90230 | (310) 398-5175 |
| 24 | SAN DIMAS, CA | 802 WEST ARROW HIGHWAY | SAN DIMAS | CA | 91773 | (909) 592-3636 |
| 25 | HOLLYWOOD, CA | 5420 SUNSET BLVD. | HOLLYWOOD | CA | 90027 | (323) 463-9684 |
| 26 | NORWALK, CA | 10851 IMPERIAL HWY. | NORWALK | CA | 90650 | (562) 863-1006 |
| 27 | CRENSHAW / SLAUSON, CA | 3222 W. SLAUSON BLVD. | LOS ANGELES | CA | 90043 | (323) 295-5598 |
| 28 | GARDENA, CA | 715 W. REDONDO BEACH BLVD. | GARDENA | CA | 90247 | (310) 324-5949 |
| 29 | EAGLE ROCK, CA | 2700 COLORADO BLVD, #263 | LOS ANGELES | CA | 90041 | (323) 340-8311 |
| 30 | STOCKTON, CA | 636 WEST HAMMER LANE | STOCKTON | CA | 95210 | (209) 957-5692 |
| 31 | ELK GROVE, CA | 9163 E. STOCKTON BLVD., #360 | ELK GROVE | CA | 95624 | (916) 714-9152 |
| 32 | OAKLAND, CA | 10700 MACARTHUR BLVD., SSUITE 4A | OAKLAND | CA | 94605 | (510) 394-3207 |
| 34 | COMPTON, CA | 1785 S. ALAMEDA | COMPTON | CA | 90220 | (310) 668-1040 |
| 36 | SALINAS, CA | 1411 N. DAVIS RD. | SALINAS | CA | 93907 | (831) 751-9184 |
| 37 | SANTA MARIA, CA | 2342 S. BRADLEY ROAD, SUITE 9-B | SANTA MARIA | CA | 93455 | (805) 925-0738 |
| 38 | WEST HILLS, CA - FALLBROOK CENTER | 6749 FALLBROOK AVE. | WEST HILLS | CA | 91307 | (818) 992-4965 |
| 39 | VALLEJO, CA | 946 ADMIRAL CALLAGHAN LANE | VALLEJO | CA | 94591 | (707) 649-1910 |
| 40 | MISSION HILLS, CA | 10310 SEPULVEDA BLVD. | MISSION HILLS | CA | 91345 | (818) 898-1964 |
| 41 | FRESNO - MARKETPLACE AT EL PASEO | 6575 N. RIVERSIDE DR. | FRESNO | CA | 93722 | (559) 400-7765 |
| 47 | WHITTIER, CA | 13400 WHITTIER BLVD. | WHITTIER | CA | 90605 | (562) 693-6600 |
| 53 | WALNUT PARK, CA | 7400 ALAMEDA ST. | WALNUT PARK | CA | 90255 | (323) 581-8534 |
| 61 | COLMA, CA | 29 COLMA BLVD. | COLMA | CA | 94014 | (650) 757-2177 |
| 63 | SAN JOSE, CA | 434 N. CAPITOL | SAN JOSE | CA | 95133 | (408) 729-3272 |
| 64 | WESTERN - VENICE, CA | 1713 S. WESTERN AVE. | LOS ANGELES | CA | 90006 | (323)735-5097 |
| 65 | SAN JOSE - THE PLANT, CA | 2151 MONTEREY ROAD, SUITE #10 | SAN JOSE | CA | 95125 | (408) 287-2275 |
| 70 | CHULA VISTA, CA | 555 BROADWAY, #1016 | CHULA VISTA | CA | 91910 | (619) 426-8898 |
| 74 | MONTEREY PARK, CA | 2022 S. ATLANTIC BLVD. | MONTEREY PARK | CA | 91754 | (323) 726-9006 |
| 75 | LEMON GROVE, CA | 7044 BROADWAY | LEMON GROVE | CA | 91945 | (619) 644-5530 |
| 78 | CHINO, CA | 5533 - D PHILADELPHIA | CHINO | CA | 91710 | (909) 465-1131 |
| 79 | BURBANK, CA | 928 N. SAN FERNANDO RD, #F | BURBANK | CA | 91504 | (818) 729-0790 |
| 92 | FONTANA, CA | 17093 VALLEY BLVD. | FONTANA | CA | 92335 | (909) 823-3800 |
| 94 | LANCASTER, CA | 44436 VALLEY CENTRAL WAY | LANCASTER | CA | 93536 | (661) 729-3939 |
| 95 | MORENO VALLEY, CA | 12530 DAY STREET, SUITE E1-B | MORENO VALLEY | CA | 92553 | (951) 656-1600 |
| 96 | SANTA ANA, CA | 2120 S. BRISTOL ST. | SANTA ANA | CA | 92704 | (714) 751-1740 |
| 97 | VAN NUYS, CA | 7888-2 VAN NUYS BLVD. | VAN NUYS | CA | 91402 | (818) 787-7003 |
| 98 | GARDEN GROVE, CA | 9901 CHAPMAN AVE. | GARDEN GROVE | CA | 92841 | (714) 530-3434 |
| 99 | RANCHO CUCAMONGA, CA | 10828 FOOTHILL BLVD, #120 | RANCHO CUCAMONGA | CA | 91730 | (909) 945-2974 |
| 101 | ANAHEIM, CA | 2078 E LINCOLN AVE. | ANAHEIM | CA | 92806 | (714) 808-3935 |
| 102 | INDIO, CA | 42225 JACKSON ST., STE. C-101 | INDIO | CA | 92203 | (760) 775-6445 |
| 103 | SAN BERNARDINO, CA | 570 S. MOUNT VERNON AVE, #C1 | SAN BERNARDINO | CA | 92410 | (909) 885-6011 |
| 106 | OXNARD, CA | 1881 E. VENTURA BLVD. | OXNARD | CA | 93036 | (805) 604-0413 |
| 107 | PITTSBURG, CA | 4407 CENTURY BLVD. | PITTSBURG | CA | 94565 | (925)706-7044 |
| 108 | OCEANSIDE, CA | 2435 VISTA WAY | OCEANSIDE | CA | 92054 | (760) 433-2525 |
| 109 | FRESNO - WINEPRESS, CA | 3080 W. SHAW AVE. | FRESNO | CA | 93711 | (559) 276-0911 |
| 110 | NORTH HOLLYWOOD, CA | 12201 VICTORY BLVD. | N. HOLLYWOOD | CA | 91606 | (818) 763-3006 |
| 112 | REDLANDS, CA | 2066 W. REDLANDS BLVD. | REDLANDS | CA | 92373 | (909) 792-4758 |
| 114 | PASADENA, CA | 1247 NORTH LAKE AVE. | PASADENA | CA | 91104 | (626) 798-2018 |
| 115 | HAWTHORNE, CA | 14350 OCEAN GATE  AVE. | HAWTHORNE | CA | 90250 | (310) 675-7832 |
| 116 | FRESNO-KING RD, CA | 4856 E. KINGS CANYON RD. | FRESNO | CA | 93727 | (559) 252-5374 |
| 118 | VISALIA, CA | 3446 SOUTH MOONEY BLVD | VISALIA | CA | 93277 | (559) 735-0870 |
| 123 | PICO RIVERA, CA | 8850 WASHINGTON BLVD, #A | PICO RIVERA | CA | 90660 | (562) 942-1219 |
| 124 | TORRANCE NORTH, CA | 20026 HAWTHORNE BLVD. | TORRANCE | CA | 90503 | (310) 370-9599 |
| 130 | NORTHRIDGE, CA | 8762 CORBIN AVE. | NORTHRIDGE | CA | 91324 | (818) 709-1489 |
| 132 | MONTCLAIR, CA | 5427 MORENO ST, #D | MONTCLAIR | CA | 91763 | (909) 447-5464 |
| 133 | VIEJAS, CA | 5001 WILLOWS RD, #J109 | ALPINE | CA | 91901 | (619) 659-8831 |
| 136 | TEMECULA, CA | 26447 YNEZ RD. | TEMECULA | CA | 92591 | (951) 296-0812 |

| # | Anna's Store Name | Street | City | ST | Zip Code | Phone # |
|---|---|---|---|---|---|---|
| 137 | VISTA, CA | 1744 UNIVERSITY DR. | VISTA | CA | 92083 | (760) 758-9401 |
| 141 | VICTORVILLE, CA | 12550-A AMARGOSA RD. | VICTORVILLE | CA | 92392 | (760) 951-1740 |
| 143 | SACRAMENTO - MACK RD, CA | 4440 A FLORIN RD. | SACRAMENTO | CA | 95823 | (916) 427-9401 |
| 144 | FREMONT, CA | 39035 FREMONT HUB | FREMONT | CA | 94538 | (510) 818-0645 |
| 145 | COUNTRY CLUB PLAZA, CA | 3430 EL CAMINO AVE. | SACRAMENTO | CA | 95821 | (916) 482-8890 |
| 146 | LA MESA, CA | 5500 GROSSMONT CENTER DR, #249 | LA MESA | CA | 91942 | (619) 668-1204 |
| 149 | BAKERSFIELD, CA | 4340 MING AVE. | BAKERSFIELD | CA | 93309 | (661) 396-0181 |
| 151 | LAS VEGAS - WEST, NV | 1191 S. DECATUR AVE. | LAS VEGAS | NV | 89102 | (702) 877-0088 |
| 153 | LAS VEGAS - NELLIS, NV | 1276 S. NELLIS BLVD. | LAS VEGAS | NV | 89104 | (702) 438-3800 |
| 154 | LAS VEGAS - TROPICANA, NV | 5270 S. FORT APACHE RD, #340 | LAS VEGAS | NV | 89148 | (702) 257-9020 |
| 156 | LAS VEGAS - EAST & SILVER, NV | 9833 S. EASTERN AVE. | LAS VEGAS | NV | 89123 | (702) 791-2662 |
| 157 | LAS VEGAS - GALLERIA, NV | 574 N. STEPHANIE ST. | HENDERSON | NV | 89014 | (702) 456-0499 |
| 158 | LAS VEGAS - CRAIG, NV | 1925 W CRAIG RD, #104 | NORTH LAS VEGAS | NV | 89032 | (702) 631-0681 |
| 159 | LAS VEGAS, NV | 4040 BLUE DIAMOND RD., STE. A | LAS VEGAS | NV | 89139 | (702) 386-9647 |
| 165 | MERCED, CA | 1742 W. OLIVE AVE. | MERCED | CA | 95348 | (209) 722-2413 |
| 166 | RIVERPARK FRESNO, CA | 7464 N. BLACKSTONE | FRESNO | CA | 93720 | (559) 261-1624 |
| 167 | CLOVIS, CA | 1215 HERNDON AVE., SUITE 103 | CLOVIS | CA | 93611 | (559) 297-1825 |
| 170 | PHOENIX - DESERT SKY, AZ | 7333 W. THOMAS RD, #52 | PHOENIX | AZ | 85033 | (623) 247-3585 |
| 171 | PHOENIX - BELL, AZ | 245 E. BELL RD, #16 | PHOENIX | AZ | 85022 | (602) 298 -5215 |
| 172 | PHOENIX - SPECTRUM, AZ | 1619 W. BETHANY | PHOENIX | AZ | 85015 | (602) 249-8087 |
| 175 | PEORIA CROSSING, AZ | 9420 W. NORTHERN AVE, #103 | GLENDALE | AZ | 85305 | (623) 772-5771 |
| 176 | GLENDALE - TALAVI, AZ | 5715 W BELL RD. | GLENDALE | AZ | 85308 | (602) 564-8500 |
| 183 | CHANDLER, AZ | 1195 S. ARIZONA AVE, #20 | CHANDLER | AZ | 85248 | (480) 786-0919 |
| 184 | AVONDALE, AZ | 1627 N. DYSART ROAD | AVONDALE | AZ | 85392 | (623) 536-9755 |
| 186 | MESA RANCH PLAZA, AZ | 1060 E. SOUTHERN AVE. | MESA | AZ | 85204 | (480) 890-5671 |
| 188 | PHOENIX - ARCADIA, AZ | 4523 E. THOMAS RD. | PHOENIX | AZ | 85018 | (602) 957-2103 |
| 190 | TUCSON PLACE, AZ | 605 E. WETMORE RD. | TUCSON | AZ | 85705 | (520) 292-3117 |
| 191 | TUCSON - WESTPOINT, AZ | 1171 W. IRVINGTON RD. | TUCSON | AZ | 85714 | (520) 434-0773 |
| 192 | TUCSON - SWANWAY, AZ | 4724 E. BROADWAY BLVD | TUCSON | AZ | 85711 | (520)795-1280 |
| 194 | EL PASO - EL PASEO, TX | 1842A JOE BATTLE BLVD. | EL PASO | TX | 79936 | (915) 856-8600 |
| 196 | EL PASO - FOX PLAZA, TX | 5567 ALAMEDA AVE, #24A | EL PASO | TX | 79905 | (915) 778-8400 |
| 197 | EL PASO - ZARAGOSA, TX | 700 N. ZARAGOZA, SUITE B | EL PASO | TX | 79907 | (915) 859-2900 |
| 198 | EL PASO - CORONADO, TX | 5917 N. MESA | EL PASO | TX | 79912 | (915) 875-0802 |
| 200 | HOUSTON - NORTHTOWN PLAZA, TX | 5444 N. FREEWAY 1-45 | HOUSTON | TX | 77076 | (713) 742-9967 |
| 201 | HOUSTON - ALMEDA MALL, TX | 10007 ALMEDA GENOA RD. | HOUSTON | TX | 77075 | (713) 947-6932 |
| 203 | HOUSTON - FONDREN, TX | 11234 FONDREN RD. | HOUSTON | TX | 77096 | (713) 995-4094 |
| 204 | HOUSTON - NORTHBROOK, TX | 5280 WEST 34TH ST. | HOUSTON | TX | 77092 | (713) 956-6423 |
| 205 | BEAUMONT, TX | 5886 EASTEX FRWY. | BEAUMONT | TX | 77708 | (409) 924-0618 |
| 207 | HOUSTON - WESTHEIM & DAIRY, TX | 12552 WESTHEIMER | HOUSTON | TX | 77077 | (281) 497-1877 |
| 210 | HOUSTON - NORTH OAKS, TX | 13817 BRECK ST. | HOUSTON | TX | 77066 | (281) 397-0438 |
| 211 | HOUSTON - GULFGATE, TX | 560 GULFGATE CTR. | HOUSTON | TX | 77087 | (713) 847-6086 |
| 212 | HOUSTON - RELIANT STADIUM, TX | 8232 - A KIRBY DR. | HOUSTON | TX | 77054 | (713) 666-0667 |
| 214 | HOUSTON - PASADENA, TX | 1000 SOUTHMORE AVE, SUITE 190 | PASADENA | TX | 77502 | (713) 473-7600 |
| 215 | HOUSTON - STEEPLECHASE, TX | 10849 JONES RD. | HOUSTON | TX | 77065 | (281) 890-5658 |
| 216 | HOUSTON - SAM HOUSTON PKWY, TX | 6025 E. SAM HOUSTON PKWY, N | HOUSTON | TX | 77049 | (281) 459-9293 |
| 217 | HOUSTON - HEARTHSTONE, TX | 6150 HWY 6 NORTH | HOUSTON | TX | 77084 | (281) 855-2222 |
| 218 | HOUSTON - BAYTOWN, TX | 4665 GARTH RD., SUITE #500 | BAYTOWN | TX | 77521 | (281) 428-7236 |
| 219 | HOUSTON - BAYBROOK, TX | 19050 GULF FREEWAY | FRIENDSWOOD | TX | 77546 | (281) 486-0191 |
| 220 | SAN ANTONIO -SOUTH PARK MALL, TX | 2310 S.W. MILITARY, #304 | SAN ANTONIO | TX | 78224 | (210) 928-3330 |
| 221 | SAN ANTONIO - AUSTIN HEIGHTS, TX | 1533 AUSTIN HWY, #107 | SAN ANTONIO | TX | 78218 | (210) 822-6280 |
| 222 | SAN ANTONIO - WESTOVER MALL, TX | 8219 STATE HWY 151, #121 | SAN ANTONIO | TX | 78245 | (210) 680-3526 |
| 223 | SAN ANTONIO - WONDERLAND MALL, TX | 4522 FREDERICKSBURG RD, SUITE B61 | SAN ANTONIO | TX | 78201 | (210) 733-0924 |
| 224 | SAN ANTONIO - MISSION CROSSING, TX | 2902 GOLIAD RD, #112 | SAN ANTONIO | TX | 78223 | (210) 333-3292 |
| 225 | SAN ANTONIO - DEZAVALA, TX | 12651 VANCE JACKSON, #128 | SAN ANTONIO | TX | 78230 | (210) 694-5964 |
| 226 | SAN ANTONIO - THE FORUM, TX | 8215 AGORA PKWY. | LIVE OAK | TX | 78154 | (210) 659-8705 |
| 229 | SAN ANTONIO - ALAMO RANCH, TX | 5511 LOOP 1604 N., SUITE 105 | SAN ANTONIO | TX | 78253 | (210) 520-5008 |
| 231 | DALLAS - REDBIRD, TX | 4241 W. CAMP WISDOM RD, #B | DALLAS | TX | 75237 | (972) 780-1937 |
| 232 | DALLAS - MESQUITE, TX | 1515 TOWN EAST BLVD, #144 | MESQUITE | TX | 75150 | (972) 279-7381 |
| 233 | DALLAS - CARROLLTON, TX | 2630 N. JOSEY LN, #128 | CARROLLTON | TX | 75007 | (972) 245-7800 |
| 234 | LAKE WORTH, TX | 6598 LAKE WORTH BLVD. | LAKE WORTH | TX | 76135 | (817) 237-0597 |
| 235 | DALLAS - FORT WORTH, TX | 4678 SW LOOP 820 | FORT WORTH | TX | 76109 | (817) 732-3920 |
| 236 | DALLAS - IRVING, TX | 3305 W. AIRPORT FRWY. | IRVING | TX | 75062 | (972) 870-5905 |
| 237 | WACO, TX | 5201 BOSQUE BLVD, #380 | WACO | TX | 76710 | (254) 772-4500 |
| 241 | BROWNSVILLE, TX | 411 E. MORRISON RD. | BROWNSVILLE | TX | 78526 | (956) 350-4900 |
| 242 | DALLAS - LANCASTER, TX | 404 N. BECKLY AVE. | LANCASTER | TX | 75146 | (972) 223-1600 |

| # | Anna's Store Name | Street | City | ST | Zip Code | Phone # |
|---|---|---|---|---|---|---|
| 243 | KILLEEN, TX | 1500 LOWES BLVD. | KILLEEN | TX | 76542 | (254) 554-6060 |
| 245 | HOUSTON - CONROE, TX | 1420 N LOOP 336, #104 | CONROE | TX | 77304 | (936) 539-6302 |
| 247 | MISSION, TX | 2515 E. EXPRESSWAY  83, #100 | MISSION | TX | 78572 | (956) 686-7422 |
| 250 | NEW ORLEANS - GRETNA, LA | 64 WESTBANK EXPRESSWAY, #E | GRETNA | LA | 70053 | (504) 362-0410 |
| 252 | HUMBLE, TX | 224 EAST FM 1960 BYPASS | HUMBLE | TX | 77338 | (832) 777-5481 |
| 253 | BATON ROUGE, LA | 9638 AIRLINE HWY, #B6 | BATON ROUGE | LA | 70815 | (225) 926-8885 |
| 256 | HAMMOND, LA | 2406 W. THOMAS | HAMMOND | LA | 70401 | (985) 542-3136 |
| 257 | LAKE CHARLES, LA | 3051 STATE HWY 14 | LAKE CHARLES | LA | 70601 | (337) 480-0788 |
| 259 | LAFAYETTE, LA | 1800 NE EVANGELINE THRUWAY | LAFAYETTE | LA | 70501 | (337) 235-9930 |
| 260 | MOBILE, AL | 3226 DAUPHIN ST. | MOBILE | AL | 36606 | (251) 479-8899 |
| 261 | BIRMINGHAM, AL | 7001 CRESTWOOD BLVD, #200 | BIRMINGHAM | AL | 35210 | (205) 591-6096 |
| 269 | SLIDELL, LA | 360 TOWN CENTER PARKWAY | SLIDELL | LA | 70458 | (985) 641-4724 |
| 271 | SAN ANTONIO - PARK NORTH, TX | 630 N.W. LOOP 410, #105 | SAN ANTONIO | TX | 78216 | (210) 525-9522 |
| 272 | PORT ARTHUR, TX | 8801 MEMORIAL BLVD., #202 | PORT ARTHUR | TX | 77640 | (409) 722-2377 |
| 273 | COLLEGE STATION, TX | 1659 S. TEXAS AVE. | COLLEGE STATION | TX | 77840 | (979) 694-6517 |
| 274 | DALLAS - RICHARDSON, TX | 511 S. PLANO RD., SUITE B | RICHARDSON | TX | 75081 | (972) 231-8026 |
| 275 | HOUSTON - ROSENBERG, TX | 24101 BRAZOS TOWN CROSSING | ROSENBERG | TX | 77471 | (281) 232-9068 |
| 276 | HOUSTON - NE MARKETPLACE, TX | 4050 LITTLE YORK RD. | HOUSTON | TX | 77093 | (713) 691-2889 |
| 277 | HOUSTON - SOUTHWAY, TX | 8020 S GESSNER DRIVE | HOUSTON | TX | 77036 | (713) 778-9533 |
| 278 | WESLACO, TX | 675 E EXPRESSWAY 83 | WESLACO | TX | 78596 | (956) 969 -1328 |
| 279 | ARLINGTON, TX | 4638 S. COOPER ST. SUITE 192 | ARLINGTON | TX | 76017 | (817) 466-2282 |
| 280 | D'IBERVILLE, MS | 3680 SANGANI BLVD | D'IBERVILLE | MS | 39540 | (228) 392-6500 |
| 284 | GRAND PRAIRIE, TX | 4045. GREAT SOUTHWEST PKWY, STE. #100 | GRAND PRAIRIE | TX | 75052 | (972) 602-8705 |
| 286 | FORTH WORTH - GRAN PLAZA, TX | 4200 SOUTH FREEWAY, STE 2500 | FORT WORTH | TX | 76115 | (817) 923-1700 |
| 287 | LAREDO, TX | 5506 SAN BERNARDO | LAREDO | TX | 78041 | (956) 725-7200 |
| 288 | MCKINNEY, TX | 1751 NORTH CENTRAL EXPRESSWAY, BLDG. G STE. 200 | MCKINNEY | TX | 75070 | (469)952-3700 |
| 290 | DALLAS - BUCKNER, TX | 9208 EAST THORTON FREEWAY, STE 112 | DALLAS | TX | 75228 | (214) 328-7600 |
| 292 | GENTILLY, LA | 4800 CHEF MENTEUR HIGHWAY, STE K | NEW ORLEANS | LA | 70126 | (504) 944-8957 |
| 293 | EDINBURG, TX | 339 EAST TRENTON ROAD | EDINBURG | TX | 78539 | (956) 386-1730 |
| 294 | NEW ORLEANS - ELMWOOD, LA | 1002-A SOUTH CLEARVIEW PKWY. | HARAHAN | LA | 70123 | (504) 733-0118 |
| 298 | AUSTIN, TX | 5465 NORTH IH-35 | AUSTIN | TX | 78723 | (512) 323-9573 |
| 302 | ATLANTA - GREENBRIAR, GA | 2841 GREENBRIAR PKWY, SW | ATLANTA | GA | 30331 | (404) 629-5959 |
| 304 | NEWNAN, GA | 1068 BULLSBORO DRIVE | NEWNAN | GA | 30263 | (770) 254-4944 |
| 305 | ATLANTA - STONE MOUNTAIN VILLAGE, GA | 5211 MEMORIAL DR, #A | STONE MOUNTAIN | GA | 30083 | (404) 298-6422 |
| 306 | ATLANTA - SOUTHLAKE, GA | 1964 MOUNT ZION RD. | MORROW | GA | 30260 | (770) 472-4466 |
| 308 | LITHONIA, GA | 7300 STONECREST CONCOURSE, #10 | LITHONIA | GA | 30058 | (770) 482-0116 |
| 309 | FAYETTEVILLE, GA | 127-C PAVILION PKWY. | FAYETTEVILLE | GA | 30214 | (770) 716-5822 |
| 310 | DULUTH, GA | 3850 VENTURE DR, #100 | DULUTH | GA | 30096 | (770) 813-8454 |
| 312 | ATLANTA - KENNESAW, GA | 2505 CHASTAIN MEADOWS PKWY, STE B-2 | MARIETTA | GA | 30066 | (770) 422-0488 |
| 313 | ATLANTA - SMYRNA, GA | 2540 CUMBERLAND Blvd., STE 8A | SMYRNA | GA | 30080 | (770) 434-5454 |
| 315 | SNELLVILLE, GA | 2059 SCENIC HWY., STE. 101 | SNELLVILLE | GA | 30078 | (770) 985-9989 |
| 317 | DOTHAN, AL | 3500 ROSS CLARK CIRCLE, STES. 900 & 930 | DOTHAN | AL | 36303 | (334) 792-6901 |
| 319 | DOUGLASVILLE, GA | 2866 CHAPEL HILL RD. STES 9 & 10 | DOUGLASVILLE | GA | 30135 | (770) 947-4080 |
| 320 | COLONIAL PROMENADE - BESSEMER, AL | 4863 PROMENADE PKWY., STE 121 | BESSEMER | AL | 35022 | (205) 424-1799 |
| 347 | MIAMI - BIRD RD, FL | 11397 SW 40TH STREET | MIAMI | FL | 33165 | (305) 221-0519 |
| 348 | TAMARAC, FL | 5767 N. UNIVERSITY DR. | TAMARAC | FL | 33321 | (954)724-5466 |
| 349 | DELRAY BEACH, FL | 1610 S. FEDERAL HWY, #B-128 | DELRAY BEACH | FL | 33483 | (561) 272-7011 |
| 350 | LAUDERDALE LAKES, FL | 3201 NORTH STATE ROAD #7 | LAUDERDALE LAKES | FL | 33319 | (954) 739-0946 |
| 352 | HOLLYWOOD, FL | 3791 OAKWOOD BLVD | HOLLYWOOD | FL | 33020 | (954) 922-0648 |
| 354 | MIAMI - CUTLER RIDGE, FL | 19189-B SOUTH DIXIE HWY | MIAMI | FL | 33189 | (305) 232-5862 |
| 355 | MIAMI - PEMBROKE PINES, FL | 8354 PINES BLVD | PEMBROKE PINES | FL | 33024 | (954) 431-9540 |
| 356 | MIAMI - 7TH ST, FL | 3801 NW 7th STREET | MIAMI | FL | 33126 | (305) 643-2620 |
| 358 | WEST PALM BEACH, FL | 1951B N. MILITARY TRAIL | WEST PALM BEACH | FL | 33409 | (561) 687-0956 |
| 359 | MIAMI - HIALEAH, FL | 515 W 49TH ST | HIALEAH | FL | 33012 | (305) 557-0111 |
| 362 | MIAMI - HIAL-GARDENS, FL | 2424 W 60TH ST | HIALEAH | FL | 33016 | (305) 512-1541 |
| 365 | MIAMI - 163RD MALL, FL | 1371 NE 163rd ST, #1114 | NORTH MIAMI | FL | 33162 | (305) 949-1637 |
| 366 | MIAMI - OAKLAND PARK, FL | 997 E COMMERCIAL BLVD | OAKLAND PARK | FL | 33334 | (954) 689-3697 |
| 367 | MARGATE, FL | 5385 WEST ATLANTIC BLVD | MARGATE | FL | 33063 | (954) 970-1689 |
| 371 | TAMPA - UNIVERSITY, FL | 2127A UNIVERSITY SQUARE MALL | TAMPA | FL | 33612 | (813) 910-1547 |
| 375 | MIAMI - MIAMI GARDENS, FL | 5800 NORTHWEST 183RD ST | HIALEAH | FL | 33015 | (305) 698-3471 |
| 376 | MIAMI - FLAGLER PLAZA, FL | 8263 W. FLAGLER ST. | MIAMI | FL | 33144 | (305) 269-7440 |
| 392 | MIAMI - LONDON SQUARE, FL | 13550 SW 120TH ST., STE #426 | KENDALL | FL | 33186 | (305) 251-3429 |
| 405 | CHICAGO - CHATHAM, IL | 112 W. 87TH ST., SUITE N | CHICAGO | IL | 60620 | (773) 487-5410 |
| 408 | LANSING, IL | 16795 TORRENCE AVE, #2 | LANSING | IL | 60438 | (708) 418-5019 |
| 411 | CHICAGO - FORD CITY, IL | 7601 S. CICERO, #1950 | CHICAGO | IL | 60652 | (773) 767-1668 |

