DAVID B. GOLUBCHIK (SBN 185520)
EVE H. KARASIK (SBN 155356)
JULIET Y. OH (SBN 211414)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: dbg@lnbyb.com, ehk@lnbyb.com, jyo@lnbyb.com; lls@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>ANNA'S LINENS, INC.,<br><br>               Debtor. | ) Case No. 8:15-bk-13008-TA<br>)<br>) Chapter 11<br>)<br>)<br>)<br>) **DECLARATION OF J.E. RICK BUNKA**<br>) **IN SUPPORT OF DEBTOR'S**<br>) **EMERGENCY "FIRST DAY" MOTIONS**<br>)<br>) DATE:     June 16, 2015<br>) TIME:     2:00 p.m.<br>) PLACE:  Courtroom 5B<br>)            411 West Fourth Street<br>)            Santa Ana, California<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1

I, J.E. Rick Bunka, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.      I am the sole member of Point North, LLC, a financial advisory services firm that specialize in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. In my capacity as the sole member of Point North, LLC  I have been engaged as the Chief Financial Officer Anna's Linen's, Inc., the debtor and debtor in possession in the above-captioned bankruptcy case (the "Debtor" or "Anna's"), and am therefore familiar with the business operations and financial books and records of the Debtor.  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

3.      I have access to the Debtor's books and records.  I am familiar with the history, organization, operations and financial condition of the Debtor.  The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own personal knowledge and my knowledge of the Debtor's books and records.

4.      I make this declaration in support of the following emergency "first day" motions filed concurrently herewith by the Debtor:

a.   "Debtor's Emergency Motion For Entry Of An Order Authorizing Debtor To (A) Reject Certain Unexpired Non-Residential Real Property Leases Pursuant To 11 U.S.C. § 365, and (B) Abandon Any Remaining Personal Property Located At The Leased Premises" (the "Lease Rejection Motion").

b.   "Debtor's Emergency Motion For Entry Of An Order Limiting Notice And Related Relief" (the "Limit Notice Motion").

c.   "Debtor's Emergency Motion For Entry Of An Order Authorizing The Debtor To Honor Certain Prepetition Obligations To Customers" (the "Customer Programs Motion")

    d.   "Debtor's Emergency Motion For Authority To (1) Pay Pre-Petition Priority Wages; And (2) Honor Employment And Benefit Policies" (the "<u>Wage Motion</u>").

    e.   "Debtor's Emergency Motion For Entry Of An Order Authorizing The Debtor To provide Adequate Protection For Warehouse And Carrier Liens" (the "<u>Warehouse and Carriers Lien Motion</u>").

    f.   "Debtor's Emergency Motion For Entry Of An Order Authorizing The Debtor To Implement And Maintain Cash Management System" (the "<u>Cash Management Motion</u>").

    g.   "Emergency Motion By Debtor For Entry Of Interim And Final Orders: (A) Authorizing Assumption Of Agency Agreement; (B) Authorizing Sale Free And Clear Of All Liens, Claims, And Encumbrances Pursuant To Bankruptcy Code Sections 363(b) And (f); (C) Approving The Store Closing Sale Guidelines; (D) Authorizing The Debtor To Abandon; And (E) Authorizing Lease Rejection Procedures With Respect To The Closing Store Pursuant To Section 365" (the "<u>GOB Motion</u>").

## A.   **Background.**

1.   The Debtor, a Delaware corporation, filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") on June 14, 2015 (the "<u>Petition Date</u>").  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.   The Debtor is a leading specialty retailer offering high quality and stylish home textiles, furnishings, and décor at attractive prices.  The Debtor is headquartered in Costa Mesa, California, operates a chain of 261 company owned retail stores (the "Retail Stores") throughout 19 states in the United States (including Puerto Rico and Washington, D.C.), generates over $300 million in annual revenue, and employs a workforce of over 2,500.

3.   Over the last 25 years, the Debtor has built its store base through a clustering approach in key markets, including Los Angeles, Dallas, Chicago, Miami and Houston.  The Debtor has three distribution centers to support its nationwide presence in Fontana, California, Coppell, Texas, and Charlotte, North Carolina.  The Debtor leases its distribution centers, which are operated by third-party logistics providers.

4.      The Debtor employs a flexible small-box retail strategy with approximately 9,500 square foot stores with a focus on price, value, and expert customer service.  The Debtor's stores are typically located in high traffic strip centers in the heart of local neighborhoods that the stores are servicing. The Debtor also has developed an e-commerce platform that provides customers across the country with access to the Debtor's full merchandise assortment. The Debtor's model enables it to compete well with traditional self-service big box home retailers and discounters.

5.      The Debtor targets a large and growing segment of the United States population that values fashion, brand names and customer service, but is seeking high value and attractive price points. Merchandise is selected to appeal to its core customer base and is focused on domestic items such as bed linens, bath items, kitchen textiles, window drapes, and furniture covers, and certain home furnishing categories.

**B.    Events Leading To The Filing Of The Debtor's Chapter 11 Bankruptcy Case And Anticipated Exit Strategy.**

6.      The Debtor opened its first store in 1987, and by 2013, it had 309 stores.  Beginning in 2011, the Debtor started experiencing significant financial and operational challenges.  The Debtor was unsuccessful in some of its new markets such as Puerto Rico and St. Louis, and overbuilt otherwise healthy markets in response to its new television marketing.  In addition, the Debtor's core demographic changed as Generation X and Millennials replaced Baby Boomers as the primary home furnishing shoppers.   Merchandise did not resonate with the new shoppers, and aged and unfashionable inventory remained in the stores reaching a high of $380,000 per store by fiscal year 2013.  The Debtor's shift to "Every Day Low Prices" from promotions and in-store discounts as well as new expensive television advertising strategy did not attract customers.

7.      The over expansion and excess inventory led to increased indebtedness and, ultimately, a default with the Debtor's long-time lender, Union Bank.  In order to refinance the Debtor's obligations to Union Bank, the Debtor entered into a Credit Agreement with Salus Capital Partners, LLC, as Administrative Agent (in such capacity, the "Administrative Agent") and the

4

lenders party thereto (the "Lenders" and together with Salus, the "Secured Parties") for an $80 million line of credit on July 18, 2014 (the "Credit Agreement").

8.      On March 30, 2015 the Debtor notified the Administrative Agent of a Default or Event of Default for failure to maintain a specified Operating Expenditures to Gross Margin Dollars Ratio under the Credit Agreement.  On April 29, 2015, the Administrative Agent delivered to the Debtor a notice of Events of Default and Reservations of Rights based on the existing defaults under the Credit Agreement.  After negotiation between the Debtor and the Administrative Agent, the Administrative Agent and Lenders agreed to waive such Events of Default and, on May 13, 2015, the Administrative Agent delivered to the Debtor the "First Amendment and Waiver to the Credit Agreement" (the "First Amendment"). The First Amendment provided  a waiver of the Specific Defaults (as defined therein) and provided certain consents under amendments to the Credit Agreement including, without limitation, (i) increased availability through removal of an availability block, (ii) a requirement for the Debtor to deliver and abide by a Cash Flow Budget, (iii) an agreement by the Debtor to place specific milestones on activities with several projects that were already underway  and (iv) payment of certain fees and expenses.

9.      Over the resulting weeks, the Debtor's merchandise vendors significantly reduced delivery of anticipated merchandise resulting in an additional default of the Credit Agreement. As a result of the Credit Agreement defaults, and the inability of the Debtor to affect the Capital Transaction prepetition, the Debtor determined it was necessary to commence the Chapter 11 Case.

