DAVID B. GOLUBCHIK (SBN 185520)
EVE H. KARASIK (SBN 155356)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: dbg@lnbyb.com, ehk@lnbyb.com, jyo@lnbyb.com,

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>ANNA'S LINENS, INC.,<br><br>        Debtor. | Case No. 8:15-bk-13008-TA<br><br>Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:** |

**(I)   AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d)(1) AND 364(e), AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;**

**(II)  GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364;**

**(III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND**

**(IV)  GRANTING RELATED RELIEF**

**MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF**

DATE:      June 16, 2015
TIME:      2:00 p.m.
PLACE:   Courtroom 5B
             411 West Fourth Street
             Santa Ana, California

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 13

I.     STATEMENT OF FACTS ................................................................................ 13

     A.     Background ................................................................................................ 13

     B.     Events Leading To The Filing Of The Debtor's Chapter 11
           Bankruptcy Case And Anticipated Exit Strategy ................................. 14

     C.     The Debtors' Primary Assets And Secured Debts ............................. 17

II.    THE DEBTOR SHOULD BE AUTHORIZED TO USE CASH
      COLLATERAL ................................................................................................ 20

     A.     The Debtor Must Be Authorized To Use Cash Collateral To Operate,
           Maintain And Preserve Its Assets In Accordance With The Budget ......... 20

     B.     The DIP Agent and Tiger/Yellen Stalking Horse Have Consented to
           the Debtor's Use of Cash Collateral ................................................... 21

III.   THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN THE
      PROPOSED POST-PETITION DIP FACILITY ........................................ 24

     A.     The Debtor Should Be Authorized To Obtain The Proposed
           Post-Petition Secured DIP Facility From the DIP Agent To Maintain
           The Debtor's Business And To Maintain And Preserve The Value
           Of The Debtor's Assets ........................................................................ 24

           1.     The Debtor Is Unable To Obtain Unsecured Credit Or
                   Secured Credit On A Junior Lien Basis ............................. 26

           2.     The Terms Of The Proposed Post-Petition DIP Facility From
                   the DIP Agent Are Fair, Reasonable, and Adequate ...................... 28

           3.     The Prepetition Agent Consented To The Priming of Its Liens
                   Securing the Prepetition Obligations And The Prepetition
                   Agent's Liens And Any Other Liens Being "Primed" Are
                   Adequately Protected ....................................................... 29

           4.     The Proposed DIP Facility From the DIP Agent Is Necessary
                   And Proper ........................................................................ 31

IV.   THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE .................... 31

V.    CONCLUSION ................................................................................................ 32

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re 495 Cent. Park Ave. Corp.*
   136 B.R. 626 (Bankr. S.D.N.Y. 1992) .......................................................................29

*In re Ames Dept. Stores*
   115 B.R. 34 (Bankr. S.D.N.Y. 1990) ..........................................................24, 27, 31

*In re Aqua Assoc.*
   123 B.R. 192 (Bankr. E.D.Pa. 1991) ......................................................26, 29, 30

*In re Beker Ind. Corp.*
   58 B.R. 725 (Bankr. S.D.N.Y. 1986) .......................................................................29

*In re C.B.G. Ltd.*
   150 B.R. 570 (Bankr. M.D.Pa. 1992) ......................................................................26

*In re Crouse Group, Inc.*
   71 B.R. 544 (Bankr. E.D.Pa. 1987) .........................................................................26

*In re Defender Drug Stores*
   126 B.R. 76 (Bankr. D. Ariz. 1991), *aff'd* 145 B.R. 312 (Bankr. 9th Cir. 1992) ...................25

*In re Dynaco Corporation*
   162 B.R. 389 (Bankr. D.N.H. 1993) ...............................................................21, 22

*In re Ellingsen MacLean Oil Co.*
   834 F.2d 599 (6th Cir. 1987) .....................................................................................25

*In re Hubbard Power & Light*
   202 B.R. 680 (Bankr. E.D.N.Y. 1996) .....................................................................29

*In re Immenhausen Corp.*
   164 B.R. 347 (Bankr. M.D. Fla. 1994) .....................................................................22

*In re McCombs Properties VI, Ltd.*
   88 B.R. 261 (Bankr. C.D. Cal. l988) ("McCombs")..........................................21, 22

*In re Mellor*
   734 F.2d 1396 (9th Cir. 1984) ..................................................................................21

*In re Newark Airport/Hotel Ltd. Partnership*
   156 B.R. 444 (Bankr. D.N.J. 1993) ..........................................................................22

*In re O'Connor*
   808 F.2d 1393 (10th Cir. 1987) .........................................................................21, 23

*In re Oak Glen R-Vee*
8 B.R. 213 (Bankr. C.D. Cal. 1981).......................................................................20

*In re Photo Promotion Associates, Inc.*
87 B.R. 835 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989) ................25

*In re Planned System, Inc.*
78 B.R. 852 (Bankr. S.D. Ohio 1987).................................................................29

*In re Simasko Production Co.*
47 B.R. 444 (D. Colo.1985).............................................................................24

*In re Snowshoe Co.*
789 F.2d 1085 (4th Cir. 1986) ........................................................................27

*In re Stein*
19 B.R. 458. (Bankr. E.D. Pa. 1982) ..............................................................22

*In re T.M. Sweeney & Sons LTL Services, Inc.*
131 B.R. 984 (Bankr.N.D.Ill.1991) ................................................................25

*In re Triplett*
87 B.R. 25 (Bankr. W.D.Tex. 1988) ...............................................................22

*In re Tucson Industrial Partners*
129 B.R. 614 (B.A.P. 9th Cir. 1991)...............................................................21

*Matter of Pursuit Athletic Footwear, Inc.*
193 B.R. 713 (Bankr. D. Del. 1996) ..............................................................22

*Richmond Leasing Co. v. Capital Bank N.A.*
762 F.2d 1303 (5th Cir. 1985) .......................................................................31

*United Savings Association v. Timbers of Inwood Forest Associates*
108 S.Ct. 626 (1988) .....................................................................................22

**FEDERAL STATUTES**

11 U.S.C. § 105(a) ..........................................................................................2, 4

11 U.S.C. § 326 ...................................................................................................4

11 U.S.C. § 328 ...................................................................................................4

11 U.S.C. § 330 ...................................................................................................4

11 U.S.C. § 331 ...................................................................................................4

11 U.S.C. § 361...........................................................................................5, 22, 29

11 U.S.C. § 362 .................................................................................................. 5, 6

11 U.S.C. § 363 ........................................................................ 5, 7, 9, 16, 20, 21, 23

11 U.S.C. § 364 ................................................................................................ passim

11 U.S.C. § 364(a) .................................................................................................. 27

11 U.S.C. § 364(b) ............................................................................................ 26, 27

11 U.S.C. § 364(c) .................................................................... 4, 5, 9, 19, 24, 25, 26

11 U.S.C. § 364(d) ...................................................................... 5, 19, 24, 25, 26, 29

11 U.S.C. § 364(e) ............................................................................................ 20, 29

11 U.S.C. § 503 ............................................................................................ 4, 6, 19

11 U.S.C. § 506(a) ............................................................................................ 4, 22

11 U.S.C. § 506(c) ..................................................................................... 6, 11, 10

11 U.S.C. § 507 ................................................................................................. 4, 6

11 U.S.C. § 544 ............................................................................................... 10, 11

11 U.S.C. § 545 ............................................................................................... 10, 11

11 U.S.C. § 546 ...................................................................................................... 4

11 U.S.C. § 547 ............................................................................................... 10, 11

11 U.S.C. § 548 ............................................................................................... 10, 11

11 U.S.C. § 549 .................................................................................................... 10

11 U.S.C. § 552(b) ............................................................................................... 11

11 U.S.C. § 553(b) ............................................................................................... 10

11 U.S.C. § 723(a) ............................................................................................... 10

11 U.S.C. § 726 ..................................................................................................... 4

11 U.S.C. § 1102 ................................................................................................... 4

11 U.S.C. § 1107 ............................................................................................ 13, 20

11 U.S.C. § 1108 ................................................................................................. 13

11 U.S.C. § 1114 ................................................................................................... 4

28 U.S.C. § 1930................................................................................................................4

**FEDERAL RULES**

Fed.R.Bankr.P. 2081-1(a)(9) ..........................................................................................2

Fed.R.Bankr.P. 4001-2.....................................................................................................2

Fed.R.Bankr.P. 9075-1.....................................................................................................2

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, SALUS CAPITAL PARTNERS, LLC, PURPORTED SECURED CREDITORS, THE DEBTOR'S TWENTY LARGEST UNSECURED CREDITORS AND OTHER PARTIES IN INTEREST:**

## SUMMARY

Anna's Linens, Inc., the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), hereby moves, on an emergency basis by this motion (the "Motion"), pursuant to Local Bankruptcy Rules ("LBR") 2081-1(a)(9), 4001-2, and 9075-1, Federal Rule of Bankruptcy Procedure ("FRBP"), and sections 105(a), 361, 362, 363, and 364 of chapter 11 of title 11 of the United States Code §§ 101, et seq. (the "Bankruptcy Code"),[1] for the entry of interim and final orders (respectively, the "Interim Order" and the "Final Order," collectively, the "Financing Orders"):

(1)       authorizing the Debtor to obtain a senior secured super-priority revolving credit facility (the "DIP Facility"), pursuant to the terms and conditions of that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Credit Agreement")[2] by and among the Debtor, the lenders party thereto (the "DIP Lenders" and each a "DIP Lender"), and Salus Capital Partners, LLC, as Administrative and Collateral Agent (in such capacity, the "DIP Agent" and together with the DIP Lenders, the "DIP Secured Parties") for the DIP Lenders, substantially in the form of **Exhibit "1"** attached hereto, which, subject to borrowing base requirements, provides for a DIP Facility of up to approximately $20 million (up to approximately $11.4 million on an interim basis, depending on the date of the final hearing on the Motion) in excess of the outstanding secured debt to Salus Capital Partners, LLC, as administrative agent and

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

[2] All summaries and descriptions of the terms of the DIP Credit Agreement herein are for informational purposes only.  If there are any inconsistencies between the summaries and descriptions of the terms of the DIP Credit Agreement and the actual provisions of the DIP Credit Agreement, the terms of the DIP Credit Agreement shall control.

collateral agent (in such capacity, the "Prepetition Agent") for various lenders (the "Prepetition Lenders") and collectively, with the Prepetition Agent, the "Prepetition Secured Creditors" and each a "Prepetition Secured Creditor"), pursuant to that certain Credit Agreement dated as of July 18, 2014, by and among the Borrower, the Prepetition Agent and the lenders party thereto (as amended, modified and supplemented from time to time, the "Prepetition Credit Agreement" and together with all related documents, instruments, guaranties and agreements, the "Prepetition Credit Documents"), in the approximate amount of $66.425 million (the "Prepetition Obligations"),[3] which is intended to be paid in full with the DIP Facility, with the balance of funds to be used to pay (a) fees, costs and expenses of the DIP Facility, including payment of the DIP Agent's reasonable attorneys' fees and other out of pocket expenses, (b) post-petition operating expenses of the Debtor incurred in the ordinary course of business, (c) costs and expenses of administration of the Debtor's Chapter 11 bankruptcy case, including payment of approved professional fees, a noticing/claims agent and U.S. Trustee quarterly fees, and (d) other amounts, with payments specified in (b) through (d) to be as set forth and in accordance with the budget attached hereto as **Exhibit "2,"** as may be amended pursuant to the DIP Credit Agreement (the "Budget"), provided that, except as expressly agreed by the DIP Agent and set forth in the Financing Orders, none of the DIP Facility proceeds may be used to investigate or challenge the validity, perfection, priority, extent or enforceability of the DIP Facility, the Prepetition Obligations, the liens or security interests securing the DIP Facility or Prepetition Obligations, or any claim against the DIP Secured Parties or the Prepetition Secured Creditors;

(2)      authorizing the Debtor to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, the "DIP Loan Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

---

[3] The Prepetition Obligations include approximately (1) $63 million in principal and interest, (2) $3.2 million in early termination fees, and (3) $225,000 in credit monitoring fees.

3

(3)    providing that all parties-in-interest (other than the Debtor), any trustee appointed in the case, and any official committee in this Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code (each, a "Statutory Committee") will have a period of earlier of (a) sixty (60) days following the date of the appointment of any Statutory Committee and (b) seventy-five days following the Petition Date if a Statutory Committee is not appointed in the Chapter 11 Case to challenge the stipulations, findings, representations, and releases contained in the DIP Loan Documents and the Interim Order with respect to the Prepetition Secured Creditors and the Prepetition Obligations (the "Challenge Rights"), provided that after the expiration of the period the Challenge Rights and related claims will be waived and forever barred;

(4)    granting allowed superpriority administrative expense claim status in each of the Chapter 11 Case and any and any successor thereto, including without limitation, any trustee or other estate representative appointed in the Chapter 11 Case, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case (collectively, "Successor Case") to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents to the DIP Agent (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "DIP Obligations") pursuant to Section 364(c)(1) of the Bankruptcy Code and having priority over all pre-petition and post-petition liabilities, including administrative expenses of the kind specified in, in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1114, or otherwise (collectively, the (the "DIP Superpriority Claim"), subject to the priorities set forth in the DIP Credit Agreement and ¶ 8 of the proposed form of the Interim Order attached as **Exhibit "I"** to the DIP Credit Agreement, which is attached hereto as **Exhibit "1,"** and generally junior only to (a) the DIP Liens (as defined below), (b) U.S. Trustee fees pursuant to 28 U.S.C. § 1930 and, upon occurrence of the Carve-Our Trigger Date (as defined in the DIP Credit Agreement), the payment of approved fees and expenses of estate professionals, which were incurred (i) on and after the Petition Date and prior to the Carve-Out Trigger Date in amounts not in excess of the amounts set forth in the Budget and (ii) on and after the Carve-Out Trigger Date, in an aggregate amount not exceeding $100,000 (the "Carve-Out"), and (c) valid, binding, enforceable, properly perfected,

4

non-avoidable and senior in priority to the prepetition liens of the Prepetition Agent as of the petition date (the "Prepetition Permitted Liens") that otherwise had priority over any and all other liens on the collateral securing the Prepetition Obligations;

(5)    authorizing the Debtor to use in accordance with the Budget "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, that the Debtor is holding or may obtain, pursuant to the Bankruptcy Code Section 361 and 363 and FRBP 4001(b) and 6004;

(6)    granting to the DIP Agent automatically perfected security interests in and liens (the "DIP Liens") on all assets of the Debtor, whether now owned or hereinafter acquired, including, without limitation, all property constituting Cash Collateral (collectively, the "DIP Collateral," as defined and described in the ¶ 6 if the Interim Order), pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, which liens shall be subject to the priorities set forth in the DIP Credit Agreement and ¶ 7 of the proposed form of the Interim Order, and generally subject only to (a) Prepetition Permitted Liens and (b) the DIP Carve Out; subject to entry of the Final Financing Order, the DIP Collateral will include avoidance actions pursuant to Chapter 5 of the Bankruptcy Code and the proceeds thereof;

(7)    authorizing and directing the Debtor to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, continuing commitment fees, closing fees, servicing fees, audit fees, structuring fees, monitoring and exit fees, the reasonable fees and disbursements of the DIP Secured Parties' attorneys, advisers, accountants, and other consultants, and all related expenses of the DIP Secured Parties, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents and the Interim Order;

(8)    authorizing and directing the Debtor to pay in full the Prepetition Obligations upon entry of the Final Order and as set forth more specifically in the Interim Order, subject to the but subject to the Challenge Rights;

(9)    providing adequate protection to the Prepetition Secured Creditors as set forth more specifically in the Interim Order consisting of (a) valid and perfected replacement and additional security interests in, and liens on all of the Debtor's right, title and interest in, to and

under all DIP Collateral (the "Adequate Protection Liens") to secure only the Prepetition Obligations, which Adequate Protection Liens shall be subordinate and subject only to (i) the DIP Liens, (ii) the Prepetition Permitted Liens, and (iii) the DIP Carve Out, (b) payment of the Prepetition Obligations from the proceeds of the DIP Collateral, (c) payments in the amount of interest (which shall be payable at the default rate under the Prepetition Credit Agreement), fees, costs, expenses (including attorneys' fees and expenses), indemnities and other amounts with respect to the Prepetition Obligations when due in accordance with the Prepetition Credit Documents (collectively, the "Prepetition Agent Adequate Protection Payments"), and (d) an allowed administrative claim against the Debtor's estate under sections 503 and 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claims") to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the value of the Prepetition Secured Creditors' interests in the prepetition collateral, which shall be shall be junior to (i) the DIP Liens and (ii) the DIP Carve Out;

(10)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Financing Orders;

(11)    approving the general release of any claims of the Debtor against the DIP Secured Parties, including those under section 506(c) (which will only be released pursuant to the Final Financing Order);

(12)    finding that adequate notice of the Motion has been provided;

(13)    finding that the DIP Secured Parties have acted in good faith in connection with the DIP Credit Agreement;

(14)    granting related relief;

(15)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

(16)    waiving any applicable stay, including under FRBP 4001(b) and (c) and providing for the immediate effectiveness of the Interim Financing Order.

## OTHER INFORMATION REGARDING THE DIP CREDIT AGREEMENT AND CASH COLLATERAL USE THEREUNDER

In addition to the summary of terms set forth above, the Debtor provides the following information regarding principal terms of the DIP Credit Agreement as required by FRBP 4001(b)(1)(B) and (c)(1)(B):

• **Termination Date:** The DIP Facility and related Cash Collateral use thereunder, will run from entry of the Interim Financing Order (the "Closing Date") to the earliest of (1) June [tbd], 2016, (2) the effective date of a plan of reorganization confirmed by the Court, (3) consummation of the sale of all or a substantial portion of the assets of the Debtor under Section 363 (excluding, for this purpose, any transaction under an Agency Agreement relating to the liquidation of the Debtor's retail stores), (4) 30 days after the Closing Date, if the Final Order has not been entered by that date, (5) the occurrence of any of the events of default (the "Events of Default") under the DIP Credit Agreement after the expiration of all applicable grace or cure periods, or (f) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto.

• **Events of Default:** The following are Events of Default under the DIP Credit Agreement: (1) failure to make payments when due; (2) noncompliance with covenants, including, without limitation, failure to comply with the Budget within agreed upon variances; (3) breaches of representations and warranties; (4) failure to satisfy or stay execution of judgments in excess of specified amounts; (5) the existence of certain materially adverse employee benefit or environmental liabilities; (6) impairment of loan documentation or security; (7) a Material Adverse Change (as defined described in the DIP Credit Agreement); (8) change of ownership or control of the Debtor; (9) any party filing of a complaint or objection to any of the Prepetition Lenders' claims with respect to the Prepetition Obligations or any liens securing the Prepetition Obligations; (10) dismissal of the Chapter 11 Case or conversion to a Chapter 7 Case; (11) appointment of a chapter 11 trustee; (12) appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Debtor; (13)

7

granting of relief from the automatic stay to permit foreclosure on any assets of the Debtor constituting DIP Collateral; (14) entry of an order granting any super-priority claim which is senior or pari passu with the DIP Agent's claims under the DIP Credit Agreement; (15) entry of an order amending, supplementing or otherwise modifying either of the Financing Orders without the consent of the DIP Agent; (16) reversal, vacation or stay of the effectiveness, or modification without the consent of the DIP Agent of either Financing Orders (or any other order of the Court affecting the DIP Facility); (17) if the Final Order is not approved by the Bankruptcy Court within 30 days after the Closing Date; (18) the filing of a motion to sell all or substantially all of the Debtor's assets without the consent of the DIP Agent; (19) the filing of any plan of reorganization which either does not provide for the payment in full of all of the Prepetition Obligations and the DIP Facility, or to which the DIP Agent has not consented in writing; (20) any cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all material respects; and (21) the failure of the Debtor to achieve any of the following milestones (with all dates subject to the Court's availability and docket): (a) the Debtor's filing of (i) a motion seeking approval of a going out of business sale of all of its locations (subject to rights to seek a going concern sale) (the "Interim Approval Motion"), and (ii) a motion seeking to assume the agreement with an entity to allow it to conduct the going out of business sale (the "Assumption Motion"), within one day following the petition date; (b) Court approval of the Interim Approval Motion by no later than June 18, 2015; (c) Court approval of the Assumption Motion by no later than June 30, 2015.

- **Interest Rate:** LIBOR plus 8.5%, with a minimum interest rate of 8.75%, paid monthly in arrears; during an event of default, the applicable rate will increase by 4%.

- **Fees:** A closing fee equal to 0.5% of the aggregate DIP Facility commitment amount of approximately $20 million in excess of the Prepetition Obligations, which fee shall be fully earned and due and payable on the Closing Date. An exit fee equal to 1.0% of the aggregate of the aggregate DIP Facility commitment amount of approximately $20 million in in excess of the Prepetition Obligations, which fee shall be fully earned on the Closing Date, and due and payable on the Termination Date, provided that if the Debtor is not sold in a going-

concern sale such exit fee shall be reduced to 0.5%.  A DIP Facility monitoring fee of $120,000 per annum (which amount shall be fully earned for the life of the DIP Facility, regardless of any early termination), paid monthly in advance in the amount $10,000 (with the first payment being made on the Closing Date).  All fees shall be non-refundable and shall be deemed fully earned when paid.  All out of pocket costs and expenses paid by the DIP Agent (or the lenders it represents) in connection with the documenting, funding, enforcing and protected rights under the DIP Facility.

Pursuant to FRBP 4001, the Debtor hereby provides the following disclosures with respect to the terms of the DIP Credit Agreement and Interim Order:

| | **DIP Credit Agreement** | **Interim Order** |
|---|---|---|
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | §§ 5.19, 5.27(b) and (c) | ¶¶ G, 3, 6, 7, 8, 13 |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | §§ 5.27(b) and (c) to the extent that the funds of the DIP Facility are used to pay the Pre-Petition Debt pursuant to §§ 2.05, 6.11, 6.26(e), 6.27 (and related provisions of the Financing Orders), 8.01(a), (b), and (f)(ii)-(iv), (ix), (xvi), and/or 8.03 | ¶¶ F(iv), (vi), G, 3, 6, 7, 8, 12, 13, 18 |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | | ¶¶ E, 33 |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | § 5.27(e) | ¶ 16 |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | §§ 2.17, 7.01, 7.16, 7.18, 7.19, and 8.01(f)(ii)-(iv), (ix) , (xvi) | ¶¶ 19, 44 |

| | DIP Credit Agreement | Interim Order |
|---|---|---|
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | | |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | § 5.19 | ¶¶ 6, 12, 17 |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | §§ 8.01(f)(viii), (xii), (xiii), (j), 10.04(d), and 10.21 | ¶¶ E(iii), H, 3, 7, 33, 36, 37, 41 |
| The indemnification of an entity | §§ 3.01(c), 9.13, 10.02(e), and 10.04(b) | ¶ 27 |
| A release, waiver, or limitation of any right under Section 506(c) | §§ 8.01(f)(viii), (xii), (xiii), (j), 10.04(d), and 10.21 | ¶¶ E(iii), H, 3, 36, 41 |
| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | | ¶¶ 6(a)(xv), (xvi), 12 |

Pursuant to the provisions of LBR 4001-2, the Debtor hereby provides the following disclosures with respect to the terms of the DIP Credit Agreement and Interim Order:

| | DIP Credit Agreement | Interim Order |
|---|---|---|
| Provisions that grant cross-collateralization protection to the prepetition secured creditors | §§ 5.27(b) and (c) to the extent that the funds of the DIP Facility are used to pay the Pre-Petition Debt pursuant to §§ 2.05, 6.11, 6.26(e), 6.27 (and related provisions of the Financing Orders), 8.01(a), (b), and (f)(ii)-(iv), (ix), (xvi), and/or 8.03 | ¶¶ G, 3, 6, 7, 12 |
| Provisions that bind the estate or all parties in interest with respect to the validity, perfection, or | §§ 8.01(f)(viii), (xii), (xiii), (j), 10.04(d), and 10.21 | ¶¶ E, H, 3. 33, 36, 37, 41 |

|  | **DIP Credit Agreement** | **Interim Order** |
|---|---|---|
| amount of the secured creditor's prepetition lien or debt or the waiver of claims against a secured creditor | | |
| Provisions that seek to waive or limit the estate's rights under 11 U.S.C. § 506(c) | §§ 8.01(f)(viii), (xii), (xiii), (j), 10.04(d), and 10.21 | ¶ E(iii), H, 3, 36 |
| Provisions that grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549 | | ¶¶ 6(a)(xv), (xvi), 12 |
| Provisions that deem secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b) | §§ 5.27(b) and (c) to the extent that the funds of the DIP Facility are used to pay the Pre-Petition Debt pursuant to §§ 2.05, 6.11, 6.26(e), 6.27 (and related provisions of the Financing Orders), 8.01(a), (b), and (f)(ii)-(iv), (ix), (xvi), and/or 8.03 | ¶¶ F(iv), (vi), G, 3, 6, 7, 18 |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out | | |
| Provisions that prime any secured lien | § 5.27(c) | ¶¶ G, 6, 7, 12 |

## INFORMATION REGARDING OTHER PURPORTED SECURED CREDITORS AND NOTICE OF THE MOTION

As far as the Debtor is aware, while there are some creditors with purported security interests in particular pieces of personal property based on purchase money and/or lease transactions, as well as some statutory transportation and warehouse liens, the DIP Agent is the only creditor that asserts a security interest in all of the Debtor's collateral, including its Cash Collateral.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor served a notice of hearing on the Motion, which contains a

website address which any party can visit and obtain a copy of the Motion, upon (1) the Office of the United States Trustee, (2) all purported secured creditors and their counsel (if known) as reflected in the UCC financing statements (the "UCC Financing Statements") recorded against the Debtor in Delaware, the state of the Debtor's incorporation, and (while likely not valid) California, where the Debtor's headquarters is located, a summary of which is attached hereto as **Exhibit "3"** (the "UCC Summary") (4), the 20 largest unsecured creditors of the Debtor, (5) Greenberg Traurig, LLP, attorneys for the DIP Agent and the Prepetition Agent, (6) the Internal Revenue Service, (7) counsel for any Statutory Committee, and (8) parties requesting special notice.

This Motion is based on this Motion and the exhibits hereto, the annexed Memorandum of Points and Authorities and declarations, the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

**WHEREFORE**, the Debtor respectfully requests that the Court:

(1)    grant the relief requested in the Motion on an interim basis;

(2)    enter the proposed form of the Interim Order attached as **Exhibit "I"** to the DIP Credit Agreement, which is attached hereto as **Exhibit "1;"**

(3)    schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(4)    grant such further relief as the Court deems just and proper.

Dated: June 15, 2015              ANNA'S LINENS, INC.

                                   By:    /s/ David B. Golubchik
                                          DAVID B. GOLUBCHIK
                                          EVE H. KARASIK
                                          JULIET Y. OH
                                          LEVENE, NEALE, BENDER, YOO
                                              & BRILL L.L.P.
                                          Proposed Attorneys for Debtor and
                                          Debtor in Possession

12

# MEMORANDUM OF POINTS AND AUTHORITIES[4]

## I.

## STATEMENT OF FACTS

**A.    Background.**

The Debtor filed a voluntary petition under Chapter 11 of Bankruptcy Code on June 14, 2015 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a leading specialty retailer offering high quality and stylish home textiles, furnishings, and décor at attractive prices. The Debtor is headquartered in Costa Mesa, California, operates a chain of 261 company owned retail stores throughout 19 states in the United States (including Puerto Rico and Washington, D.C.), generates over $300 million in annual revenue, and employs a workforce of over 2,500.

Over the last 25 years, the Debtor has built its store base through a clustering approach in key markets, including Los Angeles, Dallas, Chicago, Miami and Houston. The Debtor has three distribution centers to support its nationwide presence in Fontana, California, Coppell, Texas, and Charlotte, North Carolina. The Debtor leases its distribution centers, which are operated by third-party logistics providers.

The Debtor employs a flexible small-box retail strategy with approximately 9,500 square foot stores with a focus on price, value, and expert customer service. The Debtor's stores are typically located in high traffic strip centers in the heart of local neighborhoods that the stores are servicing. The Debtor also has developed an e-commerce platform that provides customers across the country with access to the Debtor's full merchandise assortment. The Debtor's model enables it to compete well with traditional self-service big box home retailers and discounters.

The Debtor targets a large and growing segment of the United States population that values fashion, brand names and customer service, but is seeking high value and attractive price points.

---

[4] All capitalized terms herein have the same meanings as in the preceding Motion.

Merchandise is selected to appeal to its core customer base and is focused on domestic items such as bed linens, bath items, kitchen textiles, window drapes, and furniture covers, and certain home furnishing categories.

**B.    Events Leading To The Filing Of The Debtor's Chapter 11 Bankruptcy Case And Anticipated Exit Strategy.**

The Debtor opened its first store in 1987, and by 2013, it had 309 stores.  Beginning in 2011, the Debtor started experiencing significant financial and operational challenges.  The Debtor was unsuccessful in some of its new markets such as Puerto Rico and St. Louis, and overbuilt otherwise healthy markets in response to its new television marketing.  In addition, the Debtor's core demographic changed as Generation X and Millennials replaced Baby Boomers as the primary home furnishing shoppers.  Merchandise did not resonate with the new shoppers, and aged and unfashionable inventory remained in the stores reaching a high of $380,000 per store by fiscal year 2013.  The Debtor's shift to "Every Day Low Prices" from promotions and in-store discounts as well as new expensive television advertising strategy did not attract customers.

The over expansion and excess inventory led to increased indebtedness and, ultimately, a default with the Debtor's long-time lender, Union Bank.  In order to refinance the Debtor's obligations to Union Bank, the Debtor entered into the Prepetition Credit Agreement with the Prepetition Secured Creditors for an $80 million line of credit on July 18, 2014.  A true and correct copy of the Prepetition Credit Agreement (without its exhibits, schedules, or documents and agreements related thereto, except for that certain "Fee Letter" dated July 18, 2014)  is attached as **Exhibit "1"** to the appendix of supplemental exhibits submitted in support of the Motion (the "Supplemental Appendix").

On March 30, 2015 the Debtor notified the Prepetition Agent of a Default or Event of Default for failure to maintain a specified Operating Expenditures to Gross Margin Dollars Ratio under the Prepetition Credit Agreement.  On April 29, 2015, the Prepetition Agent delivered to the Debtor a notice of Events of Default and Reservations of Rights based on the existing defaults under the Prepetition Credit Agreement.  After negotiation between the Debtor and the Prepetition Agent, the Prepetition and Prepetition Lenders agreed to waive such Events of

14

Default and, on May 13, 2015, the Prepetition Agent delivered to the Debtor the "First Amendment and Waiver to the Credit Agreement" (the "First Amendment"). A true and correct copy of the First Amendment is attached as **Exhibit "2"** to the Supplemental Appendix. The First Amendment provided a waiver of the Specific Defaults (as defined therein) and provided certain consents under amendments to the Prepetition Credit Agreement including, without limitation, (1) increased availability through removal of an availability block, (2) a requirement for the Debtor to deliver and abide by a Cash Flow Budget, (3) an agreement by the Debtor to place specific milestones on activities with several projects that were already underway, and (4) payment of certain fees and expenses.

Over the resulting weeks, the Debtor's merchandise vendors significantly reduced delivery of anticipated merchandise resulting in an additional default of the Prepetition Credit Agreement. As a result of the Prepetition Credit Agreement defaults, and the inability of the Debtor to affect the Capital Transaction prepetition, the Debtor determined it was necessary to commence the Chapter 11 Case.

Prepetition, the Debtor engaged in a process whereby simultaneously the Debtor negotiated with its largest vendors to convert certain trade payables into long term Junior Secured Notes Payables to create additional long term liquidity and, through its investment banker Wunderlich Securities, Inc. ("Wunderlich"), it pursued additional outside investments to recapitalize its balance sheet. Wunderlich undertook a broad process in search of additional capital that included contacting over 200 investors and institutions. Wunderlich's efforts resulted in the receipt of multiple written indications of interest from potential acquirers and investors, including a Letter of Intent (the "LOI") from DW Partners, LP ("DW Partners"). The Debtor, in consultation with its advisers, determined that the DW Partners' LOI was the highest and best received. The Debtor and DW Partners are currently in the process of negotiating a definitive asset purchase agreement for a going concern transaction (the "Going Concern Transaction" and the "Going Concern APA"). The Debtor is using best efforts to achieve a transaction that will preserve the Debtor's business operations, which will preserve jobs of thousands of employees, going forward customer for the Debtor's vendors and the Debtor's continuing support of the local communities in which the Debtor's stores operate. The Debtor believes that it has until Friday,

June 19, 2015 to execute the Going Concern APA.  Any such Going Concern APA would require the consent of the Prepetition Agent.  If the Debtor enters into the Going Concern Transaction by such date and Prepetition Administrative consent is received, then the Debtor intends to go forward with a Bankruptcy Code section 363 sale and auction process with DW Partners as the stalking horse purchaser.

As required by the First Amendment, the Debtor has also engaged in a process to identify and select a stalking horse bidder for the possible sale and/or liquidation of the business as an alternative to the Going Concern Transaction.  The Debtor's efforts to retain a liquidator resulted in the execution of the Stalking Horse Agency Agreement with a joint venture comprised of Tiger Capital Group ("Tiger") and Yellen Partners, LLC ("Yellen" together with Tiger, "Tiger/Yellen Stalking Horse"), which included a guarantee from Tiger/Yellen Stalking Horse that the Debtor would receive 93.5% of the aggregate Cost Value of the Merchandise (terms as defined in the Stalking Horse Agency Agreement), subject to certain adjustments, Further, as a result of the default, an auction was held on June 9, 2015 and June 10, 2015 at which the Tiger/Yellen Stalking Horse was outbid by a group formed by Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Hilco/GB"), which included an increase in the guarantee to 111% of the Cost Value of the Merchandise with a Merchandise Threshold (terms as defined in the Agency Agreement, defined below) of not less than $61.5 million and not more than $67 million, subject to certain adjustments. The Debtor and Hilco/GB, with the approval of the Prepetition Agent, signed an Agency Agreement (the "Agency Agreement") on June 11, 2015.

The Debtor and the Prepetition Agent agreed that if the Going Concern APA is executed and the Prepetition Agent consents to such Going Concern APA, the Agency Agreement will convert to an equity transaction for a lesser number of stores, allowing the Debtor to pursue an alternative exit strategy for the Chapter 11 Case. If the Debtor enters into such Going Concern Transaction by the deadline that is acceptable to the Prepetition Agent, then the Debtor will pursue a sale of substantially all of its assets pursuant to Bankruptcy Code section 363. If the Debtor does not enter into the Going Concern Transaction, then the Debtor will conduct store closing sales (the "Store Closing Sales") pursuant to the Agency Agreement.

**C.    The Debtors' Primary Assets And Secured Debts.**

The Debtor's primary assets are as follows:[5]

Cash.    Pursuant to the Debtor's cash management arrangement with the Prepetition Agent, Debtor's cash is swept by the Prepetition Agent daily.    As a result, the Debtor had minimal, if any, cash on hand on the Petition Date.

Accounts Receivable.    As of the Petition Date, the Debtor had approximately $3,785,000 in accounts receivable, primarily consisting of credit card receivables.

Inventory.    As of the Petition Date, the Debtor had inventory with a cost value of approximately $65 million.    However, under the Agency Agreement, Hilco/GB guaranteed a payment to the Debtor of 111% of the cost value of inventory.    Therefore, the Debtor values inventory at $72.15 million ($65 multiplied by 1.11).

Intellectual Property.    As of the Petition Date, the Debtor had intellectual property, including the Debtor's trade name, valued at approximately $4,000,000.

Other Assets.    As of the Petition Date, the Debtor had furniture, fixtures, and equipment ("FF&E") with a fair market value of approximately $125,000. However, under the Agency Agreement, Hilco/GB is entitled to retain all funds from the sale of the FF&E. Therefore, the Debtor currently values FF&E within the calculation of inventory, as set forth above.

As of the Petition Date, pursuant to the Prepetition Credit Agreement, as amended by the First Amendment, the Debtor owed the Prepetition Secured Creditors the Prepetition Obligations totaling approximately $66.425 million.  The Prepetition Obligations include approximately (1) $63 million in principal and interest, (2) $3.2 million in early termination fees, and (3) $225,000 in credit monitoring fees, which are intended to be paid in full with the DIP Facility, with the balance of funds of up to approximately $20 million to be used to pay, inter alia, ongoing operational costs and the costs associated with administering the Debtor's Chapter 11 case in accordance with the Budget attached hereto as **Exhibit "2."**  The Prepetition Agent filed a UCC-

---

[5] The Prepetition Secured Parties and DIP Secured Parties shall not be deemed to have agreed to, or to have waived any objections, with respect to the asset valuations set forth herein.

1 financing statement against the Debtor asserting a lien against substantially all of the Debtor's

assets. A true and correct copy of the financing statement recorded by the Prepetition Agent, as

provided and certified by the Delaware Secretary of State, is attached hereto as **Exhibit "4."**

In addition, as part of the Agency Agreement, Tiger/Yellen Stalking Horse was granted a

security interest in their break up fee of up to $1,000,000. The Debtor anticipates that the UCC-1

Financing Statement related to the foregoing was recorded immediately prior to the Petition

Date. This is a lien that is junior to the Prepetition Agent's lien securing the Prepetition

Obligations and secured by substantially all assets of Debtor. The Tiger/Yellen Stalking Horse

claim will be paid in full by Hilco/GB upon entry of the Interim Order related to the Agency

Agreement, when Hilco/GB makes the initial guarantied payment pursuant to the Agency

Agreement.

As reflected in the annexed Declaration of Todd M. Arnold, the only other financing

statements filed against assets of the Debtor are financing statements filed for equipment leases

or financings. The Debtor is also aware of certain freight forwarders and warehouses that may

assert statutory possessory liens, as addressed in the Debtor's accompanying motion to provide

adequate protection to such creditors. To the best of Debtor's knowledge, the Prepetition Agent

and Tiger/Yellen Stalking Horse are the only creditors that assert a security interest in all of the

Debtor's collateral, including its Cash Collateral.

### a.    The Need For Use Of Cash Collateral And Post-Petition Financing.

Due to the Debtor's current financial condition, the use of the Debtor's Cash Collateral

alone will be insufficient to meet the Debtor's ability to pay immediate and ongoing expenses. The

Debtor requires funding to maintain its business and preserve the value of its assets while the

Debtor pursues the Store Closing Sales and possibly a Going Concern Transaction on an expedited

basis.

In light of the foregoing, the DIP Agent agreed to provide the Debtor with the post-petition

DIP Facility of up to approximately $20 million (plus repayment of all Prepetition Obligations

owed to the Prepetition Secured Creditors) and to allow the Debtor to use the Prepetition Secured

Creditors' Cash Collateral subject to the terms of the DIP Credit Agreement, a true and correct

1   copy of which is attached hereto as **Exhibit "1"** (without schedules and exhibits, other than Exhibit

2   "I," which is the proposed form of the Interim Order),  and in accordance with the Budget, a true

3   and correct copy of which is attached hereto as **Exhibit "2."**

4           Based on the Debtor's Budget, which sets forth the Debtor's projected cash receipts and

5   cash disbursements for the 13-week period following the Petition Date, the Debtor believes that the

6   proposed DIP Facility will provide it with sufficient funds to maintain operations until the Debtor

7   is able to conclude the Store Closing Sales and any Going Concern Transaction.