| # | Anna's Store Name | Street | City | ST | Zip Code | Phone # |
|---|---|---|---|---|---|---|
| 417 | MILWAUKEE LOOMIS CENTER, WI | 3551 S. 27th ST. | MILWAUKEE | WI | 53221 | (414) 647-8490 |
| 418 | MILWAUKEE - MIDTOWN, WI | 5750 W. CAPITAL DR, A | MILWAUKEE | WI | 53216 | (414) 442-0264 |
| 419 | CHICAGO - STONY ISLAND, IL | 7546 S. STONY ISLAND AVE | CHICAGO | IL | 60649 | (773) 643-0205 |
| 420 | MILWAUKEE - W. ALLIS, WI | 6834 GREENFIELD AVE. | WEST ALLIS | WI | 53214 | (414) 257-1136 |
| 421 | CHICAGO - HAWTHORNE, IL | 4757 W. CERMAK | CICERO | IL | 60804 | (708) 652-1726 |
| 422 | CHICAGO CLARK-HOWARD, IL | 7503 N. CLARK ST., SPACE A102 | CHICAGO | IL | 60626 | (773) 338-8080 |
| 423 | CHICAGO - MARSHFIELD, IL | 11614 S MARSHFIELD AVE | CHICAGO | IL | 60643 | (773) 821-5619 |
| 424 | CHICAGO - CRESTWOOD, IL | 4913 CAL SAG ROAD | CRESTWOOD | IL | 60445 | (708) 396-1671 |
| 425 | CHICAGO - NAPERVILLE, IL | 530 S. ROUTE 59 | NAPERVILLE | IL | 60540 | (630) 637-1052 |
| 427 | CHICAGO - EVERGREEN PARK, IL | 2500 WEST 94TH ST. | EVERGREEN PARK | IL | 60805 | (708) 422-0521 |
| 428 | MELROSE PARK, IL | 1200 WINSTON PLAZA | MELROSE PARK | IL | 60160 | (708) 345-2588 |
| 429 | CHICAGO - WASHINGTON SQUARE, IL | 4855 W. NORTH AVENUE | CHICAGO | IL | 60639 | (773) 278-8290 |
| 501 | OXON HILL, MD | 5109 INDIAN HEAD HWY. | OXON HILL | MD | 20745 | (301)-686-0156 |
| 506 | LARGO, MD | 840 LARGO CENTER DR. | LARGO | MD | 20774 | (301) 324-8290 |
| 507 | WASHINGTON DC | 1060 BRENTWOOD ROAD NE | WASHINGTON DC | | 20018 | (202) 529-3402 |
| 508 | BALTIMORE - EASTPOINT, MD | 7839 EASTPOINT MALL, #7721 | BALTIMORE | MD | 21224 | (410) 284-6610 |
| 509 | LAUREL, MD | 3405B FORT MEADE ROAD | LAUREL | MD | 20724 | (301) 317-0025 |
| 511 | RICHMOND, VA | 4501 S. LABURNUM AVE., SUITE 190 | RICHMOND | VA | 23231 | (804) 222-9939 |
| 513 | CATONSVILLE, MD | 5648 BALTIMORE NATIONAL PIKE | CATONSVILLE | MD | 21228 | (410) 744-2743 |
| 514 | GREENBELT, MD | 6076 GREENBELT ROAD | GREENBELT | MD | 20770 | (301) 441-1805 |
| 515 | RICHMOND - SOUTHSIDE, VA | 624 W. SOUTHSIDE PLAZA ST. | RICHMOND | VA | 23224 | (804) 232-9093 |
| 550 | PHILADELPHIA, PA | 5675 NORTH FRONT ST, #141 | PHILADELPHIA | PA | 19120 | (215) 276-2944 |
| 551 | SOUTH PHILLY, PA | 2550 SOUTH 24TH ST, 8A | PHILADELPHIA | PA | 19145 | (215) 755-3519 |
| 552 | PHILADELPHIA - BUSTLETON, PA | 2133 COTTMAN AVE. | PHILADELPHIA | PA | 19149 | (215) 342-4398 |
| 555 | PHILADELPHIA - PARKWEST, PA | 1575 N. 52ND STREET, SUITE 701 | PHILADELPHIA | PA | 19131 | (215) 879-1025 |
| 561 | PHILADELPHIA - ARAMINGO, PA | 2200 WHEATSHEAF LANE, SUITE BLDG D1 | PHILADELPHIA | PA | 19137 | (215) 535-3704 |
| 601 | GREENSBORO, NC | 4611 HIGH POINT RD. | GREENSBORO | NC | 27407 | (336) 294-4441 |
| 602 | WINSTON-SALEM, NC | 1215 SILAS CREEK PKWY. | WINSTON-SALEM | NC | 27127 | (336) 723-1888 |
| 603 | CONCORD, NC | 349 COPPERFIELD BLVD. NE | CONCORD | NC | 28025 | (704) 792-2736 |
| 604 | BURLINGTON, NC | 2737 S. CHURCH ST. | BURLINGTON | NC | 27215 | (336) 584-7577 |
| 605 | HICKORY, NC | 2108 US HIGHWAY 70 SE., UNIT 2 | HICKORY | NC | 28602 | (828) 328-4596 |
| 606 | GASTONIA, NC | 3054 E. FRANKLIN BLVD, #1 | GASTONIA | NC | 28054 | (704) 853-0300 |
| 607 | SPARTANBURG, SC | 1000 N. PINE ST. | SPARTANBURG | SC | 29303 | (864) 591-3399 |
| 608 | SUMTER, SC | 1121 BROAD ST. | SUMTER | SC | 29150 | (803) 778-6800 |
| 609 | CHARLOTTE - MATHEWS, NC | 10418 E. INDEPENDENCE BLVD. | MATTHEWS | NC | 28105 | (704) 841-7819 |
| 610 | ROCKY MOUNT, NC | 542 SUTTER'S CREEK BLVD. | ROCKY MOUNT | NC | 27804 | (252) 442-0642 |
| 611 | GREENVILLE - KMART PLAZA, SC | 2 K MART PLAZA | GREENVILLE | SC | 29605 | (864) 232-1755 |
| 612 | ASHEVILLE, NC | 85 TUNNEL RD. | ASHEVILLE | NC | 28805 | (828) 253-2291 |
| 613 | CHARLESTON, SC | 7800 RIVERS AVE, #1640 | N. CHARLESTON | SC | 29406 | (843) 569-7491 |
| 614 | GREENSBORO PYRAMIDS, NC | 2103 PYRAMID VILLAGE BLVD #106 | GREENSBORO | NC | 27405 | (336) 621-7771 |
| 616 | NORFOLK, VA | 5900 E. VIRGINIA BEACH BLVD., SUITE 30 | NORFOLK | VA | 23502 | (757) 455-8870 |
| 617 | CHARLOTTE - PINEVILLE, NC | 10408 CENTRUM PARKWAY | PINEVILLE | NC | 28134 | (704) 752-1725 |
| 618 | FAYETTEVILLE, NC | 1800 SKIBO ROAD, STE. 228 | FAYETTEVILLE | NC | 28303 | (910) 826-0035 |
| 619 | COLUMBIA, SC | 5560 FOREST DR. | COLUMBIA | SC | 29206 | (803) 782-7927 |
| 622 | GREENVILLE - CHERRYDALE, SC | 3215 N. PLEASANTBURG DR., STE E-1 | GREENVILLE | SC | 29609 | (864) 233-5177 |
| 624 | CHARLOTTE - UNIVERSITY, NC | 5700 UNIVERSITY POINTE DR., STE. 102 | CHARLOTTE | NC | 28262 | (704) 547-1951 |
| 627 | VERDAE VILLAGE - GREENVILLE, SC | 101 VERDAE BLVD., STE 1100 | GREENVILLE | SC | 29607 | (864) 289-9627 |
| 629 | COLUMBIA - NORTH POINTE, SC | 10050 TWO NOTCH RD., SUITE 8 | COLUMBIA | SC | 29223 | (803) 865-1140 |
| 630 | AUGUSTA, GA | 3412 WRIGHTSBORO ROAD, SUITE 501 | AUGUSTA | GA | 30909 | (706) 667-5470 |
| 631 | ANDERSON, SC | 3102 NORTH MAIN STREET, SUITE 250 | ANDERSON | SC | 29621 | (864) 642-2873 |
| 700 | TRUJILLO ALTO, PR | TRUJILLO ALTO PLAZA - 200 CARR. 181, STE. 8 | TRUJILLO ALTO | PR | 00976 | (787) 292-0100 |
| 703 | PONCE, PR | PONCE TOWN CENTER - CARR. ESTATAL #2 KM 257.07 - PLOTS 010, 014 | PONCE | PR | 00728 | (787) 259-8322 |
| 704 | CAGUAS, PR | PLAZA CENTRO - 200 AVE RAFAEL CORDERO | CAGUAS | PR | 00725 | (787) 747-2155 |
| 705 | MAYAGUEZ, PR | MAYAGUEZ MALL - 975 HOSTOS AVE. CARR #2, SUITE 420 | MAYAGUEZ | PR | 00680 | (787) 265-5100 |
| 750 | ST. LOUIS, MO | 3562 GUSTINE AVE | ST. LOUIS | MO | 63116 | (314) 772-8802 |
| 752 | MAPLEWOOD, MO | 3232 LACLEDE STATION RD. | MAPLEWOOD | MO | 63143 | (314) 645-7713 |
| 753 | FERGUSON, MO | 10940 NEW HALLS FERRY RD. | FERGUSON | MO | 63136 | (314) 388-0776 |
| 777 | E-Commerce | 3550 HYLAND AVE | Costa Mesa | CA | 92626 | 714-850-0504 |

253   Total Count

Exhibit A-2

(List of DC's)

Exhibit  A-2

(List of DC's)

| Distribution Center | Address |
| --- | --- |
| Dallas Distribution Center - (#9993) | 400 Dividend Drive, Suite100, Coppell TX 75019 |
| West Distribution Center - (#9999) | 10721 Jasmine, Fontana, CA 92337 |
| East Distribution Center - (#9994) | 10230 Ridge Creek Drive Charlotte NC 28273 |
| Crowley Logistics Center - PR | Rd165, KM 2.4 Building 13 Guaynabo Puerto Rico 00970 |

Exhibit 3-1(c)

Merchandise Ceiling ($000's)

## EXHIBIT 3.1(c)

### MERCHANDISE CEILING ($000's)

| Incremental Dollars in Inventory | Cost Value of Merchandise | Guarantee % | Guarantee $ | Guarantee Increase / (Decrease) | Decremental Percent in Guarantee |
|---|---|---|---|---|---|
| 200 | 69,000 | 109.78% | 75,748 | 116 | -0.150% |
| 200 | 68,800 | 109.93% | 75,632 | 117 | -0.150% |
| 200 | 68,600 | 110.08% | 75,515 | 131 | -0.130% |
| 200 | 68,400 | 110.21% | 75,384 | 132 | -0.130% |
| 200 | 68,200 | 110.34% | 75,252 | 132 | -0.130% |
| 200 | 68,000 | 110.47% | 75,120 | 133 | -0.130% |
| 200 | 67,800 | 110.60% | 74,987 | 154 | -0.100% |
| 200 | 67,600 | 110.70% | 74,833 | 154 | -0.100% |
| 200 | 67,400 | 110.80% | 74,679 | 154 | -0.100% |
| 200 | 67,200 | 110.90% | 74,525 | 155 | -0.100% |
| CEILING | 67,000 | 111.00% | 74,370 | | |

### MERCHANDISE THRESHOLD ($000's)

| Decremental Dollars in Inventory | Cost Value of Merchandise | Guarantee % | Guarantee $ | Guarantee Increase / (Decrease) | Decremental Percent in Guarantee |
|---|---|---|---|---|---|
| THRESHOLD | 61,500 | 111.00% | 68,265 | | |
| 200 | 61,300 | 110.90% | 67,982 | (283) | -0.100% |
| 200 | 61,100 | 110.80% | 67,699 | (283) | -0.100% |
| 200 | 60,900 | 110.70% | 67,416 | (282) | -0.100% |
| 200 | 60,700 | 110.60% | 67,134 | (282) | -0.100% |
| 200 | 60,500 | 110.47% | 66,834 | (300) | -0.130% |
| 200 | 60,300 | 110.34% | 66,535 | (299) | -0.130% |
| 200 | 60,100 | 110.21% | 66,236 | (299) | -0.130% |
| 200 | 59,900 | 110.08% | 65,938 | (298) | -0.130% |
| 200 | 59,700 | 109.93% | 65,628 | (310) | -0.150% |
| 200 | 59,500 | 109.78% | 65,319 | (309) | -0.150% |
| 200 | 59,300 | 109.63% | 65,011 | (309) | -0.150% |
| 200 | 59,100 | 109.45% | 64,685 | (326) | -0.180% |
| 200 | 58,900 | 109.27% | 64,360 | (325) | -0.180% |
| 200 | 58,700 | 109.09% | 64,036 | (324) | -0.180% |
| 200 | 58,500 | 108.88% | 63,695 | (341) | -0.210% |
| 200 | 58,300 | 108.67% | 63,355 | (340) | -0.210% |
| 200 | 58,100 | 108.46% | 63,015 | (339) | -0.210% |
| 200 | 57,900 | 108.23% | 62,665 | (350) | -0.230% |
| 200 | 57,700 | 108.00% | 62,316 | (349) | -0.230% |
| 200 | 57,500 | 107.77% | 61,968 | (348) | -0.230% |

*Prorate between intervals

*Reduce the Guarantee % by .5% for

for every $200k below $57.5 million

Exhibit 3-1(d)

(Cost Factor)

**Anna's Linens**
**Exhibit 3.1(d)**

| Cost Factor | | |
|---|---|---|
| **Cost Factor** | **Adjustment Points** | **Adjusted Guaranty** |
| **38.70%** | | **111.00%** |
| 38.80% | 0.05% | 110.95% |
| 38.90% | 0.10% | 110.85% |
| 39.00% | 0.10% | 110.75% |
| 39.10% | 0.10% | 110.65% |
| 39.20% | 0.10% | 110.55% |
| 39.30% | 0.15% | 110.40% |
| 39.40% | 0.15% | 110.25% |
| 39.50% | 0.15% | 110.10% |
| 39.60% | 0.15% | 109.95% |
| 39.70% | 0.15% | 109.80% |
| 39.80% | 0.20% | 109.60% |
| 39.90% | 0.20% | 109.40% |
| 40.00% | 0.20% | 109.20% |
| 40.10% | 0.30% | 108.90% |
| 40.20% | 0.30% | 108.60% |
| 40.30% | 0.30% | 108.30% |
| 40.40% | 0.40% | 107.90% |
| 40.50% | 0.40% | 107.50% |
| 40.60% | 0.50% | 107.00% |
| 40.70% | 0.50% | 106.50% |

_Notes:_
*\*\*\*For every 0.10% above 40.70%, increment shall decrease the Guaranty by 1.00%.*
*\*\*\*Adjustments betgween the above increments will be handled on a pro rata basis.*

Exhibit 3.1(e)

(Interim Approval Order Per Diem Adjustment Schedule)

**Anna's Linens**
**Exhibit 3.1(e)**

| Interim Approval Order Per Diem Adjustment Schedule | | | |
|---|---|---|---|
| Interim Approval Order Date | Inventory Guaranty % | Guaranty % Decrease | Cumulative Decrease |
| **6/18/15** | **111.00%** | **0.00%** | **0.00%** |
| 6/19/15 | 109.50% | 1.50% | 1.50% |
| 6/20/15 | 108.00% | 1.50% | 3.00% |
| 6/21/15 | 106.50% | 1.50% | 4.50% |
| 6/22/15 | 105.00% | 1.50% | 6.00% |
| 6/23/15 | 103.50% | 1.50% | 7.50% |
| 6/24/15 | 102.00% | 1.50% | 9.00% |
| 6/25/15 | 100.50% | 1.50% | 10.50% |
| 6/26/15 | 99.00% | 1.50% | 12.00% |
| 6/27/15 | 97.50% | 1.50% | 13.50% |
| 6/28/15 | 96.00% | 1.50% | 15.00% |
| 6/29/15 | 94.50% | 1.50% | 16.50% |
| 6/30/15 | 93.00% | 1.50% | 18.00% |

Exhibit 3.3(a)

(Merchant's Designated Account)

**EXHIBIT 3.3 (a)**

**Merchant's Designated Account**

Account Name:          Salus Capital Partners, LLC

Account Number:        75860051418

Account ABA:           011 075 150

Bank Name:             Santander Bank

                       Boston, MA 02109

RE:                    Anna's Linens, Inc.

Exhibit 3.3(g)

(Form Letter of Credit)

## **FORM OF AGENT LETTER OF CREDIT**

### [NAME OF ISSUING BANK]

### [ADDRESS]

Date: _____, 2012


Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY: _____
_____
_____
_____

_____
_____
_____
_____


Credit No.: _____
Opener's Reference No.: _____

Gentlemen:

BY ORDER OF: _____

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit") for the account of _____ (the "Agent") for a sum or sums not exceeding a total of _____ U.S. Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2012, or such earlier date on which the beneficiaries shall notify us in writing that this Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in the form attached hereto as **Exhibit A** signed by an officer of _____ and an officer of _____ (the "Beneficiaries").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from the Beneficiaries in the form attached as **Exhibit B**.

If a drawing is received by _____ at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiaries, as directed below, in immediately available funds on the same Business Day.  If however, a drawing is received by _____ after 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms with the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiaries in immediately available funds on the next Business Day.

As used in this Letter of Credit, "Business Day" shall mean any day other than Saturday, Sunday or a day on which banking institutions in _____ are required or authorized to close.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause, "Drawn under Letter of Credit No. _____, dated _____, 20[  ] of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

## EXHIBIT A

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:    Drawing for Amounts Due to:

_____

_____

_____

_____


_____

_____

_____

_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "Letter of Credit").  Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officers of _____ and of _____, in their respective capacities as Beneficiaries of the Letter of Credit hereby certifies to you that:

(i)    _____ (the "Agent") has not made a payment when due of or for the Guaranteed Amount or Expenses due by the Agent to _____ (the "Merchant'), pursuant to, and as such terms are defined in that certain Agency Agreement, dated as of _____, 2012, by and between the Merchant on the one hand, and the Agent, on the other.

(ii)    The amount to be drawn is $_____ (the "Amount Owing").

(iii)    Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof.

(iv)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)    In accordance with the terms of the Letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account:

[_____]
[_____]
[_____]
Further Credit to: [Account Title]
[Account No. _____]

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this _____ day of _____, 20[  ].

_____

By: _____
Name: _____
Title: _____


_____

By: _____
Name: _____
Title: _____

## **EXHIBIT B**

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:    Reduction of Face Amount

_____

_____

_____

_____

_____

_____

_____

_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "Letter of Credit"). Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officers of _____ and of _____, in their respective capacities as Beneficiaries of the Letter of Credit hereby confirms to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this \_\_\_\_\_ day of _____, 20[  ].

_____

By: _____

Name: _____

Title: _____

_____

By: _____

Name: _____

Title: _____

Exhibit 4.1(a)

(Store Occupancy Expense)

**Occupancy Expense**

| Store | Location | State | Rent | CAM | Association | % Rent | Telephone | Utilities (incl trash) | Security (excl Armored Car) | Outside Storage | Repairs & Maintenance | R & M Window Cleaning | Taxes & Licenses | Total Daily Occupancy Costs (as defined) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | WEST COVINA | CA | 234.00 | 273.00 | 12.74 | - | 3.15 | 37.30 | - | - | 16.69 | 0.35 | 2.86 | 580.09 | |
| 3 | MONTEBELLO | CA | 366.00 | 81.00 | - | - | 2.22 | 76.93 | - | - | 16.92 | 0.35 | 13.83 | 557.25 | |
| 4 | LYNWOOD | CA | 659.00 | 252.00 | 13.74 | 5.0% | 2.28 | 57.47 | - | - | 19.89 | 0.46 | 4.41 | 1,009.25 | Subject to % rent at breakpoint at $91,667 per month at 5.0 % |
| 5 | INGLEWOOD | CA | 455.00 | 176.00 | - | - | 2.09 | 60.79 | - | - | 10.91 | 0.46 | 12.27 | 717.52 | |
| 8 | ALHAMBRA | CA | 423.00 | 151.00 | - | - | 2.62 | 69.57 | - | - | 14.25 | 0.46 | 6.04 | 666.94 | |
| 8 | SOUTH GATE | CA | 396.00 | 139.00 | - | - | 6.28 | 79.23 | - | - | 32.56 | 0.94 | 13.53 | 667.54 | |
| 10 | CORONA | CA | 474.00 | 145.00 | - | - | 6.61 | 130.75 | - | - | 27.44 | 0.46 | 7.64 | 791.90 | |
| 19 | LONG BEACH | CA | 352.00 | 174.00 | - | - | 1.96 | 71.29 | - | - | 9.02 | 0.46 | 13.19 | 621.92 | |
| 20 | LONG BEACH | CA | 253.00 | 54.00 | - | - | 1.16 | 2.81 | 0.86 | - | 9.46 | 0.46 | 3.70 | 325.45 | |
| 21 | TORRANCE | CA | 253.00 | 46.00 | - | - | 2.05 | 3.86 | 0.86 | - | 4.37 | 0.46 | 2.91 | 313.51 | |
| 22 | ANAHEIM | CA | 308.00 | 125.00 | - | - | 0.97 | 59.54 | 1.39 | - | 7.84 | 0.46 | 12.70 | 515.90 | |
| 23 | CULVER CITY | CA | 1,062.00 | 207.00 | - | - | 4.86 | 68.97 | 1.39 | - | 4.87 | 0.46 | 16.77 | 1,366.32 | |
| 24 | SAN DIMAS | CA | 350.00 | 81.00 | - | - | 4.43 | 77.31 | 1.39 | - | 11.61 | 0.35 | 7.19 | 533.28 | |
| 25 | HOLLYWOOD | CA | 265.00 | 13.00 | 2.00 | - | 2.24 | 13.65 | 1.56 | 1.58 | 3.39 | 0.46 | 6.31 | 309.19 | |
| 26 | NORWALK | CA | 628.00 | 141.00 | - | - | 4.76 | 95.44 | 0.86 | - | 13.75 | 0.46 | 4.69 | 888.96 | |
| 27 | LOS ANGELES | CA | 488.00 | 257.00 | - | - | 2.96 | 76.56 | 0.86 | 16.74 | 14.95 | 0.46 | 10.09 | 867.62 | |
| 28 | GARDENA | CA | 374.00 | 81.00 | - | - | 2.05 | 49.55 | 0.86 | 16.48 | 4.50 | 0.46 | 8.99 | 537.89 | |
| 29 | LOS ANGELES | CA | 386.00 | - | - | 8.0% | 2.50 | 57.47 | 0.86 | 18.95 | 13.83 | 0.46 | 8.22 | 488.29 | Subject to % rent at breakpoint at $133,333 per month at 8.0 % |
| 30 | STOCKTON | CA | 321.00 | 87.00 | - | - | 1.17 | 78.58 | 0.86 | - | 3.67 | 0.35 | 6.65 | 499.28 | |
| 31 | ELK GROVE | CA | 235.00 | 79.00 | - | 6.0% | 1.92 | 55.47 | 0.86 | - | 5.95 | 0.46 | 12.94 | 391.60 | Subject to % rent at breakpoint at $108,333 per month at 6.0 % |
| 32 | OAKLAND | CA | 253.00 | 92.00 | - | - | 3.55 | 83.86 | 2.01 | - | 4.83 | 0.85 | 2.04 | 442.14 | |
| 34 | COMPTON | CA | 380.00 | 77.00 | - | - | 2.46 | 62.46 | 0.86 | 28.38 | 9.07 | 0.30 | 3.15 | 563.68 | |
| 36 | SALINAS | CA | 368.00 | 67.00 | - | - | 5.08 | 98.39 | 1.39 | - | 19.57 | 0.35 | 11.72 | 571.50 | |
| 37 | SANTA MARIA | CA | 346.00 | 88.00 | - | - | 1.57 | 58.05 | 1.39 | - | 14.38 | 0.66 | 11.30 | 521.35 | |
| 38 | WEST HILLS | CA | 415.00 | 50.00 | - | - | - | 53.49 | 1.39 | - | 7.19 | 0.58 | 6.60 | 534.25 | |
| 39 | VALLEJO | CA | 255.00 | 96.00 | - | 10.0% | 2.03 | 73.90 | 0.86 | 2.47 | 15.20 | 0.35 | 6.58 | 452.39 | Subject to % rent at breakpoint at $106,333 per month at 10.0 % |
| 40 | MISSION HILLS | CA | 544.00 | 127.00 | - | - | 4.96 | 94.10 | 0.86 | - | 5.09 | 0.46 | 14.74 | 791.21 | |
| 41 | FRESNO | CA | 323.00 | 118.00 | - | - | 2.34 | 83.36 | 1.56 | - | 2.24 | 1.29 | 3.46 | 535.25 | |
| 47 | WHITTIER | CA | 330.00 | - | - | 8.0% | 6.76 | 105.61 | 2.06 | 4.94 | 17.73 | 0.92 | 9.22 | 477.24 | Subject to % rent at breakpoint at $125,000 per month at 8.0 % |
| 58 | WALNUT PARK | CA | 445.00 | 134.00 | 8.24 | - | 2.39 | 66.24 | 0.80 | 2.59 | 6.47 | 0.46 | 7.25 | 673.44 | |
| 61 | COLMA | CA | 488.00 | 111.00 | 5.48 | - | 2.42 | 100.99 | 5.36 | - | 7.01 | 0.46 | 4.36 | 725.08 | |
| 63 | SAN JOSE | CA | 506.00 | 129.00 | 11.82 | - | 2.07 | 95.09 | 0.86 | 2.99 | 11.34 | 0.46 | 9.18 | 768.81 | |
| 64 | LOS ANGELES | CA | 497.00 | 173.00 | - | - | 4.33 | 55.98 | 0.86 | - | 7.33 | 0.46 | 13.61 | 752.57 | |
| 65 | SAN JOSE | CA | 336.00 | 169.00 | - | - | 2.07 | 48.33 | 0.86 | 4.71 | 7.11 | 0.92 | 6.62 | 575.62 | |
| 70 | CHULA VISTA | CA | 604.00 | 141.00 | - | 10.0% | 5.07 | 103.45 | 1.00 | 4.76 | 18.49 | 0.69 | 5.55 | 884.01 | Subject to % rent at breakpoint at $158,333 per month at 10.0 % |
| 74 | MONTEREY PARK | CA | 285.00 | 157.00 | - | - | 2.87 | 49.36 | 0.86 | - | 8.18 | 0.44 | 12.24 | 515.95 | |
| 75 | LEMON GROVE | CA | 328.00 | 10.00 | - | - | 4.07 | 71.97 | 1.62 | 4.15 | 10.73 | 0.46 | 5.03 | 436.03 | |
| 78 | CHINO | CA | 250.00 | 58.00 | - | - | 1.51 | 54.77 | 0.86 | 19.25 | 7.67 | 0.35 | 9.78 | 402.19 | |
| 91 | BURBANK | CA | 334.00 | 62.00 | - | 6.0% | 1.71 | 47.86 | 0.86 | 1.76 | 4.07 | 0.46 | 2.61 | 455.33 | Subject to % rent at breakpoint at $119,167 per month at 6.0 % |
| 92 | FONTANA | CA | 467.00 | - | - | 7.0% | 4.30 | 81.09 | 1.83 | 2.91 | 11.42 | 0.46 | 7.56 | 576.57 | Subject to % rent at breakpoint at $141,667 per month at 7.0 % |
| 94 | LANCASTER | CA | 326.00 | 126.00 | - | - | 2.71 | 71.80 | 0.86 | 4.12 | 15.42 | 0.46 | 14.32 | 561.69 | |
| 95 | MORENO VALLEY | CA | 390.00 | 27.00 | - | - | 1.73 | 86.18 | 0.86 | - | 9.30 | 0.46 | 7.38 | 522.91 | |
| 96 | SANTA ANA | CA | 495.00 | 151.00 | - | - | 1.87 | 111.50 | 2.52 | - | 16.52 | 0.46 | 9.97 | 788.84 | |
| 97 | VAN NUYS | CA | 334.00 | 159.00 | - | 7.0% | 1.94 | 84.20 | 1.39 | 33.13 | 6.29 | 0.46 | 15.53 | 635.94 | Subject to % rent at breakpoint at $145,833 per month at 7.0 % |
| 98 | GARDEN GROVE | CA | 246.00 | 65.00 | - | - | 1.94 | 48.84 | 0.86 | - | 3.83 | 0.46 | 6.31 | 373.24 | |
| 99 | RANCHO CUCAMONGACA | | | 577.00 | - | - | - | 1.35 | 59.03 | 0.86 | 8.47 | 7.50 | 0.46 | 5.39 | 660.06 | |
| 101 | ANAHEIM | CA | 307.00 | 12.00 | 6.13 | - | 1.94 | 70.46 | 1.72 | - | 6.20 | 0.46 | 3.89 | 409.80 | |
| 102 | INDIO | CA | 262.00 | 82.00 | - | - | 1.85 | 61.21 | 0.86 | - | 13.79 | 0.33 | 7.25 | 429.29 | |
| 103 | SAN BERNARDINO | CA | 241.00 | 98.00 | - | - | 0.82 | 48.92 | 1.39 | - | 11.25 | 0.35 | 5.49 | 407.22 | |
| 106 | OXNARD | CA | 391.00 | 141.00 | - | - | 0.91 | 84.04 | 1.44 | - | 8.47 | 0.46 | 11.81 | 639.13 | |
| 107 | PITTSBURG | CA | 330.00 | 82.00 | - | - | 2.31 | 77.07 | 0.86 | - | 18.66 | 0.46 | 7.51 | 518.87 | |
| 108 | OCEANSIDE | CA | 402.00 | 124.00 | - | - | 4.24 | 81.50 | 1.39 | - | 11.80 | 0.35 | 5.39 | 630.67 | |
| 109 | FRESNO | CA | 301.00 | 3.00 | - | 7.0% | 3.18 | 72.07 | 0.86 | - | 20.81 | 0.92 | 8.43 | 410.27 | Subject to % rent at breakpoint at $133,333 per month at 7.0 % |
| 110 | N. HOLLYWOOD | CA | 642.00 | 81.00 | - | - | 4.19 | 78.88 | 1.09 | - | 10.34 | 0.46 | 14.05 | 831.51 | |
| 113 | REDLANDS | CA | 314.00 | 188.00 | - | - | 10.37 | 64.91 | 1.39 | - | 4.53 | 0.46 | 9.29 | 592.95 | |
| 114 | PASADENA | CA | 223.00 | - | - | - | 2.30 | 38.27 | 2.64 | - | 7.70 | 0.46 | 2.99 | 277.36 | |
| 115 | HAWTHORNE | CA | 771.00 | 201.00 | - | - | 3.68 | 66.68 | 0.86 | - | 13.04 | 0.46 | 12.21 | 1,068.93 | |
| 116 | FRESNO | CA | 275.00 | 77.00 | - | - | 1.79 | 65.84 | 0.86 | 5.86 | 11.14 | 0.46 | 5.85 | 443.80 | |
| 118 | VISALIA | CA | 386.00 | 43.00 | - | - | 1.25 | 64.81 | 1.39 | 3.85 | 9.14 | 0.46 | 6.02 | 515.92 | |