10.      Prepetition, the Debtor engaged in a process whereby simultaneously the Debtor negotiated with its largest vendors to convert certain trade payables into long term Junior Secured Notes Payables to create additional long term liquidity and, through its investment banker Wunderlich Securities, Inc. ("Wunderlich"), it pursued additional outside investments to recapitalize its balance sheet.  Wunderlich undertook a broad process in search of additional capital that included contacting over 200 investors and institutions. Wunderlich's efforts resulted in the receipt of multiple written indications of interest from potential acquirers and investors, including a Letter of Intent (the "LOI") from DW Partners, LP ("DW Partners"). The Debtor, in consultation with its advisers, determined

that the DW Partners' LOI was the highest and best received. The Debtor and DW Partners are currently in the process of negotiating a definitive asset purchase agreement for a going concern transaction (the "Going Concern Transaction" and the "Going Concern APA"). The Debtor is using best efforts to achieve a transaction that will preserve the Debtor's business operations, which will preserve jobs of thousands of employees, going forward customer for the Debtor's vendors and the Debtor's continuing support of the local communities in which the Debtor's stores operate. The debtor believes that they have until Friday, June 19, 2015 to execute the Going Concern APA. Any such Going Concern APA would require the consent of the Administrative Agent. If the Debtor enters into the Going Concern Transaction by such date and Administrative Agent consent is received, then Debtor intends to go forward with a Bankruptcy Code section 363 sale and auction process with DW Partners as the stalking horse purchaser.

11.    As required by the First Amendment, the Debtor has also engaged in a process to identify and select a stalking horse bidder for the possible sale and/or liquidation of the business as an alternative to the Going Concern Transaction.   The Debtor's efforts to retain a liquidator resulted in the execution of the Stalking Horse Agency Agreement with a joint venture comprised of Tiger Capital Group ("Tiger") and Yellen Partners, LLC ("Yellen" together with Tiger, "Tiger/Yellen Stalking Horse"), which included a guarantee from Tiger/Yellen Stalking Horse that the Debtor would receive 93.5% of the aggregate Cost Value of the Merchandise (terms as defined in the Stalking Horse Agency Agreement), subject to certain adjustments, Further, as a result of the default, an auction was held on June 9, 2015 and June 10, 2015 at which the Tiger/Yellen Stalking Horse was outbid by a group formed by Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Agent" or "Hilco/GB"), which included an increase in the guarantee to 111% of the Cost Value of the Merchandise with a Merchandise Threshold (terms as defined in the Agency Agreement, defined below) of not less than $61.5 million and not more than $67 million, subject to certain adjustments. The Debtor and the Agent, with the approval of the Administrative Agent, signed the Agency Agreement (the "Agency Agreement") on June 11, 2015. A true and correct copy of the Agency Agreement is attached as **Exhibit C** to the GOB Motion.

12.     The Debtor and the Administrative Agent agreed that if the Going Concern APA is executed and Administrative Agent consent to such Going Concern APA is received, the Agency Agreement will convert to an equity transaction for a lesser number of stores, allowing the Debtor to pursue an alternative exit strategy for the Chapter 11 Case. If the Debtor enters into the Going Concern Transaction by the deadline that is acceptable to the Administrative Agent, then the Debtor will pursue a sale of substantially all of its assets pursuant to Bankruptcy Code section 363. If the Debtor does not enter into such a Going Concern Transaction, then the Debtor will conduct store closing sales pursuant to the Agency Agreement.

**C.      The Lease Rejection Motion.**

13.     All of the premises from which the Debtor operates the Retail Stores are leased by the Debtor.

14.     Prior to the Petition Date, the Debtor made significant efforts to streamline its operations and reduce operating expenses, both at the corporate overhead level and at the Retail Stores level.  However, notwithstanding the Debtor's efforts, the Debtor has not been able to generate the revenues necessary to sustain operations at all of its existing Retail Stores.

15.     The Debtor and I have analyzed the performance of its existing Retail Stores to determine which of the Retail Stores are underperforming.  Based upon such analysis, the Debtor and I have identified a total of 8 Retail Stores that are among the least profitable store locations and/or stores that erode performance in adjacent stores which the Debtor and I have determined, in the exercise of our business judgment, should be closed without delay (collectively, the "Closing Stores").  A list which identifies the Closing Stores and their addresses, as well as the names and addresses of the landlords for the Closing Stores is attached as **Exhibit "A"** to the Lease Rejection Motion and is incorporated herein by reference.

16.     Attached as **Exhibit "B"** to the Lease Rejection Motion are the income statements for each of the Closing Stores for the twelve-month period preceding the Petition Date, which reflect that the Closing Stores were (or are) operating at a net loss or at a small net profit (which, after taking into

account the Debtor's distribution and corporate overhead expenses, results in an operation that is ultimately not profitable).

17.    I believe that the rent and other obligations payable under the Leases are generally at or above the current market. Accordingly, I do not believe that the marketing and assignment of the Leases to third parties would result in any net recovery for its bankruptcy estate.

18.    For the reasons noted above and in the Lease Rejection Motion, the Debtor is seeking the entry of an order authorizing the Debtor to immediately reject the unexpired non-residential real property leases (collectively, the "Leases," and individually a "Lease") for the Closing Stores identified in **Exhibit "A"** to the Lease Rejection Motion.

19.    Although the Debtor was continuing to occupy the Closing Stores as of the Petition Date, I anticipate that the Debtor will be vacating the Closing Stores shortly, specifically, on the dates set forth in **Exhibit "A"** to the Lease Rejection Motion.

20.    Pursuant to the Lease Rejection Motion, the Debtor seeks to reject each of the Leases for the Closing Stores effective as of the date on which the Debtor actually vacates such leased premises and provides notice to the applicable landlord thereof (the "Actual Vacate Date").

21.    Given the Debtor's and my determination that the Closing Stores are unprofitable store locations, I submit that each day that such Closing Stores remain open results in significant financial losses (and increased administrative expense) to the Debtor's bankruptcy estate, which I submit must be avoided to preserve the value of the Debtor's assets, conserve the Debtor's resources and cash, and maximize the Debtor's ability to successfully reorganize in this case. As such, I have determined that having to file the Lease Rejection Motion to obtain Court authority to reject the Leases on regular notice would result in a material loss of the Debtor's cash and accrual of administrative claims for unpaid rent, with no benefit to the estate.

22.    Additionally, I have determined, in my reasonable business judgment, that there is no net benefit that can be realized from an attempt to market and assign the Leases for the Closing Stores.  As a result, I have determined that the cost to the Debtor of continuing to occupy the Closing Stores, and of performing its obligations under the Leases for the Closing Stores and incurring

unnecessary administrative expenses, is burdensome, and that rejection of the Leases for the Closing Stores is therefore in the best interests of the Debtor's estate and creditors.

23.    I believe that the Debtor will remove all owned personal property assets (the "Remaining Personal Property") located at the Closing Stores as of the Actual Vacate Date. However, out of an abundance of caution and solely to the extent that the Debtor retained (or retains) any ownership interest in any Remaining Personal Property, pursuant to the Lease Rejection Motion, the Debtor seeks authority to abandon any Remaining Personal Property that remain at the Closing Stores as of the Actual Vacate Date.

24.    I believe that the costs associated with liquidating any Remaining Personal Property at the Closing Stores will likely approach or exceed the value of such assets.  Accordingly, I believe that the Remaining Personal Property at the Closing Stores, if any, have inconsequential value to the Debtor's estate and should be abandoned as requested in the Lease Rejection Motion.