8           The Debtor was unable to obtain sufficient interim and long-term financing from sources

9   other than the DIP Agent on terms and subject to conditions more favorable than under the DIP

10   Credit Agreement because there is very little availability, if any, in the Debtor's asset base over

11   and above the Prepetition Obligations owed to the Prepetition Secured Creditors and lenders

12   were not willing to lend in a junior position to that of the Prepetition Secured Creditors and is not

13   able to obtain the necessary financing as unsecured credit allowable only as an administrative

14   expense under Section 503(b)(1).  The Debtor was also unable to obtain credit from the DIP

15   Agent without providing the DIP Agent and DIP Lenders with (1) a "super-priority"

16   administrative expense claim pursuant to Section 364(c)(1) for the Prepetition Obligations owed

17   by the Debtor to the Prepetition Secured Creditors under the DIP Credit Agreement, (2)

18   perfected first priority priming DIP Liens on all of the Debtor's pre-petition and post-petition

19   collateral to secure the Prepetition Obligations owed by the Debtor to the Prepetition Secured

20   Creditors under the DIP Credit Agreement pursuant to Section 364(d)(1), and (3) the other

21   protections and inclusions in the DIP Credit Agreement and in the Financing Orders as set forth

22   in the preceding "Summary" and "Other Information Regarding the DIP Credit Agreement and

23   Cash Collateral Use Thereunder" sections hereof.

24           After considering alternatives, the Debtor concluded, in an exercise of its sound business

25   judgment, that the DIP Facility proposed to be provided by the DIP Agent and DIP Lenders, when

26   coupled with the authorization to use Cash Collateral to be provided by the DIP Agent pursuant to

27   the terms of the DIP Credit Agreement, represents the best financing presently available to the

28   Debtor.  The terms of the DIP Credit Agreement are the result of arms-length negotiations between

1  the Debtor and the DIP Agent.   Thus, any credit extended, loans made, and other financial

2  accommodations extended to the Debtor by the DIP Agent have been extended, issued or made, as

3  the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

4  <center>**II.**</center>

5  <center>**THE DEBTOR SHOULD BE AUTHORIZED TO USE CASH COLLATERAL**</center>

6  **A.      The Debtor Must Be Authorized To Use Cash Collateral To Operate, Maintain And**

7  **Preserve Its Assets In Accordance With The Budget.**

8       The Debtor's use of property of the estate is governed by  Bankruptcy Code section 363.

9  11 U.S.C. § 363(c).  Section 363(c)(1) provides in pertinent part:

10
11
12
13
14
> If the business of the debtor is authorized to be operated under
> section. . .1108. . . of this title and unless the court orders
> otherwise, the trustee may enter into transactions, including the
> sale or lease of property of the estate, in the ordinary course of
> business, without notice or a hearing, and may use property of the
> estate in the ordinary course of business without notice or a
> hearing.

15  11 U.S.C. § 363(c)(1).  A debtor in possession has all of the rights and powers of a trustee with

16  respect to property of the estate, including the right to use property of the estate in compliance

17  with Section 363.  11 U.S.C. § 1107(a).

18       "Cash collateral" is defined as "cash, negotiable instruments, documents of title,

19  securities, deposit accounts or other cash equivalents in which the estate and an entity other than

20  the estate have an interest [.]"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special

21  requirement with respect to "cash collateral," providing that the trustee or debtor in possession

22  may use "cash collateral" under subsection (c)(1) if:

23  (A)      each entity that has an interest in such cash collateral
          consents; or
24  (B)      the court, after notice and a hearing, authorizes such use,
          sale or lease in accordance with the provisions of this section.

25

26  11 U. S.C. §363(c)(2)(A) and (B).

27       It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the

28  purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-*

<center>20</center>

1    *Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614

2    (B.A.P. 9th Cir. 1991).  In addition, where the debtor is operating a business, it is extremely

3    important that the access to cash collateral be allowed in order to facilitate the goal of

4    reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

5    collateral is necessary to operate a business."  *In re Dynaco Corporation*, 162 B.R. 389 (Bankr.

6    D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

7            For all of the reasons discussed herein, the Debtor has no ability to continue to maintain

8    its business operations or preserve the value of its assets unless the Debtor has the ability to use

9    its Cash Collateral to pay its projected expenses in accordance with the Budget.  The Debtor's

10    inability to pay those expenses would cause immediate and irreparable harm to the Debtor's

11    bankruptcy estate.  Indeed, the Debtor's inability to pay its expenses, including payroll, utilities,

12    and other "bare bones" operating expenses would result in the immediate shutdown of the

13    Debtor's business and the decimation of the value (going-concern or otherwise) of the Debtor's

14    business and assets.  The maintenance of the Debtor's business and preservation of the Debtor's

15    assets are critical to maximizing value and providing for recoveries to creditors in these cases.

16    **B.      The DIP Agent and Tiger/Yellen Stalking Horse Have Consented to the Debtor's**

17    **        Use of Cash Collateral.**

18            Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a

19    secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is

20    adequately protected.  *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984).  *See also In re*

21    *O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R.

22    261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

23            As noted above, the Debtors believe that the DIP Agent and possibly Tiger/Yellen

24    Stalking Horse are the only parties with valid security interests in the Debtor's Cash Collateral.

25    Here, the DIP Agent has consented to the Debtor's use of Cash Collateral to pay the expenses set

26    forth in the Budget in accordance with the provisions of the DIP Credit Agreement.  The Debtor

27    further understands that Tiger/Yellen consents to such use of Cash Collateral.  Accordingly, the

28    Debtor should be authorized to use its Cash Collateral pursuant to Section 363(c)(2).

Furthermore, the Debtor submits that, to the extent there is any other creditor with an interest in the Debtor's Cash Collateral, such interest in will be adequately protected by, among other things, the maintenance and continued operation of the Debtor's business.  Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood Forest Associates*, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630; *see also, McCombs,* 88 B.R. at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." *McCombs*, 88 B.R. at 266.  The law is clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral.  *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988).  *See also In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982).  The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business.  *See also, In re McCombs*, *supra*, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

As reflected in the Budget, the payment of the expenses necessary for the Debtor to maintain and continue operating its business will adequately protect any other parties with purported interests in the Debtor's Cash Collateral, because, by doing so, the Debtors will be able to preserve the going-concern value of the Debtor's business pending the conclusion of the Store Closing Sales and any Going Concern Transaction, which will benefit all creditors.  Other Courts have determined that a debtor's continued business operations can constitute the adequate protection of a secured creditor.  *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization.  In *In re O'Connor*, *supra*, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest.  Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The use of Cash Collateral is critical to the Debtor's ability to implement an effective reorganization strategy for the benefit of all creditors.  As discussed above, the Debtor already is proceeding expeditiously with the marketing and sale of the Debtor's assets to effectuate the Store Closing Sales and any Going Concern Transaction.  If the Debtor is not permitted to use Cash Collateral to maintain the Debtor's business operations and to preserve the value of the Debtor's assets, the chances of successfully completing the Store Closing Sales and any Going Concern Transaction will evaporate, and the value of the Debtor's assets will be dramatically and negatively impacted.  On the other hand, if the Debtor is authorized to use its Cash Collateral, the Debtor will be able to maintain the Debtor's business operations and preserve the value of the Debtor's assets while the Debtor pursues the successful consummation of a transaction or transactions benefiting all creditors.  The use of Cash Collateral will therefore only enhance the prospect of the Debtor's reorganization.

Since the Debtor believes that the DIP Agent and Tiger/Yellen Stalking Horse (on a very limited basis) are the only parties with an interest in the Debtor's Cash Collateral and both consent to the use thereof in accordance with the terms of the DIP Credit Agreement and the Budget, the Debtor submits that the requirements of Section 363(c)(2) have been satisfied and that the Debtor should be authorized to use its Cash Collateral in accordance with the DIP Credit

Agreement and the Budget.

### III.

### THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN THE PROPOSED

### POST-PETITION DIP FACILITY

**A.    The Debtor Should Be Authorized To Obtain The Proposed Post-Petition Secured DIP Facility From the DIP Agent To Maintain The Debtor's Business And To Maintain And Preserve The Value Of The Debtor's Assets.**

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  Section 364(c) provides, in pertinent part, that:

> (c)   If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
> (1)   with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:
> (2)   secured by a lien on property of the estate that is not otherwise subject to a lien; or
> (3)   secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans.  Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

> (1)     the trustee is unable to obtain such credit otherwise; and
> (2)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal

24

1    lien is proposed to be granted.

2    11 U.S.C. § 364 (d)(1).

3    Section 364 is structured with an escalating series of inducements which a debtor in

4    possession may offer to attract credit during the post-petition period. *In re Photo Promotion*

5    *Associates, Inc.*, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989).

6    Where a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit,

7    such credit may be obtained under certain carefully proscribed conditions. *In re T.M. Sweeney &*

8    *Sons LTL Services, Inc.*, 131 B.R. 984, 989 (Bankr.N.D.Ill.1991). For example, if creditors are

9    unwilling to extend unsecured credit to a debtor in possession, further inducements are offered,

10   with court approval after notice and a hearing, including, without limitation, liens equal to or

11   senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d). *In re*

12   *Photo Promotion Associates, Inc.*, 87 B.R. at 839.

13   Section 364(c) also enumerates certain incentives that a court may grant to post-petition

14   lenders. However, the list set forth in Section 364(c) is not exhaustive. Courts have frequently

15   authorized the use of inducements not specified in the statute. *See, e.g., In re Ellingsen MacLean*

16   *Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges

17   to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D.

18   Ariz. 1991) (authorizing enhancement fee to post-petition lender), *aff'd* 145 B.R. 312, 316

19   (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial

20   arrangements containing lender incentives beyond the explicit priorities and liens specified in

21   section 364").

22   As discussed above, the Debtor's cash has been swept daily by the Prepetition Agent

23   pursuant to the terms of the Prepetition Credit Agreement. As a result, on the Petition Date, the

24   Debtor had no cash with which to fund expenses. In addition, the Debtor's projection show that,

25   even if the Debtor has access to cash, it is insufficient to fund post-petition operations, especially

26   considering the administrative costs related thereto. Additional financing is necessary to proceed

27   with operations pending orderly liquidation and preserve the value of the Debtor's remaining

28   assets, which may benefit unsecured creditors of the estate.

1    Subject to the approval of the Court, and in order to obtain the necessary DIP Facility, the

2    Debtor has agreed to provide the DIP Agent with (1) the DIP Superiority Claim pursuant to

3    Section 364(c)(1) for all amounts owed by the Debtor under the DIP Credit Agreement, (2)

4    perfected first priority priming DIP Liens on all of the Debtor's pre-petition and post-petition

5    collateral to secure all obligations under the DIP Credit Agreement pursuant to Section

6    364(d)(1), and (3) the other protections and inclusions in the Financing Orders as set forth in the

7    preceding "Summary" and "Other Information Regarding the DIP Credit Agreement and Cash

8    Collateral Use Thereunder" sections hereof.

9    For all of the reasons explained herein, the Debtor believes that granting the DIP Agent

10    the DIP Liens (as well as the other protections being provided under the DIP Credit Agreement)

11    is warranted, appropriate and necessary given the circumstances of this case where the DIP

12    Agent has agreed to provide the Debtor with critically necessary emergency DIP Facility and to

13    consensual Cash Collateral use, without which the Debtor would be forced to shut down and

14    immediately liquidate.

15    Two factors courts consider in determining whether to authorize post-petition financing

16    which contemplates the granting of a security interest in favor of the lender are (1) whether the

17    debtor is unable to obtain unsecured credit per Section 364(b), *i.e.*, by allowing a lender only an

18    administrative claim per Section 364(b)(1)(A); and (2) whether the terms of the transaction are

19    fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed

20    lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also In re Aqua*

21    *Assoc.*, 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

22    In addition to the foregoing, a debtor in possession seeking subordination of liens to new

23    financing must establish adequate protection of the liens to be subordinated to the new financing.

24    *In re C.B.G. Ltd.*, 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992).

25    The Debtor submits that all of these standards have been satisfied in this case.

26    **1.    *The Debtor Is Unable To Obtain Unsecured Credit Or Secured Credit On A***

27    ***Junior Lien Basis.***

28    In satisfying the standards of Section 364, a debtor need not seek credit from every

1  available source, but should make a reasonable effort to seek other sources of credit available

2  under § 364(a) and (b).  *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986)

3  (trustee had demonstrated by good faith effort that credit was not available without senior lien by

4  unsuccessfully contacting other financial institutions in immediate geographic area; "the statute

5  imposes no duty to seek credit from every possible lender before concluding that such credit is

6  unavailable"); *Ames, supra*, 115 B.R. at 40 (finding that debtors demonstrated the unavailability

7  of unsecured financing where debtors approached four lending institutions).

8      To date, the best (and only current) post-petition financing commitment that has been

9  provided to the Debtor is the one offered by the DIP Agent.  In order to avoid a complete

10 shutdown of the Debtor's business and immediate liquidation of the Debtor's assets, the Debtor

11 diligently sought additional financing before the Debtor's bankruptcy filing.  All sources of

12 funding required that the Prepetition Secured Creditors be taken out and were unwilling to

13 provide junior financing.  Moreover, based on the high loan-to-value situation, the Debtor

14 priming the Prepetition Secured Creditors would not be realistic since the Debtor would have to

15 show that the Prepetition Secured Creditors are adequately protected during a liquidation that

16 depletes collateral.  Additionally, given the amount of the Debtor's secured debt and the potential

17 value of the Debtor's assets, it was not realistic for any lender to be willing to provide the Debtor

18 with unsecured financing or even secured financing on a junior lien basis.  Fortunately, the DIP

19 Agent (which is also the Prepetition Agent regarding the Prepetition Obligations) and the only

20 party (other than Tiger/Yellen Stalking Horse (on a very limited basis)) believed to have a lien

21 on all of the Debtor's assets, including its Cash Collateral, offered to provide the Debtor with

22 post-petition secured financing but solely on the terms and conditions set forth in the DIP Credit

23 Agreement.  The DIP Agent has presumably agreed to provide financing to the Debtor, when no

24 other lender has expressed a willingness to do so (on equal or better terms), in the hopes of

25 maximizing the recovery on the Prepetition Obligations.  The Debtor has little doubt that, even if

26 there was another lender who was willing to provide the Debtor with the necessary post-petition

27 financing (recognizing that the Debtor is not aware of any such lender at this time), such lender

28 would require that its financing be secured by a senior priming lien against the Debtor's assets,

1  upon terms that would very likely be less favorable than those offered by the DIP Agent.  The

2  terms and conditions set forth in the DIP Credit Agreement have been negotiated extensively, in

3  good faith and at arms' length, by the parties.

4        After considering all of their alternatives, the Debtor has concluded, in an exercise of its

5  sound business judgment, that the DIP Facility to be provided by the DIP Agent (particularly, in

6  conjunction with the authorization to use Cash Collateral to be provided by the DIP Agent)

7  represents the best financing presently available to the Debtor.

8        **2.**       ***The Terms Of The Proposed Post-Petition DIP Facility From the DIP Agent***

9          ***Are Fair, Reasonable, and Adequate.***

10        The Debtors submit that terms of the proposed DIP Facility from the DIP Agent are fair,

11  reasonable, and adequate.  As noted above, the terms and conditions set forth in the DIP Credit

12  Agreement were negotiated extensively, in good faith and at arms' length, by the parties.  The

13  DIP Agent is well aware of the fact that the Debtor would have very little chance of avoiding an

14  immediate shutdown of the Debtor's business if not for the DIP Facility offered by the DIP

15  Agent.  The DIP Agent has agreed to provide the DIP Facility to the Debtor in an effort to assist

16  the Debtor in preserving the going-concern value of the Debtor's business and to facilitate the

17  successful consummation of the Store Closing Sales and any Going Concern Transaction.  The

18  amount of financing being offered to the Debtor is certainly not insignificant.  The Debtor

19  submits that the benefits afforded to the Debtor by the DIP Facility justify the protections being

20  afforded under the terms of the DIP Credit Agreement.  The DIP Facility offers the Debtor its

21  best and, likely, only opportunity to maintain and preserve the value of its assets while pursuing

22  the Store Closing Sales and any Going Concern Transaction, which will benefit of all creditors

23  and parties in interest in these cases.

24        Based on the foregoing, the Debtor believes that (1) the terms and conditions of the

25  proposed DIP Facility under the DIP Credit Agreement are fair and reasonable, reflect the

26  Debtor's exercise of prudent business judgment in light of the current circumstances and are

27  supported by reasonably equivalent value and fair consideration, (2) the DIP Facility has been

28  negotiated in good faith and at arm's length by the Debtors and the DIP Agent, and (3) any credit

extended, loans made and other financial accommodations extended to the Debtors by the DIP

Agent and DIP Lenders have been extended, issued or made, as the case may be, in "good faith"

within the meaning of Section 364(e).

**3.      *The Prepetition Agent Consented To The Priming of Its Liens Securing the Prepetition Obligations And The Prepetition Agent's Liens And Any Other Liens Being "Primed" Are Adequately Protected.***

The proposed priming liens are authorized by the Bankruptcy Code, even absent consent

of other existing lien holders.   Section 364(d)(1)(B) of the Bankruptcy Code requires the

furnishing of adequate protection in favor of lien holders which assert an interest in collateral.

11 U.S.C. §§ 364(d)(1)(B).  Although section 364 does not specifically define the term "adequate

protection," Bankruptcy Code section 361 requires that adequate protection be furnished to the

extent Debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest

in such property."  11 U.S.C. §§ 361(1), (2), (3).  Stated succinctly, adequate protection protects

a secured creditor against a decrease in the value of its collateral.  *See e.g., In re Planned System,*

*Inc.*, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987).  This standard applies equally with respect to

"priming" financing under section 364(d)(1)(B).  *See, e.g., In re Hubbard Power & Light*, 202

B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the

provision entitling a debtor to obtain financing secured by liens senior to all other interests is to

safeguard the secured creditor from diminution in the value of its interests."); *In re Aqua Assoc.*,

123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Beker Ind. Corp.*, 58 B.R. 725, 741-42 (Bankr.

S.D.N.Y. 1986).

The Court has broad discretion to determine whether adequate protection is furnished.

*See e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).  Whether

the party entitled to such protection is over or undersecured is not dispositive of whether

adequate protection is furnished.  As the court in *Aqua Assoc.*, 123 B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion
> should be a relevant factor, it should not be a determinative factor
> in any 'adequate protection' analysis, and particularly one relating
> to § 364(d)(1)(B).   The important question, in determination of

> whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

*Id.* at 196 (emphasis added; approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate).

The Prepetition Agent holds a claim for the Prepetition Obligations in the approximate amount of $66.425 million that is secured by a first priority lien against most of the Debtor's assets. Pursuant to the DIP Credit Agreement, the Prepetition Agent is consenting to the "priming" of the liens securing the Prepetition Obligations. Further, the Prepetition Agent is adequately protected, because the DIP Credit Agreement provides for the payment of the Prepetition Obligations with the proceeds of the DIP Facility, which will effectively eliminate the Prepetition Agent's liens securing the Prepetition Obligations that are to be "primed." Debtor further understands that Tiger/Yellen Stalking Horse consent to the foregoing as well, although will likely be taken out by the time of the funding herein.

The only other secured creditors with liens on the Debtor's assets that Debtor is aware of, as reflected in the UCC Summary and as set forth in the annexed Declaration of Todd M. Arnold, are the parties with liens on specific personal property under purchase money or secured lease transactions. Under the terms of the DIP Credit Agreement, the valid, existing and perfected security interests and liens held by purchase money vendors and/or personal property lessors that existed as of the Petition Date and which were senior in priority to the existing security interests of the Prepetition Agent are ***not*** being primed. Accordingly, the Debtor is not aware of any secured creditor whose lien will effectively be "primed" by the lien granted to the DIP Agent to secure the DIP Facility (other than the Prepetition Agent and Tiger/Yellen Stalking Horse who are consenting).

It is by virtue of the DIP Facility that the Debtor will have the ability to maintain its business operations and preserve the value of its assets while the Debtors pursue the Store Closing Sales and any Going Concern Transaction in order to maximize value for all creditors. The Debtor therefore submits that, to the extent any creditor holds a lien against the Debtor's

1    assets which is being primed (which the Debtor is not aware of), such secured creditor is

2    adequately protected as a result of, and indeed will substantially benefit from, the DIP Facility.

3        **4.**     *The Proposed DIP Facility From the DIP Agent Is Necessary And Proper.*

4        While in determining whether to approve such a transaction, a Court is authorized to act

5    in its informed discretion, *In re Ames Department Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y.

6    1990), the Court should give broad deference to the business decision of a Chapter 11 debtor,

7    particularly with respect to a debtor's business judgment regarding the need for and proposed use

8    of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). As

9    the Court noted in *In re Ames Dept. Stores Inc., supra*, "the court's discretion under section 364

10    is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to

11    be exercised . . ." *In re Ames Department Stores, Inc.*, 115 B.R. at 40.

12        There is little dispute that, without substantial post-petition financing, the Debtor will be

13    forced to immediately cease business operations and engage in a disorderly fire-sale liquidation

14    of its assets without the ability to maximize value through the Store Closing Sales or any Going

15    Concern Transaction, which would result in pennies on the dollar for the inventory as compared

16    to the current guaranties gross bid of $1.11 per cost dollar of inventory. There can also be no

17    question that such a result would cause the Debtor, its estate and its creditors immediate and

18    irreparable harm. In contrast, the proposed DIP Facility affords the Debtor the ability to

19    maintain the going-concern value of its business and provides the Debtor with the time necessary

20    to pursue an expedited but orderly liquidation through the Store Closing Sales or any Going

21    Concern Transaction. The Debtor has therefore concluded that obtaining the proposed DIP

22    Facility from the DIP Agent is critically important to maximizing the recovery for creditors, and

23    is therefore in the best interests of the Debtor's estate.

24        **IV.**

25        <u>**THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE**</u>

26        For the reasons noted herein, the Debtor will suffer immediate and irreparable harm if the

27    Debtor is not able to pay the expenses set forth in the Budget, pending a final hearing on the

28    Motion. The Debtor requires the terms of the Interim Order to become immediately effective to

1  ensure that the Debtor will be able to use their Cash Collateral and obtain the proposed DIP

2  Facility from the DIP Agent to pay such critical expenses.  Based on the foregoing, the Debtor

3  requests that any applicable stay, including the stay provided under FRBP 6004, be waived to

4  allow the Interim Order to become immediately effective.

5  <div align="center">**V.**</div>

6  <div align="center">**CONCLUSION**</div>

7  Based upon all of the foregoing, the Debtor respectfully requests that the Court:

8  (1)    grant the relief requested in the Motion on an interim basis;

9  (2)    enter the proposed form of the Interim Order attached as Exhibit "I" to the DIP

10  Credit Agreement, which is attached hereto as Exhibit "1;"

11  (3)    schedule a Final Hearing on the Motion to consider entry of a Final Order

12  granting the relief requested in the Motion on a final basis; and

13  (4)    grant such further relief as the Court deems just and proper.

14

15  Dated:  June 15, 2015                    ANNA'S LINENS, INC.

16                                   By:___ */s/ David B. Golubchik*_____
                                        DAVID B. GOLUBCHIK
17                                       EVE H. KARASIK
                                        JULIET Y. OH
18                                       LEVENE, NEALE, BENDER, YOO
                                           & BRILL L.L.P.
19                                       Proposed Attorneys for Debtor and
20                                       Debtor in Possession

21

22

23

24

25

26

27

28

## DECLARATION OF J.E. RICK BUNKA

I, J.E. Rick Bunka, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.      I am the sole member of Point North, LLC, a financial advisory services firm that specializes in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. In my capacity as the sole member of Point North, LLC  I have been engaged as the Chief Financial Officer Anna's Linens, Inc., the debtor and debtor in possession in the above-captioned bankruptcy case (the "<u>Debtor</u>" or "<u>Anna's</u>"), and am therefore familiar with the business operations and financial books and records of the Debtor.

3.      I have access to the Debtor's books and records.  I am familiar with the history, organization, operations and financial condition of the Debtor.   The records and documents referred to in this declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own personal knowledge and my knowledge of the Debtor's books and records.

4.      I make this declaration in support of the Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Debtor to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d)(1) and 364(e), and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Pre-Petition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (IV) Granting Related Relief (the "<u>Motion</u>").

5.      The Debtor is a corporation incorporated in the State of Delaware.

6.      The Debtor filed a voluntary petition under Chapter 11 of Bankruptcy Code on June 14, 2015 (the "<u>Petition Date</u>").  The Debtor continues to operate its business, manage its financial

1  affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and

2  1108 of the Bankruptcy Code.

3      7.      The Debtor is a leading specialty retailer offering high quality and stylish home

4  textiles, furnishings, and décor at attractive prices.  The Debtor is headquartered in Costa Mesa,

5  California, operates a chain of 261 company owned retail stores throughout 19 states in the United

6  States (including Puerto Rico and Washington, D.C.), generates over $300 million in annual

7  revenue, and employs a workforce of over 2,500.

8      8.      Over the last 25 years, the Debtor has built its store base through a clustering

9  approach in key markets, including Los Angeles, Dallas, Chicago, Miami and Houston.  The

10  Debtor has three distribution centers to support its nationwide presence in Fontana, California,

11  Coppell, Texas, and Charlotte, North Carolina.  The Debtor leases its distribution centers, which

12  are operated by third-party logistics providers.

13      9.      The Debtor employs a flexible small-box retail strategy with approximately 9,500

14  square foot stores with a focus on price, value, and expert customer service.  The Debtor's stores

15  are typically located in high traffic strip centers in the heart of local neighborhoods that the stores

16  are servicing. The Debtor also has developed an e-commerce platform that provides customers

17  across the country with access to the Debtor's full merchandise assortment. The Debtor's model

18  enables it to compete well with traditional self-service big box home retailers and discounters.

19      10.      The Debtor targets a large and growing segment of the United States population

20  that values fashion, brand names and customer service, but is seeking high value and attractive

21  price points. Merchandise is selected to appeal to its core customer base and is focused on

22  domestic items such as bed linens, bath items, kitchen textiles, window drapes, and furniture

23  covers, and certain home furnishing categories.

24      11.      The Debtor opened its first store in 1987, and by 2013, it had 309 stores.  Beginning

25  in 2011, the Debtor started experiencing significant financial and operational challenges.  The

26  Debtor was unsuccessful in some of its new markets such as Puerto Rico and St. Louis, and

27  overbuilt otherwise healthy markets in response to its new television marketing.  In addition, the

28  Debtor's core demographic changed as Generation X and Millennials replaced Baby Boomers as

the primary home furnishing shoppers.  Merchandise did not resonate with the new shoppers, and aged and unfashionable inventory remained in the stores reaching a high of $380,000 per store by fiscal year 2013.  The Debtor's shift to "Every Day Low Prices" from promotions and in-store discounts as well as new expensive television advertising strategy did not attract customers.

12.    The over expansion and excess inventory led to increased indebtedness and, ultimately, a default with the Debtor's long-time lender, Union Bank.  In order to refinance the Debtor's obligations to Union Bank, the Debtor entered into the Prepetition Credit Agreement with the Prepetition Secured Creditors for an $80 million line of credit on July 18, 2014.  A true and correct copy of the Prepetition Credit Agreement (without its exhibits, schedules, or documents and agreements related thereto, except for that certain "Fee Letter" dated July 18, 2014)  is attached as **Exhibit "1"** to the appendix of supplemental exhibits submitted in support of the Motion (the "Supplemental Appendix").

13.    On March 30, 2015 the Debtor notified the Prepetition Agent of a Default or Event of Default for failure to maintain a specified Operating Expenditures to Gross Margin Dollars Ratio under the Prepetition Credit Agreement.  On April 29, 2015, the Prepetition Agent delivered to the Debtor a notice of Events of Default and Reservations of Rights based on the existing defaults under the Prepetition Credit Agreement.  After negotiation between the Debtor and the Prepetition Agent, the Prepetition and Prepetition Lenders agreed to waive such Events of Default and, on May 13, 2015, the Prepetition Agent delivered to the Debtor the "First Amendment and Waiver to the Credit Agreement" (the "First Amendment"). A true and correct copy of the First Amendment is attached as **Exhibit "2"** to the Supplemental Appendix.  The First Amendment provided a waiver of the Specific Defaults (as defined therein) and provided certain consents under amendments to the Prepetition Credit Agreement including, without limitation, (1) increased availability through removal of an availability block, (2) a requirement for the Debtor to deliver and abide by a Cash Flow Budget, (3) an agreement by the Debtor to place specific milestones on activities with several projects that were already underway, and (4) payment of certain fees and expenses.

14.    Over the resulting weeks, the Debtor's merchandise vendors significantly reduced

delivery of anticipated merchandise resulting in an additional default of the Prepetition Credit Agreement. As a result of the Prepetition Credit Agreement defaults, and the inability of the Debtor to affect the Capital Transaction prepetition, the Debtor determined it was necessary to commence the Chapter 11 Case.

15.    Prepetition, the Debtor engaged in a process whereby simultaneously the Debtor negotiated with its largest vendors to convert certain trade payables into long term Junior Secured Notes Payables to create additional long term liquidity and, through its investment banker Wunderlich Securities, Inc. ("Wunderlich"), it pursued additional outside investments to recapitalize its balance sheet. Wunderlich undertook a broad process in search of additional capital that included contacting over 200 investors and institutions. Wunderlich's efforts resulted in the receipt of multiple written indications of interest from potential acquirers and investors, including a Letter of Intent (the "LOI") from DW Partners, LP ("DW Partners"). The Debtor, in consultation with its advisers, determined that the DW Partners' LOI was the highest and best received. The Debtor and DW Partners are currently in the process of negotiating a definitive asset purchase agreement for a going concern transaction (the "Going Concern Transaction" and the "Going Concern APA"). The Debtor is using best efforts to achieve a transaction that will preserve the Debtor's business operations, which will preserve jobs of thousands of employees, going forward customer for the Debtor's vendors and the Debtor's continuing support of the local communities in which the Debtor's stores operate. I believe that the Debtor has until Friday, June 19, 2015 to execute the Going Concern APA. I understand that any such Going Concern APA would require the consent of the Prepetition Agent. If the Debtor enters into the Going Concern Transaction by such date and any required Prepetition Agent consent is received, then the Debtor intends to go forward with a Bankruptcy Code section 363 sale and auction process with DW Partners as the stalking horse purchaser.

16.    As required by the First Amendment, the Debtor has also engaged in a process to identify and select a stalking horse bidder for the possible sale and/or liquidation of the business as an alternative to the Going Concern Transaction. The Debtor's efforts to retain a liquidator resulted in the execution of the Stalking Horse Agency Agreement with a joint venture comprised

of Tiger Capital Group ("<u>Tiger</u>") and Yellen Partners, LLC ("<u>Yellen</u>" together with Tiger, "<u>Tiger/Yellen Stalking Horse</u>"), which included a guarantee from Tiger/Yellen Stalking Horse that the Debtor would receive 93.5% of the aggregate Cost Value of the Merchandise (terms as defined in the Stalking Horse Agency Agreement), subject to certain adjustments, Further, as a result of the default, an auction was held on June 9, 2015 and June 10, 2015 at which the Tiger/Yellen Stalking Horse was outbid by a group formed by Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "<u>Hilco/GB</u>"), which included an increase in the guarantee to 111% of the Cost Value of the Merchandise with a Merchandise Threshold (terms as defined in the Agency Agreement, defined below) of not less than $61.5 million and not more than $67 million, subject to certain adjustments. The Debtor and Hilco/GB, with the approval of the Prepetition Agent, signed an Agency Agreement (the "<u>Agency Agreement</u>") on June 11, 2015.

17.    The Debtor and the Prepetition Agent agreed that if the Going Concern APA is executed and the Prepetition Agent consents to such Going Concern APA, the Agency Agreement will convert to an equity transaction for a lesser number of stores, allowing the Debtor to pursue an alternative exit strategy for the Chapter 11 Case. If the Debtor enters into such Going Concern Transaction by the deadline that is acceptable to the Prepetition Agent, then the Debtor will pursue a sale of substantially all of its assets pursuant to Bankruptcy Code section 363. If the Debtor does not enter into the Going Concern Transaction, then the Debtor will conduct store closing sales (the "<u>Store Closing Sales</u>") pursuant to the Agency Agreement.

18.    The Debtor's primary assets are as follows:

<u>Cash</u>.   Pursuant to the Debtor's cash management arrangement with the Prepetition Agent, Debtor's cash is swept by the Prepetition Agent daily.  As a result, the Debtor had minimal, if any, cash on hand on the Petition Date.

<u>Accounts Receivable</u>.   As of the Petition Date, the Debtor had approximately $3,785,000 in accounts receivable, primarily consisting of credit card receivables.

<u>Inventory</u>.   As of the Petition Date, the Debtor had inventory with a cost value of approximately $65 million.  However, under the Agency Agreement, Hilco/GB guaranteed a

payment to the Debtor of 111% of the cost value of inventory.  Therefore, the Debtor values inventory at $72.15 million ($65 multiplied by 1.11).

Intellectual Property.  As of the Petition Date, the Debtor had intellectual property, including the Debtor's trade name, valued at approximately $4,000,000.

Other Assets.  As of the Petition Date, the Debtor had furniture, fixtures, and equipment ("FF&E") with a fair market value of approximately $125,000.  However, under the Agency Agreement, Hilco/GB is entitled to retain all funds from the sale of the FF&E. Therefore, the Debtor currently values FF&E within the calculation of inventory, as set forth above.

19.    As of the Petition Date, pursuant to the Prepetition Credit Agreement, as amended by the First Amendment, the Debtor owed the Prepetition Secured Creditors the Prepetition Obligations totaling approximately $66.425 million.   The Prepetition Obligations include approximately (1) $63 million in principal and interest, (2) $3.2 million in early termination fees, and (3) $225,000 in credit monitoring fees, which are intended to be paid in full with the DIP Facility, with the balance of funds of up to approximately $20 million to be used to pay, inter alia, ongoing operational costs and the costs associated with administering the Debtor's Chapter 11 case in accordance with the Budget attached hereto as **Exhibit "2."**  I am informed and believe that the Prepetition Agent filed a UCC-1 financing statement against the Debtor asserting a lien against substantially all of the Debtor's assets per the financing statement recorded by the Prepetition Agent, as provided and certified by the Delaware Secretary of State, a copy of which is attached hereto as **Exhibit "4."**

20.    In addition, as part of the Agency Agreement, Tiger/Yellen Stalking Horse was granted a security interest in their break up fee of up to $1,000,000.  I anticipate that the UCC-1 Financing Statement related to the foregoing was recorded immediately prior to the Petition Date.   This is a lien that is junior to the Prepetition Agent's lien securing the Prepetition Obligations and secured by substantially all assets of Debtor.  The Tiger/Yellen Stalking Horse claim will be paid in full by Hilco/GB upon entry of the Interim Order related to the Agency Agreement, when Hilco/GB makes the initial guarantied payment pursuant to the Agency

Agreement.

21.    Based on the annexed Declaration of Todd M. Arnold, I am informed and believe that the only other financing statements filed against assets of the Debtor are financing statements filed for equipment leases or financings.  I am also aware of certain freight forwarders and warehouses that may assert statutory possessory liens, as addressed in the Debtor's accompanying motion to provide adequate protection to such creditors.  To the best of my knowledge, the Prepetition Agent and Tiger/Yellen Stalking Horse are the only creditors that assert a security interest in all of the Debtor's collateral, including its Cash Collateral.

22.    Due to the Debtor's current financial condition, the use of the Debtor's Cash Collateral alone will be insufficient to meet the Debtor's ability to pay immediate and ongoing expenses.  The Debtor requires funding to maintain its business and preserve the value of its assets while the Debtor pursues the Store Closing Sales and possibly a Going Concern Transaction on an expedited basis.

23.    In light of the foregoing, the DIP Agent agreed to provide the Debtor with the post-petition DIP Facility of up to approximately $20 million (plus repayment of all Prepetition Obligations owed to the Prepetition Secured Creditors) and to allow the Debtor to use the Prepetition Secured Creditors' Cash Collateral subject to the terms of the DIP Credit Agreement, a true and correct copy of which is attached hereto as **Exhibit "1"** (without schedules and exhibits, other than Exhibit "I," which is the proposed form of the Interim Order),  and in accordance with the Budget, a true and correct copy of which is attached hereto as **Exhibit "2."**

24.    Based on the Debtor's Budget, which sets forth the Debtor's projected cash receipts and cash disbursements for the 13-week period following the Petition Date, the Debtor believes that the proposed DIP Facility will provide it with sufficient funds to maintain operations until the Debtor is able to conclude the Store Closing Sales and any Going Concern Transaction.

25.    The Debtor was unable to obtain sufficient interim and long-term financing from sources other than the DIP Agent on terms and subject to conditions more favorable than under the DIP Credit Agreement because there is very little availability, if any, in the Debtor's asset

base over and above the Prepetition Obligations owed to the Prepetition Secured Creditors and lenders were not willing to lend in a junior position to that of the Prepetition Secured Creditors and is not able to obtain the necessary financing as unsecured credit allowable only as an administrative expense under Section 503(b)(1).  The Debtor was also unable to obtain credit from the DIP Agent without providing the DIP Agent and DIP Lenders with (1) a "super-priority" administrative expense claim pursuant to Section 364(c)(1) for the Prepetition Obligations owed by the Debtor to the Prepetition Secured Creditors under the DIP Credit Agreement, (2) perfected first priority priming DIP Liens on all of the Debtor's pre-petition and post-petition collateral to secure the Prepetition Obligations owed by the Debtor to the Prepetition Secured Creditors under the DIP Credit Agreement pursuant to Section 364(d)(1), and (3) the other protections and inclusions in the DIP Credit Agreement and in the Financing Orders as set forth in the preceding "Summary" and "Other Information Regarding the DIP Credit Agreement and Cash Collateral Use Thereunder" sections hereof.

26.    After considering alternatives, I concluded, in an exercise of my business judgment, that the DIP Facility proposed to be provided by the DIP Agent and DIP Lenders, when coupled with the authorization to use Cash Collateral to be provided by the DIP Agent pursuant to the terms of the DIP Credit Agreement, represents the best financing presently available to the Debtor.  The terms of the DIP Credit Agreement are the result of arms-length negotiations between the Debtor and the DIP Agent.

27.    The DIP Agent has consented to the Debtor's use of Cash Collateral to pay the expenses set forth in the Budget in accordance with the provisions of the DIP Credit Agreement. I further understand that Tiger/Yellen consents to such use of Cash Collateral.