Occupancy Expense

| Store | Location | State | Rent | CAM | Association | % Rent | Telephone | Utilities (incl trash) | Security (excl Armored Car) | Outside Storage | Repairs & Maintenance | R & M Window Cleaning | Taxes & Licenses | Total Daily Occupancy Costs (as defined) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 123 | PICO RIVERA | CA | 330.00 | 228.00 | 2.75 | - | 1.08 | 82.79 | 88.06 | - | 6.81 | 0.46 | 4.11 | 744.06 | |
| 124 | TORRANCE | CA | 330.00 | 179.00 | - | - | 1.82 | 56.28 | 0.86 | 3.99 | 6.83 | 0.92 | 7.62 | 587.32 | |
| 130 | NORTHRIDGE | CA | 638.00 | 80.00 | - | - | 2.33 | 99.54 | 1.39 | 6.94 | 6.96 | 0.46 | 24.56 | 860.18 | |
| 132 | MONTCLAIR | CA | 418.00 | 66.00 | - | 8.0% | 1.55 | 57.71 | 1.39 | 2.27 | 4.47 | 0.46 | 9.27 | 561.12 | |
| 136 | ALPINE | CA | 131.51 | - | - | - | 2.64 | 68.25 | 1.39 | 1.64 | 5.07 | 0.92 | 3.38 | 214.50 | Subject to % rent at breakpoint at $83,333 per month at 8.0 % |
| 136 | TEMECULA | CA | 412.00 | 123.00 | - | - | 1.50 | 88.02 | 1.39 | 7.51 | 15.16 | 0.46 | 7.69 | 656.73 | |
| 137 | VISTA | CA | 291.00 | 234.00 | - | - | 1.94 | 96.25 | 0.86 | - | 22.68 | 0.46 | 6.70 | 653.89 | |
| 141 | VICTORVILLE | CA | 537.00 | 123.00 | - | - | 0.70 | 123.71 | 1.39 | - | 2.89 | 0.92 | 11.71 | 801.32 | |
| 143 | SACRAMENTO | CA | 190.00 | 126.00 | 4.08 | - | 6.16 | 22.26 | 0.86 | - | 26.65 | 0.46 | 11.43 | 387.90 | |
| 144 | FREMONT | CA | 275.00 | - | - | - | 1.88 | 39.52 | 1.39 | - | 15.26 | 0.46 | 6.16 | 339.67 | |
| 145 | SACRAMENTO | CA | 362.00 | 49.00 | - | 5.0% | 3.31 | 40.56 | 1.90 | - | 10.88 | 0.46 | 3.98 | 472.09 | Subject to % rent at breakpoint at $91,667 per month at 5.0 % |
| 146 | LA MESA | CA | 468.00 | 144.00 | - | - | 1.94 | 72.74 | 0.86 | - | 12.97 | 0.46 | 3.96 | 704.93 | |
| 149 | BAKERSFIELD | CA | 403.00 | 98.00 | - | - | 1.72 | 95.40 | 0.86 | 9.91 | 8.51 | 2.20 | 7.12 | 626.72 | |
| 151 | LAS VEGAS | NV | 950.00 | 180.00 | - | - | 2.32 | 69.79 | 0.86 | - | 8.58 | 1.15 | 15.28 | 1,227.98 | |
| 153 | LAS VEGAS | NV | 352.00 | 63.00 | - | 4.0% | 1.41 | 56.91 | 1.62 | - | 10.82 | 0.58 | 9.52 | 495.87 | Subject to % rent at breakpoint at $166,667 per month at 4.0 % |
| 154 | LAS VEGAS | NV | 462.00 | 64.00 | - | - | 1.41 | 65.01 | 0.86 | - | 24.02 | 0.46 | 8.90 | 626.66 | |
| 156 | LAS VEGAS | NV | 299.00 | 56.00 | - | - | 1.06 | 59.87 | 0.86 | 1.57 | 45.36 | 0.58 | 7.74 | 472.04 | |
| 157 | HENDERSON | NV | 440.00 | - | - | 10.0% | 1.29 | 105.13 | 0.86 | 10.30 | 8.60 | 0.58 | 6.73 | 573.49 | Subject to % rent at breakpoint at $133,333 per month at 10.0 % |
| 158 | NORTH LAS VEGAS | NV | 396.00 | 85.00 | - | - | 1.25 | 38.14 | 1.62 | 1.53 | 16.65 | 0.58 | 9.70 | 550.47 | |
| 159 | LAS VEGAS | NV | 242.00 | 57.00 | - | 6.0% | 1.25 | 54.59 | 0.86 | 10.50 | 4.75 | 0.58 | 9.43 | 380.96 | Subject to % rent at breakpoint at $75,000 per month at 6.0 % |
| 165 | MERCED | CA | 326.00 | 114.00 | - | - | 1.80 | 69.75 | 0.86 | 8.99 | 13.39 | 0.35 | 11.26 | 546.40 | |
| 166 | FRESNO | CA | 332.00 | 123.00 | - | - | 2.18 | 81.02 | 0.86 | 15.94 | 2.85 | 0.46 | 9.93 | 568.24 | |
| 167 | CLOVIS | CA | 412.00 | 31.00 | - | - | 2.76 | 109.11 | 0.86 | 2.78 | 6.79 | 0.46 | 6.00 | 571.76 | |
| 170 | PHOENIX | AZ | 281.00 | 112.00 | - | 6.0% | 1.11 | 54.48 | 1.39 | - | 5.66 | 0.46 | 3.58 | 459.68 | Subject to % rent at breakpoint at $108,333 per month at 6.0 % |
| 171 | PHOENIX | AZ | 239.00 | 109.00 | - | 4.0% | 0.87 | 38.09 | 0.86 | 37.09 | 7.26 | 0.46 | 1.78 | 434.41 | Subject to % rent at breakpoint at $132,417 per month at 4.0 % |
| 172 | PHOENIX | AZ | 382.00 | 112.00 | 2.95 | - | 1.20 | 55.28 | 0.86 | 6.98 | 12.85 | 0.46 | 1.31 | 575.89 | |
| 175 | GLENDALE | AZ | 381.00 | 96.00 | - | - | 1.26 | 48.23 | 1.09 | - | 3.77 | 0.46 | 0.75 | 532.56 | |
| 176 | GLENDALE | AZ | 483.00 | 117.00 | - | - | 3.06 | 91.35 | 0.86 | - | 3.26 | 0.46 | 2.05 | 701.04 | |
| 183 | CHANDLER | AZ | 335.00 | 95.00 | - | 8.0% | 1.24 | 43.77 | 1.09 | - | 5.22 | 0.46 | 1.62 | 483.40 | Subject to % rent at breakpoint at $124,406 per month at 8.0 % |
| 184 | AVONDALE | AZ | 305.00 | 118.00 | - | 8.0% | 0.87 | 53.02 | 1.69 | - | 4.38 | 0.46 | 0.28 | 483.70 | Subject to % rent at breakpoint at $116,667 per month at 8.0 % |
| 186 | MESA | AZ | 287.00 | 62.00 | - | - | 0.81 | 47.12 | 0.90 | 7.07 | 11.74 | 0.46 | 4.90 | 422.00 | |
| 188 | PHOENIX | AZ | 194.00 | 75.00 | - | - | 1.11 | 53.36 | 0.90 | - | 4.16 | 0.46 | 0.27 | 329.26 | |
| 190 | TUCSON | AZ | 362.00 | 155.00 | - | - | 1.62 | 87.80 | 0.88 | 4.40 | 25.27 | 0.46 | 1.49 | 638.92 | |
| 191 | TUCSON | AZ | 358.00 | 84.00 | - | - | 1.26 | 74.55 | 0.88 | - | 10.29 | 0.46 | 1.64 | 531.08 | |
| 192 | TUCSON | AZ | 385.00 | 105.00 | - | - | 1.55 | 36.67 | 0.88 | 5.88 | 11.95 | 0.46 | 3.75 | 551.14 | |
| 194 | EL PASO | TX | 410.00 | 60.00 | - | - | 3.44 | 51.07 | 0.88 | 2.93 | 13.37 | 0.50 | 20.49 | 562.68 | |
| 196 | EL PASO | TX | | 150.00 | - | 10.0% | 3.28 | 85.94 | 0.87 | 2.84 | 17.41 | 0.50 | 23.27 | 284.11 | % Rent in lieu of Base rent at 10.0% |
| 197 | EL PASO | TX | 288.00 | 82.00 | - | - | 9.19 | 59.25 | 1.69 | - | 14.05 | 0.50 | 29.47 | 484.15 | |
| 198 | EL PASO | TX | 236.00 | 105.00 | - | 4.0% | 3.43 | 59.42 | 2.23 | 1.69 | 15.33 | 0.50 | 22.12 | 445.72 | Subject to % rent at breakpoint at $133,333 per month at 4.0 % |
| 200 | HOUSTON | TX | 484.00 | 154.00 | - | - | 2.89 | 77.02 | 0.87 | 6.66 | 51.28 | 1.00 | 21.11 | 798.83 | |
| 201 | HOUSTON | TX | 227.00 | 107.00 | - | - | 6.58 | 55.80 | 1.42 | 2.30 | 5.64 | 0.50 | 22.21 | 428.45 | |
| 203 | HOUSTON | TX | 297.00 | 155.00 | - | 5.0% | 3.49 | 61.66 | 0.93 | - | 22.22 | 0.50 | 15.15 | 559.95 | Subject to % rent at breakpoint at $133,333 per month at 5.0 % |
| 204 | HOUSTON | TX | 297.00 | 154.00 | - | - | 3.31 | 51.41 | 1.46 | - | 11.43 | 0.37 | 18.43 | 537.41 | |
| 205 | BEAUMONT | TX | 389.00 | 81.00 | - | - | 9.64 | 48.13 | 1.10 | - | 21.53 | 0.50 | 18.81 | 569.71 | |
| 207 | HOUSTON | TX | 337.00 | 45.00 | - | - | 3.31 | 54.79 | 0.93 | - | 13.39 | 0.50 | 19.15 | 474.07 | |
| 210 | HOUSTON | TX | 396.00 | 141.00 | - | - | 3.27 | 77.67 | 1.46 | - | 7.93 | 0.50 | 24.54 | 652.37 | |
| 211 | HOUSTON | TX | 396.00 | 220.00 | - | 5.0% | 3.31 | 54.60 | 0.93 | - | 7.34 | 0.50 | 20.88 | 703.56 | Subject to % rent at breakpoint at $141,667 per month at 5.0 % |
| 212 | HOUSTON | TX | 490.00 | 157.00 | - | - | 10.10 | 51.34 | 2.28 | - | 15.84 | 0.50 | 18.17 | 745.23 | |
| 214 | PASADENA | TX | 331.00 | 40.00 | - | - | 9.95 | 43.69 | 0.93 | - | 19.13 | 1.00 | 19.75 | 465.45 | |
| 215 | HOUSTON | TX | 316.00 | - | - | 5.0% | 4.51 | 60.14 | 0.93 | 4.30 | 7.31 | 0.37 | 17.84 | 411.40 | Subject to % rent at breakpoint at $104,067 per month at 5.0 % |
| 216 | HOUSTON | TX | 310.00 | 75.00 | - | - | 5.09 | 44.69 | 0.93 | - | 12.46 | 1.00 | 18.31 | 467.48 | |
| 217 | HOUSTON | TX | 287.00 | 60.00 | - | - | 2.66 | 57.42 | 0.93 | - | 25.96 | 0.50 | 17.28 | 451.75 | |
| 218 | BAYTOWN | TX | 317.00 | 78.00 | - | 4.0% | 0.79 | 53.73 | 0.93 | - | 8.74 | 0.50 | 18.83 | 478.52 | Subject to % rent at breakpoint at $141,667 per month at 4.0 % |
| 219 | FRIENDSWOOD | TX | 440.00 | 104.00 | - | - | 3.27 | 45.16 | 0.93 | 2.32 | 13.53 | 0.50 | 18.92 | 628.63 | |
| 220 | SAN ANTONIO | TX | 467.00 | - | - | 6.0% | 3.24 | 64.14 | 0.93 | - | 17.90 | 0.37 | 19.13 | 572.71 | Subject to % rent at breakpoint at $133,333 per month at 6.0 % |
| 221 | SAN ANTONIO | TX | 311.00 | 183.00 | - | - | 3.19 | 79.58 | 0.93 | - | 22.66 | 0.50 | 20.82 | 621.68 | |
| 222 | SAN ANTONIO | TX | 349.00 | 103.00 | - | - | 3.24 | 39.35 | 0.93 | - | 13.67 | 0.50 | 18.03 | 527.72 | |
| 223 | SAN ANTONIO | TX | 292.00 | 79.00 | - | - | 3.17 | 69.08 | 0.93 | - | 7.37 | 0.50 | 27.63 | 479.68 | |
| 224 | SAN ANTONIO | TX | 338.00 | 88.00 | - | 3.0% | 3.24 | 54.47 | 0.93 | - | 33.87 | 0.50 | 17.72 | 536.73 | Subject to % rent at breakpoint at $364,140 per month at 3.0 % |

**Occupancy Expense**

| Store | Location | State | Rent | CAM | Association | % Rent | Telephone | Utilities (incl trash) | Security (excl Armored Car) | Outside Storage | Repairs & Maintenance | R & M Window Cleaning | Taxes & Licenses | Total Daily Occupancy Costs (as defined) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 225 | SAN ANTONIO | TX | 278.00 | 167.00 | - | 4.0% | 2.62 | 38.82 | 0.93 | - | 14.87 | 0.37 | 18.89 | 521.50 | Subject to % rent at breakpoint at $138,889 per month at 4.0 % |
| 226 | LIVE OAK | TX | 353.00 | 132.00 | - | 6.0% | 3.52 | 62.17 | 0.93 | - | 15.26 | 1.00 | 16.74 | 584.62 | Subject to % rent at breakpoint at $178,289 per month at 6.0 % |
| 229 | SAN ANTONIO | TX | 448.00 | 166.00 | - | - | 2.71 | 34.44 | 1.46 | - | 10.61 | 0.50 | 19.52 | 683.24 | |
| 231 | DALLAS | TX | 314.00 | 123.00 | - | - | 3.37 | 80.46 | 1.71 | - | 8.15 | 0.37 | 29.19 | 560.25 | |
| 232 | MESQUITE | TX | 395.00 | 106.00 | - | - | 2.77 | 38.52 | 0.93 | - | 5.26 | 0.37 | 20.82 | 569.67 | |
| 233 | CARROLLTON | TX | | 99.00 | - | 4.0% | 2.07 | 48.70 | 0.93 | - | 8.31 | 0.50 | 13.51 | 173.02 | % Rent in lieu of Base rent at 4.0% |
| 234 | LAKE WORTH | TX | 327.00 | 89.00 | - | - | 2.63 | 66.65 | 0.93 | 5.22 | 16.99 | 0.50 | 18.87 | 527.59 | |
| 235 | FORT WORTH | TX | 409.00 | 129.00 | - | - | 2.65 | 57.42 | 0.93 | - | 25.48 | 0.50 | 23.02 | 648.00 | |
| 236 | IRVING | TX | 318.00 | 121.00 | - | - | 0.99 | 54.47 | 6.21 | - | 8.99 | 0.50 | 19.86 | 530.02 | |
| 237 | WACO | TX | 339.00 | 146.00 | - | - | 2.64 | 46.70 | 1.07 | - | 15.02 | 0.50 | 19.75 | 570.68 | |
| 241 | BROWNSVILLE | TX | 211.00 | 48.00 | - | 5.0% | 2.68 | 34.26 | 0.93 | 5.49 | - | 1.00 | 15.12 | 318.48 | Subject to % rent at breakpoint at $127,818 per month at 5.0 % |
| 242 | LANCASTER | TX | 298.00 | 148.00 | - | - | 2.70 | 30.44 | 0.93 | - | 15.83 | 0.37 | 17.38 | 513.65 | |
| 243 | KILLEEN | TX | 300.00 | 74.00 | - | - | 2.00 | 55.29 | 1.07 | - | 15.40 | 0.50 | 16.32 | 464.58 | |
| 245 | CONROE | TX | 341.00 | 42.00 | - | - | 3.17 | 31.94 | 0.93 | - | 9.68 | 0.50 | 14.25 | 443.47 | |
| 247 | MISSION | TX | 385.00 | 175.00 | - | - | 2.64 | 45.47 | 0.93 | 6.94 | 12.60 | 0.50 | 21.50 | 650.58 | |
| 250 | GRETNA | LA | 377.00 | 172.00 | - | 4.0% | 6.80 | 105.33 | 0.93 | 14.09 | 59.12 | 0.48 | 32.70 | 768.10 | Subject to % rent at breakpoint at $253,094 per month at 4.0 % |
| 252 | HUMBLE | TX | | 43.00 | - | 5.0% | 4.38 | 71.70 | 1.00 | - | 11.35 | 0.54 | 2.08 | 134.05 | % Rent in lieu of Base rent at 5.0% |
| 253 | BATON ROUGE | LA | 442.00 | 84.00 | - | - | 3.54 | 56.94 | 0.93 | 15.05 | 22.92 | 0.48 | 22.16 | 648.02 | |
| 256 | HAMMOND | LA | 179.00 | 34.00 | - | 4.0% | 3.46 | 55.05 | 0.93 | - | 10.57 | 0.48 | 14.62 | 298.11 | Subject to % rent at breakpoint at $135,417 per month at 4.0 % |
| 257 | LAKE CHARLES | LA | 223.00 | - | - | - | 3.53 | 55.57 | 0.93 | - | 10.43 | 0.48 | 15.41 | 309.35 | |
| 259 | LAFAYETTE | LA | 220.00 | - | - | - | 3.83 | 73.14 | 2.34 | - | 19.55 | 0.25 | 11.20 | 330.31 | |
| 260 | MOBILE | AL | 268.00 | 54.00 | - | - | 3.11 | 88.51 | 1.41 | - | 8.68 | 0.46 | 8.05 | 432.22 | |
| 261 | BIRMINGHAM | AL | 371.00 | - | - | - | 2.41 | 86.09 | 0.86 | 8.50 | 14.16 | 0.46 | 7.96 | 491.44 | |
| 269 | SLIDELL | LA | 348.00 | 75.00 | - | - | 4.07 | 61.04 | 0.86 | 7.70 | 33.59 | 1.06 | 25.08 | 556.40 | |
| 271 | SAN ANTONIO | TX | 330.00 | - | - | - | 2.75 | 30.91 | 0.86 | - | 18.47 | 0.50 | 18.00 | 401.49 | |
| 272 | PORT ARTHUR | TX | 214.00 | 84.00 | - | - | 3.49 | 42.82 | 0.86 | - | 18.12 | 0.50 | 16.90 | 380.69 | |
| 273 | COLLEGE STATION | TX | 240.00 | 84.00 | - | - | 3.09 | 73.52 | 0.86 | - | 13.03 | 0.50 | 15.28 | 430.28 | |
| 274 | RICHARDSON | TX | 467.00 | - | - | - | 4.03 | 55.17 | 0.86 | - | 20.22 | 0.50 | 20.95 | 568.73 | |
| 275 | ROSENBERG | TX | 331.00 | 225.00 | - | - | 2.35 | 44.92 | 1.86 | 1.83 | 12.53 | 0.50 | 16.72 | 636.71 | |
| 276 | HOUSTON | TX | 392.00 | 120.00 | - | - | 5.58 | 46.52 | 0.93 | - | 27.82 | 0.75 | 14.29 | 607.89 | |
| 277 | HOUSTON | TX | 307.00 | 115.00 | - | - | 2.80 | 59.31 | 0.93 | 7.67 | 18.54 | 0.50 | 21.47 | 533.22 | |
| 278 | WESLACO | TX | 243.00 | 131.00 | - | 6.0% | 1.91 | 46.41 | 0.93 | - | 9.49 | 0.37 | 18.10 | 451.21 | Subject to % rent at breakpoint at $100,000 per month at 6.0 % |
| 279 | ARLINGTON | TX | 248.00 | 79.00 | - | 4.0% | - | 50.16 | 0.93 | 5.70 | 7.13 | 0.37 | 19.77 | 411.06 | Subject to % rent at breakpoint at $150,000 per month at 4.0 % |
| 280 | D'IBERVILLE | MS | 227.00 | 67.00 | - | - | 4.27 | 38.15 | 0.93 | - | 13.55 | 0.91 | 9.60 | 361.41 | |
| 284 | GRAND PRAIRIE | TX | 255.00 | 122.00 | - | - | 3.25 | 33.53 | 3.46 | 12.67 | 5.64 | 0.25 | 18.30 | 454.10 | |
| 286 | FORT WORTH | TX | 189.00 | - | - | 8.0% | 3.13 | 40.16 | 1.46 | - | 8.74 | 0.50 | 14.20 | 267.19 | Subject to % rent at breakpoint at $75,863 per month at 8.0 % |
| 287 | LAREDO | TX | 319.00 | 130.00 | - | - | 8.27 | 72.59 | 0.93 | - | 31.00 | 0.62 | 22.02 | 584.43 | |
| 288 | MCKINNEY | TX | 192.00 | 118.00 | - | - | 5.40 | 63.36 | 0.93 | - | 16.43 | 0.50 | 21.32 | 417.94 | |
| 290 | DALLAS | TX | 219.00 | 114.00 | - | - | 2.64 | 38.98 | 0.92 | 0.05 | 11.02 | 0.50 | 20.75 | 407.86 | |
| 292 | NEW ORLEANS | LA | 264.00 | 81.00 | - | - | 1.79 | 46.40 | 0.93 | - | 31.65 | 0.48 | 28.08 | 454.33 | |
| 293 | EDINBURG | TX | | 70.00 | - | 6.0% | 2.55 | 38.57 | 0.93 | - | 18.38 | 0.50 | 20.63 | 151.56 | % Rent in lieu of Base rent at 6.0% |
| 294 | HARAHAN | LA | 531.00 | 161.00 | - | - | 4.79 | 80.34 | 0.93 | - | 11.86 | 0.48 | 24.65 | 815.05 | |
| 298 | AUSTIN | TX | 225.00 | 153.00 | - | 5.0% | 4.32 | 104.44 | 0.93 | - | 8.65 | 0.50 | 19.72 | 516.56 | Subject to % rent at breakpoint at $91,667 per month at 5.0 % |
| 302 | ATLANTA | GA | 283.00 | 181.00 | 1.02 | - | 3.32 | 74.54 | 2.78 | 7.78 | 33.34 | 0.46 | 22.22 | 609.46 | |
| 304 | NEWNAN | GA | 442.00 | 70.00 | - | - | 8.57 | 75.13 | 0.86 | - | 11.77 | 0.35 | 14.17 | 622.85 | |
| 305 | STONE MOUNTAIN | GA | 201.00 | 86.00 | - | 4.0% | 3.12 | 73.47 | 0.93 | - | 8.16 | 0.46 | 21.00 | 394.14 | Subject to % rent at breakpoint at $125,000 per month at 4.0 % |
| 306 | MORROW | GA | | 122.00 | - | 4.0% | 8.57 | 97.15 | 2.30 | - | 6.86 | 0.46 | 29.43 | 266.77 | % Rent in lieu of Base rent at 4.0% |
| 308 | LITHONIA | GA | 473.00 | 124.00 | - | - | 3.11 | 102.38 | 0.86 | - | 9.98 | 0.35 | 26.62 | 740.30 | |
| 309 | FAYETTEVILLE | GA | 359.00 | 95.00 | - | - | 9.30 | 65.25 | 1.40 | 1.69 | 7.56 | 0.46 | 12.63 | 552.29 | |
| 310 | DULUTH | GA | 549.00 | - | - | 6.0% | 5.79 | 74.89 | 0.86 | - | 20.37 | 0.46 | 16.62 | 667.99 | Subject to % rent at breakpoint at $183,333 per month at 6.0 % |
| 312 | MARIETTA | GA | 157.00 | - | - | - | 3.08 | 49.30 | 1.10 | 2.93 | 12.99 | 0.46 | 13.17 | 240.03 | |
| 313 | SMYRNA | GA | 351.00 | 76.00 | - | - | 2.47 | 71.20 | 1.13 | - | 52.30 | 0.46 | 16.57 | 571.13 | |
| 315 | SNELLVILLE | GA | 330.00 | 77.00 | - | - | 2.81 | 80.55 | 0.93 | - | 22.08 | 0.46 | 19.71 | 533.54 | |
| 317 | DOTHAN | AL | | 36.00 | - | 6.0% | 2.33 | 41.63 | 0.86 | 1.88 | 12.79 | 0.46 | 18.74 | 114.69 | % Rent in lieu of Base rent at 6.0% |
| 319 | DOUGLASVILLE | GA | 230.00 | 41.00 | - | - | 2.96 | 55.36 | 1.09 | - | 13.24 | 0.23 | 17.99 | 361.87 | |
| 320 | BESSEMER | AL | 243.00 | 86.00 | - | - | 2.10 | 42.04 | 0.86 | 9.61 | 11.52 | 0.46 | 10.04 | 405.63 | |
| 347 | MIAMI | FL | 521.00 | 82.00 | - | - | 2.86 | 70.96 | 0.86 | 21.72 | 6.48 | 0.49 | 2.47 | 708.84 | |
| 348 | TAMARAC | FL | 307.00 | 226.00 | - | - | 3.15 | 54.11 | 0.86 | - | 13.96 | 0.48 | 6.00 | 611.56 | |
| 349 | DELRAY BEACH | FL | 374.00 | 25.00 | - | - | 3.33 | 67.40 | 0.92 | - | 6.26 | 0.36 | 6.70 | 483.97 | |