**D.    The Limit Notice Motion.**

25.    Based on the Debtor's books and records, the Debtor has more than 10,000 creditors and more than 96 equity security holders and 128 option holders. I submit that many of the motions and applications that will be filed in this will not actually affect a majority of creditors or equity interest holders.

26.    I expect that administrative costs will be reduced as a result of the noticing procedures proposed in the Limit Notice Motion and would like to effectuate such reductions in costs as soon as practicable.  Therefore, I believe that bringing this request on an emergency basis is warranted.

27.    I believe that the adoption of the proposed procedures set forth in the Limit Notice Motion is necessary and appropriate for at least four reasons. First, having to provide notice of all such matters to all creditors may delay and hamper the conduct of the Debtor's business and impede the consummation of transactions and negotiation of settlements which may be advantageous to the Debtor's estate and creditors.  I submit that allowing for the form of notice requested in the Limit Notice Motion will allow the Debtor to better focus its energies on maximizing value for creditors and the estate. Second, I submit that sending notice to all creditors would substantially increase the

copying and postage costs of this case, resulting in less value being potentially available to the estate. Third, any party in interest who is sufficiently interested in the kinds of transactions that are the subject of the requested limitation of notice may, by special request, receive all notices.  Fourth, any party against who direct relief is sought by a motion, application or otherwise, will be afforded notice by the Debtor as a matter of course.

28.    I anticipate that the involvement of all such parties in interest and the potential (and likely) presence of an Official Unsecured Creditors Committee in this case will ensure adequate representation of the interests of holders of claims and interests generally in the course of this case and in the evaluation of the actions proposed to be taken as described in the notices to be given.

29.    I believe that the Debtor's requested relief in the Limit Notice Motion will reduce the burden, complication, delay, and cost to the Debtor's estate associated with mailing notice of all pleadings and other papers filed in this case to all creditors without significantly impacting creditors' participation in this case.

**E.    <u>The Customer Programs Motion.</u>**

30.    The Debtor has instituted several customer programs to remain competitive and to enhance its customer base. As of the Petition Date, the Debtor's customer programs (collectively, the "<u>Customer Programs</u>") consist of the following:

i.    <u>Merchandise Credits</u>.  Merchandise credits arise when a customer purchases a product in the store and later returns the product to the store without a receipt. Rather than provide the customer with a cash refund, the store gives the customer a credit that can be applied, up to the amount of the credit, to purchase goods in the store. Merchandise credits do not expire. I believe that the outstanding obligations on account of unredeemed merchandise credit totals approximately $1,794,000 as of the Petition Date. Historically, 91.8% of the merchandise credits are redeemed by customers.  This balance represents credits issued over several years.

ii.    <u>Gift Cards</u>.  The Debtor sells gift cards in all denominations starting from $5.00 to $200.00 that are valid towards future purchases of product from the Debtor's

stores. Gift Cards are sold at the Debtor's stores and online, and cannot be redeemed for cash. Gift Cards can be reloaded and balances checked at any of the Debtor's stores and online and do not expire. I believe that the outstanding obligations on account of unredeemed Gift Cards total approximately $506,000.00 as of the Petition Date. Historically, 93.5% of the gift cards issued is redeemed by customers.  This balance represents Gift Cards issued over several years.

     iii.     <u>Advertising Programs</u>. The Debtor regularly sends out coupons through newspapers and other publications and by mail to the public (the "<u>Coupon Program</u>").  The Coupon Program generally consists of promotional specials or discount amounts that enable guests to apply the amount of the coupon against their bill during a pre-defined period. Once the predefined period lapses, the discounts are no longer valid. The Coupon Program also includes the "club cash" program, which allows a customer to earn cash dollars for a qualified purchase of a specified dollar value of goods during a specified time period and redeem the club cash during a separate shopping period, which is generally the following two week period. Typically, the "club cash" program offers a customer between $5.00 to $30.00 of club cash for qualified purchases between $25.00 to $100.00.

31.    The Customer Programs have been provided in the Debtor's ordinary course of business and I believe that the Customer Programs are essential for the Debtor to stay competitive in its industry. The Debtor's customers are familiar with the Customer Programs and expect the benefits they receive from them. I believe that the success of the Debtor's business, and the ability for the Debtor to successfully reorganize and/or to maximize value for creditors is completely dependent upon the loyalty and confidence of their customers. I believe that any delay in honoring the Customer Programs obligations likely will create customer dissatisfaction and frustration, causing customers to offer their business to the Debtor's competitors.

32.    Absent the relief requested in the Customer Programs Motion, I believe that the Debtor's customer relations will be severely and irreparably harmed at a time when customer

loyalty and patronage is extremely critical to the Debtor and the Debtor's ability to maximize value for the benefit of all of the parties.

33.    In the event the Debtor does not pursue the Going Concern Transaction described above, the Debtor will honor the Customer Programs in accordance with the Agency Agreement, which provides for the going out of business sale liquidation of the Debtor's stores. The Agency Agreement provides certain limits for the acceptance of gift cards and merchandise credit, which provides that gift cards and merchandise credit will be honored for 30 days after the Petition Date. The Agency Agreement also contains specific provisions regarding the acceptance of coupons, including the limitation of time for acceptance of coupons.

34.    The customers are individuals and the amounts due the customers under the Customer Programs arise in connection with the purchase of household goods. I believe the prepetition obligations due to the customers on an individual basis will not exceed the $2,775 per individual priority amount.

**F.    The Wage Motion.**

35.    As of the Petition Date, the Debtor employed approximately 2,500 non-insider employees (collectively, the "Employees," and each, an "Employee"). All of the Employees are paid on a bi-weekly basis (*i.e.*, every other Friday), approximately one week in arrears. So, for example, the payroll paid prior to the commencement of the Chapter 11 Case, on Friday, June 5, 2015, covered the two-week period from Monday, May 18, 2015 through and including Sunday, May 31, 2015.

36.    The Debtor utilizes a payroll service, Automatic Data Processing, Inc. ("ADP"), to process the payment of wages and commissions, including paid vacation, sick and leave pay (collectively, "Wages") to its Employees. Generally, the funds necessary for the payment of Wages must be transferred to ADP by the Wednesday before each payroll date to ensure that the Wages are paid to the Employees (either by check or direct deposit into the Employees' bank accounts) by the payroll date.

37.    As noted above, on Friday, June 5, 2015, the Debtor paid Wages to its Employees for the two-week period from Monday, May 18, 2015 through and including Sunday, May 31, 2015. On

Friday, June 19, 2015, the Debtor will owe Wages to its Employees for the two-week period from Monday, June 1, 2015 through and including Sunday, June 14, 2015 – fourteen (14) days of which will constitute pre-petition obligations.

38.    I estimate that the total payroll obligations due on each payroll date (*i.e.*, on Friday, June 19, 2015), including all payroll taxes, will be approximately $1,941,550.

39.    The wage amounts must be transferred to the Debtor's payroll service, ADP, by the Wednesday before each payroll date, and the payroll tax amounts must be paid the following day via ACH debit. So, for example, the payroll amount for the Wages due on Friday, June 19, 2015 must be transferred to ADP **by Wednesday, June 17, 2015** to ensure that there is no interruption in the payment of the Employees' Wages.