28.    The use of Cash Collateral is critical to the Debtor's ability to implement an effective reorganization strategy for the benefit of all creditors.  As discussed above, the Debtor already is proceeding expeditiously with the marketing and sale of the Debtor's assets to effectuate the Store Closing Sales and any Going Concern Transaction.  If the Debtor is not permitted to use Cash Collateral to maintain the Debtor's business operations and to preserve the value of the Debtor's assets, the chances of successfully completing the Store Closing Sales and

any Going Concern Transaction will evaporate, and the value of the Debtor's assets will be dramatically and negatively impacted. On the other hand, if the Debtor is authorized to use its Cash Collateral, the Debtor will be able to maintain the Debtor's business operations and preserve the value of the Debtor's assets while the Debtor pursues the successful consummation of a transaction or transactions benefiting all creditors.

29.    The Debtor's cash has been swept daily by the Prepetition Agent pursuant to the terms of the Prepetition Credit Agreement. As a result, on the Petition Date, the Debtor had no cash with which to fund expenses. In addition, the Debtor's projection show that, even if the Debtor has access to cash, it is insufficient to fund post-petition operations, especially considering the administrative costs related thereto. Additional financing is necessary to proceed with operations pending orderly liquidation and preserve the value of the Debtor's remaining assets, which may benefit unsecured creditors of the estate.

30.    For all of the reasons explained herein, I believe that granting the DIP Agent the DIP Liens (as well as the other protections being provided under the DIP Credit Agreement) is warranted, appropriate and necessary given the circumstances of this case where the DIP Agent has agreed to provide the Debtor with critically necessary emergency DIP Facility and to consensual Cash Collateral use, without which the Debtor would be forced to shut down and immediately liquidate.

31.    To date, the best (and only current) post-petition financing commitment that has been provided to the Debtor is the one offered by the DIP Agent. In order to avoid a complete shutdown of the Debtor's business and immediate liquidation of the Debtor's assets, the Debtor diligently sought additional financing before the Debtor's bankruptcy filing. All sources of funding required that the Prepetition Secured Creditors be taken out and were unwilling to provide junior financing. Moreover, based on the high loan-to-value situation, I do not believe that the Debtor priming the Prepetition Secured Creditors would be realistic since the Debtor would have to show that the Prepetition Secured Creditors are adequately protected during a liquidation that depletes collateral. Additionally, given the amount of the Debtor's secured debt and the potential value of the Debtor's assets, I do not believe it was not realistic for any lender

to be willing to provide the Debtor with unsecured financing or even secured financing on a junior lien basis.

32.    I have little doubt that, even if there was another lender who was willing to provide the Debtor with the necessary post-petition financing (recognizing that the Debtor is not aware of any such lender at this time), such lender would require that its financing be secured by a senior priming lien against the Debtor's assets, upon terms that would very likely be less favorable than those offered by the DIP Agent.    The terms and conditions set forth in the DIP Credit Agreement have been negotiated extensively, in good faith and at arms' length, by the parties.

33.    After considering all of their alternatives, I have concluded, in an exercise of my business judgment, that the DIP Facility to be provided by the DIP Agent (particularly, in conjunction with the authorization to use Cash Collateral to be provided by the DIP Agent) represents the best financing presently available to the Debtor.

34.    I submit that terms of the proposed DIP Facility from the DIP Agent are fair, reasonable, and adequate.    As noted above, the terms and conditions set forth in the DIP Credit Agreement were negotiated extensively, in good faith and at arms' length, by the parties.    The DIP Agent is well aware of the fact that the Debtor would have very little chance of avoiding an immediate shutdown of the Debtor's business if not for the DIP Facility offered by the DIP Agent.    The DIP Agent has agreed to provide the DIP Facility to the Debtor in an effort to assist the Debtor in preserving the going-concern value of the Debtor's business and to facilitate the successful consummation of the Store Closing Sales and any Going Concern Transaction.    I believe that the benefits afforded to the Debtor by the DIP Facility justify the protections being afforded under the terms of the DIP Credit Agreement.    The DIP Facility offers the Debtor its best and, likely, only opportunity to maintain and preserve the value of its assets while pursuing the Store Closing Sales and any Going Concern Transaction, which will benefit of all creditors and parties in interest in these cases.

35.    It is by virtue of the DIP Facility that the Debtor will have the ability to maintain its business operations and preserve the value of its assets while the Debtors pursue the Store

1   Closing Sales and any Going Concern Transaction in order to maximize value for all creditors.

2          36.     There is little dispute that, without substantial post-petition financing, the Debtor

3   will be forced to immediately cease business operations and engage in a disorderly fire-sale

4   liquidation of its assets without the ability to maximize value through the Store Closing Sales or

5   any Going Concern Transaction, which would result in pennies on the dollar for the inventory as

6   compared to the current guaranties gross bid of $1.11 per cost dollar of inventory.  There can

7   also be no question that such a result would cause the Debtor, its estate and its creditors

8   immediate and irreparable harm.  In contrast, the proposed DIP Facility affords the Debtor the

9   ability to maintain the going-concern value of its business and provides the Debtor with the time

10  necessary to pursue an expedited but orderly liquidation through the Store Closing Sales or any

11  Going Concern Transaction.  The I have therefore concluded that obtaining the proposed DIP

12  Facility from the DIP Agent is critically important to maximizing the recovery for creditors, and

13  is therefore in the best interests of the Debtor's estate.

14         I declare under penalty of perjury that the foregoing is true and correct to the best of my

15  knowledge.

16         Executed on this 15th day of June 2015, at Costa Mesa, California.

J.E. RICK BUNKA

### DECLARATION OF TODD M. ARNOLD

I, Todd M. Arnold, hereby declare as follows:

1.      I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.      I am a partner of Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), bankruptcy counsel to Anna's Linens, Inc., the debtor and debtor in possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor").  I am licensed to practice law in the State of California and before this Court.

3.      I make this declaration in support of the Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Debtor to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d)(1) and 364(e), and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Pre-Petition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (IV) Granting Related Relief (the "Motion").

4.      I am informed and advised by the Debtor that it is a corporation incorporated in the State of Delaware.

5.      On or about June 3, 2015, LNBYB obtained copies of financing statements recorded with the Delaware Secretary of State's office for the Debtor, and, on or about May 13, 2015, LNBYB obtained copies of financing statements filed with the California Secretary of State's office for the Debtor (collectively, the "UCC Financing Statements").  A true and correct copy of the summaries of the UCC Financing Statements recorded in Delaware, as certified by the Delaware Secretary of State, and California, as provided by third-party service provider, Class Information Services, are collectively attached hereto as **Exhibit "3."**

6.      I have reviewed the UCC Financing Statements.  Based on that review, a brief summary of the active filings with respect to the Debtor follows.

7.      **General Electric Capital Corporation**.  General Electric Capital Corporation ("GE Capital") has three (3) active financing statements, as described below:

44

a.    *April 9, 2007*:  A financing statement (filing number 2007 1332856), which purports to cover all of the information technology equipment identified therein, "plus all existing and future replacements, exchanges and substitutions therefor, attachments, accessories, accessions and additions thereto, and insurance, lease, sublease and other proceeds thereof," was originally recorded by GE Capital on April 9, 2007.  A continuation statement (filing number 2012 0411191) was recorded by GE Capital on February 1, 2012.

b.    *June 28, 2007*:  A financing statement (filing number 2007 2694262), which purports to cover all of the equipment and other assets identified therein, consisting of certain copier, printer, scanner and fax equipment, "plus all existing and future replacements, exchanges and substitutions therefor, attachments, accessories, accessions and additions thereto, and insurance, lease, sublease and other proceeds thereof," was originally recorded by GE Capital on June 28, 2007.   A continuation statement (filing number 2012 1446394) was recorded by GE Capital on April 16, 2012.

c.    *March 27, 2008*:  A financing statement (filing number 2008 1142734), which purports to cover all of the equipment and other assets identified therein, consisting of certain copier, printer, scanner and fax equipment, "plus all existing and future replacements, exchanges and substitutions therefor, attachments, accessories, accessions and additions thereto, and insurance, lease, sublease and other proceeds thereof," was originally recorded by GE Capital on March 27, 2008.  A continuation statement (filing number 2013 0087594) was recorded by GE Capital on January 8, 2013.

8.    **Macquarie Equipment Finance, LLC**.  Macquarie Equipment Finance, LLC ("Macquarie") has two (2) active financing statements, as described below:

a.    *December 3, 2010*:  A financing statement (filing number 2010 4245357), which purports to cover all of the equipment then or thereafter leased to the Debtor under a master lease between the Debtor (as Lessee) and Macquarie (as Lessor), "along with any extensions, renewals, or modifications thereto, including but not limited to, insurance covering same and the proceeds of all the foregoing," was recorded by Macquarie on

December 3, 2010.  Amendments to the original financing statement (filing number 2013 4713575 recorded on November 20, 2013, and filing number 2014 0023192 recorded on January 3, 2014) were recorded by Macquarie to modify the description of the collateral set forth in the original financing statement.

b.    *December 3, 2010*:  A second financing statement (filing number 2010 4245431), which purports to cover the equipment leased by the Debtor (as Lessee) from Macquarie (as Lessor) pursuant to Schedule No. 001 to a master lease agreement between the parties, together with "insurance covering same and the proceeds of all of the foregoing" was recorded by Macquarie on December 3, 2010.  Amendments to the original financing statement (filing number 2013 4713682 filed on November 20, 2013, and filing number 2014 0023218 recorded on January 3, 2014) were recorded by Macquarie to modify the description of the collateral set forth in the original financing statement.

9.    **JP Morgan Chase Bank, N.A.**  JP Morgan Chase Bank, N.A. has one active financing statement (filing number 2011 4013663) which purports to cover all of the warehouse and telecommunication equipment identified therein, "together with all attachments, additions, accessions, parts, repairs, improvements, replacements and substitutions thereto, together with all proceeds thereof," which was recorded on October 18, 2011.

10.    **Signature Financial LLC**.  Signature Financial LLC has one active financing statement recorded on September 25, 2013 (filing number 2013 3745271), as amended by the amendment to the financing statement recorded on December 16, 2013 (filing number 2013 4962651), which together purport to cover all equipment and personal property then or thereafter subject to that certain Master Lease Agreement No. 2013319, Schedule No. 001, "plus all replacement parts, substitutions, additions, attachments, modifications, updates, upgrades, revisions, new revisions, improvements, enhancements, accessories, accessions and all proceeds of all the foregoing (including cash and non-cash proceeds and insurance proceeds)."

11.    **Sterling National Bank**.  Sterling National Bank has one active financing statement recorded on October 8, 2013 (filing number 2013 3939643), as amended by the

amendment to the financing statement recorded on December 16, 2013 (filing number 2013 4962701), which together purport to cover all equipment and personal property then or thereafter subject to that certain Master Lease Agreement No. 2013319, Schedule No. 002, "plus all replacement parts, substitutions, additions, attachments, modifications, updates, upgrades, revisions, new revisions, improvements, enhancements, accessories, accessions and all proceeds of all the foregoing (including cash and non-cash proceeds and insurance proceeds)."

12.    **Corporation Service Company, As Representative**.    A financing statement (filing number 2013 3939668), which purports to cover all equipment and personal property then or thereafter subject to that certain Master Lease Agreement No. 2013319, "including all parts, accessories, accessions and attachments thereto, and all replacements, substitutions and exchanges (including trade-ins) for such goods, together with proceeds of all of the foregoing," was recorded by Corporation Service Company, As Representative, on October 8, 2013.

13.    **Cisco Systems Capital Corporation ("Cisco")**.    A financing statement (filing number 2014 2569424), which purports to cover all of the equipment then or thereafter leased to the Debtor under any master agreement between the Debtor (as Lessee) and Cisco (as Lessor), together with "all insurance, warranty, rental and other claims and rights to payment and chattel paper arising out of such Equipment, and…all books, records and proceeds relating to the foregoing," was recorded by Cisco on June 30, 2014.

14.    **Salus Capital Partners, LLC, as Administrative Agent and Collateral Agent**. A financing statement (filing number 2014 2852861), which purports to cover all assets now owned or hereafter acquired by the Debtor, was recorded by Salus Capital Partners, LLC, as Administrative Agent and Collateral Agent, on July 17, 2014.    A true and correct copy of the financing statement recorded by Salus, as provided and certified by the Delaware Secretary of State, is attached hereto as **Exhibit "4."**

15.    The foregoing is provided for information purposes only.    Nothing contained herein is intended to be, and nothing contained herein shall be, construed or interpreted as the provision of any legal opinion by the declarant or LNBYB, or acknowledgement by the Debtor, regarding the validity, priority and extent of any liens asserted by any of the Debtor's creditors

1    against the Debtor or otherwise.  The rights of the Debtor and all of its creditors which respect to

2    the claims, liens and interests asserted by such creditors are fully preserved.

3         I declare under penalty of perjury that the foregoing is true and correct to the best of my

4    knowledge.

5         Executed on this 15th day of June 2015, at Los Angeles, California.

6

7                                             /s/ Todd M. Arnold
                                             TODD M. ARNOLD

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

**SENIOR SECURED SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of June [__], 2015

among

**ANNA'S LINENS, INC.,**
as the Borrower

**SALUS CAPITAL PARTNERS, LLC,**
as Administrative Agent and Collateral Agent,

and

The Lenders Party Hereto

Article I
DEFINITIONS AND ACCOUNTING TERMS ......................................................... - 2 -
    1.01    Defined Terms ................................................................... - 2 -
    1.02    Other Interpretive Provisions.......................................... - 42 -
    1.03    Accounting Terms Generally........................................... - 43 -
    1.04    Rounding .......................................................................... - 43 -
    1.05    Times of Day .................................................................... - 43 -
    1.06    Letter of Credit Amounts................................................. - 43 -

Article II
THE COMMITMENTS AND CREDIT EXTENSIONS ........................................ - 44 -
    2.01    Loans; Reserves................................................................ - 44 -
    2.02    Borrowings and of Loans. ............................................... - 44 -
    2.03    Letters of Credit................................................................ - 45 -
    2.04    Reserved. .......................................................................... - 52 -
    2.05    Prepayments..................................................................... - 52 -
    2.06    Termination or Reduction of Commitments..................... - 53 -
    2.07    Repayment of Loans ........................................................ - 54 -
    2.08    Interest. ............................................................................. - 54 -
    2.09    Fees .................................................................................. - 54 -
    2.10    Computation of Interest and Fees; Application of Payments ................................. - 54 -
    2.11    Evidence of Debt. ............................................................. - 54 -
    2.12    Payments Generally; Agent's Clawback. ......................... - 55 -
    2.13    Sharing of Payments by Lenders ..................................... - 57 -
    2.14    Settlement Amongst Lenders............................................ - 57 -
    2.15    Defaulting Lenders. .......................................................... - 58 -
    2.16    Release.............................................................................. - 59 -
    2.17    Waiver of any Priming Rights; Credit Bid ....................... - 60 -

Article III
TAXES, YIELD PROTECTION AND ILLEGALITY;
APPOINTMENT OF BORROWER......................................................................... - 60 -
    3.01    Taxes................................................................................ - 60 -
    3.02    Illegality........................................................................... - 63 -
    3.03    Inability to Determine Rates ............................................ - 63 -
    3.04    Increased Costs; Reserves on LIBO Rate Loans. ............. - 63 -
    3.05    Reserved ........................................................................... - 65 -

i

3.06    Mitigation Obligations .................................................................................- 65 -

3.07    Survival ........................................................................................................- 65 -

**Article IV**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS** ...............................- 65 -

4.01    Conditions of Initial Credit Extension .........................................................- 65 -

4.02    Conditions to all Credit Extensions .............................................................- 68 -

**Article V**
**REPRESENTATIONS AND WARRANTIES**.........................................................- 69 -

5.01    Existence, Qualification and Power..............................................................- 69 -

5.02    Authorization; No Contravention .................................................................- 69 -

5.03    Governmental Authorization; Other Consents .............................................- 70 -

5.04    Binding Effect...............................................................................................- 70 -

5.05    Reserved. ......................................................................................................- 70 -

5.06    Litigation ......................................................................................................- 70 -

5.07    No Default .....................................................................................................- 70 -

5.08    Ownership of Property; Liens.......................................................................- 71 -

5.09    Environmental Compliance. .........................................................................- 71 -

5.10    Insurance.......................................................................................................- 72 -

5.11    Taxes.............................................................................................................- 72 -

5.12    ERISA Compliance. .....................................................................................- 72 -

5.13    Subsidiaries; Equity Interests ......................................................................- 73 -

5.14    Margin Regulations; Investment Company Act ...........................................- 73 -

5.15    Disclosure .....................................................................................................- 74 -

5.16    Compliance with Laws .................................................................................- 74 -

5.17    Intellectual Property; Licenses .....................................................................- 74 -

5.18    Labor Matters ...............................................................................................- 74 -

5.19    Security Documents.......................................................................................- 75 -

5.20    Reserved .......................................................................................................- 76 -

5.21    Deposit Accounts; Credit Card Arrangements. ............................................- 76 -

5.22    Reserved .......................................................................................................- 76 -

5.23    Customer and Trade Relations .....................................................................- 76 -

5.24    Material Contracts ........................................................................................- 76 -

5.25    Casualty ........................................................................................................- 76 -

5.26    Personally Identifiable Information...............................................................- 76 -

5.27    Bankruptcy Matters. .....................................................................................- 77 -

ii

Article VI

AFFIRMATIVE COVENANTS ......................................................................................- 77 -
6.01    Financial Statements ..................................................................................- 78 -
6.02    Certificates; Other Information ..................................................................- 78 -
6.03    Notices .......................................................................................................- 80 -
6.04    Payment of Obligations ..............................................................................- 81 -
6.05    Preservation of Existence, Etc ...................................................................- 82 -
6.06    Maintenance of Properties ..........................................................................- 82 -
6.07    Maintenance of Insurance ...........................................................................- 82 -
6.08    Compliance with Laws ...............................................................................- 83 -
6.09    Books and Records; Accountants. ..............................................................- 84 -
6.10    Inspection Rights. .......................................................................................- 84 -
6.11    Use of Proceeds .........................................................................................- 85 -
6.12    Additional Loan Parties ..............................................................................- 85 -
6.13    Cash Management. ......................................................................................- 86 -
6.14    Information Regarding the Collateral ..........................................................- 88 -
6.15    Reserved. ....................................................................................................- 88 -
6.16    Environmental Laws ...................................................................................- 88 -
6.17    Further Assurances. ....................................................................................- 89 -
6.18    Compliance with Terms of Leaseholds ......................................................- 89 -
6.19    Material Contracts ......................................................................................- 90 -
6.20    Approved Budget ........................................................................................- 90 -
6.21    Employee Benefit Plans ..............................................................................- 90 -
6.22    Consultants .................................................................................................- 90 -
6.23    Board Observer Rights. ..............................................................................- 91 -
6.24    Reserved .....................................................................................................- 92 -
6.25    Leases .........................................................................................................- 92 -
6.26    Sale Process; Milestones ............................................................................- 92 -
6.27    Financing Orders ........................................................................................- 93 -
6.28    Post-Closing Obligations ............................................................................- 93 -

Article VII

NEGATIVE COVENANTS .............................................................................................- 93 -
7.01    Liens ...........................................................................................................- 93 -
7.02    Investments .................................................................................................- 93 -
7.03    Indebtedness; Disqualified Stock ...............................................................- 94 -

iii

7.04    Fundamental Changes..............................................................................- 94 -

7.05    Dispositions .............................................................................................- 94 -

7.06    Restricted Payments ...............................................................................- 94 -

7.07    Prepayments of Indebtedness ...............................................................- 94 -

7.08    Change in Nature of Business ..............................................................- 95 -

7.09    Transactions with Affiliates...................................................................- 95 -

7.10    Burdensome Agreements.......................................................................- 95 -

7.11    Use of Proceeds .....................................................................................- 95 -

7.12    Amendment of Material Documents ....................................................- 96 -

7.13    Fiscal Year...............................................................................................- 96 -

7.14    Deposit Accounts; Credit Card Processors.........................................- 96 -

7.15    Approved Budget Variance ...................................................................- 96 -

7.16    Repayment of Indebtedness ..................................................................- 96 -

7.17    Reclamation Claims ...............................................................................- 96 -

7.18    Chapter 11 Claims .................................................................................- 97 -

7.19    Bankruptcy Actions ...............................................................................- 97 -

Article VIII
EVENTS OF DEFAULT AND REMEDIES ...............................................................- 97 -

8.01    Events of Default ...................................................................................- 97 -

8.02    Remedies Upon Event of Default ........................................................ - 102 -

8.03    Application of Funds .............................................................................- 103 -

Article IX
THE AGENT ...................................................................................................................- 104 -

9.01    Appointment and Authority..................................................................- 104 -

9.02    Rights as a Lender .................................................................................- 104 -

9.03    Exculpatory Provisions..........................................................................- 105 -

9.04    Reliance by Agent ..................................................................................- 106 -

9.05    Delegation of Duties ..............................................................................- 106 -

9.06    Resignation of Agent .............................................................................- 106 -

9.07    Non-Reliance on Agent and Other Lenders .......................................- 107 -

9.08    Agent May File Proofs of Claim ..........................................................- 107 -

9.09    Collateral and Guaranty Matters.........................................................- 108 -

9.10    Notice of Transfer..................................................................................- 108 -

9.11    Reports and Financial Statements........................................................- 109 -

9.12    Agency for Perfection.............................................................................- 109 -

9.13    Indemnification of Agent ................................................................ - 109 -

9.14    Relation among Lenders ................................................................ - 110 -

Article X
MISCELLANEOUS ................................................................................ - 110 -

10.01    Amendments, Etc. .................................................................... - 110 -

10.02    Notices; Effectiveness; Electronic Communications. ............... - 112 -

10.03    No Waiver; Cumulative Remedies ........................................... - 113 -

10.04    Expenses; Indemnity; Damage Waiver. ................................... - 113 -

10.05    Payments Set Aside ................................................................. - 115 -

10.06    Successors and Assigns. .......................................................... - 115 -

10.07    Treatment of Certain Information; Confidentiality .................. - 120 -

10.08    Right of Setoff ......................................................................... - 120 -

10.09    Interest Rate Limitation ........................................................... - 121 -

10.10    Counterparts; Integration; Effectiveness ................................. - 121 -

10.11    Survival .................................................................................... - 122 -

10.12    Severability .............................................................................. - 122 -

10.13    Replacement of Lenders ........................................................... - 122 -

10.14    Governing Law; Jurisdiction; Etc ............................................ - 123 -

10.15    Waiver of Jury Trial ................................................................. - 124 -

10.16    No Advisory or Fiduciary Responsibility ................................ - 124 -

10.17    USA PATRIOT Act Notice ..................................................... - 125 -

10.18    Foreign Asset Control Regulations .......................................... - 125 -

10.19    Time of the Essence ................................................................. - 126 -

10.20    Press Releases. ......................................................................... - 126 -

10.21    Additional Waivers. ................................................................. - 126 -

10.22    No Strict Construction .............................................................. - 127 -

10.23    Attachments .............................................................................. - 127 -

v

**SCHEDULES**

| | |
|---|---|
| 2.01 | Commitments and Applicable Percentages |
| 4.01 | Pre-Petition Wages |
| 5.01 | Loan Parties Organizational Information |
| 5.06 | Litigation |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.13 | Subsidiaries; Equity Interests |
| 5.17 | Intellectual Property Matters |
| 5.18 | Collective Bargaining Agreements |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 6.25 | Leases |
| 6.28 | Post-Closing Obligations |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Borrowing Notice |
| B | Note |
| C | Reserved |
| D | Assignment and Assumption |
| E | Borrowing Base Certificate |
| F | Credit Card Notification |
| G | DDA Notification |
| H | Cash Management Order |
| I | Interim Financing Order |

## SENIOR SECURED SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") is entered into as of June [__], 2015, among ANNA'S LINENS, INC., a Delaware corporation (the "Borrower"), each lender from time to time party hereto (each a "Lender" and collectively, the "Lenders"), and SALUS CAPITAL PARTNERS, LLC, as Administrative Agent and Collateral Agent for the Lenders (in such capacity or any successor thereto in such capacity, the "Agent").

### RECITALS

On June 14, 2015 (the "Petition Date"), the Borrower commenced a case under Chapter 11 of the Bankruptcy Code, 11 U.S.C. 1011 et seq. (the "Bankruptcy Code"), case number 15-13008 (the "Chapter 11 Case") by filing a voluntary petition for relief with the United States Bankruptcy Court for the Central District of California, Santa Ana Divisional Office (the "Bankruptcy Court"). The Borrower continues to operate its businesses and manage its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Borrower has requested, and the Agent and the Lenders have agreed, upon the terms and conditions set forth in this Agreement, to make available to the Borrower a senior secured super-priority credit facility, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, in an aggregate amount not to exceed $80,000,000, the proceeds of which will be used solely in order to (a) the extent permitted in the Interim Financing Order and the Final Financing Order, to repay certain Pre-Petition Obligations, (b) pay fees, costs and expenses in connection with this Agreement, including payment of Agent's reasonable attorney's fees and other out of pocket expenses, (c) pay post-petition operating expenses of the Borrower incurred in the ordinary course of business, (d) pay costs and expenses of administration of the Chapter 11 Case, including payment of Allowed Professional Fees, and (e) pay other amounts as specified in the Approved Budget and/or operative documentation and allowed by the Bankruptcy Court, in the case of (c) through (e), in amounts and categories consistent with the Approved Budget.

The Lenders have agreed to provide a revolving loan to the Borrower pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on terms and conditions of this Agreement and in the Interim Financing Order (or the Final Financing Order when applicable) so long as (a) such postpetition credit obligations are secured by a first priority and senior security interest in and lien upon substantially all of the assets of the Borrower, whether now existing or hereafter acquired and (b) all Obligations of the Loan Parties to the Agent and Lenders hereunder and under the other Loan Documents shall be full recourse to each of the Loan Parties, in each instance as more fully set forth in the Loan Documents and in the Interim Financing Order or the Final Financing Order when applicable.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

- 1 -

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Document of Title" means, with respect to any Inventory, a tangible, negotiable bill of lading or other Document (as defined in the UCC) that (a) is issued by a common carrier which is not an Affiliate of the Approved Foreign Vendor or any Loan Party which is in actual possession of such Inventory, (b) is issued to the order of a Loan Party or, if so requested by the Agent, to the order of the Agent, (c) names the Agent as a notify party and bears a conspicuous notation on its face of the Agent's security interest therein, (d) is not subject to any Lien (other than in favor of the Agent and non-consensual Permitted Encumbrances), and (e) is on terms otherwise reasonably acceptable to the Agent.

"ACH" means automated clearing house transfers.

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.  The term "Account" includes health-care-insurance receivables.

"Act" shall have the meaning provided in Section 10.17.

"Adjusted LIBO Rate" means an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent) equal to (i) the LIBO Rate multiplied by (ii) the Statutory Reserve Rate.  The Adjusted LIBO Rate will be adjusted automatically as of the effective date of any change in the Statutory Reserve Rate.

"Administrative Agent" means Salus Capital Partners, LLC, in its capacity as administrative agent under any of the Loan Documents, or any successor thereto in such capacities.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding ten percent (10%) or more of any class of the Equity Interests of that Person, and (iv) any other Person ten percent (10%) or more of any class of whose Equity Interests is held directly or indirectly by that Person.

- 2 -

"Agent" has the meaning assigned to such term in the Preamble.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Borrower and the Lenders.

"Agent Party" shall have the meaning specified in Section 10.02(c).

"Aggregate Commitments" means the sum of the Commitments of all of the Lenders. For the period from and including the Closing Date to the date upon which the Loan Parties receive the Initial Guaranty Payment, the Aggregate Commitments are $80,000,000. Upon the Loan Parties' receipt of the Initial Guaranty Guaranteed Amount, the Aggregate Commitments shall automatically and permanently be reduced to $20,000,000. Upon the date the Loan Parties receipt of the final installment of the Guaranteed Amount as set forth in Section 3.3(a) of the Agency Agreement, the Aggregate Commitments shall automatically and permanently be reduced to $0.

"Agreement" means this Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, as amended or modified in accordance with its terms.

"Allowed Professional Fees" means incurred and unpaid professional fees and expenses of the Case Professionals, to the extent such fees and expenses are ultimately allowed and payable pursuant to an order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed) and provided for in the Approved Budget.

"Applicable Margin" has the meaning specified in the Fee Letter.

"Applicable Percentage" means, in each case as the context requires, (a) with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Commitment at such time, or (b) with respect to all Lenders at any time, the percentage of the sum of the Aggregate Commitments represented by the sum of such Lender's Commitment at such time, in each case as the context provides. If the commitment of each Lender to make Loans has been terminated pursuant to Section 2.05 or Section 8.02 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraised Value" means with respect to Eligible Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory as set forth in the inventory stock ledger of the Borrower, which value shall be acceptable to the Agent in its sole discretion and determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent.

"Approval Order" has the meaning provided in the Sale Agency Agreement.

- 3 -

"Approved Budget" shall mean the debtor-in-possession thirteen (13) week budget prepared by the Borrower and furnished to the Agent on or before the Closing Date and thereafter weekly in accordance with this Agreement, as the same may be updated, modified and/or supplemented thereafter from time to time as provided in Section 6.01(b), which budget shall include a weekly cash budget, including information on a line item basis as to (a) projected Net Cash Flow, (b) a calculation of Availability, and (c) the balance of Obligations outstanding under this Agreement.

"Approved Budget Variance Report" shall mean a weekly report provided by the Borrower to the Agent in accordance with Section 6.01(b), (i) showing actual Net Cash Flow, Availability and the balance of Obligations outstanding under this Agreement as of the last day of each applicable Testing Period and for the Cumulative Period then ended, noting therein all variances from such amounts set forth in the Approved Budget for such Testing Period and Cumulative Period, and shall include explanations for all material variances, and (ii) certified by a Responsible Officer of the Borrower.  The calculation of any variance for purposes of determining the Borrower's compliance with Section 7.15(a) shall be set forth on the Approved Budget Variance Report.

"Approved Foreign Vendor" means a Foreign Vendor which (a) is located in any country acceptable to the Agent, (b) has received payment in a manner consistent with past practice or performance of all obligations owed to it by the Loan Parties, (c) has not asserted and has no right to assert any reclamation, repossession, diversion, stoppage in transit, Lien or title retention rights in respect of such Inventory, and (d), if so requested by the Agent, has entered into and is in compliance in all material respects with the terms of a Foreign Vendor Agreement.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of **Exhibit D** or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Auto-Extension Letter of Credit" shall have the meaning specified in Section 2.03(b)(ii).

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

- 4 -

(a)      the Maximum Loan Amount

minus

(b)      the Total Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Borrower shall certify to the Agent that all post-petition obligations are being paid within thirty (30) days after the due date thereof (or are being contested in good faith with adequate reserves established by the Borrower) and in accordance with the Approved Budget.

"Availability Block" means an amount equal to three percent (3.0%) of the lesser of (a) Formula Availability, and (b) the Aggregate Commitments, provided that upon entry of the Approval Order the Availability Block shall reduce to $0.

"Availability Period" means the period from and including the Closing Date to the Termination Date.

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base or assets, business, financial performance of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists.  Without limiting the generality of the foregoing, Availability Reserves may include (but are not limited to) reserves based on: (i) rent in an amount equal to two (2) months' rent for leased properties located in a Landlord Lien State for which Agent is not party to a Collateral Access Agreement; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of any Borrower, (v) Customer Credit Liabilities; (vi) Customer Deposits; (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals; (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral; (ix) amounts due to vendors on account of consigned goods; (x) royalties payable in respect of licensed merchandise; (xi) the Expeditors Reserve; (xi) any unfunded Carve-Out; and (xii) the Pre-Petition Reserve.

"Bankruptcy Code" has the meaning specified in the Recitals hereto.

"Bankruptcy Court" has the meaning specified in the Recitals hereto.

"Base Rate" means a variable rate of interest per annum equal to the prime rate of interest from time to time published by www.bankrate.com.  The applicable prime rate for any date not set forth therein shall be the rate set forth the immediately preceding date.  In the event that www.bankrate.com ceases to publish a prime rate or its equivalent, the term "Base Rate" shall

- 5 -

mean a variable rate of interest per annum equal to the highest of the "prime rate", "reference rate", "base rate", or other similar rate announced from time to time by any of the three largest banks (based on combined capital and surplus) headquartered in New York, New York and published in The Wall Street Journal (with the understanding that any such rate may merely be a reference rate and may not necessarily represent the lowest or best rate actually charged to any customer by any such bank or by the Agent or any Lender).

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Blocked Account" has the meaning provided in Section 6.13(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the bank maintaining such account agrees, to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" means any Borrowing Base information, reports, financial statements and other materials delivered by the Borrower hereunder, as well as other Reports and information provided by the Agent to the Lenders.

"Borrowing" means a borrowing of Loans.

"Borrowing Base" means, at any time of calculation, an amount equal to without duplication:

> (a)    until entry of the Approval Order, the lesser of (i) Formula Availability and (ii) $80,000,0000 (it being understood that upon entry of the Approval Order the amount attributable to this clause (a) shall be deemed to be zero);

> plus

> (b)    upon entry of the Approval Order, 100% of the Eligible SAA Guaranty Receivable;

> minus

> (c)    the Availability Block;

> minus

- 6 -

(d)    the then amount of all Availability Reserves (including, without limitation, the Carve-Out and the Pre-Petition Reserve).

"Borrowing Base Certificate" means a certificate substantially in the form of **Exhibit E** hereto (with such changes therein as may be required by the Agent to reflect the components of and Reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent.

"Borrowing Notice" means a notice of a Borrowing, pursuant to Section 2.02, which, if in writing, shall be substantially in the form of **Exhibit A**.

"Business" means business of the Borrower as of the Closing Date.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.  For the avoidance of doubt, "Capital Lease Obligations" shall not include obligations or liabilities of any Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as existing on the Closing Date.

"Carve-Out" shall have the meaning provided in the then applicable Financing Order.

"Carve-Out Trigger Notice" shall have the meaning provided in the then applicable Financing Order.

"Case Professionals" means the Loan Parties' and any Statutory Committee's professionals, retained by either of them by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327 or 1103(a) of the Bankruptcy Code.

"Cash Collateral Account" means a non-interest bearing account established by one or more of the Loan Parties with an L/C Issuer, in which deposits are required to be made in accordance with Sections 2.03(g), Section 2.04 or 8.02(c).

"Cash Collateralize" means to pledge and deposit with or deliver to the applicable L/C Issuer, for its benefit, as collateral for the applicable L/C Obligations, cash or deposit account balances or, if the Agent and the applicable L/C Issuer shall otherwise agree in their sole discretion, other credit support, in each case pursuant to documentation in form and substance

satisfactory to the Agent and the applicable L/C Issuer (which documentation is hereby Consented to by the Lenders). "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent, which, among other matters, authorizes the Loan Parties to use their cash management system, substantially in the form of Exhibit H.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, for the purposes of this Agreement: (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)     at any time, the Permitted Holders shall fail to own beneficially (within the meaning of Rule 13d-5 of the Exchange Act) and control, directly or indirectly, in the aggregate, outstanding Equity Interests representing at least a majority of the aggregate (i) ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or (ii) the issued and outstanding shares of Equity Interests of the Borrower, whether or not having the power to vote;

(b)     at any time, the Permitted Holders shall fail to own beneficially (within the meaning of Rule 13d-5 of the Exchange Act) and control, directly or indirectly, in the aggregate, outstanding Equity Interests representing at least a majority of the economic interests in the Borrower;

(c)     during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing

body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(d)    any Person or two or more Persons acting in concert other than the Permitted Holders shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Borrower, or control over the Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such Person or Persons have the right to acquire pursuant to any option right) representing twenty-five percent (25%) or more of the combined voting power of such securities; or

(e)    any "change in control" or "sale" or "disposition" or similar event as defined in any Organizational Document of any Loan Party or in any Material Contract, or any document governing Material Indebtedness of any Loan Party, and including, without limitation, any sale, transfer or other disposition of all or substantially all of the assets of the Borrower;

(f)    the Borrower fails at any time to own, directly or indirectly, one-hundred percent (100%) of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents; or

(g)    the Chief Executive Officer as of the Closing Date shall for any reason either cease to hold such office or be actively engaged in the day-to-day management of the Borrower, unless a successor with similar industry experience, reputation and expertise and satisfactory to the Lenders is appointed within fifteen (15) Business Days of such cessation.

"Chapter 11 Case" has the meaning assigned to such term in the Preamble.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, or (b)

- 9 -

any landlord of Real Estate leased by any Loan Party, pursuant to which such Person (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Agent as the Agent may reasonably require.

"Collateral Agent" means Salus Capital Partners, LLC, in its capacity as collateral agent under any of the Loan Documents, or any successor thereto in such capacities.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

"Commercial Letter of Credit Agreement" means the Commercial Letter of Credit Agreement relating to the issuance of a Commercial Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"Commitment" means, as to each Lender, its obligation to make Loans to the Borrower pursuant to Section 2.01 in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Concentration Account" has the meaning provided in Section 6.13(c).

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender giving the Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is contractually bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Disbursement Account" the DDA with account number 908-001-3598 in the name of the Borrower maintained at Union Bank, N.A.

- 10 -

"Cost" means the lower of cost or market value of Inventory, based upon the Borrower's accounting practices, known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrower, the Borrower's purchase journals or the Borrower's stock ledger.    "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrower's calculation of cost of goods sold.

"Credit Card Issuer" shall mean any person (other than the Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc.,  and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in Section 6.13(a)(i).

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Extensions" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, and (iii) each L/C Issuer, (iv) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (v) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (vi) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" mean (a) all reasonable and documented allocable expenses incurred by the Agent, any Lender and its Affiliates in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent and Lenders, (B) outside consultants for the Agent, (C) appraisers, (D) commercial finance examinations, and (E) all such reasonable and documented allocable expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication or financing of the credit facilities provided for herein, including any fees or expenses incurred in connection with obtaining a rating for such credit facilities, (B) the preparation, negotiation, management,

- 11 -

execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the administration of this Agreement and the other Loan Documents or (D) the enforcement or protection of the rights of the Credit Parties in connection with this Agreement or the Loan Documents or efforts to monitor, preserve, protect, collect, or enforce the Collateral; (b) with respect to any L/C Issuer and its Affiliates, all reasonable and documented allocable expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; (c) all customary fees and charges (as adjusted from time to time) of the Agent with respect to access to online Loan information, the disbursement of funds (or the receipt of funds) to or for the account of Loan Parties (whether by wire transfer or otherwise), together with any reasonable and documented allocable costs and expenses incurred in connection therewith; and (d) upon the occurrence and during the continuance of an Event of Default or upon any increase in the amount of Aggregate Commitments after the Closing Date, all reasonable expenses incurred by the Credit Parties who are not the Agent, an L/C Issuer or any Affiliate of any of them, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Cumulative Period" shall mean the cumulative period from the Petition Date up to and through the Sunday of the most recent week then ended.

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrower entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (b) outstanding merchandise credits of the Borrower, and (c) liabilities in connection with frequent shopping programs of the Borrower.

"Customer Deposits" means at any time, the aggregate amount at such time of (a) deposits made by customers with respect to the purchase of goods or the performance of services and (b) layaway obligations of the Borrower.