**Occupancy Expense**

| Store | Location | State | Rent | CAM | Association | % Rent | Telephone | Utilities (incl trash) | Security (excl Armored Car) | Outside Storage | Repairs & Maintenance | R & M Window Cleaning | Taxes & Licenses | Total Daily Occupancy Costs (as defined) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 350 | LAUDERDALE LAKES | FL | 375.00 | 187.00 | - | - | 7.50 | 133.95 | 0.91 | - | 21.43 | 0.48 | 8.96 | 735.23 | |
| 352 | HOLLYWOOD | FL | 574.00 | 222.00 | - | - | 3.96 | 90.37 | 0.91 | - | 6.13 | 0.48 | 7.12 | 904.97 | |
| 354 | MIAMI | FL | 443.00 | 106.00 | - | - | 3.17 | 100.14 | 0.91 | - | 26.91 | 0.48 | 2.23 | 682.84 | |
| 355 | PEMBROKE PINES | FL | 299.00 | 257.00 | - | 4.0% | 4.90 | 66.70 | 0.91 | - | 10.58 | 0.48 | 21.04 | 660.61 | Subject to % rent at breakpoint at $176,458 per month at 4.0 % |
| 356 | MIAMI | FL | 948.00 | 132.00 | 13.65 | - | 5.87 | 97.23 | 1.47 | - | 18.45 | 0.49 | 9.01 | 1,226.17 | |
| 358 | WEST PALM BEACH | FL | 427.00 | 211.00 | - | - | 3.63 | 53.11 | 0.91 | - | 25.26 | 0.48 | 0.49 | 721.88 | |
| 359 | HIALEAH | FL | 474.00 | 364.00 | - | 4.0% | 3.18 | 143.43 | 0.92 | - | 21.21 | 0.48 | 13.24 | 1,020.46 | Subject to % rent at breakpoint at $247,500 per month at 4.0 % |
| 362 | HIALEAH | FL | 444.00 | 164.00 | - | - | 8.18 | 58.39 | 0.91 | 7.94 | 7.69 | 0.49 | 5.86 | 697.46 | |
| 365 | NORTH MIAMI | FL | 500.00 | 110.00 | 17.64 | 5.0% | 3.17 | 91.77 | 1.37 | 37.81 | 18.35 | 0.48 | 3.64 | 784.23 | Subject to % rent at breakpoint at $312,057 per month at 5.0 % |
| 366 | OAKLAND PARK | FL | 467.00 | 243.00 | - | - | 3.40 | 51.52 | 2.33 | 5.05 | 21.11 | 0.48 | 2.96 | 796.85 | |
| 367 | MARGATE | FL | 329.00 | 125.00 | - | - | 2.88 | 68.42 | 1.08 | 0.27 | 1.94 | 0.24 | 14.51 | 543.34 | |
| 371 | TAMPA | FL | - | - | - | 9.0% | 0.51 | 69.66 | 0.91 | - | 18.72 | 0.48 | 0.84 | 91.12 | % Rent in lieu of Base rent at 9.0% |
| 375 | HIALEAH | FL | 503.00 | 96.00 | - | - | 1.88 | 84.33 | 1.15 | 3.12 | 6.21 | 0.49 | 7.57 | 703.75 | |
| 376 | MIAMI | FL | 372.00 | 65.00 | - | - | 3.17 | 63.09 | 1.46 | - | 6.67 | 0.49 | 5.41 | 517.29 | |
| 392 | KENDALL | FL | 297.00 | 108.00 | - | - | 6.02 | 36.32 | 0.92 | 1.81 | 19.77 | 0.49 | 2.42 | 472.75 | |
| 405 | CHICAGO | IL | 696.00 | 308.00 | - | - | 2.18 | 76.73 | 0.92 | - | 9.89 | 0.46 | 0.77 | 1,094.95 | |
| 408 | LANSING | IL | 378.00 | 339.00 | - | - | 2.43 | 69.43 | 0.92 | - | 17.51 | 0.46 | 0.44 | 808.19 | |
| 411 | CHICAGO | IL | 302.00 | 244.00 | - | - | 7.14 | 71.71 | 1.09 | - | 38.80 | 0.46 | 2.09 | 667.29 | |
| 417 | MILWAUKEE | WI | 278.00 | 88.00 | - | - | 2.97 | 71.12 | 1.13 | - | 19.05 | 0.47 | 4.62 | 465.36 | |
| 418 | MILWAUKEE | WI | 394.00 | 139.00 | - | - | 2.97 | 48.20 | 0.86 | - | 18.89 | 0.36 | 4.94 | 609.22 | |
| 419 | CHICAGO | IL | 295.00 | 125.00 | - | - | 4.76 | 47.14 | 0.90 | - | 16.73 | 0.46 | 1.76 | 491.75 | |
| 420 | WEST ALLIS | WI | 251.00 | 26.00 | - | 6.0% | 2.32 | 49.29 | 1.43 | - | 13.80 | 0.47 | 9.23 | 353.54 | Subject to % rent at breakpoint at $83,333 per month at 6.0 % |
| 421 | CICERO | IL | 551.00 | 11.00 | - | - | 2.10 | 50.65 | 1.74 | - | 17.30 | 0.46 | 1.46 | 635.71 | |
| 422 | CHICAGO | IL | 151.00 | 175.00 | - | - | 2.31 | 47.34 | 0.90 | - | 43.60 | 0.46 | 0.77 | 421.38 | |
| 423 | CHICAGO | IL | 378.00 | 162.00 | - | - | 2.85 | 40.82 | 0.86 | 9.91 | 8.00 | 0.52 | 0.99 | 603.95 | |
| 424 | CRESTWOOD | IL | 288.00 | 153.00 | - | - | 4.05 | 45.83 | 0.86 | - | 16.05 | 0.46 | 1.46 | 509.71 | |
| 425 | NAPERVILLE | IL | 253.00 | 77.00 | - | - | 2.07 | 46.10 | 0.86 | - | 15.91 | 0.46 | 0.09 | 395.49 | |
| 427 | EVERGREEN PARK | IL | 267.00 | 154.00 | - | - | 2.10 | 40.19 | 0.86 | 6.07 | 8.78 | 0.46 | 0.68 | 480.14 | |
| 428 | MELROSE PARK | IL | 337.00 | 153.00 | 3.53 | - | 13.00 | 48.08 | 0.86 | - | 12.00 | 0.46 | 1.19 | 569.12 | |
| 429 | CHICAGO | IL | 242.00 | 90.00 | - | - | 3.68 | 41.88 | 0.86 | 1.03 | 8.73 | 0.46 | 0.77 | 389.41 | |
| 431 | OXON HILL | MD | 223.00 | 115.00 | - | 4.0% | 0.84 | 39.39 | 0.86 | - | 20.92 | 0.49 | 6.72 | 407.22 | Subject to % rent at breakpoint at $225,000 per month at 4.0 % |
| 506 | LARGO | MD | 285.00 | 58.00 | - | - | 1.53 | 67.33 | 3.22 | 19.77 | 6.81 | 0.49 | 7.02 | 449.17 | |
| 507 | WASHINGTON DC | 0 | 515.00 | 173.00 | - | - | 0.88 | 35.99 | 2.87 | - | 10.72 | 0.49 | 1.87 | 740.82 | |
| 508 | BALTIMORE | MD | 231.00 | - | - | - | 1.03 | 75.01 | 1.44 | 11.57 | 6.46 | 0.49 | 6.27 | 333.27 | |
| 509 | LAUREL | MD | 275.00 | - | - | - | 3.20 | 62.83 | 1.44 | 23.88 | 25.18 | 0.49 | 6.83 | 398.85 | |
| 511 | RICHMOND | VA | 275.00 | - | - | - | 1.24 | 30.84 | 1.44 | - | 17.22 | 0.35 | 11.24 | 337.33 | |
| 513 | CATONSVILLE | MD | 298.00 | 54.00 | - | - | 1.22 | 51.91 | 1.43 | 8.24 | 13.15 | 0.49 | 10.55 | 439.39 | |
| 514 | GREENBELT | MD | 330.00 | 29.00 | 3.30 | - | 0.79 | 35.22 | 4.73 | - | 8.59 | 0.49 | 23.28 | 435.40 | |
| 515 | RICHMOND | VA | 315.00 | - | - | - | 2.46 | 54.39 | 1.44 | 4.97 | 7.82 | 0.46 | 28.06 | 414.60 | |
| 550 | PHILADELPHIA | PA | 346.00 | - | - | 4.0% | 1.71 | 40.52 | 1.62 | - | 26.06 | 0.50 | 1.19 | 417.60 | Subject to % rent at breakpoint at $108,333 per month at 4.0 % |
| 551 | PHILADELPHIA | PA | - | 63.00 | - | 10.0% | 0.31 | 48.44 | 1.39 | - | 37.35 | 0.50 | 1.60 | 152.59 | % Rent in lieu of Base rent at 10.0% |
| 552 | PHILADELPHIA | PA | 446.00 | 90.00 | - | - | 2.98 | 71.14 | 1.39 | 6.85 | 18.48 | 0.50 | 0.77 | 638.11 | |
| 555 | PHILADELPHIA | PA | 304.00 | 109.00 | - | - | 1.20 | 49.93 | 2.14 | - | 17.63 | 0.50 | 0.22 | 484.62 | |
| 561 | PHILADELPHIA | PA | 405.00 | 58.00 | - | - | 1.20 | 57.20 | 6.66 | 1.18 | 14.50 | 0.50 | 0.72 | 544.96 | |
| 601 | GREENSBORO | NC | 132.00 | 56.00 | - | 4.0% | 3.08 | 55.54 | 0.86 | - | 23.08 | 0.46 | 4.73 | 275.75 | Subject to % rent at breakpoint at $133,667 per month at 4.0 % |
| 602 | WINSTON-SALEM | NC | 438.00 | 114.00 | - | - | 3.08 | 64.49 | 0.86 | - | 25.49 | 0.46 | 6.85 | 653.23 | |
| 603 | CONCORD | NC | 228.00 | 42.00 | - | - | 2.77 | 41.03 | 1.39 | - | 17.29 | 0.46 | 3.83 | 336.77 | |
| 604 | BURLINGTON | NC | 235.00 | 47.00 | - | - | 3.08 | 46.91 | 0.86 | - | 9.93 | 0.46 | 5.47 | 348.71 | |
| 605 | HICKORY | NC | 237.00 | 1.00 | - | 6.0% | 5.53 | 79.36 | 1.23 | - | 35.44 | 0.73 | 4.94 | 365.23 | Subject to % rent at breakpoint at $166,667 per month at 6.0 % |
| 606 | GASTONIA | NC | 343.00 | 99.00 | - | - | 6.00 | 77.55 | 1.83 | - | 20.53 | 0.35 | 3.28 | 551.54 | |
| 607 | SPARTANBURG | SC | 199.00 | 74.00 | - | 3.5% | 2.89 | 28.92 | 0.86 | - | 2.82 | 0.48 | 12.44 | 321.41 | Subject to % rent at breakpoint at $145,697 per month at 3.5 % |
| 608 | SUMTER | SC | 167.00 | 19.00 | - | 3.5% | 1.15 | 46.87 | 0.86 | - | 16.41 | 0.36 | 9.13 | 260.78 | Subject to % rent at breakpoint at $144,643 per month at 3.5 % |
| 609 | MATTHEWS | NC | 209.00 | 69.00 | - | - | 0.24 | 47.54 | 0.86 | 2.40 | 11.86 | 0.46 | 3.16 | 344.52 | |
| 610 | ROCKY MOUNT | NC | 165.00 | 1.00 | - | - | 3.00 | 47.58 | 0.86 | 1.60 | 6.09 | 0.46 | 1.88 | 227.47 | |
| 611 | GREENVILLE | SC | 183.00 | 44.00 | - | 4.5% | 2.46 | 36.96 | 0.86 | - | 18.04 | 0.48 | 5.33 | 291.13 | Subject to % rent at breakpoint at $125,000 per month at 4.5 % |
| 612 | ASHEVILLE | NC | 219.00 | 23.00 | - | - | 3.08 | 44.11 | 0.86 | - | 13.80 | 0.46 | 5.28 | 309.59 | |
| 613 | N. CHARLESTON | SC | 114.00 | 36.00 | - | - | 2.68 | 68.48 | 0.86 | 2.14 | 17.45 | 0.48 | 7.76 | 249.85 | |
| 614 | GREENSBORO | NC | 275.00 | 88.00 | - | - | 1.50 | 28.68 | 0.86 | - | 13.40 | 0.46 | 4.45 | 412.35 | |
| 616 | NORFOLK | VA | 258.00 | 97.00 | - | - | 1.07 | 47.78 | 1.09 | - | 3.38 | 0.71 | 15.09 | 424.12 | |

**Occupancy Expense**

| Store | Location | State | Rent | CAM | Association | % Rent | Telephone | Utilities (incl trash) | Security (excl Armored Car) | Outside Storage | Repairs & Maintenance | R & M Window Cleaning | Taxes & Licenses | Total Daily Occupancy Costs (as defined) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 617 | PINEVILLE | NC | 440.00 | 100.00 | - | - | 4.10 | 92.07 | 2.27 | - | 12.41 | 0.46 | 6.86 | 658.17 | |
| 618 | FAYETTEVILLE | NC | 278.00 | 51.00 | - | - | 2.13 | 44.39 | 0.86 | 8.51 | 4.79 | 0.92 | 4.91 | 395.51 | |
| 619 | COLUMBIA | SC | 387.00 | 146.00 | - | - | 3.62 | 86.98 | 1.07 | 4.94 | 14.07 | 0.84 | 16.36 | 660.88 | |
| 622 | GREENVILLE | SC | 273.00 | 65.00 | - | - | 2.71 | 37.52 | 1.41 | - | 6.70 | 0.48 | 13.14 | 399.96 | |
| 624 | CHARLOTTE | NC | 299.00 | 68.00 | - | - | 1.50 | 26.56 | 0.86 | - | 19.81 | 0.88 | 6.47 | 423.08 | |
| 627 | GREENVILLE | SC | 90.00 | 57.00 | - | - | 2.82 | 41.56 | 1.09 | - | 4.83 | 0.48 | 4.68 | 202.46 | |
| 629 | COLUMBIA | SC | 274.00 | 61.00 | - | - | 4.48 | 49.37 | 1.09 | - | 3.62 | 0.80 | 22.47 | 416.83 | |
| 630 | AUGUSTA | GA | 382.00 | 94.00 | - | - | 2.77 | 82.27 | 1.09 | - | 10.02 | - | 17.06 | 589.21 | |
| 631 | ANDERSON | SC | 240.00 | 41.00 | - | - | 4.26 | 67.05 | 1.13 | 0.80 | 5.46 | 0.56 | 1.46 | 361.72 | |
| 700 | TRUJILLO ALTO | PR | 819.00 | 136.00 | - | - | 14.01 | 216.35 | 1.39 | 6.04 | 30.22 | - | 186.91 | 1,409.92 | |
| 703 | PONCE | PR | 545.00 | 71.00 | - | - | 10.25 | 164.23 | 1.39 | 35.25 | 12.61 | - | 170.75 | 1,010.48 | |
| 704 | CAGUAS | PR | 591.00 | 315.00 | - | - | 9.15 | 214.06 | 0.86 | 3.22 | 12.26 | - | 171.04 | 1,316.59 | |
| 705 | MAYAGUEZ | PR | 608.00 | 690.00 | - | - | 10.74 | 309.11 | 4.45 | 16.94 | 17.44 | - | 196.19 | 1,852.87 | |
| 750 | ST. LOUIS | MO | 219.00 | 132.00 | - | - | 3.07 | 39.70 | 1.34 | 9.20 | 11.66 | 1.65 | 9.74 | 427.36 | |
| 752 | MAPLEWOOD | MO | 259.00 | 70.00 | - | - | 1.77 | 37.17 | 1.09 | 7.87 | 4.73 | 1.04 | 21.08 | 403.75 | |
| 753 | FERGUSON | MO | 229.00 | 115.00 | - | 5.0% | 3.07 | 65.30 | 1.09 | - | 15.23 | 1.37 | 41.49 | 471.55 | Subject to % rent at breakpoint at $116,667 per month at 5.0 % |
| 777 | E-Commerce | CA | | | | | | | | | | | | | |
| | Grand Total  (Count = 253 ) | | 86,495.51 | 25,778.00 | 109.07 | | 807.28 | 16,321.54 | 389.79 | 741.32 | 3,510.82 | 129.62 | 3,480.13 | 137,763.08 | |

Exhibit 4.1(x)

(DC Center Expense)

**Anna's Linens, Inc.**
**Estimated DC and In-Transit Inventory with Logistics Expense**

Method 2
All-in Variable cost
as percentage of
**Transfer Cost**
(Daily Volume)

| | 6/7/2015 Week 1 | 6/14/2015 Week 2 | 6/21/2015 Week 3 | 6/28/2015 Week 4 | 7/5/2015 Week 5 | 7/12/2015 Week 6 | Total | | Processing Rate | Transportation Rate | All-in Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total All DC's** | | | | | | | | | | | |
| Beginning Inventory | 15,565,837 | 14,025,630 | 9,665,101 | 6,598,915 | 3,958,453 | 1,556,584 | 15,565,837 | | | | |
| Receipts/In-Transits | 3,145,921 | 651,197 | 745,160 | 133,987 | - | - | 4,676,265 | $111,340 | | | |
| Outbound Transfers | 4,686,128 | 5,011,727 | 3,811,346 | 2,774,449 | 2,401,869 | 1,556,584 | 20,242,102 | $481,955 | | | |
| Ending Inventory | 14,025,630 | 9,665,101 | 6,598,915 | 3,958,453 | 1,556,584 | - | - | | | | |
| **Total Processing Cost:** | | | | | | | | | | | |
| Rent Expense | 70,911 | 70,911 | 70,911 | 70,911 | 70,911 | 70,911 | 425,464 | | | | |
| Fixed Expenses | 6,556 | 6,556 | 6,556 | 6,556 | 6,556 | 6,556 | 39,335 | | | | |
| Variable Expenses | 149,259 | 107,426 | 86,133 | 55,612 | 45,536 | 29,359 | 473,325 | | | | |
| Total Processing Costs | 226,726 | 184,892 | 163,600 | 133,078 | 123,003 | 106,825 | 938,124 | 3.765% | 3.765% | 3.384% | 7.149% |
| **Transportation Costs** | | | | | | | | | | | |
| Inbound Costs | 121,085 | 25,064 | 28,681 | 5,157 | - | - | 179,986 | | | | |
| Outbound Costs | 153,558 | 164,227 | 124,893 | 90,915 | 78,706 | 51,007 | 663,306 | | | | |
| Total Transportation Costs | 274,642 | 189,292 | 153,573 | 96,072 | 78,706 | 51,007 | 843,292 | 3.38% | | | |
| **Total Logistics Expense** | **501,368** | **374,184** | **317,173** | **229,150** | **201,709** | **157,833** | **1,781,417** | | *Estimated Total Cost - ALL DC's* | | *$ 1,781,417* |
| | | | | | | | | | | | |
| **SDC (#9993)** | | | | | | | | | | | |
| Beginning Inventory | 2,687,986 | 2,522,523 | 1,699,998 | 1,142,106 | 738,990 | 268,799 | 2,687,986 | | | | |
| Receipts/In-Transits | 744,268 | 174,412 | 133,824 | 133,987 | - | - | 1,186,491 | $28,250 | | | |
| Outbound Transfers | 909,731 | 996,937 | 691,715 | 537,103 | 470,191 | 268,799 | 3,874,477 | $92,249 | | | |
| Ending Inventory | 2,522,523 | 1,699,998 | 1,142,106 | 738,990 | 268,799 | - | - | | | | |
| **SDC Processing Cost:** | | | | | | | | | | | |
| Rent Expense | 25,423 | 25,423 | 25,423 | 25,423 | 25,423 | 25,423 | 152,540 | | | | |
| Fixed Expenses | 2,797 | 2,797 | 2,797 | 2,797 | 2,797 | 2,797 | 16,784 | | | | |
| Variable Expenses | 36,980 | 26,189 | 18,457 | 15,004 | 10,512 | 6,010 | 113,152 | | | | |
| Total Expenses | 65,201 | 54,410 | 46,678 | 43,225 | 38,733 | 34,231 | 282,477 | 5.581% | 5.581% | 3.384% | 8.966% |
| | | | | | | | | | *Estimated Total Costs SDC* | | *$ 453,751* |
| **EDC (#9994)** | | | | | | | | | | | |
| Beginning Inventory | 3,765,607 | 3,396,431 | 2,293,166 | 1,611,189 | 941,402 | 376,561 | 3,765,607 | | | | |
| Receipts/In-Transits | 767,891 | 67,603 | 209,893 | - | - | - | 1,045,387 | $24,890 | | | |
| Outbound Transfers | 1,137,067 | 1,170,868 | 891,869 | 669,788 | 564,841 | 376,561 | 4,810,994 | $114,547 | | | |
| Ending Inventory | 3,396,431 | 2,293,166 | 1,611,189 | 941,402 | 376,561 | - | - | | | | |
| **EDC Processing Cost:** | | | | | | | | | | | |
| Rent Expense | 11,607 | 11,607 | 11,607 | 11,607 | 11,607 | 11,607 | 69,643 | | | | |
| Fixed Expenses | 1,393 | 1,393 | 1,393 | 1,393 | 1,393 | 1,393 | 8,360 | | | | |
| Variable Expenses | 38,153 | 24,805 | 22,067 | 13,415 | 11,313 | 7,542 | 117,295 | | | | |
| Total Expenses | 51,154 | 37,805 | 35,067 | 26,415 | 24,313 | 20,542 | 195,297 | 3.335% | 3.335% | 3.384% | 6.719% |
| | | | | | | | | | *Estimated Total Costs EDC* | | *$ 393,490* |
| **WDC (#9999 inch E-Com)** | | | | | | | | | | | |
| Beginning Inventory | 9,112,244 | 8,106,676 | 5,671,937 | 3,845,619 | 2,278,061 | 911,224 | 9,112,244 | | | | |
| Receipts/In-Transits | 1,633,762 | 409,182 | 401,443 | - | - | - | 2,444,387 | $58,200 | | | |
| Outbound Transfers | 2,639,330 | 2,843,921 | 2,227,761 | 1,567,558 | 1,366,837 | 911,224 | 11,556,631 | $275,158 | | | |
| Ending Inventory | 8,106,676 | 5,671,937 | 3,845,619 | 2,278,061 | 911,224 | - | - | | | | |
| **WDC Processing Cost:** | | | | | | | | | | | |
| Rent Expense | 33,880 | 33,880 | 33,880 | 33,880 | 33,880 | 33,880 | 203,280 | | | | |
| Fixed Expenses | 2,365 | 2,365 | 2,365 | 2,365 | 2,365 | 2,365 | 14,191 | | | | |
| Variable Expenses | 74,126 | 56,432 | 45,609 | 27,193 | 23,711 | 15,807 | 242,878 | | | | |
| Total Expenses | 110,371 | 92,678 | 81,855 | 63,438 | 59,956 | 52,053 | 460,350 | 3.288% | 3.288% | 3.384% | 6.672% |
| | | | | | | | | | *Estimated Total Costs WDC* | | *$ 934,175* |

**Assumptions:**

| | |
|---|---|
| Beginning DC Inventory (@ cost | 15,565,837 |
| In Transit Inventory | 4,676,265 |
| ***Total Inventory processed*** | ***20,242,102*** |

Exhibit 5.2(b)(1)

(List of DC Merchandise)

Exhibit 5.2 (b)(1)

(List of DC Merchandise)

Filename:        Inventory by SKU 5-12-15.xlsx (worksheet name "DC")

Exhibit 5.2(b)(2)

(List of E-Commerce Merchandise)

Exhibit 5.2 (b)(2)

(List of E-cCommerce Merchandise)

Filename:        Inventory by SKU 5-12-15.xlsx (worksheet name "E-com")

Exhibit 5.2(b)(3)

(List of In-Transit Merchandise)

Exhibit 5.2(b)3

(In-Transit Inventory)


Filename:        "Item 5. In-Transit Inventory.xlsx"

Exhibit 8.1

(Sale Guidelines)

## ANNA'S LINENS, INC.

## EXHIBIT 8.1 SALE GUIDELINES

A.    The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.    The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.    On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.    At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, _provided_, _however_, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.    Prior to entry of the Interim Approval Order, Agent may advertise the sale as a "sale on everything", "everything must go", "inventory liquidation" or similar themed sale. Following, and subject to, the entry of the Interim Approval Order and/or the Approval Order (as applicable), the Agent may also advertise the sale as a "store closing" and/or "going-out-of-business" sale, as dictated by the respective Interim Approval Order and/or Approval Order (as applicable).

F.    Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; _provided_, _however_, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; _provided_, _however_, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet. In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Interim Approval Order and/or the Approval Order. Nothing contained in these Sale Guidelines shall be

construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

F.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.      Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.      The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.      The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores and Distribution Center(s) (the "FF&E").  The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores and Distribution Center(s).  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.      The Agent shall be entitled to include Additional Agent Merchandise in the Sale in accordance with the terms of the Interim Approval Order and/or the Approval Order and the Agency Agreement.

L.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases.  The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

M.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.  Agent shall have no responsibility therefor.

N.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.      If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

        If to Agent:

        If to Merchant:

2

Exhibit 11.1(d)

(Pre-Existing Liens Cover Page)

Exhibit 11.1(d)

(As of the dates of the respective UCC search documents and to be updated upon receipt of UCC search documents for the period of May 14, 2015 through date of Agency Agreement to the extent such search documents reflect liens reasonably acceptable to Agent)

Exhibit 11.1(k)

(Promotional Activity)

May & June Ad Calendar

| May-15 | Fiscal Wk | Print Ad | POS | FOA | Progressive MD | Comments |
|---|---|---|---|---|---|---|
| 5/4-5/10 | 14 | 2nd Wk 4/27 Ad (Lowest Prices of the Season Sale) | 2nd Wk 4/27 POS | 5/8-5/10 $10 off $40 and Addit. 30% off Clearance | | |
| 5/11-5/17 | 15 | 5/11-5/22 AD (Mega May) | 5/11-5/22 POS | FOA Secret Sale (lower Ad pricing across the Ad) One week only ends 5/17 | Effective 5/12 | |
| 5/18-5/24 | 16 | 2nd wk 5/11 AD | 5/11-5/22 POS | | | |
| | 16 | 5/23-5/25 BOGO | NO POS 5/23-5/25 | 5/23-5/25 Addit. 10% off $40 or more | | |
| 5/25-5/31 | 17 | Cont BOGO 5/25 | No POS 5/25-5/28 | In Store Entire Store 20% off - 5/26-5/28 | | |
| | 17 | 5/29 -6/14 AD Early Start* | 5/29 - 6/14 POS | $10 Club Cash for every $25 Spent | | * AD drop to customers 6/2 - 6/3 |

| Jun-15 | Fiscal Wk | Print Ad | POS | FOA | Progressive MD | Comments |
|---|---|---|---|---|---|---|
| 6/1-6/7 | 18 | 5/29-5/14 AD | 5/29 - 6/14 POS Continues | $10 Club Cash for every $25 Spent | | Club Cash $10 for every $25 Earn Period |
| 6/8-6/14 | 19 | 2nd Wk 5/29-6/14 AD | 5/29 - 6/14 POS Continues | $10 Club Cash for every $ Plus Daily Deals (TBD) double Earn $20 for every $25 for 6/13-6/14 | | Club Cash $10 for every $25 Earn Period |
| 6/15-6/21 | 20 | 6/15-6/29 In Store Only Ad | 6/15-6/28 POS | TBD | | Club Cash $10 for $20 spent Redeem Period |
| 6/22/6/28 | 21 | 2nd Wk 6/15-6/28 In Store Only Ad | 6/15 - 6/28 POS Continues | TBD | | Club Cash $10 for $20 spent Redeem Period |
| 6/29-7/5 | 22 | 6/29 - 7/5 AD (America's Biggest Bedding Event) | 6/29  7/5 POS | TBD | | Club Cash $10 for $20 spent Redeem Period |

8:29 -   .14 pos - Chain

| Department 3 | |
|---|---|
| *D Decorative Rods | 30% off |
| Chadwick | 30% off |
| Deonne | 30% off |
| FELICE | 84" 19 99, V 12 99 |
| JANRLA | 30% off |
| Juvi  Show off Streamers | 30% off |
| Kingsbury Panels | 30% off |
| LUSTER | 20% off |
| Magic Pleat Sheers | 30% off |
| MERCATO | 30% off |
| Remington | 30% off |
| Saroya /Suyen Thermal | 30% off |
| SHELDON | 20% off |
| SPARKS | 30% off |
| Tiffany | 30% off |
| Victoria Pinch Pleats | 40% off |
| | |
| | |
| Barista Tier | 30% off |
| Chels Tier | 30% off |
| Cocina Tier | 30% off |
| Annie Tier | 30% off |
| Griselda Tier | 30% off |
| | |
| Cutlery Tier | 30% off |
| Marla Tier | 30% off |
| Peetie Tier | 30% off |
| | |
| | |
| AUTUMN TIER | 30% off |
| GISELA TIER | 30% off |

| DEPARTMENT 7 | |
|---|---|
| MASON SLIPCOVERS | 34 99 R 44 99 LV 54 99 SO |
| DOORMATS | 25% OFF |
| SUEDE FURNITURE PROTECTOR | 50% OFF |
| CORDUROY STRETCH FURNITURE COVERS | 40% OFF |
| MATRIX FURNITURE COVERS | 17 99 LV, 19 99 SO, 24 99 JU SO |
| FASHION THROWS | 40% OFF |
| TAPESTRY 19X27 ACCENT RUGS | 7 99 |
| MOHAWK ACCENT RUGS | 9 99 |
| BERBER ACCENT RUG | 3 99/5 99 |
| ODESSA SHAG ROOM RUGS | 49 99 |
| DAMASK FURNITURE THROWS | 30% OFF |
| TROPICAL FURN THROW | 30% OFF |
| DINING CHAIR COVERS | 20 % OFF |
| RECLINER STRETCH SLIPCOVER | 24 99 |
| 2 PK PILLOWS | 12 99 |
| LATHAM CHAIRPADS | 9 99 |
| THAILAND CHAIRPAD | 5 99 |
| ANIMAL BEDREST/FLOOR CUSHIC | 16 99/12 99 |
| PRINT ACCENT RUGS | 20X30 5 99/ 31X50 12 99/ RUNNER 12 99 |
| SELECT ROOM SIZE RUGS REG 39 99 | 29 99 |
| 3PC ROOM SZ RUG SET6 | 25% OFF |

| DEPARTMENT 6 | |
|---|---|
| BELLA DAMASK | $1.49/$1.99/$7.99/$12.99 |
| ELEGANCE | 1.49/$1.99/57.99/59 99/$12.99 |
| RACHEL | 1.49/$1.99/57.99/59 99/$12.99 |
| SOLITAIRE | 40% OFF |
| WAFFLE PLACEMATS | 0.75 |
| SCALLOP SCROLL, SHIMMER RUFFLE AND RUFFLE ROUND PM | 1 99 |
| AURELIA | 50% OFF |
| JILLIAN AND ISABELLA | $1.49/$1.99/$7.99 |
| MICROFIBER KITCHEN SOLIDS AND GARDEN GATE PRINTED | $3.99-$3.99 |
| COMFORT MATS | 6 99/9 99 |
| FLOWER BURST DOILIES | 25% OFF LAVENDAR AND PINK ONLY |
| CONCORD AND FAUX SILK RUNNEI | 7 99 |
| SATIN ROUNDS | 5 99 |
| BIG LOOP AND SONOMA STRIPE RUG | 4 99/7 99/9 99 |
| CASBAH NAPKIN/PM/RUNNER | 1 49/2 49/7 99 |
| | |
| | |
| | |

| Department 4 | |
|---|---|
| Down Alternative Comforters | 24 99 T/29 99 F Q /34 99 K |
| Mink Mini Sets | 29 99 |
| Forever Mini Sets | 24 99 |
| Suede Comforter Sets | 34 99 |
| Microplush Mini Sets | 29 99 |
| Print Mini Sets | 19 99 |
| Madison Bedspreads | 30% off |
| Quilt Mini Sets | 30% off |
| Cotton Quilt Mini Set | 30% off |
| Matlesse Quilt Mini Sets | 30% off |
| 4pc print sets  Casa Galena | 29 99 T or F /39 99 Q or K |
| 5pc Sets | 39 99 |
| Suede 4pc or 6pc sets | 39 99 |
| Living Space 6pc sets | 39 99 |
| 16pc Sets ( F,Q,K) | 69 99 |
| 4 Luxury Sets | 9 99/18 99 dec / 12 99 sham |
| 4 Luxury Sets Hastings | 9 99/16 99 dec / 7 99 sham |
| 4 Luxury Set-Mosaic | 99 99/16 99/ shams / 99 val 14 99  panels 29 99 |
| 7pc Luxury C/Sets | 49 99 |
| 7pc Promo Sets | 49 99 |
| 8pc Luxury C/Sets[ F Q  K] | 69 99 |
| 9pc Luxury C/Sets (F Q K) | 69 99 |
| 10pc Luxury C/Sets w/quilt (Q,K) | 69 99 |
| 10pc Luxury C/Setsw 4 dec  Q K | 69 99 |
| 11pc Luxury C/Sets (Q K | 69 99 |
| 12pc Luxury C/Sets | 69 99 |
| 10pc Sets TurnStyle MultiStyle (1 | 39 99 T or F /49 99 Q or K |
| Lauren Cole F/Q or K Duvet Sets | 19 99 |
| Min  Sets with Sheets | 29 99 |
| Dolty mini Set | 24 99 |
| 11pc & 13pc Sets | 44 99 |
| Farrah and Leah 5pc&8pc Sets | 29 99 |
| 8 & 9pc BNB Sets | 29 99 |
| 20pc Sets | 69 99 |
| 4PC Sets | 39 99 |
| 24pc Sets | 69 |
| Serengeti Bedding | T24 99  F/Q 29 99--K34 99  ACC 6 99 |
| Ripple Bedding | T24 99  F/Q 29 99--K34 99  ACC 6 100 |
| Stitched Bedding | T24 99  F/Q 29 99  K34 99-- ACC 6 101 |

| partme   t | ric |
|---|---|
| Flannel Sheets | 30% Off |
| Pursuit Sheets | 1 |
| Opure  ce Sheets | 1          99 |
| MF   sets w/Bonus   -case | 7  9/9 9  1  99/  99 |
| 200 Open Stock Sheets | 3 99/7 99/9 99/12 99/3 99/5 99 |
| 500TC Cotton Blend Sheets | 29 99/29 99/34 99 |
| 400TC 100% Cotton Sheets | 29 99/34 99/3  99 |
| TC 1     Cotton Sheets | 24 99/29 99/34 99 |
| TC Pillowcases | 7 99/9 99 |
| 400 Pillowcases | 9 99/12 99 |
| 500T  P lowca | 12 99/16 99 |
| 550 TC Sheets | 19 99/24 99/29 99 |

| De    rtment 12 | |
|---|---|
| 2pk EZ Dream P low | |
| Satin P llows | |
| Waverly  rosa Pillows | 99/9    12 |
| Comfy Plush Plw | 4 99/7 99 |
| Cozy Comfort Plw | 4 99 |

| Department 2 | | | | | | Price |
|---|---|---|---|---|---|---|
| 2 pc S | r | | | | | 12 99 |
| Diamc | | color | Gold | 99- | 99 | |
| Beach | | | | | | 7 99 |
| Wash   loth | | | | 0% | | |
| Embe ish | | | | 0% | | |
| Towel | | U  . | | | | |
| Soho- | | o | | 89-  9 | | |
| ani  s | | | | | 99 | |