40.    Pursuant to the Wage Motion, the Debtor is ***not*** seeking authority to pay the pre-petition priority Wages of any employees who are, or may be considered, "insiders" within the definition of Section 101(31) of the Bankruptcy Code. The Employees who are the subject of the Wage Motion do not include any "insider" employees of the Debtor. Approval to pay compensation to the Debtor's "insider" employees will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

41.    The Debtor also provides its employees with certain employment and benefit programs comparable to the programs which are typically offered by other employers within the industry. The following employment and benefit programs are proposed to be continued to be offered to the Debtor's Employees post-petition:

    a.    ***Vacation Time, Paid Holidays, And Sick Leave Policies***. The Debtor offers a paid vacation time policy, a paid holiday policy, and a sick leave policy for certain full-time Employees. Depending on their positions, full-time Employees begin earning paid vacation either on their start date (for Regional Directors and District Managers), after six (6) months of employment (for Store Managers and Assistant Managers), or after one full year of employment (for Supervisors and Associates). Generally, however, the accrual rates for vacation time are as follows (all based on actual regular hours worked): (i) Regional Directors

– up to 3 weeks per year; (ii) District Managers and Store Managers – up to 2 weeks per year (through the first 5 years of service), then up to 3 weeks per year (after 5 years of service); (iii) Assistant Managers – up to 1 week per year (through the first 2 years of service), then up to 2 weeks per year (after 2 years of service); and (iv) Supervisors and Associates – up to 1 week per year.  Unused accrued vacation time may be carried forward subject to a vacation accrual cap (*i.e.*, vacation accrual cap is 1.5x the normal accrual).  So, for example, those Employees who accrue one week per year are capped at 7.5 days.  Once the foregoing maximum is reached, further vacation accrual will stop.  Employees are not permitted to "cash out" their unused accrued vacation time at any time but may be entitled under certain circumstances to receive any unused accrued vacation time upon termination of their employment. However, the Debtor will not "cash out" unused accrued vacation time unless such payment is required by law.

The Debtor also offers four (4) paid holidays to full-time salaried store Employees (*i.e.*, New Year's Day, Easter Sunday, Thanksgiving Day, and Christmas), effective upon hire. The Debtor also offers seven (7) paid holidays to all full-time salaried corporate Employees (*i.e.*, New Year's Day, Memorial Day, Labor Day, Thanksgiving Day, Christmas Day, Birthday, and Fourth of July) effective upon hire. Hourly Employees who work on one of the foregoing recognized holidays receives holiday pay at one and one-half times their regular hourly rates.  Hourly Employees who do not work on a recognized holiday do not get paid for such holiday.

In addition, certain Employees – specifically, Regional Directors, District Managers, Store Managers and Assistant Managers – are provided paid sick leave benefits by the Debtor. Generally, after completing a waiting period of 90 calendar days, Regional Directors, District Managers and Store Managers are eligible for sick leave benefits at the rate of 5 days per calendar year, and Assistant Managers are eligible for sick leave benefits at the rate of 3 days per calendar year.

b.    ***Health Insurance Policies***.    Certain Employees – specifically, Regional Directors, District Managers, Store Managers and their dependents – are eligible, beginning on the first of the month following 30 full days of employment, to receive company-subsidized medical insurance coverage (through Anthem, Kaiser, or Triple S in Puerto Rico), dental insurance coverage, and vision insurance coverage.    The Debtor subsidizes approximately 60% of the premiums for medical insurance coverage for the eligible Employees and their dependents.    Eligible Employees are responsible for paying 100% of the premiums for dental and vision insurance coverage.

c.    ***401(K) Plan Policy.***    Certain Employees – specifically, District Managers, Store Managers, Assistant Managers and Supervisors – are eligible, after thirty (30) days of employment, to participate in the Debtor's 401(k) plan, which is administered by Voya Financial.    The Debtor's 401(k) plan allows eligible Employees to contribute to the 401(k) plan (up to the current IRS maximum) through payroll deductions.    The Debtor is no longer matching Employees' contributions to the 401(k) plan.    The Debtor desires to continue having its existing 401(k) policy in effect and therefore, seeks authority to continue to honor such policy post-petition.

d.    ***Flex Spending Accounts Program.***    All Employees are eligible to participate in the Debtor's flexible spending accounts program, which is administered by eFlexGroup. The Debtor's flexible spending accounts program allows Employees to contribute up to $2,550 per year to a medical expense flexible spending account, and up to $5,000 per year to a dependent care flexible spending account, on a pre-tax basis through payroll deductions.

42.    The source of the funds to be used to pay and/or honor the pre-petition Wages and to continue honoring the Debtor's employment and benefit policies will be the Debtor's revenue and proceeds from debtor-in-possession financing. The revenue generated by the Debtor constitutes Administrative Agent's and the DIP Financing Agent's cash collateral.  Accordingly, concurrently herewith, the Debtor has filed a motion for entry of an order authorizing the Debtor to, among other things, use cash collateral and obtain DIP financing to allow the Debtor to maintain its business

operations and preserve the value of the Debtor's assets.  Based on the operating budget submitted in connection with the Debtor's DIP Financing/cash collateral motion, I submit that approval to pay and/or honor the Employees' Wages will not render the Debtor's bankruptcy estate administratively insolvent.

43.    All of the Employees who are the subject of the Wage Motion are still employed by the Debtor.

44.    I believe that significantly all of the Employees will quit if they are not paid their salaries and benefits in full in a timely fashion.  This is particularly true given that some of the Employees work on a part-time basis, and the majority of the Employees are paid on an hourly basis. I submit that such employees would have little incentive to continue working for the Debtor and could very acquire new employment elsewhere.  As a retail business, I believe that it is crucial for the Debtor to retain a sufficient number of full-time and part-time Employees to operate each of its retail stores as well as its corporate offices.  The Debtor must retain the Employees to continue its business operations without interruption and preserve and maximize the value of its assets during this Chapter 11 Case. The Debtor's personnel are familiar with the Debtor's operations and business philosophy, and, thus, essential to the preservation of the Debtor's business.  Therefore, I believe that the Debtor's failure to pay pre-petition Wages to the Employees and honor the Debtor's employment and benefit policies will likely result in severe disruptions to the Debtor's operations to the detriment of this case.  The Debtor's ability to preserve the full value of its business and assets depends upon the Debtor's continued operations, which cannot occur without the efforts of the Employees.

45.    In order to attract and retain the Employees, the Debtor maintains what I believe are competitive and reasonable employment and benefit policies.  I believe that maintaining good relationships with, and the morale of, the Employees requires continuing to honor the employment and benefit policies currently in effect for the Employees.

46.    I believe that retention of employees is critical for the Debtor to maximize the value of its business and assets for the benefit of creditors and the estate.

47.      All of the Employees' claims for pre-petition Wages are within the $12,475 limit established by 11 U.S.C. § 507(a)(4).

**G.      The Warehouse and Carriers Lien Motion.**

48.      The Debtor has three distribution centers to support its nationwide presence located in Fontana, California, Coppell, Texas, and Charlotte, North Carolina. The Debtor leases its distribution centers, which are operated by third-party logistics providers.  The Debtor's supply chain involves a complex global system of purchase orders from across the world, international shipments of inventory on ocean carriers, receipt at ports, storage at warehouses, and delivery by land carriers.  At each stage, these various carriers and warehouses hold possessory liens by way of contractual liens, warehouse liens, and carrier's liens by way of documents of title, bills of lading, and warehouse receipts

49.      I believe that the exercise of possessory lien rights and withholding of inventory would be extremely disruptive to the Debtor's business and would severely reduce the value of the Debtor's enterprise, whether as a going concern or in an orderly liquidation.  For the preservation of the estate, it is imperative that the Debtor's logistics, shipment, storage, and delivery of inventory continue unimpaired.