"Customs Broker/Carrier Agreement" means an agreement in form and substance reasonably satisfactory to the Agent among the Borrower, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"DDA Notification" has the meaning provided therefor in <u>Section 6.13(a)(iii)</u>.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default, unless cured or waived as provided in Section 10.01 hereof.

"Default Rate" has the meaning specified in the Fee Letter.

"Defaulting Lender" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder, or (ii) pay to the Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three (3) Business Days after written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership of acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Agent in a written notice of such determination, which shall be delivered by the Agent to the Borrower and each other Lender promptly following such determination.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction and any sale, transfer, license or other disposition) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

- 13 -

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature; provided, however, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Loan Parties or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Loan Parties in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Loan Parties may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to the Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrower, and (ii) in each case is acceptable to the Agent, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (j) below.  Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than the Borrower as payee or remittance party.  In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable.  Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

- 14 -

(a)  any Credit Card Receivable which does not constitute a "payment intangible" (as defined in the UCC);

(b)  Credit Card Receivables that (i) are past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreements with the Credit Card Issuer or Credit Card Processor of the credit card or debit card used in the purchase which gave rise to such Credit Card Receivables, or (ii) have been outstanding for more than five (5) days from the date of sale;

(c)  Credit Card Receivables (i) that are not subject to a perfected first priority security interest in favor of the Agent, or (ii) with respect to which the Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents and other Permitted Encumbrances with respect to which the Agent has established Reserves);

(d)  Credit Card Receivables which are disputed, are with recourse to any Loan Party, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e)  Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)  Credit Card Receivables due from any Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

(g)  Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(h)  Credit Card Receivables which do not conform to all applicable representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;

(i)  Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent necessary or appropriate, endorsed to the Agent;

(j)  Credit Card Receivables which the Agent determines to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine; and

(k)  Following entry of the Approval Order, Credit Card Receivables which constitute Proceeds (as defined in the Sale Agency Agreement).

"Eligible In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, In-Transit Inventory:

(a)    Which has been shipped from a foreign location for receipt by the Borrower, but which has not yet been delivered to such Borrower, which In-Transit Inventory has been in transit for sixty (60) days or less from the date of shipment of such Inventory;

(b)    For which the purchase order is in the name of the Borrower and title and risk of loss has passed to such Borrower;

(c)    For which an Acceptable Document of Title has been issued, and in each case as to which the Agent has control (as defined in the UCC) over the documents of title which evidence ownership of the subject Inventory pursuant to a Customs Broker/Carrier Agreement;

(d)    Which is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance);

(e)    the Foreign Vendor with respect to such In-Transit Inventory is an Approved Foreign Vendor;

(f)    For which payment of the purchase price has been made by the Borrower or the purchase price is supported by a Commercial Letter of Credit; and

(g)    Which otherwise would constitute Eligible Inventory;

provided that the Agent may exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise adversely impact the ability of the Agent to realize upon such Inventory.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, (i) Eligible In-Transit Inventory, and (ii) items of Inventory of the Borrower that are finished goods, merchantable and readily saleable to the public in the ordinary course of the Borrower's business and deemed by the Agent to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrower in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below.  Except as otherwise agreed by the Agent, the following items of Inventory shall not be included in Eligible Inventory:

(a)    Inventory that is not solely owned by the Borrower or the Borrower does not have good and valid title thereto;

(b)    Inventory that is leased by or is on consignment to the Borrower or which is consigned by the Borrower to a Person which is not a Loan Party;

(c)    Inventory (other than Eligible In-Transit Inventory) that is not located in the United States of America (including territories or possessions of the United States);

- 16 -

(d)     Inventory that is not located at a location that is owned or leased by the Borrower, except (i) Inventory in transit between such owned or leased locations or locations which meet the criteria set forth in clause (ii) below, or (ii) to the extent that the Borrower have furnished the Agent with (A) any UCC financing statements or other documents that the Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to the Agent;

(e)     Inventory that is located: (i) in a distribution center or warehouse leased by the Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location, provided that any such Reserves shall be implemented only for thirty (30) days after the Closing Date after which time a Collateral Access Agreement must be delivered to the Agent in order for Inventory located at a distribution center or warehouse to satisfy this clause (e), or (ii) at any leased location in a Landlord Lien State unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location;

(f)     Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, work in process, raw materials, or that constitute samples, spare parts, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in the Borrower's business, (iv) are seasonal in nature and which have been packed away for sale in the subsequent season, (v) not in compliance with all applicable standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(g)     Inventory that is not subject to a perfected first priority security interest in favor of the Agent (other than Permitted Encumbrances with respect to which the Agent has established Reserves);

(h)     Inventory that is not insured in compliance with the provisions of Section 5.10 hereof;

(i)     Inventory that has been sold but not yet delivered or as to which the Borrower has accepted a deposit;

(j)     Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which any Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement;

(k)     Following entry of the Approval Order, Inventory which constitutes Merchandise (as defined in the Sale Agency Agreement).

"Eligible SAA Guaranty Receivable" means, on any date of determination, the remaining amount payable in respect of the Guaranteed Amount (as defined in the Sale Agency Agreement) pursuant to Section 3.3(a) of the Sale Agency Agreement following receipt by the Borrower of the Initial Guaranty Payment (as defined in the Sale Agency Agreement; such remaining amount, the "Final Guaranty Obligation"), which Final Guaranty Obligation shall be deemed to be twenty

- 17 -

percent (20%) of the Estimated Guaranty Amount (as defined in the Sale Agency Agreement), as such amount may be adjusted by the Agent from time to time during the reconciliation period under the Sale Agency Agreement, to the extent that the Agent (as defined in the Sale Agency Agreement) has not raised any objection or challenge related to its obligation to pay these amounts.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal

- 18 -

under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; or (g) the determination that any Pension Plan is considered to be an "at-risk" plan or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA.

"Event of Default" has the meaning specified in Section 8.01.  An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excluded Accounts" means (a) the DDAs with account numbers 45010-49888 and 45010-49904, respectively, in the name of the Borrower maintained at Union Bank, N.A. and exclusively used for payroll, withholding tax, sales tax and employee benefits to the extent that such accounts contain only amounts designated for payment of payroll, withholding tax, sales tax and employee benefits, (b) any cash collateral accounts maintained with Union Bank, N.A. by Borrower securing reimbursement obligations in connection with letters of credit issued by Union Bank, N.A. in favor of certain beneficiaries as more specifically described on Schedule 7.01 of the Credit Agreement, and (c) such DDAs (including disbursement accounts) as may be agreed by the Agent in its sole discretion.

"Excluded Taxes" means, with respect to any Recipient, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), (i) by the jurisdiction (or any political subdivision thereof) pursuant to  the laws of the jurisdiction under which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located or (ii) as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, or become a party to any Loan Document), (b) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Recipient (other than an assignee pursuant to a request by the Lead Borrower under Section 10.13), any withholding Tax that is imposed on amounts payable to such Recipient at the time such Recipient becomes a party hereto or a Recipient hereunder (or designates a new Lending Office) or is attributable to such Recipient's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Recipient (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding Tax pursuant to Section 3.01(a), (d) any U.S. federal, state or local backup withholding Tax, and (e) any Tax imposed under FATCA.

- 19 -

"Executive Order" has the meaning set forth in Section 10.18.

"Expedited Assumption Motion" has the meaning provided in the Sale Agency Agreement.

"Expeditors PMSI Reserve equal means a Reserve equal to all amounts due to Expeditors of Washington, Inc. from Borrower as of the date of the applicable Borrowing Base Certificate.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), and indemnity payments (other than to the extent such indemnity payments are payable to a Person that is not an Affiliate of Borrower or any of its Subsidiaries).

"Facility Guaranty" means any Guarantee made by a Guarantor in favor of the Agent and the other Credit Parties, in form and substance reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"FATCA" means current Section 1471 through 1474 of the Code or any amended version or successor provision that is substantively similar to and, in each case, any regulations promulgated thereunder and any interpretation and other guidance issued in connection therewith and any intergovernmental agreement or "FFI agreements" entered into pursuant to the foregoing.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to money center banks on such day on such transactions as determined by the Agent.

"Fee Letter" means the letter agreement, dated June [__], 2015, among the Borrower and Agent referred to therein as the "Fee Letter".

"Final Financing Order" means an order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing, which order shall be satisfactory in form and substance to the Agent, and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent, which, among other matters but not by way of limitation, authorizes the Borrower (a) enter into this Agreement on the terms described herein and in the Loan Documents, (b) repay any remaining balance of the Prepetition Obligations, and (c) use Cash Collateral (as defined in in the Final Financing Order) on the terms described therein to administer the Chapter 11 Case and fund its operations.

- 20 -

"Final Guaranty Obligation" has the meaning set forth within the defined term Eligible SSA Guaranty Receivable.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Financing Order.

"Financing Orders" means collectively, the Interim Financing Order and the Final Financing Order.

"Fiscal Month" means any of the fiscal monthly accounting periods of the Loan Parties in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on the closest Sunday after April 30, July 31, October 31 and January 31 of each year; provided that if April 30, July 30, October 31 or January 31 is a Sunday, then such date shall be the end of such Fiscal Quarter.

"Fiscal Year" means the twelve (12) Fiscal Month period of the Loan Parties ending on the date that is the closest Sunday after January 31, of each year.  Subsequent changes of the Loan Parties' Fiscal Year shall not change the term "Fiscal Year" unless Agent shall consent in writing to such change.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.18.

"Foreign Lender" means any Recipient that is not a "United States person" as defined in Section 7701(a)(30) of the Code.

"Foreign Vendor" means a Person that sells In-Transit Inventory to the Borrower.

"Foreign Vendor Agreement" means an agreement between a Foreign Vendor and the Agent in form and substance reasonably satisfactory to the Agent and pursuant to which, among other things, the parties shall agree upon their relative rights with respect to In-Transit Inventory of the Borrower purchased from such Foreign Vendor.

"Formula Availability" means

(a)      the face amount of Eligible Credit Card Receivables multiplied by 97%;

plus

(b)      the greater of (i) the Appraised Value of Eligible Inventory, net of Inventory Reserves, multiplied by 105%, and (ii) the Cost of Eligible Inventory, net of Inventory Reserves multiplied by 100% (provided, that in no event shall Eligible In-Transit Inventory included in Eligible Inventory exceed $8,000,000).

"Fronting Fee" has the meaning assigned to such term in Section 2.03(j).

- 21 -

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Gross Margin Dollars" means sales less cost of goods sold (including, but not limed to purchase costs, freight costs, and shrinkage expenses).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means each Subsidiary that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12.

- 22 -

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Honor Date" means the date of any payment by the applicable L/C Issuer under a Letter of Credit.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the date on which such trade account payable was created);

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      All Attributable Indebtedness of such Person;

(g)      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock) or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and to the extent not otherwise described in Other Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial Guaranty Payment" has the meaning provided in the Sale Agency Agreement.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Interest Payment Date" means the first day after the end of each month and the Maturity Date.

"Interest Rate" means at any time of determination, the Adjusted LIBO Rate plus the Applicable Margin.

"Interest Rate Floor" has the meaning specified in the Fee Letter.

"Interim Approval Order" has the meaning provided in the Sale Agency Agreement.

"Interim Financing Order" means an order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit I.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Borrower's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"In-Transit Inventory" means Inventory of the Borrower which is in the possession of a common carrier and is in transit from a Foreign Vendor of the Borrower from a location outside of the continental United States to a location of the Borrower (or warehouse of the Borrower) that is within the continental United States.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Agent with respect to the determination of the saleability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may include (but are not limited to) reserves based on:

      (a)      Obsolescence;

      (b)      Seasonality;

      (c)      Shrink;

      (d)      Imbalance;

      (e)      Change in Inventory character;

      (f)      Change in Inventory composition;

      (g)      Change in Inventory mix;

      (h)      Markdowns (both permanent and point of sale);

      (i)      Retail markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

      (j)      Out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase, acquisition or investment in any stock, bonds, mutual funds, notes, debentures or other securities or certificates of deposit.  For purposes of covenant compliance, the amount of any

Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, the Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and any other document, agreement and instrument entered into by the applicable L/C Issuer and the Borrower (or any Subsidiary thereof) or in favor of the applicable L/C Issuer and relating to any such Letter of Credit.

"Joinder" means an agreement, in form and substance reasonably satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may reasonably determine.

"Landlord Lien State" means such state(s) in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral. As of the Closing Date, the only states in which the Borrower has real property Leases that are Landlord Lien States are the Commonwealth of Pennsylvania and the Commonwealth of Virginia.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Issuer" means (a) Salus, (b) any other financial institution that, with the consent of the Agent (and subject to such financial institution's entry into agreements reasonably satisfactory to the Agent), agrees to become an L/C Issuer for the purpose of issuing Letters of Credit hereunder, and (c) any successor issuer of Letters of Credit hereunder. Any L/C Issuer may arrange for one or more Letters of Credit to be issued by Affiliates of such L/C Issuer and/or for such Affiliate to act as an advising, transferring, confirming and/or nominated bank in connection with the issuance or administration of any such Letter of Credit, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"L/C Obligations" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit. For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit

- 26 -

shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of any "rule" under the ISP or any article of UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" means each Lender having a Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Assumption by which it becomes a Lender.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Agent.

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder.

"Letter of Credit Application" means an application for the issuance or amendment of a Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"Letter of Credit Expiration Date" means the day that is seven days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Sublimit" means an amount equal to $7,500,000. The Letter of Credit Sublimit is part of, and not in addition to, the Commitments. A permanent reduction of the Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; provided, however, that if the Commitments are reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Borrower's option, less than) the Commitments.

"LIBO Rate" means, as of any date of determination, the rate per annum for LIBOR as published by www.bankrate.com (or other commercially available source providing quotations of LIBOR as designated by the Agent from time to time) for an interest period of thirty (30) days. If such rate is not available at such time for any reason, then the "LIBO Rate" shall be the rate per annum determined by the Agent to be the rate at which deposits in Dollars in the approximate outstanding amount of the applicable Loans would be offered to major banks in the London interbank eurodollar market in which Salus participates for an interest period of thirty (30) days.

"LIBO Rate Loan" means a Loan that bears interest at a rate based on the Adjusted LIBO Rate.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or

- 27 -

nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent, of any public, private or "going out of business", "store closing", or other similarly themed sale or other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means any extension of credit by a Lender to the Borrower under Article II in the form of a Loan, issuance of Letter of Credit or otherwise.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Documents" means this Agreement, each Note, each Issuer Document, the Fee Letter, all Borrowing Base Certificates, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, each Facility Guaranty, and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), financial condition of any Loan Party or the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events would result in a Material Adverse Effect. Notwithstanding the foregoing, the filing of the Chapter 11 Case (and any defaults under Pre-Petition Loan Documents arising solely as a result of the filing of the Chapter 11 Case, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code) will not be deemed to have a Material Adverse Effect.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party involving aggregate consideration payable to or by such Person of $250,000 or more in any Fiscal Year or otherwise material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person, including, without limitation,

BOS 47658425v6

the Borrower's Lease for its corporate headquarters, agreements with Borrower's current warehousemen and freight forwarders, provided that, the definition of "Material Contracts" shall not include (a) the Borrower's Store Leases, (b) agreements with professional service providers, (c) vendor or service provider agreements for ordinary course services including for office supplies, mailing or circulation distributions, e-commerce services, shipping or annual or quarterly conferences and meetings (d) agreements for cash management, treasury or ADP services for ordinary course banking and payroll services, and (e) agreements for employee benefit programs entered into in the ordinary course of business.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $250,000.  For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means June [__], 2016.

"Maximum Loan Amount" means, at any time of determination, the lesser of (a) the Aggregate Commitments and (b) the Borrowing Base.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Flow" means, for any applicable Testing Period or Cumulative Period, an amount equal to the Borrower's aggregate receipts minus the Borrower's aggregate disbursements, in each case for such applicable period.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket fees, costs and expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)); and (C) the Taxes

- 29 -

paid or reasonably estimated to be paid to any Governmental Authority as a result of such Disposition; and

      (b)    with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Extension Notice Date" has the meaning specified in Section 2.03(b)(ii).

"Note" means a promissory note made by the Borrower in favor of a Lender evidencing the Loans made by such Lender, substantially in the form of **Exhibit B**, as each may be amended, restated, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding.

"Operating Account" the DDA with account number 45010-49771 in the name of the Borrower maintained at Union Bank, N.A.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

- 30 -

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means (i) with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date; and (ii) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date.

"Outstanding Items" has the meaning provided in Section 6.26.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Participant" has the meaning specified in Section 10.06(d).

"Participation Register" has the meaning provided therefor in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Disposition" means any of the following:

(a)    Dispositions of inventory in the ordinary course of business; and

(b)    Dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary and is replaced with similar property having at least equivalent value;

"Permitted Encumbrances" means:

(a)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

- 31 -

(b)    Carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(c)    Pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)    Deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)    Easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(f)    Liens existing on the Closing Date and listed on Schedule 7.01;

(g)    Liens on fixed or capital assets acquired by any Loan Party which are permitted under clause (c) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition, (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of such fixed or capital assets and (iii) such Liens shall not extend to any other property or assets of the Loan Parties;

(h)    Liens in favor of the Agent;

(i)    Liens in favor of the Pre-Petition Agent under the Pre-Petition Loan Documents;

(j)    Statutory Liens of landlords and lessors in respect of rent not in default (after giving effect to applicable grace periods) and the title and interest of lessors or sublessors in and to personal property leased or subleased, in each case, extending only to such personal property;

(k)    Possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Closing Date and Permitted Investments, provided that such liens (i) attach only to such Investments and (ii) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar

- 32 -

rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)    Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(n)    Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations that are (A) being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation.

(o)    Liens in the ordinary course of business on deposits or cash collateral to secure Indebtedness permitted under clause (d) of the definition of Permitted Indebtedness;

(p)    Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums securing Indebtedness permitted under clause (i) of the definition of Permitted Indebtedness; and

(q)    Liens in favor of inventory vendors to secure Indebtedness under the Vendor Notes and listed on Schedule 7.01.

"Permitted Holders" (a) Alan Gladstone and Janette Shawn Gladstone, ASG Management, LLC, The Gladstone 1999 Family Trust Dated June 11, 1999, The James A. Coufos Annuity Trust Dated 5/27/10, James A. Coufos, Anna's Family Tree, LLC, Scott Gladstone, Cindy Gladstone, Carrie Gladstone Doll, Carrie Doll Gladstone, Tony Sullivan, Marilyn & Michael Harnetiaux, Michael Harnetiaux, Mike Harnetiaux, Kimberly J. Harnetiaux, and Brian M. Harnetiaux, (b) Rosewood Capital III, L.P., Rosewood Capital IV, L.P., and Rosewood Capital IV Associates, L.P., and (c) The Rosalie Katz Family Foundation, Inc., Downtown Capital Partners LLC, and ALI Equity Holdings, LLC and in the case of this clause (c) their successors and assigns.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists or would arise from the incurrence thereof:

(a)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.03;

(b)    Indebtedness of any Loan Party to any other Loan Party;

(c)    Purchase money Indebtedness of any Loan Party to finance the acquisition of any personal property consisting solely of fixed or capital assets, including Capital Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof; provided, however, that the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed $1,000,000 at any time outstanding.

- 33 -

(d)      Contingent liabilities under statutory and appeal bonds, surety bonds or similar instruments incurred in the ordinary course of business;

(e)      the Obligations and the Pre-Petition Obligations;

(f)      Indebtedness not otherwise specifically described herein in an aggregate principal amount not to exceed $250,000 at any time outstanding;

(g)      Indebtedness in respect of Borrower's company credit card in an aggregate principal amount not to exceed $50,000 at any time outstanding;

(h)      bank product obligations, controlled disbursements and overdraft arrangements and similar bank products incurred in the ordinary course of business in an aggregate amount not to exceed $100,000 at any time outstanding;

(i)      Indebtedness in connection with the financing of insurance premiums in the ordinary course of business; and

(j)      Vendor Notes.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)      Investments existing on the Closing Date, and set forth on Schedule 7.02;

(b)      (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, and (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties;

(c)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(d)      Guarantees constituting Permitted Indebtedness;

(e)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; and

(f)      advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business in an amount not to exceed $25,000 to any individual at any time or in an aggregate amount not to exceed $100,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes; and

(g)      Capital contributions made by any Loan Party to another Loan Party.

"Permitted Overadvance" means an Overadvance made by the Agent, which:

- 34 -

(a)    Is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(b)    Is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)    Is made to pay any other amount chargeable to any Loan Party hereunder.

provided however, that the foregoing shall not result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder; provided further that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the Aggregate Commitments (as in effect prior to any termination of the Aggregate Commitments pursuant to Section 2.06 hereof).

"Permitted Variance" shall mean (i) until entry of the Approval Order, fifteen percent (15%) and (ii) after the entry of the Approval Order, ten percent (10%).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the Recitals to this Agreement.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Preferred Equity Documents" means the Stockholders Agreement, Borrower's Certificate of Designations of Series B Preferred Stock, and subscription agreements for the Preferred Shares, and all other agreements, instruments, documents and certificates now or hereafter executed and delivered in connection therewith, in each case as amended, modified, supplemented or restated from time to time in accordance with the terms hereof and thereof.

"Preferred Shares" has the meaning provided in Section 10.24.

"Prepayment Event" means:

(a)    Any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party;

(b)    Any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party in an amount in excess of $100,000, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

- 35 -

(c)      The issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party, or (ii) as a compensatory issuance to any employee, director, or consultant (including under any option plan);

(d)      The incurrence by a Loan Party of any Indebtedness for borrowed money other than Permitted Indebtedness; or

(e)      The receipt by any Loan Party of any Extraordinary Receipts.

"Pre-Petition Agent" means Salus Capital Partners, LLC, as administrative agent and collateral agent for the Pre-Petition Lenders under the Pre-Petition Credit Agreement.

"Pre-Petition Credit Agreement" means that certain Credit Agreement, dated as of July 18, 2014, among the Borrower, the Pre-Petition Lenders, the Pre-Petition Agent, and Salus Capital Partners, LLC and DCP Linens Lender, LLC, as co-Tranche A-1 Agents, as amended prior to and in effect on the Petition Date and as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Pre-Petition Indebtedness" shall mean Indebtedness of any Loan Party that was incurred or accrued prior to the commencement of the Chapter 11 Case.

"Pre-Petition Lenders" means the lenders party to the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as such term is defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loans" means the "Loans" as such term is defined in the Pre-Petition Credit Agreement.

"Pre-Petition Obligations" means the "Obligations" as such term is defined in the Pre-Petition Credit Agreement.

"Pre-Petition Permitted Liens" has the meaning specified in the Interim Financing Order.

"Pre-Petition Reserve" means, at any date of determination, an amount equal to the aggregate outstanding amount of the Pre-Petition Obligations (other than contingent indemnification obligations for which a claim has not been asserted).

"Reaffirmation of Loan Documents" means that certain Reaffirmation of Loan Documents dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receipts and Collections" has the meaning specified in <u>Section 6.13(c)</u>.

"Recipient" means the Agent, any Lender, any L/C Issuer or any other recipient (including any assignee or Participant) of any payment to be made by or on account of any obligation of the Loan Parties under this Agreement.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Borrower and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Reports" has the meaning provided in Section 9.11(b).

"Request for Credit Extension" means (a) with respect to a Borrowing of Loans, a Borrowing Notice, and (b) with respect to an L/C Credit Extension, a Letter of Credit Application and, if required by the applicable L/C Issuer, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable.

"Required Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the sum of the Aggregate Commitments or, if the Aggregate Commitments and the obligation of each L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, Lenders holding in the aggregate more than fifty percent (50%) of the Total Outstandings; provided that the Commitment of, and the portion in the aggregate of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all Inventory Reserves and Availability Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder; provided, that, in each case the Agent shall have received satisfactory background checks with respect to each such person no later than thirty (30) days after the Closing Date pursuant to Section 6.26. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property),

- 37 -

including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.  Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale Agency Agreement" means the Agency Agreement dated as of June 10, 2015, by and between the Borrower and a joint venture comprising Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, for the sale of all or substantially all of the Borrower' assets, as in effect on such date and as amended, restated, supplemented, or modified from time to time thereafter with Agent's prior written consent.

"Salus" means Salus Capital Partners, LLC and its successors.

"Salus Entity" has the meaning provided in Section 10.06(i).

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement, the Reaffirmation of Loan Documents, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

- 38 -

"Spot Rate" means, for a currency, the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two (2) Business Days prior to the date of such determination; provided that the Agent may obtain such spot rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Standby Letter of Credit Agreement" means the Standby Letter of Credit Agreement relating to the issuance of a Standby Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Statutory Committee" means any official committee appointed in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D.  LIBO Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Stockholders Agreement" means the Stockholders Agreement dated as of the date hereof among the Borrower, Alan Gladstone and Janette Shawn Gladstone, ASG Management, LLC, The Gladstone 1999 Family Trust Dated June 11, 1999, Scott Gladstone, Rosewood Capital III, L.P., Rosewood Capital IV, L.P., Rosewood Capital IV Associates, L.P. and each holder of the Preferred Shares.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

- 39 -

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

- 40 -

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, or (iii) the termination of the Commitments in accordance with the provisions of Section 2.06(a) hereof.

"Testing Period" shall mean (i) the first two (2) week period of the Approved Budget, on a cumulative basis for such two (2) week period, (ii) the first three (3) week period of the Approved Budget, on a cumulative basis for such three (3) week period, (iv) the first four (4) week period of the Approved Budget, on a cumulative basis for such four (4) week period, and (iv) thereafter on a rolling four (4) week basis.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"Trigger Event" means (a) the occurrence and continuance of an Event of Default and the exercise of remedies provided for in Section 8.02 (or after the Loans automatically becoming immediately due and payable as set forth in the proviso to Section 8.02) or (b) a sale of any of the Loan Parties' assets approved by an order of the Bankruptcy Court pursuant to Sections 363 or 365 of the Bankruptcy Code.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 of the Uniform Commercial Code; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"UFCA" has the meaning specified in Section 10.21(d).

"UFTA" has the meaning specified in Section 10.21(d).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

- 41 -

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base, or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"Vendor Notes" means the unsecured promissory notes and secured junior subordinated promissory notes issued by Borrower in favor of certain inventory vendors described on Schedule 7.03 attached hereto.

"Wage Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent, which, among other matters, authorizes the Loan Parties to pay certain pre-petition wages, benefits and other amounts owing to employees.

      **1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

      (a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

      (b)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

- 42 -

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and any other contingent Obligations, providing cash collateralization or other collateral as may be requested by the Agent) of all of the Obligations other than unasserted contingent indemnification Obligations.

**1.03    Accounting Terms Generally**.

(a)    <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP, applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein.

(b)    <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06    Letter of Credit Amounts**.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; <u>provided</u>, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

- 43 -

## ARTICLE II
## THE COMMITMENTS AND CREDIT EXTENSIONS

### 2.01    Loans; Reserves.

(a)    Subject to the terms and conditions set forth herein, (i) each Lender severally agrees to make loans (each such loan, a "Loan") to the Borrower from time to time, on any Business Day during the Availability Period on which the Agent's offices are open to conduct business, in an aggregate amount not to exceed at any time outstanding such Lender's Commitment,  and (ii) each Lender severally agrees to make a Loan to the Borrower from time to time, on any Business Day during the Availability Period on which the Agent's offices are open to conduct business, in an aggregate amount not to exceed such Lender's Commitment, subject in each case to the following limitations:

(i)    after giving effect to any Borrowing, the Total Outstandings shall not exceed the Maximum Loan Amount; and

(ii)    the Outstanding Amount of all L/C Obligations shall not at any time exceed the Letter of Credit Sublimit.

Within the limits of each Lender's Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01, prepay under Section 2.04, and reborrow under this Section 2.01.  Subject to the entry of a Final Financing Order that authorizes the payment in full of all outstanding Pre-Petition Obligations, on the Final Order Entry Date, the Borrower shall request Loans sufficient to pay off in full any outstanding Pre-Petition Obligations (other than contingent indemnification obligations for which a claim has not been asserted).

(b)    The Inventory Reserves and Availability Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to Section 4.01(c) hereof.

(c)    The Agent shall have the right, at any time and from time to time after the Closing Date to establish, modify or eliminate Reserves.

### 2.02    Borrowings and of Loans.

(a)    Each Borrowing shall be made upon the Borrower's irrevocable written notice to the Agent.  Each such notice must be received by the Agent in writing not later than 1:00 p.m. or such earlier time as Agent may designate from time to time by written notice to the Borrower on the same Business Day of the requested date of any Borrowing.  Each notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Agent of a written Borrowing Notice (or, if the Agent so requests, by electronic submission by the Borrower), appropriately completed and signed by a Responsible Officer of the Borrower. Unless otherwise agreed to by the Agent, each Borrowing shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof.  The Borrower may request Borrowings daily on any Business Day.  Each Borrowing Notice shall specify (i) the requested date of the Borrowing (which shall be a Business Day), and (ii) the principal amount of Loans to be borrowed.

- 44 -

(b)    Following receipt of a Request for Credit Extension, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Loans (or portion thereof).  Each Lender shall make the amount of its Loan(s) available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, upon satisfaction or waiver of the applicable conditions set forth in Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrower in like funds by no later than 4:00 p.m. on the day of receipt by the Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Borrower.

(c)    Each Borrowing of Loans shall be made by the Lenders pro rata in accordance with their respective Applicable Percentage  The failure of any Lender to make any Loan shall neither relieve any other Lender of its obligation to fund its Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(d)    The Agent, without the request of the Borrower, may advance as a Loan any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby.  The Agent shall advise the Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrower's obligations under Section 2.05(a). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(e) shall bear interest at the interest rate then and thereafter applicable to the Loans.

(e)    At any time that any Loans are outstanding, the Agent shall promptly notify the Borrower and the Lenders of changes in the LIBO Rate used in determining the applicable interest rate.

(f)    The Agent, the Lenders and the L/C Issuers shall have no obligation to make any Loan or to provide any Letter of Credit if an Overadvance would result.  The Agent may make Permitted Overadvances without the consent of the Borrower, the Lenders and the L/C Issuers and the Borrower and each Lender and L/C Issuer shall be bound thereby.  A Permitted Overadvance is for the account of the Borrower and shall constitute a Loan and an Obligation and shall be repaid by the Borrower in accordance with the provisions of Section 2.05(a).  The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03    Letters of Credit.**[1]

---

[1] TBD if needed in this Agreement.

(a)        The Letter of Credit Commitment.

(i)        Subject to the terms and conditions set forth herein, each L/C Issuer shall (A) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, issue Letters of Credit for the account of the Borrower, and amend or extend Letters of Credit previously issued by it, in accordance with Section 2.03(b) below, and (B) honor drawings under the Letters of Credit; provided, that all such Letters of Credit and L/C Obligations shall be deemed to be Borrowings of Loans, and after giving effect to any L/C Credit Extension with respect to any Letter of Credit and any Loans made in accordance with Section 2.04(g) below, (w) the Total Outstandings shall not exceed the Maximum Loan Amount, (x) the aggregate Outstanding Amount of the Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations shall not exceed such Lender's Commitment, and (z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit. Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)        No Letter of Credit shall be issued if:

A)        the expiry date of such requested Standby Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the L/C Issuer and the Required Lenders have approved such expiry date; or

B)        the expiry date of such requested Commercial Letter of Credit would occur more than 120 days after the date of issuance or last extension, unless the L/C Issuer and the Required Lenders have approved such expiry date; or

C)        the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless all the Lenders have approved such expiry date.

(iii)        No Letter of Credit shall be issued without the prior consent of the Agent if:

A)        any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the applicable L/C Issuer from issuing such Letter of Credit, or any Law applicable to the applicable L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the applicable L/C Issuer shall prohibit, or request that the applicable L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the applicable L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the applicable L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the applicable

L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the applicable L/C Issuer in good faith deems material to it;

B)    the issuance of such Letter of Credit would violate one or more policies of the applicable L/C Issuer applicable to letters of credit generally;

C)    except as otherwise agreed by the Agent and the applicable L/C Issuer, such Letter of Credit is in an initial Stated Amount less than $100,000, in the case of a Commercial Letter of Credit, or $250,000, in the case of a Standby Letter of Credit;

D)    such Letter of Credit is to be denominated in a currency other than Dollars; provided that if the applicable L/C Issuer, with the consent of the Agent, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrower of the honoring of any drawing under such Letter of Credit shall be paid in Dollars based on the Spot Rate; or

E)    such Letter of Credit contains any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder.

(iv)    The applicable L/C Issuer shall not amend any Letter of Credit if (A) such L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(v)    Each L/C Issuer shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by such L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Agent" as used in Article IX. included such L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to such L/C Issuer.

(b)    Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the applicable L/C Issuer (with a copy to the Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower.  Such Letter of Credit Application must be received by such L/C Issuer and the Agent not later than 11:00 a.m. at least two Business Days (or such other date and time as the Agent and such L/C Issuer may agree in a particular instance prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Agent and such L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the Agent or such L/C Issuer may reasonably require.  In the case of a request

- 47 -

for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the Agent and the applicable L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the Agent or such L/C Issuer may reasonably require.  Additionally, the Borrower shall furnish to the applicable L/C Issuer and the Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, and any Issuer Documents (including, if requested by the applicable L/C Issuer, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable), as the applicable L/C Issuer or the Agent may reasonably require.

(ii)    Promptly after receipt of any Letter of Credit Application, the applicable L/C Issuer will confirm with the Agent (in writing) that the Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, such L/C Issuer will provide the Agent with a copy thereof.  Unless the applicable L/C Issuer has received written notice from any Lender, the Agent or any Loan Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied or unless the applicable L/C Issuer would not be permitted, or would have no obligation, at such time to issue such Letter of Credit under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section 2.03(a) or otherwise), then, subject to the terms and conditions hereof, the applicable L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with such L/C Issuer's usual and customary business practices.

(iii)    If the Borrower so requests in any applicable Letter of Credit Application, the applicable L/C Issuer may, in its sole and absolute discretion, agree to issue a Standby Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that, any such Auto-Extension Letter of Credit must permit the applicable L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued.  Unless otherwise directed by the Agent or the applicable L/C Issuer, the Borrower shall not be required to make a specific request to the Agent or the applicable L/C Issuer for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable L/C Issuer to permit the extension of such Standby Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; provided, however, that the Agent shall instruct the applicable L/C Issuer not to permit any such extension if (A) the applicable L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Standby Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section 2.03(a) or otherwise), or (B) the applicable L/C Issuer has received notice in writing on or before the day that is five Business Days before the Non-Extension Notice Date (1) from the Agent that the Required Lenders have elected not to permit such extension or (2) from the Agent, any Lender or the Borrower that one or more of the applicable conditions

- 48 -

specified in <u>Section 4.02</u> is not then satisfied, and in each such case directing the applicable L/C Issuer not to permit such extension.

(iv)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the applicable L/C Issuer will also deliver to the Borrower and the Agent a true and complete copy of such Letter of Credit or amendment.

(c)    <u>Drawings</u>.  Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the applicable L/C Issuer shall notify the Borrower and the Agent thereof not less than two (2) Business Days prior to the Honor Date; <u>provided</u>, however, that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the applicable L/C Issuer with respect to any such payment.    Any notice given by the applicable L/C Issuer or the Agent pursuant to this <u>Section 2.03(c)</u> must be confirmed in writing.

(d)    Reserved.

(e)    <u>Obligations Absolute</u>.  The obligation of the Borrower to reimburse the applicable L/C Issuer for each drawing under each Letter of Credit shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that the Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the applicable L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    any payment by the applicable L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the applicable L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

- 49 -

(v)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or any of its Subsidiaries; or

(vi)    the fact that any Default or Event of Default shall have occurred and be continuing.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the Agent and the applicable L/C Issuer.  The Borrower shall be conclusively deemed to have waived any such claim against the applicable L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)    <u>Role of L/C Issuer</u>.  Each Lender and the Borrower agrees that, in paying any drawing under a Letter of Credit, the applicable L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the applicable L/C Issuer, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the applicable L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; (iii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; or (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document.  The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; <u>provided</u>, <u>however</u>, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the applicable L/C Issuer, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the applicable L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of <u>Section 2.03(e)</u> or for any action, neglect or omission under or in connection with any Letter of Credit or Issuer Documents, including, without limitation, the issuance or any amendment of any Letter of Credit, the failure to issue or amend any Letter of Credit, or the honoring or dishonoring of any demand under any Letter of Credit, and such action or neglect or omission will bind the Borrower; <u>provided</u>, <u>however</u>, that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the applicable L/C Issuer, and the applicable L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential, exemplary or punitive damages suffered by the Borrower which the Borrower proves were caused by the applicable L/C Issuer's willful misconduct or gross negligence or the applicable L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit; <u>provided</u>, <u>further</u>, that any claim against the applicable L/C Issuer by the Borrower for any loss suffered or incurred by the Borrower shall be reduced by an

- 50 -

amount equal to the sum of (i) the amount (if any) saved by the Borrower as a result of the breach or other wrongful conduct that allegedly caused such loss, and (ii) the amount (if any) of the loss that would have been avoided had the Borrower taken all reasonable steps to mitigate such loss, including, without limitation, by enforcing their rights against any beneficiary and, in case of a claim of wrongful dishonor, by specifically and timely authorizing the applicable L/C Issuer to cure such dishonor.  In furtherance and not in limitation of the foregoing, the applicable L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary (or the applicable L/C Issuer may refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit and may disregard any requirement in a Letter of Credit that notice of dishonor be given in a particular manner and any requirement that presentation be made at a particular place or by a particular time of day), and the applicable L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.  The applicable L/C Issuer shall not be responsible for the wording of any Letter of Credit (including, without limitation, any drawing conditions or any terms or conditions that are ineffective, ambiguous, inconsistent, unduly complicated or reasonably impossible to satisfy), notwithstanding any assistance the applicable L/C Issuer may provide to the Borrower with drafting or recommending text for any Letter of Credit Application or with the structuring of any transaction related to any Letter of Credit, and the Borrower hereby acknowledges and agrees that any such assistance will not constitute legal or other advice by the applicable L/C Issuer or any representation or warranty by the applicable L/C Issuer that any such wording or such Letter of Credit will be effective.  Without limiting the foregoing, the applicable L/C Issuer may, as it deems appropriate, modify or alter and use in any Letter of Credit the terminology contained on the Letter of Credit Application for such Letter of Credit.

(g)    Cash Collateral.  The Borrower shall immediately Cash Collateralize, with the proceeds of Loans, the Outstanding Amount of all L/C Obligations with respect to all Letters of Credit upon the issuance thereof in an amount equal to one hundred five percent (105%) of the Outstanding Amount of such L/C Obligations).  In furtherance thereof, on the date of issuance of each Letter of Credit hereunder, the Borrower shall request a Borrowing to be disbursed on such date in order to Cash Collateralize the Outstanding Amount of all L/C Obligations with respect to such Letter of Credit in accordance with this Section 2.03(g).  Cash Collateral shall be maintained in a Cash Collateral Account with the applicable L/C Issuer.  If at any time the Agent or the applicable L/C Issuer determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Agent or the applicable L/C Issuer or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrower will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Agent determines to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the applicable L/C Issuer and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations, unless no other Obligations are outstanding, in which case such proceeds shall be transferred promptly (and in any event, within three (3) Business Days of receipt) to the Borrower's Operating Account

- 51 -

Notwithstanding anything to the contrary contained herein or in any other Loan Document, in calculating the Borrowing Base, Total Outstandings, and compliance with the limitations contained in Sections 2.01(a) and elsewhere herein, there shall be no double counting the Outstanding Amount of the L/C Obligations and the Outstanding Amount of Loans made pursuant to this Section 2.03(g) and held as Cash Collateral for such L/C Obligations.