## 5/21/15 POS Event

| De   rtment 1 | Price |
|---|---|
| Flannel Sheets | 30% Off |
| Pursuit Sheet | 9.99/12.99/16.99/19.99 |
| O    ence Sheets | 14.99/19.99/24.99/6.99/7.99 |
| heets with   onus Pillowcase | .   1 .   14. |
| | |
| | |
| | |
| | |

| De   rtment 12 | Price |
|---|---|
| Al Blankets 30% Off | 30% Off |
| 2  k EZ Pillow | 9.99 |
| Wavel   Pillows | 7.99  9.99/12.99 |
|    n   il | 7.99/9.99/12.99 |
|   x | 5.99 |
| F   m   n   llow | 17.99/22.99 |
| Dream Essence | 13.99/1   99 |
| | |
| | |
| | |
| | |

| Department 3 | Price |
|---|---|
| *D Decora  ver Rods | 30% off |

| | |
|---|---|
| Victora Pinch Pleats | 80% OFF |
| Palais Panels | 40% OFF |
| Chloe Flocked | 40% off |
| | |
| Remington | 50% OFF |
| Mosaic | 30% off |
| | |
| LUSTER | 20% OFF |
| SILHOUETTE | 30% OFF |
| MERCATO | 50% OFF |
| BRIELLE PANEL | 20% OFF |

| | |
|---|---|
| FELICE | 84" 14.99, Val 6.99 |
| | |
| JANILLA | 30% OFF |
| | |
| CAITLIN | 20% OFF |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| De   rtment 6 | |
|---|---|
| Aurel a | 50% Off |
| Comfort Mats | $9.99 |
| Bella | $1.49/$1.99/$7.99/$12.99 |
| Isabella | $1.49/$1.99/$7.99 |
| Jillian | $1.49/$1.99/$7.100 |
| Elegance | $1.49/$1.99/$7.99/$9.99/$12.99 |
| | |
| Sparkle Ruffle & Scal op Round Placemats | $1.99 |
| Rachael | $1.49 $1.99/$7.99/$9.99/$12.99 |
| Waffle Placemats | $0.75 |
| Embel ished Spring Runners and Placemats | $3.99/$12.99/$14.99 |
| Microfiber Kitchen sold & Garden Gate | $1.99-$3.99 |
| | |
| | |
| | |
| | |

| De   rtment 7 | |
|---|---|
| Berber Accent Rug | $3.99/$5.99 |
| Mohawk Accent Rug | 9.99 |
| Paris Ac    t R  gs | 7.99 |
| Asst Room Rugs | 49.99 |
| Odessa Shag R    R  g | 49.99 |
| Damask Furn Throw | 30% Off |
| Tropical Furn Throw | 30% Off |
| Suede Furn Protector | 30% Off |
| Matrix Furn Protector | $1   99/$19.99/$24.99 |
| Tululu Dec Pi  ow | $9.99 |
| Doormats | 25% off |
| Furniture Protectors | 17.99-19.99 24.99 |

| pt | |
|---|---|
| Down Alt Comforters Single Comf | 24.99/29.99 34.99 |
| Mink Mini Sets | 29.99 |
| Suede 4pc Sets | 34.99 |
| Print Mini Sets | 19.99 |
| Microplush Mini Sets | 29.99 |
| Forever Young Mini Sets | 24.99 |
| 5pc Sets | 39.99 |
| 16pc Sets | 69.99 |
| Dotty Mini Sets | 24.99 |
| 8 pc twin &   9pc full BNB-from Beatrice | 29.99 |
| Microfiber 90gsm duvet | 19.99 |
| Min  Sets with Sheets | 39.99 |
| Farrah & Leah 5pc & 6pc sets | 29.99 |
| 11pc & 13pc Sets | 44.99 |
| 20pc 24pc | 69.99 |
| | |
| Ripple Bedding mini set/Duvet Set | Twin/24.99-f/q 29.99 k  g 34.99 |
| Ripple  dec pillow/sham/84"panel | 6  9 |
| Serengeti Bedding | 1/24.99 full/queen 29.99 king 34.99 |
| Seregeti accessories pillow,panel,valance,bedskirt | 6.99 |
| Stitched Bedding | 1/24.99 full/queen 29.99 king 34.99 |
| stitched Accessories | 6.99 |
| 4pc sets VC | 39.99 |
| 6pc Living Space | 39.99 |
| | |
| Asst Comforters | 14.99 |
| | |
| BNB | 29.99 T/F    39.99 Q/K |
| 4pc Luxury sets | 89.99/16.99 dec  12.99 shams |
| Mosaic 4pc | 99.99/16.99/ shams 7.99  val 14.99  panels 29.99 |
| Haslings 4pc sets | 89.99/16.99 dec/ 7.99 shams |
| Fashion 4pc | 39.99 T or F /49.99 Q or K |
| Casa Galeria 4pc | 29.99 T or F /39.99 Q or K |

| p | |
|---|---|
| Imperial Scroll/Imperial Grand Towels | 6.99-4.99-2.99 |
| | |
| Dakota,Essential Ultra,zero Twist, Forevercolor,soho,regal towel | 3.99-2.49-1.49 |
| Wash Cloth 6pack, 5pack | 3.99 |
| Wash Cloth 9 pack | 4.99 |
| Animal Jacqurd towel | 3.99 |
| Embellish Towels | 11.99-6.99-4.99 |
| | |
| | |

| p | |
|---|---|
| Selected Shower Curtains *D (D) Parallel-Portal-mesh pocket- Bubble wave-Gillagan-Daphene | 30% |
| Shower Curtain Sets | 9.99 |
| Asst Denise Shower Curtain | 4.99 |
| Toilet Sets/Hampers/Caddys | 25% |
| | |
| | |
| | |

| De   rtment 8 | |
|---|---|
| All Mugs | 25% Off |
| Ali Utensils | 25% off |

| De   rtment 9 | |
|---|---|
| All Potted Silk Florals | 25% off |
| All Mix & Match Lighting | 20% Off |

| De   rtment 10 | Price |
|---|---|
| Al  Wall | Mirrors |

| De   rtment 11 | Price |
|---|---|
| Select ASOTV item | |

| De   rtment 14 | Price |
|---|---|

## De rtment 1

| | |
|---|---|
| 300TC Cotton Sheet Sets | 24.88 29.8   4.88  .88  .88 |
| 300TC Blend Sheet Sets | 19.88 24.88/29.88 |
| 200 TC O  n Stock Sheets | 4.88   8    88/12 88/5 88/6 88 |
| heet | |
| h      ets | 11 99 14.   1 |
| uenc   h  t  et | 4.99/19 99/24    9.99/6      9 |
| b  heet | 9 |
| anne   eets | |
| P        heet | 1    16.     9 |
| icroßber Sheet Set w/Bonus P-C | 7 999   12 9  14 99 |
| u e   icroßber  heet set | 12 99/    6 |
| mate    ets | 1.   4.            9 |

## Department 3

| | |
|---|---|
| *D Decorative Rods | 30% off |
| Tiffany | 40% off |
| Kingsbury Panels | 40% off |
| Victora Pinch Pleats | 60% OFF |
| Palais Panels | 40% OFF |
| Magic Pleat Sheers | 40% off |
| Chloe Flocked | 40% off |
| Chadwick | 40% off |
| Remington | 50% OFF |
| Deonne | 40% off |
| Saroya /Suyen Thermal | 30% off |
| Mosaic | 30% off |
| THERMAL STRIPE. | 30% OFF |
| LUSTER | 30% OFF |
| SHELDON | 30% OFF |
| SILHOUETTE | 30% OFF |
| MERCATO | 50% OFF |
| BRIELLE PANEL / SHEER | 30% OFF |
| MURANO THERMAL | 40% off |
| Juvi  Tutti | 40% off |
| Juvi  Show off Streamers | 40% off |
| Light F lteríng Shades | 60% OFF |
| Room Darke   g S  ades | 60% OFF |
| Bar sta Tier | 40% off |
| Chels Tier | 50% OFF |
| Cocina Tier | 50% OFF |
| Annie Tier | 50% OFF |
| Grisetta Tier | 40% OFF |
| Laura Tier | 30% off |
| Cutlery Tier | 30% off |
| Marta Tier | 40% OFF |
| Peetie Tier | 40% OFF |
| ISABELLA TIERS | 30% off |
| DEBRA FLOWER TIER | 30% off |
| AUTUMN TIER | 30% off |
| GISELA TIER | 40% OFF |
| FELICE | 84" 34.99, Val 9.99 |
| BONNIE ATTACHED VAL | 30% OFF |
| BOUQUET LACE ATTACHED VAL | 30% OFF |
| JANILLA | 30% OFF |
| SPARKS | 30% OFF |

## De  rtment 6

| | |
|---|---|
| Solitaire | 30% Off |
| Aurelia | 50% Off |
| Comfort Mats | $9.99 |
| Bella | $1.49/$1.99/$7 99/$12.99 |
| Isabella | $1.49/$1.99/$7 99 |
| Jillian | $1.49/$1.99/$7 100 |
| Elegance | $1.49/$1.99/$7 99/$5.99/$12.99 |
| Sparkle Ruffle & Scallop Round Placemats | $1 99 |
| Rachael | $1.49/$1.99/$7 99/$5.99/$12.99 |
| Waffle Placemats | $0.75 |
| Embellished Spring Runners and Placemats | $3.99/$12 99/$14.99 |
| Microfiber Kitchen solid & Garden Gate | $1 99 $3 99 |

## De    rtment 7

| | |
|---|---|
| Berber Accent Rug | $3 99/$5 99 |
| Mohawk Accent Rug | 9.99 |
| Paris Accent Rugs | 7 99 |
| Asst Room Rugs | 49 99 |
| Odessa Shag Room Rugs | 49 99 |
| Damask Furn Throw | 30% Off |
| Tropical Furn Throw | 30% Off |
| Corduroy Slipcover | 30% Off |
| Asst Reckner Slipcover | 30% Off |
| Suede Furn Protector | 30% Off |
| Matrix Furn Protector | $17 99/$19.99/$24 99 |
| Dining Room Chair Cover | $7 99 |
| Tululu Dec Pillow | $9.99 |
| Jersey Stretch Slipcover | $24.99/$29.99/$39.99 |
| Doormats | 25% off |
| Furniture Protectors | 17.99 19.99 24.99 |
| Throws | 40% off |

## De    rtment 12

| | |
|---|---|
| Quilted Mattress Pads | 8.88 14.88/16.88/19.88 |
| Micro  lush Blankets 50% Off | 9.88/12.88/14.88 |
| E    llan Mattress Pads | 16.88/24.88/29.88/34.88 |
| oam   ssence  illow | 13.88/17.88 |
| Ez D    m      1 | |
| averi  illows | 7      99/12. |

| pt | |
|---|---|
| Down All Comforters Single Comf | 24.99 T / 29.99 F/Q /34.99 K |
| Mink Mini Sets | 29.99 |
| Suede 4pc Sets | 34.99 |
| Pnnt Mini Sets | 19.99 |
| Microplush Mini Sets | 29.99 |
| Forever Young Mini Sets | 24.99 |
| 5pc Sets | 39.99 |
| 16pc Sets | 69.99 |
| Dolty Mini Sets | 24.99 |
| 8 pc twin &  9pc full BNB-from Beatrice | 29.99 |
| Microfiber  90gsm duvet | 19.99 |
| Mini Sets with Sheets | 39.99 |
| 20pc-24pc | 99.99 |
| Ripple Bedding mini set/Duvet Set | 24.99 T, 29.99  F/Q , 34.99 K |
| Ripple  dec pillow/sham/84"panel | 6 99 |
| Serengeti Bedding | 24.99 T, 29.99  F/Q , 34.99 K |
| Seregeti accessories pillow,panel,valance,bedskirt | 6 99 |
| Stitched Bedding | 24.99 T, 29.99  F/Q , 34.99 K |
| stitched Accessories | 6 99 |
| 4pc sets VC | 39 99 |
| 6pc Living Space | 39 99 |
| 8 Pcs | 69.99 |
| 12 pc | 69.99 |
| 9pc  11pc luxury | 69.99 |
| 10pc | 39 99/49 99 |
| 4pc Luxury sets | 89 99/16 99 dec / 12 99 shams |
| 4pc Luxury sets | 89 99/16 99 dec / 7 99 |
| Mosaic 4pc | 99 99/16 99 shams / 99, val 14 99, panels 29 99 |
| Fashion 4pc | 39.99 T or F /49 99 Q or K |
| Casa Galena 4pc | 29 99 T or F /39 99 Q or K |
| MFCOM | 24.99 T / 29 99 F/Q /34.99 K |
| 5pc Sets | 49.99 |

| p | |
|---|---|
| Wash cloth 6pack 5 pack | 3.99 |
| Wash Cloth 9pack | 4.99 |
| Embellish Towels | 4.99-6 99-11.99 |
| 2pc Rug Set | 7.99 |
| 2pc Sigounery Rug Set | 12.99 |
| Dakota-Essential  Ultra-zero Twist-Fore ever color-Soho ,regal Towels | Bath 3.88 Hand 2.28 Wash 1.28 |
| Animal Jequard Towel | 3.99 |
| Diamond Towel | 2.99-1.99-1.29 |
| Dept 5 | Price |
| Selected Shower Curtains *D (D) Parallel-Portol-mesh pocket | |
| Bubble wave-Gillagan-Daphene | 25% |
| Shower Curtain Sets | 9.99 |
| Asst Denise Shower Curtain | 4.99 |

| De    rtment 8 | Price |
|---|---|
| | |

| De    rtment 9 | Price |
|---|---|
| All Candle Holders | 25% Off |
| All Decorative Plates/Dishes | 25% Off |

| De    rtment 10 | Price |
|---|---|
| | |

| Department 11 | Price |
|---|---|
| | |

| De    rtment 14 | Price |
|---|---|
| | |

Exhibit 11.1(l)

(Pending Matters)

# NOTICE OF DEFAULTS THROUGH 06/02/2015

| | | | | | |
|---|---|---|---|---|---|
| | | | | N TICE OF | |
| | | | | Def. Mo. | |
| | | | | Apr/May | |
| | | | | May | |
| | | | | Apr/May | |
| | | | | Apr | |
| | | | | May | |
| | | | | Apr | |
| | | | | Apr | |
| | | | | Apr/May/June | |
| | | | | Mar/Apr/May | |
| | | | | Apr/May | |
| | | | | April | |
| | | | | April | |
| | | / / | | Apr/May | |
| | | | /7/ | April | |
| | | | /_ | Apr/May | |
| | / / | | | March, April | |
| | / _ | | | Unknown | |
| | | | / / | 2013 CAM Rec Credit Taken | |
| | | / _ | | April | |
| | | | | April | |
| | / | | | Taxes | |
| | / | | | 2014 CAM Rec | |
| | | | / | 2014 and earlier balances | |
| | / | | | CAM Impounds | |
| | / | | | May | |
| | / | | | 2014 NNN Rec | |
| | | | / | Apr/May | |
| | | | | May | |
| | / | | | Unknown | |

Properties, LLC

LL.

1 of 3

6/3/2015

# NOTICE OF DEFAULTS THROUGH 06/02/2015

| # | Name | Location | | | | Def. Mo. | Notes |
|---|------|----------|---|---|---|----------|-------|
| | | | | | | Unknown | |
| | | | | | | May | |
| | | | | | | May | |
| | | | | | | April | |
| | | | | | | r/May | |
| | | | | | | April | |
| | | | | | | April | |
| | | | | | | May | |
| | | | /2 / | | | Apr/May | |
| | | | v  g | | | Apr/May | |
| 420 | Ramco Gershenson In | Farmington Hills, MI | 4/2 /2 | | | April | 2014 NNN Rec + April BRT |
| 421 | Hawthorne Parnters | Chicago IL | /  /20 5 | | | Apr/May | 3954 80   unknown balance  Need to conta t LL. |
| 425 | NaperW, LLC | Naperville  IL | | 5/ 5/20 5 | | Feb, April, May | Feb, April  May Rent + 2014 CAM Rec   'ts   d |
| 428 | NMC Melrose Park LLC | Melrose Park, IL | | | 5/28/15 | Apr/May | es   7 .9 / |
| 429 | Harlem Irving | Chicago, IL | | | 4/15/15 | April | 1694.4 |
| 507 | Acadia Realty Trust | Washington, DC | | 4/16/15 | | April | 1274.7 |
| 507 | Acadia Realty Trust | Washington, DC | | 5/13/15 | | ril, May | April recone |
| 509 | Combined Properties | Laurel, MD | 5/26/15 | | | May | Trash |
| 512 | Hechinger Plaza LP | Hyattsville, MD | 5/21/15 | | | pr/May | 05/21.  statem  Need |
| | GB Mall LP | Greenbelt, MD | | | | Apr/May | 05/21  statem  Need |
| 560 | General Growth Properties | Baltimore, MD | | 4/13/15 | | April | Misc |
| 561 | Aramngo/ WV BDG GP  II | Philadelphia PA | | Summons 5/14/14 | | Apr/May | plus inetrest  attorney fees, cost of suit |
| 602 | Brixmor | Winston Salem, NC | | | 4/10/15 | NNN Rec + Late Fees | NNNrec, Late fee  06/01/15   Paid negociated amt of $20,944.61 for outstanding CAM.  Once received the remainder due should be wavied. |
| 603 | Copper Center Partnership | Concord, NC | 4/15/15 | | | Unknown | Unknown   might be a CAM Rec but couldn t locate one as received |
| 604 | Aston Properties | Burlington, NC | | | 4/16/15 | 2014 NN Rec + Late Fees | 2014NNN Rec |
| 605 | Brixmor | Hickory, NC | | | 4/10/15 | April | |
| 606 | Brixmor | Gastonia, NC | | | 4/10/15 | April | |
| 611 | Church Street, LLC | Greenville, SC | | | 4/15/15 | NNN Rec | 2014 NNN Rec |

NOTICE OF DEFAULTS THROUGH 06/02/2015

| Store | Landlord | | Notice To Pay or Quit Date | DEFAUL DATE | Def. Mo. | Description/Comment |
|-------|----------|---|---------------------------|-------------|----------|---------------------|
| 611 | Church Street, LLC | | | 6/1/15 | May | |
| 617 | Pineville Centrum Limited Partnership | | | 5/11/15 | Apr/May | Unknown |
| 619 | East Forest Plaza III, LLC | | | 6/1/15 | Apr/May | April Rent is not the full amount but a partial amount due. |
| 629 | WMS, LLC | | | 1/2015 atty rkin on | May | Rent minus 2014 CAM Credit plus 426 12 of unknown |
| 631 | Belvedere Station, LLC | | | 5/26/15 | Apr/May | 2014 NNN Rec |
| 700 | Kimco | | | 4/16/15 | April | 2014NNNrec |
| 703 | Kimco | | | 4/16/15 | April | |
| 704 | Kimco | | | 4/16/15 | April | |
| 705 | Empresas Puertoriquenas de Dasarrollo | | | 5/4/15 | April | $340.02   Sales Tax for Rent and CAM that LL is NOT defaulting us for. |
| 75 | Priority- Crosssroads Halls Ferry | | Summons  5 6-15 | 5/11/15 | Apr/May | April + May Rent + 2014 NNN Reconcilation LL did not calculate NNN correctl .  We |
| 5 | Priority- Crosssroads Halls Fe | | | | 2014 Rec Dispute | |

6/3/2015

Exhibit 11.1(o)

(Self-Liquidating Stores)

| # | Anna's Store Name | Street | City | ST | Zip Code | Phone # |
|---|---|---|---|---|---|---|
| 69 | MISSION, CA | 2610 MISSION ST. | SAN FRANCISCO | CA | 94110 | (415) 643-4830 |
| 105 | SAN YSIDRO, CA | 4450 CAMINO DE LA PLAZA, #B4 | SAN YSIDRO | CA | 92173 | (619) 428-0499 |
| 230 | DALLAS - WHITE ROCK, TX | 11255 GARLAND RD, #1150 | DALLAS | TX | 75218 | (214) 660-0415 |
| 299 | HOUSTON - SUGAR PARK, TX | 11852 WILCREST DRIVE | HOUSTON | TX | 77031 | (281) 879-4651 |
| 303 | ATLANTA - SOUTH DEKALB, GA | 2801 CANDLER RD, #61B | DECATUR | GA | 30034 | (404) 243-6330 |
| 318 | ATLANTA - STONE MOUNTAIN, GA | 5370 STONE MOUNTAIN HWY., STE. 510 | STONE MOUNTAIN | GA | 30087 | (770) 879-2116 |
| 512 | LANGLEY PARK, MD | 1535 UNIVERSITY BLVD. E, SUITE B | HYATTSVILLE | MD | 20783 | (301) 439-5832 |
| 600 | ROCK HILL, SC | 2349 CHERRY RD. | ROCK HILL | SC | 29732 | (803) 980-3350 |

Exhibit 11.1 (p)

(List of Store Leases that Expire During Sale Term)

MASTER LIST

STORE CLOSURES AND RELOCATIONS - 2015

_CLOSURES_

| COUNT | STORE # | LOCATION | LANDLORD | LEASE ENDS | GOB START DATE-or Non Insert GOB | MISC COMMENTS |
|---|---|---|---|---|---|---|
| 1 | 512 | University Plaza - Langley Park, MD | Quantum | 6/30/2015 | 5/11/15 | send notice 5/31/15  ends 30 days after notice |
| 2 | 600 | Market on Cherry Road - Rock Hill, SC | Aston | 6/30/2015 | 5/11/15 | expires |
| 3 | 69 | Mission Street - San Francisco, CA | Sahed | 6/30/2015 | 5/26/15 | ltr agmt |
| 4 | 230 | White Rock Marketplace - Dallas, TX | DLC | 6/30/2015 | NI-GOB 5/26/15 | expires |
| 5 | 299 | Sugar Park - Houston, TX | Whitestone | 6/30/2015 | NI-GOB 5/26/15 | Ltr Agmt   notice by 8 31 w/90 days) |
| 6 | 303 | South DeKalb Mall - Decatur, GA | Thor | 6/30/2015 | NI-GOB 5/26/15 | expires |
| 7 | 318 | Stone Mountain - Stone Mountain, GA | NAI | 6/30/2015 | NI-GOB 5/26/15 | ltr agmt |
| 8 | 41 | Marketplace at El Paseo- Fresno, CA | Butcher | 7/27/2015 | 6/15/15 | amendment |
| 9 | 425 | Naper West Plaza - Naperville, IL | Bonne | 8/31/2014 | 7/13/15 | send notice  /31/1  ends 30 days from notice |
| 10 | 514 | Bethway Plaza - Greenbelt, MD | Quantum | 9/30/2015 | 8/10/15 | send notice    1 15 ends 30 days from notice |
| 11 | 28 | Gateway Crossroads - Gardena, CA | LaCraze | 10/31/2015 | 9/8/15 | sent K   notice 5/4 15 |
| 12 | 3 | Montebello Plaza - Montebello, CA | Bixmor | 10/31/2015 | 9/8/2015 | expires |
| 13 | 362 | El Mercado SC - Hialeah, FL | Terranova | 10/31/2015 | 9/8/2015 | expires |
| 14 | 287 | Rio Norte - Laredo, TX | Gemini | 11/30/2015 | TBD | lry to close 10/31 or Jan 31 |
| 15 | 172 | Christown Spectrum Mall - Phoenix, AZ | Vestar | 1/31/2016 | 12/7/15 | expires 12/31/15 move to Jan |
| 16 | 137 | North County Plaza - Vista, CA | PetSmart | 1/31/2016 | 12/7/15 | expires |
| 17 | 419 | 76th & Stoney Island - Chicago, IL | Terraco | 1/31/2016 | 12/7/15 | expires |
| 18 | 38 | Fallbrook Center - West Hills, CA | RDIC | 1/31/2016 | 12/7/15 | send notice 10/31/15 ends 90 days from notice |
| 19 | 286 | LaGran Plaza - Fort Worth, TX | Boxer | 1/31/2016 | 12/7/15 | expires |
| 20 | 422 | Gateway Centre - Chicago, IL | Mid America | 1/31/2016 | 12/7/15 | expires |

Exhibit 11.1(v)

(Merchandise Mix)

Exhibit 11.1(v)
Merchandise Mix

| Merchandise Mix | | |
|---|---|---|
| Dept. No. | Dept. Name | % of Cost Value |
| 4 | Fashion Bedding | 26.8% |
| 3 | Window | 21.0% |
| 1 | Sheets | 15.1% |
| 2 | Bath Towels and Rugs | 7.7% |
| 12 | Basic Bedding | 7.6% |
| Subtotal: Top 5 Depts. | | 78.2% |
| All other Depts | | 21.8% |
| **Total** | | **100.0%** |

**EXHIBIT "D"**

## ANNA'S LINENS, INC.

## EXHIBIT 8.1 SALE GUIDELINES

A.     The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.     The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.     On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.     At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store.  The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale.  Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.     Prior to entry of the Interim Approval Order, Agent may advertise the sale as a "sale on everything", "everything must go", "inventory liquidation" or similar themed sale.  Following, and subject to, the entry of the Interim Approval Order and/or the Approval Order (as applicable), the Agent may also advertise the sale as a "store closing" and/or "going-out-of-business" sale, as dictated by the respective Interim Approval Order and/or Approval Order (as applicable).

F.     Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet.  In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Interim Approval Order and/or the Approval Order.    Nothing contained in these Sale Guidelines shall be

1

construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

F.     Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.     Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.     The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.     The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.     Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores and Distribution Center(s) (the "FF&E"). The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores and Distribution Center(s). The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.     The Agent shall be entitled to include Additional Agent Merchandise in the Sale in accordance with the terms of the Interim Approval Order and/or the Approval Order and the Agency Agreement.

L.     At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

M.     Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Agent shall have no responsibility therefor.

N.     The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.     If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

       If to Agent:




       If to Merchant:



2

**EXHIBIT "E"**

1 DAVID B. GOLUBCHIK (SBN 185520)
EVE H. KARASIK (SBN 155356)
2 JULIET Y. OH (SBN 211414)
LINDSEY L. SMITH (SBN 265401)
3 LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
4 Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
5 Email: dbg@lnbyb.com, ehk@lnbyb.com, jyo@lnbyb.com; lls@lnbyb.com
6

7 Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession
8

9 **UNITED STATES BANKRUPTCY COURT**

10 **CENTRAL DISTRICT OF CALIFORNIA**

11 **SANTA ANA DIVISION**

12

13 In re                                              )   Case No. 8:15-bk-13008-TA
                                                     )
14 ANNA'S LINENS, INC.,                              )   Chapter 11
                                                     )
15                              Debtor.              )
                                                     )   **NOTICE OF REJECTION OF**
16                                                   )   **UNEXPIRED LEASE OF NON-**
                                                     )   **RESIDENTIAL REAL PROPERTY**
17                                                   )
                                                     )   **[Declaration of J.E. Rick Bunka Filed**
18                                                   )   **Concurrently Herewith]**
                                                     )
19                                                   )
                                                     )   Store Number:
20                                                   )   Store Address:
                                                     )
21                                                   )   [No Hearing Required]
                                                     )
22                                                   )
                                                     )
23                                                   )
                                                     )
24                                                   )
                                                     )
25                                                   )
                                                     )
26                                                   )
                                                     )
27 _____  )

28

To: [Lessor Name]

Re: Store No. ___, [Insert Store Address]

Date of Rejection Notice:

**PLEASE TAKE NOTICE** that on _____, 2015, the United States Bankruptcy Court for the Central District of California, Santa Ana Division, (the "Bankruptcy Court") entered the "Order Authorizing Debtor and Agent to assume the Agency Agreement and Continue to Perform under the Agency Agreement and Granting Related Relief" [ECF No. [Insert]] (the "Order").

**PLEASE TAKE NOTICE** that, pursuant to the terms of the Order, the above-captioned debtor and debtor in possession (the "Debtor") hereby provides notice of its intent to reject the above-referenced Lease.  Pursuant to the terms of the Order, the Lease shall be deemed rejected effective upon the later of (i) the 3rd business day from the date of this notice as reflected above, or (ii) the return of the keys to the lessor or its legal counsel (the "Effective Date of Rejection").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, any inventory, furniture, trade fixtures or equipment remaining in the store pertaining to the above-referenced Lease after the Effective Date of Rejection shall be deemed abandoned by the Debtor free and clear of any liens and, without further order of the Court, may be disposed of by the lessor as the lessor chooses without liability or accountability to any party therefore, and such lessor shall not be allowed any postpetition, administrative claim based on the abandonment of any property after the Effective Date of rejection of the Lease

Dated: _____, 2015                    ANNA'S LINENS, INC.


By:___ */s/ Lindsey L. Smith*_____
        DAVID B. GOLUBCHIK
        EVE H. KARASIK
        JULIET Y. OH
        LEVENE, NEALE, BENDER,
            YOO & BRILL L.L.P.
        Proposed Attorneys for Debtor and
        Debtor in Possession

1

**EXHIBIT "F"**

Page 1

1

2

3  ------------------------------x

4

5  ANNA'S LINENS AUCTION

6  ------------------------------x

7

8

9

10

11              ANNA'S LINENS AUCTION

12               NEW YORK, NEW YORK

13              Tuesday, June 9, 2015

14

15

16

17

18

19

20

21

22

23  Reported by:

24  JEREMY RICHMAN

25  JOB NO:  94531

Rough Transcript

## Page 2

June 9, 2015

12:00 p.m.

AUCTION FOR ANNA'S LINENS, held at the offices of GREENBERG TRAURIG, 200 Park Avenue, New York, New York, before JEREMY RICHMAN, a Shorthand Reporter and Notary Public of the State of New York

## Page 3

APPEARANCES:

GREENBERG TRAURIG
Attorneys for Salus Capital Partners
   One International Place
   Boston, MA 02110
BY:   JEFFREY M. WOLF, ESQ.

GREENBERG TRAURIG
Attorneys for Salus
   200 Park Avenue
   New York, NY 10116
BY:  MATTHEW L. HINKER, ESQ.

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
Attorneys for Anna's Linens
   10250 Constellation Blvd., Suite 1700
   Los Angeles, CA 90067
BY:   DAVID B. GOLUBCHIK, ESQ.

## Page 4

APPEARANCES (Continued):

DICONZA TRAURIG KADISH LLP
Attorneys for
   630 Third Avenue
   New York, NY 10017
BY:   MAURA I. RUSSELL, ESQ.