50.      The table below sets forth the identity of the creditors holding Possessory Liens (the "Possessory Lien Creditors"), the types of their liens, their roles in the Debtor's operations, the amount of their prepetition claims, and the value of inventory and goods in their possession as of the Petition Date (estimated, as such inventory and goods are in flux as they pass from ship to port to truck to warehouse to truck and to store):

| Creditor | Type of Lien | Role | Claim | Value of Goods |
|---|---|---|---|---|
| American Pres. Lines | Carrier's Lien | Carrier | $29,874 | ------[1] |
| CMA CGM | Carrier's Lien | Carrier | $126,184 | $1,321,178 |

[1]  Although two carriers, American Presidential Lines and Crowley Liner Services, do not have any of the Debtor's goods in their possession at the time of the filing of the Warehouse Lien Motion, the Debtor uses both carriers' services, and goods will come into their possession in the ordinary course of business, at which time they will acquire carrier's liens for their claims. Accordingly, they are included in the chart and the Warehouse and Carriers Lien Motion and relief requested therein.

| Crowley Liner | Carrier's Lien | Carrier | $27,770 | ------ |
|---|---|---|---|---|
| US Lines LLC | Carrier's Lien | Carrier | $187,208 | $194,163 |
| Evans Delivery Co. | Carrier's Lien | Land Carrier | $75,877 | $250,000 |
| Transplace Texas LP | Carrier's Lien | Land Carrier | $1,235,375 | $1,550,782 |
| Excel Inc. | Warehouse Lien | Warehouse | $717,689 | $6,726,611 |
| Expeditors Intl. | Warehouse Lien | Warehouse | ------ | $315,367 |
| Performance Team | Warehouse Lien | Warehouse | $708,258 | $9,595,927 |

51.     The value of goods in the possession of the Possessory Lien Creditors, as expressed in the table above, is the inventory value at cost.  If sold through Anna's stores, the value will be considerably higher. By contrast, I submit that if the warehouses or carriers sold the goods through warehouseman's or carrier's lien sale under the UCC, the value would likely be even lower than the cost value expressed in the table. I believe that as long as the Debtor can continue to operate, it can sell the goods and inventory at retail value and provide more cash to make regular payments to the Possessory Lien Creditors, generate more cash to operate, and ultimately, provide more cash to pay other creditors of the estate.

**H.     Cash Management Motion.**

52.     The Debtor's existing prepetition cash management system is fairly standard and is comprised of several depository accounts that sweep daily into a single store depository account at Union Bank (the "Union Bank Store Depository Account").[2] The funds then are immediately transferred to the Salus bank account. The Administrative Agent's funds the Debtor's advance requests by sending funds to the Debtor's main concentration account at Union Bank (the "Union Bank Concentration Account"). The Debtor's disbursements are made by funds transferred from the Union Bank Concentration Account to three zero balance accounts or through ACH transfers to third parties. A true and correct depiction of the cash flow through the Debtor's existing cash management system is attached to the Cash Management Motion in the Chart attached as **Exhibit**

---

[2] Weekend receipts are not posted to the Union Bank Store Depository Account until Monday of the following week.

1    "A." [3]

2       53.    As reflected in the Chart, the Debtor's main store depository account is at Union

3    Bank, Account # 45010-49912. Approximately, two-thirds (2/3) of the stores make daily cash and

4    check deposits to Wells Fargo Bank branches or cash vaults via armored car services and these

5    funds are held in the Wells Fargo Account # 4126-03666. Of the remaining approximately one-third

6    (1/3) of the stores, sixty-nine (69) make daily deposits of checks and cash into branch locations or

7    via armored car services into the Union Bank Store Depository Account.  Eight (8) make daily

8    deposits of cash and checks into to JP Morgan Chase branches or cash vaults via armored car

9    services and these funds are held in the JP Morgan Chase Account # 685852287.  Eight (8) stores

10   make daily deposits of cash and checks to Capital One Bank branches or cash vaults and these

11   funds are held in the Capital One Account # 882109062.  Lastly, the Debtor's four (4) stores in

12   Puerto Rico deposit cash and checks at Banco Popular cash vaults and these funds are held in the

13   Banco Popular Account # 030-835015.

14       54.    Except for the Banco Popular Account funds, the store deposits held in the Wells

15   Fargo, Bank One and Capital One Accounts are swept the next day after receipt into the Union

16   Bank Store Depository Account. The Banco Popular Account funds are transferred first to a Banco

17   Popular concentration account (Account # 030-834074) (the "BP Concentration Account") and then

18   the store deposits immediately are transferred into the Union Bank Store Depository Account.

19       55.    For store locations that do not make deposits into the local branches, the Debtor

20   contracts armored car service providers to pick up deposits at the Debtors store locations and

21   delivers the deposits to the respective depository bank's cash vault.  Approximately, 188 locations

22   or 72% of the Debtor's locations are serviced by one of three armored car service providers: Garda

23   (95% of stores serviced), Brinks (3% of serviced stores) and Ranger American (2% of serviced

24   stores).

25       56.    In addition to the store depository accounts, the Debtor has a Union Bank account

26

27   [3] The Debtor also maintains a cash collateral account with a $5.1 million balance at Union Bank (Account
     # 4500184936) (the "Cash Collateral Account").  The account secures standby letters of credit issued
     to the Debtor's workers compensation insurance companies by Union Bank.

28

(Account # 45010-49847) that receives all net credit card receipts for store purchases ("Credit Card Receipt Account"). These receipts are transferred daily to the Union Bank Store Depository Account.

57.    The Debtor also maintains a separate debit card account at Banco Popular that receives all store purchases made by customers on debit cards in Puerto Rico.  These debit card receipts are transferred daily to the BP Concentration Account, which then transfers the funds to the Union Bank Store Depository Account.

58.    Finally, the Debtor also has two separate accounts at Wells Fargo and Union Bank that it uses to provide change for use in the stores.

59.    As noted above, the funds from the Debtor's Union Bank Store Depository Account are swept daily into the Administrative Agent bank account and the Administrative Agent advances funds to the Debtor based on funding requests made by the Debtor to the Administrative Agent. The advanced funds are transferred to the Union Bank Concentration Account.

60.    The Debtor makes all of its disbursements from the Union Bank Concentration Account. There are three zero-balance accounts at Union Bank through which the Debtor makes payments (the "Disbursement Accounts").  These accounts are the Manual Payroll Account, Account # 45010-49888, the Controlled Disbursement Account, Account # 908-001-3598, and the Sales Tax Account, Account # 45010-49904.  The Debtor uses the Manual Payroll Account for interim corrections and adjustments to the bi-weekly payroll, to pay terminated employees as required by applicable law, to fund emergency loans for employees and other miscellaneous payroll related payments. The Debtor uses the Sales Tax Account to pay all sales taxes due on store sales. The Controlled Disbursement Account is used to make payments on all other disbursements.

61.    The Debtor also makes ACH transfers out of the Union Bank Concentration Account for certain taxes, workers compensation payments, United States customs fees, employee expense reimbursements, direct import payments, credit card fees, certain professional fees, and monthly check guarantee payments.