(h)    Applicability of ISP and UCP.  Unless otherwise expressly agreed by the applicable L/C Issuer and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit.

(i)    Reserved.

(j)    Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer.  The Borrower shall pay directly to the applicable L/C Issuer, for its own account, a customary fronting fee (the "Fronting Fee") computed on the daily amount available to be drawn under each Letter of Credit issued by such L/C Issuer and payable on a monthly basis in arrears. Such Fronting Fees shall be due and payable on the first day after the end of each month, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand.  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06.  In addition, the Borrower shall pay directly to the applicable L/C Issuer, for its own account, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(k)    Conflict with Issuer Documents.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

**2.04    Reserved.**

**2.05    Prepayments.**

(a)    If for any reason the Total Outstandings at any time exceed the Maximum Loan Amount, the Borrower shall immediately prepay in an aggregate amount necessary to eliminate such excess.

(b)    The Borrower shall prepay the Pre-Petition Obligations and the Loans and Cash Collateralize the L/C Obligations (to the extent that any such L/C Obligations are not already Cash Collateralized) with proceeds and collections received by the Loan Parties to the extent so required under the provisions of Section 6.13 hereof.

(c)    The Borrower shall prepay the Pre-Petition Obligations and the Loans and Cash Collateralize the L/C Obligations (to the extent that any such L/C Obligations are not already Cash Collateralized) in an amount equal to the Net Proceeds received by a Loan Party on account of a Prepayment Event.

(d)    Upon the expiration of any Letter of Credit, or any reduction in the amount of any Letter of Credit, the Borrower shall immediately prepay the Pre-Petition Obligations and the Loans then outstanding with the cash collateral held by the applicable L/C Issuer on account of such Letter of Credit in an amount equal to the amount of cash collateral so returned.

(e)    Prepayments made pursuant to Section (b), (c), and (d) above, first, shall be applied ratably to the outstanding Pre-Petition Obligations (other than contingent indemnification obligations for which a claim has not been asserted) in the order set forth in Section 8.03 of the Pre-Petition Credit Agreement; and second, shall be applied ratably to the outstanding Obligations pursuant to Section 8.03 hereof.

(f)    Subject to the entry of a Final Financing Order that authorizes the payment in full of all outstanding Pre-Petition Obligations, no later than one (1) Business Day after the Final Order Entry Date, the Borrower shall pay in full the total outstanding amount, if any, of the Pre-Petition Obligations (other than contingent indemnification obligations for which a claim has not been asserted).

**2.06    Termination or Reduction of Commitments.**

(a)    Provided that all Pre-Petition Obligations (other than contingent indemnification obligations for which a claim has not been asserted) have been paid in full and subject to the payment of any required fees under Section 2.09, the Borrower may, upon irrevocable notice from the Borrower to the Agent (which may be revocable if such notice states that termination of the Commitments and prepayment is contingent upon the refinancing in full of the credit facility provided for hereunder), terminate the Commitments or the Letter of Credit Sublimit or from time to time permanently reduce the Commitments or the Letter of Credit Sublimit; provided, that (i) any such notice shall be received by the Agent not later than 11:00 a.m. three (3) Business Days prior to the date of termination or reduction (or such later date or time as agreed to by Agent in writing), (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $500,000 in excess thereof, (iii) the Borrower shall not terminate or reduce (A) the Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the aggregate Outstanding Amount of the Loans and the L/C Obligations would exceed the Aggregate Commitments, and (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations would exceed the Letter of Credit Sublimit.

(b)    If, after giving effect to any reduction of the Aggregate Commitments or the Letter of Credit Sublimit, the Letter of Sublimit exceeds the amount of the Aggregate Commitments or such Letter of Credit Sublimit, the Letter of Credit Sublimit shall be automatically reduced by the amount of such excess.

(c)    The Agent will promptly notify the Lenders of any termination or reduction of the Letter of Credit Sublimit or the Aggregate Commitments under this Section 2.06.  Upon any reduction of the Aggregate Commitments, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount.  All fees (including, without limitation, commitment fees) and interest in respect of the Aggregate

- 53 -

Commitments accrued until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

**2.07    Repayment of Loans**.    The Borrower shall repay to the Lenders on the Termination Date the aggregate principal amount of Loans and all other Obligations outstanding on such date.

**2.08    Interest.**

(a)    Subject to the provisions of Section 2.08(b) below, each Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Interest Rate; provided, that notwithstanding fluctuations in the Interest Rate the effective interest rate payable by Borrower with respect to the Loans shall at no time be less than the Interest Rate Floor, which minimum interest rates will apply regardless of fluctuations in the Adjusted LIBO Rate that would otherwise cause the interest rate applicable to Loans to be less than such Interest Rate Floor.

(b)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(i)    If any other Event of Default exists, then all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times during such existing Event of Default equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.

**2.09    Fees**.    In addition to certain fees described in Section 2.03(j), the Borrower shall pay to the Agent for its own account and to the Agent, for the ratable benefit of the Lenders, fees in the amounts, and at the times, specified in the Fee Letter.

**2.10    Computation of Interest and Fees; Application of Payments**.    All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.    Interest shall accrue on each Loan for the day on which the Loan is made.    For purposes of the calculation of the Outstanding Amount and interest on the Loans, all payments made by or on account of the Borrower shall be deemed to have been applied to the Loans one (1) Business Day after receipt of such payments by the Agent (as such receipt is determined pursuant to Section 2.12).    Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest or demonstrable error.

**2.11    Evidence of Debt.**

- 54 -

(a)      The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business.   In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.   The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest or demonstrable error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.   Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.   In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest or demonstrable error.   Upon the request of any Lender made through the Agent, the Borrower shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Loans, as applicable, in addition to such accounts or records.   Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.   Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrower will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)      Agent shall render monthly statements regarding the Loan Account to the Borrower including principal, interest, fees, and including an itemization of all charges and expenses constituting Credit Party Expenses owing, and such statements, absent manifest or demonstrable error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and the Credit Parties unless, within thirty (30) days after receipt thereof by the Borrower, the Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

**2.12    Payments Generally; Agent's Clawback.**

(a)      <u>General</u>.   All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.   Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.   The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.   All payments received by the Agent (i) prior to or at 2:00 p.m., shall be deemed received on the same Business Day and (ii) after 2:00 p.m., shall be deemed received on the next succeeding Business Day; any applicable interest or fee shall continue to accrue and shall be calculated pursuant to Section 2.10.   If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

- 55 -

(b)    <u>Funding by Lenders; Presumption by Agent</u>.  Unless the Agent shall have received notice from a Lender prior to 1:00 p.m. on the date of such Borrowing that such Lender will not make available to the Agent such Lender's share of such Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Agent, then the applicable Lender and the Borrower severally agrees to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Loans.  If the Borrower and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Agent, then the amount so paid shall constitute such Lender's Loans included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Agent.

(i)    <u>Payments by Borrower; Presumptions by Agent</u>.  Unless the Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders or the applicable L/C Issuer hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable L/C Issuer, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the applicable L/C Issuer, as the case may be, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender or the applicable L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest or demonstrable error.

(c)    <u>Failure to Satisfy Conditions Precedent</u>.  If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrower by the Agent because the conditions to the applicable Credit Extension set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of <u>Section 4.02</u> hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

- 56 -

(d)      Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and to make payments hereunder are several and not joint.   The failure of any Lender to make any Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its portion of the Loan, to purchase its participation or to make its payment hereunder.

(e)      Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13      Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in any such Lender receiving payment of a proportion of the aggregate amount of such Obligations greater than its pro rata share thereof as provided herein (including, as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Lenders, as applicable, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(i)      if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)      the provisions of this Section 2.13 shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its portion of its Loans or subparticipations in L/C Obligations to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14      Settlement Amongst Lenders**.

(a)      The amount of each Lender's Applicable Percentage of outstanding Loans (shall be computed weekly (or more frequently in the Agent's discretion) and shall be adjusted

- 57 -

upward or downward based on all Loans and repayments of Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b)    The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Lender its Applicable Percentage of repayments of Loans, and (ii) each Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of the Loans made by each Lender shall be equal to such Lender's Applicable Percentage outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent.  If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**2.15    Defaulting Lenders.**

(a)    Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.01.

(ii)    Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 10.08 shall be applied at such time or times as may be determined by the Agent as follows:  first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; third, if so determined by the Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default

- 58 -

exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Aggregate Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.  No Defaulting Lender shall be entitled to receive any fee payable under the Fee Letter for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    Defaulting Lender Cure.  If the Borrower and the Agent agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lenders having been a Defaulting Lender.

**2.16    Release**

.  Each Loan Party hereby acknowledges, effective upon entry of the Interim Financing Order, that no Loan Party has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Loan Parties' liability to repay the Credit Parties as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from any Credit Party.  Each Loan Party, on behalf of itself and its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges each Credit Party and its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, affiliates, participants, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens,

- 59 -

lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Financing Order, the Final Financing Order and the transactions contemplated hereby or thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

### 2.17    Waiver of any Priming Rights; Credit Bid

. Upon the Closing Date and until such time as the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated, each Loan Party, on behalf of itself and its estate, hereby irrevocably waives any right or alleged right, (a) pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations (other than Pre-Petition Permitted Liens and the Carve-Out); or (b) to propose any sale or any plan of reorganization or liquidation which seeks to limit or eliminate the right of the Agent or Lenders to credit bid all or any portion of the Obligations.

### ARTICLE III
### TAXES, YIELD PROTECTION AND ILLEGALITY;
### APPOINTMENT OF BORROWER

### 3.01    Taxes.

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions of Indemnified Taxes or Other Taxes (including deductions applicable to additional sums payable under this Section) the Agent, the Lender or the applicable L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions of Indemnified Taxes or Other Taxes and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

BOS 47658425v6

(b)    <u>Payment of Other Taxes by the Borrower</u>.  Without limiting the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent, each Lender and each L/C Issuer, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Agent, such Lender or such L/C Issuer, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or a L/C Issuer (with a copy to the Agent), or by the Agent on its own behalf or on behalf of the Agent, a Lender or a L/C Issuer, shall be conclusive absent manifest or demonstrable error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)    <u>Status of Lenders.</u>

(i)    The Agent shall deliver to Borrower a properly completed and executed copy of any other form or forms, including IRS Form W-9 or appropriate IRS Form W-8, as applicable, as may be required under the Code or other laws of the United States as a condition to exemption from United States withholding or backup withholding Tax.  Any Recipient that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding. Such delivery shall be provided on the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered.  In addition, any Recipient, if requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(ii)    Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement

- 61 -

(and from time to time thereafter upon the request of the Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

A)    duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E claiming eligibility for benefits of an income tax treaty to which the United States is a party,

B)    duly completed copies of Internal Revenue Service Form W-8ECI,

C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E,

D)    any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower to determine the withholding or deduction required to be made;

(iii)    Each Recipient that is not a Foreign Lender shall deliver to the Borrower and the Agent two properly completed and duly executed copies of Internal Revenue Service Form W 9 (or any successor or other applicable form) certifying that such Recipient is exempt from United States federal backup withholding.

(iv)    If a payment made to a Recipient under any Loan Document would be subject to Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Agent at the time or times prescribed by applicable law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code or any applicable intergovernmental agreement) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA, to determine whether such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount (if any) to deduct and withhold from such payment. For the avoidance of doubt, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)    Treatment of Certain Refunds.    If any Recipient determines that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with

- 62 -

respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of such Recipient, agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Recipient in the event such Recipient is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

**3.02    Illegality**.  If the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan thereof that (a) adequate and reasonable means do not exist for determining the LIBO Rate or (b) the LIBO Rate does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Borrower and each Lender.  Upon receipt of such notice, interest on the Loans shall accrue at interest rates based on the Base Rate plus a margin reasonably determined by the Agent to result in interest rates similar to those based on the LIBO Rate, until the Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for LIBO Rate Loans.

**3.03    Inability to Determine Rates**.  If the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan or a conversion to a LIBO Rate Loan that (a) adequate and reasonable means do not exist for determining the LIBO Rate for with respect to a proposed LIBO Rate Loan, or (b) the LIBO Rate with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended until the Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of or conversion to LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**3.04    Increased Costs; Reserves on LIBO Rate Loans.**

(a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate) or any L/C Issuer;

(ii)    subject any Lender or any L/C Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit or any LIBO Rate Loan made by it, or change the basis of taxation of payments to such Lender or such L/C Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or such L/C Issuer); or

- 63 -

(iii)    impose on any Lender or any L/C Issuer any other condition, cost or expense affecting this Agreement or LIBO Rate Loans made by such Lender or any Letter of Credit;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such L/C Issuer of issuing or maintaining any Letter of Credit (or of maintaining its obligation to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or such L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or such L/C Issuer, the Borrower will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender or any L/C Issuer determines that any Change in Law affecting such Lender or such L/C Issuer or any Lending Office of such Lender or such Lender's or such L/C Issuer's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or such L/C Issuer's capital or on the capital of such Lender's or such L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, or the Letters of Credit issued by such L/C Issuer, to a level below that which such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such L/C Issuer's policies and the policies of such Lender's or such L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender or a L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or such L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest or demonstrable error.  The Borrower shall pay such Lender or such L/C Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender or any L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or such L/C Issuer's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender or a L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or such L/C Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

- 64 -

(e)      Reserves on LIBO Rate Loans.  The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least 10 days' prior notice (with a copy to the Agent) of such additional interest from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

**3.05    Reserved**.

**3.06    Mitigation Obligations**.    If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

**3.07    Survival**.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of the Loans and all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01    Conditions of Initial Credit Extension**.  The obligation of each L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)      The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent:

(i)      executed counterparts of this Agreement sufficient in number for distribution to the Agent, each Lender and the Borrower;

- 65 -

(ii)    a Note executed by the Borrower in favor of each Lender requesting a Note;

(iii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)    copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)    a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied, (B) that there has been no event or circumstance since February 2, 2015 that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (C) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vi)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(vii)    executed counterparts of the Security Documents and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(viii)    all other Loan Documents, each duly executed by the applicable Loan Parties;

(ix)    results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent for the

- 66 -

delivery of such termination statements and releases, satisfactions and discharges have been made;

(x)    to the extent required by the Agent, all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the reasonable satisfaction of the Agent; and

(xi)    such other assurances, certificates, documents, consents or opinions as the Agent or its counsel may reasonably require.

(b)    The Agent shall have received a Borrowing Base Certificate dated the Closing Date and executed by a Responsible Officer of the Borrower.

(c)    The Agent shall have received and be satisfied with such information (financial or otherwise) reasonably requested by the Agent.

(d)    There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(e)    There shall not have occurred any default of any Material Contract of any Loan Party, other than defaults under Material Contracts arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code.

(f)    The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

(g)    To the extent permitted by the Interim Financing Order, all fees and expenses required to be paid to the Agent on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(h)    To the extent permitted by the Interim Financing Order, the Borrower shall have paid all reasonable fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Agent).

(i)    The Agent and the Lenders shall have completed satisfactory background check of the Loan Parties' owners, shareholders and management and shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

- 67 -

(j)     No material changes in governmental regulations or policies affecting any Loan Party or any Credit Party shall have occurred prior to the Closing Date.

(k)     The Agent shall have received evidence that the Loan Parties filed the Expedited Assumption Motion, in form and substance acceptable to the Agent on the Petition Date.

(l)     The Bankruptcy Court shall have entered the Interim Financing Order, the Cash Management Order and the Wage Order (and all pre-petition amounts set forth on Schedule 4.01, the payment of which has been authorized by the Wage Order, shall have been paid).

(m)     The Agent shall have received and approved the initial Approved Budget.

(n)     The Closing Date shall have occurred on or before June [__], 2015.  The Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding on the Loan Parties.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02     Conditions to all Credit Extensions**.  The obligation of each Lender to honor any Request for Credit Extension and each L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

(a)     The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, and (iii) for changes expressly permitted by this Agreement.

(b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;

(c)     The Agent and, if applicable, the applicable L/C Issuer shall have received a Request for Credit Extension in accordance with the requirements hereof;

(d)     No event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred;

(e)     No Overadvance shall result from such Credit Extension; and

- 68 -

(f)    The Bankruptcy Court shall have entered the Interim Financing Order and, if such proposed funding date is more than 30 days after the Petition Date, the Final Financing Order, which Interim Financing Order or Final Financing Order, as the case may be, shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Agent.

Each Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.  The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Agent to cease making Loans and direct each L/C Issuer to cease issuing Letters of Credit, the Lenders will fund their Applicable Percentage of all Loans whenever made, which are requested by the Borrower and which, notwithstanding the failure of the Loan Parties  to comply with the provisions of this Article IV, agreed to by the Agent; provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power**.  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation, (b) has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02    Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require

- 69 -

any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries (other than defaults under Material Contracts or any Material Indebtedness arising from the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code) or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03    Governmental Authorization; Other Consents**.  Subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof), or (b) such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. Subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Reserved.**

**5.06    Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in <u>Schedule 5.06</u>, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect, and since the Closing Date, there has been no adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described on <u>Schedule 5.06</u>.

**5.07    No Default**.  No Loan Party or any Subsidiary is in default under or with respect to, or party to, any Material Contract or any Material Indebtedness other than defaults under Material Contracts or any Material Indebtedness arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code.  No

- 70 -

Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08    Ownership of Property; Liens.**

(a)    Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests (subject to Permitted Encumbrances) in, all Real Estate necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests (subject to Permitted Encumbrances) in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.

(b)    Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien thereon, in each case as of the Closing Date.  Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances.  Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease, in each case as of the Closing Date.  Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof (after giving effect to the applicable grace periods).

(c)    The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d)    The Loan Parties have no Investments, other than Permitted Investments.

(e)    The Loan Parties have no Indebtedness, other than Permitted Indebtedness.

**5.09    Environmental Compliance.**

(a)    Except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently

- 71 -

owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    Except as otherwise set forth on <u>Schedule 5.09</u>, no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**5.10    Insurance**.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates. <u>Schedule 5.10</u> sets forth a description of all insurance maintained by or on behalf of the Loan Parties as of the Closing Date. Each insurance policy listed on <u>Schedule 5.10</u> is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11    Taxes**.  The Loan Parties and their Subsidiaries have filed all income and other material tax returns and reports required to be filed, and have paid all income and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien (other than any Permitted Encumbrance described in clause (a) of the definition of Permitted Encumbrances) has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement primarily related to Taxes, which include any Person who is not a Loan Party or a Subsidiary.

**5.12    ERISA Compliance.**

(a)    The Borrower, each of its ERISA Affiliates and each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other

- 72 -

Federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification.  The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Sections 412 or 430 of the Code and to each Multiemployer Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Sections 412 or 430 of the Code has been made with respect to any Plan.  No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or Multiemployer Plan.

(b)  There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)  (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13   Subsidiaries; Equity Interests**.  The Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary.  All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents and the Pre-Petition Loan Documents.  Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary.  The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part(b) of Schedule 5.13.  All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents and the Pre-Petition Loan Documents.  The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14   Margin Regulations; Investment Company Act**.

(a)  No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning

- 73 -

of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.15    **Disclosure**. Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

5.16    **Compliance with Laws**. Each of the Loan Parties and each Subsidiary is in compliance (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18 hereof.

5.17    **Intellectual Property; Licenses**, Etc. The Loan Parties and their Subsidiaries own, or possess the right to use, all of the material Intellectual Property, all material licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person. To the best knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person, except as could not reasonably be expected to have a Material Adverse Effect. Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.18    **Labor Matters**. There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of

- 74 -

any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect. No Loan Party or any of its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law.  All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19   Security Documents**.

(a)    The Security Agreement and Financing Orders create in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement).   Upon entry of the Financing Orders, the financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement.  Upon entry of the Financing Orders, the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person.

(b)    Upon entry of the Financing Orders, the Security Agreement (or a short form thereof) has been or will be filed in the United States Patent and Trademark Office and the United States Copyright Office.   Upon entry of the Financing Orders, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United

States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

**5.20    Reserved**.

**5.21    Deposit Accounts; Credit Card Arrangements.**

(a)    Annexed hereto as <u>Schedule 5.21(a)</u> is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.

(b)    Annexed hereto as <u>Schedule 5.21(b)</u> is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22    Reserved**.

**5.23    Customer and Trade Relations**.  Except as may result from the filing of the Chapter 11 Case, there exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations.

**5.24    Material Contracts**.  <u>Schedule 5.24</u> sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Closing Date.  Other than defaults under Material Contracts arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code, the Loan Parties are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of default under, or of the intention of any other party thereto to terminate, any Material Contract.

**5.25    Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26    Personally Identifiable Information**.  Borrower maintains a policy for the treatment, handling and storage of consumer information and personally identifiable information in accordance with applicable Laws and a true, accurate and complete copy of the current version thereof has been provided to the Agent.

- 76 -

**5.27   Bankruptcy Matters.**

(a)     The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice of (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order has been or will be given.  The Borrower shall give, on a timely basis as specified in the Interim Financing Order or the Final Financing Order, as applicable, all notices required to be given to all parties specified in the Interim Financing Order or Final Financing Order, as applicable.

(b)     After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims (other than the Carve-Out) and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the priorities set forth in the Interim Financing Order or the Final Financing Order, as applicable.

(c)     After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected first-priority Lien on all of the Collateral subject, as to priority only, to the Carve-Out and the Pre-Petition Permitted Liens (other than the Liens in favor of the Pre-Petition Agent under the Pre-Petition Loan Documents).

(d)     The Interim Financing Order (with respect to the period on and after entry of the Interim Financing Order and prior to entry of the Final Financing Order) or the Final Financing Order (with respect to the period on and after entry of the Final Financing Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Credit Parties shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), or any Letter of Credit shall remain outstanding, the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

- 77 -

**6.01    Financial Statements**.  Deliver to the Agent, in form and detail satisfactory to the Agent:

(a)    Reserved;

(b)

(i)    Each Borrowing by the Borrower under this Agreement and the other Loan Documents shall be used strictly in accordance with the Approved Budget (subject to any variances permitted under this Agreement or the Interim Financing Order or the Final Financing Order, as applicable).  The initial Approved Budget shall set forth, on a weekly basis, Net Cash Flow, Availability, the balance of Obligations outstanding under this Agreement and other information for the first thirteen (13) week period, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Agent.  The Approved Budget shall be updated, modified or supplemented (with the consent and/or at the request of the Agent) from time to time, but in any event not less than on a weekly basis (with the delivery to the Agent on or before Wednesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day)), and each such updated, modified or supplemented budget shall be approved by, and in form and substance reasonably satisfactory to, the Agent and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that in the event that the Agent, on the one hand, and the Borrower, on the other hand, cannot agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default hereunder once the period covered by the most recent Approved Budget has terminated.  Each Approved Budget delivered to the Agent shall be accompanied by such supporting documentation as requested by the Agent.  Each Approved Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable and are satisfactory to the Agent.

(ii)    Simultaneously with delivery by the Borrower to the Agent of each updated proposed amendment to the then applicable Approved Budget in accordance with this Section 6.01(b), commencing with the first such updated proposed amendment following the Closing Date, Borrower shall also deliver to the Agent the current Approved Budget Variance Report.  In all events, however, Borrower shall deliver an Approved Budget Variance Report to the Agent on a weekly basis, to be delivered on Wednesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day).

**6.02    Certificates; Other Information**.  Deliver to the Agent and each Lender, in form and detail satisfactory to the Agent:

(a)    Reserved;

(b)    (i) on Wednesday of each Fiscal Week by 2:00 p.m. (or, if such day is not a Business Day, on the next succeeding Business Day), and (ii) concurrently with the delivery of each Borrowing Notice, a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the immediately preceding week (provided that the Appraised Value percentage applied to the Eligible Inventory set forth in each Borrowing Base

- 78 -

Certificate shall be the percentage set forth in the most recent appraisal obtained by the Agent pursuant to Section 6.10 hereof for the applicable month in which such Borrowing Base Certificate is delivered), each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Borrower and accompanied by all applicable system generated documentation supporting the information contained within the Borrowing Base Certificate, including but not limited to inventory reporting inclusive of inventory mix by category and/or department and, where applicable, accounts receivable detail documentation, screen shots of the Loan Parties' bank accounts requested by the Agent as of the date of such Borrowing Base Certificate, and any additional documentation reasonably requested by the Agent;

(c)      promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event, provided that the foregoing shall not be deemed to a requirement that the Loan Parties engage a Registered Public Accounting Firm;

(d)      reserved;

(e)      on the Wednesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day), evidence of payment by the Loan Parties of all Taxes that were due and payable during such past week;

(f)      The financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

(g)      reserved;

(h)      reserved;

(i)      promptly after the Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

(j)      promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect; and

(k)      promptly, and in any event within one (1) Business Day after receipt thereof by any Loan Party, copies of any reclamation claim or demand or any claim asserted under Section 503(b)(9) of the Bankruptcy Code;

(l)      concurrently with the delivery thereof, copies of all monthly financial statements or operating reports filed by the Borrower with the Bankruptcy Court; and

- 79 -

(m)    promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Sections 6.01(a) or 6.01(b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); provided that: (i) the Borrower shall deliver paper copies of such documents to the Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (ii) the Borrower shall notify the Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  The Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

    6.03    **Notices**.  Promptly notify the Agent upon any Responsible Officer obtaining knowledge:

        (a)    of the occurrence of any Default or Event of Default;

        (b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

        (c)    if reasonably practicable, at least two (2) Business Days prior to the date when the Borrower intends to file any such pleading, motion or other document (and, if not reasonably practicable, as soon as reasonably practicable), provide copies of all material pleadings, motions, applications, judicial information, financial information and other documents to be filed by the Borrower in the Chapter 11 Case, provided that any pleading, motion or other document that does not affect the Agent and Lenders, this Agreement or related matters shall not be subject to this notice requirement;

        (d)    of any breach or non-performance of, or any default (after giving effect to any applicable notice or cure period) under, a Material Contract or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof, other than breaches or defaults under Material Contracts or with respect to Material Indebtedness, in each case arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code;

        (e)    of any dispute or litigation where the amount in dispute is in excess of $50,000 or which involves any request for injunctive relief, or any investigation, proceeding or

- 80 -

suspension (except any suspension of a license, permit or qualification, or notice thereof, the failure of which to maintain could not reasonably be expected to have a Material Adverse Effect) between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

      (f)    of the occurrence of any ERISA Event;

      (g)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

      (h)    of any change in any Loan Party's senior executive officers;

      (i)    of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

      (j)    of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

      (k)    of the filing of any Lien for unpaid Taxes in excess of $10,000 against any Loan Party;

      (l)    of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed; and

      (m)    of any failure by any Loan Party to pay rent (after any applicable grace periods) at (i) any distribution centers or warehouses; or (ii) ten percent (10%) or more of such Loan Party's locations or (ii) any of such Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first came due and such failure would be reasonably likely to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

      **6.04**    **Payment of Obligations**.  Pay and discharge as the same shall become due and payable, all its material post-petition obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (a) the validity or amount thereof is being contested in

- 81 -

good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d) no Lien has been filed with respect thereto and (e) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

**6.05    Preservation of Existence, Etc**. Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

**6.06    Maintenance of Properties**. (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance.**

(a)    Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent.

(b)    Cause property, fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)    Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)    Cause business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the

- 82 -

insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, any Lender or any other Credit Party shall be a co insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties so long as the same are available on commercially reasonable terms.

(e)     Unless prohibited by the terms of insurance policy, cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(f)     Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence satisfactory to the Agent of payment of the premium therefor.

(g)     Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(h)     Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

(i)     None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

    6.08    **Compliance with Laws**. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties

- 83 -

in accordance with GAAP; (b) such contest effectively suspends enforcement of the contested Laws, and (c) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

### 6.09    Books and Records; Accountants.

Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

### 6.10    Inspection Rights.

(a)    Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that so long as no Event of Default has occurred and is continuing, the Loan Parties shall not be obligated to reimburse the Agent (or its representatives or independent contractors) for more than two (2) inspections per Fiscal Year; provided, however, further, that when a Default or Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations, including, without limitation, of (i) the Borrower's practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such examinations and evaluations. Without limiting the foregoing, the Loan Parties acknowledge that the Agent may undertake up to two (2) commercial finance examinations each Fiscal Year at the Loan Parties' expense. Notwithstanding the foregoing, the Agent may cause additional commercial finance examinations to be undertaken (i) as it deems necessary or appropriate, at its own expense or, (ii) if required by Agent or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base. The Loan

- 84 -

Parties shall pay the fees and expenses of the Agent and such professionals with respect to such appraisals.  Without limiting the foregoing, the Loan Parties acknowledge that the Agent may undertake up to two (2) inventory appraisals each Fiscal Year at the Loan Parties' expense.  Notwithstanding the foregoing, the Agent may cause additional appraisals to be undertaken (i) as it deems necessary or appropriate, at its own expense or, (ii) if required by Agent or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

(d)    Upon the reasonable request of the Agent after reasonable prior notice, deliver completed (or, if applicable, updated) background checks on any of the Loan Parties' officers, directors, employees or agents, from a service or source, and in form and with such detail as may be, reasonably satisfactory to the Agent.

(e)    Upon the request of Salus after reasonable prior notice, use commercially reasonable efforts to assist Salus and any other Salus Entity (and any of their lending or funding sources) in obtaining ratings for the credit facilities provided for herein from one or more national rating agencies.  Without limiting the foregoing, senior management members of the Loan Parties shall attend or host one or more meetings with such rating agencies and Salus upon reasonable prior notice.

**6.11    Use of Proceeds**.  Use the proceeds of the Credit Extensions solely (a) to repay certain Prepetition Obligations owed under the Prepetition Credit Agreement to the extent permitted under the Financing Orders, (b) for general corporate and working capital purposes of the Borrower, to the extent expressly permitted under applicable Law, the Budget and the Loan Documents, including postpetition operating expenses set forth in the Budget and other expenses arising in the Chapter 11 Case as may be approved by the Bankruptcy Court, (c) to make Prepetition Agent Adequate Protection Payments (as defined in the Financing Orders), and (d) as otherwise permitted under the Loan Documents.

**6.12    Additional Loan Parties**.  Notify the Agent at the time that any Person becomes a Subsidiary, promptly thereafter (and in any event within fifteen (15) days or such longer period as the Agent may determine in its sole discretion), cause any such Person to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness, in each case in form, content and scope reasonably satisfactory to the Agent.  In no event shall compliance with this Section 6.12 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.12 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

6.13    **Cash Management.**

(a)    On or prior to the Closing Date:

(i)    deliver to the Agent copies of notifications (each, a "Credit Card Notification") substantially in the form attached hereto as **Exhibit F** which have been executed on behalf of such Loan Party and the applicable Credit Card Issuer or Credit Card Processor and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.21(b);

(ii)    enter into a Blocked Account Agreement satisfactory in form and substance to the Agent with each Blocked Account Bank other than the Excluded Accounts (collectively, together with the Concentration Account, the "Blocked Accounts"); and

(iii)    at the request of the Agent, deliver to the Agent copies of notifications (each, a "DDA Notification") substantially in the form attached hereto as **Exhibit G** which have been executed on behalf of such Loan Party and delivered to each depository institution listed on Schedule 5.21(a).

(b)    From and after the Closing Date, the Loan Parties shall cause to be sent via ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a Blocked Account all of the following:

(i)    except for the Excluded Accounts, the Operating Account and the Controlled Disbursement Account, all amounts on deposit in each DDA (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained, excluding the effects of cash received in such DDA after the completion of the daily sweep);

(ii)    all payments due from Credit Card Processors and Credit Card Issuers and proceeds of all credit card charges;

(iii)    all cash receipts from the Disposition of Inventory and other assets (whether or not constituting Collateral);

(iv)    all proceeds of Accounts; and

(v)    all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event.

(c)    Except for the Excluded Accounts, the Operating Account and the Controlled Disbursement Account, each Blocked Account Agreement shall require upon notice from Agent, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account controlled by the Agent at Union Bank, N.A. with account number 45010-49912 (the "Concentration Account"), of all cash receipts and collections received by each Loan Party from all sources (the "Receipts and Collections"), including, without limitation, the following:

- 86 -

(i)      the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank excluding the effects of cash received in such DDA after the completion of the daily sweep);

(ii)     all amounts required to be deposited into the Blocked Accounts pursuant to clause (b) above; and

(iii)    any other cash amounts received by any Loan Party from any other source, on account of any type of transaction or event;

provided, however, the Agent may, in its sole discretion, permit the Loan Parties to have one or more "intermediate" Blocked Account Agreements, whereby such agreements would provide, upon notice from the Agent, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) all Receipts and Collections to another Blocked Account, as opposed to the Concentration Account.

(d)      The Concentration Account shall at all times be under the sole dominion and control of the Agent and all funds therein shall be wired to an account specified by Agent no less frequently than daily.  The Agent shall cause all funds on deposit in the Concentration Account to be applied to the Obligations, which amounts shall be applied to the Obligations in the order proscribed in either Section 2.05(e) or Section 8.03 of this Agreement, as applicable. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, and (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations.  In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(e)      Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above and provide the Agent with "view-only" access to each of the Loan Parties bank accounts identified by the Agent.

(f)      If the Agent does not require DDA Notifications to be delivered on the Closing Date in accordance with Section 6.13(a) above, then the Loan Parties shall, upon the request of the Agent at any time after the Closing Date, deliver to the Agent copies of DDA Notifications, which have been executed on behalf of the applicable Loan Party and delivered to each depository institution listed on Schedule 5.21(a).

(g)      Subject to Section 8.03, during the period between the Closing Date and the Final Order Entry Date, all funds on deposit in the Concentration Account shall be applied to

- 87 -

the Pre-Petition Obligations (in the order set forth in Section 8.03 of the Pre-Petition Credit Agreement) until the Pre-Petition Obligations are paid in full.

**6.14    Information Regarding the Collateral.**

(a)    Furnish to the Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

(b)    Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Closing Date, the Borrower shall periodically, on a quarterly basis, provide revisions or updates to any such Schedules as may be necessary or appropriate to update or correct the same; provided, however, that, for any changes to the Schedules resulting from matters expressly permitted under this Agreement no such periodic revision or update shall be required.  From time to time as may be reasonably requested by the Agent, the Borrower shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

**6.15    Reserved.**

**6.16    Environmental Laws**.  (a) Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with

- 88 -

Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, underlined provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

### 6.17    Further Assurances.

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.17 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.17 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    Upon the request of the Agent, cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

(d)    Upon the request of the Agent, use commercially reasonable efforts to cause any of its landlords to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

### 6.18    Compliance with Terms of Leaseholds.    Except as otherwise expressly permitted hereunder, (a) make in accordance with the Approved Budget all payments and otherwise perform all obligations, in each case that are post-petition obligations, in respect of all Leases to which any Loan Party is a party, and keep such Leases in full force and effect (excluding Leases for Stores closed in the ordinary course of business so long as otherwise permitted in this Agreement), (b) not allow such Leases to lapse or be terminated or any rights to

- 89 -

renew such Leases to be forfeited or cancelled (excluding Leases for Stores closed in the ordinary course of business so long as otherwise permitted in this Agreement), (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing.

**6.19    Material Contracts**.    Except to the extent otherwise permitted under this Agreement, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect (except for defaults under Material Contracts arising from the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code), (c) enforce each such Material Contract in accordance with its terms, (d) take all such action to such end as may be from time to time requested by the Agent, (e) upon request of the Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (f) cause each of its Subsidiaries to do the foregoing.

**6.20    Approved Budget**.    Each Loan Party shall conduct its business in a manner consistent with the Approved Budget most recently delivered pursuant to this Agreement and accepted by the Agent.

**6.21    Employee Benefit Plans.**

(a)    Maintain, and cause each ERISA Affiliate (to the extent it has the ability to do so) to maintain, each Pension Plan in substantial compliance with all applicable Laws.

(b)    Make, and cause each ERISA Affiliate (to the extent it has the ability to do so) to make, on a timely basis, all required contributions to any Multiemployer Plan.

(c)    Not, and not permit any ERISA Affiliate (to the extent it has the ability to do so) to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Plan or (iii) take any other action with respect to any Pension Plan that would, or could reasonably be expected to, entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan, unless the actions or events described in clauses (i), (ii) and (iii) above individually or in the aggregate would not have or could not reasonably be expected to have a Material Adverse Effect.

**6.22    Consultants**.

(a)    <u>PriceWaterhouse Coopers</u>.    At all times until the Obligations have been paid in full in cash and all Commitments have been terminated, employ PriceWaterhouse Coopers (or another financial consultant acceptable to the Agent) as a consultant (the "<u>Consultant</u>").    The terms and scope of the engagement of and responsibilities of the Consultant shall be acceptable to the Agent and, without limiting the foregoing, the engagement shall grant the Agent the right to communicate directly with the Consultant and authorize the Consultant to communicate directly with the Agent and to furnish the Agent with such information as the Agent may reasonably request, together with copies of all material written materials provided to the board of directors of the Loan Parties by such Consultant, subject to mutually acceptable

- 90 -

exceptions.  If requested by the Agent, the Consultant shall provide the Agent with a weekly update regarding the status of its efforts on behalf of the Loan Parties, including the status of any sale efforts.

**6.23    Board Observer Rights.**

(a)    Until the payment in full in cash of all Obligations, each of Salus Capital Partners, LLC and DCP Linens Lender, LLC (or if either Salus Capital Partners, LLC or DCP Linens Lender, LLC assigns all of its respective rights and obligations under this Agreement so that it is no longer a Lender hereunder, the assignee of such respective assignments) shall have the right to appoint one representative to exercise the rights as conferred pursuant to this <u>Section 6.23</u> (such representatives being referred to collectively, as the "<u>Observation Parties</u>" and each individually, as an "<u>Observation Party</u>") and shall notify the Borrower of the identity of such Person.

(b)    Board of Directors of the Borrower (the "<u>Board</u>") shall hold general meetings no less than on a quarterly basis for the purpose of discussing the business and operations of the Borrower.  At least one (1) such meeting each calendar year shall be held in person at the Borrower's principal place of business.  The Borrower shall notify the Observation Parties of the date and time for each general or special meeting of the Board (or any committee thereof) or of the adoption of any resolutions by any such body or committee by written consent (describing in reasonable detail the nature and substance of such action) at the time notice is provided to the outside directors or managers of the Borrower, and concurrently deliver to the Observation Parties any materials delivered to directors or managers of the Borrower, including a draft of any resolutions proposed to be adopted by written consent.  The Observation Parties shall be free during the period prior to the meeting to contact the directors of the Borrower and discuss the pending actions to be taken.

(c)    Each Observation Party shall be entitled to, or to select one (1) representative to, attend and participate (but not vote) in all meetings of the Board (including any committee thereof), including telephonic meetings.  Each Observation Party (or its representative) shall be entitled to receive all written materials and other information given to the participants in such meetings.