SB CAPITAL GROUP
   1010 Northern Boulevard, Suite 340
   Great Neck, New York 11021
BY:  ROBERT RASKIN

PRICEWATERHOUSECOOPERS LLP
   300 Madison Avenue
   New York, New York 10017
BY:  PERRY MANDARINO
   BRIAN KOLUCH

## Page 5

APPEARANCES (Continued):

PRESENT:
KYLE SHONAK, Salus Capital Partners
STEPHEN MILLER, 360 Merchant Solutions
AARON MILLER, Salus Capital Partners
NEIL SNYDER, Tiger Capital Group and Yellen Partners
JOSHUA G. SUSSBERG, Hilco and Gordon Brothers
DANIEL KANE, Tiger Capital Group and Yellen Partners

Page 6

```
 1
 2         IT IS HEREBY STIPULATED AND AGREED
 3    by and between the attorneys for the respective
 4    parties herein, that filing and sealing be and
 5    the same are hereby waived.
 6         IT IS FURTHER STIPULATED AND AGREED
 7    that all objections, except as to form of the
 8    question, shall be reserved to the time of the
 9    trial.
10         IT IS FURTHER STIPULATED AND AGREED
11    that the within deposition may be sworn to and
12    signed before any officer authorized to
13    administer an oath, with the same force and
14    effect as if signed and sworn to before the
15    Court.
16
17
18
19
20         - oOo -
21
22
23
24
25
```

Page 7

```
 1
 2         MR. MANDARINO:  Good afternoon, I'm
 3    Perry Mandarino from PWC, the financial
 4    advisor for the company, welcome to the
 5    auction of the inventory of Anna's Linens.    04:59
 6    Few ground rules to begin with, first,
 7    remind everyone you're all subject to
 8    confidentiality agreements and we except
 9    that to be upheld.  So I hope I don't read
10    about this in debt wire tomorrow, so I will    04:59
11    hold someone responsible in this room for
12    that.  Secondly, we will, I would ask that
13    each of the parties, just have one
14    representative speaking and identify
15    themselves every time for the record for       05:00
16    the court reporter.  In terms of
17    appearances on the phone, if the folks on
18    the phone could just identify yourselves
19    for the court reporter.
20         MS. KARASIK:  Eve Karasik, I'm with        05:00
21    Levene, Neale, Bender, Yoo & Brill, I am
22    representing the company.
23         MR. SWISHER:  Joe swisher, Anna's
24    Linens.
25         MR. MANDARINO:  Okay.  Next I like         05:00
```

Page 8

```
 1
 2    to say is that, first I would also like to
 3    thank everyone for their patience today as
 4    we worked through certain issues with
 5    respect to the agency agreement and other      05:00
 6    matters.  Secondly, I would like to point
 7    out that the company, as you all know, as
 8    we spoke about today is pursuing an
 9    alternative transaction with the going
10    buyer.  That transaction, is something that    05:01
11    the company very much would like to do, to
12    preserve jobs and have benefit for other
13    stakeholders.  And therefore that's why the
14    termination provisions in agency agreement
15    exist, so I want to reinforce that, that       05:01
16    termination provision may be exercised at
17    the appropriate time with the appropriate
18    notice per the agency agreement.  And
19    whoever the winning bidder is will be
20    informed of as such.  A few other rules, we    05:01
21    will each -- each bidder will allow to have
22    one pass.  If a bidder passes and they come
23    again and they're done bidding they will be
24    excused from the room.  And our first
25    auction, if you will, will be for inventory    05:02
```

Page 9

```
 1
 2    only.  I do not believe that we will, you
 3    know, put the gavel down on the inventory
 4    only auction tonight, we will do that
 5    tomorrow morning, principals of the company    05:02
 6    will be getting on a plane very soon to be
 7    here and it's appropriate that they're
 8    there when that happens.  So whenever we
 9    adjourn tonight you'll certainly have more
10    time to think about what else you want to      05:02
11    do, if anything.
12         And then before we start, I drew
13    names out of a hat, the order that we'll go
14    will be Schottenstein Bernstein or SB
15    Capital.  The Hilco Gordon Brothers joint      05:02
16    venture and then Great American.  And we
17    have a few clarifications to the agency
18    agreement that we spoke about with you each
19    separately today.  So I want to cover them
20    and then ask Maura Russell to augment any      05:03
21    of my comments.  First there was some
22    questions about the break up fee and so on.
23    So to make it simple, the initial overbid,
24    so SB Capital, the initial overbid will be
25    96.63 that covers the break up fee and a       05:03
```

Rough Transcript

Page 10

1
2  point and a half bidding increment.  In
3  section 5.3B1 we have, and I would ask
4  Tiger to confirm this, and if not we can
5  have a suggestion, but if the 5.3B1, the      05:03
6  prevailing discount was at 21 days, we ask
7  that that be moved to 30 days.  In section
8  6.2 where it says the company is not
9  obligated to pay any expenses there will be
10  an insertion that says other than occupancy    05:04
11  expenses.  There was a question about.
12      MR. SNYDER:  Can you repeat the
13  previous one?
14      MS. RUSSELL:  It's a clarification
15  provided however language carving out the      05:04
16  obligation to pay the expenses after the
17  termination date that is really intend
18  today apply to after September 30th, 2015,
19  not the sale termination dated each of the
20  stores.  So we'll read it, the intention      05:04
21  that occupancy expenses are paid through
22  the later of the vacate indicate or the
23  15th day of the month and all other
24  responses are paid through the vacate dates
25  for each of the stores.  So with the      05:04

Page 11

1
2  winning bidder we need to tweak that
3  language to clear up any confusion, we will
4  do that.  But that's what the intention of
5  that language is.      05:04
6      MR. MANDARINO:  There was some
7  questions about some folks thought in
8  sections 8.2 and 8.6 contradicted each
9  other with respect to honoring coupons or
10  Anna's Linens special promotions or      05:05
11  returns.  There is not what it's meant to
12  be.  And what it is, is that any company
13  branded coupons and discount cards and so
14  on are for 30 days.  Things like Groupon
15  and noncompany branded days are through the      05:05
16  data of the interim order.  We verify there
17  will be it no circulars after June 14th and
18  I think that covers the, that covers the
19  clarifications.  Unless Maura anything you
20  would like to add.      05:05
21      MS. RUSSELL:  Just want to confirm
22  with each of the bidding groups they
23  received the signed packages for the soft
24  sale.
25      MR. RASKIN:  No, we received half of      05:06

Page 12

1
2  it, two emails and only one came through.
3      MR. MANDARINO:  We asked the company
4  do provide that, they were provided, there
5  were emails that said email one of two, we      05:06
6  did not receive the second one, I've asked
7  the company to send the second one, I don't
8  know if the file is too big, rob, maybe
9  that's why the second one hasn't come
10  there, but we will follow-up with them.      05:06
11      MS. RUSSELL:  The other pieces to
12  confirm that the eCommerce option is on
13  option that would have to be exercised on
14  or before the sale commencement date and to
15  the extent the agent exercises the option      05:06
16  to utilize the eCommerce program, it will
17  remain in the distribution center and it
18  remains the agent's obligation to transfer
19  those goods to the stores or however they
20  determine to handle it and there will be no      05:06
21  adjustment or attempt to exclude the goods
22  because they weren't in the stores before
23  the 30th day after the sale commencement
24  date.
25      MR. RASKIN:  What happens if the      05:07

Page 13

1
2  option is not exercised.
3      MS. RUSSELL:  That's considered
4  capital and merchandise that we would
5  otherwise have to transfer to the stores      05:07
6  within 30 days of after we receive your
7  allocations, you would have to allocate.
8      MR. RASKIN:  So changing the date to
9  the sale commencement date.
10      MS. RUSSELL:  To the sale      05:07
11  commencement date, yes.
12      MR. MANDARINO:  Any other questions.
13      MR. RASKIN:  The other
14  clarifications we were going over before.
15      MS. RUSSELL:  We had on the retail      05:07
16  price definition, asked the company to
17  verify the question that had been raised
18  about the colored stickers and the pricing,
19  whether or not the pricing adjustment as
20  reflected on the colored stickers was      05:07
21  captured by the definition of retail price
22  and reflected on the price file, so we need
23  the company to confirm that.
24      MR. KOLUCH:  I have information on
25  that, we heard from Rick Bunka the CFO, the      05:08

Rough Transcript

---

**Page 14**

1
2  stickers the colored sticker of the mark
3  down price are reflected in the company's
4  perpetual inventory system.
5  　　　MR. RASKIN:  The sale commencement    05:08
6  date?
7  　　　MS. RUSSELL:  The sale commencement
8  date, unless the termination right is
9  exercised, the sale commencement date will
10 be Friday, June 12th.    05:08
11 　　　MR. RASKIN:  The break up fee
12 provisional.
13 　　　MR. RUSSELL:  The modification to
14 the break up fee provisional will be with
15 respect to the timing of the payment of the    05:08
16 break up fee.  In the event that Tiger,
17 Yellen joint venture are not the successful
18 bidder here, the bid protections, putting
19 aside termination fee payments, but in the
20 event the bid productions are due the bid    05:08
21 protections would be paid no later than two
22 days after the later of the payment date,
23 which is the first business day after entry
24 of the final approval order or the date the
25 transaction converts to a fee deal because    05:09

---

**Page 15**

1
2  the final approval order has not been
3  entered by the outside date which I believe
4  is June 30th.
5  　　　MR. SNYDER:  Earlier of, right.    05:09
6  　　　MS. RUSSELL:  Did I say the later
7  of, I apologize, to the earlier of those
8  dates to occur, and if payment is being
9  made as a result of the occurrence of the
10 payment date, the initial, from the initial    05:09
11 guarantee payment that's owed by the agent
12 to the company, the amount of the bid
13 protections will be paid by the agent to
14 the Tiger Yellen group, a joint venture and
15 the balance will be paid to the company.    05:09
16 　　　MR. RASKIN:  Out of the guaranteed
17 amount?
18 　　　MS. RUSSELL:  Out of the initial
19 guarantee amount.  To the extent that the
20 payment acts as a result of the conversion,    05:10
21 then the payment would be made by the
22 company, and if the company does not have
23 sufficient funds available, sales commits
24 to advance those funds so the company would
25 be able to pay those loans.    05:10

---

**Page 16**

1
2  　　　MR. SNYDER:  Maura, just to clarify,
3  in the event that an approval order was
4  entered but for some reason the successful
5  bidder declined to close, then I'm    05:10
6  presuming the arrangement you just
7  discussed with respect to the conversion
8  will also apply.
9  　　　MS. RUSSELL:  That would apply and
10 everyone would anyone reserve their rights    05:10
11 against the agent who has refused to commit
12 the money to Tiger Yellen.
13 　　　MR. MANDARINO:  Okay.  Anything else
14 before we start?
15 　　　MS. RUSSELL:  I believe that -- I    05:10
16 think we covered all of the questions that
17 everybody had raised in the one off
18 meetings, so...
19 　　　MR. SNYDER:  Perry, just very
20 quickly, you mentioned we weren't going to    05:11
21 put the gavel done on the liquidation
22 auction until tomorrow.
23 　　　MR. MANDARINO:  Correct.
24 　　　MR. SNYDER:  Just to be clear if
25 someone passes and eventually passes    05:11

---

**Page 17**

1
2  sufficiently that they get escorted from
3  the conference room will they be allowed --
4  　　　MR. MANDARINO:  They're done, if you
5  pass you pass and that's it.  We'll -- I    05:11
6  guess we will in consultation with the
7  company's management and Salus perhaps
8  revisit that, but as of now, I would assume
9  if you're done, you're done.  If you say
10 you're passing the second time.    05:11
11 　　　MR. SNYDER:  And if you pass a
12 second time the liquidation auction will
13 you be permitted to participate in a
14 modified form of the auction afterwards if
15 there is a sale for the whole assets along    05:11
16 those lines.
17 　　　MR. MANDARINO:  Yes.
18 　　　MS. RUSSELL:  And just to clarify,
19 when you're talking inventory only, it also
20 includes the FF and E that's already    05:12
21 contemplated.
22 　　　MR. SNYDER:  The assets and the
23 agency agreement inside and last thing, are
24 we expecting to do an all that would
25 presumably be suspended to tomorrow morning   05:12

---

Rough Transcript

## Page 18

1
2  or not.
3      MR. MANDARINO: Tomorrow morning.
4      MS. RUSSELL: Unless they bid really
5  fast.                          05:12
6      MR. MANDARINO: No, tomorrow
7  morning.
8      MR. SUSSBERG: Are there bidding
9  increments.
10      MR. MANDARINO: I thought I      05:12
11  mentioned, after the initial bid of
12  96.63, bidding increments of 50 basis
13  points.
14      MR. SNYDER: One other thing from
15  us, I think we have asked and it's fairly   05:12
16  traditional that at this point a
17  confirmation from each party bidding that
18  it is not involved in a joint venture with
19  any other party that has not been
20  disclosed.                      05:13
21      MR. MANDARINO: I look to David.
22      MR. GOLUBCHIK: Get the
23  confirmations.
24      MR. FOREMAN: SB Capital bidding
25  Alan Foreman for Great American, we are not   05:13

## Page 19

1
2  involved in the joint venture.
3      MR. SUSSBERG: Hilco and Gordon
4  Brothers have a joint and also part of a
5  joint venture with DW partners for a      05:13
6  potential going concern bid.
7      MR. MANDARINO: Thank you.
8      MR. SNYDER: Obviously Tiger and
9  Yellen Partners are involved in a joint
10  venture with each other. But as of the      05:13
11  moment are not involved with any other
12  joint ventures with any other parties.
13      MR. MANDARINO: Great, thank you. I
14  throw it to SB Capital.
15      MR. RASKIN: Robert Raskin SB      05:13
16  Capital, we're going to bid 96.7 with all
17  the changes that were read with two
18  additional changes, one is that the bonus
19  for employees could be up to 15 percent.
20  And the second is that there would be      05:14
21  payment made from the estate of $200,000 as
22  a deposit to cover expenses in the event
23  that the sale was not approved and once it
24  is approved it would just be refunded.
25      MR. MANDARINO: And that's only if      05:15

## Page 20

1
2  you're the winning bidder, correct, the
3  deposit.
4      MR. RASKIN: We'll take it anyway?
5      MR. MANDARINO: Only for the winning   05:15
6  bidder?
7      MR. RASKIN: Correct.
8      MR. MANDARINO: Okay, that would be
9  the next highest bid, so Hilco Gordon
10  Brothers joint venture.              05:15
11      MR. SUSSBERG: Hilco Gordon Brothers
12  bid on the same terms as SB Capital at
13  97.2.
14      MR. MANDARINO: Meaning the bonus to
15  employees can be 15 percent and the      05:16
16  $200,000 deposit.
17      MR. SUSSBERG: Correct.
18      MR. MANDARINO: And everything else
19  in the Tiger Yellen document.
20      MR. SUSSBERG: As reflected on the      05:16
21  record by you earlier.
22      MR. MANDARINO: Thank you. Great
23  American.
24      MR. FOREMAN: Great American will
25  bid on the same terms as previously bid   05:16

## Page 21

1
2  upon. We would also like to substantially
3  increase the bid to 103 percent and in
4  exchange we would like a $250,000 bidding
5  fee to be paid in the event that we are not   05:16
6  the successful bidder. We would like the
7  debtor and the lender to use their best
8  efforts to have the court approve that fee.
9  In the event the court does not approve it,
10  that Salus will back stop it.              05:17
11      MR. MANDARINO: So you're looking
12  for the estate to pay that fee -- in other
13  words.
14      MR. FOREMAN: The estate to pay the
15  fee and to the extent the estate doesn't      05:17
16  pay the fee, Salus back stop it.
17      MR. MANDARINO: Okay, we're going to
18  need to take a break and confer with the
19  company -- the company needs to confer with
20  our client and then Salus. Off the record.   05:17
21      (Time noted: 5:17 p.m.)
22      (Recess.)
23      (Time noted: 5:57 p.m.)
24      MR. MANDARINO: Back on the record,
25  thank you for indulging our break. After   05:58

Rough Transcript

---

Page 22

```
 1
 2      consultation with the secured lender, the
 3   company accepts great American's terms.
 4      Tiger Yellen.
 5      MR. SUSSBERG:  Can we ask for a        05:58
 6   clarification on a couple of points?
 7      MR. MANDARINO:  Sure.
 8      MR. SUSSBERG:  Can you explain how
 9   that bid works with respect to the
10   fixtures.                                 05:58
11      MR. MANDARINO:  Yes, and actually
12   thank you, that's a good point that I did
13   mean to ask for a clarification we received
14   off the record.  So Great American.
15      MR. FOREMAN:  The clarification is      05:58
16   that the bid of 103 percent includes the
17   fixtures.
18      MR. SNYDER:  What does that mean,
19   you just take the fixtures?
20      MR. FOREMAN:  Right, we purchase the    05:58
21   fixtures.
22      MS. RUSSELL:  Like a guarantee on
23   the fixtures?
24      MR. FOREMAN:  Take a hundred percent
25   of the fixtures.                          05:59
```

---

Page 23

```
 1
 2      MS. RUSSELL:  And pay all the
 3   expenses?
 4      MR. FOREMAN:  Yes.
 5      MR. SUSSBERG:  And the company has      05:59
 6   agreed to use best efforts to get approval
 7   of the $250,000 fee and we would like a
 8   confirmation that and has Salus agreed to
 9   backstop the collateral?
10      MR. MANDARINO:  Yes, to the extent      05:59
11   there's not a termination, yes.
12      Okay, Mac.
13      MR. SNYDER:  Tiger Yellen bids 105
14   on exactly the same terms that were just
15   discussed by Great American.              05:59
16      MR. MANDARINO:  Thank you.  SB
17   Capital.
18      MS. RUSSELL:  Wait.  What are the
19   same terms?
20      MR. SNYDER:  So we're not seeking       05:59
21   another $250,000.  To the extent we lose we
22   get the break fee on the same terms we
23   currently have.
24      MR. KANE:  FF&E what he was
25   currently referring to.                   06:00
```

---

Page 24

```
 1
 2      MR. MANDARINO:  Mac and I will
 3   simpatico on that.  Not everyone else.
 4      Okay, SB.
 5      MR. RASKIN:  We're going to pass.       06:00
 6      MR. MANDARINO:  Hilco, Gordon
 7   Brothers.
 8      MR. SUSSBERG:  Can we have a brief
 9   break, please?
10      MR. MANDARINO:  Yes.                    06:00
11      (Time noted:  6:00 p.m.)
12      (Recess.)
13      (Time noted:  6:13 p.m.)
14      MR. MANDARINO:  Okay, we're back on
15   the record, before I throw it back to      06:13
16   Hilco, Tiger Yellen wanted to make a
17   clarification.  Mac, your clarification,
18   we're back on the record.
19      MR. SNYDER:  Just to clarify, it
20   didn't come up earlier but now there has    06:14
21   been a point that will arguably create a
22   differential record, it is our
23   understanding throughout the process, given
24   the fact our break fee has now been pushed
25   beyond the petition date, it would require  06:14
```

---

Page 25

```
 1
 2      court approval, the point being is it was
 3   implicit in our earlier agreement regarding
 4   timing, the timing of the payments, the
 5   Tiger Yellen break fee and other bid        06:14
 6   protections that given the fact that
 7   payment was occurring after the he petition
 8   date to the extent court approval was
 9   acquired for the payment of those bid
10   protections the debtor will use reasonable  06:14
11   efforts to get such court approval, the I
12   ask the debtor to approve such on the
13   record.
14      MR. GOLUBCHIK:  If the agency
15   agreement is not terminated through the     06:15
16   termination provision, then yes.
17      MR. MANDARINO:  And the company no
18   the debtor.
19      MR. GOLUBCHIK:  The company.
20      MR. SNYDER:  It would be the debtor     06:15
21   at that point.
22      MR. MANDARINO:  Okay, Hilco Gordon
23   Brothers.
24      MR. SUSSBERG:  Okay, they bid 107 on
25   the same terms as articulated by Tiger      06:15
```

---

Rough Transcript

Page 26

```
1
2      Yellen in the prior bid with two
3      modifications and points.  Number one, we
4      would propose in section 6.01 of the form
5      agency agreement to modify the sale        06:15
6      commencement definition to be June 19th
7      instead of June 12th to allow for the
8      possibility of the going concern option.
9      And number two in section 16.11 paragraph
10     A, we would need a commitment from the      06:16
11     debtors/company as well as the secured
12     lender to obviate the impact of the
13     language included in paragraph A which I
14     can read on the record unless the debtors,
15     company and Salus are aware of that         06:16
16     language.  But it's language that relates
17     to store closings in a world where the
18     termination notice is provided and there is
19     a going concern bid, that we would want
20     that language obviated as a result of the    06:16
21     company and Salus's efforts.
22         MR. MANDARINO:  Could you please be
23     specific with respect to what language in
24     16.11 A.
25         MR. SUSSBERG:  Let me read the         06:16
```

Page 27

```
1
2      language into the record for clarity
3      purposes, it begins with the sentence, I
4      believe it's the 4th sentence.  It starts
5      with in such event and goes on to say in     06:16
6      such event agent agrees and merchant agrees
7      to use reasonable best efforts to receive
8      approval for agent to conduct in
9      consideration of a fee arrangement or other
10     means of compensation to be agreed a store   06:17
11     closing sale for any stores that be closed
12     by merchant notwithstanding merchant's
13     determination not to proceed with offers
14     for a chain wide store closing sale.
15     Definition the limited sale.  And then     06:17
16     addition, the last sentence of the
17     paragraph would need to have the language
18     in last portion of the sentence that starts
19     with and, and it reads, and agent agrees to
20     conduct a limited sale (subject to the       06:17
21     terms set forth in the immediately
22     preceding sentence) which we just read even
23     if the agent has determined not to be the
24     successful bidder at any auction taking
25     place prior to the delivery of a           06:17
```

Page 28

```
1
2      termination notice.
3          MR. SNYDER:  Josh, can you clarify
4      what had you mean which by of obviate in
5      this context.                              06:18
6          MR. SUSSBERG:  We would leave to the
7      company and Salus to determine the most
8      appropriate way to insure that language was
9      not binding on the company and whether
10     that's by agreement or through court       06:18
11     procedure and order that would be a
12     termination that the company and the lender
13     can make.
14         MR. GOLUBCHIK:  My view is that
15     section does not apply if you're the       06:18
16     successful bidder through an auction.
17         MR. SUSSBERG:  This section.
18         MS. RUSSELL:  Let's take a break.
19         MR. MANDARINO:  I would like to go
20     off the record, please.             06:18
21     (Time noted:  6:18 p.m.)
22     (Recess.).
23     (Time noted:  8:24 p.m.)
24         MR. MANDARINO:  Okay, we are back on
25     the record, thank you for being patient    08:24
```

Page 29

```
1
2      during that break.  The last bid was the
3      Hilco Gordon Brothers joint venture which
4      was at 107 cents with the same terms as the
5      last Yellen, Tiger deal so with two changes   08:24
6      to provision 6.01 and 62.11A.  That bid is
7      rejected as not being higher, better, so
8      Hilco, Gordon Brothers do have a revised
9      bid.
10         MR. SUSSBERG:  We do, Hilco and        08:24
11     Gordon Brothers will bid 110 and would like
12     to disclose an agreement that we've reached
13     with the secured lender and that is in the
14     event that Hilco, Gordon Brothers is not
15     the successful bidder at the auction, the     08:25
16     secured lender has agreed to carve out
17     $250,000 from its collateral as a reverse
18     fee due to Hilco Gordon Brothers.  That
19     would be the first dollars out and I would
20     like counsel to confirm that is correct.    08:25
21         MR. WOLF:  Jeff Wolf on behalf of
22     Salus.  We confirm that's correct with one
23     clarification which is that the 250 carve
24     out is not paid in the event the agency
25     agreement is terminated by its terms.      08:25
```

8

Rough Transcript

Page 30

1
2      MR. SUSSBERG:  That's clear.
3      MR. SNYDER:  I'm sorry, and the
4  Salus is agreeing to take this from its
5  collateral.                        08:25
6      MR. MANDARINO:  I'm going to clarify
7  something.
8      MR. SUSSBERG:  One other point,
9  Perry, before you do, just so the record is
10  clear, all of the terms of the bid are the   08:25
11  same as the prior Tiger Yellen deal.
12      MR. MANDARINO:  That was my first
13  question, thank you, Josh.  The second
14  clarification I have is that the $250,000
15  is not charged to the company's loan, it is   08:25
16  not an expense of Salus, it is Salus's
17  nickle it is being paid at.
18      MR. WOLF:  Confirmed.
19      MR. MANDARINO:  David, that
20  acceptable?                        08:26
21      MR. GOLUBCHIK:  Yes.
22      MR. SNYDER:  So just to be clear on
23  that, that does not increase the amount of
24  Salus's claim?
25      MS. RUSSELL:  Correct.           08:26

Page 31

1
2      MR. SNYDER:  So Salus is just taking
3  a $250,000 hit?
4      MR. MANDARINO:  Correct.
5      Okay.  Great American.            08:26
6      MR. FOREMAN:  We need just a couple
7  of minutes, won't be long.
8      MR. MANDARINO:  Okay.  We'll wait in
9  here.
10      (Time noted:  8:26 p.m.)          08:26
11      (Recess.)
12      (Time noted:  8:39 p.m.)
13      MR. MANDARINO:  Okay, we're back on
14  the record.  Great American.
15      MR. FOREMAN:  Great American passes.   08:39
16      MR. MANDARINO:  Rob.
17      MR. RASKIN:  It's not to me, I don't
18  believe.
19      MR. KOLUCH:  It's Tiger.
20      MR. MANDARINO:  I'm sorry, Tiger   08:40
21  Yellen.
22      MR. SNYDER:  Give us 30 seconds.
23      MR. MANDARINO:  It wasn't SB's turn,
24  it was tiger's turn.  But Great American
25  passed.                            08:40

Page 32

1
2      MR. SNYDER:  Perry?
3      MR. MANDARINO:  Yes.
4      MR. SNYDER:  Just to be clear as to
5  what happens here.  If we pass, it then   08:40
6  goes to SB who has an opportunity to bid or
7  pass, it then goes to Great American who an
8  opportunity to bid or pass and then it
9  comes back to us.
10      MR. MANDARINO:  Then goes to Hilco.   08:41
11      MR. SNYDER:  But it doesn't close
12  because it gets back to Gordon hill co-with
13  three pass plus /STPHAOEUFPLT inside that's
14  what I'm saying /-RG it has to get through
15  everybody's second pass.            08:41
16      MR. MANDARINO:  They're not going to
17  be forced to bid, it would go to SB.
18      MR. SNYDER:  That's the point, the
19  auction would not begin to be closed.
20      MR. MANDARINO:  As I said at the   08:41
21  beginning of this auction, you know, 3 or
22  4 years ago, that it wasn't going to close
23  tonight.
24      MR. SNYDER:  It's not even midnight
25  yet.                               08:41

Page 33

1
2      MR. MANDARINO:  Are you passing?
3      MR. SNYDER:  We're passing.
4      MR. MANDARINO:  Rob.
5      MR. RASKIN:  We'll consider         08:41
6  overnight, we'd like to consider overnight
7  what we're going to do but we want to be
8  paid 250 if we show up tomorrow.
9      MR. MANDARINO:  Okay.  Well with
10  that we will adjourn the auction.  Thank   08:42
11  you everyone for your patience, for your
12  hard work and have a good evening.
13      MS. RUSSELL:  What time are we
14  coming back?
15      MR. MANDARINO:  Be back at 9:00, but   08:42
16  I doubt we'll start then.  Off the record.
17      (Time noted:  8:42 p.m.)
18
19
20
21
22
23
24
25

Rough Transcript

**A**

**$200,000 (2)**
19:21 20:16
**$250,000 (6)**
21:4 23:7,21 29:17
30:14 31:3
**AARON (1)**
5:7
**able (1)**
15:25
**acceptable (1)**
30:20
**accepts (1)**
22:3
**acquired (1)**
25:9
**acts (1)**
15:20
**add (1)**
11:20
**addition (1)**
27:16
**additional (1)**
19:18
**adjourn (2)**
9:9 33:10
**adjustment (2)**
12:21 13:19
**administer (1)**
6:13
**advance (1)**
15:24
**advisor (1)**
7:4
**afternoon (1)**
7:2
**agency (8)**
8:5,14,18 9:17 17:23
25:14 26:5 29:24
**agent (8)**
12:15 15:11,13 16:11
27:6,8,19,23
**agent's (1)**
12:18
**ago (1)**
32:22
**agreed (7)**
6:2,6,10 23:6,8 27:10
29:16
**agreeing (1)**
30:4
**agreement (11)**
8:5,14,18 9:18 17:23
25:3,15 26:5 28:10

29:12,25
**agreements (1)**
7:8
**agrees (3)**
27:6,6,19
**Alan (1)**
18:25
**allocate (1)**
13:7
**allocations (1)**
13:7
**allow (2)**
8:21 26:7
**allowed (1)**
17:3
**alternative (1)**
8:9
**American (11)**
9:16 18:25 20:23,24
22:14 23:15 31:5,14
31:15,24 32:7
**American's (1)**
22:3
**amount (4)**
15:12,17,19 30:23
**Angeles (1)**
3:21
**Anna's (7)**
1:5,11 2:7 3:19 7:5,23
11:10
**anyway (1)**
20:4
**apologize (1)**
15:7
**appearances (4)**
3:2 4:2 5:2 7:17
**apply (4)**
10:18 16:8,9 28:15
**appropriate (4)**
8:17,17 9:7 28:8
**approval (8)**
14:24 15:2 16:3 23:6
25:2,8,11 27:8
**approve (3)**
21:8,9 25:12
**approved (2)**
19:23,24
**arguably (1)**
24:21
**arrangement (2)**
16:6 27:9
**articulated (1)**
25:25
**aside (1)**

14:19
**asked (4)**
12:3,6 13:16 18:15
**assets (2)**
17:15,22
**assume (1)**
17:8
**attempt (1)**
12:21
**attorneys (5)**
3:5,12,19 4:5 6:3
**auction (15)**
1:5,11 2:7 7:5 8:25
9:4 16:22 17:12,14
27:24 28:16 29:15
32:19,21 33:10
**augment (1)**
9:20
**authorized (1)**
6:12
**available (1)**
15:23
**Avenue (4)**
2:9 3:13 4:6,16
**aware (1)**
26:15

**B**

**B (1)**
3:22
**back (12)**
21:10,16,24 24:14,15
24:18 28:24 31:13
32:9,12 33:14,15
**backstop (1)**
23:9
**balance (1)**
15:15
**basis (1)**
18:12
**beginning (1)**
32:21
**begins (1)**
27:3
**behalf (1)**
29:21
**believe (5)**
9:2 15:3 16:15 27:4
31:18
**Bender (2)**
3:18 7:21
**benefit (1)**
8:12
**Bernstein (1)**