62.    Pospetition the Debtor proposes to maintain certain of its prepetition bank accounts.

The Debtor will maintain all of its store depository accounts, including the Union Bank Store Depository Account. Over time, the Debtor will change these store depository accounts to Wells Fargo accounts. The Debtor will also maintain the Cash Collateral Account, the BP Concentration Account, the Credit Card Receipts Account and the two change accounts. No funds are disbursed from these prepetition accounts to third parties so there is no risk that prepetition debts will be paid out of these accounts. Also, these are all either banks on the U.S. Trustee approved list of banks and/or have deposits within the FDIC insurance limits.

63.    The Debtor will open new accounts at Wells Fargo Bank and these will be designated as DIP Accounts. These accounts will include a new concentration account (the "Wells Fargo Concentration Account") and the Administrative Agent bank account will advance funds to this new account. The Debtor will maintain the Union Bank Store Depository Account until the store depository accounts can be converted to Wells Fargo accounts. The funds deposited or received in the Union Bank Store Depository Account will be deposited in the Wells Fargo Concentration Account. All of the Debtor's disbursements will come from the Wells Fargo Concentration Account, including all ACH, Fedwire and similar transfers to third parties. The Debtor also will close the existing Disbursement Accounts and open three new disbursement accounts at Wells Fargo (the "Wells Fargo Bank Disbursement Accounts"). The three new Wells Fargo Disbursement Accounts will be respectively designated for (i) payroll, (ii) payment of taxes, including sales taxes, and (iii) all other disbursements. In addition, the Debtor will also open a Utility Deposit DIP Account to hold the proposed aggregate deposit for the utilities to provide adequate assurance pursuant to section 366 of the Bankruptcy Code. All of the new accounts will have deposit and control agreements that are acceptable to the agent under the debtor in possession financing approved by the Court.

64.    I believe that if the requirement to close all prepetition bank accounts is enforced in this case, such requirement would cause enormous disruption in the Debtor's business and would impair the Debtor's efforts to pursue alternatives to maximize the value of its estate.  I submit that the bank accounts comprise an established cash management system that the Debtor needs to

maintain in order to ensure smooth collections and disbursements in the ordinary course.

65.    I believe that the operation of the Debtor's business requires that the Debtor be permitted to use certain of its prepetition bank accounts in its existing cash management system during the pendency of this chapter 11 case.  I believe that requiring the Debtor to open new accounts for the store depository and other receipt and miscellaneous accounts identified above at this early and critical stage of these cases would be expensive, would create unnecessary administrative problems, and would be much more disruptive than productive. I further believe that any disruption could have a severe and adverse impact upon the Debtor's ability to reorganize. Moreover, as a practical matter, requiring the Debtor to close and open all bank accounts in its cash management system would result in the incurrence of substantial additional costs and expenses to the Debtor's bankruptcy estate and a significant disruption of the Debtor's business operations. Consequently, I submit that maintenance of certain of the bank accounts in the Debtor's existing cash management system is not only essential but is in the best interests of all creditors and other parties in interest.

66.    The Debtor's cash management system is complex, highly automated and computerized. This allows the Debtor to centrally manage all of its cash flow needs and includes the necessary accounting controls to enable the Debtor, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  The Debtor will continue to maintain detailed records reflecting all transfers of funds.

67.    I believe that changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtor's estate and disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor.

68.    The Debtor's assets consist of, among other things, cash, cash equivalents and deposit accounts.  On the Petition Date, and except for the funds in the store depository accounts, including the main store depository accounts, the Debtor had no funds invested in time deposits or in any other forms of investments.

69.    I believe that the banks at which they maintain bank accounts are financially stable banking institutions and, in the United States, are FDIC insured (up to an applicable unit per account).   All such deposits and investments are prudent and designed to yield the maximum reasonable net return on the funds invested, taking into account the safety of such deposits and investments.

70.    The debtor's depository bank accounts and main concentration account are with domestic banks of substantial financial strength, as evaluated by renowned investment rating firms. The requirement of obtaining a bond secured by the undertaking of a corporate surety from each of the numerous financial institutions with which the Debtor deposit or invest funds would be prohibitively expensive,  administratively burdensome, and not necessarily more secure than the Debtor's existing banks.

## I.    The GOB Motion.[4]

69.    The Debtor distributed a request for proposal to each of the national liquidation firms, pursuant to which the Debtor solicited bids to serve as the Debtor's agent to conduct a "going out of business", "store closing' or similar themed sale at the Debtor's retail store locations, with each such bid to be submitted based upon a form agency agreement that was acceptable to the Debtor, the Administrative Agent and the Lenders (the "Request for Proposal"). The Debtor received three bids in response to its Request for Proposal, following which, the Debtor, in consultation with the Administrative Agent and the Lenders, negotiated the terms of an Agency Agreement, dated June 5, 2015, with Tiger/Yellen Stalking Horse which Agency Agreement served as the "stalking horse" against which all bids submitted at the subsequent auction would be measured (the "Stalking Horse Agency Agreement"). The Stalking Horse Agency Agreement provided for (i) a guaranteed recovery of 93.5% of the aggregate Cost Value of the Merchandise (the "Stalking Horse Guaranteed Amount'), with a Merchandise Threshold of not less than $61.5 million (terms as defined in the Agency Agreement), subject to certain adjustments; plus (ii) a

---

[4] All terms not defined in this section shall have the same meanings afforded to them as in the GOB Motion.

potential sharing recovery from the Proceeds of the Sale of Merchandise and Additional Agent

Merchandise, pursuant to a sharing formula set forth in the Stalking Horse Agency Agreement, after

recovery by the Agent of the Guaranteed Amount, Expenses, and the Agent's Fee (as each such

term is defined in the Stalking Horse Agency Agreement; plus (iii) 80% of the proceeds from the

sale of Owned FF&E (net of sales taxes); plus (iv) 80% of the sale proceeds from the sale of certain

of the Debtor's owned inventory (defined in the Stalking Horse Agency Agreement as "Merchant

Consignment Goods") that does not otherwise constitute "Merchandise" under the Agency

Agreement.    At the conclusion of a two day auction that was  held on June 9 and 10, 2015 (the

"Auction")[5] the joint venture comprising the Agent was the successful bidder, with a final bid of (i)

a guaranteed recovery of 111% of the aggregate Cost Value of the Merchandise (the "Guaranteed

Amount") with a Merchandise Threshold of not less than $61.5 million (terms as defined in the

Agency Agreement), subject to certain adjustments; plus (ii) the same potential sharing recovery

from the Proceeds of the Sale of Merchandise and Additional Agent Merchandise as provided for in

the Stalking Horse Agency Agreement; plus (iii) the same 80% share of the sale proceeds from the

sale of Merchant Consignment Goods; plus (iv) the Agent retained the right to sell the Owned

FF&E in the Stores, Distribution Centers and the Corporate Office, bore all of the expenses in

connection with such disposition and retained all of the proceeds from the sale of the Owned FF&E.

The Debtor and the Agent with approval of Admnistrative Agent and the Secured Parties signed the

Agency Agreement on June 11, 2015 and the Sale commenced on June 12, 2015.

70.    In consideration of the time, effort and commitment expended by  the Tiger/Yellen

Stalking Horse in negotiating the Stalking Horse Agency Agreement and the identification and

quantification of the assets of the Debtor, as well the service rendered by the Tiger/Yellen Stalking

Horse in providing a floor and agreed terms for bids at the Auction as a stalking-horse bidder,

subject to certain limitations not at issue here, Section 16.11 of the Stalking Horse Agency

---

[5]    In addition to the Tiger/Yellen Stalking Horse and the Hilco/GB joint venture, there were two
other bidding groups, namely: (i) Great American; and (ii) SB Capital Group, LLC.  These four
bidding groups represent all of the national liquidation firms with the logistical and financial
resources necessary to conduct a sale of this size.