(d)    If an issue is to be discussed or otherwise arises at any meeting of the Board or committee thereof which, in the reasonable good faith judgment of the Board is not appropriate to be discussed in the presence of the Observation Parties or their representatives in order to avoid a conflict of interest on the part of such Observation Parties or their representatives or, upon and consistent with the advice of legal counsel to the Borrower, is necessary to preserve an attorney-client privilege, then such issue may be discussed without the Observation Parties or their representatives present, and the Observation Parties or their representatives may be excluded from distribution of materials or draft resolutions or consents, <u>provided</u> that the Observation Parties or their representatives are given notice of the occurrence of such judgment by the Board and that the Observation Parties or their representative are being excused.

(e)     Each of the Observation Parties agrees, and agrees to cause each of its Affiliates, to keep confidential all confidential information described in Section 6.23 or which is disclosed at any meeting of the Board (or any committee thereof), including such confidential information which may be disclosed to them by any Observation Party or its representative, provided, that such information may be disclosed if required by applicable law; provided, further, to the extent practicable, the Borrower shall be afforded reasonable notice of such proposed disclosure and the opportunity to seek a protective order.

(f)     The Borrower shall pay all reasonable and documented out-of-pocket expenses incurred by the Observation Parties or Salus Capital Partners, LLC and DCP Linens Lender, LLC in connection with the exercise by the Observation Parties or Salus Capital Partners, LLC and DCP Linens Lender, LLC of its rights under this Section 6.23.

**6.24    Reserved**.

**6.25    Leases**

.    The Loan Parties shall pay all post-petition obligations under the Leases listed on Schedule 6.25 and licenses of Intellectual Property, if any, as required by the Bankruptcy Code or the Bankruptcy Court, except to the extent (a) any Loan Party is contesting any such obligations in good faith by appropriate proceedings, (b) such Loan Party has established proper reserves as required under GAAP, (c) the nonpayment of which does not result in the imposition of a Lien, and (d) the rejection of any such Lease is required under the Sale Agency Agreement. No Loan Party may assume or reject any of its Leases (other than the assumption or rejection of Leases required pursuant to the Sale Agency Agreement) without the prior written consent of the Agent (such consent not to be unreasonably withheld or delayed).  The assumption or rejection of any Lease listed on Schedule 6.25 shall be conducted in a manner consistent with a maximization of the value of the assets of the Loan Parties.

**6.26    Sale Process; Milestones**

.    The Loan Parties shall conduct a sale of all or substantially all of their assets and business in accordance with the Sale Agency Agreement.  If the Loan Parties receive any other offers or bids for all or a portion of such assets, the Loan Parties shall promptly deliver copies thereof to Agent.  The following milestones shall be completed as set forth below:

(a)     On the Petition Date, the Loan Parties shall have filed the Expedited Assumption Motion, in form and substance acceptable to the Agent, seeking entry of (x) the Approval Order authorizing and approving the assumption of the Sale Agency Agreement pursuant to Section 365 of the Bankruptcy Code on an expedited basis and authorizing the Loan Parties to conduct such sale in accordance with the terms of the Sale Agency Agreement and (y) the Interim Approval Order authorizing the Loan Parties to continue to conduct such sale pursuant to the terms of the Sale Agency Agreement and to promote such sale as a "store closing sale" pending the hearing on the Expedited Assumption Motion;

(b)     The Bankruptcy Court shall enter the Interim Approval Order, in form and substance acceptable to the Agent, no later than June 18, 2015;

BOS 47658425v6

(c)      The Bankruptcy Court shall enter the Approval Order, in form and substance acceptable to the Agent, no later than June 30, 2015;

(d)      The Initial Guaranty Payment shall be paid to the Agent on behalf of the Loan Parties no later than the earlier of (i) the first Business Day after the Approval Order is entered, and (ii) July 5, 2015; and

(e)      No later than July 12, 2015, (i) the Final Guaranty Obligation shall be paid to the Agent on behalf of the Loan Parties and (ii) all outstanding Obligations and Pre-Petition Obligations (other than continuing indemnity obligations, expense reimbursement obligations and other similar provisions intended to survive repayment of the Obligations) shall be indefeasibly paid in full in cash and the Commitments shall be terminated.

### 6.27      Financing Orders

.  The Loan Parties shall comply with the Interim Financing Order and the Final Financing Order, as then in effect, in all respects.

### 6.28      Post-Closing Obligations.  Notwithstanding the conditions precedent set forth in Section 4.01 hereof, the Borrower has informed the Agent and the Lenders that certain of such items to be required to be delivered to the Agent or otherwise satisfied as conditions precedent to the effectiveness of this Agreement will not be delivered to Agent as of the date hereof. Therefore, with respect to the items set forth on Schedule 6.28 (collectively, the "Outstanding Items"), and notwithstanding anything to the contrary contained herein or in any other Loan Document, the Borrower shall deliver or otherwise satisfy each Outstanding Item to the Agent in the form, manner and time set forth thereon for such Outstanding Item or within such other time as Agent may reasonably agree.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

### 7.01      Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

### 7.02      Investments.  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock**.  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock (other than Equity Interests issued pursuant to the Preferred Equity Documents), or (c) issue and sell any other Equity Interests (other than Equity Interests issued pursuant to the Preferred Equity Documents) unless (i) such Equity Interests shall be issued solely by the Borrower and not by a Subsidiary of a Loan Party, (ii) such Equity Interests provide that all dividends and other Restricted Payments) in respect thereof shall be made solely in additional shares of such Equity Interests, in lieu of cash, (iii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Loan Party issuing such Equity Interests and in accordance with the limitations contained in this Agreement, and (iv) all Restricted Payments in respect of such Equity Interests are expressly subordinated to the Obligations.

**7.04    Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a)    any Subsidiary which is not a Loan Party may merge with (i) a Loan Party, provided that the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties, provided that when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person;

(b)    any Subsidiary which is a Loan Party may merge into any Subsidiary which is a Loan Party or into the Borrower, provided that in any merger involving the Borrower, the Borrower shall be the continuing or surviving Person;

(c)    any Subsidiary of a Loan Party may merge with or into or consolidate with any other Person or permit any other Person to merge with or into or consolidate with it; provided that (i) the Person surviving such merger shall be a wholly-owned Subsidiary of a Loan Party and such Person shall become a Loan Party in accordance with the provisions of Section 6.12 hereof, and (ii) in the case of any such merger to which any Loan Party is a party, such Loan Party is the surviving Person.

**7.05    Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06    Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contribution, except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party.

**7.07    Prepayments of Indebtedness**.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness, or make any

payment in violation of any subordination terms of any Subordinated Indebtedness, except as long as no Default or Event of Default then exists and in accordance with the Approved Budget, regularly scheduled or mandatory repayments, repurchases, redemptions or defeasances of Permitted Indebtedness (other than Subordinated Indebtedness).

**7.08    Change in Nature of Business**.  In the case of each of the Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates**.  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) transactions described on Schedule 7.09 hereto, (c) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (d) the issuance of Equity Interests in the Borrower to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries, (e) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or any of its Subsidiaries, and (f) any issuances of securities of the Borrower (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in the Borrower) of the Borrower or any of its Subsidiaries.

**7.10    Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than any Loan Document or Pre-Petition Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds**.  Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those not prohibited under this Agreement.

- 95 -

**7.12    Amendment of Material Documents**.  Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner adverse to the Credit Parties, or (b) any Material Contract or Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder), in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect.

**7.13    Fiscal Year**.  Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

**7.14    Deposit Accounts; Credit Card Processors**.  Open new DDAs or Blocked Accounts unless the Loan Parties shall have delivered to the Agent appropriate DDA Notifications (to the extent requested by Agent pursuant to the provisions of Section 6.13(a)(iii) hereof) or Blocked Account Agreements consistent with the provisions of Section 6.13 and otherwise satisfactory to the Agent.  No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in Section 6.13 hereof.

**7.15    Approved Budget Variance**.

Permit the Borrower's actual results set forth in the Approved Budget Variance Report for any Testing Period or Cumulative Period to vary by more than the Permitted Variance from the applicable results projected in the applicable Approved Budget with respect to such periods with respect to (i) Net Cash Flow, (ii) Availability and (iii) aggregate Outstanding Amount of the Loans (except to the extent such actual results are more favorable).  The foregoing covenant shall be tested on Wednesday of each week, commencing with the second Wednesday after the Petition Date.

**7.16    Repayment of Indebtedness**

.  Without limiting any other provision hereof, except pursuant to the Approved Budget and subject to the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), without the express prior written consent of the Agent and pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer of assets with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

**7.17    Reclamation Claims**

.  Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, pre-petition trade

- 96 -

payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $100,000.

### 7.18    Chapter 11 Claims

.    Other than the Carve-Out, incur, create, assume, suffer to exist or permit any other super-priority administrative claim which is pari passu with or senior to the claims of the Agent against the Loan Parties.

### 7.19    Bankruptcy Actions

.    Seek, consent to or permit to exist, without the prior written consent of the Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

## <u>ARTICLE VIII</u>
## EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default**.  Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>.  The Borrower or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Pre-Petition Obligations, any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) any interest on any Loan, fees or other amounts payable hereunder or under any other Loan Document; or

(b)    <u>Specific Covenants</u>.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Section 6.01</u>, <u>6.02</u>, <u>6.03</u>, <u>6.05</u>, <u>6.07</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, <u>6.13</u>, <u>6.14</u>, <u>6.20</u>, <u>6.22, 6.23 6.24</u>, <u>6.25</u>, <u>6.26, 6.27 and 6.28</u> or <u>Article VII</u>; or (ii) any Guarantor fails to perform or observe any payment or other material term, covenant or agreement contained in the Facility Guaranty; or (iii) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in the Security Agreement to which it is a party; or

(c)    <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of (i) Borrowing obtaining knowledge of such failure and (ii) receipt by the Borrower of written notice by Agent of such failure; or

(d)    <u>Representations and Warranties</u>.   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>.  (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration,

- 97 -

demand, or otherwise) in respect of any Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $250,000; or

(f)      <u>Chapter 11 Case</u>.  The occurrence of any of the following in the Chapter 11 Case:

(i)      other than in connection with the Sale Agency Agreement, any Loan Party, without the Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of any Loan Party's assets or capital stock unless the transactions that are the subject of the motion will result in payment in full in cash of the Obligations and the Pre-Petition Obligations;

(ii)      other than in connection with the payment in full or refinancing of the Obligations and the Pre-Petition Obligations, the filing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by or on behalf of any Loan Party in the Chapter 11 Case (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement, (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, (C) except as provided in the Interim Financing Order or Final Financing Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent, (D) that seeks to prohibit the Agent from credit bidding on any or all of the Loan Parties' assets during the pendency of the Chapter 11 Case, or (E) that is otherwise materially adverse to the Agent or its rights and remedies hereunder or its interest in the Collateral;

(iii)      other than in connection with the payment in full or refinancing of the Obligations and the Pre-Petition Obligations, (A) the filing of any plan of reorganization or liquidation or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party or any other Person to which the Agent does not consent or otherwise agree to treatment of its claims, (B) the entry of any order terminating the Loan Parties' exclusive right to file a plan of reorganization, or (C) the expiration of the Loan Parties' exclusive right to file a plan of reorganization;

- 98 -

(iv)    the entry of an order in any of the Chapter 11 Case confirming a plan of reorganization or liquidation that (A) is not acceptable to the Agent or (B) does not contain a provision for termination of the commitments and repayment in full in cash of all of the Obligations and the Pre-Petition Obligations on or before the effective date of such plan or plans;

(v)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Pre-Petition Loan Documents or the Interim Financing Order, the Final Financing Order or the Cash Management Order without the written consent of the Agent or the filing of a motion for reconsideration with respect to the Interim Financing Order or the Final Financing Order or the Interim Financing Order, the Final Financing Order or the Cash Management Order are otherwise not in full force and effect;

(vi)    the Final Financing Order is not entered prior to the expiration of the Interim Financing Order, and in any event within thirty (30) days of the Petition Date;

(vii)    except as set forth in the "first day" motions which have been reviewed by the Agent, the payment of, or application for authority to pay, any Pre-Petition Indebtedness or pre-petition claim without the Agent's prior written consent unless set forth in the Approved Budget;

(viii)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any other Credit Party or any of the Collateral;

(ix)    the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or the sale without the Agent's consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations and the Pre-Petition Obligations and termination of the Aggregate Commitments;

(x)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from Chapter 11 to Chapter 7 of the Bankruptcy Code, or any Loan Party files a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(xi)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $250,000 or more, or (2) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

(xii)    the commencement of a suit or action against the Agent or any other Credit Party by or on behalf of any Loan Party or its bankruptcy estates;

BOS 47658425v6

(xiii)   the entry of an order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents;

(xiv)   the failure of any Loan Party to perform any of its obligations under the Interim Financing Order, the Final Financing Order or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court, which is not cured within two (2) Business Days of written notice to the Lead Borrower of same;

(xv)   the failure of the Bankruptcy Court to, within ninety (90) days after the Petition Date (or such later date to which the Lender may otherwise agree), grant an order extending the time period of the Loan Parties to assume or reject unexpired leases of real property to a date that is two hundred ten (210) days from the Petition Date;

(xvi)   the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal or superior to that granted to the Agent;

(xvii)   the termination of the Sale Agency Agreement, or the occurrence thereunder of any material breach by any party thereto which is not cured within three Business Days; or

(xviii)   the Loan Parties' failure to deliver to Agent the Letter of Credit (as defined in the Sale Agency Agreement), together with all documents (executed in blank) necessary to make a drawing thereunder, within one Business Day after the entry of the Interim Approval Order; or

(g)   Judgments.   There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $500,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, that is not voided within 10 days by the Bankruptcy Court as a violation of the automatic stay provisions of the Bankruptcy Code; or

(h)   Credit Card Issuer Termination.   Any Credit Card Issuer or Credit Card Processor shall send notice to Borrower that it is ceasing to make or suspending payments to Borrower of amounts due or to become due to Borrower or shall cease or suspend such payments, or shall send notice to Borrower that it is terminating its arrangements with Borrower or such arrangements shall terminate as a result of any event of default under such arrangements, which continues for more than the applicable cure period, if any, with respect thereto, unless Borrower shall have entered into arrangements with another Credit Card Issuer or Credit Card Processor, as the case may be, within ninety (90) days after the date of any such notice and Borrower's existing Credit Card Issuer or Credit Card Processor has not ceased to make or suspended payments to the Borrower of amounts due or to become due to Borrower and has not otherwise terminated its arrangements with Borrower; or

- 100 -

(i)      ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect; or

(j)      Invalidity of Loan Documents.  (i)  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Pre-Petition Obligations and Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral in excess of $100,000, with the priority required by the applicable Security Document; or

(k)      Change of Control.  There occurs any Change of Control; or

(l)      Cessation of Business.    Except as otherwise expressly permitted hereunder, any Loan Party shall take any action to suspend the operation of all or a material portion of its business in the ordinary course, liquidate all or a material portion of its assets or Store locations, or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of-Business" sales of any material portion of its business; or

(m)      Loss of Collateral.    There occurs any uninsured loss to any material portion of the Collateral; or

(n)      Breach of Contractual Obligation.    Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise and after giving effect to any applicable grace periods) in respect of any Material Contract or fails to observe or perform any other agreement or condition relating to any such Material Contract or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default (other than a default arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code) or other event is to cause, or to permit the counterparty to such Material Contract to terminate such Material Contract; or

(o)      Indictment.    The indictment or institution of any legal process or proceeding against, any Loan Party or any Subsidiary thereof, under any federal, state,

- 101 -

municipal, and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony;

(p)    _Guaranty_.    The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document;

(q)    _Subordination_.    (i)    The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness (the "Subordinated Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; or

(r)    _Material Adverse Effect_.    A Material Adverse Effect has occurred.

**8.02    Remedies Upon Event of Default**.    If any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)    declare the Commitments of each Lender to make Loans and any obligation of any L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Pre-Petition Obligations and Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)    require that the Loan Parties Cash Collateralize the L/C Obligations (to the extent not previously Cash Collateralized);

(d)    capitalize any accrued and unpaid interest by adding such amount to the outstanding principal balance of the Loans, at which time such capitalized amount shall bear interest at the Default Rate;

(e)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents, any of the Pre-Petition Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or the Pre-Petition Loan Documents or any instrument pursuant to which the Obligations or the Pre-Petition Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

- 102 -

<u>provided</u>, however, that upon the occurrence of any Event of Default with respect to any Loan Party or any Subsidiary thereof under <u>Section 8.01(f)</u>, the obligation of each Lender to make Loans and any obligation of each L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Loan Parties to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Agent or any Lender.

(f)    <u>Credit Bidding</u>.  The Agent, on behalf of the Lenders, may purchase, in any public or private sale conducted under the provision of the UCC (including pursuant section 9-610 and 9-620 of the UCC), the provisions of the Bankruptcy Code (including pursuant to section 363 of the Bankruptcy Code) or at any sale or foreclosure conducted by the Agent (whether by judicial action or otherwise) in accordance with Applicable Law, all or any portion of the Collateral.  The Lenders hereby irrevocably authorize the Agent, upon written consent of the Required Lenders, to Credit Bid (in an amount and on such terms as may be directed by the Required Lenders) and purchase at any such sale (either directly or through one or more acquisition vehicles) all or any portion of the Collateral on behalf of and for the benefit of the Lenders;

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03    Application of Funds**.  Upon a Trigger Event, any amounts received on account of the Obligations or Pre-Petition Obligations shall be applied by the Agent in the following order, in each case whether or not such Obligations or Pre-Petition Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under <u>Article III</u>) payable to the Agent;

<u>Second</u>, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and any L/C Issuer (including fees, charges and disbursements of counsel to the respective Lenders and L/C Issuers and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this clause Second payable to them;

<u>Third</u>, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

<u>Fourth</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, and fees (including Letter of Credit Fees), ratably among the Lenders and L/C Issuers in proportion to the respective amounts described in this clause Fourth payable to them;

- 103 -

Fifth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fifth held by them;

Sixth, to the Agent for the account of the L/C Issuers, to Cash Collateralize that portion of L/C Obligations (to the extent not already Cash Collateralized) comprised of the aggregate undrawn amount of Letters of Credit;

Seventh, to payment of all other Obligations, ratably among the Credit Parties in proportion to the respective amounts described in this clause Seventh held by them;

Eighth, to payment of the Pre-Petition Obligations, in the order set forth in Section 8.03 of the Pre-Petition Credit Agreement; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Sixth above shall be applied to satisfy drawings under such Letters of Credit as they occur. Subject to Section 2.05(c), if any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

## ARTICLE IX
## THE AGENT

**9.01    Appointment and Authority**.  Each of the Lenders hereby irrevocably appoints Salus to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations and appearing in the Chapter 11 Case on behalf of the Lenders), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent, the Lenders and the L/C Issuers, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the terms "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**9.02    Rights as a Lender**.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any

- 104 -

Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 10.01</u> and <u>8.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties, a Lender or a L/C Issuer. Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder

or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04    Reliance by Agent**.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or a L/C Issuer, the Agent may presume that such condition is satisfactory to such Lender or such L/C Issuer unless the Agent shall have received written notice to the contrary from such Lender or such L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit.  The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05    Delegation of Duties**.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Agent.  The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.  The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**9.06    Resignation of Agent**.  The Agent may at any time give written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the L/C Issuers, appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such

- 106 -

notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders or the L/C Issuers under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender and each L/C Issuer directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

**9.07    Non-Reliance on Agent and Other Lenders**. Each Lender and each L/C Issuer acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and each L/C Issuer also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.11, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08    Agent May File Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, the L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuers, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuers, the Agent, such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuers, the Agent and such Credit Parties under Sections 2.03(j), 2.09 and 10.04) allowed in such judicial proceeding; and

- 107 -

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each L/C Issuer to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuers, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender or any L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or any L/C Issuer or to authorize the Agent to vote in respect of the claim of any Lender or any L/C Issuer in any such proceeding.

**9.09    Collateral and Guaranty Matters**.  The Credit Parties irrevocably authorize the Agent, at its option,

(a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), and the expiration, termination or Cash Collateralization of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 10.01;

(b)    to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

(c)    to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Required Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.09.  In each case as specified in this Section 9.09, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.09.

**9.10    Notice of Transfer**.  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

- 108 -

**9.11    Reports and Financial Statements**.  By signing this Agreement, each Lender:

(a)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates, financial statements and other Borrower Materials required to be delivered by the Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

(b)    expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials, and shall not be liable for any information contained in any Borrower Materials (including any Report);

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(d)    agrees to keep all Reports and other Borrower Materials confidential in accordance with the provisions of Section 10.07 hereof; and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report and other Borrower Materials in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.12    Agency for Perfection**.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States, can be perfected only by possession.  Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.13    Indemnification of Agent**.  Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent, each L/C Issuer and any Related Party, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs,

- 109 -

expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, such L/C Issuer and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent, such L/C Issuer and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's, such L/C Issuer's and their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.14    Relation among Lenders**.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

<div align="center">

**ARTICLE X**
**MISCELLANEOUS**

</div>

**10.01    Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

(b)    as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Commitments hereunder or under any other Loan Document without the written Consent of such Lender;

(c)    as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (iv) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, or change the manner of computation of any financial ratio (including any change in any applicable defined term) used in determining the Applicable Margin that would result in a reduction of any interest rate on any Loan or any fee payable hereunder without the written Consent of each Lender entitled to such amount; provided, however, that only the Consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest or Letter of Credit Fees at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

<div align="center">

- 110 -

</div>

(d)    as to any Lender, change <u>Section 2.13</u> or <u>Section 8.03</u> in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender;

(e)    change any provision of this Section or the definition of "<u>Required Lenders</u>" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)    except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)    except for Permitted Dispositions, release all or substantially all of the Collateral from the Liens of the Security Documents without the written Consent of each Lender;

(h)    increase the Aggregate Commitments without the written Consent of each Lender;

(i)    increase any advance rate percentage set forth in the definition of "Borrowing Base" without the written Consent of each Lender; or otherwise change the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrower would be increased without the written Consent of each Lender, provided that the foregoing shall not limit the ability of the Agent to change, establish or eliminate any Reserves.

(j)    modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender; and

(k)    except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the applicable L/C Issuer in addition to the Lenders required above, affect the rights or duties of such L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; and (iii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the Required Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification

- 111 -

requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, any Loan Document may be amended and waived with the written consent of the Agent at the request of the Borrower without the need to obtain the consent of any Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.

### 10.02   Notices; Effectiveness; Electronic Communications.

(a)   <u>Notices Generally</u>.  Except as provided in subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)   if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and

(ii)   if to any Lender or any L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

(iii)   Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).   Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)   <u>Electronic Communications</u>.  Notices and other communications to the Loan Parties, the Lenders and the L/C Issuers hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender or any L/C Issuer pursuant to <u>Article II</u> if such Lender or such L/C Issuer, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.   The Agent may agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-

mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Internet.  In no event shall the Agent or any of its Related Parties (each, an "Agent Party") have any liability to any Loan Party, any Lender, any L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the internet.

(d)    Change of Address, Etc.  Each of the Loan Parties and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender and each L/C Issuer may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    Reliance by Agent, L/C Issuers and Lenders.  The Agent, the L/C Issuers and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Agent, each L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03  No Waiver; Cumulative Remedies**.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04  Expenses; Indemnity; Damage Waiver.**

BOS 47658425v6

(a)    <u>Costs and Expenses</u>.  The Borrower shall pay all Credit Party Expenses.

(b)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by any L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit or any other nominated person with respect to a Letter of Credit seeking to be reimbursed or indemnified or compensated, and any third party seeking to enforce the rights of the Borrower, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds, or holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)    <u>Reimbursement by Lenders</u>.  Without limiting their obligations under <u>Section 9.13</u> hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent), the applicable L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount,

- 114 -

provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) or such L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) or such L/C Issuer in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    Payments.  All amounts due under this Section shall be payable on demand therefor.

(f)    Survival.  The agreements in this Section shall survive the resignation of any Agent and any L/C Issuer, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05  Payments Set Aside**.  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and each L/C Issuer severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders and the L/C Issuers under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06  Successors and Assigns.**

(a)    <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent and each Lender.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts

A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless the Agent consents (such consent not to be unreasonably withheld or delayed);

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)    Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(iv)    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, <u>provided</u>, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

- 116 -

(v)    Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lenders having been a Defaulting Lender.  Upon request, the Borrower (at their expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)    Register.  The Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest or demonstrable error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.  The Register is intended to cause each Loan and other obligation hereunder to be in registered form within the meaning of Section 5f.103-

- 117 -

1(c) of the United States Treasury Regulations and within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)    <u>Participations</u>.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Lenders and the L/C Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in <u>Section 10.07</u> as if such Participant was a Lender hereunder.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to <u>Section 10.01</u> that affects such Participant.  Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of <u>Sections 3.01</u> and <u>3.04</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section (b)</u>; provided that each Participant shall be subject to the requirements of those Sections as if it were a Lender.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.08</u> as though it were a Lender, provided such Participant agrees to be subject to <u>Section 2.13</u> as though it were a Lender.  Each Lender, acting for this purpose as an agent of the Loan Parties, shall maintain at its offices a record of each agreement or instrument effecting any participation and a register for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts and other Obligations from time to time (each a "<u>Participation Register</u>"); provided that no Lender shall have any obligation to disclose all or any portion of the Participation Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.  The entries in each Participation Register shall be conclusive absent manifest error and the Loan Parties, the Administrative Agent, the L/C Issuers and the Lenders may treat each Person whose name is recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under <u>Section 3.01</u>, <u>Section 3.04</u> and <u>Section 10.08</u>).  The Participation Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    <u>Limitations upon Participant Rights</u>.  A Participant shall not be entitled to receive any greater payment under <u>Section 3.01</u> or <u>3.04</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale

- 118 -

of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of <u>Section 3.01</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with <u>Section 3.01(e)</u> as though it were a Lender.

(f)    <u>Certain Pledges</u>.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    <u>Electronic Execution of Assignments</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    <u>Resignation as L/C Issuer after Assignment</u>.  Notwithstanding anything to the contrary contained herein, if at any time Salus assigns all of its Commitment and Loans pursuant to subsection (b) above, Salus may, upon thirty (30) days' notice to the Borrower and the Lenders, resign as a L/C Issuer.  In the event of any such resignation as a L/C Issuer, the Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer hereunder; <u>provided</u>, however, that no failure by the Borrower to appoint any such successor shall affect the resignation of Salus as a L/C Issuer.  If Salus resigns as a L/C Issuer, it shall retain all the rights, powers, privileges and duties of a L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as a L/C Issuer and all L/C Obligations with respect thereto.  Upon the appointment of a successor L/C Issuer and/or Swing Line Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of such retiring L/C Issuer, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, issued by such retiring L/C Issuer and outstanding at the time of such succession or make other arrangements satisfactory to Salus to effectively assume the obligations of Salus with respect to such Letters of Credit.

(i)    <u>Transactions by Salus Entity</u>.    Notwithstanding anything in this Agreement or any other Loan Document to the contrary, (A) neither Salus nor any Affiliate thereof (each, a "<u>Salus Entity</u>") shall be required to comply with this <u>Section 10.06</u> in connection with any transaction involving any other Salus Entity or any of its or their lenders or funding or financing sources, and no Salus Entity shall have any obligation to disclose any such transaction to any Person, and (B) there shall be no limitation or restriction on (i) the ability of any Salus Entity to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan, or any other Obligation to any other Salus Entity or any lender or financing or funding source of a Salus Entity or (ii) any such lender's or

- 119 -

funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan, or any other Obligation; provided, however, that Salus shall continue to be liable as a "Lender" under this Agreement and the other Loan Documents unless such other Person complies with the provisions of this Agreement to become a "Lender".

**10.07   Treatment of Certain Information; Confidentiality**. Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided that, in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08   Right of Setoff**. If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, each L/C Issuer and each of their respective Affiliates is

- 120 -

hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, such L/C Issuer or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender or such L/C Issuer, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or such L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender or such L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 2.15 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, each L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, such L/C Issuer or their respective Affiliates may have. Each Lender and each L/C Issuer agrees to notify the Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09  Interest Rate Limitation**. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10  Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a

- 121 -

signature page of this Agreement by telecopy, pdf., or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11  Survival**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.  Further, the provisions of Sections 3.01, 3.04 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under Section 10.04.

**10.12  Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13  Replacement of Lenders**.  If any Lender requests compensation under Section 3.04, or if the Borrower are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)      the Borrower shall have paid to the Agent the assignment fee specified in Section 10.06(b);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**10.14    Governing Law; Jurisdiction; Etc**.

(a)    <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    <u>SUBMISSION TO JURISDICTION</u>.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK AND THE BANKRUPCTY COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

BOS 47658425v6

(c)    WAIVER OF VENUE.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN AND THE BANKRUPCTY COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15  Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16  No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is

- 124 -

capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17  USA PATRIOT Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Act.  No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know you customer" and anti-money laundering rules and regulations, including the Act.

**10.18  Foreign Asset Control Regulations**.  Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive

- 125 -

order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Borrower or its Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

      **10.19   Time of the Essence**. Time is of the essence of the Loan Documents.

      **10.20   Press Releases.**

           (a)    Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

           (b)    Each Loan Party consents to the publication by the Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Borrower for review and comment prior to the publication thereof. The Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

      **10.21   Additional Waivers.**

           (a)    The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

           (b)    The obligations of each Loan Party  shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be

- 126 -

subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitments).

(c)    To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated.  Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

**10.22  No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.23  Attachments**.  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

[Signature Page Follows]

BOS 47658425v6

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**ANNA'S LINENS, INC.,**
as the Borrower

By: _____
Name:
Title:

**SALUS CAPITAL PARTNERS, LLC**, as
Administrative Agent and Collateral Agent

By: _____
Name:
Its Authorized Signatory

By: _____
Name:
Its Authorized Signatory

Signature Page to DIP Credit Agreement

**SALUS CAPITAL PARTNERS, LLC**,
as a Lender

By: _____
Name:
Its Authorized Signatory


By: _____
Name:
Its Authorized Signatory


**SALUS CLO 2012-1, LTD.,**
as a Lender

By:  Salus Capital Partners II, LLC,
Its:  Collateral Manager


By:  _____
    Name:
    Title:


By:  _____
    Name:
    Title:


**DCP LINENS LENDER, LLC,**
as a Lender


By: _____
Name:
Its Authorized Signatory


Signature Page to DIP Credit Agreement

**Schedule 2.01**

**Commitments and Applicable Percentages**

| Lender | Commitment | Applicable Percentage |
|--------|-----------:|----------------------:|
| Salus Capital Partners, LLC | $37,497,000.00 | 46.87% |
| Salus CLO 2012-1, Ltd. | $37,503,000.00 | 46.88% |
| DCP Linens Lender, LLC | $5,000,000 | 6.25% |
| | $80,000,000 | 100% |

**EXHIBIT I**

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| In re:<br><br>ANNA'S LINENS, INC.,<br><br>                           Debtor. | Chapter 11<br><br><br>Case No. 15-13008 ([____]) |

**INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN**
**POSTPETITION SECURED FINANCING AND USE CASH COLLATERAL,**
**(II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING CERTAIN RELATED RELIEF**

THIS MATTER having come before the Court upon the motion (the "**DIP Motion**") by Anna's, Linens, Inc., a Delaware corporation (the "**Borrower**" or the "**Debtor**"), in the above-captioned Chapter 11 case (the "**Chapter 11 Case**"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101, *et seq.*, as amended, the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking entry of an interim order (this "**Interim Order**") *inter alia*:

(i)        authorizing the Borrower to obtain a senior secured super-priority revolving credit facility (the "**DIP Facility**"), pursuant to the terms and conditions of that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "**DIP Credit Agreement**") by and among the Debtor, the lenders party thereto (the "**DIP Lenders**" and each a "**DIP Lender**"), and Salus Capital Partners, LLC, as Administrative and Collateral Agent (in such capacity, the "**DIP Agent**" and together with the DIP Lenders, the "**DIP Secured Parties**") for the DIP Lenders, substantially in the form of <u>Exhibit 1</u> attached to this Interim Order; and

(ii)       authorizing the Debtor to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, the "**DIP Loan Documents**") and to

perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;[1]
and

(iii)     granting allowed superpriority administrative expense claim status in each of the Chapter 11 Case and any Successor Case (as defined herein) to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents to the DIP Agent (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "**DIP Obligations**"), subject to the priorities set forth herein; and

(iv)     authorizing the Debtor to use in accordance with the Budget (as defined herein) "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, that the Debtor is holding or may obtain, pursuant to the Bankruptcy Code Section 361 and 363 and Bankruptcy Rules 4001(b) and 6004; and

(v)     granting to the DIP Agent automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting Cash Collateral, which liens shall be subject to the priorities set forth herein; and

(vi)     authorizing and directing the Debtor to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, continuing commitment fees, closing fees, servicing fees, audit fees, structuring fees, monitoring and exit fees, the reasonable fees and disbursements of the DIP Secured Parties' attorneys, advisers, accountants, and other consultants, and all related expenses of the DIP Secured Parties, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents and this Interim Order; and

(vii)     authorizing and directing the Debtor to pay in full the Prepetition Obligations (as defined herein) upon entry of the Final Order (as defined herein) and as set forth herein, subject to the rights of parties in interest described in paragraphs 33 and 34 of this Interim Order; and

---

[1] Capitalized terms used herein but not defined have the meanings given to them in the DIP Loan Documents.

*BOS 47659718v4*

(viii)    providing adequate protection to the Prepetition Secured Creditors (as defined herein) to the extent set forth herein; and

(ix)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order; and

(x)    granting related relief; and

(xi)    scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the *Declaration of [_____]in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), including the DIP Motion, the exhibits attached thereto, the DIP Loan Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on the DIP Motion (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d) and 9014; and the Interim Hearing to consider the interim relief requested in the DIP Motion having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that, pursuant to Bankruptcy Rule 4001(c)(2), granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holders, and is essential for the continued operation and sale of the Debtor's business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTOR, INCLUDING THE SUBMISSION OF DECLARATIONS AND THE REPRESENTATIONS

*BOS 47659718v4*

OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND

CONCLUSIONS OF LAW ON AN INTERIM BASIS PENDING FINAL HEARING THEREON:[2]

A.     *Petition Date*.  On June 14, 2015 (the "**Petition Date**"), the Debtor filed a voluntary

petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central

District of California (the "**Court**") commencing this Chapter 11 Case.

B.     *Debtor in Possession*.  The Debtor is continuing in the management and operation of its

business and properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy

Code.  No trustee or examiner has been appointed in this Chapter 11 Case.

C.     *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and

1334, over these proceedings, and over the persons and property affected hereby. Consideration of the

DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Case

and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     *Committee Formation*.  As of the date hereof, the Office of the United States Trustee (the

"**U.S. Trustee**") has not yet appointed any official committee in this Chapter 11 Case pursuant to section

1102 of the Bankruptcy Code (each, a "**Statutory Committee**").

E.     *Debtor's Stipulations*.  After consultation with its attorneys and financial advisors, and

without prejudice to the rights of parties in interest as set forth in paragraph 33 herein, the Debtor (on

behalf of and for itself) admits, stipulates, acknowledges and agrees that (collectively, paragraphs E(i)

through E(v) below are referred to herein as the "**Debtor's Stipulations**"):

(i)     *Prepetition Credit Documents*.  As of the Petition Date, the Debtor had

outstanding secured debt to Salus Capital Partners, LLC, as administrative agent and collateral agent (in

such capacity, the "**Prepetition Agent**") for various lenders (the "**Prepetition Lenders**") and

collectively, with the Prepetition Agent, the "**Prepetition Secured Creditors**" and each a "**Prepetition**

---

[2] Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law
shall be construed as findings of fact.

*BOS 47659718v4*

**Secured Creditor**"), pursuant to that certain Credit Agreement dated as of July 18, 2014, by and among the Borrower, the Prepetition Agent and the lenders party thereto (as amended, modified and supplemented from time to time, the "**Prepetition Credit Agreement**" and together with all related documents, instruments, guaranties and agreements, the "**Prepetition Credit Documents**").

(ii)     *Prepetition Obligations*.  As of the Petition Date, the aggregate outstanding principal amount owed by the Debtor under the Prepetition Credit Documents was not less than $64,601,622.89 (collectively, together with any interest, fees (including, without limitation, any early termination and prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Credit Documents, including all "Obligations" as described in the Prepetition Credit Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "**Prepetition Obligations**").  As more fully set forth in the Prepetition Credit Documents, prior to the Petition Date, the Debtor granted first-priority security interests in and liens on substantially all personal and real property of the Debtor, including, without limitation, owned real estate, accounts, inventory, equipment and general intangibles (collectively, the "**Prepetition Collateral**") to the Prepetition Agent (for the ratable benefit of the Prepetition Secured Creditors) (collectively, the "**Prepetition Liens**") to secure repayment of the Prepetition Obligations.

(iii)     *Validity, Perfection and Priority of Prepetition Liens and Obligations*.  The Debtor (for itself but without limiting the rights of other parties in interest under paragraphs 33 and 34 of this Interim Order) acknowledges and agrees that:  (a) as of the Petition Date, the Prepetition Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected, (b) as of the Petition Date, the Prepetition Liens have priority over any and all other liens, if any, on the Prepetition Collateral, subject only to certain other liens otherwise permitted by the Prepetition Credit Documents (to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "**Prepetition Permitted Liens**")

5

and otherwise had priority over any and all other liens on the Prepetition Collateral;[3] (d) the Prepetition

Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor; (e) no offsets,

challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition

Liens or the Prepetition Obligations exist, and no portion of the Prepetition Liens or the Prepetition

Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance,

disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the

Bankruptcy Code or applicable non-bankruptcy law; (f) the Debtor and its estate have no claims,

objections, challenges, causes of actions, and/or choses in action, including without limitation, Avoidance

Actions,[4] against any of the Prepetition Secured Creditors or any of their respective affiliates, agents,

attorneys, advisors, professionals, officers, directors or employees arising out of, based upon or related to

the Prepetition Credit Documents; (g) as of the Petition Date, the value of the Prepetition Collateral

securing the Prepetition Obligations exceeded the amount of the Prepetition Obligations, and accordingly

the Prepetition Obligations are allowed secured claims within the meaning of section 506 of the

Bankruptcy Code, in a principal amount of not less than $64,601,622.89 as of Petition Date, together with

accrued and unpaid and hereafter accruing interest, fees (including, without limitation, reasonable

attorneys' fees and related expenses), costs and other charges.

(iv)    *Cash Collateral*.  The Debtor represents that all of the Debtor's cash, including

the cash in its deposit accounts (other than Excluded Accounts), wherever located, whether as original

collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral and is Prepetition

Collateral of the Prepetition Secured Creditors.

---

[3] For purposes of Order, Prepetition Permitted Liens shall include all liens that were valid, senior, enforceable, nonavoidable, and perfected under applicable law as of the Petition Date.  Nothing herein shall constitute a finding or ruling by this Court that any such Prepetition Permitted Liens are valid, senior, enforceable, perfected or non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtor, the DIP Agent, and any Statutory Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Prepetition Permitted Lien and/or security interest.