9:14
**best (3)**
21:7 23:6 27:7
**better (1)**
29:7
**beyond (1)**
24:25
**bid (28)**
14:18,20,20 15:12
18:4,11 19:6,16
20:9,12,25,25 21:3
22:9,16 25:5,9,24
26:2,19 29:2,6,9,11
30:10 32:6,8,17
**bidder (12)**
8:19,21,22 11:2 14:18
16:5 20:2,6 21:6
27:24 28:16 29:15
**bidding (8)**
8:23 10:2 11:22 18:8
18:12,17,24 21:4
**bids (1)**
23:13
**big (1)**
12:8
**binding (1)**
28:9
**Blvd (1)**
3:20
**bonus (2)**
19:18 20:14
**Boston (1)**
3:7
**Boulevard (1)**
4:11
**branded (2)**
11:13,15
**break (13)**
9:22,25 14:11,14,16
21:18,25 23:22 24:9
24:24 25:5 28:18
29:2
**BRIAN (1)**
4:19
**brief (1)**
24:8
**Brill (2)**
3:18 7:21
**Brothers (12)**
5:10 9:15 19:4 20:10
20:11 24:7 25:23
29:3,8,11,14,18
**Bunka (1)**
13:25

business (1)
14:23
**buyer (1)**
8:10

**C**

**CA (1)**
3:21
**capital (14)**
3:5 4:10 5:5,7,8,11
9:15,24 13:4 18:24
19:14,16 20:12
23:17
**captured (1)**
13:21
**cards (1)**
11:13
**carve (2)**
29:16,23
**carving (1)**
10:15
**center (1)**
12:17
**cents (1)**
29:4
**certain (1)**
8:4
**certainly (1)**
9:9
**CFO (1)**
13:25
**chain (1)**
27:14
**changes (3)**
19:17,18 29:5
**changing (1)**
13:8
**charged (1)**
30:15
**circulars (1)**
11:17
**claim (1)**
30:24
**clarification (8)**
10:14 22:6,13,15
24:17,17 29:23
30:14
**clarifications (3)**
9:17 11:19 13:14
**clarify (5)**
16:2 17:18 24:19 28:3
30:6
**clarity (1)**
27:2

Rough Transcript

**clear (6)**
11:3 16:24 30:2,10,22
32:4
**client (1)**
21:20
**close (3)**
16:5 32:11,22
**closed (2)**
27:11 32:19
**closing (2)**
27:11,14
**closings (1)**
26:17
**co-with (1)**
32:12
**collateral (3)**
23:9 29:17 30:5
**colored (3)**
13:18,20 14:2
**come (3)**
8:22 12:9 24:20
**comes (1)**
32:9
**coming (1)**
33:14
**commencement (8)**
12:14,23 13:9,11 14:5
14:7,9 26:6
**comments (1)**
9:21
**commit (1)**
16:11
**commitment (1)**
26:10
**commits (1)**
15:23
**company (27)**
7:4,22 8:7,11 9:5 10:8
11:12 12:3,7 13:16
13:23 15:12,15,22
15:22,24 21:19,19
22:3 23:5 25:17,19
26:15,21 28:7,9,12
**company's (3)**
14:3 17:7 30:15
**compensation (1)**
27:10
**concern (3)**
19:6 26:8,19
**conduct (2)**
27:8,20
**confer (2)**
21:18,19
**conference (1)**

17:3
**confidentiality (1)**
7:8
**confirm (6)**
10:4 11:21 12:12
13:23 29:20,22
**confirmation (2)**
18:17 23:8
**confirmations (1)**
18:23
**Confirmed (1)**
30:18
**confusion (1)**
11:3
**consider (2)**
33:5,6
**consideration (1)**
27:9
**considered (1)**
13:3
**Constellation (1)**
3:20
**consultation (2)**
17:6 22:2
**contemplated (1)**
17:21
**context (1)**
28:5
**Continued (2)**
4:2 5:2
**contradicted (1)**
11:8
**conversion (2)**
15:20 16:7
**converts (1)**
14:25
**correct (8)**
16:23 20:2,7,17 29:20
29:22 30:25 31:4
**counsel (1)**
29:20
**couple (2)**
22:6 31:6
**coupons (2)**
11:9,13
**court (9)**
6:15 7:16,19 21:8,9
25:2,8,11 28:10
**cover (2)**
9:19 19:22
**covered (1)**
16:16
**covers (3)**
9:25 11:18,18

**create (1)**
24:21
**currently (2)**
23:23,25

**D**
**DANIEL (1)**
5:11
**data (1)**
11:16
**date (15)**
10:17 12:14,24 13:8,9
13:11 14:6,8,9,22
14:24 15:3,10 24:25
25:8
**dated (1)**
10:19
**dates (2)**
10:24 15:8
**David (3)**
3:22 18:21 30:19
**day (3)**
10:23 12:23 14:23
**days (6)**
10:6,7 11:14,15 13:6
14:22
**deal (3)**
14:25 29:5 30:11
**debt (1)**
7:10
**debtor (5)**
21:7 25:10,12,18,20
**debtors (1)**
26:14
**debtors/company (1)**
26:11
**declined (1)**
16:5
**definition (4)**
13:16,21 26:6 27:15
**delivery (1)**
27:25
**deposit (3)**
19:22 20:3,16
**deposition (1)**
6:11
**determination (1)**
27:13
**determine (2)**
12:20 28:7
**determined (1)**
27:23
**DICONZA (1)**
4:4

**differential (1)**
24:22
**disclose (1)**
29:12
**disclosed (1)**
18:20
**discount (2)**
10:6 11:13
**discussed (2)**
16:7 23:15
**distribution (1)**
12:17
**document (1)**
20:19
**dollars (1)**
29:19
**doubt (1)**
33:16
**drew (1)**
9:12
**due (2)**
14:20 29:18
**DW (1)**
19:5

**E**
**E (1)**
17:20
**earlier (5)**
15:5,7 20:21 24:20
25:3
**eCommerce (2)**
12:12,16
**effect (1)**
6:14
**efforts (5)**
21:8 23:6 25:11 26:21
27:7
**email (1)**
12:5
**emails (2)**
12:2,5
**employees (2)**
19:19 20:15
**entered (2)**
15:3 16:4
**entry (1)**
14:23
**escorted (1)**
17:2
**ESQ (4)**
3:8,15,22 4:8
**estate (4)**
19:21 21:12,14,15

**Eve (1)**
7:20
**evening (1)**
33:12
**event (10)**
14:16,20 16:3 19:22
21:5,9 27:5,6 29:14
29:24
**eventually (1)**
16:25
**everybody (1)**
16:17
**everybody's (1)**
32:15
**exactly (1)**
23:14
**exchange (1)**
21:4
**exclude (1)**
12:21
**excused (1)**
8:24
**exercised (4)**
8:16 12:13 13:2 14:9
**exercises (1)**
12:15
**exist (1)**
8:15
**expecting (1)**
17:24
**expense (1)**
30:16
**expenses (6)**
10:9,11,16,21 19:22
23:3
**explain (1)**
22:8
**extent (6)**
12:15 15:19 21:15
23:10,21 25:8

**F**
**fact (2)**
24:24 25:6
**fairly (1)**
18:15
**fast (1)**
18:5
**fee (18)**
9:22,25 14:11,14,16
14:19,25 21:5,8,12
21:15,16 23:7,22
24:24 25:5 27:9
29:18

**FF (1)**
17:20
**FF&E (1)**
23:24
**file (2)**
12:8 13:22
**filing (1)**
6:4
**final (2)**
14:24 15:2
**financial (1)**
7:3
**first (7)**
7:6 8:2,24 9:21 14:23
29:19 30:12
**fixtures (6)**
22:10,17,19,21,23,25
32:12
**folks (2)**
7:17 11:7
**follow-up (1)**
12:10
**force (1)**
6:13
**forced (1)**
32:17
**Foreman (10)**
18:24,25 20:24 21:14
22:15,20,24 23:4
31:6,15
**form (3)**
6:7 17:14 26:4
**forth (1)**
27:21
**Friday (1)**
14:10
**funds (2)**
15:23,24
**FURTHER (2)**
6:6,10

_____
**G**
**G (1)**
5:10
**gavel (2)**
9:3 16:21
**getting (1)**
9:6
**Give (1)**
31:22
**given (2)**
24:23 25:6
**go (3)**
9:13 28:19 32:17
**goes (4)**

27:5 32:6,7,10
**going (13)**
8:9 13:14 16:20 19:6
19:16 21:17 24:5
26:8,19 30:6 32:16
32:22 33:7
**GOLUBCHIK (6)**
3:22 18:22 25:14,19
28:14 30:21
**good (3)**
7:2 22:12 33:12
**goods (2)**
12:19,21
**Gordon (13)**
5:10 9:15 19:3 20:9
20:11 24:6 25:22
29:3,8,11,14,18
32:12
**great (14)**
4:12 9:16 18:25 19:13
20:22,24 22:3,14
23:15 31:5,14,15,24
32:7
**GREENBERG (3)**
2:8 3:4,11
**ground (1)**
7:6
**group (4)**
4:10 5:8,11 15:14
**Groupon (1)**
11:14
**groups (1)**
11:22
**guarantee (1)**
15:11,19 22:22
**guaranteed (1)**
15:16
**guess (1)**
17:6

_____
**H**
**half (2)**
10:2 11:25
**handle (1)**
12:20
**happens (3)**
9:8 12:25 32:5
**hard (1)**
33:12
**hat (1)**
9:13
**heard (1)**
13:25
**held (1)**

2:7
**higher (1)**
29:7
**highest (1)**
20:9
**Hilco (14)**
5:10 9:15 19:3 20:9
20:11 24:6,16 25:22
29:3,8,10,14,18
32:10
**hill (1)**
32:12
**HINKER (1)**
3:15
**hit (1)**
31:3
**hold (1)**
7:11
**honoring (1)**
11:9
**hope (1)**
7:9
**hundred (1)**
22:24

_____
**I**
**identify (2)**
7:14,18
**immediately (1)**
27:21
**impact (1)**
26:12
**implicit (1)**
25:3
**included (1)**
26:13
**includes (2)**
17:20 22:16
**increase (2)**
21:3 30:23
**increment (1)**
10:2
**increments (2)**
18:9,12
**indicate (1)**
10:22
**indulging (1)**
21:25
**information (1)**
13:24
**informed (1)**
8:20
**initial (6)**
9:23,24 15:10,10,18

18:11
**insertion (1)**
10:10
**inside (2)**
17:23 32:13
**insure (1)**
28:8
**intend (1)**
10:17
**intention (2)**
10:20 11:4
**interim (1)**
11:16
**International (1)**
3:6
**inventory (5)**
7:5 8:25 9:3 14:4
17:19
**involved (4)**
18:18 19:2,9,11
**issues (1)**
8:4

_____
**J**
**Jeff (1)**
29:21
**JEFFREY (1)**
3:8
**JEREMY (2)**
1:24 2:9
**JOB (1)**
1:25
**jobs (1)**
8:12
**Joe (1)**
7:23
**joint (11)**
9:15 14:17 15:14
18:18 19:2,4,5,9,12
20:10 29:3
**Josh (2)**
28:3 30:13
**JOSHUA (1)**
5:10
**June (7)**
1:13 2:4 11:17 14:10
15:4 26:6,7

_____
**K**
**KADISH (1)**
4:4
**KANE (2)**
5:11 23:24
**Karasik (2)**

7:20,20
**know (4)**
8:7 9:3 12:8 32:21
**KOLUCH (3)**
4:19 13:24 31:19
**KYLE (1)**
5:5

_____
**L**
**L (1)**
3:15
**L.L.P (1)**
3:18
**language (11)**
10:15 11:3,5 26:13,16
26:16,20,23 27:2,17
28:8
**leave (1)**
28:6
**lender (6)**
21:7 22:2 26:12 28:12
29:13,16
**Let's (1)**
28:18
**Levene (2)**
3:18 7:21
**limited (2)**
27:15,20
**Linens (7)**
1:5,11 2:7 3:19 7:5,24
11:10
**lines (1)**
17:16
**liquidation (2)**
16:21 17:12
**LLP (2)**
4:4,15
**loan (1)**
30:15
**loans (1)**
15:25
**long (1)**
31:7
**look (1)**
18:21
**looking (1)**
21:11
**Los (1)**
3:21
**lose (1)**
23:21

_____
**M**
**M (1)**

3:8
**MA (1)**
3:7
**Mac (3)**
23:12 24:2,17
**Madison (1)**
4:16
**management (1)**
17:7
**Mandarino (56)**
4:18 7:2,3,25 11:6
  12:3 13:12 16:13,23
  17:4,17 18:3,6,10
  18:21 19:7,13,25
  20:5,8,14,18,22
  21:11,17,24 22:7,11
  23:10,16 24:2,6,10
  24:14 25:17,22
  26:22 28:19,24 30:6
  30:12,19 31:4,8,13
  31:16,20,23 32:3,10
  32:16,20 33:2,4,9
  33:15
**mark (1)**
14:2
**matters (1)**
8:6
**MATTHEW (1)**
3:15
**Maura (4)**
4:8 9:20 11:19 16:2
**mean (3)**
22:13,18 28:4
**Meaning (1)**
20:14
**means (1)**
27:10
**meant (1)**
11:11
**meetings (1)**
16:18
**mentioned (2)**
16:20 18:11
**merchandise (1)**
13:4
**merchant (3)**
5:6 27:6,12
**merchant's (1)**
27:12
**midnight (1)**
32:24
**MILLER (2)**
5:6,7
**minutes (1)**

31:7
**modification (1)**
14:13
**modifications (1)**
26:3
**modified (1)**
17:14
**modify (1)**
26:5
**moment (1)**
19:11
**money (1)**
16:12
**month (1)**
10:23
**morning (4)**
9:5 17:25 18:3,7
**moved (1)**
10:7

___
**N**
**names (1)**
9:13
**Neale (2)**
3:18 7:21
**Neck (1)**
4:12
**need (6)**
11:2 13:22 21:18
  26:10 27:17 31:6
**needs (1)**
21:19
**NEIL (1)**
5:8
**New (10)**
1:12,12 2:9,9,11 3:14
  4:7,12,17,17
**nickle (1)**
30:17
**noncompany (1)**
11:15
**Northern (1)**
4:11
**Notary (1)**
2:10
**noted (9)**
21:21,23 24:11,13
  28:21,23 31:10,12
  33:17
**notice (3)**
8:18 26:18 28:2
**notwithstanding (1)**
27:12
**number (2)**

26:3,9
**NY (2)**
3:14 4:7

___
**O**
**oath (1)**
6:13
**objections (1)**
6:7
**obligated (1)**
10:9
**obligation (2)**
10:16 12:18
**obviate (2)**
26:12 28:4
**obviated (1)**
26:20
**Obviously (1)**
19:8
**occupancy (2)**
10:10,21
**occur (1)**
15:8
**occurrence (1)**
15:9
**occurring (1)**
25:7
**offers (1)**
27:13
**officer (1)**
6:12
**offices (1)**
2:8
**Okay (14)**
7:25 16:13 20:8 21:17
  23:12 24:4,14 25:22
  25:24 28:24 31:5,8
  31:13 33:9
**once (1)**
19:23
**oOo (1)**
6:20
**opportunity (2)**
32:6,8
**option (5)**
12:12,13,15 13:2 26:8
**order (6)**
9:13 11:16 14:24 15:2
  16:3 28:11
**outside (1)**
15:3
**overbid (2)**
9:23,24
**overnight (2)**

33:6,6
**owed (1)**
15:11

___
**P**
**p.m (10)**
2:5 21:21,23 24:11,13
  28:21,23 31:10,12
  33:17
**packages (1)**
11:23
**paid (9)**
10:21,24 14:21 15:13
  15:15 21:5 29:24
  30:17 33:8
**paragraph (3)**
26:9,13 27:17
**Park (2)**
2:8 3:13
**part (1)**
19:4
**participate (1)**
17:13
**parties (3)**
6:4 7:13 19:12
**partners (7)**
3:5 5:5,7,9,12 19:5,9
**party (2)**
18:17,19
**pass (11)**
8:22 17:5,5,11 24:5
  32:5,7,8,13,13,15
**passed (1)**
31:25
**passes (4)**
8:22 16:25,25 31:15
**passing (3)**
17:10 33:2,3
**patience (2)**
8:3 33:11
**patient (1)**
28:25
**pay (7)**
10:9,16 15:25 21:12
  21:14,16 23:2
**payment (10)**
14:15,22 15:8,10,11
  15:20,21 19:21 25:7
  25:9
**payments (2)**
14:19 25:4
**percent (5)**
19:19 20:15 21:3
  22:16,24

**permitted (1)**
17:13
**perpetual (1)**
14:4
**Perry (5)**
4:18 7:3 16:19 30:9
  32:2
**petition (2)**
24:25 25:7
**phone (2)**
7:17,18
**pieces (1)**
12:11
**place (2)**
3:6 27:25
**plane (1)**
9:6
**please (3)**
24:9 26:22 28:20
**point (9)**
8:6 10:2 18:16 22:12
  24:21 25:2,21 30:8
  32:18
**points (3)**
18:13 22:6 26:3
**portion (1)**
27:18
**possibility (1)**
26:8
**potential (1)**
19:6
**preceding (1)**
27:22
**PRESENT (1)**
5:4
**preserve (1)**
8:12
**presumably (1)**
17:25
**presuming (1)**
16:6
**prevailing (1)**
10:6
**previous (1)**
10:13
**previously (1)**
20:25
**price (4)**
13:16,21,22 14:3
**PRICEWATERH...**
4:15
**pricing (2)**
13:18,19
**principals (1)**

Rough Transcript

9:5
**prior (3)**
26:2 27:25 30:11
**procedure (1)**
28:11
**proceed (1)**
27:13
**process (1)**
24:23
**productions (1)**
14:20
**program (1)**
12:16
**promotions (1)**
11:10
**propose (1)**
26:4
**protections (5)**
14:18,21 15:13 25:6
 25:10
**provide (1)**
12:4
**provided (3)**
10:15 12:4 26:18
**provision (3)**
8:16 25:16 29:6
**provisional (2)**
14:12,14
**provisions (1)**
8:14
**Public (1)**
2:10
**purchase (1)**
22:20
**purposes (1)**
27:3
**pursuing (1)**
8:8
**pushed (1)**
24:24
**put (2)**
9:3 16:21
**putting (1)**
14:18
**PWC (1)**
7:3

---
**Q**

**question (4)**
6:8 10:11 13:17 30:13
**questions (4)**
9:22 11:7 13:12 16:16
**quickly (1)**
16:20

---
**R**

**raised (2)**
13:17 16:17
**Raskin (15)**
4:13 11:25 12:25 13:8
 13:13 14:5,11 15:16
 19:15,15 20:4,7
 24:5 31:17 33:5
**reached (1)**
29:12
**read (6)**
7:9 10:20 19:17 26:14
 26:25 27:22
**reads (1)**
27:19
**really (2)**
10:17 18:4
**reason (1)**
16:4
**reasonable (2)**
25:10 27:7
**receive (3)**
12:6 13:6 27:7
**received (3)**
11:23,25 22:13
**Recess (4)**
21:22 24:12 28:22
 31:11
**record (16)**
7:15 20:21 21:20,24
 22:14 24:15,18,22
 25:13 26:14 27:2
 28:20,25 30:9 31:14
 33:16
**referring (1)**
23:25
**reflected (4)**
13:20,22 14:3 20:20
**refunded (1)**
19:24
**refused (1)**
16:11
**regarding (1)**
25:3
**reinforce (1)**
8:15
**rejected (1)**
29:7
**relates (1)**
26:16
**remain (1)**
12:17
**remains (1)**
12:18

**remind (1)**
7:7
**repeat (1)**
10:12
**Reported (1)**
1:23
**reporter (3)**
2:10 7:16,19
**representative (1)**
7:14
**representing (1)**
7:22
**require (1)**
24:25
**reserve (1)**
16:10
**reserved (2)**
6:8
**respect (6)**
8:5 11:9 14:15 16:7
 22:9 26:23
**respective (1)**
6:3
**responses (1)**
10:24
**responsible (1)**
7:11
**result (3)**
15:9,20 26:20
**retail (2)**
13:15,21
**returns (1)**
11:11
**reverse (1)**
29:17
**revised (1)**
29:8
**revisit (1)**
17:8
**RG (1)**
32:14
**RICHMAN (2)**
1:24 2:10
**Rick (1)**
13:25
**right (3)**
14:8 15:5 22:20
**rights (1)**
16:10
**rob (3)**
12:8 31:16 33:4
**Robert (2)**
4:13 19:15
**room (3)**

7:11 8:24 17:3
**rules (2)**
7:6 8:20
**Russell (22)**
4:8 9:20 10:14 11:21
 12:11 13:3,10,15
 14:7,13 15:6,18
 16:9,15 17:18 18:4
 22:22 23:2,18 28:18
 30:25 33:13

---
**S**

**sale (16)**
10:19 11:24 12:14,23
 13:9,10 14:5,7,9
 17:15 19:23 26:5
 27:11,14,15,20
**sales (1)**
15:23
**Salus (15)**
3:5,12 5:5,7 17:7
 21:10,16,20 23:8
 26:15 28:7 29:22
 30:4,16 31:2
**Salus's (3)**
26:21 30:16,24
**saying (1)**
32:14
**says (2)**
10:8,10
**SB (11)**
4:10 9:14,24 18:24
 19:14,15 20:12
 23:16 24:4 32:6,17
**SB's (1)**
31:23
**Schottenstein (1)**
9:14
**sealing (1)**
6:4
**second (8)**
12:6,7,9 17:10,12
 19:20 30:13 32:15
**Secondly (2)**
7:12 8:6
**seconds (1)**
31:22
**section (6)**
10:3,7 26:4,9 28:15
 28:17
**sections (1)**
11:8
**secured (4)**
22:2 26:11 29:13,16

**seeking (1)**
23:20
**send (1)**
12:7
**sentence (5)**
27:3,4,16,18,22
**separately (1)**
9:19
**September (1)**
10:18
**set (1)**
27:21
**SHONAK (1)**
5:5
**Shorthand (1)**
2:10
**show (1)**
33:8
**signed (3)**
6:12,14 11:23
**simpatico (1)**
24:3
**simple (1)**
9:23
**SNYDER (26)**
5:8 10:12 15:5 16:2
 16:19,24 17:11,22
 18:14 19:8 22:18
 23:13,20 24:19
 25:20 28:3 30:3,22
 31:2,22 32:2,4,11
 32:18,24 33:3
**soft (1)**
11:23
**Solutions (1)**
5:6
**soon (1)**
9:6
**sorry (2)**
30:3 31:20
**speaking (1)**
7:14
**special (1)**
11:10
**specific (1)**
26:23
**spoke (2)**
8:8 9:18
**stakeholders (1)**
8:13
**start (3)**
9:12 16:14 33:16
**starts (2)**
27:4,18

Rough Transcript

**State (1)**
2:11
**STEPHEN (1)**
5:6
**sticker (1)**
14:2
**stickers (3)**
13:18,20 14:2
**STIPULATED (3)**
6:2,6,10
**stop (2)**
21:10,16
**store (3)**
26:17 27:10,14
**stores (6)**
10:20,25 12:19,22
13:5 27:11
**STPHAOEUFPLT ...**
32:13
**subject (2)**
7:7 27:20
**substantially (1)**
21:2
**successful (6)**
14:17 16:4 21:6 27:24
28:16 29:15
**sufficient (1)**
15:23
**sufficiently (1)**
17:2
**suggestion (1)**
10:5
**Suite (2)**
3:20 4:11
**Sure (1)**
22:7
**suspended (1)**
17:25
**SUSSBERG (17)**
5:10 18:8 19:3 20:11
20:17,20 22:5,8
23:5 24:8 25:24
26:25 28:6,17 29:10
30:2,8
**swisher (2)**
7:23,23
**sworn (2)**
6:11,14
**system (1)**
14:4

**T**
**take (6)**
20:4 21:18 22:19,24

28:18 30:4
**talking (1)**
17:19
**terminated (2)**
25:15 29:25
**termination (11)**
8:14,16 10:17,19 14:8
14:19 23:11 25:16
26:18 28:2,12
**terms (12)**
7:16 20:12,25 22:3
23:14,19,22 25:25
27:21 29:4,25 30:10
**thank (10)**
8:3 19:7,13 20:22
21:25 22:12 23:16
28:25 30:13 33:10
**thing (2)**
17:23 18:14
**Things (1)**
11:14
**think (4)**
9:10 11:18 16:16
18:15
**Third (1)**
4:6
**thought (2)**
11:7 18:10
**three (1)**
32:13
**throw (2)**
19:14 24:15
**Tiger (17)**
5:8,11 10:4 14:16
15:14 16:12 19:8
20:19 22:4 23:13
24:16 25:5,25 29:5
30:11 31:19,20
**tiger's (1)**
31:24
**time (16)**
6:8 7:15 8:17 9:10
17:10,12 21:21,23
24:11,13 28:21,23
31:10,12 33:13,17
**timing (3)**
14:15 25:4,4
**today (4)**
8:3,8 9:19 10:18
**tomorrow (7)**
7:10 9:5 16:22 17:25
18:3,6 33:8
**tonight (3)**
9:4,9 32:23

**traditional (1)**
18:16
**transaction (3)**
8:9,10 14:25
**transfer (2)**
12:18 13:5
**TRAURIG (4)**
2:8 3:4,11 4:4
**trial (1)**
6:9
**Tuesday (1)**
1:13
**turn (2)**
31:23,24
**tweak (1)**
11:2
**two (7)**
12:2,5 14:21 19:17
26:2,9 29:5

**U**
**understanding (1)**
24:23
**upheld (1)**
7:9
**use (4)**
21:7 23:6 25:10 27:7
**utilize (1)**
12:16

**V**
**vacate (2)**
10:22,24
**venture (9)**
9:16 14:17 15:14
18:18 19:2,5,10
20:10 29:3
**ventures (1)**
19:12
**verify (2)**
11:16 13:17
**view (1)**
28:14

**W**
**wait (2)**
23:18 31:8
**waived (1)**
6:5
**want (6)**
8:15 9:10,19 11:21
26:19 33:7
**wanted (1)**
24:16

**wasn't (2)**
31:23 32:22
**way (1)**
28:8
**we'll (7)**
9:13 10:20 17:5 20:4
31:8 33:5,16
**we're (9)**
19:16 21:17 23:20
24:5,14,18 31:13
33:3,7
**we've (1)**
29:12
**welcome (1)**
7:4
**weren't (2)**
12:22 16:20
**wide (1)**
27:14
**winning (4)**
8:19 11:2 20:2,5
**wire (1)**
7:10
**Wolf (4)**
3:8 29:21,21 30:18
**words (1)**
21:13
**work (1)**
33:12
**worked (1)**
8:4
**works (1)**
22:9
**world (1)**
26:17

**X**
**x (2)**
1:3,6

**Y**
**years (1)**
32:22
**Yellen (15)**
5:8,11 14:17 15:14
16:12 19:9 20:19
22:4 23:13 24:16
25:5 26:2 29:5
30:11 31:21
**Yoo (2)**
3:18 7:21
**York (10)**
1:12,12 2:9,9,11 3:14
4:7,12,17,17

**Z**

**0**
**02110 (1)**
3:7
**04:59 (2)**
7:5,10
**05:00 (4)**
7:15,20,25 8:5
**05:01 (3)**
8:10,15,20
**05:02 (4)**
8:25 9:5,10,15
**05:03 (3)**
9:20,25 10:5
**05:04 (5)**
10:10,15,20,25 11:5
**05:05 (3)**
11:10,15,20
**05:06 (5)**
11:25 12:5,10,15,20
**05:07 (5)**
12:25 13:5,10,15,20
**05:08 (5)**
13:25 14:5,10,15,20
**05:09 (4)**
14:25 15:5,10,15
**05:10 (5)**
15:20,25 16:5,10,15
**05:11 (5)**
16:20,25 17:5,10,15
**05:12 (5)**
17:20,25 18:5,10,15
**05:13 (5)**
18:20,25 19:5,10,15
**05:14 (1)**
19:20
**05:15 (3)**
19:25 20:5,10
**05:16 (4)**
20:15,20,25 21:5
**05:17 (3)**
21:10,15,20
**05:58 (5)**
21:25 22:5,10,15,20
**05:59 (5)**
22:25 23:5,10,15,20
**06:00 (3)**
23:25 24:5,10
**06:13 (1)**
24:15
**06:14 (4)**
24:20,25 25:5,10
**06:15 (4)**

Rough Transcript

25:15,20,25 26:5
**06:16 (5)**
26:10,15,20,25 27:5
**06:17 (4)**
27:10,15,20,25
**06:18 (4)**
28:5,10,15,20
**08:24 (3)**
28:25 29:5,10
**08:25 (6)**
29:15,20,25 30:5,10
30:15
**08:26 (4)**
30:20,25 31:5,10
**08:39 (1)**
31:15
**08:40 (3)**
31:20,25 32:5
**08:41 (5)**
32:10,15,20,25 33:5
**08:42 (2)**
33:10,15

_____ **1**
**10017 (2)**
4:7,17
**1010 (1)**
4:11
**10116 (1)**
3:14
**10250 (1)**
3:20
**103 (2)**
21:3 22:16
**105 (1)**
23:13
**107 (2)**
25:24 29:4
**110 (1)**
29:11
**11021 (1)**
4:12
**12:00 (1)**
2:5
**12th (2)**
14:10 26:7
**14th (1)**
11:17
**15 (2)**
19:19 20:15
**15th (1)**
10:23
**16.11 (2)**
26:9,24

**1700 (1)**
3:20
**19th (1)**
26:6

_____ **2**
**200 (2)**
2:8 3:13
**2015 (3)**
1:13 2:4 10:18
**21 (1)**
10:6
**250 (2)**
29:23 33:8

_____ **3**
**3 (1)**
32:21
**30 (4)**
10:7 11:14 13:6 31:22
**300 (1)**
4:16
**30th (3)**
10:18 12:23 15:4
**340 (1)**
4:11
**360 (1)**
5:6

_____ **4**
**4 (1)**
32:22
**4th (1)**
27:4

_____ **5**
**5.3B1 (2)**
10:3,5
**5:17 (1)**
21:21
**5:57 (1)**
21:23
**50 (1)**
18:12

_____ **6**
**6.01 (2)**
26:4 29:6
**6.2 (1)**
10:8
**6:00 (1)**
24:11
**6:13 (1)**
24:13

**6:18 (1)**
28:21
**62.11A (1)**
29:6
**630 (1)**
4:6

_____ **7**

_____ **8**
**8.2 (1)**
11:8
**8.6 (1)**
11:8
**8:24 (1)**
28:23
**8:26 (1)**
31:10
**8:39 (1)**
31:12
**8:42 (1)**
33:17

_____ **9**
**9 (2)**
1:13 2:4
**9:00 (1)**
33:15
**90067 (1)**
3:21
**94531 (1)**
1:25
**96.63 (2)**
9:25 18:12
**96.7 (1)**
19:16
**97.2 (1)**
20:13

Page 1

1

2  _____

3  ANNA'S LINENS AUCTION

4  _____

5

6

7

8

9

10

11

12              AUCTION OF ANNA'S LINENS

13                New York, New York

14              Wednesday, June 10, 2015

15

16

17

18

19

20

21

22

23  Reported by:

24  Tiffany Valentine

25  JOB NO. 94580

## Page 2

4 June 10, 2015

5 12:15 p.m.