Agreement provided:

> (i)     the Tiger/Yellen Stalking Horse would be provided with a break-up fee of $650,000, plus an expense reimbursement of up to $350,000 for reasonable fees and expenses of its legal, accounting and financial advisors and the out-of-pocket costs and expenses incurred by the Stalking Horse in connection with conducting due diligence and the negotiation, documentation and implementation of the Stalking Horse Agency Agreement and the transactions contemplated thereby (collectively, the "<u>Bid Protections</u>") in the event that the Stalking Horse was not the successful bidder at the ;

> (ii)     the Initial Overbid at the Auction had to be for an amount not less than the sum of (x) the Stalking Horse Guaranteed Amount; (y) the Bid Protections, plus (z) an amount equal to 1.5% of the aggregate Cost Value of the Merchandise; and

> (iii)     each competing bidder at the Auction had to agree to reimburse any signage costs incurred by the Tiger/Yellen Stalking Horse prior to the Auction, in an amount not to exceed $2,900 per store if the Tiger/Yellen Stalking Horse was overbid at the auction and under certain other circumstances  as described in the Stalking Horse Agreement. [6]

71.    A work fee in the amount of $200,000 paid by the Debtor to the Tiger/Yellen Stalking Horse concurrently with the entrance into the Stalking Horse Agency Agreement would be applied to the Bid Protections if the Tiger/Yellen Stalking Horse was not the successful bidder at the Auction.    Under the original terms of the Stalking Horse Agency Agreement, the Bid Protections were payable by the successful bidder in the sale process for the Debtor's assets (or, if there was no such successful bidder or such successful bidder failed to make timely payment, the Debtor) within one business day of the earlier of (i) the completion of an auction at which the Stalking Horse was not designated the successful bidder or (ii) the termination of this Agreement (subject to certain limitations not at issue here).    The Tiger/Yellen Stalking Horse's claims against the Debtor in respect of the Bid Protections are secured by security interests in and liens upon

---

[6]    Due to the timing between the execution of the Stalking Horse Agency Agreement and the commencement of the Auction, no additional signage costs were incurred by the Tiger/Yellen Stalking Horse and thus there is no reimbursement obligation by the Agent to the Tiger/Yellen Stalking Horse in connection with the Signage Costs.  However, as set forth in Section 11.1(w) of the Stalking Horse Agency Agreement and the Agency Agreement, the Debtor purchased the initial signage necessary for the sale during the Interim Sale Period in an amount equal to $500 per Store.  Upon entry of the Approval Order, the Agent shall reimburse the Debtor for such signage costs as an Expense of the Sale.

certain of the Debtor's assets as set forth in Section 16.11(d) of the Stalking Horse Agency Agreement.

72.    At the outset of the Auction, following questions and concerns expressed by each of the bidding groups, certain clarifications/modifications were made to the Stalking Horse Agency Agreement by the Debtor (in consultation with the Administrative Agent and the Lenders) and the Tiger/Yellen Stalking Horse, including a modification to the timing of the payment of the Bid Protections, which was changed from the first business day after the Sale Commencement Date, to the earlier of (i) on the Payment Date (which is the day after entry of the Approval Order) by the "successful bidder" from the Retaining Initial Guaranty Payment; or (ii) absent the Approval Order, two business days after June 30, 2015 (the outside date for entry of a final approval order as contemplated by the Stalking Horse Agency Agreement) and (B) an agreement by the Administrative Agent in the event that the Debtor does not have sufficient funds (after accounting for all other claims, if any, the Debtor is required to pay before paying the Bid Protections) to remit the remaining amount of the Bid Protections to the Tiger/Yellen Stalking Horse, to advance any shortfall amount (up to a maximum of the remaining amount of the Bid Protections and the Great American Break-up Fee) to the Debtor under the Existing Credit Facility or the DIP Facility (each as defined in the Stalking Horse Agency Agreement), with the Debtor to remit such amounts to the Tiger/Yellen Stalking Horse.

73.    In addition to the Bid Protections payable to the Tiger/Yellen Stalking Horse during the Auction, in consideration of increasing the bid from 97.5% to 103%, Great American Group requested that it be paid a $250,000 break-up fee (the "Great American Break-Up Fee") to be paid by the Debtor, or alternatively by the Lenders, as an advance under the Credit Agreement. Given that the resulting bid served as an increase of more than $4,100,000 above the bid of the preceding bidder, both the Debtor and the Administrative Agent and the Secured Parties agreed to the Great American Break-Up Fee. The bidding continued and culminated with the Hilco/GB joint venture being named the successful bidder at the Auction with the bid described above. Accordingly, the Tiger/Yellen Stalking Horse and Great American were determined to be entitled to payment of the

Bid Protections by the Agent in accordance with the payment provisions described above.  A copy of the transcript of the Auction is attached as **Exhibit "F"** to the GOB Motion (the "Auction Transcript").

74.    The Administrative Agent and the Secured Parties were actively involved in the Stalking Horse Agency Agreement negotiations and the selection of Tiger/Yellen Stalking Horse as the stalking horse. The Administrative Agent and the Secured Lenders were also an active participant at the Auction and have approved the Agency Agreement with the Hilco/GB joint venture.

75.    Pursuant to the Agency Agreement, the Debtor commenced the Sale in a "soft sale" mode as of June 12, 2015 at which time the sales were conducted in some of the Debtor's Stores and in compliance with the Agency Agreement,  the sale guidelines (the "Sale Guidelines"), and all Contractual Restrictions, Liquidation Sale Laws, and Applicable General Laws.  A true and correct copy of the Sale Guidelines is attached to the GOB Motion as **Exhibit D**. During the period between entry of the Interim Order and the Approval Order and after entry of the Approval Order through the termination of the sale, the Debtor will conduct the Sale in compliance with the Agency Agreement, Sale Guidelines and Applicable General Laws.

76.    The Debtor also seeks approval of an orderly process to reject the leases of the Closing Stores (the "GOB Leases").  Specifically, the Debtor proposes to serve, by overnight mail, each affected landlord with a notice (the "Rejection Notice"), substantially in the form attached as **Exhibit "E"** to the GOB Motion, and that the rejection of any such lease shall become effective upon the 3rd business day following the service of the Rejection Notice to the affected landlord (the "Effective Date of Rejection").

77.    I, in the exercise of my sound business judgment and in consultation with the Debtor's advisors and Secured Parties, have determined that assumption of the Agency Agreement, is in the best interests of the estate because it will allow the Debtor to conduct the Sale of the Merchandise, the Merchant Consignment Goods, the Owned FF&E, and the Additional Agent Merchandise.  The Sale commenced prepetition and, in order to maximize the return from these

sales, I believe that the Sale must continue uninterrupted. Furthermore, the Agent has agreed to a Guaranteed Amount of 111% of the Cost Value of the Merchandise to be sold which is based on the amount of inventory. Given the Merchandise Threshold of $61.5 to $67 million, I believe that there should be recoveries from the liquidation process beyond the claims of the Secured Parties for other creditors. I believe that the sooner the Debtor is able to assume the Agency Agreement, the larger the Guaranteed Amount will be payable to the Debtors by the Agent. Moreover, I submit that the Auction, through its competitive bidding process, ensured that the Agent was chosen in good faith and that the terms and conditions of the Agency Agreement are fair and reasonable, and represents the highest and best offer for the Merchandise and Owned FF&E. In light of the foregoing, I submit that the assumption of the Agency Agreement represents a reasonable exercise of the Debtor's business judgment, is in the best interest of its estate, and should be approved.