[4] "**Avoidance Actions**" means all claims and causes of action under Chapter 5 of the Bankruptcy Code including, without limitation, those under sections 502(d), 544, 545, 547, 548, 550, 552(b) and 553, and state laws of similar import.

6

(v)     *Default by the Debtor*.  The Debtor acknowledges and stipulates that the Debtor is in default under the Prepetition Credit Documents.

F.     <u>*Findings Regarding the Postpetition Financing*</u>.

(i)     *Request for Postpetition Financing*.  The Debtor seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents, (b) repay any remaining balance of the Prepetition Obligations upon entry of the Final Order and as otherwise set forth herein, and (c) use Cash Collateral on the terms described herein to administer its Chapter 11 Case and fund its operations and sale.  At the Final Hearing, the Debtor will seek final approval of the proposed postpetition financing arrangements and use of Cash Collateral arrangements pursuant to a proposed final order (the "**Final Order**"), which shall be in form and substance acceptable to the DIP Agent.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)     *Need for Postpetition Financing and Use of Cash Collateral*.  The Debtor's need to use Cash Collateral and to obtain credit pursuant to the DIP Facility is immediate and critical in order to enable the Debtor to continue operations, pursue the sale of its assets and to administer and preserve the value of its estate.  The ability of the Debtor to finance its operations, complete its sale process, maintain business relationships, pay its employees, and protect the value of its assets and estates requires the availability of the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtor, its estate, its creditors and equity holders, and the possibility for a successful administration of this Chapter 11 Case.  The Debtor does not have sufficient available sources of liquidity and financing to operate its businesses, pursue the sale of its assets or to maintain its properties without the DIP Facility and authorized use of Cash Collateral.

(iii)     *No Credit Available on More Favorable Terms*.  Given its current financial condition, financing arrangements, and capital structure, the Debtor is unable to obtain financing from sources other than the DIP Agent or on terms more favorable than the DIP Facility.  The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an

7

administrative expense.  The Debtor has also been unable to obtain credit:  (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, (1) perfected security interests in and liens on all of the Debtor's existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

(iv)     *Use of Proceeds of the DIP Facility.*  As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Agent requires, and the Debtor has agreed, that proceeds of the DIP Facility shall be used (a) for the repayment in full in cash of the Prepetition Obligations (other than contingent indemnification obligations) upon entry of the Final Order and (b) in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the budget (a copy of which is attached as <u>Exhibit 2</u> hereto, as the same may be modified from time to time consistent with the terms of the DIP Loan Documents, and subject to such variances as may be permitted thereby, the "**<u>Budget</u>**"), solely (i) to repay certain Prepetition Obligations owned in connection with the Prepetition Credit Agreement, (ii)  to the extent required by the Sale Agency Agreement, to finance the acquisition of working capital assets of the Debtor including the purchase of inventory, (iii) for general corporate and working capital purposes of the Debtor, in each case to the extent expressly permitted under applicable Law, the Budget and the DIP Loan Documents, including postpetition operating expenses set forth in the Budget and other expenses arising in the Chapter 11 Case as may be approved by the Bankruptcy Court, (iv) to make Prepetition Agent Adequate Protection Payments (as defined herein), and (v) as otherwise permitted under the DIP Loan Documents.  The repayment of the Prepetition Obligations as set forth herein is necessary, as the Prepetition Agent has not otherwise consented to the use of Cash Collateral or the subordination of its liens to the DIP Liens, and the DIP Agent is not willing to provide the DIP Facility unless the Prepetition Obligations (other than contingent indemnification obligations) are  paid in full, in cash upon entry of the

8

Final Order and as otherwise set forth herein.  Such payments will not prejudice the Debtor or its estate, because payment of such amounts is subject to the rights of parties in interest under paragraphs 33 and 34 herein.

(v)    *Budget.*  The Debtor has determined that the Budget is reasonable and will allow the Debtor to pursue the Chapter 11 Case without the accrual of unpaid allowed administrative expense and that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred for the period set forth in the Budget.

(vi)    *Application of Proceeds of DIP Collateral.*  As a condition to entry into the DIP Loan Documents, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, the Debtor and the DIP Agent have agreed that the proceeds of DIP Collateral (as defined herein) shall be applied in accordance with paragraph 18 of this Interim Order.

G.    *Adequate Protection*.  The Prepetition Agent and the other Prepetition Secured Creditors shall receive (i) subject to the priorities set forth in paragraphs 12 and 13 below, the Adequate Protection Liens (as defined herein) to secure the Prepetition Obligations and Adequate Protection Superpriority Claims (as defined herein) with respect to the Prepetition Obligations and (ii) additional adequate protection in the form of (A) payment of the Prepetition Obligations from the proceeds of the DIP Collateral as set forth in paragraph 18(a) below and (B) payments in the amount of interest (which shall be payable at the default rate under the Prepetition Credit Agreement), fees, costs, expenses (including attorneys' fees and expenses), indemnities and other amounts with respect to the Prepetition Obligations when due in accordance with the Prepetition Credit Documents (collectively, the "**Prepetition Agent Adequate Protection Payments**"). For the avoidance of doubt, the Adequate Protection Liens and the Adequate Protection Superpriority Claims each shall be junior in all respects to the DIP Liens and the DIP Carve Out (as defined herein), and the Adequate Protection Superpriority Claims are junior in all respects to the DIP Superpriority Claim (as defined herein).

9

H.    _Sections 506(c) and 552(b)_.  In light of the DIP Agent's agreement to subordinate its liens and superpriority claims, as applicable, to the DIP Carve Out upon entry of the Final Order, the DIP Agent is entitled to a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

I.    _Good Faith of the DIP Agent_.

(i)    _Willingness to Provide Financing_.  The DIP Agent has indicated a willingness to provide financing to the Debtor subject to:  (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents and the payoff of the Prepetition Obligations as set forth in this Interim Order; and (c) entry of findings by this Court that such financing is essential to the Debtor's estate, that the DIP Agent is extending credit to the Debtor pursuant to the DIP Loan Documents in good faith, and that the DIP Agent's claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

(ii)    _Business Judgment and Good Faith Pursuant to Section 364(e)_.  The extension of credit under the DIP Facility reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtor and the DIP Agent.  The use of Cash Collateral and credit to be extended under the DIP Loan Documents shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent is therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

10

_BOS 47659718v4_

J.      _Notice_.  Notice of the Interim Hearing and the emergency relief requested in the DIP

Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or hand delivery,

to certain parties in interest, including:  (i) the U.S. Trustee for the Central District of California; (ii) the

Internal Revenue Service; (iii) the parties included on the Debtor's consolidated list of [fifty (50)] largest

unsecured creditors; (iv) counsel to the Prepetition Agent; (v) the United States Attorney for the Central

District of California; (vi) parties asserting a Lien against the Debtor's assets, and (vii) those parties who

have filed a notice of appearance and request for service of pleadings in this Chapter 11 Case pursuant to

Bankruptcy Rule 2002.  The Debtor has made reasonable efforts to afford the best notice possible under

the circumstances and such notice is due, good, sufficient and adequate and no other or further notice is or

shall be required.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the

Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      _Interim Financing Approved_.  The DIP Motion is granted on an interim basis, the Interim

Financing (as defined herein) is authorized and approved on an interim basis, and the use of Cash

Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim

Order.

2.      _Objections Overruled_.  All objections to the Interim Financing to the extent not

withdrawn or resolved are hereby overruled on their merits.

**DIP Facility Authorization**

3.      _Authorization of the DIP Financing and DIP Loan Documents_.  The Debtor is expressly

and immediately authorized and empowered (i) to execute and deliver the DIP Loan Documents, (ii) to

incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim

Order, the DIP Loan Documents, and the Budget, (iii) to deliver all instruments and documents that may

be necessary or required for performance by the Debtor under the DIP Facility and the creation and

perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan

11

_BOS 47659718v4_

Documents, and (iv) subject to the rights of third parties pursuant to paragraphs 33 and 34 below and

entry of the Final Order, to (x) grant releases in favor of the Prepetition Secured Creditors and each of

their related parties and (y) repay in full in cash of the Prepetition Obligations subject only to the ability

of the Court to unwind the repayment of the Prepetition Obligations in the event there is a successful

Challenge (as defined herein) to the validity, enforceability, extent, perfection and priority of the

Prepetition Secured Creditors' claims or liens. The Debtor is hereby authorized to pay the principal,

interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due and

without need to obtain further Court approval, including, without limitation, closing fees, unused facility

fees, continuing commitment fees, monitoring and exit fees, servicing fees, audit fees, structuring fees,

the reasonable fees and disbursements of the DIP Agent's and the DIP Lenders' attorneys, advisers,

accountants, and other consultants, whether or not the transactions contemplated hereby are

consummated, all to the extent provided in the DIP Loan Documents, with invoices to be provided in

accordance with paragraph 26 below.  All collections and proceeds, whether from ordinary course

collections, asset sales, debt issuances, insurance recoveries, condemnations or otherwise, will be

deposited and applied as required by this Interim Order and the DIP Loan Documents.  Upon execution

and delivery, the DIP Loan Documents shall represent valid and binding, and joint and several,

obligations of the Debtor, enforceable against the Debtor and its estate in accordance with their terms.

4.      Authorization to Borrow.  Until the Termination Date (as defined in the DIP Credit

Agreement), and subject to the terms, conditions, limitations on availability and reserves set forth in the

DIP Loan Documents, the DIP Facility, and this Interim Order, and in order to prevent immediate and

irreparable harm to the Debtor's estate, the Debtor is hereby authorized to request extensions of revolving

credit under the DIP Facility up to an aggregate principal amount of $80,000,000 at any one time

outstanding (the "**Interim Financing**").

5.      DIP Obligations.  The DIP Loan Documents and this Interim Order shall constitute and

evidence the validity and binding effect of the Debtor's DIP Obligations, which DIP Obligations shall be

enforceable against the Debtor, its estate and any successor thereto, including without limitation, any

12

trustee or other estate representative appointed in the Chapter 11 Case, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case (collectively, "**Successor Case**").  Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness, indemnities or obligations, contingent or absolute, which may now or from time to time be owing by the Debtor to the DIP Agent under the DIP Loan Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses, indemnities and other amounts owed pursuant to the DIP Loan Documents, and shall be obligations of the Debtor in all respects.

6.    Postpetition Liens and Collateral.

(a)    Effective immediately upon the entry of this Interim Order, pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for itself and the ratable benefit of the DIP Lenders) is hereby granted, continuing valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on (collectively, the "**DIP Liens**") any and all presently owned and hereafter acquired assets and real and personal property of the Debtor, including, without limitation, the following (the "**DIP Collateral**"):

(i)    all Accounts[5];

(ii)    all Goods, including Equipment, Inventory and Fixtures;

(iii)    all Documents, Instruments and Chattel Paper;

(iv)    all Letters of Credit and Letter-of-Credit Rights;

(v)    all Securities Collateral;

(vi)    all Investment Property;

(vii)    all Intellectual Property Assets;

(viii)    all Commercial Tort Claims;

(ix)    all General Intangibles (including, without limitation, all Payment Intangibles);

---

[5]  All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Loan Documents.  All terms not specifically defined in the DIP Loan Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

13

(x)      all Deposit Accounts (including, without limitation, the Concentration Account);

(xi)     all Supporting Obligations;

(xii)    all money, cash or cash equivalents;

(xiii)   all credit balances, deposits and other property now or hereafter held or received by or in transit to the DIP Agent or at any other depository or other institution from or for the account of the Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiv)    all proceeds of leases of real property and all owned real property;[6]

(xv)     effective upon the entry of the Final Order, all claims or causes of action or the proceeds thereof to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including, without limitation, Avoidance Actions and proceeds thereof;

(xvi)    effective upon the entry of the Final Order, the Debtor's rights under section 506(c) and section 550 of the Bankruptcy Code and the proceeds thereof;

(xvii)   to the extent not otherwise described above, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of the Debtor;

(xviii)  all books, records, and information relating to any of the foregoing and/or to the operation of the Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained; and to the extent not otherwise included or specifically excluded, all other personal property of the Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

---

[6]  For the avoidance of doubt, the DIP Liens extend only to the proceeds of leased real property and are not direct liens on the Debtor's leases of real property unless such liens are expressly permitted pursuant to the underlying lease documents.

(b)    Effective upon the entry of the Interim Order, (i) all DIP Liens and the DIP Carve Out shall each be and remain at all times senior to the Prepetition Liens, and all existing blocked account agreements, deposit account control agreements, securities account control agreements, credit card acknowledgements, credit card agreements, collateral access agreements, landlord agreements, warehouse agreements, bailee agreements, carrier agency agreements, customs broker agency agreements, subordination agreements and freight forwarder agreements constituting Prepetition Credit Documents, and all existing Uniform Commercial Code filings and all existing filings with the United States Patent and Trademark Office or the United States Copyright Office with respect to the recordation of an interest in the intellectual property of the Debtor which were filed by the Prepetition Agent, shall be deemed to be delivered and/or filed in connection with the DIP Facility as well as the Prepetition Credit Agreement, shall constitute DIP Credit Documents (as well as Prepetition Credit Documents) and shall remain in full force and effect without any further action by the Debtor, the DIP Agent or any other person, (ii) any and all references in any such agreements or documents to the "Credit Agreement" shall hereafter be deemed to mean and refer to the DIP Credit Agreement and the Prepetition Credit Agreement, and (iii) any and all references in any such agreements or documents to the "Loan Documents" shall hereafter be deemed to mean and refer to the DIP Loan Documents or Prepetition Credit Documents, in each case as amended, modified, supplemented or restated and in effect from time to time.

7.    <u>DIP Lien Priority</u>.

(a)    *DIP Liens*.  The DIP Liens shall be junior only to the (i) DIP Carve Out and (ii) the Prepetition Permitted Liens and shall otherwise be senior in priority and superior to the Prepetition Liens, the Adequate Protection Liens (as defined herein) and Adequate Protection Superpriority Claims (as defined herein) and any other security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral.

(b)    Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or other estate

15

representative appointed in the Chapter 11 Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or Successor Case.  The DIP Liens shall not be subject to challenge under sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

(c)	*Prepetition Liens*.  For the avoidance of doubt, the Prepetition Liens shall be junior to the (i) DIP Carve Out; (ii) DIP Liens; (iii) the DIP Superpriority Claim, (iv) the Adequate Protection Liens; (v) the Adequate Protection Superpriority Claims; and (vi) Prepetition Permitted Liens.

8.	DIP Superpriority Claim.

(a)	*DIP Agent Superpriority Claim*.  Upon entry of this Interim Order, the DIP Agent (for itself and the ratable benefit of the DIP Lenders) is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Chapter 11 Case and any Successor Case (collectively, the "**DIP Superpriority Claim**") for all DIP Obligations.  The DIP Superpriority Claim shall be subordinate only to the DIP Liens, the DIP Carve Out and Prepetition Permitted Liens, and shall otherwise have priority over any and all administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code.

(b)	*Priority of DIP Superpriority Claim.* The DIP Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations, the DIP Carve Out and amounts secured by the Prepetition Permitted Liens to the extent of their interest in any collateral.  If necessary, upon entry of the Final Order, the DIP Superpriority Claim shall be payable from or have recourse to Avoidance Actions and proceeds thereof.

16

9.      <u>No Obligation to Extend Credit</u>.  The DIP Agent and the DIP Lenders shall not have any obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit or the issuance of such letter of credit under the applicable DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Agent.

10.      <u>Use of DIP Facility Proceeds</u>.  From and after the Petition Date, the Debtor shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the DIP Loan Documents and the Budget and shall be subject at all times to compliance with the Budget subject to permitted variances and the terms of this Interim Order.

**<u>Authorization to Use Cash Collateral</u>**

11.      <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in accordance with the Budget and subject to such variances as may be permitted thereby, the Debtor is authorized to use Cash Collateral until the Termination Date; <u>provided</u>, <u>however</u>, that during the Remedies Notice Period (as defined herein) the Debtor may use Cash Collateral in accordance with the terms and provisions of the Budget solely to meet payroll and related expenses, and for other expenses approved critical to the preservation of the Debtor and its estate as agreed by the DIP Agent.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business (which shall be subject to further Orders of this Court), or Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Loan Documents, and in accordance with the Budget.

12.      <u>Adequate Protection Payments and Adequate Protection Liens</u>.

(a)      The Prepetition Agent and the other Prepetition Secured Creditors shall receive adequate protection in the form of the Prepetition Agent Adequate Protection Payments.

(b)      *Prepetition Agent – Adequate Protection Liens*.  The Prepetition Agent (for the ratable benefit of the Prepetition Secured Creditors) is hereby granted valid and perfected replacement and additional security interests in, and liens on all of the Debtor's right, title and interest in, to and under

17

all DIP Collateral (the "**Adequate Protection Liens**").  The Adequate Protection Liens granted to the Prepetition Agent shall secure only the Prepetition Obligations.  The Adequate Protection Liens are and shall be valid, binding enforceable and fully perfected as of the date hereof and subordinate and subject only to (i) the DIP Liens, (ii) the Permitted Prior Liens, and (iii) the DIP Carve Out.

(c)    *Treatment of Adequate Protection Liens.*  Other than as set forth herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any Successor Case.  The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or Successor Case.

13.    Adequate Protection Superpriority Claims.

(a)    *Superpriority Claim of Prepetition Agent*.  As further adequate protection of the interests of the Prepetition Agent with respect to the Prepetition Obligations (including, without limitation, the Surviving Obligations), the Prepetition Agent (for the ratable benefit of the Prepetition Secured Creditors) is hereby granted an allowed administrative claim against the Debtor's estate under sections 503 and 507(b) of the Bankruptcy Code (the "**Adequate Protection Superpriority Claims**") to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the value of the Prepetition Secured Creditors' interests in the Prepetition Collateral.

(b)    *Priority of Adequate Protection Superpriority Claims*.  The Adequate Protection Superpriority Claims shall be junior to the DIP Carve Out and the DIP Liens, the DIP Superpriority Claim and the Adequate Protection Liens and shall otherwise have priority over administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

14.    Amendments.  The DIP Loan Documents may from time to time be amended, modified or supplemented by the parties thereto without notice or a hearing if:  (i) in the reasonable judgment of the

18

Debtor and the DIP Agent, the amendment, modification, or supplement (A) is not prejudicial in any material respect to the rights of third parties, and (B) has been consented to by the DIP Agent, and (ii) a copy (which may be provided through electronic mail or facsimile) of the form of amendment, modification or supplement is provided to counsel for any Statutory Committee and the U.S. Trustee at least two (2) Business Days prior to the effective date of the amendment, modification or supplement.

15.    <u>Budget Maintenance</u>.  The Budget and any modification to, or amendment or update of, the Budget shall be in form and substance reasonably acceptable to the DIP Agent and approved by the DIP Agent.  The Debtor shall comply with and update the Budget from time to time in accordance with the DIP Loan Documents (provided that any update shall be in form and substance reasonably acceptable to the DIP Agent and approved by the DIP Agent), but in any event not less than on a weekly basis (with delivery to the DIP Agent on or before Wednesday of each week and to counsel for any Statutory Committee each week after delivery to the DIP Agent).

16.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtor to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the Adequate Protection Superpriority Claims; and (b) authorize the Debtor to pay, and the DIP Agent and Prepetition Secured Creditors to retain and apply, payments made in accordance with the terms of this Interim Order.

17.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)    *Automatic Perfection of Liens*.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, collateral access agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-

19

bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to entitle the DIP Agent or the

Prepetition Secured Creditors to the priorities granted herein.  Notwithstanding the foregoing, each of the

DIP Agent is authorized to file, as it deems necessary, such financing statements, mortgages, notices of

liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to

otherwise evidence any of the DIP Liens or Adequate Protection Liens, and all such financing statements,

mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition

Date; provided, however, that no such filing or recordation shall be necessary or required in order to

create, perfect or enforce the DIP Liens or the Adequate Protection Liens.  The Debtor is authorized to

execute and deliver promptly upon demand to the DIP Agent or Prepetition Agent all such financing

statements, mortgages, control agreements, notices and other documents as the DIP Agent or Prepetition

Agent may reasonably request.  The DIP Agent or the Prepetition Agent may file a photocopy of this

Interim Order as a financing statement with any filing or recording office or with any registry of deeds or

similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

　　　　18.　　Application of Proceeds of DIP Collateral.  As a condition to the entry into the DIP Loan

Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral,

the Debtor has agreed that the proceeds of DIP Collateral shall be applied as follows:

　　　　　　　　(a)　　　(i) all payments received by the DIP Agent in respect of any DIP Obligation and

all funds transferred and credited to the "Concentration Account" maintained by the Debtor at Union

Bank, N.A. with account number 45010-49912 and (ii) all net proceeds from any Disposition of DIP

Collateral (including, without limitation, payments received pursuant to the Sale Agency Agreement (as

defined in the DIP Credit Agreement)), each shall be applied in accordance with the DIP Credit

Agreement (including, without limitation, Sections 2.05 and 8.03 thereof) or, to the extent the DIP Credit

Agreement does not direct the application of such amounts, as follows:  *first*, to payment of the

Prepetition Obligations in accordance with the terms of the Prepetition Credit Documents, *second*, to

payment of the costs and expenses of the DIP Agent and DIP Lenders, including Credit Party Expenses

payable and reimbursable by the Debtor under the DIP Credit Agreement and the other DIP Loan

Documents; *third*, to payment of fees and interest with respect to the DIP Obligations, *fourth*, to payment of all other DIP Obligations in accordance with the DIP Loan Documents, and *fifth*, to the Debtor's operating account, or for the account of and paid to whoever may be lawfully entitled thereto.  As between the DIP Lenders, nothing provided herein shall be deemed to modify the allocation of the proceeds of DIP Collateral set forth in the DIP Loan Documents.

(b)     The Debtor shall not, directly or indirectly, voluntarily purchase, redeem, defease, prepay any principal of, premium, if any, interest or other amount payable in respect of any indebtedness prior to its scheduled maturity, other than the DIP Obligations and the Prepetition Obligations (each in accordance with the DIP Loan Documents and this Interim Order) and other obligations authorized by an order of the Court.

19.     <u>Proceeds of Subsequent Financing</u>.  If the Debtor, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in this Chapter 11 Case or any Successor Case shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, including subsequent to the confirmation of any plan of reorganization or liquidation with respect to the Debtor and the Debtor's estate, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth in paragraph 18(a) herein;

20.     <u>Maintenance of DIP Collateral</u>.  Until the payment in full in cash of all DIP Obligations and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, as provided therein, the Debtor shall:  (a) insure the DIP Collateral as required under the DIP Facility; and (b) maintain the cash management system which has been agreed to by the DIP Agent or as otherwise required by the DIP Loan Documents.

21.     <u>Disposition of DIP Collateral; Rights of DIP Agent</u>.  Unless otherwise authorized by the Court, the Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP

21

Collateral except as permitted by the DIP Loan Documents.  Nothing provided herein shall limit the right of the DIP Agent or the DIP Lenders to object to any proposed disposition of the DIP Collateral.

22.      <u>Termination Date</u>.  On the Termination Date, (i) all DIP Obligations shall be immediately due and payable, subject to the payment of any unfunded amounts of the DIP Carve Out, and all commitments to extend credit under the DIP Facility will terminate, and (ii) all authority to use Cash Collateral derived from the proceeds of DIP Collateral shall cease, <u>provided</u>, <u>however</u>, that during the Remedies Notice Period (as defined herein), the Debtor may use Cash Collateral solely as set forth in paragraph 11 herein.

23.      <u>Events of Default</u>.  The occurrence of an "Event of Default" under the DIP Credit Agreement (unless the DIP Agent, in its sole discretion, elects to waive such Event of Default) shall constitute an event of default under this Interim Order (each, an "**Event of Default**").

24.      <u>Rights and Remedies Upon Event of Default</u>.

(a)      *DIP Facility Termination.*        Immediately upon the occurrence and during the continuance of an Event of Default or the Termination Date, the DIP Agent may in its discretion (i) declare the DIP Facility terminated (such declaration, a "**<u>Termination Declaration</u>**") or (ii) send a reservation of rights notice to the Debtor, which notice may advise the Debtor that any further advances under the DIP Facility will be made in the sole discretion of the DIP Agent.  Upon the issuance of a Termination Declaration, at the DIP Agent's option: (I) all or any portion of the Commitment of the DIP Agent and DIP Lenders to make loans or otherwise extend credit may be suspended or terminated; (II) all DIP Obligations may be deemed immediately due and payable; and (III) after expiration of the Remedies Notice Period, any right or ability of the Debtor to use any Cash Collateral may be terminated, reduced or restricted by the DIP Agent, provided that, during the Remedies Notice Period, the Debtor may use Cash Collateral solely in accordance with paragraph 11 of this Interim Order.  With respect to the DIP Collateral, following the Termination Declaration, subject to the Remedies Notice Period, the DIP Agent, the DIP Lenders and the Prepetition Agent may exercise all rights and remedies available to them under the DIP Loan Documents or the Prepetition Credit Documents, as applicable, or applicable law against

22

the DIP Collateral. Without limiting the foregoing, the DIP Agent, the DIP Lenders and the Prepetition Agent may, subject to the Remedies Notice Period, (i) enter onto the premises of the Debtor in connection with an orderly liquidation of the DIP Collateral; and/or (ii) exercise any rights and remedies provided to DIP Agent, the DIP Lenders or the Prepetition Agent under the DIP Loan Documents or the Prepetition Credit Documents, as applicable, or at law or equity, including all remedies provided under the Bankruptcy Code and pursuant to this Interim Order and the Final Order. [Following the termination of the Remedies Notice Period, the DIP Agent or the Prepetition Agent may require the Debtor to seek authority from the Court to retain an Approved Liquidator for the purpose of conducting a liquidation or "going out of business" sale and/or the orderly liquidation of the DIP Collateral and, if the Debtor refuses to seek such authority, the DIP Agent or the Prepetition Agent shall be entitled to seek such authority directly.] Notwithstanding of the rights and remedies set forth herein or in the DIP Credit Agreement or the DIP Loan Documents, the DIP Agent's and each DIP Lender's right to use or occupy the Debtor's leased premises in connection with the exercise of any right or remedy upon the occurrence of an Event of Default shall be limited to (i) the existing rights of the DIP Agent, each DIP Lender, and the applicable landlord under applicable non-bankruptcy law, (ii) the written consent of the applicable landlord, or (iii) the further order of the Court upon motion and notice appropriate under the circumstances.

(b)     *Notice of Termination*. Any Termination Declaration shall be given by facsimile (or other electronic means, including electronic mail) to counsel to the Debtor, counsel to any Statutory Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "**Termination Declaration Date**"). The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the third (3) day following the Termination Declaration Date, except as provided in paragraphs 11 and 24 of this Interim Order. Any automatic stay otherwise applicable to the DIP Agent, the DIP Lenders and the Prepetition Agent is hereby modified so that three (3) business days after the Termination Declaration Date (the "**Remedies Notice Period**"), the DIP Agent, the DIP Lenders and the Prepetition Agent shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Loan

23

Documents or the Prepetition Credit Documents, as applicable, and this Interim Order and shall be permitted to satisfy the DIP Superpriority Claim and the DIP Liens and the Adequate Protection Liens and Adequate Protection Superpriority Claims of the Prepetition Agent, subject only to the DIP Carve Out. During the Remedies Notice Period, the Debtor shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default or the Termination Date has occurred and/or is continuing. Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order and the DIP Agent, the DIP Lenders and the Prepetition Agent shall be permitted to exercise all remedies set forth herein, in the DIP Credit Agreement, the DIP Loan Documents, the Prepetition Credit Documents and as otherwise available at law against the DIP Collateral or the Prepetition Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to (x) the DIP Agent with respect thereto pursuant to the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order and (y) the Prepetition Agent with respect thereto pursuant to the Prepetition Credit Agreement, the other Prepetition Credit Documents, or this Interim Order.

25.    <u>Good Faith Under Section 364 of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>. The DIP Agent and each DIP Lender have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court, or any other court, the DIP Agent and each of the DIP Lenders shall be and are entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized

24

or created hereby, provided that the Interim Order was not stayed by court order after due notice had been given to the DIP Agent at the time the advances were made or the liens, claims or priorities were authorized and/or created. Any liens or claims granted to the DIP Agent and the DIP Lenders hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, provided that the Interim Order was not stayed by court order after due notice had been given to the DIP Agent and each DIP Lender at the time the advances were made or the liens, claims or priorities were authorized and/or created.

26.     <u>DIP and Other Expenses</u>. The Debtor is authorized and directed to pay all reasonable and documented out-of-pocket expenses of (x) the DIP Agent and the DIP Lenders in connection with the DIP Facility (including, without limitation, expenses incurred prior to the Petition Date), as provided in the DIP Loan Documents, and (y) the Prepetition Agent (including, without limitation, expenses incurred prior to the Petition Date) as provided in the Prepetition Credit Documents, whether or not the transactions contemplated hereby are consummated, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses, upon the Debtor's receipt of invoices for the payment thereof. Payment of all such fees and expenses shall not be subject to allowance by the Court and professionals for the DIP Agent, the DIP Lenders and the Prepetition Agent shall not be required to comply with the U.S. Trustee fee guidelines. Notwithstanding the foregoing, at the same time such invoices are delivered to the Debtor, the professionals for the DIP Agent, the DIP Lenders and the Prepetition Agent shall deliver a copy of their respective invoices to counsel for any Statutory Committee and the U.S. Trustee, redacted as necessary with respect to any privileged or confidential information contained therein. Any objections raised by the Debtor, the U.S. Trustee or any Statutory Committee with respect to such invoices within ten (10) business days of the receipt thereof will be resolved by the Court. In the event of any objection, the provisions of section 107 of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure shall apply.

BOS 47659718v4

Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtor. Notwithstanding the foregoing, the Debtor is authorized and directed to pay on the Closing Date all reasonable fees, costs and expenses of the DIP Agent, the DIP Lenders and the Prepetition Agent incurred on or prior to such date without the need for any professional engaged by the DIP Agent, the DIP Lenders or the Prepetition Agent to first deliver a copy of its invoice as provided for herein.

27.    Indemnification.

(a)    The Debtor shall indemnify and hold harmless the DIP Agent and its shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Loan Documents, or the DIP Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Loan Documents and as further described therein and herein, or in connection with this Chapter 11 Case, any plan, or any action or inaction by the Debtor, in each case except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Agent's exercise of discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, the DIP Agent shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtor agrees to promptly pay the reasonable fees and expenses of such counsel.

(b)    *DIP Indemnity Account.* Upon the earlier to occur of (i) the payment in full, in cash of all amounts due to the DIP Agent and DIP Lenders under the DIP Loan Documents or (ii) the conclusion of the Remedies Notice Period, the Debtor shall pay an amount equal to the lesser of (x) $[_____] and (y) the Credit Party Expenses payable and reimbursable by the Debtor under the DIP Credit Agreement and the other DIP Loan Documents, from proceeds of the DIP Collateral into an

26

indemnity account (the "**DIP Indemnity Account**") subject to first priority liens of the DIP Agent. The

DIP Indemnity Account shall be released and the funds applied in accordance with paragraph 18 of this

Interim Order upon the receipt by the DIP Agent and each DIP Lender of releases from the Debtor and its

estate acceptable to the DIP Agent and each DIP Lender in their sole discretion approved by a final Order

of this Court.

28.    <u>Proofs of Claim</u>.  Any order entered by the Court in relation to the establishment of a bar

date for any claims (including without limitation administrative claims) in the Chapter 11 Case or

Successor Case shall not apply to the DIP Agent, DIP Lenders or the Prepetition Secured Parties.  Neither

DIP Agent nor the Prepetition Agent will be required to file proofs of claim or requests for approval of

administrative expenses in the Chapter 11 Case or Successor Case, and the provisions of this Interim

Order relating to the amount of the DIP Obligations, the DIP Superpriority Claim, the Prepetition

Obligations and the Adequate Protection Superpriority Claim shall constitute timely filed proofs of claim

and/or administrative expense requests.

29.    <u>Rights of Access and Information</u>.  Without limiting the rights of access and information

afforded the DIP Agent and the DIP Lenders under the DIP Loan Documents, the Debtor shall be, and

hereby is, required to afford representatives, agents and/or employees of the DIP Agent and DIP Lenders

reasonable access to the Debtor's premises and its books and records in accordance with the DIP Loan

Documents, and shall reasonably cooperate, consult with, and provide to such persons all such

information as may be reasonably requested.  In addition, the Debtor authorize its independent certified

public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and

provide to the DIP Agent all such information as may be reasonably requested with respect to the

business, results of operations and financial condition of the Debtor.

30.    <u>DIP Carve Out</u>.

(a)    <u>Generally</u>.  Upon the occurrence of the Carve-Out Trigger Date (defined below),

the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens (defined below), and the

507(b) Claims (defined below) of the Prepetition Secured Parties, and all other claims and liens granted

by the Interim Order shall each be subject and subordinate to the payment (from either Cash Collateral or proceeds resulting from liquidation of DIP Collateral or Prepetition Collateral) of the following: (i) the unpaid fees payable to the Clerk of the Bankruptcy Court and statutory fees payable to the U.S. Trustee pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest (for the avoidance of doubt, there is no limitation on the obligations of the Debtor and its Estate with respect to unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code); plus (ii) the fee and expense claims of the respective retained professionals of the Debtor and any Statutory Committee that have been approved by this Court during the Chapter 11 Case pursuant to sections 327, 328, and 1103 of the Bankruptcy Code or otherwise (the retained professionals of the Debtor and any Statutory Committee are collectively referred to as the "**Retained Professionals**"), which were incurred (A) on and after the Petition Date and prior to the Carve-Out Trigger Date in amounts not in excess of the amounts set forth in the DIP Budget, and (B) on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $100,000 in the aggregate for all Retained Professionals provided that, in each case, such fees and expenses of the Retained Professionals are in accordance with the DIP Budget on a cumulative basis for the applicable period and are ultimately allowed on a final basis by this Court (whether or not such fees and expenses are allowed by this Court as of or after the Carve-Out Trigger Date) pursuant to sections 330 and 331 of the Bankruptcy Code or otherwise and are not excluded from the Carve-Out, provided, however, nothing herein shall waive the right of any party to object to the allowance of any such fees and expenses, and provided further, that the Carve-Out shall not include any bonus, transaction, success or completion fees or any other fees of similar import for Retained Professionals (all such amounts in this Paragraph 30(a)(i) and (ii), together with the limitations set forth therein, are collectively referred to as the "**DIP Carve-Out**").

> (b)    Professional Fee Escrow.  On a weekly basis the Debtor shall be authorized to transfer funds to the a segregated account maintained by Levene, Neale, Bender, Yoo & Brill L.L.P. (the "**Professional Fee Account**") in the amounts for the preceding week, if any, set forth in the DIP Budget

for fees and expenses of the Retained Professionals.  Such funds shall be held in escrow in the

Professional Fee Account for the benefit of the Retained Professionals, respectively, to be applied pro rata

to the fees and expenses of such Retained Professionals (the "**Escrowed Funds**"), provided, however,

that payment from the Professional Fee Account shall only be made pursuant to any interim compensation

order or interim or final fee order; provided further, however, that for the avoidance of doubt, fees and

expenses payable to the Retained Professionals shall be paid solely out of the Professional Fee Account,

and all amounts deposited in the Professional Fee Account shall reduce, on a dollar for dollar basis, the

obligation to fund the DIP Carve-Out, and provided further that success fees that may be earned by any

Retained Professional and approved by the Court shall be paid from the proceeds of any transaction and

shall not be deposited into the Professional Fee Escrow.  Without in any way limiting the Debtor's ability

to use the Escrowed Funds to pay the fees and expenses of the Retained Professionals, the Escrowed

Funds in the Professional Fee Account shall remain property of the Debtor's estate and encumbered by

and subject to the DIP Liens, and the Superpriority Claims, in their respective order of priority; provided,

however, that such liens and claims shall be subordinate to the DIP Carve-Out.  The DIP Lender shall

have no obligation to pay any fees and expenses of the Retained Professional except to the extent of the

funding in the Professional Fee Account.

        (c)        Carve-Out Trigger Date.  The term "**Carve-Out Trigger Date**" means the date

on which the DIP Agent provides written notice to the Debtor, the U.S. Trustee, counsel to the Statutory

Committee that the DIP Carve-Out is invoked, which notice may be delivered only on or after the

occurrence of the Termination Date.

        (d)        *No Direct Obligation to Pay Professional Fees or Committee Expenses*.  The DIP

Agent, the DIP Lenders, and the Prepetition Secured Creditors shall not be responsible for the funding,

direct payment or reimbursement of any fees or disbursements of any Case Professionals or any

Committee Expenses incurred in connection with the Chapter 11 Case or any Successor Case.  Nothing in

this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the

Prepetition Secured Creditors in any way to pay compensation to or to reimburse expenses of any Case

<div align="center">29</div>

Professional (including any Committee Expenses), or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement.  Nothing in this Interim Order or otherwise shall be construed to increase the DIP Carve Out if actual (i) Allowed Professional Fees of any Case Professional or (ii) Committee Expenses are higher in fact than the estimated fees and disbursements reflected in the Budget.

(e)    *Payment of DIP Carve Out*.  Upon the occurrence of the Termination Date, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall be subject to the payment of the unfunded amount of the DIP Carve Out.  The funding of the DIP Carve Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

31.    <u>Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral and the Case Professionals DIP Carve Out</u>.  Unless otherwise ordered by the Court or consented to by the DIP Agent, and subject to entry of a Final Order, the DIP Facility, the DIP Collateral, the Cash Collateral and the DIP Carve Out may not be used:  (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to or against the interests of the Prepetition Secured Creditors, the DIP Agent or the DIP Lenders or their rights and remedies under the DIP Loan Documents, the Prepetition Credit Documents, or this Interim Order or the Final Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtor in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations, the Prepetition Obligations, (iii) for monetary, injunctive or other affirmative relief against the DIP Agent, the DIP Lenders, the Prepetition Secured Creditors, or their respective collateral, (iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors of any rights and remedies under this Interim Order or the Final Order, the DIP Loan Documents, the

30

Prepetition Credit Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Agent upon any of the DIP Collateral, by the Prepetition Agent with respect to its Adequate Protection Liens, or (iv) to pursue litigation against any Prepetition Secured Creditor; (b) to make any distribution under a plan of reorganization in any Chapter 11 Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor; (e) objecting to, contesting, or interfering with, in any way, the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, except as provided for in this Interim Order or Final Order, or seeking to prevent the DIP Agent from credit bidding in connection with any proposed plan or reorganization or liquidation or any proposed transaction pursuant to section 363 of the Bankruptcy Code; (f) using or seeking to use Cash Collateral while the DIP Obligations or the Prepetition Obligations remain outstanding in a manner inconsistent with the Budget; (g) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agent; (h) incurring Indebtedness (as defined in the DIP Credit Agreement) outside the ordinary course of business, except as permitted under the DIP Loan Documents; (i) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Agent or Prepetition Agent; (j) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors; or (k) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the Prepetition Obligations, the DIP Liens, the Prepetition Liens or any other rights or interests of the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors.