8 Auction of Anna's Linens, held at
9 the offices of Greenberg Traurig, 200 Park
10 Avenue, New York, New York, before Tiffany
11 Valentine, a Notary Public of the State of
12 New York.

## Page 3

2 APPEARANCES:

4 GREENBERG TRAURIG
5 Attorneys for Salus Capital Partners
6 One International Place
7 Boston, MA 02110
8 BY: JEFFREY M. WOLF, ESQ.

11 GREENBERG TRAURIG
12 Attorneys for Salus
13 200 Park Avenue
14 New York, NY 10116
15 BY: MATTHEW L. HINKER, ESQ.

18 LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
19 Attorneys for Anna's Linens
20 10250 Constellation Blvd., Suite 1700
21 Los Angeles, CA 90067
22 BY: DAVID B. GOLUBCHIK, ESQ.

## Page 4

2 APPEARANCES (Continued):

4 DICONZA TRAURIG KADISH LLP
5 Attorneys for
6 630 Third Avenue
7 New York, NY 10017
8 BY: MAURA I. RUSSELL, ESQ.

11 PRICEWATERHOUSECOOPERS LLP
12 300 Madison Avenue
13 New York, New York 10017
14 BY: PERRY MANDARINO
15 BRIAN KOLUCH

## Page 5

2 APPEARANCES (Continued):

4 PRESENT:
5 KYLE SHONAK, Salus Capital Partners
6 STEPHEN MILLER, 360 Merchant Solutions
7 AARON MILLER, Salus Capital Partners
8 NEIL SNYDER, Tiger Capital Group and Yellen
9 Partners
10 JOSHUA G. SUSSBERG, Hilco and Gordon Brothers
11 DANIEL KANE, Tiger Capital Group and Yellen
12 Partners

Rough Transcript

## Page 6

1

2      IT IS HEREBY STIPULATED AND AGREED

3  by and between the attorneys for the

4  respective parties herein, that filing and

5  sealing the same are hereby waived.

6      IT IS FURTHER STIPULATED AND AGREED

7  that all objections, except as to the form

8  of the question, shall be reserved to the

9  time of the trial.

10      IT IS FURTHER STIPULATED AND AGREED

11  that the within deposition may be sworn to

12  and signed before any officer authorized

13  to administer an oath, with the same

14  force and effect as if signed and sworn

15  to before the Court.

16

17

18

19

20                    - oOo -

21

22

23

24

25

## Page 7

1

12:15   2      MR. MANDARINO:  Good afternoon.

12:15   3  We're back on the record.  Perry Mandarino

12:15   4  from PWC.  Again, thank you everyone for

12:15   5  your patience this morning.

12:15   6      When we left last night, SB Capital

12:15   7  asked for a break.  I received an e-mail

12:16   8  from Robert Raskin, which was addressed to

12:16   9  myself, Maura Russell and Jeffrey Wolf.  I

12:16  10  will read it:  "Just wanted to let you

12:16  11  know, we have no further bid at this time.

12:16  12  Thanks for your courtesy."

12:16  13      So SB Capital is out.

12:16  14      GA is next, but before I throw to

12:16  15  GA, we announce for the record to the

12:16  16  extent -- yesterday if you recall there is

12:16  17  controversy or discussion about the break

12:16  18  up fee in section 16.11-A.  To the extent

12:16  19  that the bidding goes up to 110.5 from its

12:16  20  current 110, the company has acknowledged

12:16  21  that the language in 16.11-A, I believe,

12:16  22  would entitle Tiger, if they're not the

12:16  23  winning bidder and do not do a partial or

12:16  24  full store liquidation, to their full

12:16  25  million-dollar break up fee which they have

## Page 8

1

12:16   2  been paid $200,000.

12:16   3      So in either case, there's no

12:17   4  objection from the company that Tiger will

12:17   5  be entitled to that break up fee.

12:17   6      So, do you have any comments?

12:17   7      MR. SNYDER:  Neil Snyder on behalf

12:17   8  of Tiger.

12:17   9      This is sort of what I was talking

12:17  10  about with you earlier.  I think we

12:17  11  understood the deal -- and let me know if

12:17  12  you want to go off the record for 30

12:17  13  seconds -- is that just if we get

12:17  14  terminated at this point, we get the full

12:17  15  break up fee.  And then if the stores come

12:17  16  to us, we will work out some sort of deal

12:17  17  which will presumably involve crediting

12:17  18  back to the company.

12:17  19      MR. MANDARINO:  Consistent with

12:17  20  1611-A, your reading.

12:17  21      MR. SUSSBERG:  Can we ask a few

12:17  22  questions, Perry?

12:17  23      MR. MANDARINO:  Sure.

12:17  24      MR. SUSSBERG:  1611-A had

12:17  25  termination of a hundred thousand dollars.

## Page 9

1

12:17   2      Is the termination fee now a million

12:17   3  dollars?

12:17   4      MR. MANDARINO:  No.  What we are

12:17   5  saying is that the termination fee, if

12:18   6  there is no liquidation, is a hundred

12:18   7  thousand dollars.  So if a concerned buyer

12:18   8  takes the language in there, substantially

12:18   9  I think the language, if that doesn't

12:18  10  happen, they're entitled to their hundred

12:18  11  thousand dollars to the extent there is a

12:18  12  substantial liquidation.  If they don't do

12:18  13  it, they're entitled to full million.

12:18  14      That is the understanding of the

12:18  15  parties during the negotiation and we're

12:18  16  clearing that up.

12:18  17      MR. SUSSBERG:  Follow up question --

12:18  18      MR. MANDARINO:  Clearing up

12:18  19  ambiguities in the contract.

12:18  20      MR. SUSSBERG:  So if there is a

12:18  21  going concern, as well as a store closing,

12:18  22  so you would elevate to the million dollar

12:18  23  fee, does the company, in light of the

12:18  24  language that's in 1611-A, still have

12:18  25  obligation to use reasonable best efforts

Rough Transcript

## Page 10

to ensure that Tiger facility and
conduct --

MR. SNYDER:  Josh, what we are
saying, and the deal we are proposing, if
the stores do not come to us -- it is
essentially the remedy for the failure on
that provision that if the stores that are
being liquidated come to Tiger Yellen,
Tiger Yellen pays the full break fee.

MR. SUSSBERG:  Can you confirm that?

MR. MANDARINO:  Yes.

GA, it is your turn.

MR. SNYDER:  Perry, before we move
on, that fee would be subject to the same
agreements we talked about earlier, that
the company would use reasonable best
efforts to the extent of reasonable court
approval.

MR. MANDARINO:  As we talked about
yesterday, yes.  So forget about yesterday,
yes.

MR. SNYDER:  He just clarified if it
doesn't get terminated.  We're talking
about where it does get terminated here.

## Page 11

So he would use reasonable efforts to
dispose of that.

MR. FOREMAN:  Alan Foreman for Great
American.

We decline to bid at this time.  We
will work with the company and Salus to
arrange for the payment of our bid fee as
we previously put into the record
yesterday.  And thank you.

MR. MANDARINO:  Great, thank you.
And thank you to the team at Great American
for their participation.

Tiger Yellen.

MR. SNYDER:  Tiger Yellen bids, in
light of that agreement and on the same
terms that were otherwise set forth by the
Gordon Hilco Group yesterday, 110.5.

MR. MANDARINO:  Hilco Gordon
Brothers.

MS. RUSSELL:  That is without the
additional 250?

MR. SNYDER:  Correct.  We're not
seeking an additional 250.

MR. MANDARINO:  Before you take a

## Page 12

break, we're not coming back on the record
until about 2:00, okay?

Thank you.

(Time noted 12:21 p.m.)

(Recess taken.)

MR. MANDARINO:  We're back on the
record.  Thank you again for your
indulgence.

We left off with Tiger Yellen at
110.5.

Hilco Gordon Brothers.

MR. SUSSBERG:  On behalf of the
Hilco Gordon Brothers joint venture, we bid
111.

I wanted to make two comments:  One
is new term, one is clarification.

The new term is that we need an
agreement on merchandise ceiling at 67.

And the second is consistent with, I
believe, the first bid yesterday; we're
going to need the $200,000 expense wire
prior to the sale commencement date.  I
know we're past the wire deadline for
today, but it would need to be tomorrow.

## Page 13

MS. RUSSELL:  That's the $200,000
work fee?

MR. SUSSBERG:  SB Capital's first
bid yesterday --

MS. RUSSELL:  Same as the work fee
you guys got?

MR. SUSSBERG:  To cover expenses if
the sale is not approved.

MS. RUSSELL:  Okay.  Got it.

MR. MANDARINO:  Josh, the
merchandise ceiling of 67 million dollars
is regardless of the date, it's at the sale
commencement date?

MR. SUSSBERG:  Correct.

MS. RUSSELL:  That's with the sale
commencement date of 6/12.

MR. SUSSBERG:  Based on your number
based on 6/12.

MR. MANDARINO:  Thank you for the
clarification.

Okay.  The $200,000 expense --
excuse me.

MR. SUSSBERG:  Its always been in
there.  Just a clarification.

## Page 14

| | |
|---|---|
| 1 | |
| 04:06  2 | MS. RUSSELL:  Confirming that you're |
| 04:06  3 | getting it before? |
| 04:06  4 | MR. SUSSBERG:  Need it before the |
| 04:06  5 | start, right. |
| 04:06  6 | THE COURT:  With the 67 ceiling, the |
| 04:06  7 | step-down starts at 67? |
| 04:06  8 | MR. SUSSBERG:  Yes. |
| 04:06  9 | MS. RUSSELL:  Do we know your |
| 04:06 10 | adjustment schedule? |
| 04:06 11 | MR. MANDARINO:  We don't know.  It will |
| 04:06 12 | be mutually agreeable. |
| 04:06 13 | MR. MANDARINO:  All right. |
| 04:06 14 | Tiger Yellen? |
| 04:06 15 | MR. SNYDER:  Give us a few minutes. |
| 04:06 16 | MR. MANDARINO:  Like literally a few |
| 04:06 17 | minutes or like the last few minutes? |
| 04:06 18 | MR. SNYDER:  Should not be two and a |
| 04:06 19 | half hours. |
| 04:07 20 | After this auction is over, whenever |
| 04:07 21 | it ends, what's the plan for going forward? |
| 04:07 22 | Are we doing a separate auction on the IP |
| 04:07 23 | and/or leases or whatever? |
| 04:07 24 | MR. MANDARINO:  Not today. |
| 04:07 25 | MR. SNYDER:  Not today? |

## Page 15

| | |
|---|---|
| 1 | |
| 04:07  2 | THE COURT:  Not today.  It's not |
| 04:07  3 | going to be today. |
| 04:07  4 | (Time noted: 4:07 p.m.) |
| 04:07  5 | (Recess taken.) |
| 05:10  6 | MR. MANDARINO:  We're back on the |
| 05:10  7 | record. |
| 05:10  8 | We're at Tiger Yellen. |
| 05:10  9 | MR. SNYDER:  Tiger Yellen will pass. |
| 05:10 10 | We congratulate Gordon Rosen Hilco on the |
| 05:10 11 | auction in this matter. |
| 05:10 12 | MR. LIPOFF:  Thank you for your |
| 05:10 13 | graciousness. |
| 05:10 14 | MR. MANDARINO:  Thank you Mack. |
| 05:10 15 | Thank you Corey, Josh and Rick. |
| 05:10 16 | That will conclude the auction for |
| 05:11 17 | this evening and I thank everyone's |
| 05:11 18 | attendance. |
| 19 | (Time Noted: 5:11 p.m.) |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

## Page 16

| |
|---|
| 1 |
| 2 |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

## Page 17

| | |
|---|---|
| 1 | |
| 2 | C E R T I F I C A T E |
| 3 | |
| 4 | STATE OF NEW YORK  ) |
| 5 | ) ss.: |
| 6 | COUNTY OF NASSAU  ) |
| 7 | |
| 8 | I, Tiffany Valentine, a Notary |
| 9 | Public within and for the State of New |
| 10 | York, do hereby certify: |
| 11 | That auction hereinbefore set forth, |
| 12 | is a true record of the proceedings. |
| 13 | I further certify that I am not |
| 14 | related to any of the parties to this |
| 15 | action by blood or marriage; and that I am |
| 16 | in no way interested in the outcome of this |
| 17 | matter. |
| 18 | IN WITNESS WHEREOF, I have hereunto |
| 19 | set my hand this 10th day of June, 2015. |
| 20 | |
| 21 | |
| 22 | ------------------------- |
| 23 | Tiffany Valentine |
| 24 | |
| 25 | |

**A**

**$200,000 (4)**
8:2 12:22 13:2,22
**AARON (1)**
5:7
**acknowledged (1)**
7:20
**action (1)**
17:15
**additional (2)**
11:22,24
**addressed (1)**
7:8
**adjustment (1)**
14:10
**administer (1)**
6:13
**afternoon (1)**
7:2
**agreeable (1)**
14:12
**AGREED (3)**
6:2,6,10
**agreement (2)**
11:16 12:19
**agreements (1)**
10:16
**Alan (1)**
11:4
**ambiguities (1)**
9:19
**American (2)**
11:5,12
**and/or (1)**
14:23
**Angeles (1)**
3:21
**Anna's (4)**
1:3,12 2:8 3:19
**announce (1)**
7:15
**APPEARANCES (3)**
3:2 4:2 5:2
**approval (1)**
10:19
**approved (1)**
13:9
**arrange (1)**
11:8
**asked (1)**
7:7
**attendance (1)**
15:18
**attorneys (5)**

3:5,12,19 4:5 6:3
**auction (8)**
1:3,12 2:8 14:20,22
15:11,16 17:11
**authorized (1)**
6:12
**Avenue (3)**
2:10 3:13 4:6,12

**B**

**B (1)**
3:22
**back (5)**
7:3 8:18 12:2,7 15:6
**based (2)**
13:18,19
**behalf (2)**
8:7 12:13
**believe (2)**
7:21 12:21
**BENDER (1)**
3:18
**best (2)**
9:25 10:17
**bid (6)**
7:11 11:6,8 12:14,21
13:5
**bidder (1)**
7:23
**bidding (1)**
7:19
**bids (1)**
11:15
**blood (1)**
17:15
**Blvd (1)**
3:20
**Boston (1)**
3:7
**break (7)**
7:7,17,25 8:5,15
10:10 12:2
**BRIAN (1)**
4:15
**BRILL (1)**
3:18
**Brothers (4)**
5:10 11:20 12:12,14
**buyer (1)**
9:7

**C**

**C (2)**
17:2,2

**CA (1)**
3:21
**Capital (7)**
3:5 5:5,7,8,11 7:6,13
**Capital's (1)**
13:4
**case (1)**
8:3
**ceiling (3)**
12:19 13:12 14:6
**certify (2)**
17:10,13
**clarification (3)**
12:17 13:21,25
**clarified (1)**
10:23
**clearing (2)**
9:16,18
**closing (1)**
9:21
**come (3)**
8:15 10:6,9
**coming (1)**
12:2
**commencement (3)**
12:23 13:14,17
**comments (2)**
8:6 12:16
**company (6)**
7:20 8:4,18 9:23
10:17 11:7
**concern (1)**
9:21
**concerned (1)**
9:7
**conclude (1)**
15:16
**conduct (1)**
10:3
**confirm (1)**
10:11
**Confirming (1)**
14:2
**congratulate (1)**
15:10
**consistent (2)**
8:19 12:20
**Constellation (1)**
3:20
**Continued (2)**
4:2 5:2
**contract (1)**
9:19
**controversy (1)**

7:17
**Corey (1)**
15:15
**Correct (2)**
11:23 13:15
**COUNTY (1)**
17:6
**court (4)**
6:15 10:18 14:6 15:2
**courtesy (1)**
7:12
**cover (1)**
13:8
**crediting (1)**
8:17
**current (1)**
7:20

**D**

**DANIEL (1)**
5:11
**date (4)**
12:23 13:13,14,17
**DAVID (1)**
3:22
**day (1)**
17:19
**deadline (1)**
12:24
**deal (3)**
8:11,16 10:5
**decline (1)**
11:6
**deposition (1)**
6:11
**DICONZA (1)**
4:4
**discussion (1)**
7:17
**dispose (1)**
11:3
**doing (1)**
14:22
**dollar (1)**
9:22
**dollars (5)**
8:25 9:3,7,11 13:12

**E**

**E (2)**
17:2,2
**e-mail (1)**
7:7
**earlier (2)**

8:10 10:16
**effect (1)**
6:14
**efforts (3)**
9:25 10:18 11:2
**either (1)**
8:3
**elevate (1)**
9:22
**ends (1)**
14:21
**ensure (1)**
10:2
**entitle (1)**
7:22
**entitled (3)**
8:5 9:10,13
**ESQ (4)**
3:8,15,22 4:8
**essentially (1)**
10:7
**evening (1)**
15:17
**everyone's (1)**
15:17
**excuse (1)**
13:23
**expense (2)**
12:22 13:22
**expenses (1)**
13:8
**extent (4)**
7:16,18 9:11 10:18

**F**

**F (1)**
17:2
**facility (1)**
10:2
**failure (1)**
10:7
**fee (12)**
7:18,25 8:5,15 9:2,5
9:23 10:10,15 11:8
13:3,6
**filing (1)**
6:4
**first (2)**
12:21 13:4
**Follow (1)**
9:17
**force (1)**
6:14
**Foreman (2)**

Rough Transcript

11:4,4
**forget (1)**
10:21
**form (1)**
6:7
**forth (2)**
11:17 17:11
**forward (1)**
14:21
**full (5)**
7:24,24 8:14 9:13
10:10
**further (4)**
6:6,10 7:11 17:13

**G**

**G (1)**
5:10
**GA (3)**
7:14,15 10:13
**getting (1)**
14:3
**Give (1)**
14:15
**go (1)**
8:12
**goes (1)**
7:19
**going (4)**
9:21 12:22 14:21 15:3
**GOLUBCHIK (1)**
3:22
**Good (1)**
7:2
**Gordon (6)**
5:10 11:18,19 12:12
12:14 15:10
**graciousness (1)**
15:13
**Great (3)**
11:4,11,12
**Greenberg (3)**
2:9 3:4,11
**Group (3)**
5:8,11 11:18
**guys (1)**
13:7

**H**

**half (1)**
14:19
**hand (1)**
17:19
**happen (1)**

9:10
**held (1)**
2:8
**hereinbefore (1)**
17:11
**hereunto (1)**
17:18
**Hilco (6)**
5:10 11:18,19 12:12
12:14 15:10
**HINKER (1)**
3:15
**hours (1)**
14:19
**hundred (3)**
8:25 9:6,10

**I**

**indulgence (1)**
12:9
**interested (1)**
17:16
**International (1)**
3:6
**involve (1)**
8:17
**IP (1)**
14:22

**J**

**Jeffrey (2)**
3:8 7:9
**JOB (1)**
1:25
**joint (1)**
12:14
**Josh (3)**
10:4 13:11 15:15
**JOSHUA (1)**
5:10
**June (3)**
1:14 2:4 17:19

**K**

**KADISH (1)**
4:4
**KANE (1)**
5:11
**know (5)**
7:11 8:11 12:24 14:9
14:11
**KOLUCH (1)**
4:15
**KYLE (1)**

5:5

**L**

**L (1)**
3:15
**L.L.P (1)**
3:18
**language (4)**
7:21 9:8,9,24
**leases (1)**
14:23
**left (2)**
7:6 12:10
**LEVENE (1)**
3:18
**light (2)**
9:23 11:16
**Linens (4)**
1:3,12 2:8 3:19
**LIPOFF (2)**
14:11 15:12
**liquidated (1)**
10:9
**liquidation (3)**
7:24 9:6,12
**literally (1)**
14:16
**LLP (2)**
4:4,11
**Los (1)**
3:21

**M**

**M (1)**
3:8
**MA (1)**
3:7
**Mack (1)**
15:14
**Madison (1)**
4:12
**Mandarino (20)**
4:14 7:2,3 8:19,23 9:4
9:18 10:12,20 11:11
11:19,25 12:7 13:11
13:20 14:13,16,24
15:6,14
**marriage (1)**
17:15
**matter (2)**
15:11 17:17
**MATTHEW (1)**
3:15
**Maura (2)**

4:8 7:9
**merchandise (2)**
12:19 13:12
**Merchant (1)**
5:6
**MILLER (2)**
5:6,7
**million (4)**
9:2,13,22 13:12
**million-dollar (1)**
7:25
**minutes (3)**
14:15,17,17
**morning (1)**
7:5
**move (1)**
10:14
**mutually (1)**
14:12

**N**

**NASSAU (1)**
17:6
**NEALE (1)**
3:18
**need (4)**
12:18,22,25 14:4
**negotiation (1)**
9:15
**Neil (2)**
5:8 8:7
**new (13)**
1:13,13 2:10,10,12
3:14 4:7,13,13
12:17,18 17:4,9
**night (1)**
7:6
**Notary (2)**
2:11 17:8
**noted (3)**
12:5 15:4,19
**number (1)**
13:18
**NY (2)**
3:14 4:7

**O**

**oath (1)**
6:13
**objection (1)**
8:4
**objections (1)**
6:7
**obligation (1)**

9:25
**officer (1)**
6:12
**offices (1)**
2:9
**okay (3)**
12:3 13:10,22
**oOo (1)**
6:20
**outcome (1)**
17:16

**P**

**p.m (4)**
2:5 12:5 15:4,19
**paid (1)**
8:2
**Park (2)**
2:9 3:13
**partial (1)**
7:23
**participation (1)**
11:13
**parties (3)**
6:4 9:15 17:14
**Partners (5)**
3:5 5:5,7,9,12
**pass (1)**
15:9
**patience (1)**
7:5
**payment (1)**
11:8
**pays (1)**
10:10
**Perry (4)**
4:14 7:3 8:22 10:14
**Place (1)**
3:6
**plan (1)**
14:21
**point (1)**
8:14
**PRESENT (1)**
5:4
**presumably (1)**
8:17
**previously (1)**
11:9
**PRICEWATERH...**
4:11
**prior (1)**
12:23
**proceedings (1)**

Rough Transcript

17:12
**proposing (1)**
10:5
**provision (1)**
10:8
**Public (2)**
2:11 17:9
**put (1)**
11:9
**PWC (1)**
7:4

_____ **Q**
**question (2)**
6:8 9:17
**questions (1)**
8:22

_____ **R**
**R (1)**
17:2
**Raskin (1)**
7:8
**read (1)**
7:10
**reading (1)**
8:20
**reasonable (4)**
9:25 10:17,18 11:2
**recall (1)**
7:16
**received (1)**
7:7
**Recess (2)**
12:6 15:5
**record (8)**
7:3,15 8:12 11:9 12:2
12:8 15:7 17:12
**regardless (1)**
13:13
**related (1)**
17:14
**remedy (1)**
10:7
**Reported (1)**
1:23
**reserved (1)**
6:8
**respective (1)**
6:4
**Rick (1)**
15:15
**right (2)**
14:5,13

**Robert (1)**
7:8
**Rosen (1)**
15:10
**Russell (9)**
4:8 7:9 11:21 13:2,6
13:10,16 14:2,9

_____ **S**
**sale (4)**
12:23 13:9,13,16
**Salus (5)**
3:5,12 5:5,7 11:7
**saying (2)**
9:5 10:5
**SB (3)**
7:6,13 13:4
**schedule (1)**
14:10
**sealing (1)**
6:5
**second (1)**
12:20
**seconds (1)**
8:13
**section (1)**
7:18
**seeking (1)**
11:24
**separate (1)**
14:22
**set (3)**
11:17 17:11,19
**SHONAK (1)**
5:5
**signed (2)**
6:12,14
**Snyder (12)**
5:8 8:7,7 10:4,14,23
11:15,23 14:15,18
14:25 15:9
**Solutions (1)**
5:6
**sort (2)**
8:9,16
**ss (1)**
17:5
**start (1)**
14:5
**starts (1)**
14:7
**State (3)**
2:11 17:4,9
**step-down (1)**

14:7
**STEPHEN (1)**
5:6
**STIPULATED (3)**
6:2,6,10
**store (2)**
7:24 9:21
**stores (3)**
8:15 10:6,8
**subject (1)**
10:15
**substantial (1)**
9:12
**substantially (1)**
9:8
**Suite (1)**
3:20
**Sure (1)**
8:23
**SUSSBERG (14)**
5:10 8:21,24 9:17,20
10:11 12:13 13:4,8
13:15,18,24 14:4,8
**sworn (2)**
6:11,14

_____ **T**
**T (2)**
17:2,2
**take (1)**
11:25
**taken (2)**
12:6 15:5
**takes (1)**
9:8
**talked (2)**
10:16,20
**talking (2)**
8:9 10:24
**team (1)**
11:12
**term (2)**
12:17,18
**terminated (3)**
8:14 10:24,25
**termination (3)**
8:25 9:2,5
**terms (1)**
11:17
**thank (11)**
7:4 11:10,11,12 12:4
12:8 13:20 15:12,14
15:15,17
**Thanks (1)**

7:12
**think (2)**
8:10 9:9
**Third (1)**
4:6
**thousand (3)**
8:25 9:7,11
**throw (1)**
7:14
**Tiffany (1)**
1:24 2:10 17:8,23
**Tiger (14)**
5:8,11 7:22 8:4,8 10:2
10:9,10 11:14,15
12:10 14:14 15:8,9
**time (6)**
6:9 7:11 11:6 12:5
15:4,19
**today (5)**
12:25 14:24,25 15:2,3
**tomorrow (1)**
12:25
**Traurig (4)**
2:9 3:4,11 4:4
**trial (1)**
6:9
**true (1)**
17:12
**turn (1)**
10:13
**two (2)**
12:16 14:18

_____ **U**
**understanding (1)**
9:14
**understood (1)**
8:11
**use (3)**
9:25 10:17 11:2

_____ **V**
**Valentine (4)**
1:24 2:11 17:8,23
**venture (1)**
12:14

_____ **W**
**waived (1)**
6:5
**want (1)**
8:12
**wanted (2)**
7:10 12:16

**way (1)**
17:16
**we're (10)**
7:3 9:15 10:24 11:23
12:2,7,21,24 15:6,8
**Wednesday (1)**
1:14
**WHEREOF (1)**
17:18
**winning (1)**
7:23
**wire (2)**
12:22,24
**WITNESS (1)**
17:18
**Wolf (2)**
3:8 7:9
**work (4)**
8:16 11:7 13:3,6

_____ **X**

_____ **Y**
**Yellen (10)**
5:8,11 10:9,10 11:14
11:15 12:10 14:14
15:8,9
**yesterday (7)**
7:16 10:21,21 11:10
11:18 12:21 13:5
**YOO (1)**
3:18
**York (11)**
1:13,13 2:10,10,12
3:14 4:7,13,13 17:4
17:10

_____ **Z**

_____ **0**
**02110 (1)**
3:7

_____ **1**
**10 (2)**
1:14 2:4
**10017 (2)**
4:7,13
**10116 (1)**
3:14
**10250 (1)**
3:20
**10th (1)**
17:19

Rough Transcript

**110 (1)**
7:20
**110.5 (3)**
7:19 11:18 12:11
**111 (1)**
12:15
**12:15 (1)**
2:5
**12:21 (1)**
12:5
**16.11-A (2)**
7:18,21
**1611-A (3)**
8:20,24 9:24
**1700 (1)**
3:20

**2**

**2:00 (1)**
12:3
**200 (2)**
2:9 3:13
**2015 (3)**
1:14 2:4 17:19
**250 (2)**
11:22,24

**3**

**30 (1)**
8:12
**300 (1)**
4:12
**360 (1)**
5:6

**4**

**4:07 (1)**
15:4

**5**

**5:11 (1)**
15:19

**6**

**6/12 (2)**
13:17,19
**630 (1)**
4:6
**67 (4)**
12:19 13:12 14:6,7

**7**

**8**

**9**

**90067 (1)**
3:21
**94580 (1)**
1:25

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **EMERGENCY MOTION BY DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (A) AUTHORIZING ASSUMPTION OF AGENCY AGREEMENT; (B) AUTHORIZING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO BANKRUPTCY CODE SECTIONS 363(B) AND (F); (C) APPROVING THE STORE CLOSING SALE GUIDELINES; (D) AUTHORIZING THE DEBTOR TO ABANDON; AND (E) AUTHORIZING LEASE REJECTION PROCEDURES WITH RESPECT TO THE CLOSING STORES PURSUANT TO SECTION 365; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 15, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Dustin P Branch**    dustin.branch@kattenlaw.com, jessica.mickelsen@kattenlaw.com;brian.huben@kattenlaw.com;adelle.shafer@kattenlaw.com;donna.carolo@kattenlaw.com
- **John-Patrick M Fritz**    jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com
- **David B Golubchik**    dbg@lnbyb.com, dbg@ecf.inforuptcy.com
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Eve H Karasik**    ehk@lnbyb.com
- **Lindsey L Smith**    lls@lnbyb.com, lls@ecf.inforuptcy.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov

**2.  SERVED BY UNITED STATES MAIL**: On **June 15, 2015**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 15, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Theodor C. Albert
United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5085 / Courtroom 5B
Santa Ana, CA 92701-4593

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 15, 2015 | Stephanie Reichert | */s/ Stephanie Reichert* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                **F 9013-3.1.PROOF.SERVICE**