78. I, in the exercise of my sound business judgment and in consultation with the Debtor's advisors, Administrative Agent, and Secured Parties, have also determined that the payment of the Bid Protections to the Tiger/Yellen Stalking Horse in an aggregate amount not to exceed $1 million (which is approximately 1.6% of the Stalking Horse Guaranteed Amount, assuming an aggregate Cost Value of Merchandise of $66.5 million), plus the Great American Break-Up Fee of $250,000 (which is less than .25% of the guaranteed amount to be paid under Great American's bid of 103%) is in the best interests of the estate. The Debtor's agreement to pay the Bid Protections to the Tiger/Yellen Stalking Horse was a condition to Tiger/Yellen Stalking Horse's willingness to enter into the Stalking Horse Agency Agreement, which provided a floor for bidding at the Auction, as well as a structure for such bids. Additionally, I submit that agreement by the Debtor to pay the Great American Break-Up Fee payable to Great American was a necessary condition to Great American's willingness to substantially increase its bid during the Auction as described above. Based on the floor and structure provided by the Stalking Horse Agency Agreement and taking into account the substantial increase in bidding by Great American, the Debtor conducted a successful auction which I believe should result in substantial recoveries to creditors other than the Debtor's secured lender after payment of the Bid Protections and the Great

American Break-Up Fee.  In light of the foregoing, I submit that the payment of the Bid Protections and the Great American Break-Up Fee represents a reasonable exercise of my business judgment, is in the best interest of its estate, and should be approved and directed.

79.    I submit that adequate business justification exists to support conducting the Sale and conducting, through the Agent, the proposed Sale for the sale of the Sale Assets.  As stated above, the Debtor, in consultation with its advisors and Secured Parties, concluded that it was in the best interests of the Debtor and its stakeholders to conduct store closures and going out of business sales if the Debtor is unable to enter into a Going Concern Transaction by June 19, 2015. Due to its financial and operational challenges, the Debtor could not continue operations and satisfy its obligations to its secured creditors and other parties in interest.  Moreover, I believe that the amount of the guarantee provided by the Agent should result in recoveries for creditors other than the secured lenders. I also determined that time is of the essence to preserve and maximize the value of its assets and to minimize its expenses.  Accordingly, I have determined, in the exercise of my business judgment, that liquidating the Merchandise and Owned FF&E at the Closing Stores and Distribution Centers, is the best means of maximizing the recovery from the Debtor's assets for the benefit of the estate and the estate's creditors absent a Going Concern Transaction.

80.    As far I am aware, the Administrative Agent and the Secured Parties arethe only creditors which assert a security interest in all of the Debtor's Merchandise and Owned FF&E (except for liens given to the Tiger/Yellen Stalking Horse and the Agent), and the Administrative Agent and the Secured Parties have consented to the Sale and particularly, to the sale of the Merchandise and FF&E free and clear of liens, claims and encumbrances, with all such obligations to attach to the Guaranteed Amount, Expense reimbursement, the Sharing Amount (if any), or other amounts due to the Debtor from the Agent under the Agency Agreement (the "Transaction Consideration Due to Debtor") with the same validity, and priority that such liens, claims, encumbrances, or interests had against the Sale Assets.

81.    I submit that the selection of the Agent and the terms and conditions of the Agency Agreement were the product of arm's length, good faith negotiations after an extensive and highly

competitive bidding process. The assets that will be sold as part of the Sale will not be sold to the Debtor's insiders. I submit that there is no fraud or collusion or any attempt to take unfair advantage of another through the Sale.

82.    Many states in which the Debtor operates have laws and regulations that require the Debtor to pay an employee substantially contemporaneously with his or her termination. In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. The nature of the Sale contemplated by this Motion will result in a substantial number of employees being terminated during the Sale. The Debtor's payroll systems may be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

83.    While the Debtor intends to pay their terminated employees as expeditiously as possible, I believe that the requirements imposed by these state laws and regulations are unworkable in light of these extraordinary circumstances. I believe that if the Debtor is required to comply with these state laws and regulations, their efforts to wind down their operations and mitigate unnecessary payroll costs will be hampered. Indeed, I believe that if forced to comply, the Debtor will face the choice of (a) having to incur the costs of keeping employees employed after the conclusion of the Sale while payroll is being prepared, or (b) staging terminations to the detriment of the Debtor's estate. I submit that both of these options will provide no benefit to the Debtor's estate and will only increase the administrative costs of conducting the Sale.

84.    The Closing Stores are located in 19 different states (including Washington D.C. and Puerto Rico) and numerous municipalities. Certain state statutes and local ordinances in which the Closing Stores are located may have licensing or permit requirements, statutory or regulatory waiting periods, signage restrictions, and/or time limits which would normally affect the conduct of liquidation or other similar closing sales. Some localities also have statutes or regulations requiring creditor notification before bulk sales are conducted. I believe that the Debtor's ability to conduct the Sale within the time-frame contemplated is premised upon the Debtor's ability to conduct the sales in an orderly manner, without the need to comply with such regulations. The Debtor fully

1  intends to be bound by and comply with remaining statutes and regulations, such as health and

2  safety laws.

3        85.    I submit that if the Debtor is unable to sell or dispose of any assets following the

4  Sale, it would be costly and burdensome to the estate to retain them.

5        86.    I believe that the proposed lease rejection procedures set forth in the GOB Motion

6  will streamline the Debtor's ability to reject idle, or at or above market GOB Leases that provide

7  little or no benefit to the Debtor's estate.  In addition, I believe that these procedures will allow the

8  estate to market the Leases to the greatest extent possible under the circumstances.

9        I declare under penalty of perjury that the foregoing is true and correct to the best of my

10  knowledge. Executed on this 15th day of June, 2015, at Costa Mesa, California.

J.E. RICK BUNKA

# PROOF OF SERVICE OF DOCUMENT

1
2

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

3
4

A true and correct copy of the foregoing document entitled **DECLARATION OF J.E. RICK BUNKA IN SUPPORT OF DEBTOR'S EMERGENCY "FIRST DAY" MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

5
6
7

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 15, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

8
9
10
11
12
13
14

- Todd M Arnold     tma@lnbyb.com
- Dustin P Branch     dustin.branch@kattenlaw.com, jessica.mickelsen@kattenlaw.com;brian.huben@kattenlaw.com;adelle.shafer@kattenlaw.com;donna.carolo@kattenlaw.com
- John-Patrick M Fritz     jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com
- David B Golubchik     dbg@lnbyb.com, dbg@ecf.inforuptcy.com
- Michael J Hauser     michael.hauser@usdoj.gov
- Eve H Karasik     ehk@lnbyb.com
- Mette H Kurth     mkurth@foxrothschild.com, vcordi@foxrothschild.com;pchlum@foxrothschild.com
- Juliet Y Oh     jyo@lnbrb.com, jyo@lnbrb.com
- Lindsey L Smith     lls@lnbyb.com, lls@ecf.inforuptcy.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov

15
16
17

**2.   SERVED BY UNITED STATES MAIL**: On **June 15, 2015**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

18

☐  *Service information continued on attached page*

19
20
21

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 15, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

22
23
24
25

***Served via Attorney Service***
Hon. Theodor C. Albert
United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5085 / Courtroom 5B
Santa Ana, CA 92701-4593

26

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

27
28

| June 15, 2015 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.