32.    <u>Payment of Compensation</u>.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Case Professionals or shall affect the right of the DIP Agent or any of the DIP Lenders to object to the allowance and payment of such fees and expenses.

31

33.     <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(a)     The stipulations, findings, representations and releases contained in this Interim Order or the DIP Loan Documents with respect to the Prepetition Secured Creditors and the Prepetition Obligations shall be binding upon all parties-in-interest, any trustee appointed in this case and any Statutory Committee (each, a "**Challenge Party**"), unless and solely to the extent that (i) any Challenge Party, with standing and requisite authority, has timely filed appropriate pleadings and timely commenced a Challenge (as defined herein) during the Challenge Period (as defined herein) and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.  For purposes of this paragraph 33: (a) "**Challenge**" means any claim or cause of action against any of the Prepetition Secured Creditors on behalf of the Debtor or the Debtor's creditors and interest holders, or to object to or to challenge the stipulations, findings or Debtor's Stipulations set forth herein, including, but not limited to those in relation to:  (i) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of any Prepetition Secured Creditor; (ii) the validity, allowability, priority, or amount of the Prepetition Obligations (including any fees included therein); (iii) the secured status of the Prepetition Obligations; or (iv) any liability of any of the Prepetition Secured Creditors with respect to anything arising from any of the respective Prepetition Credit Documents; and (b)  "**Challenge Period**" means the time period for the Statutory Committee or other party in interest to commence, or to file a motion to obtain authority to commence, any related proceedings which shall be the earlier of  (i) sixty (60) days following the date of the appointment of any Statutory Committee and (ii) seventy-five days following the Petition Date if a Statutory Committee is not appointed in the Chapter 11 Case.

(b)     Upon the expiration of the Challenge Period without the filing of a Challenge (the "**Challenge Period Termination Date**"):  (A) any and all such Challenges and objections by any party (including, without limitation, any Statutory Committee, any Chapter 11 trustee, and/or any examiner or other estate representative appointed in these Chapter 11 Case, and any Chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case), shall be deemed to be forever waived, released and barred, (B) all matters not subject to the Challenge, and all findings,

32

Debtor's Stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to each Prepetition Secured Creditors' claims, liens, and interests shall be of full force and effect and forever binding upon the Debtor, the Debtor's bankruptcy estate and all creditors, interest holders, and other parties in interest in these Chapter 11 Case and any Successor Chapter 11 Case; and (C) any and all claims or causes of action against any of the Debtor or the Prepetition Secured Creditors relating in any way to the Debtor or the Prepetition Credit Documents shall be forever waived and released by the Debtor's estate, all creditors, interest holders and other parties in interest in these Chapter 11 Case and any Successor Case.

34.    <u>Reservation of Rights</u>:    Notwithstanding anything to the contrary contained in this Interim Order, in the event there is a timely and successful Challenge by any party in interest (in accordance with paragraph 33 hereof), this Court may unwind the repayment of the Prepetition Obligations and order the repayment of such amount to the extent that such payment resulted in the payment of any Prepetition Obligations consisting of an unsecured claim or other amount not allowable under section 502 of the Bankruptcy Code.    Notwithstanding the foregoing, a successful Challenge shall not in any way affect the validity, enforceability or priority of the DIP Obligations or the DIP Liens unless otherwise ordered by the Court.

35.    <u>No Third Party Rights</u>.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

36.    <u>Section 506(c) Claims</u>.    Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case at any time shall be charged against the DIP Agent, the DIP Lenders or the DIP Collateral, the Prepetition Secured Creditors or the Prepetition Liens pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

37.    <u>No Marshaling/Applications of Proceeds</u>.    Upon entry of the Final Order, neither the DIP Agent, the DIP Lenders, nor the Prepetition Secured Creditors shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

<div align="center">33</div>

38.     <u>Section 552(b)</u>.  The DIP Agent shall be entitled to all of the rights and benefits of section

552(b) of the Bankruptcy Code.  Subject to the entry of the Final Order, the "equities of the case"

exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP

Lenders, or the Prepetition Secured Creditors with respect to proceeds, products, offspring or profits of

any of the Prepetition Collateral.

39.     <u>Discharge Waiver</u>.  The Debtor expressly stipulates, and the Court finds and adjudicates

that, none of the DIP Obligations, the DIP Superpriority Claim or the DIP Liens shall be discharged by

the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section

1141(d) of the Bankruptcy Code, unless the DIP Obligations have been paid in full in cash on or before

the effective date of a confirmed plan of reorganization.  The Debtor expressly stipulates, and the Court

finds and adjudicates that, none of the Adequate Protection Liens or Adequate Protection Superpriority

Claims shall be discharged by the entry of an order confirming any plan of reorganization,

notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Adequate

Protection Superpriority Claims and claims secured by the Adequate Protection Liens have been paid in

full in cash on or before the effective date of a confirmed plan of reorganization.  The Debtor shall not

propose or support any plan or sale of all or substantially all of the Debtor's assets or entry of any

confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective

date of such plan of all DIP Obligations and Adequate Protection Superpriority Claims.

40.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this

Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a)

DIP Agent's or the Prepetition Secured Creditors' right to seek any other or supplemental relief in respect

of the Debtor (including the right to seek additional adequate protection, including, without limitation, in

the form of reimbursement of fees and expenses of counsel to the Prepetition Secured Creditors); (b) the

rights of any of the Prepetition Secured Creditors to seek the payment by the Debtor of post-petition

interest or fees pursuant to section 506(b) of the Bankruptcy Code; or (c) any of the rights of the DIP

Agent under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to

34

(i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Chapter 11 Case or Successor Case, conversion of the Chapter 11 Case to a case under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Agent and the DIP Lenders are preserved.

41.    **Release of DIP Secured Parties.  The Debtor hereby acknowledges effective upon entry of this Interim Order, that it has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Debtor's liability to repay the DIP Agent or DIP Lenders as provided in the DIP Credit Agreement or to seek affirmative relief or damages of any kind or nature from the DIP Agent or any DIP Lender. The Debtor, on behalf of itself, and on behalf of all its successors, assigns, and Subsidiaries and any Person acting for and on behalf of, or claiming through them (collectively, and in each case in their capacities as such, the "<u>Releasing Parties</u>"), hereby fully, finally and forever releases and discharges the DIP Agent and each DIP Lender and its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, participants, and each Person acting for or on behalf of any of them (collectively, and in each case in their capacities as such, the "<u>Released Parties</u>") of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, whether held in a**

35

**personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, arising out of, connected with or relating to the DIP Credit Agreement, the Interim Order, the Chapter 11 Case or any other agreement, document or instrument related to any of the foregoing and the transactions contemplated hereby or thereby.**

42.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Agent or the DIP Lenders to seek relief or otherwise exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent or the DIP Lenders.

43.     <u>Binding Effect of Interim Order</u>.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Agent, the DIP Lenders, the Prepetition Secured Creditors, all other creditors of the Debtor, any Statutory Committee or any other court appointed committee, appointed in the Chapter 11 Case, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Case, any Successor Case, or upon dismissal of the Chapter 11 Case or Successor Case. Notwithstanding anything contained herein with respect to obligations or limitations when a Final Order is entered, the terms of the Final Order shall be what is binding on all parties.

44.     <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtor irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the DIP Agent (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified

36

in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Case or Successor Case, equal or superior to the DIP Superpriority Claim, other than the DIP Carve Out; (b) any order allowing use of Cash Collateral resulting from DIP Collateral; and (c) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens.  The Debtor irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent.

45.    <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

46.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in the Chapter 11 Case; (b) converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Case or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Case or Successor Case.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Agent and Prepetition Secured Creditors pursuant to this Interim Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Chapter 11 Case, in any Successor Case, or following dismissal of the Chapter 11 Case or any Successor Case, and shall maintain their priority as provided by this Interim Order until all DIP Obligations have been paid in full and all commitments to extend credit under the DIP Facility are terminated.  The terms and provisions concerning the indemnification of the DIP Agent shall continue in the Chapter 11 Case and in any Successor Case, following dismissal of the Chapter 11 Case or any Successor Case, following termination of the DIP Loan Documents and/or the repayment of the DIP Obligations.

47.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [_____], 2015 at [_____] [a.m./p.m] (ET).

37

48.    <u>Notice of Final Hearing</u>:  On or before [_____], 2015, the Debtor shall serve, by United States mail, first-class postage prepaid, a copy of the DIP Motion and this Interim Order upon:  (a) the Office of the United States Trustee for the Central District of California, Santa Ana Division; (b) the Internal Revenue Service; (c) the twenty (20) largest unsecured creditors of the Debtor at its last known addresses; (d) Greenberg Traurig, LLP (Attn: Nancy A. Mitchell, Esq. and Jeffrey M. Wolf, Esq.), attorneys for the DIP Agent and the Prepetition Agent; (e) any party which has filed prior to such date a request for notices under Bankruptcy Rule 2002 with this Court; and (f) counsel for any Statutory Committee.

49.    <u>Objection Deadline</u>: Objections, if any, to the relief sought in the Motion shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the clerk of the Bankruptcy Court, and personally served upon (a) Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067 (Attn: David B. Golubchik, Esq.) counsel to the Debtor; (b) the Office of the United States Trustee, 411 W. Fourth Street, Suite 9041, Santa Ana, CA 92701-8000, Attn:  Michael Hauser, Esq.; (c) counsel to any Statutory Committee; (d) Greenberg Traurig, LLP, One International Place, Boston, MA 02110 (Attn: Nancy A. Mitchell, Esq. and Jeffrey M. Wolf, Esq.), attorneys for the DIP Agent and the Prepetition Agent; and (e) [_____], [_____] (Attn: [_____], Esq.), so that such objections are filed with the Court and received by said parties on or before 12 noon Eastern Time on [_____], 2015 with respect to entry of the Final Order.

50.    <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

51.    <u>Retention of Jurisdiction</u>.    The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

###

**EXHIBIT "2"**

# Anna's Linens, Inc. - DIP Budget

| | Week 1 6/21 | Week 2 6/28 | Week 3 7/5 | Week 4 7/12 | Week 5 7/19 | Week 6 7/26 | Week 7 8/2 | Week 8 8/9 | Week 9 8/16 | Week 10 8/23 | Week 11 8/30 | Week 12 9/6 | Week 13 9/13 | 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Receipts | 428 | - | - | - | - | - | - | - | - | - | - | - | - | 428 |
| Credit Card Receipts | 1,104 | - | - | - | - | - | - | - | - | - | - | - | - | 1,104 |
| **Total Operating Receipts** | **1,532** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **1,532** |
| | | | | | | | | | | | | | | |
| Guaranteed GOB Inventory Liquidation Proceeds | 5,056 | 7,617 | 46,269 | - | - | - | - | - | - | - | - | - | 14,735 | 73,677 |
| Sale of Intellectual Property | - | - | - | - | - | - | - | - | - | - | - | - | 500 | 500 |
| Sale Expense Reimbursement / Prefunding | 2,894 | 1,383 | 3,646 | 1,238 | 3,099 | 1,152 | 3,364 | 1,065 | 2,968 | 1,065 | 2,943 | 1,382 | 3,141 | 29,342 |
| Other | - | - | 326 | - | - | - | - | - | - | - | - | - | 200 | 526 |
| **Total Non-Operating Receipts** | **7,950** | **9,000** | **50,241** | **1,238** | **3,099** | **1,152** | **3,364** | **1,065** | **2,968** | **1,065** | **2,943** | **1,382** | **18,576** | **104,045** |
| **Total Receipts** | **9,482** | **9,000** | **50,241** | **1,238** | **3,099** | **1,152** | **3,364** | **1,065** | **2,968** | **1,065** | **2,943** | **1,382** | **18,576** | **105,576** |
| | | | | | | | | | | | | | | |
| Trade Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Freight and DC Costs | (2,333) | (303) | (246) | (158) | (131) | (87) | - | - | - | - | - | - | - | (3,259) |
| Customs Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DC Rents | (165) | - | (330) | - | - | - | - | - | - | - | - | - | - | (496) |
| **Total Trade & Freight Disbursements** | **(2,499)** | **(303)** | **(577)** | **(158)** | **(131)** | **(87)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(3,755)** |
| | | | | | | | | | | | | | | |
| Store Payroll | (1,371) | - | (1,546) | - | (1,586) | - | (1,586) | - | (1,586) | - | (1,586) | - | (2,779) | (12,039) |
| G&A Payroll | (432) | (194) | (120) | - | (120) | - | (120) | - | (108) | - | (95) | - | (119) | (1,307) |
| Benefits | (135) | (39) | (302) | - | (341) | - | (341) | - | (339) | - | (336) | - | (500) | (2,332) |
| **Payroll & Benefits Disbursements** | **(1,938)** | **(233)** | **(1,968)** | **-** | **(2,047)** | **-** | **(2,047)** | **-** | **(2,032)** | **-** | **(2,017)** | **-** | **(3,397)** | **(15,679)** |
| | | | | | | | | | | | | | | |
| Store Rents | (900) | - | (3,526) | (40) | - | - | - | (3,526) | (40) | - | - | (1,763) | - | (9,795) |
| Sales Taxes | (39) | (1,670) | (82) | (8) | (7) | (389) | (360) | - | - | - | - | - | - | (2,554) |
| Credit Card Fees | (3) | (3) | (327) | (80) | - | - | (396) | - | - | - | - | (342) | (69) | (1,218) |
| **Store Operating Disbursements** | **(941)** | **(1,673)** | **(3,935)** | **(127)** | **(7)** | **(389)** | **(756)** | **(3,526)** | **(40)** | **-** | **-** | **(2,105)** | **(69)** | **(13,568)** |
| | | | | | | | | | | | | | | |
| Corporate Rent | (33) | - | (66) | - | - | - | - | (66) | - | - | - | (66) | - | (233) |
| Utilities | (208) | (159) | (159) | (159) | (159) | (159) | (159) | (159) | (159) | (159) | (159) | (159) | (159) | (2,120) |
| Other | (1,058) | (118) | (118) | (118) | (88) | (88) | (88) | (88) | (88) | (88) | (88) | (88) | (88) | (2,205) |
| **Other Operating Disbursements** | **(1,299)** | **(277)** | **(344)** | **(277)** | **(247)** | **(247)** | **(247)** | **(314)** | **(247)** | **(247)** | **(247)** | **(314)** | **(247)** | **(4,558)** |
| **Net CF before Non-Operating Disbursements** | **2,805** | **6,513** | **43,418** | **675** | **667** | **429** | **314** | **(2,775)** | **649** | **818** | **679** | **(1,037)** | **14,863** | **68,017** |
| | | | | | | | | | | | | | | |
| **Non-Operating Cash Flow** | | | | | | | | | | | | | | |
| Interest & Fees | - | - | (442) | - | - | - | (110) | - | - | - | - | (118) | (154) | (824) |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Non-Operating Disbursements** | **-** | **-** | **(442)** | **-** | **-** | **-** | **(110)** | **-** | **-** | **-** | **-** | **(118)** | **(154)** | **(824)** |
| | | | | | | | | | | | | | | |
| **Restructuring** | | | | | | | | | | | | | | |
| Debtor Professional Fees | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (130) |
| DIP Lender Professional Fees | - | - | (90) | - | - | - | (120) | - | - | - | - | (150) | (65) | (425) |
| DIP Closing Costs / Exit Fee | (100) | - | - | - | - | - | - | - | - | - | - | - | (100) | (200) |
| UST Fees | - | - | (30) | - | - | - | - | - | - | - | - | - | - | (30) |
| 503(b)(9) Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Adequate Assurance / Utility Deposit | (358) | - | - | - | - | - | - | - | - | - | - | - | 300 | (58) |
| Professional Fee Escrow | (220) | (220) | (220) | (220) | (220) | (100) | (100) | (100) | (100) | (40) | - | - | - | (1,540) |
| Other Restructuring Disbursements | - | - | (1,050) | - | - | - | - | - | - | - | - | - | - | (1,050) |
| **Total Restructuring Disbursements** | **(688)** | **(230)** | **(1,400)** | **(230)** | **(230)** | **(110)** | **(230)** | **(110)** | **(110)** | **(50)** | **(10)** | **(160)** | **125** | **(3,433)** |
| **Net Receipts (Disbursements)- Book** | **2,117** | **6,283** | **41,576** | **445** | **437** | **319** | **(26)** | **(2,885)** | **539** | **768** | **669** | **(1,315)** | **14,834** | **63,761** |
| Incr. (Decr.) in Outstanding Checks | 841 | (616) | 2,091 | (1,698) | (449) | (112) | (28) | 2,238 | (1,661) | (404) | (110) | 14 | (71) | (0) |
| **Net Receipts (Disbursements)- Bank** | **2,959** | **5,667** | **43,667** | **(1,252)** | **(13)** | **207** | **(54)** | **(647)** | **(1,122)** | **327** | **559** | **(1,301)** | **14,763** | **63,761** |
| | | | | | | | | | | | | | | |
| **Beginning Pre-Petition Revolver Balance** | **63,706** | **54,224** | **45,224** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | |
| Borrowings/ (Repayments) | (9,482) | (9,000) | (45,224) | - | - | - | - | - | - | - | - | - | - | |
| **Ending Pre-Petition Revolver Balance** | **54,224** | **45,224** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | |
| | | | | | | | | | | | | | | |
| **Beginning Post-Petition Revolver Balance** | **-** | **6,523** | **9,856** | **11,413** | **12,665** | **12,678** | **12,471** | **12,525** | **13,171** | **14,293** | **13,966** | **13,407** | **14,708** | |
| Borrowings/ (Repayments) | 6,523 | 3,333 | 1,557 | 1,252 | 13 | (207) | 54 | 647 | 1,122 | (327) | (559) | 1,301 | (14,708) | |
| **Ending Post-Petition Revolver Balance** | **6,523** | **9,856** | **11,413** | **12,665** | **12,678** | **12,471** | **12,525** | **13,171** | **14,293** | **13,966** | **13,407** | **14,708** | **-** | |
| | | | | | | | | | | | | | | |
| Beginning Available Cash | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Receipts (Disbursements) | (6,523) | (3,333) | (1,557) | (1,252) | (13) | 207 | (54) | (647) | (1,122) | 327 | 559 | (1,301) | 14,763 | |
| **Available Cash** | **(6,523)** | **(3,333)** | **(1,557)** | **(1,252)** | **(13)** | **207** | **(54)** | **(647)** | **(1,122)** | **327** | **559** | **(1,301)** | **14,763** | |
| Revolver (Repayment) / Draw | 6,523 | 3,333 | 1,557 | 1,252 | 13 | (207) | 54 | 647 | 1,122 | (327) | (559) | 1,301 | (14,708) | |
| **Ending Available Cash** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **55** | |
| **Ending Unused Availability** | **3,455** | **5,226** | **44,335** | **2,070** | **2,058** | **2,264** | **2,211** | **1,564** | **442** | **770** | **1,328** | **27** | **14,735** | |

# EXHIBIT "3"

# Delaware

**PAGE       1**

## The First State

CERTIFICATE

SEARCHED JUNE 3, 2015, AT 12:35 P.M.
FOR DEBTOR "ANNA'S LINENS, INC."

```
  1 OF    21    LEASE                          71332856
          EXPIRATION DATE: APRIL 9, 2017
  DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVENUE                        ADDED 04-09-07
          COSTA MESA                    CA   92626
 SECURED: GENERAL ELECTRIC CAPITAL CORPORATION
          3031 N. ROCKY POINT DRIVE WEST,           ADDED 04-09-07
          SUITE 400
          TAMPA                         FL   33607  REMOVED 02-01-12
 SECURED: GENERAL ELECTRIC CAPITAL CORPORATION
          PO BOX 35713                              ADDED 02-01-12
          BILLINGS                      MT   59107--571
               F I L I N G   H I S T O R Y
 71332856  FILED 04-09-07    AT   4:36 P.M.   LEASE
 20411191  FILED 02-01-12    AT   3:45 P.M.   CONTINUATION
 20411225  FILED 02-01-12    AT   3:45 P.M.   AMENDMENT

  2 OF    21    LEASE                          72694262
          EXPIRATION DATE: JUNE 28, 2017
  DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVENUE                        ADDED 06-28-07
          COSTA MESA                    CA   92626
 SECURED: GENERAL ELECTRIC CAPITAL CORPORATION
          3031 NORTH ROCKY POINT DRIVE,             ADDED 06-28-07
          SUITE 400
          TAMPA                         FL   33607  REMOVED 04-16-12
 SECURED: GENERAL ELECTRIC CAPITAL CORPORATION
          PO BOX 35713                              ADDED 04-16-12
          BILLINGS                      MT   59107--571
               F I L I N G   H I S T O R Y
 72694262  FILED 06-28-07    AT   6:59 P.M.   LEASE
 21446394  FILED 04-16-12    AT  10:39 A.M.   CONTINUATION
 21446428  FILED 04-16-12    AT  10:39 A.M.   AMENDMENT

  3 OF    21    FINANCING STATEMENT            73302188
```

20152356979UCXL

150872145

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 2431898

DATE: 06-03-15

# Delaware

### The First State

```
          EXPIRATION DATE: AUGUST 29, 2017
 DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVENUE                        ADDED 08-29-07
          COSTA MESA               CA   92626
SECURED: UNION BANK OF CALIFORNIA, N.A.
          455 SOUTH FIGUEROA STREET, 13TH           ADDED 08-29-07
          FLOOR
          LOS ANGELES              CA   90071
              F I L I N G   H I S T O R Y
73302188  FILED 08-29-07    AT  2:58 P.M.   FINANCING STATEMENT
73343661  FILED 08-31-07    AT  8:15 P.M.   AMENDMENT
12070715  FILED 06-01-11    AT  5:19 A.M.   AMENDMENT
21096900  FILED 03-22-12    AT 11:54 A.M.   AMENDMENT
22906883  FILED 07-27-12    AT  8:03 P.M.   CONTINUATION
43361581  FILED 08-21-14    AT 12:32 P.M.   TERMINATION

   4 OF   21   LEASE                           81142734
          EXPIRATION DATE: MARCH 27, 2018
 DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVENUE                        ADDED 03-27-08
          COSTA MESA               CA   92626
SECURED: GENERAL ELECTRIC CAPITAL CORPORATION
          3031 NORTH ROCKY POINT DRIVE              ADDED 03-27-08
          WEST, SUITE 400
          TAMPA                    FL   33607     REMOVED 01-08-13
SECURED: GENERAL ELECTRIC CAPITAL CORPORATION
          PO BOX 35713                              ADDED 01-08-13
          BILLINGS                 MT   59107--571
              F I L I N G   H I S T O R Y
81142734  FILED 03-27-08    AT  5:16 P.M.   LEASE
30087594  FILED 01-08-13    AT 10:47 A.M.   CONTINUATION
30087602  FILED 01-08-13    AT 10:47 A.M.   AMENDMENT

   5 OF   21   FINANCING STATEMENT               92431945
          EXPIRATION DATE: JULY 29, 2014
 DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVE                           ADDED 07-29-09
          COSTA MESA               CA   92626
SECURED: DELL FINANCIAL SERVICES L.L.C.
          12234 N. IH-35 BLDG B                     ADDED 07-29-09
```

Jeffrey W. Bullock, Secretary of State

20152356979UCXL

150872145

AUTHENTICATION: 2431898

DATE: 06-03-15

# Delaware

PAGE    3

### The First State

```
        AUSTIN                    TX   78753
              F I L I N G    H I S T O R Y
92431945  FILED 07-29-09    AT  4:52 P.M.  FINANCING STATEMENT

   6 OF   21   FINANCING STATEMENT              92971452
        EXPIRATION DATE: SEPTEMBER 16, 2014
 DEBTOR: ANNA'S LINENS, INC.
        3550 HYLAND AVE                        ADDED 09-16-09
        COSTA MESA              CA  92626
SECURED: VARILEASE FINANCE INC.
        6340 SOUTH 3000 EAST SUITE 400         ADDED 09-16-09
        SALT LAKE CITY         UT  84121
              F I L I N G    H I S T O R Y
92971452  FILED 09-16-09    AT  6:55 P.M.  FINANCING STATEMENT
01647670  FILED 05-11-10    AT  6:15 P.M.  TERMINATION

   7 OF   21   LEASE                           93514194
        EXPIRATION DATE: NOVEMBER 2, 2014
 DEBTOR: ANNA'S LINENS, INC.
        3550 HYLAND AVENUE                     ADDED 11-02-09
        COSTA MESA              CA  92626
SECURED: CSI LEASING, INC.
        9990 OLD OLIVE STREET ROAD             ADDED 11-02-09
        SUITE 101
        ST. LOUIS              MO  63141
              F I L I N G    H I S T O R Y
93514194  FILED 11-02-09    AT  5:33 P.M.  LEASE
01479488  FILED 04-28-10    AT  3:32 P.M.  AMENDMENT

   8 OF   21   LEASE                           00891451
        EXPIRATION DATE: MARCH 16, 2015
 DEBTOR: ANNA'S LINENS, INC.
        3550 HYLAND AVENUE                     ADDED 03-16-10
        COSTA MESA              CA  92626
SECURED: CSI LEASING, INC.
        9990 OLD OLIVE STREET ROAD             ADDED 03-16-10
        SUITE 101
        SAINT LOUIS            MO  63141
              F I L I N G    H I S T O R Y
00891451  FILED 03-16-10    AT 11:28 A.M.  LEASE
```

Jeffrey W. Bullock, Secretary of State

20152356979UCXL

AUTHENTICATION: 2431898

150872145

DATE: 06-03-15

# Delaware

PAGE    4

## The First State

34784865  FILED 12-05-13    AT 10:54 A.M.   TERMINATION

  9 OF    21   FINANCING STATEMENT             01110604
          EXPIRATION DATE: MARCH 31, 2015
 DEBTOR: ANNA'S LINENS, INC.
          3560 HYLAND AVE                          ADDED 03-31-10
          COSTA MESA              CA   92626
SECURED: IBM CREDIT LLC
          1 NORTH CASTLE DRIVE                     ADDED 03-31-10
          ARMONK                 NY   10504
              F I L I N G   H I S T O R Y
01110604  FILED 03-31-10    AT  5:15 P.M.  FINANCING STATEMENT

 10 OF    21   FINANCING STATEMENT             04245357
          EXPIRATION DATE: DECEMBER 3, 2015
 DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVENUE                       ADDED 12-03-10
          COSTA MESA              CA   92626
SECURED: MACQUARIE EQUIPMENT FINANCE, LLC
          2285 FRANKLIN ROAD SUITE 100             ADDED 12-03-10
          BLOOMFIELD HILLS         MI   48302
              F I L I N G   H I S T O R Y
04245357  FILED 12-03-10    AT 10:05 A.M.  FINANCING STATEMENT
34713575  FILED 11-20-13    AT 10:00 A.M.  AMENDMENT
40023192  FILED 01-03-14    AT  2:39 P.M.  AMENDMENT

 11 OF    21   FINANCING STATEMENT             04245431
          EXPIRATION DATE: DECEMBER 3, 2015
 DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVENUE                       ADDED 12-03-10
          COSTA MESA              CA   92626
SECURED: MACQUARIE EQUIPMENT FINANCE, LLC
          2285 FRANKLIN ROAD SUITE 100             ADDED 12-03-10
          BLOOMFIELD HILLS         MI   48302
              F I L I N G   H I S T O R Y
04245431  FILED 12-03-10    AT 10:06 A.M.  FINANCING STATEMENT
34713682  FILED 11-20-13    AT 10:00 A.M.  AMENDMENT
40023218  FILED 01-03-14    AT  2:40 P.M.  AMENDMENT

 12 OF    21   LEASE                           10280738

Jeffrey W. Bullock, Secretary of State

20152356979UCXL                AUTHENTICATION: 2431898

150872145                      DATE: 06-03-15

# Delaware

**PAGE   5**

### The First State

```
          EXPIRATION DATE: JANUARY 25, 2016
  DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVENUE                      ADDED 01-25-11
          COSTA MESA                CA   92626
 SECURED: CSI LEASING, INC.
          9990 OLD OLIVE ST RD SUITE 101          ADDED 01-25-11
          ST. LOUIS               MO   63141
              F I L I N G   H I S T O R Y
 10280738  FILED 01-25-11   AT  3:42 P.M.  LEASE
 11150047  FILED 03-29-11   AT  3:18 P.M.  TERMINATION


   13 OF   21   FINANCING STATEMENT            13175448
          EXPIRATION DATE: AUGUST 16, 2016
  DEBTOR: ANNA'S LINENS, INC.
          3350HYLAND AVE                          ADDED 08-16-11
          COSTA MESA                CA   92626
 SECURED: JPMORGAN CHASE BANK, N.A.
          1111 POLARIS PARKWAY, SUITE A-3         ADDED 08-16-11
          COLUMBUS                OH   43240
              F I L I N G   H I S T O R Y
 13175448  FILED 08-16-11   AT  2:36 P.M.  FINANCING STATEMENT
 42982320  FILED 07-28-14   AT  8:27 A.M.  TERMINATION


   14 OF   21   FINANCING STATEMENT            13707885
          EXPIRATION DATE: SEPTEMBER 27, 2016
  DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVE                         ADDED 09-27-11
          COSTA MESA                CA   92626
 SECURED: JPMORGAN CHASE BANK, N.A.
          1111 POLARIS PARKWAY, SUITE A-3         ADDED 09-27-11
          COLUMBUS                OH   43240
              F I L I N G   H I S T O R Y
 13707885  FILED 09-27-11   AT  4:00 P.M.  FINANCING STATEMENT
 14184522  FILED 10-31-11   AT  8:15 A.M.  AMENDMENT
 21096785  FILED 03-22-12   AT 11:50 A.M.  AMENDMENT
 51119857  FILED 03-17-15   AT  3:42 P.M.  TERMINATION


   15 OF   21   FINANCING STATEMENT            14013663
          EXPIRATION DATE: OCTOBER 18, 2016
  DEBTOR: ANNA'S LINENS, INC.
```

Jeffrey W. Bullock, Secretary of State

20152356979UCXL

**AUTHENTICATION: 2431898**

150872145

**DATE: 06-03-15**

# Delaware

**PAGE     6**

### The First State

```
          3550 HYLAND AVE                          ADDED 10-18-11
          COSTA MESA                    CA   92626
SECURED: JPMORGAN CHASE BANK, N.A.
          1111 POLARIS PARKWAY, SUITE A-3          ADDED 10-18-11
          COLUMBUS                      OH   43240
                F I L I N G   H I S T O R Y
14013663  FILED 10-18-11    AT  3:34 P.M.  FINANCING STATEMENT


 16 OF   21   FINANCING STATEMENT                33745271
          EXPIRATION DATE: SEPTEMBER 25, 2018
 DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVENUE                       ADDED 09-25-13
          COSTA MESA                    CA   92626
SECURED: CORPORATION SERVICE COMPANY, AS REPRESENTATIVE
          P.O. BOX 2576 UCCSPREP ATCSCINFO.COM     ADDED 09-25-13
          SPRINGFIELD                   IL   62708    REMOVED 12-16-13
SECURED: SIGNATURE FINANCIAL LLC
          225 BROADHOLLOW ROAD                      ADDED 12-16-13
          MELVILLE                      NY   11747
                F I L I N G   H I S T O R Y
33745271  FILED 09-25-13    AT  5:08 P.M.  FINANCING STATEMENT
34962651  FILED 12-16-13    AT  2:29 P.M.  ASSIGNMENT


 17 OF   21   FINANCING STATEMENT                33939643
          EXPIRATION DATE: OCTOBER 8, 2018
 DEBTOR: ANNA'S LINENS, INC.
          3550 HYLAND AVENUE                       ADDED 10-08-13
          COSTA MESA                    CA   92626
SECURED: CORPORATION SERVICE COMPANY, AS REPRESENTATIVE
          P.O. BOX 2576 UCCSPREP ATCSCINFO.COM     ADDED 10-08-13
          SPRINGFIELD                   IL   62708    REMOVED 12-16-13
SECURED: STERLING NATIONAL BANK
          42 BROADWAY, 3RD FLOOR                    ADDED 12-16-13
          NEW YORK                      NY   10004
                F I L I N G   H I S T O R Y
33939643  FILED 10-08-13    AT  1:14 P.M.  FINANCING STATEMENT
34962701  FILED 12-16-13    AT  2:31 P.M.  ASSIGNMENT


 18 OF   21   FINANCING STATEMENT                33939668
          EXPIRATION DATE: OCTOBER 8, 2018
```

Jeffrey W. Bullock, Secretary of State

**20152356979UCXL**

**150872145**

**AUTHENTICATION: 2431898**

**DATE: 06-03-15**

# Delaware

*The First State*

```
    DEBTOR: ANNA'S LINENS, INC.
            3550 HYLAND AVENUE                          ADDED 10-08-13
            COSTA MESA                  CA   92626
   SECURED: CORPORATION SERVICE COMPANY, AS REPRESENTATIVE
            P.O. BOX 2576 UCCSPREP ATCSCINFO.COM      ADDED 10-08-13
            SPRINGFIELD                 IL   62708
                F I L I N G   H I S T O R Y
  33939668  FILED 10-08-13    AT  1:14 P.M.  FINANCING STATEMENT

    19 OF   21   FINANCING STATEMENT              34802840
            EXPIRATION DATE: DECEMBER 5, 2018
    DEBTOR: ANNA'S LINENS, INC.
            3550 HYLAND AVENUE                          ADDED 12-05-13
            COSTA MESA                  CA   92626
   SECURED: CALIFORNIA FIRST NATIONAL BANK
            28 EXECUTIVE PARK                          ADDED 12-05-13
            IRVINE                      CA   92614    REMOVED 12-23-13
   SECURED: STERLING NATIONAL BANK
            42 BROADWAY                                ADDED 12-23-13
            NEW YORK                    NY   10004
                F I L I N G   H I S T O R Y
  34802840  FILED 12-05-13    AT  6:39 P.M.  FINANCING STATEMENT
  35075909  FILED 12-23-13    AT 11:58 A.M.  AMENDMENT
  35076675  FILED 12-23-13    AT 12:15 P.M.  ASSIGNMENT
  40789602  FILED 02-28-14    AT  3:42 P.M.  TERMINATION

    20 OF   21   FINANCING STATEMENT              42569424
            EXPIRATION DATE: JUNE 30, 2019
    DEBTOR: ANNA'S LINENS, INC.
            3550 HYLAND AVE                            ADDED 06-30-14
            COSTA MESA                  CA   92626
   SECURED: CISCO SYSTEMS CAPITAL CORPORATION
            170 W. TASMAN DRIVE MS SJ13-3             ADDED 06-30-14
            SAN JOSE                    CA   95134
                F I L I N G   H I S T O R Y
  42569424  FILED 06-30-14    AT  2:23 P.M.  FINANCING STATEMENT

    21 OF   21   FINANCING STATEMENT              42852861
            EXPIRATION DATE: JULY 17, 2019
    DEBTOR: ANNA'S LINENS, INC.
```

Jeffrey W. Bullock, Secretary of State

*20152356979UCXL*

*150872145*

*AUTHENTICATION: 2431898*

*DATE: 06-03-15*

# Delaware

**PAGE    8**

## The First State

          *3550 HYLAND AVENUE                    ADDED 07-17-14*
          *COSTA MESA                  CA   92626*
*SECURED: SALUS CAPITAL PARTNERS, LLC, AS ADMINISTRATIVE AGENT AND*
          *COLLATERAL AGENT*
          *197 FIRST AVENUE, SUITE 250           ADDED 07-17-14*
          *NEEDHAM                     MA   02494*
             *F I L I N G   H I S T O R Y*
*42852861  FILED 07-17-14    AT  4:53 P.M.  FINANCING STATEMENT*
          *E N D   O F   F I L I N G   H I S T O R Y*

     *THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE*
*ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING*
*STATEMENTS, LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND*
*UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE*
*ABOVE DEBTOR, AS OF MAY 12, 2015 AT 11:59 P.M.*

Jeffrey W. Bullock, Secretary of State

*20152356979UCXL*

*150872145*

*AUTHENTICATION: 2431898*

*DATE: 06-03-15*

Report Date:  May 13, 2015

ASK US ABOUT UCC eZFILE®
800.952.5696



# CLAS INFORMATION SERVICES

2020 Hurley Way, Suite 350, Sacramento, CA 95825
Local: 916/564-7800 Fax: 916/564-7900 Toll Free: 800/952-5696

## UCC Search Report

**Type of Search :** UCCs, Federal Tax Liens, State Tax Liens, and Judgments

**Jurisdiction/Filing Office :** State of California, Secretary of State Uniform Commercial Code Division

**Effective Index Date :** May. 5, 2015

**Subject Search Name :** ANNA'S LINENS, INC.

**Search Key Entered :** ANNASLINENSINC

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of California, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein.
**Certification can only be obtained through the office of the California Secretary of State.**

**1. UCC Financing Statement**

    **Document No. :** 20157456875745      **Lapses:** 3/27/2020

    **Filed :** 3/27/2015

    **Debtor :** ANNA'S LINENS, INC.
             3550 HYLAND AVE
             COSTA MESA  CA  92626

    **Secured Party:** XEROX FINANCIAL SERVICES
             45 GLOVER AVE.
             NORWALK  CT  06856

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- **END OF REPORT** ----------

**Report Parameters**

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

# EXHIBIT "4"

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 04:53 PM 07/17/2014
INITIAL FILING # 2014 2852861

SRV: 140968177

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Daniel Blanchard, Esq.
Greenberg Traurig, LLP
One International Place
Boston, MA  02109

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Anna's Linens, Inc. | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3550 Hyland Avenue | Costa Mesa | CA | 92626 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Salus Capital Partners, LLC, as Administrative Agent and Collateral Agent | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 197 First Avenue, Suite 250 | Needham | MA | 02494 | USA |

4. COLLATERAL:  This financing statement covers the following collateral:

All assets now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box.
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Delaware Secretary of State (137025.014000)

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d)(1) AND 364(e), AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (IV) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 15, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Todd M Arnold    tma@lnbyb.com
- Dustin P Branch    dustin.branch@kattenlaw.com, jessica.mickelsen@kattenlaw.com;brian.huben@kattenlaw.com;adelle.shafer@kattenlaw.com;donna.carolo@kattenlaw.com
- John-Patrick M Fritz    jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com
- David B Golubchik    dbg@lnbyb.com, dbg@ecf.inforuptcy.com
- Michael J Hauser    michael.hauser@usdoj.gov
- Eve H Karasik    ehk@lnbyb.com
- Mette H Kurth    mkurth@foxrothschild.com, vcordi@foxrothschild.com;pchlum@foxrothschild.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

**2.    SERVED BY UNITED STATES MAIL**: On **June 15, 2015**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 15, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1

***Served via Attorney Service***
Hon. Theodor C. Albert
2  United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse
3  411 West Fourth Street, Suite 5085 / Courtroom 5B
Santa Ana, CA 92701-4593
4

5  I declare under penalty of perjury under the laws of the United States of America that the foregoing is
true and correct.

6

  June 15, 2015          Stephanie Reichert                    /s/ Stephanie Reichert
7    *Date*                    *Type Name*                         *Signature*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                              **F 9013-3.1.PROOF.SERVICE**