DAVID B. GOLUBCHIK (SBN 185520)
EVE H. KARASIK (SBN 155356)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: dbg@lnbyb.com, ehk@lnbyb.com, jyo@lnbyb.com,

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>ANNA'S LINENS, INC.,<br><br>            Debtor. | Case No. 8:15-bk-13008-TA<br><br>Chapter 11<br><br>**APPENDIX OF SUPPLEMENTAL EXHIBITS IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:**<br>**(I)  AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d)(1) AND 364(e), AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;**<br>**(II)  GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364;**<br>**(III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND**<br>**(IV) GRANTING RELATED RELIEF**<br><br>DATE:     June 16, 2015<br>TIME:     2:00 p.m.<br>PLACE:   Courtroom 5B<br>             411 West Fourth Street<br>             Santa Ana, California |

Anna's Linens, Inc., the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, hereby submits its Appendix of Supplemental Exhibits In Support of Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Debtor to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d)(1) and 364(e), and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Pre-Petition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (IV) Granting Related Relief, as follows:

- **Exhibit "1"**        -        Credit Agreement among Anna's Linens, Inc., as Borrower, Salus Capital Partners, LLC, as Administrative Agent and Collateral Agent, and the Other Lenders Party Thereto (without its exhibits, schedules, or documents and agreements related thereto, except for that certain "Fee Letter" dated July 18, 2014).

- **Exhibit "2"**        -        First Amendment and Waiver to Credit Agreement.

Dated: June 15, 2015                    ANNA'S LINENS, INC.

By:    */s/ David B. Golubchik*
          DAVID B. GOLUBCHIK
          EVE H. KARASIK
          JULIET Y. OH
          LEVENE, NEALE, BENDER, YOO
              & BRILL L.L.P.
          Proposed Attorneys for Debtor and
          Debtor in Possession

2

**EXHIBIT "1"**

CREDIT AGREEMENT

among

**ANNA'S LINENS, INC.,**

as Borrower

**SALUS CAPITAL PARTNERS, LLC**
as Administrative Agent and Collateral Agent,

and

The Other Lenders Party Thereto

July 18, 2014

| **DOCUMENT** | **TAB NO.** |
| --- | --- |
| Credit Agreement | 1 |
| Exhibits to the Credit Agreement | 2 |

| | |
| --- | --- |
| Exhibit A | Borrowing Notice |
| Exhibit B | Tranche A Note |
| Exhibit B-1 | Tranche A-1 Note |
| Exhibit C | Compliance Certificate |
| Exhibit D | Assignment and Assumption |
| Exhibit E | Borrowing Base Certificate |
| Exhibit F | Credit Card Notification |
| Exhibit G | DDA Notification |
| Exhibit H | Initial Business Plan |

| | |
| --- | --- |
| Schedules to Credit Agreement | 3 |
| Fee Letter | 4 |
| Tranche A Revolving Notes | 5 |
| Tranche A-1 Revolving Notes | 6 |
| Security Agreement | 7 |
| Perfection Certificate | 8 |
| UCC-1 Financing Statement | 9 |
| Trademark Security Agreement | 10 |
| Disqualified Lender's Letter | 11 |

**DOCUMENT**                                                    **TAB NO.**


Deposit Account Control Agreements                                    12

A.    Deposit Account Control Agreement (Access Restricted Immediately) by and
      among Anna's Linens, Inc., Agent and Wells Fargo Bank, National
      Association
B.    Special Deposit Account Control Agreement (Security Interest in Deposit
      Account - Contingency) by and among Anna's Linens, Inc., Agent and MUFG
      Union Bank, N.A.
C.    Special Deposit Account Control Agreement (Security Interest in Deposit
      Account) by and among Anna's Linens, Inc., Agent and MUFG Union Bank,
      N.A.
D.    Blocked Account Control Agreement ("Automatic Sweep/Frozen Account") by
      and among Anna's Linens, Inc., Agent and JPMorgan Chase Bank, N.A.
E.    Deposit Account Control Agreement (Non-Springing – Sweep) by and among
      Anna's Linens, Inc., Agent and Capital One, National Association
F.    Special Deposit Account Control Agreement (Security Interest in Deposit
      Account) by and among Anna's Linens, Inc., Agent and Banco Popular de
      Puerto Rico


Collateral Access Agreements                                          13

A.    10721 Jasmine Street, Fontana, California  927337
B.    400 Dividend, Coppell, Texas  75019
C     10230 Ridge Creek Drive, Charlotte, North Carolina 28273


Warehouseman Agreements                                              14

A.    Exel Inc.
B.    Performance Team
C.    Crowley Caribbean Logistics, LLC


Customs Broker Agreements                                            15

A.    Expeditors International of Washington, Inc.

| DOCUMENT | TAB NO. |
|---|---|
| Secretary's Certificate of Anna's Linens, Inc., including attachments and attesting to incumbency: | 16 |
| Exhibit A - Certified copy of Certificate of Incorporation (immediately prior to equity transaction); | |
| Exhibit B - Certified copy of the Certificate of Incorporation (immediately following the equity transaction); | |
| Exhibit C – By-Laws; | |
| Exhibit D - Amended and Restated By-Laws; | |
| Exhibit E - Authorizing Resolutions; | |
| Exhibit F - Legal Existence & Good Standing Certificate (state of incorporation); and | |
| Exhibit G - Certificate(s) of Foreign Qualification. | |
| Collateral Assignment of Life Insurance Policy | 17 |
| Payoff Letter for Union Bank of California, N.A. | 18 |
| UCC-3 termination for Union Bank of California, N.A. and other releases | 19 |
| Lien Searches and Intellectual Property Searches | 20 |
| Closing and Solvency Certificate | 21 |
| Disbursement Letter | 22 |
| Legal Opinion | 23 |
| Publicity Consent Letter | 24 |
| Insurance Review | 25 |

Execution Version

# CREDIT AGREEMENT

Dated as of July 18, 2014

among

**ANNA'S LINENS, INC.,**
as the Borrower

**SALUS CAPITAL PARTNERS, LLC,**
as Administrative Agent and Collateral Agent,

**SALUS CAPITAL PARTNERS, LLC and DCP LINENS LENDER, LLC,**
as Co-Tranche A-1 Agents,

and

The Other Lenders Party Hereto

Article I
DEFINITIONS AND ACCOUNTING TERMS ........................................................ - 1 -
   1.01    Defined Terms ............................................................................ - 1 -
   1.02    Other Interpretive Provisions.................................................... - 1 -
   1.03    Accounting Terms Generally..................................................... - 44 -
   1.04    Rounding .................................................................................. - 45 -
   1.05    Times of Day ............................................................................ - 46 -
   1.06    Letter of Credit Amounts.......................................................... - 46 -

Article II
THE COMMITMENTS AND CREDIT EXTENSIONS ....................................... - 46 -
   2.01    Loans; Reserves....................................................................... - 46 -
   2.02    Borrowings and of Loans......................................................... - 47 -
   2.03    Letters of Credit........................................................................ - 49 -
   2.04    Reserved. .................................................................................. - 55 -
   2.05    Prepayments............................................................................. - 55 -
   2.06    Termination or Reduction of Commitments.............................. - 57 -
   2.07    Repayment of Loans................................................................. - 57 -
   2.08    Interest. ..................................................................................... - 58 -
   2.09    Fees........................................................................................... - 58 -
   2.10    Computation of Interest and Fees; Application of Payments ..... - 58 -
   2.11    Evidence of Debt....................................................................... - 59 -
   2.12    Payments Generally; Agent's Clawback. .................................. - 59 -
   2.13    Sharing of Payments by Lenders ............................................. - 61 -
   2.14    Settlement Amongst Lenders.................................................... - 62 -
   2.15    Defaulting Lenders. .................................................................. - 62 -

Article III
TAXES, YIELD PROTECTION AND ILLEGALITY;
APPOINTMENT OF BORROWER..................................................................... - 64 -
   3.01    Taxes......................................................................................... - 64 -
   3.02    Illegality.................................................................................... - 66 -
   3.03    Inability to Determine Rates..................................................... - 66 -
   3.04    Increased Costs; Reserves on LIBO Rate Loans. ..................... - 67 -
   3.05    Reserved .................................................................................. - 68 -
   3.06    Mitigation Obligations; Replacement of Lenders .................... - 68 -
   3.07    Survival..................................................................................... - 69 -

i

BOS 47487387v10

Article IV

CONDITIONS PRECEDENT TO CREDIT EXTENSIONS.................................................- 69 -

4.01    Conditions of Initial Credit Extension...................................................- 69 -

4.02    Conditions to all Credit Extensions ......................................................- 72 -

Article V

REPRESENTATIONS AND WARRANTIES.................................................................- 73 -

5.01    Existence, Qualification and Power.......................................................- 73 -

5.02    Authorization; No Contravention ..........................................................- 74 -

5.03    Governmental Authorization; Other Consents ......................................- 74 -

5.04    Binding Effect........................................................................................- 74 -

5.05    Financial Statements; No Material Adverse Effect................................- 74 -

5.06    Litigation ...............................................................................................- 75 -

5.07    No Default ..............................................................................................- 75 -

5.08    Ownership of Property; Liens.................................................................- 75 -

5.09    Environmental Compliance....................................................................- 76 -

5.10    Insurance................................................................................................- 77 -

5.11    Taxes......................................................................................................- 77 -

5.12    ERISA Compliance.................................................................................- 77 -

5.13    Subsidiaries; Equity Interests ...............................................................- 78 -

5.14    Margin Regulations; Investment Company Act .....................................- 78 -

5.15    Disclosure ..............................................................................................- 79 -

5.16    Compliance with Laws ...........................................................................- 79 -

5.17    Intellectual Property; Licenses ..............................................................- 79 -

5.18    Labor Matters ........................................................................................- 79 -

5.19    Security Documents................................................................................- 80 -

5.20    Solvency .................................................................................................- 80 -

5.21    Deposit Accounts; Credit Card Arrangements.......................................- 81 -

5.22    Brokers...................................................................................................- 81 -

5.23    Customer and Trade Relations ..............................................................- 81 -

5.24    Material Contracts .................................................................................- 81 -

5.25    Casualty .................................................................................................- 81 -

5.26    Business Plan .........................................................................................- 81 -

5.27    Personally Identifiable Information........................................................- 82 -

Article VI

AFFIRMATIVE COVENANTS ...................................................................................- 82 -

ii

6.01   Financial Statements ................................................................. - 82 -

6.02   Certificates; Other Information ............................................... - 83 -

6.03   Notices ....................................................................................... - 85 -

6.04   Payment of Obligations ............................................................ - 86 -

6.05   Preservation of Existence, Etc. ................................................ - 86 -

6.06   Maintenance of Properties ........................................................ - 86 -

6.07   Maintenance of Insurance. ....................................................... - 87 -

6.08   Compliance with Laws ............................................................. - 88 -

6.09   Books and Records; Accountants. ............................................ - 88 -

6.10   Inspection Rights. ..................................................................... - 89 -

6.11   Use of Proceeds ........................................................................ - 90 -

6.12   Additional Loan Parties ........................................................... - 90 -

6.13   Cash Management. .................................................................... - 90 -

6.14   Information Regarding the Collateral. ...................................... - 92 -

6.15   Physical Inventories. ................................................................ - 93 -

6.16   Environmental Laws. ................................................................ - 94 -

6.17   Further Assurances. .................................................................. - 94 -

6.18   Compliance with Terms of Leaseholds .................................... - 95 -

6.19   Material Contracts .................................................................... - 95 -

6.20   Business Plan ............................................................................ - 95 -

6.21   Employee Benefit Plans. ........................................................... - 95 -

6.22   Consultants ............................................................................... - 96 -

6.23   Board Observer Rights. ............................................................ - 97 -

6.24   Key-Person Life Insurance Policy ........................................... - 98 -

6.25   Inactive Subsidiary ................................................................... - 98 -

6.26   Post-Closing Obligations .......................................................... - 98 -

Article VII
NEGATIVE COVENANTS .................................................................... - 98 -

7.01   Liens .......................................................................................... - 98 -

7.02   Investments. .............................................................................. - 99 -

7.03   Indebtedness; Disqualified Stock ............................................. - 99 -

7.04   Fundamental Changes. .............................................................. - 99 -

7.05   Dispositions .............................................................................. - 99 -

7.06   Restricted Payments ............................................................... - 100 -

7.07   Prepayments of Indebtedness ................................................. - 100 -

iii

7.08    Change in Nature of Business ............................................................- 100 -

7.09    Transactions with Affiliates...............................................................- 100 -

7.10    Burdensome Agreements.....................................................................- 100 -

7.11    Use of Proceeds ..................................................................................- 101 -

7.12    Amendment of Material Documents ...................................................- 101 -

7.13    Fiscal Year ..........................................................................................- 101 -

7.14    Deposit Accounts; Credit Card Processors.........................................- 101 -

7.15    Financial Covenants ...........................................................................- 101 -

Article VIII
EVENTS OF DEFAULT AND REMEDIES ......................................................- 102 -

8.01    Events of Default.................................................................................- 102 -

8.02    Remedies Upon Event of Default........................................................- 106 -

8.03    Application of Funds ...........................................................................- 107 -

Article IX
THE AGENT ......................................................................................................- 108 -

9.01    Appointment and Authority.................................................................- 108 -

9.02    Rights as a Lender ...............................................................................- 108 -

9.03    Exculpatory Provisions .......................................................................- 109 -

9.04    Reliance by Agent ...............................................................................- 110 -

9.05    Delegation of Duties............................................................................- 110 -

9.06    Resignation of Agent ...........................................................................- 110 -

9.07    Non-Reliance on Agent and Other Lenders ........................................- 111 -

9.08    Agent May File Proofs of Claim .........................................................- 111 -

9.09    Collateral and Guaranty Matters.........................................................- 112 -

9.10    Notice of Transfer................................................................................- 112 -

9.11    Reports and Financial Statements........................................................- 113 -

9.12    Agency for Perfection..........................................................................- 113 -

9.13    Indemnification of Agent.....................................................................- 113 -

9.14    Relation among Lenders ......................................................................- 114 -

Article X
MISCELLANEOUS ...........................................................................................- 114 -

10.01    Amendments, Etc................................................................................- 114 -

10.02    Notices; Effectiveness; Electronic Communications. ........................- 116 -

10.03    No Waiver; Cumulative Remedies .....................................................- 117 -

10.04    Expenses; Indemnity; Damage Waiver. .............................................- 118 -

iv

10.05   Payments Set Aside ............................................................................- 119 -

10.06   Successors and Assigns. ......................................................................- 120 -

10.07   Treatment of Certain Information; Confidentiality .............................- 124 -

10.08   Right of Setoff....................................................................................- 125 -

10.09   Interest Rate Limitation .....................................................................- 125 -

10.10   Counterparts; Integration; Effectiveness ...........................................- 126 -

10.11   Survival...............................................................................................- 126 -

10.12   Severability ........................................................................................- 126 -

10.13   Replacement of Lenders .....................................................................- 126 -

10.14   Governing Law; Jurisdiction; Etc.......................................................- 127 -

10.15   Waiver of Jury Trial ..........................................................................- 128 -

10.16   No Advisory or Fiduciary Responsibility............................................- 129 -

10.17   USA PATRIOT Act Notice ................................................................- 129 -

10.18   Foreign Asset Control Regulations.....................................................- 130 -

10.19   Time of the Essence............................................................................- 130 -

10.20   Press Releases; Non-Disclosure. ........................................................- 130 -

10.21   Additional Waivers.............................................................................- 131 -

10.22   No Strict Construction .......................................................................- 132 -

10.23   Attachments .......................................................................................- 132 -

10.24   Preferred Equity.................................................................................- 132 -

BOS 47487387v10

**SCHEDULES**

| | |
|---|---|
| 2.01 | Commitments and Applicable Percentages |
| 5.01 | Loan Parties Organizational Information |
| 5.06 | Litigation |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.13 | Subsidiaries; Equity Interests |
| 5.17 | Intellectual Property Matters |
| 5.18 | Collective Bargaining Agreements |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 6.26 | Post-Closing Obligations |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Borrowing Notice |
| B-1 | Tranche A Note |
| B-2 | Tranche A-1 Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Borrowing Base Certificate |
| F | Credit Card Notification |
| G | DDA Notification |
| H | Initial Business Plan |

CREDIT AGREEMENT

This CREDIT AGREEMENT ("Agreement") is entered into as of July 18, 2014, among ANNA's LINENS, INC., a Delaware corporation (the "Borrower"), each Lender from time to time party hereto, SALUS CAPITAL PARTNERS, LLC ("Salus"), as Administrative Agent and Collateral Agent (the "Agent"), and Salus and DCP LINENS LENDER, LLC, as co-Tranche A-1 Agents (individually and collectively, the "Tranche A-1 Agent").

The Borrower has requested that the Lenders provide it a revolving credit facility and certain other financial accommodations, and the Lenders have indicated their willingness to lend, in each case on the terms and conditions set forth herein.

All Obligations of the Loan Parties to the Lenders hereunder and under the other Loan Documents shall be full recourse to each of the Loan Parties and secured by the Agent's security interest in and liens on all or substantially all of the assets of the Loan Parties included in the Collateral.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms.** As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Document of Title" means, with respect to any Inventory, a tangible, negotiable bill of lading or other Document (as defined in the UCC) that (a) is issued by a common carrier which is not an Affiliate of the Approved Foreign Vendor or any Loan Party which is in actual possession of such Inventory, (b) is issued to the order of a Loan Party or, if so requested by the Agent, to the order of the Agent, (c) names the Agent as a notify party and bears a conspicuous notation on its face of the Agent's security interest therein, (d) is not subject to any Lien (other than in favor of the Agent and non-consensual Permitted Liens), and (e) is on terms otherwise reasonably acceptable to the Agent.

"ACH" means automated clearing house transfers.

"Accommodation Payment" as defined in Section 10.21(d).

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or

- 1 -

authorized to operate the game by a state or governmental unit of a state. The term "Account" includes health-care-insurance receivables.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, a more than fifty percent (50%) of the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or more than fifty percent (50%) of Equity Interests of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Act" shall have the meaning provided in Section 10.17.

"Adjusted LIBO Rate" means an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent) equal to (i) the LIBO Rate multiplied by (ii) the Statutory Reserve Rate. The Adjusted LIBO Rate will be adjusted automatically as of the effective date of any change in the Statutory Reserve Rate.

"Administrative Agent" means Salus in its capacity as administrative agent under any of the Loan Documents, or any successor thereto in such capacities.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding ten percent (10%) or more of any class of the Equity Interests of that Person, and (iv) any other Person ten percent (10%) or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means Salus in its capacity as Administrative Agent and Collateral Agent under any of the Loan Documents, or any successor thereto in such capacities.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Borrower and the Lenders.

"Agent Party" shall have the meaning specified in Section 10.02(c).

"Aggregate Commitments" means the sum of the Aggregate Tranche A Commitments and the Aggregate Tranche A-1 Commitments of all of the Lenders. As of the Closing Date, the Aggregate Commitments are $80,000,000.

"Aggregate Tranche A Commitments" means the sum of the Tranche A Commitment(s) of all the Tranche A Lenders. As of the Closing Date, the Aggregate Tranche A Commitments are $70,000,000.

- 2 -

"Aggregate Tranche A-1 Commitments" means the sum of the Tranche A-1 Commitment(s) of all of the Tranche A-1 Lenders. As of the Closing Date, the Aggregate Tranche A-1 Commitments are $10,000,000.

"Agreement" means this Credit Agreement.

"Allocable Amount" has the meaning specified in Section 10.21(d).

"Applicable Margin" has the meaning specified in the Fee Letter.

"Applicable Percentage" means, in each case as the context requires, (a) with respect to each Credit Extension under the Tranche A Commitments, the Tranche A Applicable Percentage, (b) with respect to each Credit Extension under the Tranche A-1 Commitments, the Tranche A-1 Applicable Percentage and (c) with respect to all Lenders at any time, the percentage of the sum of the Aggregate Commitments represented by the sum of such Lender's Commitments at such time. If the Tranche A Commitments or the Tranche A-1 Commitments have been terminated pursuant to Section 2.05 or Section 8.02 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraised Value" means with respect to Eligible Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory as set forth in the inventory stock ledger of the Borrower, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent.

"Approved Foreign Vendor" means a Foreign Vendor which (a) is located in any country acceptable to the Agent in its Permitted Discretion, (b) has received payment in a manner consistent with the Business Plan or performance of all obligations owed to it by the Loan Parties, (c) has not asserted and has no right to assert any reclamation, repossession, diversion, stoppage in transit, Lien or title retention rights in respect of such Inventory, and (d), if so requested by the Agent, has entered into and is in compliance in all material respects with the terms of a Foreign Vendor Agreement.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of **Exhibit D** or any other form approved by the Agent.

- 3 -

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Audited Financial Statements" means the draft audited consolidated balance sheet of the Borrower and its Subsidiaries for the Fiscal Year ended February 2, 2014, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Borrower and its Subsidiaries, including the notes thereto.

"Auto-Extension Letter of Credit" shall have the meaning specified in Section 2.03(b)(ii).

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

(a)     the Maximum Loan Amount

        minus

(b)     the Total Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Borrower shall certify to the Agent that all accounts payable (including, without limitation, all rents) are being paid in a manner consistent with the Business Plan and Taxes are being paid on a timely basis subject to the right to contest the same as provided in Section 6.04; provided, that with respect to Credit Extensions made on the Closing Date, such certification with respect to rents shall apply to rents due in June 2014 or prior to such time, which shall have been paid by July 7, 2014.

"Availability Block" means an amount equal to three percent (3.0%) of the lesser of (a) Formula Availability, and (b) the Aggregate Commitments.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Lender to make Loans and of the obligation of each L/C Issuer to make L/C Credit Extensions pursuant to Section 8.02.

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial

- 4 -

performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists.  Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion, (but are not limited to) reserves based on: (i) rent in an amount equal to two (2) months' rent for leased properties located in a Landlord Lien State for which Agent is not party to a Collateral Access Agreement; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of any Borrower, (v) Customer Credit Liabilities; (vi) Customer Deposits; (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals; (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral; (ix) amounts due to vendors on account of consigned goods; (x) royalties payable in respect of licensed merchandise; and (xi) the Expeditors Reserve.

"Base Rate" means a variable rate of interest per annum equal to the prime rate of interest from time to time published by www.bankrate.com.  The applicable prime rate for any date not set forth therein shall be the rate set forth the immediately preceding date.  In the event that www.bankrate.com ceases to publish a prime rate or its equivalent, the term "Base Rate" shall mean a variable rate of interest per annum equal to the highest of the "prime rate", "reference rate", "base rate", or other similar rate announced from time to time by any of the three largest banks (based on combined capital and surplus) headquartered in New York, New York and published in The Wall Street Journal (with the understanding that any such rate may merely be a reference rate and may not necessarily represent the lowest or best rate actually charged to any customer by any such bank or by the Agent or any Lender).

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Blocked Account" has the meaning provided in Section 6.13(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the bank maintaining such account agrees, to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" means any Borrowing Base information, reports, financial statements and other materials delivered by the Borrower hereunder, as well as other Reports and information provided by the Agent to the Lenders.

BOS 47487387v10

"Borrowing" means a borrowing of Tranche A Loans or Tranche A-1 Loans, as applicable.

"Borrowing Base" means, at any time of calculation, an amount equal to without duplication:

(a)     the lesser of (i) Formula Availability and (ii) $80,000,0000;

minus

(b)     the Availability Block;

minus

(c)     the then amount of all Availability Reserves.

"Borrowing Base Certificate" means a certificate substantially in the form of **Exhibit E** hereto (with such changes therein as may be required by the Agent to reflect the components of and Reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent.

"Borrowing Notice" means a notice of a Borrowing, pursuant to Section 2.02, which, if in writing, shall be substantially in the form of **Exhibit A**.

"Business" means business of the Borrower as of the Closing Date.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Business Plan" means, (i) the Initial Business Plan, and (ii) with respect to any Fiscal Year for time periods commencing after the Initial Business Plan, a detailed forecast prepared by management of the Borrower for such Fiscal Year, which shall include (without limitation) an Availability model, Consolidated income statement, balance sheet, and statement of cash flow, by month, each prepared in conformity with GAAP (as applicable) and consistent with the Borrower's then current practices, Borrower's anticipated schedule of Store closings and projected costs on a closing Store by closing Store basis, and such other information (financial or otherwise) as is reasonably requested by the Agent, and (iii) any revisions to such forecast, in each case in form and substance satisfactory to the Agent in its Permitted Discretion. For the avoidance of doubt, a draft or preliminary plan submitted by the Borrower to the Agent shall not be deemed the "Business Plan" hereunder until it has been finalized and accepted by the Borrower and the Agent.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations

- 6 -

are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP. For the avoidance of doubt, "Capital Lease Obligations" shall not include obligations or liabilities of any Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as existing on the Closing Date.

"Cash Collateral Account" means a non-interest bearing account established by one or more of the Loan Parties with an L/C Issuer, in which deposits are required to be made in accordance with Sections 2.03(g), Section 2.04 or 8.02(c).

"Cash Collateralize" means to pledge and deposit with or deliver to the applicable L/C Issuer, for its benefit, as collateral for the applicable L/C Obligations, cash or deposit account balances or, if the Agent and the applicable L/C Issuer shall otherwise agree in their sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to the Agent and the applicable L/C Issuer (which documentation is hereby Consented to by the Lenders). "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, for the purposes of this Agreement: (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)      at any time, the Permitted Holders shall fail to own beneficially (within the meaning of Rule 13d-5 of the Exchange Act) and control, directly or indirectly, in the aggregate, outstanding Equity Interests representing at least a majority of the aggregate (i) ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or (ii) the issued and outstanding shares of Equity Interests of the Borrower, whether or not having the power to vote;

- 7 -

(b)    at any time, the Permitted Holders shall fail to own beneficially (within the meaning of Rule 13d-5 of the Exchange Act) and control, directly or indirectly, in the aggregate, outstanding Equity Interests representing at least a majority of the economic interests in the Borrower;

(c)    during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(d)    any Person or two or more Persons acting in concert other than the Permitted Holders shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Borrower, or control over the Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such Person or Persons have the right to acquire pursuant to any option right) representing twenty-five percent (25%) or more of the combined voting power of such securities; or

(e)    any "change in control" or "sale" or "disposition" or similar event as defined in any Organizational Document of any Loan Party or in any Material Contract, or any document governing Material Indebtedness of any Loan Party, and including, without limitation, any sale, transfer or other disposition of all or substantially all of the assets of the Borrower;

(f)    the Borrower fails at any time to own, directly or indirectly, one-hundred percent (100%) of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents; or

(g)    the Chief Executive Officer as of the Closing Date shall for any reason either cease to hold such office or be actively engaged in the day-to-day management of the Borrower, unless a successor with similar industry experience, reputation and expertise and satisfactory to the Lenders is appointed within fifteen (15) Business Days of such cessation.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

- 8 -

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, or (b) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Agent as the Agent may reasonably require.

"Collateral Assignment of Key Person Life Insurance Policy" means the Assignment of the Key Person Life Insurance Policy as Collateral relative to the Key Person Life Insurance Policy, to be executed by the owner and beneficiary of such policy and acknowledged by the applicable insurer, in form and substance reasonably satisfactory to Agent, assigning to Agent all right, title and interest of the Borrower in the Key Person Life Insurance Policy.

"Collateral Agent" means Salus in its capacity as collateral agent under any of the Loan Documents, or any successor thereto in such capacities.

"Collateral Coverage Ratio" means as of any date of determination, the ratio of (a) Formula Availability to (b) Total Outstandings for the trailing three-month period ending as of the last day of the Fiscal Month.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

"Commercial Letter of Credit Agreement" means the Commercial Letter of Credit Agreement relating to the issuance of a Commercial Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"Commitment" means, as to each Lender, such Lender's Tranche A Commitment and Tranche A-1 Commitment, as applicable.

"Compliance Certificate" means a certificate substantially in the form of **Exhibit D**.

"Concentration Account" has the meaning provided in Section 6.13(c).

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Lender from the Agent

BOS 47487387v10

of a proposed course of action to be followed by the Agent without such Lender giving the Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is contractually bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.    "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Disbursement Account" the DDA with account number 908-001-3598 in the name of the Borrower maintained at Union Bank, N.A.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrower's accounting practices, known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrower, the Borrower's purchase journals or the Borrower's stock ledger.    "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrower's calculation of cost of goods sold.

"Credit Card Issuer" shall mean any person (other than the Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in Section 6.13(a)(i).

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

- 10 -

"Credit Extensions" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) the Tranche A-1 Agents, (iv) each L/C Issuer, (v) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (vi) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (vii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" mean (a) all reasonable and documented allocable expenses incurred by the Agent, the Tranche A-1 Agents, any Lender and its Affiliates in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, Tranche A-1 Agents and Lenders, (B) outside consultants for the Agent, (C) appraisers, (D) commercial finance examinations, and (E) all such reasonable and documented allocable expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication or financing of the credit facilities provided for herein, including any fees or expenses incurred in connection with obtaining a rating for such credit facilities, (B) the preparation, negotiation, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the administration of this Agreement and the other Loan Documents or (D) the enforcement or protection of the rights of the Credit Parties in connection with this Agreement or the Loan Documents or efforts to monitor, preserve, protect, collect, or enforce the Collateral; (b) with respect to any L/C Issuer and its Affiliates, all reasonable and documented allocable expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; (c) all customary fees and charges (as adjusted from time to time) of the Agent with respect to access to online Loan information, the disbursement of funds (or the receipt of funds) to or for the account of Loan Parties (whether by wire transfer or otherwise), together with any reasonable and documented allocable costs and expenses incurred in connection therewith; and (d) upon the occurrence and during the continuance of an Event of Default or upon any increase in the amount of Aggregate Commitments after the Closing Date, all reasonable expenses incurred by the Credit Parties who are not the Agent, Tranche A-1 Agent, a L/C Issuer or any Affiliate of any of them, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrower entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (b) outstanding merchandise credits of the Borrower, and (c) liabilities in connection with frequent shopping programs of the Borrower.

"Customer Deposits" means at any time, the aggregate amount at such time of (a) deposits made by customers with respect to the purchase of goods or the performance of services and (b) layaway obligations of the Borrower.

"Customs Broker/Carrier Agreement" means an agreement in form and substance reasonably satisfactory to the Agent among the Borrower, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"DDA Notification" has the meaning provided therefor in Section 6.13(a)(iii).

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default, unless cured or waived as provided in Section 10.01 hereof.

"Default Rate" has the meaning specified in the Fee Letter.

"Defaulting Lender" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder, or (ii) pay to the Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three (3) Business Days after written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as

BOS 47487387v10

such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Agent in a written notice of such determination, which shall be delivered by the Agent to the Borrower and each other Lender promptly following such determination.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction and any sale, transfer, license or other disposition) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Lenders" means a Person identified as a "Disqualified Lender" in the letter agreement dated as of the date hereof between the Borrower and Lenders, as such Disqualified Lenders list may be updated semi-annually from time to time.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature; provided, however, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Loan Parties or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Loan Parties in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Loan Parties may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

BOS 47487387v10

"Dollars" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to the Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrower, and (ii) in each case is acceptable to the Agent in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (j) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than the Borrower as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable. Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

      (a)     any Credit Card Receivable which does not constitute a "payment intangible" (as defined in the UCC);

      (b)     Credit Card Receivables that (i) are past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreements with the Credit Card Issuer or Credit Card Processor of the credit card or debit card used in the purchase which gave rise to such Credit Card Receivables, or (ii) have been outstanding for more than five (5) days from the date of sale;

      (c)     Credit Card Receivables (i) that are not subject to a perfected first priority security interest in favor of the Agent, or (ii) with respect to which the Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents);

      (d)     Credit Card Receivables which are disputed, are with recourse to any Loan Party, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

- 14 -

(e)     Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)     Credit Card Receivables due from any Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

(g)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(h)     Credit Card Receivables which do not conform to all applicable representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;

(i)     Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent necessary or appropriate, endorsed to the Agent; or

(j)     Credit Card Receivables which the Agent determines in its Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine in its Permitted Discretion.

"Eligible In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, In-Transit Inventory:

(a)     Which has been shipped from a foreign location for receipt by the Borrower, but which has not yet been delivered to such Borrower, which In-Transit Inventory has been in transit for sixty (60) days or less from the date of shipment of such Inventory;

(b)     For which the purchase order is in the name of the Borrower and title and risk of loss has passed to such Borrower;

(c)     For which an Acceptable Document of Title has been issued, and in each case as to which the Agent has control (as defined in the UCC) over the documents of title which evidence ownership of the subject Inventory pursuant to a Customs Broker/Carrier Agreement;

(d)     Which is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance);

(e)     the Foreign Vendor with respect to such In-Transit Inventory is an Approved Foreign Vendor;

(f)     For which payment of the purchase price has been made by the Borrower or the purchase price is supported by a Commercial Letter of Credit; and

(g)     Which otherwise would constitute Eligible Inventory;

- 15 -

provided that the Agent may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise adversely impact the ability of the Agent to realize upon such Inventory.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, (i) Eligible In-Transit Inventory, and (ii) items of Inventory of the Borrower that are finished goods, merchantable and readily saleable to the public in the ordinary course of the Borrower's business and deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrower in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below.  Except as otherwise agreed by the Agent, in its Permitted Discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)    Inventory that is not solely owned by the Borrower or the Borrower does not have good and valid title thereto;

(b)    Inventory that is leased by or is on consignment to the Borrower or which is consigned by the Borrower to a Person which is not a Loan Party;

(c)    Inventory (other than Eligible In-Transit Inventory) that is not located in the United States of America (including territories or possessions of the United States);

(d)    Inventory that is not located at a location that is owned or leased by the Borrower, except (i) Inventory in transit between such owned or leased locations or locations which meet the criteria set forth in clause (ii) below, or (ii) to the extent that the Borrower have furnished the Agent with (A) any UCC financing statements or other documents that the Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to the Agent;

(e)    Inventory that is located: (i) in a distribution center or warehouse leased by the Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location, provided that any such Reserves shall be implemented only for thirty (30) days after the Closing Date after which time a Collateral Access Agreement must be delivered to the Agent in order for Inventory located at a distribution center or warehouse to satisfy this clause (e), or (ii) at any leased location in a Landlord Lien State unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location;

(f)    Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, work in process, raw materials, or that constitute samples, spare parts, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in the Borrower's business, (iv) are seasonal in nature and which

- 16 -

have been packed away for sale in the subsequent season, (v) not in compliance with all applicable standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(g)    Inventory that is not subject to a perfected first priority security interest in favor of the Agent (subject to non-consensual Permitted Encumbrances);

(h)    Inventory that is not insured in compliance with the provisions of Section 5.10 hereof;

(i)    Inventory that has been sold but not yet delivered or as to which the Borrower has accepted a deposit; and

(j)    Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which any Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

- 17 -

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; or (g) the determination that any Pension Plan is considered to be an "at-risk" plan or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA.

"Event of Default" has the meaning specified in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excluded Accounts" means (a) the DDAs with account numbers 45010-49888 and 45010-49904, respectively, in the name of the Borrower maintained at Union Bank, N.A. and exclusively used for payroll, withholding tax, sales tax and employee benefits to the extent that such accounts contain only amounts designated for payment of payroll, withholding tax, sales tax and employee benefits, (b) any cash collateral accounts maintained with Union Bank, N.A. by Borrower securing reimbursement obligations in connection with letters of credit issued by Union Bank, N.A. in favor of certain beneficiaries as more specifically described on Schedule 7.01 of the Credit Agreement, and (c) such DDAs (including disbursement accounts) as may be agreed by the Agent in its sole discretion.

"Excluded Taxes" means, with respect to any Recipient, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), (i) by the jurisdiction (or any political subdivision thereof) pursuant to the laws of the jurisdiction under which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located or (ii) as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, or become a party to any Loan Document), (b) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Recipient (other than an assignee pursuant to a request

- 18 -

by the Lead Borrower under Section 10.13), any withholding Tax that is imposed on amounts payable to such Recipient at the time such Recipient becomes a party hereto or a Recipient hereunder (or designates a new Lending Office) or is attributable to such Recipient's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Recipient (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding Tax pursuant to Section 3.01(a), (d) any U.S. federal, state or local backup withholding Tax, and (e) any Tax imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.18.

"Existing Credit Agreement" means that certain Loan and Security Agreement dated as of August 31, 2007 by and between the Borrower and Union Bank of California, N.A., as lender.

"Expeditors PMSI Reserve equal means a Reserve equal to all amounts due to Expeditors of Washington, Inc. from Borrower as of the date of the applicable Borrowing Base Certificate.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including (i) payments received by the Loan Parties pursuant to any Acquisition after the Closing Date, including without limitation, any deferred payment, any purchase price adjustments that result in a payment by the seller to the Borrower, and any indemnity payments made by the seller (other than to the extent such payments are payable to a Person that is not an Affiliate of Borrower or any of its Subsidiaries) and (ii) tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments (other than to the extent such indemnity payments are payable to a Person that is not an Affiliate of Borrower or any of its Subsidiaries) and any purchase price adjustments related to any Acquisition.

"Facility Guaranty" means any Guarantee made by a Guarantor in favor of the Agent and the other Credit Parties, in form and substance reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"FATCA" means current Section 1471 through 1474 of the Code or any amended version or successor provision that is substantially similar to and, in each case, any regulations promulgated thereunder and any interpretation and other guidance issued in connection therewith and any intergovernmental agreement or "FFI agreements" entered into pursuant to the foregoing.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal

Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to money center banks on such day on such transactions as determined by the Agent.

"Fee Letter" means the letter agreement, dated July 18, 2014, among the Borrower and Agent referred to therein as the "Fee Letter".

"Fiscal Month" means any of the fiscal monthly accounting periods of the Loan Parties in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on the closest Sunday after April 30, July 31, October 31 and January 31 of each year; provided that if April 30, July 30, October 31 or January 31 is a Sunday, then such date shall be the end of such Fiscal Quarter.

"Fiscal Year" means the twelve (12) Fiscal Month period of the Loan Parties ending on the date that is the closest Sunday after January 31, of each year.  Subsequent changes of the Loan Parties' Fiscal Year shall not change the term "Fiscal Year" unless Agent shall consent in writing to such change.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.18.

"Foreign Lender" means any Recipient that is not a "United States person" as defined in Section 7701(a)(30) of the Code.

"Foreign Vendor" means a Person that sells In-Transit Inventory to the Borrower.

"Foreign Vendor Agreement" means an agreement between a Foreign Vendor and the Agent in form and substance reasonably satisfactory to the Agent and pursuant to which, among other things, the parties shall agree upon their relative rights with respect to In-Transit Inventory of the Borrower purchased from such Foreign Vendor.

"Formula Availability" means

(a)    the face amount of Eligible Credit Card Receivables multiplied by 97%;

plus

(b)    the greater of (i) the Appraised Value of Eligible Inventory, net of Inventory Reserves, multiplied by 105%, and (ii) the Cost of Eligible Inventory, net of Inventory Reserves multiplied by 100% (provided, that in no event shall Eligible In-Transit Inventory included in Eligible Inventory exceed $8,000,000).

"Fronting Fee" has the meaning assigned to such term in Section 2.03(j).

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

- 20 -

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Gross Margin Dollars" means sales less cost of goods sold (including, but not limed to purchase costs, freight costs, and shrinkage expenses).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means each Subsidiary that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum

- 21 -

distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Honor Date" means the date of any payment by the applicable L/C Issuer under a Letter of Credit.

"Inactive Subsidiary" means Anna's Management Company, Inc. a Virginia corporation.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the date on which such trade account payable was created);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     All Attributable Indebtedness of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock) or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

- 22 -

"Indemnified Taxes" means Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and to the extent not otherwise described in Other Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial Business Plan" means the business and operational plan annexed hereto as **Exhibit H**, which contains, among other items, Borrower's rolling 13 week cash flow forecast, same store sales projections, Store and SKU rationalization plans, and has been approved by the Chief Executive Officer and the Board of Directors of the Borrower and is deemed acceptable by the Agent.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Interest Payment Date" means the first day after the end of each month and the Maturity Date.

"Interest Rate Floor" has the meaning specified in the Fee Letter.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Borrower's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"In-Transit Inventory" means Inventory of the Borrower which is in the possession of a common carrier and is in transit from a Foreign Vendor of the Borrower from a location outside of the continental United States to a location of the Borrower (or warehouse of the Borrower) that is within the continental United States.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or

- 23 -

consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's Permitted Discretion, include (but are not limited to) reserves based on:

    (a)    Obsolescence;

    (b)    Seasonality;

    (c)    Shrink;

    (d)    Imbalance;

    (e)    Change in Inventory character;

    (f)    Change in Inventory composition;

    (g)    Change in Inventory mix;

    (h)    Markdowns (both permanent and point of sale);

    (i)    Retail markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

    (j)    Out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) the purchase, acquisition or investment in any stock, bonds, mutual funds, notes, debentures or other securities or certificates of deposit. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

BOS 47487387v10

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, the Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and any other document, agreement and instrument entered into by the applicable L/C Issuer and the Borrower (or any Subsidiary thereof) or in favor of the applicable L/C Issuer and relating to any such Letter of Credit.

"Joinder" means an agreement, in form and substance reasonably satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may reasonably determine.

"Key Person Life Insurance Policy" has the meaning specified in Section 6.24.

"Landlord Lien State" means such state(s) in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral. As of the Closing Date, the only states in which the Borrower has real property Leases that are Landlord Lien States are the Commonwealth of Pennsylvania and the Commonwealth of Virginia.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Issuer" means (a) Salus, (b) any other financial institution that, with the consent of the Agent (and subject to such financial institution's entry into agreements reasonably satisfactory to the Agent), agrees to become an L/C Issuer for the purpose of issuing Letters of Credit hereunder, and (c) any successor issuer of Letters of Credit hereunder. Any L/C Issuer may, in its Permitted Discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such L/C Issuer and/or for such Affiliate to act as an advising, transferring, confirming and/or nominated bank in connection with the issuance or administration of any such Letter of Credit, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"L/C Obligations" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit. For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of any "rule" under the ISP or any article of UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

- 25 -

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" means, individually, a Tranche A Lender or a Tranche A-1 Lender, and collectively, all such persons.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Agent.

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder.

"Letter of Credit Application" means an application for the issuance or amendment of a Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"Letter of Credit Expiration Date" means the day that is seven days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Sublimit" means an amount equal to $7,500,000.  The Letter of Credit Sublimit is part of, and not in addition to, the Tranche A Commitments.  A permanent reduction of the Tranche A Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; provided, however, that if the Tranche A Commitments are reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Borrower's option, less than) the Tranche A Commitments.

"LIBO Rate" means, as of any date of determination, the rate per annum for LIBOR as published by www.bankrate.com (or other commercially available source providing quotations of LIBOR as designated by the Agent from time to time) for an interest period of thirty (30) days.  If such rate is not available at such time for any reason, then the "LIBO Rate" shall be the rate per annum determined by the Agent to be the rate at which deposits in Dollars in the approximate outstanding amount of the applicable Loans would be offered to major banks in the London interbank eurodollar market in which Salus participates for an interest period of thirty (30) days.

"LIBO Rate Loan" means a Loan that bears interest at a rate based on the Adjusted LIBO Rate.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

- 26 -

"Loan" means any extension of credit by a Lender to the Borrower under Article II in the form of a Tranche A Loan, a Tranche A-1 Loan, issuance of Letter of Credit or otherwise.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Documents" means this Agreement, each Note, each Issuer Document, the Fee Letter, all Borrowing Base Certificates, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, each Facility Guaranty, and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), financial condition of any Loan Party or the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party, provided that, the issuance by the Borrower's Registered Public Accounting Firm of a "going concern" or like qualification for Borrower's audited financial statements for the Fiscal Year ended February 2, 2014 shall not be deemed to constitute a Material Adverse Effect. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events would result in a Material Adverse Effect.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party involving aggregate consideration payable to or by such Person of $250,000 or more in any Fiscal Year or otherwise material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person, including, without limitation, the Borrower's Lease for its corporate headquarters, agreements with Borrower's current warehousemen and freight forwarders, provided that, the definition of "Material Contracts" shall not include (a) the Borrower's Store Leases, (b) agreements with professional service providers (including Kirkland & Ellis, LLP, Alix Partners and Deloitte LLP), (c) vendor or service provider agreements for ordinary course services including for office supplies, mailing or circulation distributions, e-commerce services, shipping or annual or quarterly conferences and meetings (including with Federal Express, Office Max, Harte Hanks, Valassis, Rock Communications and Planet Hollywood or other hotel or similar conference facilities) (d) agreements for cash management, treasury or ADP services for ordinary course banking and payroll services, and (e) agreements for employee benefit programs entered into in the ordinary course of business.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $250,000. For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any

BOS 47487387v10

Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means July 18, 2017.

"Maximum Loan Amount" means, at any time of determination, the lesser of (a) the Aggregate Commitments and (b) the Borrowing Base.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Minimum Availability Amount" means (i) for the Fiscal Month ending October 5, 2014, $5,000,000, and (ii) for each Fiscal Month ending November 2, 2014 through the Fiscal Month ending February 1, 2015, $6,000,000.

"Minimum Availability Compliance Event" means on October 5, 2014 and as of the end of each Fiscal month thereafter through the end of the Fiscal Month ending February 1, 2015, if Borrower has failed to deliver to Agent evidence reasonably satisfactory to the Agent that as of such date Borrower has obtained (x) written agreements for payment terms of no less than 120 days with inventory vendors or (y) Vendor Substitute Financing, in the aggregate for (x) and (y) representing no less than the Vendor Threshold Amount as of such date of determination.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket fees, costs and expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)); and (C) the Taxes paid or reasonably estimated to be paid to any Governmental Authority as a result of such Disposition; and

(b)    with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents

- 28 -

received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Extension Notice Date" has the meaning specified in Section 2.03(b)(ii).

"Note" means a Tranche A Note, or a Tranche A-1 Note, as each may be amended, restated, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding.

"Operating Account" the DDA with account number 45010-49771 in the name of the Borrower maintained at Union Bank, N.A.

"Operating Expenditures" mean the sum of (a) all Store expenses (including, but not limited to Store level occupancy, payroll and related expenses, merchant and bank card fees, advertising, and new Store opening expenses) plus (b) general and administrative expenses, net of depreciation (each item as determined in accordance with past historical accounting practices).

"Operating Expenditures to Gross Margin Dollars Ratio" means the ratio of (a) Operating Expenditures to (b) Gross Margin Dollars for the trailing six-month period ending as of the last day of each Fiscal Month.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to

- 29 -

which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means (i) with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date; and (ii) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date.

"Outstanding Items" has the meaning provided in Section 6.26.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Participant" has the meaning specified in Section 10.06(d).

"Participation Register" has the meaning provided therefor in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Perfection Certificate" means that certain perfection certificate dated as of the date hereof, executed and delivered by the Loan Parties in favor of the Agent, for the benefit of the Credit Parties, and each other Perfection Certificate (which shall be in form and substance reasonably acceptable to the Agent) executed and delivered by the applicable Borrower or Guarantor in favor of the Agent for the benefit of the Credit Parties contemporaneously with the execution and delivery of Joinder executed in accordance with Section 6.12, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance herewith.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable business judgment from the perspective of a secured, asset-based commercial lender.

"Permitted Disposition" means any of the following:

- 30 -

(a)    Dispositions of inventory in the ordinary course of business;

(b)    bulk sales or other Dispositions of the Inventory of a Loan Party not in the ordinary course of business and all other property of any Loan Party located at a Store in connection with the Permitted Store Closings; provided, that all Net Proceeds received in connection therewith are applied to the Obligations if then required in accordance with Section 2.05 hereof;

(c)    non-exclusive licenses of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business;

(d)    licenses for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business; provided that, if requested by the Agent, the Agent shall have entered into an intercreditor agreement with the Person operating such licensed department on terms and conditions reasonably satisfactory to the Agent;

(e)    Dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary and is replaced with similar property having at least equivalent value;

(f)    sales, transfers and Dispositions among the Loan Parties or by any Subsidiary to a Loan Party; and

(g)    sales, transfers and Dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party.

"Permitted Encumbrances" means:

(a)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)    Carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(c)    Pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)    Deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)    Liens in respect of judgments that would not constitute an Event of Default hereunder;

- 31 -

(f)    Easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g)    Liens existing on the Closing Date and listed on Schedule 7.01, the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto and any Permitted Refinancings thereof;

(h)    Liens on fixed or capital assets acquired by any Loan Party which are permitted under clause (c) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition, (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of such fixed or capital assets and (iii) such Liens shall not extend to any other property or assets of the Loan Parties;

(i)    Liens in favor of the Agent;

(j)    Statutory Liens of landlords and lessors in respect of rent not in default (after giving effect to applicable grace periods) and the title and interest of lessors or sublessors in and to personal property leased or subleased, in each case, extending only to such personal property;

(k)    Possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Closing Date and Permitted Investments, provided that such liens (i) attach only to such Investments and (ii) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)    Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(n)    Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations that are (A) being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation.

- 32 -

(o)      Liens in the ordinary course of business on deposits or cash collateral to secure Indebtedness permitted under clause (d) of the definition of Permitted Indebtedness; and

(p)      Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums securing Indebtedness permitted under clause (j) of the definition of Permitted Indebtedness.

"Permitted Holders" (a) Alan Gladstone and Janette Shawn Gladstone, ASG Management, LLC, The Gladstone 1999 Family Trust Dated June 11, 1999, The James A. Coufos Annuity Trust Dated 5/27/10, James A. Coufos, Anna's Family Tree, LLC, Scott Gladstone, Cindy Gladstone, Carrie Gladstone Doll, Carrie Doll Gladstone, Tony Sullivan, Marilyn & Michael Harnetiaux, Michael Harnetiaux, Mike Harnetiaux, Kimberly J. Harnetiaux, and Brian M. Harnetiaux, (b) Rosewood Capital III, L.P., Rosewood Capital IV, L.P., and Rosewood Capital IV Associates, L.P., and (c) The Rosalie Katz Family Foundation, Inc., Downtown Capital Partners LLC, and ALI Equity Holdings, LLC and in the case of this clause (c) their successors and assigns.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists or would arise from the incurrence thereof:

(a)      Indebtedness outstanding on the Closing Date and listed on Schedule 7.03, showing as of the Closing Date the amount, obligor or issuer and maturity thereof and any Permitted Refinancing thereof;

(b)      Indebtedness of any Loan Party to any other Loan Party;

(c)      Purchase money Indebtedness of any Loan Party to finance the acquisition of any personal property consisting solely of fixed or capital assets, including Capital Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and Permitted Refinancings thereof; provided, however, that the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed (i) $600,000 incurred for the purposes of acquiring PIN pads for the Borrower's Store locations, plus (ii) an additional $2,000,000 at any time outstanding.

(d)      obligations (contingent or otherwise) of any Loan Party or any Subsidiary thereof existing or arising under any Swap Contract, provided that such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates or foreign exchange rates, and not for purposes of speculation or taking a "market view;" provided that the aggregate Swap Termination Value thereof shall not exceed $150,000 at any time outstanding;

(e)      Contingent liabilities under statutory and appeal bonds, surety bonds or similar instruments incurred in the ordinary course of business;

(f)      the Obligations;

- 33 -

(g)    Indebtedness not otherwise specifically described herein in an aggregate principal amount not to exceed $250,000 at any time outstanding;

(h)    Indebtedness in respect of any corporate procurement cards, travel and entertainment cards, import vendor financings or similar products in an aggregate principal amount not to exceed $1,000,000 at any time outstanding;

(i)    bank product obligations, controlled disbursements and overdraft arrangements and similar bank products incurred in the ordinary course of business in an aggregate amount not to exceed $100,000 at any time outstanding;

(j)    Indebtedness in connection with the financing of insurance premiums in the ordinary course of business;

(k)    unsecured Indebtedness not to exceed $1,000,000 incurred to obtain credit from OEM financing subsidiaries (e.g. IBM global finance, Cisco, Dell, Oracle) for customer upgrades of Borrower's equipment;

(l)    Subordinated Indebtedness in an aggregate amount not to exceed $5,000,000; and

(m)    Vendor Notes.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)    readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)    commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)    Fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the

- 34 -

criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than one hundred percent (100%) of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(e)    Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above;

(f)    Investments existing on the Closing Date, and set forth on <u>Schedule 7.02</u>, held by any Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity (if any) thereof but not any increase in the amount thereof or any other modification of the terms thereof;

(g)    (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, and (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties;

(h)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(i)    Guarantees constituting Permitted Indebtedness;

(j)    Investments by any Loan Party in Swap Contracts entered into in the ordinary course of business and for bona fide business (and not speculative) purposes to protect against fluctuations in interest rates in respect of the Obligations;

(k)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; and

(l)    advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business in an amount not to exceed $25,000 to any individual at any time or in an aggregate amount not to exceed $100,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes.

(m)    Capital contributions made by any Loan Party to another Loan Party; and

<u>provided, however,</u> that notwithstanding the foregoing, no such Investments specified in clauses (a) through (e) shall be permitted unless (i) no Loans, or, if then required to be Cash Collateralized, Letters of Credit are then outstanding, and (ii) such Investments shall be pledged to the Agent as additional collateral for the Obligations pursuant to such agreements as may be reasonably required by the Agent.

- 35 -

"Permitted Overadvance" means an Overadvance made by the Agent, in its Permitted Discretion, which:

(a)    Is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(b)    Is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)    Is made to pay any other amount chargeable to any Loan Party hereunder.

provided however, that the foregoing shall not result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder; provided further that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the Aggregate Commitments (as in effect prior to any termination of the Aggregate Commitments pursuant to Section 2.06 hereof).

"Permitted Refinancing" means, with respect to any Person, any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting a Permitted Refinancing); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premiums thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) the weighted average life to maturity of such Permitted Refinancing is greater than or equal to the weighted average life to maturity of the Indebtedness being Refinanced (c) such Permitted Refinancing shall not require any scheduled principal payments due prior to the Maturity Date, (d) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Credit Parties as those contained in the documentation governing the Indebtedness being Refinanced (e) no Permitted Refinancing shall have direct or indirect obligors who were not also obligors of the Indebtedness being Refinanced, or greater guarantees or security, than the Indebtedness being Refinanced, (f) such Permitted Refinancing shall either be unsecured or secured by liens having the same or junior priority, and subject to any applicable subordination terms, as existing liens securing the Indebtedness being Refinanced, (g) such Permitted Refinancing shall be otherwise on terms, taken as a whole, not materially less favorable to the Credit Parties than those contained in the documentation governing the Indebtedness being Refinanced, including, without limitation, with respect to financial and other covenants and events of default, (h) the interest rate applicable to any such Permitted Refinancing shall not exceed the then applicable market interest rate, and (i) at the time thereof, no Default or Event of Default shall have occurred and be continuing.

- 36 -

"Permitted Store Closings" means the Borrower's closing of Stores identified in the Business Plan.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Preferred Equity Documents" means the Stockholders Agreement, Borrower's Certificate of Designations of Series B Preferred Stock, and subscription agreements for the Preferred Shares, and all other agreements, instruments, documents and certificates now or hereafter executed and delivered in connection therewith, in each case as amended, modified, supplemented or restated from time to time in accordance with the terms hereof and thereof.

"Preferred Shares" has the meaning provided in Section 10.24.

"Prepayment Event" means:

(a)    Any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party;

(b)    Any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party in an amount in excess of $100,000, unless (i) the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent or (ii) the proceeds therefrom are deposited into a segregated account and utilized for purposes of replacing or repairing the assets in respect of which such proceeds, awards or payments were received within 180 days of the occurrence of the damage to or loss of the assets being repaired or replaced;

(c)    The issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party, or (ii) as a compensatory issuance to any employee, director, or consultant (including under any option plan);

(d)    The incurrence by a Loan Party of any Indebtedness for borrowed money other than Permitted Indebtedness; or

(e)    The receipt by any Loan Party of any Extraordinary Receipts.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receipts and Collections" has the meaning specified in Section 6.13(c).

"Recipient" means the Agent, the Tranche A-1 Agent, any Lender, any L/C Issuer or any other recipient (including any assignee or Participant) of any payment to be made by or on account of any obligation of the Loan Parties under this Agreement.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Borrower and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided in Section 9.11(b).

"Request for Credit Extension" means (a) with respect to a Borrowing of Loans, a Borrowing Notice, and (b) with respect to an L/C Credit Extension, a Letter of Credit Application and, if required by the applicable L/C Issuer, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable.

"Required Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the sum of the Aggregate Commitments or, if the Aggregate Commitments and the obligation of each L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, Lenders holding in the aggregate more than fifty percent (50%) of the Total Outstandings; provided that the Commitment of, and the portion in the aggregate of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all Inventory Reserves and Availability Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder; provided, that, in each case the Agent shall have received satisfactory background checks with respect to each such person no later than thirty (30) days after the Closing Date pursuant to Section 6.26.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property),

- 38 -

including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.  Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Salus" means Salus Capital Partners, LLC and its successors.

"Salus Entity" has the meaning provided in Section 10.06(i).

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Collateral Assignment of Key Person Life Insurance Policy and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Solvent" and "Solvency" means, with respect to any Person on a particular date, that on such date (a) at fair valuation, all of the properties and assets of such Person are greater than the sum of the debts, including contingent liabilities, of such Person, (b) the present fair saleable value of the properties and assets of such Person is not less than the amount that would be required to pay the probable liability of such Person on its debts as they become absolute and

- 39 -

matured, (c) such Person is able to realize upon its properties and assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts beyond such Person's ability to pay as such debts mature, and (e) such Person is not engaged in a business or a transaction, and is not about to engage in a business or transaction, for which such Person's properties and assets would constitute unreasonably small capital after giving due consideration to the prevailing practices in the industry in which such Person is engaged. The amount of all guarantees at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, can reasonably be expected to become an actual or matured liability.

"Spot Rate" means, for a currency, the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two (2) Business Days prior to the date of such determination; provided that the Agent may obtain such spot rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Standby Letter of Credit Agreement" means the Standby Letter of Credit Agreement relating to the issuance of a Standby Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. LIBO Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

- 40 -

"Stockholders Agreement" means the Stockholders Agreement dated as of the date hereof among the Borrower, Alan Gladstone and Janette Shawn Gladstone, ASG Management, LLC, The Gladstone 1999 Family Trust Dated June 11, 1999, Scott Gladstone, Rosewood Capital III, L.P., Rosewood Capital IV, L.P., Rosewood Capital IV Associates, L.P. and each holder of the Preferred Shares.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

- 41 -

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, or (iii) the termination of the Commitments in accordance with the provisions of Section 2.06(a) hereof.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"Tranche A Applicable Percentage" means with respect to any Tranche A Lender at any time, the percentage (carried out to the fourth decimal place) of the Aggregate Tranche A Commitments represented by such Tranche A Lender's Tranche A Commitment at such time. If the commitment of each Tranche A Lender to make Tranche A Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 2.06 or Article VIII or if the Aggregate Tranche A Commitments have expired, then the Tranche A Applicable Percentage of each Lender shall be determined based on the Tranche A Applicable Percentage of such Tranche A Lender most recently in effect, giving effect to any subsequent assignments. The initial Tranche A Applicable Percentage of each Tranche A Lender is set forth opposite the name of such Tranche A Lender on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Tranche A Lender becomes a party hereto, as applicable.

"Tranche A Commitment" means, with respect to each Tranche A Lender, the commitment of such Lender hereunder to make Tranche A Loans set forth as its Tranche A Commitment opposite its name on Schedule 2.01 hereto or as may subsequently be set forth in the Register from time to time, as the same may be adjusted from time to time pursuant to the terms of this Agreement. As of the Closing Date the aggregate Tranche A Commitments are in the amount of $70,000,000.

"Tranche A Interest Rate" means at any time of determination, the Adjusted LIBO Rate plus the Applicable Margin.

"Tranche A Lender" means each Lender having a Tranche A Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Acceptance by which it becomes a Tranche A Lender.

- 42 -

BOS 47487387v10

"Tranche A Loans" has the meaning set forth in Section 2.01.

"Tranche A Note" means a promissory note made by the Borrower in favor of a Tranche A Lender evidencing the Tranche A Loans made by such Tranche A Lender, substantially in the form of **Exhibit B-1**.

"Tranche A-1 Applicable Percentage" means with respect to any Tranche A-1 Lender at any time, the percentage (carried out to the fourth decimal place) of the Aggregate Tranche A-1 Commitments represented by such Tranche A-1 Lender's Tranche A-1 Commitment at such time. If the commitment of each Tranche A-1 Lender to make Tranche A-1 Loans has been terminated pursuant to Section 2.06 or Article VIII or if the Aggregate Tranche A-1 Commitments have expired, then the Tranche A-1 Applicable Percentage of each Lender shall be determined based on the Tranche A-1 Applicable Percentage of such Tranche A-1 Lender most recently in effect, giving effect to any subsequent assignments. The initial Tranche A-1 Applicable Percentage of each Tranche A-1 Lender is set forth opposite the name of such Tranche A-1 Lender on Schedule 2.01 in the Assignment and Acceptance pursuant to which such Tranche A-1 Lender becomes a party hereto, as applicable.

"Tranche A-1 Commitment" shall mean, with respect to each Tranche A-1 Lender, the commitment of such Tranche A-1 Lender hereunder to make Tranche A-1 Loans set forth as its Tranche A-1 Commitment opposite its name on Schedule 2.01 hereto or as may subsequently be set forth in the Register from time to time, as the same may be adjusted from time to time pursuant to this Agreement. As of the Closing Date the Tranche A-1 Commitments are in the aggregate amount of $10,000,000.

"Tranche A-1 Interest Rate" means at any time of determination, the Adjusted LIBO Rate plus the Applicable Margin.

"Tranche A-1 Lender" means each Lender having a Tranche A-1 Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Acceptance by which it becomes a Tranche A-1 Lender.

"Tranche A-1 Loans" has the meaning set forth in Section 2.01.

"Tranche A-1 Note" means a promissory note made by the Borrower in favor of a Tranche A-1 Lender evidencing the Tranche A-1 Loans made by such Tranche A-1 Lender, substantially in the form of **Exhibit B-2**.

"Turnaround Consultant" has the meaning specified in Section 6.22.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 of the Uniform Commercial Code; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in

- 43 -

such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"UFCA" has the meaning specified in Section 10.21(d).

"UFTA" has the meaning specified in Section 10.21(d).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base, or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

Vendor Note(s)" means an unsecured promissory note issued by Borrower in favor of an inventory vendor, which note shall (i) be issued in a face amount no more than the accounts payable owing by Borrower to such vendor, (ii) have a maturity date of at least six (6) months from the date of issuance of such note, and (iii) be in form reasonably satisfactory to the Agent.

"Vendor Substitute Amount" means the net proceeds received by Borrower in respect of any Vendor Substitute Financing (including for this purpose the face amount of any Vendor Note issued by the Borrower).

"Vendor Substitute Financing" means the Borrower's (i) receipt of proceeds of capital contributions or issuance of Borrower's Capital Stock, (ii) receipt of proceeds of the issuance of Subordinated Indebtedness, or (iii) issuance of Vendor Notes, in each case on term and conditions reasonably satisfactory to Agent, and undertaken by the Borrower to satisfy any shortfall in the applicable required Vendor Threshold Amount.

"Vendor Threshold Amount" means, as of any date of determination, an amount equal to forty percent (40%) of Borrower's accounts payable due to inventory vendors.

**1.02    Other Interpretive Provisions.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include

- 44 -

the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)     Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and any other contingent Obligations, providing cash collateralization or other collateral as may be requested by the Agent) of all of the Obligations other than unasserted contingent indemnification Obligations.

**1.03    Accounting Terms Generally.**

(a)     <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP, applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein.

(b)     <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Borrower

- 45 -

shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

   **1.04 Rounding.** Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

   **1.05 Times of Day.** Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

   **1.06 Letter of Credit Amounts.** Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

   **2.01 Loans; Reserves.**

     (a) Subject to the terms and conditions set forth herein, (i) each Tranche A Lender severally agrees to make loans (each such loan, a "Tranche A Loan") to the Borrower from time to time, on any Business Day during the Availability Period on which the Agent's offices are open to conduct business, in an aggregate amount not to exceed at any time outstanding such Lender's Tranche A Commitment, and (ii) each Tranche A-1 Lender severally agrees to make loans (each such loan, a "Tranche A-1 Loan") to the Borrower from time to time, on any Business Day during the Availability Period on which the Agent's offices are open to conduct business, in an aggregate amount not to exceed such Lender's Tranche A-1 Commitment, subject in each case to the following limitations:

       (i) after giving effect to any Borrowing, the Total Outstandings shall not exceed the Maximum Loan Amount; and

       (ii) the Outstanding Amount of all L/C Obligations shall not at any time exceed the Letter of Credit Sublimit.

- 46 -

Within the limits of each Lender's Commitment, and subject to the other terms and conditions hereof (including subsection 2.10(d) below), the Borrower may borrow under this Section 2.01, prepay under Section 2.04, and reborrow under this Section 2.01.

(b)        The Inventory Reserves and Availability Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to Section 4.01(c) hereof.

(c)        The Agent shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish, modify or eliminate Reserves.

(d)        Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, the Tranche A-1 Loans shall at all times be deemed to be the initial $10,000,000 of Loans made under this Agreement and outstanding, and deemed to be made on a "first-in-last-out basis", and as such, the Tranche A-1 Loans shall be the initial Loans made by Lenders hereunder and the last Loans repaid hereunder.  In furtherance of the foregoing, (ii) each request for a Loan hereunder shall be deemed to be a request for a Tranche A-1 Loan until such time as the aggregate principal balance of the Tranche A-1 Loans equals the aggregate Tranche A-1 Loan Commitments, and thereafter, each request for a Loan shall be deemed to be a request for a Tranche A Loan, (ii) subject to Section 8.3 hereof, all collections, payments and other amounts applied to the principal of the Obligations shall be applied first to the Tranche A Loans until paid in full, and then against the Tranche A-1 Loans, and (iii) Borrower shall not be permitted to prepay the Tranche A-1 Loans and/or terminate the Tranche A-1 Commitments in whole or in part unless and until the Tranche A-1 Loans are paid in full and the Tranche A Commitments have been terminated.

**2.02    Borrowings and of Loans.**

(a)        Each Borrowing shall be made upon the Borrower's irrevocable written notice to the Agent.  Each such notice must be received by the Agent in writing not later than 1:00 p.m. or such earlier time as Agent may designate from time to time by written notice to the Borrower on the same Business Day of the requested date of any Borrowing.  Each notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Agent of a written Borrowing Notice (or, if the Agent so requests, by electronic submission by the Borrower), appropriately completed and signed by a Responsible Officer of the Borrower.  Unless otherwise agreed to by the Agent, each Borrowing shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof.  The Borrower may request Borrowings daily on any Business Day.  Each Borrowing Notice shall specify (i) the requested date of the Borrowing (which shall be a Business Day), and (ii) the principal amount of Loans to be borrowed.

(b)        Notwithstanding anything to the contrary contained in this Agreement, the Borrower shall not request, and the Tranche A Lenders shall be under no obligation to fund, any Tranche A Loan unless the Borrower has borrowed the full amount available under the aggregate Tranche A-1 Commitments.  If any Tranche A-1 Loan is prepaid in whole or part pursuant to Section 2.06, any Loans thereafter requested shall automatically be Tranche A-1 Loans until the outstanding principal amount of Tranche A-1 Loans outstanding equals the aggregate Tranche A-1 Commitments and thereafter all Loans funded hereunder shall be Tranche A Loans.

- 47 -

(c)     Following receipt of a Request for Credit Extension, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Loans (or portion thereof) and, if applicable identify whether such requested Loans are Tranche A Loans and/or Tranche A-1 Loans. Each Lender shall make the amount of its Loan(s) available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, upon satisfaction or waiver of the applicable conditions set forth in Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrower in like funds by no later than 4:00 p.m. on the day of receipt by the Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Borrower.

(d)     Each Borrowing of Tranche A Loans shall be made by the Tranche A Lenders pro rata in accordance with their respective Tranche A Applicable Percentage and each Borrowing of Tranche A-1 Loans shall be made by the Tranche A-1 Lenders pro rata in accordance with their respective Tranche A-1 Applicable Percentage. The failure of any Lender to make any Loan shall neither relieve any other Lender of its obligation to fund its Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(e)     The Agent, without the request of the Borrower, may advance as a Tranche A Loan any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The Agent shall advise the Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrower's obligations under Section 2.05(a). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(e) shall bear interest at the interest rate then and thereafter applicable to the Tranche A Loans.

(f)     At any time that any Loans are outstanding, the Agent shall promptly notify the Borrower and the Lenders of changes in the LIBO Rate used in determining the applicable interest rate.

(g)     The Agent, the Lenders and the L/C Issuers shall have no obligation to make any Loan or to provide any Letter of Credit if an Overadvance would result. The Agent may, in its Permitted Discretion, make Permitted Overadvances without the consent of the Borrower, the Lenders and the L/C Issuers and the Borrower and each Lender and L/C Issuer shall be bound thereby. A Permitted Overadvance is for the account of the Borrower and shall constitute a Tranche A Loan and an Obligation and shall be repaid by the Borrower in accordance with the provisions of Section 2.05(a). The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The Agent shall have no liability for, and no Loan Party or Credit Party shall

- 48 -

have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03    Letters of Credit.**

    (a)    The Letter of Credit Commitment.

    (i)    Subject to the terms and conditions set forth herein, each L/C Issuer shall (A) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, issue Letters of Credit for the account of the Borrower, and amend or extend Letters of Credit previously issued by it, in accordance with Section 2.03(b) below, and (B) honor drawings under the Letters of Credit; provided, that all such Letters of Credit and L/C Obligations shall be deemed to be Borrowings of Tranche A Loans, and after giving effect to any L/C Credit Extension with respect to any Letter of Credit and any Committed Loans made in accordance with Section 2.04(g) below, (w) the Total Outstandings shall not exceed the Maximum Loan Amount, (x) the aggregate Outstanding Amount of the Tranche A Loans of any Tranche A Lender, plus such Lender's Tranche A Applicable Percentage of the Outstanding Amount of all L/C Obligations shall not exceed such Tranche A Lender's Commitment, and (z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit. Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

    (ii)    No Letter of Credit shall be issued if:

    A)    the expiry date of such requested Standby Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the L/C Issuer and the Required Lenders have approved such expiry date; or

    B)    the expiry date of such requested Commercial Letter of Credit would occur more than 120 days after the date of issuance or last extension, unless the L/C Issuer and the Required Lenders have approved such expiry date; or

    C)    the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless all the Lenders have approved such expiry date.

    (iii)    No Letter of Credit shall be issued without the prior consent of the Agent if:

    A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the applicable L/C Issuer from issuing such Letter of Credit, or any Law applicable to the applicable L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority

- 49 -

with jurisdiction over the applicable L/C Issuer shall prohibit, or request that the applicable L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the applicable L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the applicable L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the applicable L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the applicable L/C Issuer in good faith deems material to it;

B)    the issuance of such Letter of Credit would violate one or more policies of the applicable L/C Issuer applicable to letters of credit generally;

C)    except as otherwise agreed by the Agent and the applicable L/C Issuer, such Letter of Credit is in an initial Stated Amount less than $100,000, in the case of a Commercial Letter of Credit, or $250,000, in the case of a Standby Letter of Credit;

D)    such Letter of Credit is to be denominated in a currency other than Dollars; provided that if the applicable L/C Issuer, with the consent of the Agent, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrower of the honoring of any drawing under such Letter of Credit shall be paid in Dollars based on the Spot Rate; or

E)    such Letter of Credit contains any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder.

(iv)    The applicable L/C Issuer shall not amend any Letter of Credit if (A) such L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(v)    Each L/C Issuer shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by such L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Agent" as used in Article IX. included such L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to such L/C Issuer.

(b)    Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the applicable L/C Issuer (with a copy to the Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower.  Such Letter of Credit Application must be received by such L/C Issuer and the Agent not later than 11:00 a.m. at least two Business Days (or such other date and time as the Agent and such L/C Issuer may agree in a particular instance in their Permitted Discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Agent and such L/C Issuer: (A)

- 50 -

the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the Agent or such L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the Agent and the applicable L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the Agent or such L/C Issuer may reasonably require. Additionally, the Borrower shall furnish to the applicable L/C Issuer and the Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, and any Issuer Documents (including, if requested by the applicable L/C Issuer, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable), as the applicable L/C Issuer or the Agent may reasonably require.

(ii)    Promptly after receipt of any Letter of Credit Application, the applicable L/C Issuer will confirm with the Agent (in writing) that the Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, such L/C Issuer will provide the Agent with a copy thereof. Unless the applicable L/C Issuer has received written notice from any Lender, the Agent or any Loan Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied or unless the applicable L/C Issuer would not be permitted, or would have no obligation, at such time to issue such Letter of Credit under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section 2.03(a) or otherwise), then, subject to the terms and conditions hereof, the applicable L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with such L/C Issuer's usual and customary business practices.

(iii)    If the Borrower so requests in any applicable Letter of Credit Application, the applicable L/C Issuer may, in its sole and absolute discretion, agree to issue a Standby Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that, any such Auto-Extension Letter of Credit must permit the applicable L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued. Unless otherwise directed by the Agent or the applicable L/C Issuer, the Borrower shall not be required to make a specific request to the Agent or the applicable L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable L/C Issuer to permit the extension of such Standby Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; provided, however, that the Agent shall instruct the applicable L/C Issuer not to permit any such extension if (A) the applicable L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Standby Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of

- 51 -

clause (ii) or (iii) of Section 2.03(a) or otherwise), or (B) the applicable L/C Issuer has received notice in writing on or before the day that is five Business Days before the Non-Extension Notice Date (1) from the Agent that the Required Lenders have elected not to permit such extension or (2) from the Agent, any Lender or the Borrower that one or more of the applicable conditions specified in Section 4.02 is not then satisfied, and in each such case directing the applicable L/C Issuer not to permit such extension.

(iv)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the applicable L/C Issuer will also deliver to the Borrower and the Agent a true and complete copy of such Letter of Credit or amendment.

(c)    Drawings.  Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the applicable L/C Issuer shall notify the Borrower and the Agent thereof not less than two (2) Business Days prior to the Honor Date; provided, however, that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the applicable L/C Issuer with respect to any such payment.  Any notice given by the applicable L/C Issuer or the Agent pursuant to this Section 2.03(c) must be confirmed in writing.

(d)    Reserved.

(e)    Obligations Absolute.  The obligation of the Borrower to reimburse the applicable L/C Issuer for each drawing under each Letter of Credit shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that the Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the applicable L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    any payment by the applicable L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the applicable L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any

- 52 -

beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or any of its Subsidiaries; or

(vi)    the fact that any Default or Event of Default shall have occurred and be continuing.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the Agent and the applicable L/C Issuer. The Borrower shall be conclusively deemed to have waived any such claim against the applicable L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)    Role of L/C Issuer. Each Lender and the Borrower agrees that, in paying any drawing under a Letter of Credit, the applicable L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the applicable L/C Issuer, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the applicable L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; (iii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; or (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the applicable L/C Issuer, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the applicable L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.03(e) or for any action, neglect or omission under or in connection with any Letter of Credit or Issuer Documents, including, without limitation, the issuance or any amendment of any Letter of Credit, the failure to issue or amend any Letter of Credit, or the honoring or dishonoring of any demand under any Letter of Credit, and such action or neglect or omission will bind the Borrower; provided, however, that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the applicable L/C Issuer, and the applicable L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential, exemplary or punitive damages suffered by the Borrower which the Borrower proves were caused by the applicable L/C Issuer's willful misconduct or gross negligence or the applicable L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it

- 53 -

by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit; provided, further, that any claim against the applicable L/C Issuer by the Borrower for any loss suffered or incurred by the Borrower shall be reduced by an amount equal to the sum of (i) the amount (if any) saved by the Borrower as a result of the breach or other wrongful conduct that allegedly caused such loss, and (ii) the amount (if any) of the loss that would have been avoided had the Borrower taken all reasonable steps to mitigate such loss, including, without limitation, by enforcing their rights against any beneficiary and, in case of a claim of wrongful dishonor, by specifically and timely authorizing the applicable L/C Issuer to cure such dishonor. In furtherance and not in limitation of the foregoing, the applicable L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary (or the applicable L/C Issuer may refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit and may disregard any requirement in a Letter of Credit that notice of dishonor be given in a particular manner and any requirement that presentation be made at a particular place or by a particular time of day), and the applicable L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason. The applicable L/C Issuer shall not be responsible for the wording of any Letter of Credit (including, without limitation, any drawing conditions or any terms or conditions that are ineffective, ambiguous, inconsistent, unduly complicated or reasonably impossible to satisfy), notwithstanding any assistance the applicable L/C Issuer may provide to the Borrower with drafting or recommending text for any Letter of Credit Application or with the structuring of any transaction related to any Letter of Credit, and the Borrower hereby acknowledges and agrees that any such assistance will not constitute legal or other advice by the applicable L/C Issuer or any representation or warranty by the applicable L/C Issuer that any such wording or such Letter of Credit will be effective. Without limiting the foregoing, the applicable L/C Issuer may, as it deems appropriate, modify or alter and use in any Letter of Credit the terminology contained on the Letter of Credit Application for such Letter of Credit.

(g)     Cash Collateral. The Borrower shall immediately Cash Collateralize, with the proceeds of Loans, the Outstanding Amount of all L/C Obligations with respect to all Letters of Credit upon the issuance thereof in an amount equal to one hundred five percent (105%) of the Outstanding Amount of such L/C Obligations). In furtherance thereof, on the date of issuance of each Letter of Credit hereunder, the Borrower shall request a Borrowing to be disbursed on such date in order to Cash Collateralize the Outstanding Amount of all L/C Obligations with respect to such Letter of Credit in accordance with this Section 2.03(g). Cash Collateral shall be maintained in a Cash Collateral Account with the applicable L/C Issuer. If at any time the Agent or the applicable L/C Issuer determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Agent or the applicable L/C Issuer or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrower will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the applicable L/C Issuer and, to the extent

- 54 -

not so applied, shall thereafter be applied to satisfy other Obligations, unless no other Obligations are outstanding, in which case such proceeds shall be transferred promptly (and in any event, within three (3) Business Days of receipt) to the Borrower's Operating Account Notwithstanding anything to the contrary contained herein or in any other Loan Document, in calculating the Borrowing Base, Total Outstandings, and compliance with the limitations contained in Sections 2.01(a) and elsewhere herein, there shall be no double counting the Outstanding Amount of the L/C Obligations and the Outstanding Amount of Loans made pursuant to this Section 2.03(g) and held as Cash Collateral for such L/C Obligations.

(h)     Applicability of ISP and UCP.  Unless otherwise expressly agreed by the applicable L/C Issuer and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit.

(i)     Reserved.

(j)     Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer.  The Borrower shall pay directly to the applicable L/C Issuer, for its own account, a customary fronting fee (the "Fronting Fee") computed on the daily amount available to be drawn under each Letter of Credit issued by such L/C Issuer and payable on a monthly basis in arrears. Such Fronting Fees shall be due and payable on the first day after the end of each month, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand.  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06.  In addition, the Borrower shall pay directly to the applicable L/C Issuer, for its own account, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(k)     Conflict with Issuer Documents.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

**2.04    Reserved.**

**2.05    Prepayments.**

(a)     Subject to Section 2.09 hereof, the Borrower may, upon irrevocable notice from the Borrower to the Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; provided that (i) such notice must be received by the Agent not later than 11:00 a.m. three Business Days prior to any date of prepayment (or such later date or time as agreed to by Agent in writing); and (ii) any prepayment shall be in a principal amount of $100,000 or a whole multiple of $10,000 in excess thereof or, if less, the entire principal amount thereof then outstanding; provided that prepayments applied to the Obligations pursuant to Section 6.13(d) shall not be subject to any prepayment minimums or notice requirements.  Except as provided in Section 2.05(b) below or in connection with a permanent reduction in the Aggregate Tranche A-1 Commitments permitted hereunder, all

- 55 -

payments shall be first applied to Tranche A Loans, and upon payment of Tranche A Loans in full, to Tranche A-1 Loans. Each such notice shall specify the date and amount of such prepayment. The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Borrower and is not later revoked, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment shall be accompanied by all accrued interest on the amount prepaid. Each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

(b)    If for any reason the Total Outstandings at any time exceed the lesser of (i) the Aggregate Commitments or (ii) the Borrowing Base, the Borrower shall immediately prepay in an aggregate amount necessary to eliminate such excess, (x) first, the Tranche A Loans, and (y) second, if there remains an excess after the payments made under clause (x) above, the Tranche A-1 Loans.

(c)    The Borrower shall prepay the Loans and Cash Collateralize the L/C Obligations (to the extent that any such L/C Obligations are not already Cash Collateralized) with proceeds and collections received by the Loan Parties to the extent so required under the provisions of Section 6.13 hereof.

(d)    The Borrower shall prepay the Loans and Cash Collateralize the L/C Obligations (to the extent that any such L/C Obligations are not already Cash Collateralized) in an amount equal to the Net Proceeds received by a Loan Party on account of a Prepayment Event.

(e)    Upon the expiration of any Letter of Credit, or any reduction in the amount of any Letter of Credit, the Borrower shall immediately prepay the Loans then outstanding with the cash collateral held by the applicable L/C Issuer on account of such Letter of Credit in an amount equal to (i) in the case of the expiration of such Letter of Credit, the aggregate amount of Cash Collateral held by the applicable L/C Issuer on account of such Letter of Credit prior to giving effect to such prepayment, and (ii) in the case of any reduction in the amount of such Letter of Credit, (A) the aggregate amount of Cash Collateral held by the applicable L/C Issuer on account of such Letter of Credit prior to giving effect to such prepayment minus (ii) the amount of cash collateral required to Cash Collateralize the aggregate undrawn amount available to be drawn on such Letter of Credit, after giving effect to the reduction thereof, in accordance with Section 2.03(g).

(f)    Prepayments made pursuant to Sections (c), (d) and (e) above, first, shall be applied ratably to the outstanding Tranche A Loans; second, shall be applied to the outstanding Tranche A-1 Loans, third, shall be used to Cash Collateralize the remaining L/C Obligations (to the extent that any such L/C Obligations are not already Cash Collateralized); and, fourth, the amount remaining, if any, may be retained by the Borrower for use in the ordinary course of its business. Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrower or any other Loan Party) to reimburse the applicable L/C Issuer.

**2.06    Termination or Reduction of Commitments.**

(a)    Subject to Section 2.09, the Borrower may, upon irrevocable notice from the Borrower to the Agent (which may be revocable if such notice states that termination of the Commitments and prepayment is contingent upon the refinancing in full of the credit facility provided for hereunder), terminate the Aggregate Tranche A Commitments, the Aggregate Tranche A-1 Commitments or the Letter of Credit Sublimit or from time to time permanently reduce the Aggregate Tranche A Commitments, the Aggregate Tranche A-1 Commitments or the Letter of Credit Sublimit; provided, that (i) any such notice shall be received by the Agent not later than 11:00 a.m. three (3) Business Days prior to the date of termination or reduction (or such later date or time as agreed to by Agent in writing), (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $500,000 in excess thereof, (iii) the Borrower shall not terminate or reduce (A) the Tranche A Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the aggregate Outstanding Amount of the Tranche A Loans and the L/C Obligations would exceed the Aggregate Tranche A Commitments, (B) the Tranche A-1 Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the aggregate Outstanding Amount of the Tranche A-1 Loans would exceed the Aggregate Tranche A-1 Commitments, C) the Tranche A-1 Commitments unless prior to or simultaneously therewith, all Tranche A Loans and L/C Obligations have been paid in full (or, in the case of L/C Obligations, Cash Collateralized, to the extent not previously Cash Collateralized) and all Tranche A Commitments have been terminated, and (D) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations would exceed the Letter of Credit Sublimit.

(b)    If, after giving effect to any reduction of the Aggregate Tranche A Commitments or the Letter of Credit Sublimit, the Letter of Sublimit exceeds the amount of the Aggregate Tranche A Commitments or such Letter of Credit Sublimit, the Letter of Credit Sublimit shall be automatically reduced by the amount of such excess.

(c)    In the event that the Tranche A Commitments are terminated or are reduced to zero, the Tranche A-1 Commitments shall be automatically terminated.

(d)    The Agent will promptly notify the Lenders of any termination or reduction of the Letter of Credit Sublimit, the Aggregate Tranche A Commitments or the Aggregate Tranche A-1 Commitments under this Section 2.06.  Upon any reduction of the Aggregate Tranche A Commitments, the Tranche A Commitment of each Tranche A Lender shall be reduced by such Tranche A Lender's Applicable Percentage of such reduction amount. Upon any reduction of the Aggregate Tranche A-1 Commitments, the Tranche A-1 Commitment of each Tranche A-1 Lender shall be reduced by such Tranche A-1 Lender's Applicable Percentage of such reduction amount.  All fees (including, without limitation, commitment fees) and interest in respect of the Aggregate Tranche A Commitments or Aggregate Tranche A-1 Commitments, as applicable, accrued until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

**2.07    Repayment of Loans.**    The Borrower shall repay to the Lenders on the Termination Date the aggregate principal amount of Loans and all other Obligations outstanding on such date.

- 57 -

**2.08    Interest.**

(a)    Subject to the provisions of <u>Section 2.08(b)</u> below, each Tranche A Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Tranche A Interest Rate and each Tranche A-1 Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Tranche A-1 Interest Rate; <u>provided</u>, that notwithstanding fluctuations in the Tranche A Interest Rate or Tranche A-1 Interest Rate, the effective interest rate payable by Borrower with respect to the Tranche A Loans and Tranche A-1 Loans shall at no time be less than the Interest Rate Floor, which minimum interest rates will apply regardless of fluctuations in the Adjusted LIBO Rate that would otherwise cause the interest rate applicable to Tranche A Loans and Tranche A-1 Loans to be less than such Interest Rate Floor.

(b)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(i)    If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times during such existing Event of Default equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09    Fees.** In addition to certain fees described in <u>Section 2.03(j)</u>, the Borrower shall pay to the Agent for its own account and to the Agent, for the ratable benefit of the Tranche A-1 Agent and the Lenders (as applicable) fees in the amounts, and at the times, specified in the Fee Letter.

**2.10    Computation of Interest and Fees; Application of Payments.** All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made. For purposes of the calculation of the Outstanding Amount and interest on the Loans, all payments made by or on account of the Borrower shall be deemed to have been applied to the Loans one (1) Business Day after receipt of such payments by the Agent (as such receipt is determined pursuant to <u>Section 2.12</u>). Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest or demonstrable error.

- 58 -

**2.11    Evidence of Debt.**

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business.    In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.    The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest or demonstrable error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.    Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.    In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest or demonstrable error.    Upon the request of any Lender made through the Agent, the Borrower shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Loans, as applicable, in addition to such accounts or records.    Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.    Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrower will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)    Agent shall render monthly statements regarding the Loan Account to the Borrower including principal, interest, fees, and including an itemization of all charges and expenses constituting Credit Party Expenses owing, and such statements, absent manifest or demonstrable error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and the Credit Parties unless, within thirty (30) days after receipt thereof by the Borrower, the Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

**2.12    Payments Generally; Agent's Clawback.**

(a)    General.    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.    Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.    The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.    All payments received by the Agent (i) prior to or at 2:00 p.m., shall be deemed received on the same Business Day and (ii) after 2:00 p.m., shall be deemed received on the next succeeding Business Day; any applicable interest or fee shall continue to accrue and shall be calculated pursuant to Section 2.10.    If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next

- 59 -

following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    _Funding by Lenders; Presumption by Agent_.  Unless the Agent shall have received notice from a Lender prior to 1:00 p.m. on the date of such Borrowing that such Lender will not make available to the Agent such Lender's share of such Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Agent, then the applicable Lender and the Borrower severally agrees to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Tranche A Loans.  If the Borrower and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Agent, then the amount so paid shall constitute such Lender's Loans included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Agent.

(i)    _Payments by Borrower; Presumptions by Agent_.  Unless the Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders or the applicable L/C Issuer hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable L/C Issuer, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the applicable L/C Issuer, as the case may be, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender or the applicable L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest or demonstrable error.

(c)    _Failure to Satisfy Conditions Precedent_.  If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of

- 60 -

Section 4.02 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and to make payments hereunder are several and not joint.   The failure of any Lender to make any Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its portion of the Loan, to purchase its participation or to make its payment hereunder.

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

2.13    Sharing of Payments by Lenders.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in any such Lender receiving payment of a proportion of the aggregate amount of such Obligations greater than its pro rata share thereof as provided herein (including, as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Lenders, as applicable, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section 2.13 shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its portion of its Loans or subparticipations in L/C Obligations to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

- 61 -

BOS 47487387v10

**2.14    Settlement Amongst Lenders.**

(a)    The amount of each Lender's Applicable Percentage of outstanding Loans (shall be computed weekly (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Loans and repayments of Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b)    The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Loans for the period and the amount of repayments received for the period. As reflected on the summary statement, (i) the Agent shall transfer to each Tranche A Lender its Tranche A Applicable Percentage of repayments of Tranche A Loans and shall transfer to each Tranche A-1 Lender its Tranche A-1 Applicable Percentage of repayments of Tranche A-1 Loans, and (ii) each Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Tranche A Loans and Tranche A-1 Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all Tranche A Loans and Tranche A-1 Loans, as applicable, outstanding as of such Settlement Date. If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent. If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**2.15    Defaulting Lenders.**

(a)    Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.01.

(ii)    Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 10.08 shall be applied at such time or times as may be determined by the Agent as follows:  first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such

- 62 -

Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; third, if so determined by the Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Aggregate Commitments hereunder. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     Certain Fees. No Defaulting Lender shall be entitled to receive any fee payable under the Fee Letter for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)     Defaulting Lender Cure. If the Borrower and the Agent agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lenders having been a Defaulting Lender.

BOS 47487387v10

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY;
## APPOINTMENT OF BORROWER

**3.01   Taxes.**

(a)   <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions of Indemnified Taxes or Other Taxes (including deductions applicable to additional sums payable under this Section) the Agent, the Lender or the applicable L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions of Indemnified Taxes or Other Taxes and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b)   <u>Payment of Other Taxes by the Borrower</u>.  Without limiting the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)   <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent, each Lender and each L/C Issuer, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Agent, such Lender or such L/C Issuer, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or a L/C Issuer (with a copy to the Agent), or by the Agent on its own behalf or on behalf of the Agent, a Lender or a L/C Issuer, shall be conclusive absent manifest or demonstrable error.

(d)   <u>Evidence of Payments</u>.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)   <u>Status of Lenders.</u>

(i)   The Agent shall deliver to Borrower a properly completed and executed copy of any other form or forms, including IRS Form W-9 or appropriate IRS Form W-8, as applicable, as may be required under the Code or other laws of the United States as a condition to exemption from United States withholding or backup withholding Tax.  Any

- 64 -

Recipient that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding. Such delivery shall be provided on the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered. In addition, any Recipient, if requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(ii)    Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

A)    duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E claiming eligibility for benefits of an income tax treaty to which the United States is a party,

B)    duly completed copies of Internal Revenue Service Form W-8ECI,

C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E,

D)    any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower to determine the withholding or deduction required to be made;

(iii)    Each Recipient that is not a Foreign Lender shall deliver to the Borrower and the Agent two properly completed and duly executed copies of Internal Revenue Service Form W 9 (or any successor or other applicable form) certifying that such Recipient is exempt from United States federal backup withholding.

BOS 47487387v10

(iv)    If a payment made to a Recipient under any Loan Document would be subject to Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Agent at the time or times prescribed by applicable law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code or any applicable intergovernmental agreement) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA, to determine whether such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount (if any) to deduct and withhold from such payment. For the avoidance of doubt, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)    Treatment of Certain Refunds.    If any Recipient determines, in its Permitted Discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to this Section, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrowers, upon the request of such Recipient, agree to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Recipient in the event such Recipient is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrowers or any other Person.

3.02    **Illegality.**    If the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan thereof that (a) adequate and reasonable means do not exist for determining the LIBO Rate or (b) the LIBO Rate does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Borrower and each Lender. Upon receipt of such notice, interest on the Loans shall accrue at interest rates based on the Base Rate plus a margin reasonably determined by the Agent to result in interest rates similar to those based on the LIBO Rate, until the Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for LIBO Rate Loans.

3.03    **Inability to Determine Rates.**    If the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan or a conversion to a LIBO Rate Loan that (a) adequate and reasonable means do not exist for determining the LIBO Rate for with respect to a proposed LIBO Rate Loan, or (b) the LIBO Rate with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended until the Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the

- 66 -

Borrower may revoke any pending request for a Borrowing of or conversion to LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Committed Borrowing of Base Rate Loans in the amount specified therein.

    **3.04    Increased Costs; Reserves on LIBO Rate Loans.**

        (a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

            (i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate) or any L/C Issuer;

            (ii)    subject any Lender or any L/C Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit or any LIBO Rate Loan made by it, or change the basis of taxation of payments to such Lender or such L/C Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or such L/C Issuer); or

            (iii)    impose on any Lender or any L/C Issuer any other condition, cost or expense affecting this Agreement or LIBO Rate Loans made by such Lender or any Letter of Credit;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such L/C Issuer of issuing or maintaining any Letter of Credit (or of maintaining its obligation to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or such L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or such L/C Issuer, the Borrower will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

        (b)    <u>Capital Requirements</u>.  If any Lender or any L/C Issuer determines that any Change in Law affecting such Lender or such L/C Issuer or any Lending Office of such Lender or such Lender's or such L/C Issuer's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or such L/C Issuer's capital or on the capital of such Lender's or such L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, or the Letters of Credit issued by such L/C Issuer, to a level below that which such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such L/C Issuer's policies and the policies of such Lender's or such L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such

BOS 47487387v10

Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement. A certificate of a Lender or a L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or such L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest or demonstrable error.  The Borrower shall pay such Lender or such L/C Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender or any L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or such L/C Issuer's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender or a L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs or reductions suffered more than nine months prior to the date that such Lender or such L/C Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on LIBO Rate Loans. The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least 10 days' prior notice (with a copy to the Agent) of such additional interest from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

3.05    Reserved.

3.06    Mitigation Obligations; Replacement of Lenders.

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be

- 68 -

disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)   Replacement of Lenders.   If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrower may replace such Lender in accordance with Section 10.13.

3.07   **Survival.**   All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of the Loans and all other Obligations hereunder.

## ARTICLE IV
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

4.01   **Conditions of Initial Credit Extension.**   The obligation of each L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)   The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent:

(i)   executed counterparts of this Agreement sufficient in number for distribution to the Agent, each Lender and the Borrower;

(ii)   a Note executed by the Borrower in favor of each Lender requesting a Note;

(iii)   the Preferred Equity Documents, in each case, executed by all parties thereto;

(iv)   such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(v)   copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or

- 69 -

operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(vi)    a favorable opinion of Kirkland & Ellis LLP, counsel to the Loan Parties, addressed to the Agent and each Lender, as to such matters concerning the Loan Parties and the Loan Documents as the Agent may reasonably request;

(vii)    a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied, (B) that there has been no event or circumstance since February 2, 2014 that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, (C) to the Solvency of the Loan Parties as of the Closing Date after giving effect to the transactions contemplated hereby, and (D) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(viii)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(ix)    a payoff letter from the lender under the Existing Credit Agreement reasonably satisfactory in form and substance to the Agent evidencing that the Existing Credit Agreement has been or concurrently with the Closing Date is being terminated, all obligations thereunder are being paid in full, and all Liens securing obligations under the Existing Credit Agreement have been or concurrently with the Closing Date are being released;

(x)    the Security Documents and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(xi)    all other Loan Documents, each duly executed by the applicable Loan Parties;

(xii)    receipt of satisfactory intercreditor agreements and/or subordination agreements in respect of any Subordinated Indebtedness;

(xiii)    appraisals (based on net liquidation value) by a third party appraiser acceptable to the Agent of all Inventory of the Borrower, the results of which are satisfactory to the Agent and (B) a written report regarding the results of a commercial finance examination of the Loan Parties, which shall be satisfactory to the Agent;

(xiv)    results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent are being tendered

- 70 -

concurrently with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

(xv)     all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, or concurrently with the Closing Date shall be filed, registered or recorded to the reasonable satisfaction of the Agent, (B) the DDA Notifications, Credit Card Notifications, and Blocked Account Agreements required pursuant to Section 6.13 hereof, (C) control agreements with respect to the Loan Parties' securities and investment accounts, and (D) Collateral Access Agreements as required by the Agent;

(xvi)     such other assurances, certificates, documents, consents or opinions as the Agent or its counsel may reasonably require.

(b)     After giving effect to (i) the first funding under the Loans, (ii) any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby and (iii) all Letters of Credit to be issued at, or immediately subsequent to, such establishment, Availability shall be not less than $15,000,000.

(c)     The Agent shall have received a Borrowing Base Certificate dated the Closing Date and executed by a Responsible Officer of the Borrower.

(d)     The Agent shall be reasonably satisfied that any financial statements delivered to it fairly present the business and financial condition of the Loan Parties and that there has been no Material Adverse Effect since February 2, 2014.

(e)     The Agent shall have received and be satisfied with the Borrower's Initial Business Plan and such other information (financial or otherwise) reasonably requested by the Agent.

(f)     There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(g)     There shall not have occurred any default of any Material Contract of any Loan Party.

(h)     The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

(i)     All reasonable and documented fees and expenses required to be paid to the Agent on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

- 71 -

(j)    The Borrower shall have paid all reasonable fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Agent).

(k)    Scott Gladstone shall be reaffirmed as Chief Executive Officer of the Borrower;

(l)    The Agent and the Lenders shall have completed satisfactory background check of the Loan Parties' owners, shareholders and management and shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(m)    No material changes in governmental regulations or policies affecting any Loan Party or any Credit Party shall have occurred prior to the Closing Date.

(n)    The Agent and Lenders shall have received a satisfactory quality of earnings report;

(o)    Evidence satisfactory to the Agent that (i) all of Borrower's rents due in June 2014 or prior shall have been paid by July 7, 2014, and (ii) all of Borrower's rents due prior to the Closing Date shall have been paid current as of the Closing Date or such rents shall be paid with the proceeds of the initial Loans under this Agreement on the Closing Date; and

(p)    The Closing Date shall have occurred on or before July 31, 2014.  The Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding on the Loan Parties.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

4.02    **Conditions to all Credit Extensions**.  The obligation of each Lender to honor any Request for Credit Extension and each L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

(a)    The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (ii) in the case of any representation and warranty

- 72 -

qualified by materiality, they shall be true and correct in all respects, and (iii) for changes expressly permitted by this Agreement.

(b)    No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;

(c)    The Agent and, if applicable, the applicable L/C Issuer shall have received a Request for Credit Extension in accordance with the requirements hereof;

(d)    No event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred; and

(e)    No Overadvance shall result from such Credit Extension.

Each Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Agent to cease making Loans and direct each L/C Issuer to cease issuing Letters of Credit, the Lenders will fund their Applicable Percentage of all Loans whenever made, which are requested by the Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, agreed to by the Agent; provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power.**  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation, (b) has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or

- 73 -

BOS 47487387v10

organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02   Authorization; No Contravention.** The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03   Governmental Authorization; Other Consents.**   No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof), (b) such as have been obtained or made and are in full force and effect or (c) notices required under applicable law in connection with the enforcement of remedies pursuant to the Loan Documents.

**5.04   Binding Effect.** This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05   Financial Statements; No Material Adverse Effect.**

(a)      The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all Material Indebtedness and other liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness, in accordance with GAAP except as otherwise expressly noted therein.

(b)      The unaudited Consolidated balance sheet of the Borrower and its Subsidiaries dated May 4, 2014, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the Fiscal Quarter ended on that date (i)

were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)     Since the date of the Audited Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)     To the best knowledge of the Borrower, no Internal Control Event exists or has occurred since the date of the Audited Financial Statements that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Agent or the Lenders, (ii) of the Borrowing Base, or (iii) of the assets, liabilities, financial condition or results of operations of the Borrower and its Subsidiaries on a Consolidated basis.

(e)     The Loan Parties and their Subsidiaries have no Indebtedness other than Indebtedness permitted pursuant to Section 7.03. There has not been (and none of the Loan Parties has received any notice of) (i) a material reduction or proposed reduction in the aggregate amount of trade credit available to the Loan Parties for purchases of inventory from their key merchandise vendors, or (ii) a material tightening of the terms of the trade credit or the credit limits made available to the Loan Parties by any of the its key merchandise vendors.

5.06    **Litigation.** There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in Schedule 5.06, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect, and since the Closing Date, there has been no adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described on Schedule 5.06.

5.07    **No Default.** No Loan Party or any Subsidiary is in default under or with respect to, or party to, any Material Contract or any Material Indebtedness. No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

5.08    **Ownership of Property; Liens.**

(a)     Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests (subject to Permitted Encumbrances) in, all Real Estate necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each of the Loan Parties and each Subsidiary has good and marketable

- 75 -

title to, valid leasehold interests (subject to Permitted Encumbrances) in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.

(b)     Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien thereon, in each case as of the Closing Date. Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances. Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease, in each case as of the Closing Date. Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof (after giving effect to the applicable grace periods).

(c)     The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d)     The Loan Parties have no Investments, other than Permitted Investments.

(e)     The Loan Parties have no Indebtedness, other than Permitted Indebtedness.

**5.09    Environmental Compliance.**

(a)     Except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Except as otherwise set forth on Schedule 5.09, no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed,

- 76 -

either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.10    **Insurance**.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates. Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

5.11    **Taxes**.  The Loan Parties and their Subsidiaries have filed all income and other material tax returns and reports required to be filed, and have paid all income and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien (other than any Permitted Encumbrance described in clause (a) of the definition of Permitted Encumbrances) has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement primarily related to Taxes, which include any Person who is not a Loan Party or a Subsidiary.

5.12    **ERISA Compliance.**

(a)    The Borrower, each of its ERISA Affiliates and each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Sections 412 or 430 of the Code and to each Multiemployer Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Sections 412 or 430 of the Code has been made with respect to any Plan. No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or Multiemployer Plan.

- 77 -

(b)    There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13    Subsidiaries; Equity Interests.**  The Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary.  All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents.  Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary.  The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part(b) of Schedule 5.13.  All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents.  The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14    Margin Regulations; Investment Company Act.**

(a)    No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

- 78 -

5.15    **Disclosure.**  Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

5.16    **Compliance with Laws.**  Each of the Loan Parties and each Subsidiary is in compliance (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18 hereof.

5.17    **Intellectual Property; Licenses, Etc.**  The Loan Parties and their Subsidiaries own, or possess the right to use, all of the material Intellectual Property, all material licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.  To the best knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person, except as could not reasonably be expected to have a Material Adverse Effect.  Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.18    **Labor Matters.**  There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect. No Loan Party or any of its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law.  All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock,

- 79 -

stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

### 5.19    Security Documents.

(a)    The Security Agreement creates in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement. Upon such filings and/or the obtaining of "control" (as defined in the UCC), the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person.

(b)    When the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified in Schedule II of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

### 5.20    Solvency.

After giving effect to the transactions contemplated by this Agreement, and before and after giving effect to each Credit Extension, the Loan Parties, on a

- 80 -

Consolidated basis, are Solvent. No transfer of property has been or will be made by any Loan Party and no obligation has been or will be incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of any Loan Party.

**5.21    Deposit Accounts; Credit Card Arrangements.**

(a)    Annexed hereto as Schedule 5.21(a) is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.

(b)    Annexed hereto as Schedule 5.21(b) is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22    Brokers.**  Except with respect to the transactions and fees contemplated by that certain engagement letter dated as of January 27, 2014 by and between the Borrower and Alix Partners, LLC as amended or supplemented from time to time, no broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.  Notwithstanding the foregoing, the Loan Parties shall be solely responsible for payment of any finder's or brokerage fees.

**5.23    Customer and Trade Relations.**  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations.

**5.24    Material Contracts.**  Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Closing Date.  The Loan Parties are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of default under, or of the intention of any other party thereto to terminate, any Material Contract.

**5.25    Casualty.**  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26    Business Plan.**  The Borrower is operating its business in all material respects in a manner consistent with the Business Plan most recently delivered pursuant to Section 6.01(c) and accepted by the Agent in its Permitted Discretion.

- 81 -

**5.27   Personally Identifiable Information.**   Borrower maintains a policy for the treatment, handling and storage of consumer information and personally identifiable information in accordance with applicable Laws and a true, accurate and complete copy of the current version thereof has been provided to the Agent.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted) , or any Letter of Credit shall remain outstanding, the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

**6.01   Financial Statements.**  Deliver to the Agent, in form and detail satisfactory to the Agent:

(a)     as soon as available, but in any event within 120 days after the end of each Fiscal Year of the Borrower (commencing with the Fiscal Year ended February 2, 2014, which shall be delivered no later than thirty (30) days after the Closing Date), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by (i) for the Fiscal Year ended February 2, 2014, a report and opinion of a Registered Public Accounting Firm of nationally recognized standing reasonably acceptable to the Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any exception as to the scope of such audit, and (ii) for any Fiscal Year after the Fiscal Year ended February 2, 2014, a report and unqualified opinion of a Registered Public Accounting Firm of nationally recognized standing reasonably acceptable to the Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit;

(b)     as soon as available, but in any event within 30 days after the end of each of the Fiscal Months of each Fiscal Year of the Borrower (commencing with the Fiscal Month ended July 6, 2014), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Month, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Month (provided that for the Fiscal Month ended July 6, 2014 through the Fiscal Month ended November 30, 2014, such cash flow statements shall be delivered within 36 days after the end of each Fiscal Month), and for the portion of the Borrower's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(c)(i) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, such consolidated statements to be certified by a Responsible Officer of the Borrower as fairly presenting the

- 82 -

financial condition, results of operations, Shareholders' Equity and cash flows of the Borrower and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)    prior to the Closing Date, the Borrower shall have delivered the Initial Business Plan; and

(i)    as soon as available, but in any event no more than 30 days before the end of each Fiscal Year of the Borrower for time periods commencing after the Initial Business Plan, the Business Plan of the Borrower and its Subsidiaries on a monthly basis for the immediately following Fiscal Year (including the Fiscal Year in which the Maturity Date occurs), and as soon as available, any significant revisions to the Business Plan with respect to such Fiscal Year.

6.02    **Certificates; Other Information.**  Deliver to the Agent and Tranche A-1 Agent, in form and detail satisfactory to the Agent:

(a)    concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and 6.01(b) (commencing with the delivery of the financial statements for the Fiscal Month ended July 6, 2014), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower , and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP;

(b)    on Thursday of each Fiscal Week by 2:00 p.m. (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the immediately preceding week (provided that the Appraised Value percentage applied to the Eligible Inventory set forth in each Borrowing Base Certificate shall be the percentage set forth in the most recent appraisal obtained by the Agent pursuant to Section 6.10 hereof for the applicable month in which such Borrowing Base Certificate is delivered), each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Borrower and accompanied by all applicable system generated documentation supporting the information contained within the Borrowing Base Certificate, including but not limited to inventory reporting inclusive of inventory mix by category and/or department and, where applicable, accounts receivable detail documentation, screen shots of the Loan Parties' bank accounts requested by the Agent as of the date of such Borrowing Base Certificate, and any additional documentation reasonably requested by the Agent;

(c)    promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(d)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan

- 83 -

Parties in their capacities as such, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto;

(e)     The financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

(f)     promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary in their capacities as thereof pursuant to the terms of any indenture, loan or credit or similar agreement evidencing Material Indebtedness and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(g)     as soon as available, but in any event within 30 days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

(h)     promptly after the Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

(i)     promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect; and

(j)     promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Sections 6.01(a), 6.01(b) or 6.01(c) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); provided that: (i) the Borrower shall deliver paper copies of such documents to the Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (ii) the Borrower shall notify the Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the

- 84 -

Compliance Certificates required by Section 6.02(a) to the Agent. The Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

   6.03    **Notices.**    Promptly notify the Agent upon any Responsible Officer obtaining knowledge:

   (a)    of the occurrence of any Default or Event of Default;

   (b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

   (c)    of any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof;

   (d)    of any dispute or litigation where the amount in dispute is in excess of $50,000 or which involves any request for injunctive relief, or any investigation, proceeding or suspension (except any suspension of a license, permit or qualification, or notice thereof, the failure of which to maintain could not reasonably be expected to have a Material Adverse Effect) between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

   (e)    of the occurrence of any ERISA Event;

   (f)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

   (g)    of any change in any Loan Party's senior executive officers;

   (h)    of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

   (i)    of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

   (j)    of the filing of any Lien for unpaid Taxes in excess of $10,000 against any Loan Party;

   (k)    of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

- 85 -

(l)    of any material variance of the Loan Parties' actual performance from the projected results in the Business Plan or of any plan of the Loan Parties to deviate materially from operating in the ordinary course of business; and

(m)    of any failure by any Loan Party to pay rent (after any applicable grace periods) at (i) any distribution centers or warehouses; or (ii) ten percent (10%) or more of such Loan Party's locations or (ii) any of such Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first came due and such failure would be reasonably likely to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04    Payment of Obligations.**  Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d) no Lien has been filed with respect thereto and (e) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

**6.05    Preservation of Existence, Etc.**  Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

**6.06    Maintenance of Properties.**  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

- 86 -

**6.07    Maintenance of Insurance.**

(a)    Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent.

(b)    Cause property, fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)    Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)    Cause business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, any Lender or any other Credit Party shall be a co insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties so long as the same are available on commercially reasonable terms.

(e)    Unless prohibited by the terms of insurance policy, cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(f)    Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence satisfactory to the Agent of payment of the premium therefor.

(g)    Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried

- 87 -

by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(h)     Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

(i)     None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08    Compliance with Laws.** Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; (b) such contest effectively suspends enforcement of the contested Laws, and (c) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09    Books and Records; Accountants.**

(a)     Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)     At all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Agent and shall instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Agent (it being agreed that the Borrower has the right to be present at all such discussions).

### 6.10    Inspection Rights.

(a)    Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the Business Plan, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that so long as no Event of Default has occurred and is continuing, the Loan Parties shall not be obligated to reimburse the Agent (or its representatives or independent contractors) for more than two (2) inspections per Fiscal Year; provided, however, further, that when a Default or Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations, quality of earnings, and other evaluations, including, without limitation, of (i) the Borrower's practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (ii) the Business Plan. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such examinations and evaluations; provided, however, that so long as no Event of Default has occurred and is continuing, the Loan Parties shall not be obligated to pay such fees or expenses for more than two (2) examinations or evaluations per Fiscal Year. Without limiting the foregoing, the Loan Parties acknowledge that the Agent may, in its Permitted Discretion, undertake up to two (2) commercial finance examinations each Fiscal Year at the Loan Parties' expense. Notwithstanding the foregoing, the Agent may cause additional commercial finance examinations to be undertaken (i) as it deems necessary or appropriate, at its own expense or, (ii) if required by Agent in its Permitted Discretion or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such appraisals; provided, however, that so long as no Event of Default has occurred and is continuing, the Loan Parties shall not be obligated to pay such fees or expenses for more than two (2) appraisals per Fiscal Year. Without limiting the foregoing, the Loan Parties acknowledge that the Agent may, in its Permitted Discretion, undertake up to two (2) inventory appraisals each Fiscal Year at the Loan Parties' expense. Notwithstanding the foregoing, the Agent may cause additional appraisals to be undertaken (i) as it deems necessary or appropriate, at its own expense or, (ii) if required by Agent in its Permitted Discretion or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

- 89 -

(d)     Upon the reasonable request of the Agent after reasonable prior notice, deliver completed (or, if applicable, updated) background checks on any of the Loan Parties' officers, directors, employees or agents, from a service or source, and in form and with such detail as may be, reasonably satisfactory to the Agent.

(e)     Upon the request of Salus after reasonable prior notice, use commercially reasonable efforts to assist Salus and any other Salus Entity (and any of their lending or funding sources) in obtaining ratings for the credit facilities provided for herein from one or more national rating agencies. Without limiting the foregoing, senior management members of the Loan Parties shall attend or host one or more meetings with such rating agencies and Salus upon reasonable prior notice.

**6.11    Use of Proceeds.** Use the proceeds of the Credit Extensions (a) to refinance Indebtedness under the Existing Credit Agreement, (b) to the extent not current, pay rent for Borrower's Leases so that all Leases are current through the calendar month ending June 30, 2014, (c) finance the acquisition of working capital assets of the Borrower, including the purchase of inventory and equipment, in each case in the ordinary course of business, and (d) for general corporate purposes of the Loan Parties, in each case to the extent not prohibited under applicable Law and the Loan Documents.

**6.12    Additional Loan Parties.** Notify the Agent at the time that any Person becomes a Subsidiary, promptly thereafter (and in any event within fifteen (15) days or such longer period as the Agent may determine in its sole discretion), cause any such Person to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness, in each case in form, content and scope reasonably satisfactory to the Agent. In no event shall compliance with this Section 6.12 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.12 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

**6.13    Cash Management.**

(a)     On or prior to the Closing Date:

(i)     deliver to the Agent copies of notifications (each, a "Credit Card Notification") substantially in the form attached hereto as **Exhibit F** which have been executed on behalf of such Loan Party and the applicable Credit Card Issuer or Credit Card Processor and

- 90 -

delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.21(b);

(ii)  enter into a Blocked Account Agreement satisfactory in form and substance to the Agent with each Blocked Account Bank other than the Excluded Accounts (collectively, together with the Concentration Account, the "Blocked Accounts"); and

(iii)  at the request of the Agent, deliver to the Agent copies of notifications (each, a "DDA Notification") substantially in the form attached hereto as **Exhibit G** which have been executed on behalf of such Loan Party and delivered to each depository institution listed on Schedule 5.21(a).

(b)  From and after the Closing Date, the Loan Parties shall cause to be sent via ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a Blocked Account all of the following:

(i)  except for the Excluded Accounts, the Operating Account and the Controlled Disbursement Account, all amounts on deposit in each DDA (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained, excluding the effects of cash received in such DDA after the completion of the daily sweep);

(ii)  all payments due from Credit Card Processors and Credit Card Issuers and proceeds of all credit card charges;

(iii)  all cash receipts from the Disposition of Inventory and other assets (whether or not constituting Collateral);

(iv)  all proceeds of Accounts; and

(v)  all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event.

(c)  Except for the Excluded Accounts, the Operating Account and the Controlled Disbursement Account, each Blocked Account Agreement shall require upon notice from Agent, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account controlled by the Agent at Union Bank, N.A. with account number 45010-49912 (the "Concentration Account"), of all cash receipts and collections received by each Loan Party from all sources (the "Receipts and Collections"), including, without limitation, the following:

(i)  the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank excluding the effects of cash received in such DDA after the completion of the daily sweep);

- 91 -

(ii)    all amounts required to be deposited into the Blocked Accounts pursuant to clause (b) above; and

(iii)    any other cash amounts received by any Loan Party from any other source, on account of any type of transaction or event;

provided, however, the Agent may, in its sole discretion, permit the Loan Parties to have one or more "intermediate" Blocked Account Agreements, whereby such agreements would provide, upon notice from the Agent, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) all Receipts and Collections to another Blocked Account, as opposed to the Concentration Account.

(d)    The Concentration Account shall at all times be under the sole dominion and control of the Agent and all funds therein shall be wired to an account specified by Agent no less frequently than daily.  The Agent shall cause all funds on deposit in the Concentration Account to be applied to the Obligations, which amounts shall be applied to the Obligations in the order proscribed in either Section 2.05(f) or Section 8.03 of this Agreement, as applicable. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, and (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations.  In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(e)    Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above and provide the Agent with "view-only" access to each of the Loan Parties bank accounts identified by the Agent.

(f)    If the Agent does not require DDA Notifications to be delivered on the Closing Date in accordance with Section 6.13(a) above, then the Loan Parties shall, upon the request of the Agent at any time after the Closing Date, deliver to the Agent copies of DDA Notifications, which have been executed on behalf of the applicable Loan Party and delivered to each depository institution listed on Schedule 5.21(a).

6.14    **Information Regarding the Collateral.**

(a)    Furnish to the Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's

- 92 -

organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

(b)     Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Closing Date, the Borrower shall periodically, on a quarterly basis, provide revisions or updates to any such Schedules as may be necessary or appropriate to update or correct the same; provided, however, that, for any changes to the Schedules resulting from matters expressly permitted under this Agreement no such periodic revision or update shall be required. From time to time as may be reasonably requested by the Agent, the Borrower shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein). Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

**6.15    Physical Inventories.**

(a)     Cause not less than one (1) physical inventory to be undertaken, at the expense of the Loan Parties, in each Fiscal Year and periodic cycle counts, in each case consistent with past practices, conducted by such inventory takers as are satisfactory to the Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be reasonably satisfactory to the Agent. The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party. The Borrower, within ten (10) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (upon the request of the Agent, any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)     Permit the Agent, in its Permitted Discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines (each, at the expense of the Loan Parties).

- 93 -

**6.16    Environmental Laws.**  (a) Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, _provided_, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.17    Further Assurances.**

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.17 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.17 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    Use, and cause each of the Subsidiaries to use, their commercially reasonable efforts to obtain lease terms in any Lease entered into by any Loan Party after the Closing Date not expressly prohibiting the recording in the relevant real estate filing office of an appropriate memorandum of lease and the encumbrancing of the leasehold interest of such Loan Party in the property that is the subject of such Lease.

(d)    Upon the request of the Agent, cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

(e)    Upon the request of the Agent, use commercially reasonable efforts to cause any of its landlords to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

**6.18    Compliance with Terms of Leaseholds.**    Except as otherwise expressly permitted including, without limitation, in connection with the Permitted Store Closings and the Business Plan, (a) make all payments and otherwise perform all obligations in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party, keep such Leases in full force and effect and do not extend any leases without Agent's prior written consent (such consent not to be unreasonably withheld), (b) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing.

**6.19    Material Contracts.**    (a) Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect, (c) enforce each such Material Contract in accordance with its terms, (d) take all such action to such end as may be from time to time requested by the Agent, (e) upon request of the Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (f) cause each of its Subsidiaries to do the foregoing.

**6.20    Business Plan.**    Operate the business of the Borrower in all material respects in a manner consistent with the Business Plan most recently delivered pursuant to Section 6.01(c) hereof and accepted by the Agent in its Permitted Discretion, provided that such operation does not guarantee that actual results will match the estimates contained in the Business Plan.

**6.21    Employee Benefit Plans.**

(a)    Maintain, and cause each ERISA Affiliate (to the extent it has the ability to do so) to maintain, each Pension Plan in substantial compliance with all applicable Laws.

(b)    Make, and cause each ERISA Affiliate (to the extent it has the ability to do so) to make, on a timely basis, all required contributions to any Multiemployer Plan.

(c)    Not, and not permit any ERISA Affiliate (to the extent it has the ability to do so) to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Plan or (iii) take any other action with respect to any Pension Plan that would, or could reasonably be expected to, entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan, unless the actions or events described in clauses (i), (ii) and (iii) above individually or in the aggregate would not have or could not reasonably be expected to have a Material Adverse Effect.

**6.22    Consultants.**

(a)    The Borrower shall, at the Borrower's sole cost and expense, continue to engage Alix Partners (or other operational and turnaround consultant acceptable to the Agent, the "Turnaround Consultant"). The terms, conditions, scope and duration of the Borrower's engagement of the Turnaround Consultant shall be acceptable to the Agent, provided that the Turnaround Consultant's engagement shall be for the later of (i) three (3) months after the Closing Date, and (ii) the hiring of a new Chief Financial Officer, acceptable to the Agent and the Lenders. The Borrower shall, subject to the Borrower's right to participate in any and all communications between, the Agent, the Tranche A-1 Agent, the Lenders and their counsel and other advisors with respect to matters relating to the Borrower, its business and assets, (i) authorize the Turnaround Consultant and the Agent, the Tranche A-1 Agent, the Lenders and their counsel and other advisors, to communicate directly regarding all matters relating to the services to be rendered by Turnaround Consultant to the Borrower, including, without limitation, to discuss all financial reports, business information, findings and recommendations of the Turnaround Consultant, and (ii) authorize and direct the Turnaround Consultant to provide the Agent, the Tranche A-1 Agent, the Lenders and their counsel and other advisors with copies of the Borrower's rolling 13 week cash flow forecast, and such other documents, bi-weekly status reports and work product/work reports prepared by or reviewed by the Turnaround Consultant, (provided that the Agent, the Tranche A-1 Agent, and the Lenders shall execute a non-reliance letter in favor of the Turnaround Consultant in a form mutually acceptable to the parties).

(b)    No later than thirty (30) days after the Closing Date (or such longer period as agreed to by Agent in its sole discretion), the Borrower shall, at the Borrower's sole cost and expense, engage a real estate consultant reasonably acceptable to the Agent, the "Real Estate Consultant") to assist the Borrower in the analyzing the Borrower's Lease portfolio. The Borrower shall, subject to the Borrower's right to participate in any and all communications between, the Agent, the Tranche A-1 Agent, the Lenders and their counsel and other advisors with respect to matters relating to the Borrower's Lease portfolio and other related matters, use commercially reasonable efforts to (i) authorize the Real Estate Consultant and the Agent, the Tranche A-1 Agent, the Lenders and their counsel and other advisors, to communicate directly regarding all matters relating to the services to be rendered by Real Estate Consultant to the Borrower, including, without limitation, to discuss all reports, business information, findings and recommendations of the Real Estate Consultant, and (ii) authorize and direct the Real Estate Consultant to provide the Agent, the Tranche A-1 Agent, the Lenders and their counsel and other advisors with copies of all reports and other information prepared or reviewed by the Real Estate Consultant (provided that to the extent requested by the Real Estate Consultant, the Agent, the Tranche A-1 Agent, and the Lenders shall execute a non-reliance letter in favor of the Real Estate Consultant in a form mutually acceptable to the parties).

(c)    PriceWaterhouse Coopers. Notwithstanding the provisions of Section 6.10(a) hereof, for so long as PriceWaterhouse Coopers ("PWC") is engaged by Agent in evaluating the Borrower's turnaround and restructuring efforts, Agent may, in its Permitted Discretion, direct PWC to visit and inspect any of Borrower's properties, examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, discuss Borrower's affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, subject to the limitations of the Registered Public Accounting Firm's policy

- 96 -

and professional standards, and conduct evaluations of the Business Plan, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that so long as no Event of Default has occurred and is continuing, the Loan Parties shall not be obligated to reimburse the Agent (or PWC and its affiliates) for more than two (2) inspections per Fiscal Year.

### 6.23    Board Observer Rights.

(a)    Until the payment in full in cash of all Obligations, each of Salus Capital Partners, LLC and DCP Linens Lender, LLC (or if either Salus Capital Partners, LLC or DCP Linens Lender, LLC assigns all of its respective rights and obligations under this Agreement so that it is no longer a Lender hereunder, the assignee of such respective assignments) shall have the right to appoint one representative to exercise the rights as conferred pursuant to this Section 6.23 (such representatives being referred to collectively, as the "Observation Parties" and each individually, as an "Observation Party") and shall notify the Borrower of the identity of such Person.

(b)    Board of Directors of the Borrower (the "Board") shall hold general meetings no less than on a quarterly basis for the purpose of discussing the business and operations of the Borrower. At least one (1) such meeting each calendar year shall be held in person at the Borrower's principal place of business. The Borrower shall notify the Observation Parties of the date and time for each general or special meeting of the Board (or any committee thereof) or of the adoption of any resolutions by any such body or committee by written consent (describing in reasonable detail the nature and substance of such action) at the time notice is provided to the outside directors or managers of the Borrower, and concurrently deliver to the Observation Parties any materials delivered to directors or managers of the Borrower, including a draft of any resolutions proposed to be adopted by written consent. The Observation Parties shall be free during the period prior to the meeting to contact the directors of the Borrower and discuss the pending actions to be taken.

(c)    Each Observation Party shall be entitled to, or to select one (1) representative to, attend and participate (but not vote) in all meetings of the Board (including any committee thereof), including telephonic meetings. Each Observation Party (or its representative) shall be entitled to receive all written materials and other information given to the participants in such meetings.

(d)    If an issue is to be discussed or otherwise arises at any meeting of the Board or committee thereof which, in the reasonable good faith judgment of the Board is not appropriate to be discussed in the presence of the Observation Parties or their representatives in order to avoid a conflict of interest on the part of such Observation Parties or their representatives or, upon and consistent with the advice of legal counsel to the Borrower, is necessary to preserve an attorney-client privilege, then such issue may be discussed without the Observation Parties or their representatives present, and the Observation Parties or their representatives may be excluded from distribution of materials or draft resolutions or consents, provided that the Observation Parties or their representatives are given notice of the occurrence

- 97 -

of such judgment by the Board and that the Observation Parties or their representative are being excused.

(e)      Each of the Observation Parties agrees, and agrees to cause each of its Affiliates, to keep confidential all confidential information described in Section 6.23 or which is disclosed at any meeting of the Board (or any committee thereof), including such confidential information which may be disclosed to them by any Observation Party or its representative, provided, that such information may be disclosed if required by applicable law; provided, further, to the extent practicable, the Borrower shall be afforded reasonable notice of such proposed disclosure and the opportunity to seek a protective order.

(f)      The Borrower shall pay all reasonable and documented out-of-pocket expenses incurred by the Observation Parties or Salus Capital Partners, LLC and DCP Linens Lender, LLC in connection with the exercise by the Observation Parties or Salus Capital Partners, LLC and DCP Linens Lender, LLC of its rights under this Section 6.23.

**6.24    Key-Person Life Insurance Policy.**  The Borrower's key-man" life insurance policy upon the life of Alan Gladstone (the "Key Person Life Insurance Policy") shall be assigned to the Agent pursuant to a Collateral Assignment of Key Person Life Insurance Policy, duly executed by the Borrower and acknowledged by the applicable insurance company, and in form and substance reasonably satisfactory to the Agent.

**6.25    Inactive Subsidiary.**  The Loan Parties covenant and agree (i) that no business activities are being conducted or shall be conducted by the Inactive Subsidiary, (ii) that no assets are held by or shall be held by the Inactive Subsidiary, and (iii) no later than thirty (30) days after the Closing Date (or such longer period as agreed to by Agent in its sole discretion), the Loan Parties shall cause the dissolution of the Inactive Subsidiary.

**6.26    Post-Closing Obligations.**  Notwithstanding the conditions precedent set forth in Section 4.01 hereof, the Borrower has informed the Agent and the Lenders that certain of such items to be required to be delivered to the Agent or otherwise satisfied as conditions precedent to the effectiveness of this Agreement will not be delivered to Agent as of the date hereof. Therefore, with respect to the items set forth on Schedule 6.26 (collectively, the "Outstanding Items"), and notwithstanding anything to the contrary contained herein or in any other Loan Document, the Borrower shall deliver or otherwise satisfy each Outstanding Item to the Agent in the form, manner and time set forth thereon for such Outstanding Item or within such other time as Agent may reasonably agree.

**ARTICLE VII**
**NEGATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist

- 98 -

under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

7.02   **Investments.**  Make any Investments, except Permitted Investments.

7.03   **Indebtedness; Disqualified Stock.**  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock (other than Equity Interests issued pursuant to the Preferred Equity Documents), or (c) issue and sell any other Equity Interests (other than Equity Interests issued pursuant to the Preferred Equity Documents) unless (i) such Equity Interests shall be issued solely by the Borrower and not by a Subsidiary of a Loan Party, (ii) such Equity Interests provide that all dividends and other Restricted Payments) in respect thereof shall be made solely in additional shares of such Equity Interests, in lieu of cash, (iii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Loan Party issuing such Equity Interests and in accordance with the limitations contained in this Agreement, and (iv) all Restricted Payments in respect of such Equity Interests are expressly subordinated to the Obligations.

7.04   **Fundamental Changes.**  Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a)   any Subsidiary which is not a Loan Party may merge with (i) a Loan Party, provided that the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties, provided that when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person;

(b)   any Subsidiary which is a Loan Party may merge into any Subsidiary which is a Loan Party or into the Borrower, provided that in any merger involving the Borrower, the Borrower shall be the continuing or surviving Person;

(c)   any Subsidiary of a Loan Party may merge with or into or consolidate with any other Person or permit any other Person to merge with or into or consolidate with it; provided that (i) the Person surviving such merger shall be a wholly-owned Subsidiary of a Loan Party and such Person shall become a Loan Party in accordance with the provisions of Section 6.12 hereof, and (ii) in the case of any such merger to which any Loan Party is a party, such Loan Party is the surviving Person.

7.05   **Dispositions.**  Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

- 99 -

**7.06    Restricted Payments.** Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contribution, except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a)    each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party;

(b)    the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person;

**7.07    Prepayments of Indebtedness.** Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness, or make any payment in violation of any subordination terms of any Subordinated Indebtedness, except (a) as long as no Default or Event of Default then exists, regularly scheduled or mandatory repayments, repurchases, redemptions or defeasances of (i) Permitted Indebtedness (other than Subordinated Indebtedness), and (ii) Subordinated Indebtedness in accordance with the subordination terms thereof or the applicable subordination agreement relating thereto, (b) Subordinated Indebtedness in accordance with the subordination terms thereof or the applicable subordination agreement relating thereto, and (c) Permitted Refinancings of any such Indebtedness.

**7.08    Change in Nature of Business.** In the case of each of the Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates.** Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) transactions described on Schedule 7.09 hereto, (c) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (d) the issuance of Equity Interests in the Borrower to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries, (e) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or any of its Subsidiaries, and (f) any issuances of securities of the Borrower (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in the Borrower) of the Borrower or any of its Subsidiaries.

**7.10    Burdensome Agreements.** Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i)

- 100 -

of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

7.11    **Use of Proceeds.**  Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those not prohibited under this Agreement.

7.12    **Amendment of Material Documents.**  Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner adverse to the Credit Parties, or (b) any Material Contract or Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder), in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect.

7.13    **Fiscal Year.**  Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

7.14    **Deposit Accounts; Credit Card Processors.**  Open new DDAs or Blocked Accounts unless the Loan Parties shall have delivered to the Agent appropriate DDA Notifications (to the extent requested by Agent pursuant to the provisions of Section 6.13(a)(iii) hereof) or Blocked Account Agreements consistent with the provisions of Section 6.13 and otherwise satisfactory to the Agent.  No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in Section 6.13 hereof.

7.15    **Financial Covenants.**

(a)    Minimum Availability.  Upon the occurrence and at all times during the continuance of a Minimum Availability Compliance Event, permit Availability to be less than an amount equal to (i) the applicable Minimum Availability Amount minus (ii) the amount of Borrower's inventory accounts payable then subject to written agreements for payment terms of no less than 120 days, minus (iii) any Vendor Substitute Amount.

(b)    Collateral Coverage Ratio.  .  Commencing with the Fiscal Month ended February 1, 2015 through the Fiscal Month ended July 5 2015, permit the Collateral Coverage Ratio to be less than 1.10 to 1.00.  For each Fiscal Month ended after July 5, 2015, the Collateral

- 101 -

Coverage Ratio will be determined in accordance with the revised Business Plan delivered and approved by the Agent in accordance with Section 6.1(c)(i) hereof and based upon the same methodology used to establish the Collateral Coverage Ratio above.

(c)    <u>Operating Expenditures to Gross Margin Dollars Ratio</u>.    Commencing with the Fiscal Month ended February 1, 2015 through the Fiscal Month ended July 5, 2015, permit the Operating Expenditures to Gross Margin Dollars Ratio to be less than 0.95 to 1.00. For each Fiscal Month ended after July 5, 2015, the Operating Expenditures to Gross Margin Dollars Ratio will be determined in accordance with the revised Business Plan delivered and approved by the Agent in accordance with Section 6.1(c)(i) hereof and based upon the same methodology used to establish the Operating Expenditures to Gross Margin Dollars Ratio above.

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

**8.01    Events of Default**. Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>.  The Borrower or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) any interest on any Loan, fees or other amounts payable hereunder or under any other Loan Document; or

(b)    <u>Specific Covenants</u>.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.07, 6.10, 6.11, 6.12, 6.13, 6.14, 6.20, 6.22, 6.23 6.24, 6.25, 6.26 or Article VII; or (ii) any Guarantor fails to perform or observe any payment or other material term, covenant or agreement contained in the Facility Guaranty; or (iii) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in the Security Agreement to which it is a party; or

(c)    <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of (i) Borrowing obtaining knowledge of such failure and (ii) receipt by the Borrower of written notice by Agent of such failure; or

(d)    <u>Representations and Warranties</u>.    Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>.  (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or

- 102 -

other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $250,000; or

(f)      Insolvency Proceedings, Etc.  Any Loan Party institutes, consents to the institution of or declares its intention to institute any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or a proceeding shall be commenced or a petition filed, without the application or consent of such Person, seeking or requesting the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed and the appointment continues undischarged, undismissed or unstayed for forty-five (45) calendar days or an order or decree approving or ordering any of the foregoing shall be entered; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for forty-five (45) calendar days, or an order for relief is entered in any such proceeding; or

(g)      Inability to Pay Debts; Attachment.  (i) Any Loan Party thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due in the ordinary course of business, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within fifteen (15) days after its issuance or levy; or

(h)      Judgments.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $500,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(i)      Attachment or Seizure of Assets.  Any of the assets of Borrower or any Loan Party with an aggregate fair market value in excess of $500,000 shall be attached, seized,

- 103 -

levied upon or subjected to a writ or distress warrant; or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of such Person, and shall remain unstayed or undismissed for forty-five (45) calendar days; or any Person other than Borrower shall apply for the appointment of a receiver, trustee or custodian for the assets of Borrower (or those of any of Loan Party) and the order appointing such receiver, trustee or custodian shall remain unstayed or undismissed for forty-five (45) calendar days; or Borrower or any Loan Party shall have concealed, removed or permitted to be concealed or removed, any part of its property with intent to hinder, delay or defraud its creditors or any of them; or

(j)  Credit Card Issuer Reserve.  Any Credit Card Issuer or Credit Card Processor withholds payment of amounts otherwise payable to Borrower to fund a reserve account or otherwise hold as collateral, or shall require Borrower to pay funds into a reserve account or for such Credit Card Issuer or Credit Card Processor to otherwise hold as collateral, or Borrower shall provide a letter of credit, guarantee, indemnity or similar instrument to or in favor of such Credit Card Issuer or Credit Card Processor such that in the aggregate all of such funds in the reserve account, other amounts held as collateral and the amount of such letters of credit, guarantees, indemnities or similar instruments shall exceed Seven Hundred Fifty Thousand Dollars ($750,000); or

(k)  Credit Card Issuer Termination.  Any Credit Card Issuer or Credit Card Processor shall send notice to Borrower that it is ceasing to make or suspending payments to Borrower of amounts due or to become due to Borrower or shall cease or suspend such payments, or shall send notice to Borrower that it is terminating its arrangements with Borrower or such arrangements shall terminate as a result of any event of default under such arrangements, which continues for more than the applicable cure period, if any, with respect thereto, unless Borrower shall have entered into arrangements with another Credit Card Issuer or Credit Card Processor, as the case may be, within ninety (90) days after the date of any such notice and Borrower's existing Credit Card Issuer or Credit Card Processor has not ceased to make or suspended payments to the Borrower of amounts due or to become due to Borrower and has not otherwise terminated its arrangements with Borrower; or

(l)  ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect; or

(m)  Invalidity of Loan Documents.  (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to

- 104 -

revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral in excess of $100,000, with the priority required by the applicable Security Document; or

(n)    Change of Control.  There occurs any Change of Control; or

(o)    Cessation of Business; Failure to Operate in Ordinary Course.  Except as otherwise expressly permitted hereunder or as contemplated in the Initial Business Plan, any Loan Party shall take any action to suspend the operation of its business, shall cease to conduct its business in the ordinary course or advise the Agent that it plans to cease the ordinary course conduct of its business, liquidate all or a material portion of its assets or Store locations, or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of-Business" sales of any material portion of its business; or

(p)    Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral; or

(q)    Breach of Contractual Obligation.  Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise and after giving effect to any applicable grace periods) in respect of any Material Contract or fails to observe or perform any other agreement or condition relating to any such Material Contract or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the counterparty to such Material Contract to terminate such Material Contract; or

(r)    Indictment.  The indictment or institution of any legal process or proceeding against, any Loan Party or any Subsidiary thereof, under any federal, state, municipal, and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony;

(s)    Guaranty.  The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document;

(t)    Subordination.  (i)  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness (the "Subordinated Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; or

- 105 -

(u)     Material Adverse Effect. A Material Adverse Effect has occurred.

**8.02.   Remedies Upon Event of Default.**   If any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)     declare the Commitments of each Lender to make Loans and any obligation of any L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)     require that the Loan Parties Cash Collateralize the L/C Obligations (to the extent not previously Cash Collateralized);

(d)     capitalize any accrued and unpaid interest by adding such amount to the outstanding principal balance of the Loans, at which time such capitalized amount shall bear interest at the Default Rate;

(e)     whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties; and/or

(f)     Credit Bidding. The Agent may purchase, in any public or private sale conducted under the provision of the UCC (including pursuant section 9-610 and 9-620 of the UCC), the provisions of the Bankruptcy Code (including pursuant to section 363 of the Bankruptcy Code) or at any sale or foreclosure conducted by the Agent (whether by judicial action or otherwise) in accordance with Applicable Law, all or any portion of the Collateral. The Lenders hereby irrevocably authorize the Agent, upon written consent of the Required Lenders, to Credit Bid (in an amount and on such terms as may be directed by the Required Lenders) and purchase at any such sale (either directly or through one or more acquisition vehicles) all or any portion of the Collateral on behalf of and for the benefit of the Lenders;

provided, however, that upon the occurrence of any Event of Default with respect to any Loan Party or any Subsidiary thereof under Section 8.01(f), the obligation of each Lender to make Loans and any obligation of each L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Loan Parties to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Agent or any Lender.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03    Application of Funds.**    After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Agent in the following order, in each case whether or not such Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law:

First, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent and the Tranche A-1 Agents, ratably among them in proportion to the amounts described in this clause First payable to them;

Second, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and any L/C Issuer (including fees, charges and disbursements of counsel to the respective Lenders and L/C Issuers and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

Fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Tranche A Loans and other Obligations (other than Obligations in respect of the Tranche A-1 Loans), and fees (including Letter of Credit Fees), ratably among the Tranche A Lenders and L/C Issuers in proportion to the respective amounts described in this clause Fourth payable to them;

Fifth, to payment of that portion of the Obligations constituting unpaid principal of the Tranche A Loans, ratably among the Tranche A Lenders in proportion to the respective amounts described in this clause Fifth held by them;

Sixth, to the Agent for the account of the L/C Issuers, to Cash Collateralize that portion of L/C Obligations (to the extent not already Cash Collateralized) comprised of the aggregate undrawn amount of Letters of Credit;

Seventh, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Tranche A-1 Lenders (including fees, charges and disbursements of counsel to the respective Tranche A-1 Lenders), ratably among them in proportion to the amounts described in this clause Seventh;

BOS 47487387v10

Eighth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Tranche A-1 Loans and other Obligations, and fees, ratably among the Tranche A-1 Lenders in proportion to the respective amounts described in this clause Eighth payable to them;

Ninth, to payment of that portion of the Obligations constituting unpaid principal of the Tranche A-1 Loans, ratably among the Tranche A-1 Lenders in proportion to the respective amounts described in this clause Ninth held by them;

Tenth, to payment of all other Obligations, ratably among the Credit Parties in proportion to the respective amounts described in this clause Tenth held by them

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Sixth above shall be applied to satisfy drawings under such Letters of Credit as they occur. Subject to Section 2.05(c), if any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

## ARTICLE IX
## THE AGENT

**9.01    Appointment and Authority.**  Each of the Lenders hereby irrevocably appoints Salus to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent, the Lenders and the L/C Issuers, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the terms "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**9.02    Rights as a Lender.**  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any

BOS 47487387v10

Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions.**  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties, a Lender or a L/C Issuer. Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder

- 109 -

or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04    Reliance by Agent.**  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or a L/C Issuer, the Agent may presume that such condition is satisfactory to such Lender or such L/C Issuer unless the Agent shall have received written notice to the contrary from such Lender or such L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit.  The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05    Delegation of Duties.**  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Agent.  The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.  The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**9.06    Resignation of Agent.**  The Agent may at any time give written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the L/C Issuers, appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such

- 110 -

notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders or the L/C Issuers under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender and each L/C Issuer directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

**9.07    Non-Reliance on Agent and Other Lenders.** Each Lender and each L/C Issuer acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and each L/C Issuer also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.11, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08    Agent May File Proofs of Claim.** In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, the L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuers, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuers, the Agent, such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuers, the Agent and such Credit Parties under Sections 2.03(j), 2.09 and 10.04) allowed in such judicial proceeding; and

- 111 -

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each L/C Issuer to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuers, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender or any L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or any L/C Issuer or to authorize the Agent to vote in respect of the claim of any Lender or any L/C Issuer in any such proceeding.

**9.09    Collateral and Guaranty Matters.**  The Credit Parties irrevocably authorize the Agent, at its option and in its Permitted Discretion,

(a)     to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), and the expiration, termination or Cash Collateralization of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 10.01;

(b)     to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

(c)     to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Required Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.09.  In each case as specified in this Section 9.09, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.09.

**9.10    Notice of Transfer.**  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

**9.11    Reports and Financial Statements.** By signing this Agreement, each Lender:

(a)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates, financial statements and other Borrower Materials required to be delivered by the Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

(b)    expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials, and shall not be liable for any information contained in any Borrower Materials (including any Report);

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(d)    agrees to keep all Reports and other Borrower Materials confidential in accordance with the provisions of Section 10.07 hereof; and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report and other Borrower Materials in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.12    Agency for Perfection.** Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States, can be perfected only by possession. Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.13    Indemnification of Agent.** Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent, each L/C Issuer and any Related Party, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs,

- 113 -

expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, such L/C Issuer and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent, such L/C Issuer and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's, such L/C Issuer's and their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

9.14    **Relation among Lenders.** The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

## ARTICLE X
## MISCELLANEOUS

10.01    **Amendments, Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

(b)    as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Commitments hereunder or under any other Loan Document without the written Consent of such Lender;

(c)    as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (iv) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, or change the manner of computation of any financial ratio (including any change in any applicable defined term) used in determining the Applicable Margin that would result in a reduction of any interest rate on any Loan or any fee payable hereunder without the written Consent of each Lender entitled to such amount; provided, however, that only the Consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest or Letter of Credit Fees at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

- 114 -

(d)    as to any Lender, change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender;

(e)    change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)    except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)    except for Permitted Dispositions, release all or substantially all of the Collateral from the Liens of the Security Documents without the written Consent of each Lender;

(h)    increase the Aggregate Commitments without the written Consent of each Lender;

(i)    increase any advance rate percentage set forth in the definition of "Borrowing Base" without the written Consent of each Lender; or otherwise change the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrower would be increased without the written Consent of each Lender, provided that the foregoing shall not limit the Permitted Discretion of the Agent to change, establish or eliminate any Reserves.

(j)    modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender; and

(k)    except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the applicable L/C Issuer in addition to the Lenders required above, affect the rights or duties of such L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; and (iii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the Required Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification

- 115 -

requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender. ·

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, any Loan Document may be amended and waived with the written consent of the Agent at the request of the Borrower without the need to obtain the consent of any Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.

### 10.02  Notices; Effectiveness; Electronic Communications.

(a)    <u>Notices Generally</u>.  Except as provided in subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and

(ii)    if to any Lender or any L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

(iii) ·  Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).    Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    <u>Electronic Communications</u>.  Notices and other communications to the Loan Parties, the Lenders and the L/C Issuers hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender or any L/C Issuer pursuant to <u>Article II</u> if such Lender or such L/C Issuer, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent may, in its Permitted Discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from

- 116 -

the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Internet.  In no event shall the Agent or any of its Related Parties (each, an "Agent Party") have any liability to any Loan Party, any Lender, any L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the internet.

(d)     Change of Address, Etc.  Each of the Loan Parties and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender and each L/C Issuer may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Agent, L/C Issuers and Lenders.  The Agent, the L/C Issuers and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03  No Waiver; Cumulative Remedies.**  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

- 117 -

**10.04  Expenses; Indemnity; Damage Waiver.**

(a)  <u>Costs and Expenses</u>.  The Borrower shall pay all Credit Party Expenses.

(b)  <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by any L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit or any other nominated person with respect to a Letter of Credit seeking to be reimbursed or indemnified or compensated, and any third party seeking to enforce the rights of the Borrower, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds, or holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)  <u>Reimbursement by Lenders</u>.  Without limiting their obligations under Section 9.13 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent), the applicable L/C Issuer or such Related

BOS 47487387v10

Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) or such L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) or such L/C Issuer in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of <u>Section 2.12(d)</u>.

(d)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    <u>Payments</u>. All amounts due under this Section shall be payable on demand therefor.

(f)    <u>Survival</u>. The agreements in this Section shall survive the resignation of any Agent and any L/C Issuer, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05    Payments Set Aside.** To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its Permitted Discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and each L/C Issuer severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders and the L/C Issuers under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

- 119 -

**10.06   Successors and Assigns.**

(a)   <u>Successors and Assigns Generally</u>.   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent and each Lender. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   <u>Assignments by Lenders</u>.   Any Lender may at any time assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)   Minimum Amounts

A)   in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

B)   in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless each of the Agent (such consent not to be unreasonably withheld or delayed);

(ii)   Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)   Required Consents.   No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

A)   the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

B)   notwithstanding anything to the contrary, no Lender shall assign or sell a participation in respect of any of its Commitments or Loans to any Disqualified

- 120 -

Lender without the Borrower's prior written consent, unless an Event of Default has occurred and is continuing, in which case, no consent shall be required.

(iv)    Assignment and Assumption. The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

(v)    Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lenders having been a Defaulting Lender. Upon request, the Borrower (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)    Register. The Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic

- 121 -

form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest or demonstrable error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice. The Register is intended to cause each Loan and other obligation hereunder to be in registered form within the meaning of Section 5f.103-1(c) of the United States Treasury Regulations and within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)     Participations. Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Lenders and the L/C Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01 and 3.04 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section (b); provided that each Participant shall be subject to the requirements of those Sections as if it were a Lender. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender, acting for this purpose as an agent of the Loan Parties, shall maintain at its offices a record of each agreement or instrument effecting any participation and a register for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts and other Obligations from time to time (each a "Participation Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participation Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code. The entries in each Participation Register shall be conclusive absent manifest error and the Loan Parties, the Administrative Agent, the L/C Issuers and the Lenders may treat each Person whose name is

- 122 -

recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under Section 3.01, Section 3.04 and Section 10.08). The Participation Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    Resignation as L/C Issuer after Assignment.  Notwithstanding anything to the contrary contained herein, if at any time Salus assigns all of its Commitment and Loans pursuant to subsection (b) above, Salus may, upon thirty (30) days' notice to the Borrower and the Lenders, resign as a L/C Issuer.  In the event of any such resignation as a L/C Issuer, the Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer hereunder; provided, however, that no failure by the Borrower to appoint any such successor shall affect the resignation of Salus as a L/C Issuer.  If Salus resigns as a L/C Issuer, it shall retain all the rights, powers, privileges and duties of a L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as a L/C Issuer and all L/C Obligations with respect thereto.  Upon the appointment of a successor L/C Issuer and/or Swing Line Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of such retiring L/C Issuer, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, issued by such retiring L/C Issuer and outstanding at the time of such succession or make other arrangements satisfactory to Salus to effectively assume the obligations of Salus with respect to such Letters of Credit.

- 123 -

(i)    Transactions by Salus Entity.    Notwithstanding anything in this Agreement or any other Loan Document to the contrary, (A) neither Salus nor any Affiliate thereof (each, a "Salus Entity") shall be required to comply with this Section 10.06 in connection with any transaction involving any other Salus Entity or any of its or their lenders or funding or financing sources, and no Salus Entity shall have any obligation to disclose any such transaction to any Person, and (B) there shall be no limitation or restriction on (i) the ability of any Salus Entity to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan, or any other Obligation to any other Salus Entity or any lender or financing or funding source of a Salus Entity or (ii) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan, or any other Obligation; provided, however, that Salus shall continue to be liable as a "Lender" under this Agreement and the other Loan Documents unless such other Person complies with the provisions of this Agreement to become a "Lender".

**10.07  Treatment of Certain Information; Confidentiality.**  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided that, in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08   Right of Setoff.**  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, each L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, such L/C Issuer or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender or such L/C Issuer, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or such L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender or such L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 2.15 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender, each L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, such L/C Issuer or their respective Affiliates may have.  Each Lender and each L/C Issuer agrees to notify the Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09   Interest Rate Limitation.**  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

BOS 47487387v10

**10.10  Counterparts; Integration; Effectiveness.**  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf., or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11  Survival.**  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.  Further, the provisions of Sections 3.01, 3.04 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under Section 10.04.

**10.12  Severability.**  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13  Replacement of Lenders.**  If any Lender requests compensation under Section 3.04, or if the Borrower are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such

Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

    (a)    the Borrower shall have paid to the Agent the assignment fee specified in Section 10.06(b);

    (b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

    (c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

    (d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**10.14  Governing Law; Jurisdiction; Etc.**

    (a)    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

    (b)    SUBMISSION TO JURISDICTION.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER

- 127 -

PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15  Waiver of Jury Trial.** EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

BOS 47487387v10

**10.16 No Advisory or Fiduciary Responsibility.** In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17 USA PATRIOT Act Notice.** Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Act. No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know you customer" and anti-money laundering rules and regulations, including the Act.

BOS 47487387v10

**10.18  Foreign Asset Control Regulations.**  Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Furthermore, none of the Borrower or its Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19  Time of the Essence.**  Time is of the essence of the Loan Documents.

**10.20  Press Releases; Non-Disclosure.**

(a)     Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b)     Each Loan Party consents to the publication by the Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Borrower for review and comment prior to the publication thereof. The Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

(c)     Each Loan Party agrees to maintain the confidentiality of this Agreement and the other Loan Documents and the terms hereof and thereof, and agrees that it will not disclose (pursuant to any press release or otherwise) the name of the Agent or its Affiliates or this Agreement or the other Loan Documents or the terms hereof or thereof, in each case without the prior written consent of the Agent, except that such information may be disclosed (a) to such Loan Party's directors, officers, employees, attorneys, advisors and equityholders (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential), (b) to the extent required by applicable Laws or regulations or by an subpoena or similar legal process or (c) to

- 130 -

the extent such information becomes publicly available other than as a result of a breach of this section.

### 10.21    Additional Waivers.

(a)    The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)    The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitments).

(c)    To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

- 131 -

(d)    Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Loan Party making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Loan Parties in an amount, for each of such other Loan Parties, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Loan Parties' Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Loan Parties. As of any date of determination, the "Allocable Amount" of each Loan Party shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

10.22    **No Strict Construction.**    The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

10.23    **Attachments.**    The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

10.24    **Preferred Equity.**

(a)    In consideration of the Lenders' willingness to enter into this Agreement and make the Loans, the Borrower agrees to sell and issue to designees of the Lenders 100,000 shares of the Borrower's Series B Preferred Stock (the "Preferred Shares"). The Preferred

BOS 47487387v10

Shares will be issued on the date hereof in accordance with the Preferred Equity Documents. The relative rights and obligations of the Borrower and the purchasers with respect to the Preferred Shares will be governed by the Preferred Equity Documents and the Borrower's Organization Documents.

(b)    The Borrower and the Lenders hereby acknowledge and agree that the Notes and the Preferred Shares are part of an investment unit within the meaning of Section 1273(c)(2) of the Code. The Borrower and the Lenders hereby further acknowledge and agree that, for United States federal income tax purposes, the issue price of such investment unit within the meaning of Section 1273(b) of the Code is 100% of the principal amount of the Notes. Each of the Borrower and the Lenders agrees that the fair market value of the Preferred Shares is $10,000 and shall prepare all of their respective U.S. federal income tax returns, statements and reports, as the case may be, in a manner consistent with such fair market value.

[Signature Page Follows]

BOS 47487387v10

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

ANNA'S LINENS, INC.,
as the Borrower

By: _____
Name:  Scott Gladstone
Title:    Chief Executive Officer

Signature Page to Credit Agreement

**SALUS CAPITAL PARTNERS, LLC**, as
Administrative Agent, Collateral Agent and Co-
Tranche A-1 Agent

By: _____
Name: Jonas D.L. McCray
Title: Senior Vice President

By: _____
Name:  Kyle C. Shonak
Title:   Executive Vice President


**SALUS CAPITAL PARTNERS, LLC**, as a
Lender

By: _____
Name: Jonas D.L. McCray
Title: Senior Vice President

By: _____
Name:  Kyle C. Shonak
Title:   Executive Vice President


**SALUS CLO 2012-1, LTD.**, as a Lender

By:  Salus Capital Partners II, LLC,
Its:  Collateral Manager

By: _____
Name:  Kyle C. Shonak
Title:   Executive Vice President

By: _____
Name:   Robert F. Kuppens
Title:   Executive Vice President


Signature Page to Credit Agreement

DCP LINENS LENDER, LLC,
as Co-Tranche A-1 Agent

By: _____

Name: _____

Its Authorized Signatory


DCP LINENS LENDER, LLC, as a Lender

By: _____

Name: _____

Its Authorized Signatory


Signature Page to Credit Agreement

July 18, 2014

Anna's Linens, Inc.
3550 Hyland Avenue
Costa Mesa, California 92626

Ladies and Gentlemen:

This is the Fee Letter (this "Fee Letter") referred to in that certain Credit Agreement, dated as of July 18, 2014 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Anna's Linens, Inc., a Delaware corporation the "Borrower"), each Lender from time to time party thereto (each a "Lender" and collectively, the "Lenders"), Salus Capital Partners, LLC ("Salus"), as Administrative Agent and Collateral Agent for the Lenders (in such capacity, the "Agent") and Salus and DCP Linens, Lender, LLC, as co-Tranche A-1 Agents (individually and collectively, the "Tranche A-1 Agent"). Unless otherwise defined herein, capitalized terms shall have the same meanings as specified therefor in the Credit Agreement.

In connection with, and in consideration of Agent and Lenders entering into the Credit Agreement and providing Loans as contemplated therein, the Borrower and the Agent hereby agree as follows:

(a)    Applicable Margin. "Applicable Margin" means (i) with respect to Tranche A Loans, six and eighty-five one hundreds of one percent (6.85%), and (ii) with respect to Tranche A-1 Loans, nine and one half of one percent (9.50%); provided, that to the extent that the Borrower achieves Consolidated EBITDA of at least $3,000,000 as of the end of two consecutive Fiscal Quarters (calculated as at the end of each Fiscal Quarter on the basis of the four Fiscal Quarters then ended), the Applicable Margin with respect to Tranche A Loans shall be reduced to five and eighty-five one hundreds of one percent (5.85%); provided further, that if following any such reduction in the Applicable Margin the Borrower fails to maintain Consolidated EBITDA of at least $3,000,000 at the end of any Fiscal Quarter (calculated on the basis of the four Fiscal Quarters then ended), the Applicable Margin for Tranche A Loans shall return to the original Applicable Margin for Tranche A Loans established herein.

For purposes hereof, "Consolidated EBITDA" means, at any date of determination, an amount equal to Consolidated Net Income of the Borrower and its Subsidiaries on a Consolidated basis, plus, without duplication, (a) the following to the extent deducted in calculating such Consolidated Net Income: (i) Consolidated Interest Charges, (ii) the provision for Federal, state, local and foreign income Taxes, (iii) depreciation and amortization expense and (iv) other non-recurring expenses reducing such Consolidated Net Income which do not represent a cash item in such period or any future period, minus (b) the following to the extent included in calculating such Consolidated Net Income: (i) Federal, state, local and foreign income tax credits and (ii) all non-cash items increasing Consolidated Net Income, all as determined on a Consolidated basis in accordance with GAAP.

For purposes hereof, "Consolidated Net Income" means, as of any date of determination, the net income of the Borrower and its Subsidiaries, all as determined on a

Consolidated basis in accordance with GAAP; provided, however, that there shall be excluded therefrom (a) extraordinary gains and extraordinary losses, (b) the income (or loss) of such Person in which any other Person has a joint interest, except to the extent of the amount of cash dividends or other distributions actually paid in cash to such Person, (c) the income (or loss) of such Person and accrued prior to the date it becomes a Subsidiary of a Person or any of such Person's Subsidiaries or is merged into or consolidated with a Person or any of its Subsidiaries or that Person's assets are acquired by such Person or any of its Subsidiaries, and (d) the income of any direct or indirect Subsidiary of a Person to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its Organization Documents or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, except that the Borrower's equity in any net loss of any such Subsidiary shall be included in determining Consolidated Net Income.

(b)     Interest Rate Floor. "Interest Rate Floor" means (i) with respect to Tranche A Loans, seven and thirty-five one hundreds of one percent (7.35%), and (ii) with respect to Tranche A-1 Loans, ten percent (10.00%); provided, that to the extent that (and for so long as) the Borrower achieves the reduction in the Applicable Margin for Tranche A Loans described in the preceding paragraph (a), the Interest Rate Floor with respect to Tranche A Loans shall be reduced to six and thirty-five one hundreds of one percent (6.35%).

(c)     Default Rate. "Default Rate" means, (i) with respect to the Tranche A Loans and the Tranche A-1 Loans, four percent (4%) in excess of the interest rate otherwise applicable thereto from time to time, and (ii) with respect to any other Obligations as to which an interest rate is not otherwise specified, a rate per annum equal to the sum of (x) the LIBO Rate, plus (y) the Applicable Margin applicable to Tranche A Loans, plus (iii) four percent (4.00%) per annum.

(d)     Tranche A Origination Fee. The Borrower shall pay to the Agent, for the account of the Tranche A Lenders in accordance with their respective Tranche A Applicable Percentages, an origination fee (the "Tranche A Origination Fee") in the amount of 2.0% of the Aggregate Tranche A Commitments ($1,400,000.00), which Tranche A Origination Fee is deemed fully earned and non-refundable on the Closing Date. The Borrower shall pay 50% of the Tranche A Origination Fee to Agent in cash on the Closing Date, with the balance of the Tranche A Origination Fee due and payable on the earliest of (i) the first anniversary of the Closing Date, (ii) the occurrence of an Event of Default, or (iii) the Termination Date. No portion of the Tranche A Origination Fee shall be subject to refund, rebate or abatement in whole or part.

(e)     Tranche A-1 Origination Fee. The Borrower shall pay to the Agent, for the account of the Tranche A-1 Lenders in accordance with their respective Tranche A-1 Applicable Percentages, an origination fee (the "Tranche A-1 Origination Fee") in the amount of 3.0% of the Aggregate Tranche A-1 Commitments ($300,000.00), which Tranche A-1 Origination Fee is deemed fully earned and non-refundable on the Closing Date. The Borrower shall pay 50% of the Tranche A-1 Origination Fee to Agent in cash on the Closing Date, with the balance of the Tranche A-1 Origination Fee due and payable on the earliest of (i) the first anniversary of the Closing Date, (ii) the occurrence of an Event of Default, or (iii) the

Termination Date. No portion of the Tranche A-1 Origination Fee shall be subject to refund, rebate or abatement in whole or part.

(f)     Collateral Monitoring Fee. The Borrower shall pay to the Agent, for its own account, a fee in the amount of $100,000 per annum (the "Collateral Monitoring Fee"), payable in advance in quarterly installments of $25,000, the first such installment to be paid on the Closing Date and thereafter payable on the first day of each calendar quarter, commencing September 1, 2014. All Collateral Monitoring Fees payable hereunder through the Maturity Date shall be fully earned on the Closing Date and, once paid, shall not be refundable for any reason whatsoever.

(g)     Unused Line Fee. The Borrower shall pay to the Agent, for the account of the Tranche A Lenders in accordance with their respective Tranche A Applicable Percentages, an unused line of credit fee (the "Unused Line Fee"), which shall accrue at a rate equal to one percent (1.00%) per annum times the average daily unused portion of the Tranche A Commitments. The Unused Line Fee shall be payable monthly in arrears on the first day of each month, commencing with the first full month following the Closing Date, and on the Termination Date.

(h)     Early Termination Fee. In the event that the Termination Date occurs for any reason other than a Change of Control Transaction (as hereinafter defined), or the Borrower elects prior to the Maturity Date to reduce the Aggregate Commitments of the Lenders in any amount, the Borrower shall pay to the Agent, for the account of the Lenders in accordance with their respective Applicable Percentages, a fee in respect of amounts which are or become payable by reason thereof (and/or the applicable termination or reduction of the Commitments) as follows:  (i) four percent (4.00%) of the Aggregate Commitments then in effect (without regard to any termination thereof) or of the amount of any reduction in the Aggregate Commitments (without regard to any reduction thereof), if such termination or reduction occurs on or before the second anniversary of the Closing Date, and (ii) two percent (2.00%) of the Aggregate Commitments then in effect (without regard to any termination thereof) or of the amount of any reduction in the Aggregate Commitments (without regard to any reduction thereof), if such termination or reduction occurs after the second anniversary of the Closing Date and prior to the Maturity Date. In the event that the Termination Date occurs in connection with a Change of Control Transaction, the Borrower shall pay to the Agent, for the account of the Lenders in accordance with their respective Applicable Percentages, a fee in respect of amounts which are or become payable by reason thereof and/or the termination of the Commitments as follows:  (i) four percent (4.00%) of the Aggregate Commitments then in effect (without regard to any termination thereof) if the Termination Date occurs on or before the first anniversary of the Closing Date, (ii) two percent (2.00%) of the Aggregate Commitments then in effect (without regard to any termination thereof) if the Termination Date occurs after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date, and (iii) one percent (1.00%) of the Aggregate Commitments then in effect (without regard to any termination thereof) if the Termination Date occurs after the second anniversary of the Closing Date but prior to the Maturity Date. Each of the fees described in this paragraph (h) shall be defined as the "Early Termination Fee". Early Termination Fees shall be payable in accordance with this paragraph (h) upon the occurrence of the Termination Date or upon the reduction of the Commitments, in the event of a voluntary termination or reduction by the Borrower, or upon the

occurrence of an Event of Default or any other termination or reduction of the Lenders' Commitments under the Credit Agreement. As used in this paragraph (h), "Change of Control Transaction" shall mean any sale of all or substantially all of the assets of the Borrower or all or substantially all of the Equity Interests of the Borrower.

All fees payable under this Fee Letter constitute compensation for services rendered and do not constitute interest or a charge for the use of money. All fees payable hereunder shall be fully earned when due or as otherwise provided herein and shall not be subject to refund or rebate under any circumstances. All fees payable hereunder will be paid in immediately available funds and shall not be subject to reduction by way of setoff or counterclaim.

The Borrower agrees to keep the terms of this Fee Letter confidential pursuant to the confidentiality provisions of the Credit Agreement.

This Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto. **THIS FEE LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THEREOF.** This Fee Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Fee Letter by electronic transmission shall be equally effective as delivery of a manually executed counterpart of this Fee Letter. Section headings used herein are for convenience of reference only, are not part of this Fee Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Fee Letter.

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Fee Letter shall become a binding agreement between us.

**[SIGNATURE PAGES FOLLOW]**

Very truly yours,

**SALUS CAPITAL PARTNERS, LLC**, as
Administrative Agent and as Collateral Agent

By: _____
Name: Jonas D.L. McCray
Title: Senior Vice President

By: _____
Name:  Kyle C. Shonak
Title:    Executive Vice President

Signature Page to Fee Letter

Accepted and agreed to as of
the date first above written:

**BORROWER:**

**ANNA'S LINENS, INC.,**
as Borrower

By: _____
Name: Scott Gladstone
Title:   Chief Executive Officer

Signature Page to Fee Letter

# EXHIBIT "2"

## FIRST AMENDMENT AND WAIVER TO CREDIT AGREEMENT

This FIRST AMENDMENT AND WAIVER TO CREDIT AGREEMENT (this "Amendment") is entered into as of May 13, 2015, among Anna's Linens, Inc., a Delaware corporation the "Borrower"), each Lender from time to time party thereto (each a "Lender" and collectively, the "Lenders"), Salus Capital Partners, LLC ("Salus"), as Administrative Agent and Collateral Agent for the Lenders (in such capacity, the "Agent") and Salus and DCP Linens Lender, LLC, as co-Tranche A-1 Agents (individually and collectively, the "Tranche A-1 Agent").

## RECITALS

WHEREAS, the Borrower, Lenders, Agent and Tranche A-1 Agent are parties to that certain Credit Agreement, dated as of July 18, 2014 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; all capitalized terms used but not specifically defined herein shall have the respective meanings provided for such terms in the Credit Agreement); and

WHEREAS, certain Defaults and Events of Default have occurred and continue to exist under the Credit Agreement as described on Schedule 1 attached hereto (collectively, the "Specified Defaults" and each a "Specified Default"); and

WHEREAS, the Borrower has requested that the Agent, Tranche A-1 Agent and Lenders permanently waive the Specified Defaults, and the Agent and Lenders have agreed to do so on the terms and conditions set forth herein, including the modifications to the Credit Agreement set forth below.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Waiver.    Subject to the terms and conditions of this Amendment, the Agent, Tranche A-1 Agent and the Lenders hereby waive the Specified Defaults and their rights to pursue the remedies available to them solely on account of such Specified Defaults. The waiver contained in this Section 1 shall (a) not constitute or be deemed to constitute a waiver (except as otherwise expressly set forth herein), of (i) any Default or Event of Default other than the Specified Defaults, or (ii) any term or condition of the Credit Agreement except as modified herein, (b) not constitute or be deemed to constitute consent by the Agent or the Lenders to anything other than the specific purpose set forth herein, and (c) not constitute a custom or course of dealing among the parties hereto.

2.    Amendments to the Credit Agreement.    As of the First Amendment Effective Date, the Credit Agreement is hereby amended as follows:

A.    Additional Defined Terms.    Section 1.01 of the Credit Agreement is hereby amended by adding the following defined terms, such terms to be incorporated into Section 1.01 of the Credit Agreement in the correct alphabetical order:

""First Amendment" means that certain First Amendment and Waiver to Credit Agreement, dated as of May 13, 2015, by and among the Borrower, Lenders and Agent."

""First Amendment Effective Date" means May 13, 2015."

"Supplemental Availability Block" means (i) at any time Availability is less than $2,500,000, the sum of $1,000,000, and (ii) at all other times, $0.

B.    Amended Defined Term.  Section 1.01 of the Credit Agreement is hereby amended by deleting the defined term "Borrowing Base" in its entirety and replacing such term with the following:

"Borrowing Base" means, at any time of calculation, an amount equal to without duplication:

(a) the lesser of (i) Formula Availability and (ii) $80,000,0000;

minus

(b) the Availability Block;

minus

(c) the Supplemental Availability Block;

minus

(d) the then amount of all Availability Reserves."

C.    Section 7.15 of the Credit Agreement is hereby amended by adding a new subsection 7.15(d) as follows:

"(d)    Cash Flow Budget.

(1)    The Borrower has prepared and delivered to the Agent a rolling thirteen 13-week cash flow budget covering the period from March 29, 2015 until June 21, 2015, a copy of which is attached hereto as **Exhibit A** (as supplemented, amended and updated as provided in this Agreement, the "Budget"), which sets forth, among other information, (i) projected cumulative weekly cash revenues, (ii) projected weekly inventory receipts, (iii) projected cumulative weekly cash disbursements, and (iv) projected Availability under the Credit Agreement.

(2)    Commencing May 5, 2015, and by 5:00 p.m. on Tuesday each week thereafter, the Borrower shall deliver to the Agent, in form and substance acceptable to the Agent, a subsequent weekly Budget for the period from the delivery of such Budget forward for thirteen (13) weeks, which subsequent Budget(s) shall roll forward by one week the immediately preceding Budget.

(3)    Commencing May 5, 2015, and by 5:00 p.m. on Tuesday after the end of each three-week period covered by the Budget, and each week thereafter (for the three-week period then ended) (each such rolling three-week period being referred to herein as a "Test Period"), the Borrower shall deliver to Agent a reconciliation of (i) projected cumulative weekly cash revenues of the Borrower set forth in the Budget to actual aggregate cumulative weekly cash revenues, (ii) projected cumulative weekly inventory receipts of the Borrower set forth in the Budget to actual aggregate cumulative weekly inventory receipts, (iii) projected cumulative weekly cash disbursements of the Borrower set forth in the Budget to actual aggregate cumulative weekly cash disbursements, and (iv) projected Availability set forth in the Budget to actual Availability, in each case for such Test Period.

(4)    The Borrower agrees that if (i) actual aggregate cumulative cash revenues during such Test Period are less than ninety percent (90%) of the projected aggregate cumulative cash revenues set forth in the Budget during such Test Period, (ii) actual aggregate cumulative inventory receipts during such Test Period are less than ninety percent (90%) of the projected aggregate cumulative inventory receipts set forth in the Budget during such Test Period, (iii) actual aggregate cumulative cash disbursements during such Test Period are greater than one hundred and ten percent (110%) of the projected aggregate cumulative cash disbursements set forth in the Budget during such Test Period, or (iv) actual Availability under the Credit Agreement is less than ninety percent (90%) of the projected Availability set forth in the Budget as of the last day of such Test Period, then any such variance shall be deemed an immediate Event of Default."

3.    Additional Agreements.  In consideration of the waiver by Agent and Lenders of the Specified Defaults  as set forth in this Amendment, the Borrower covenants and agrees as follows:

(a)    Capital Transaction or Sale Transaction.  The Borrower shall continue to engage Wunderlich Securities, or another investment banker or financial intermediary reasonably acceptable to the Agent, to continue to pursue in an expeditious manner (i) a transaction for a capital investment in the Borrower to yield no less than $10,000,000 in net proceeds to the Borrower (a "Capital Transaction"), or (ii) a sale of all or substantially all of the Borrower's assets and/or equity for net cash consideration in an amount sufficient to repay all of the Obligations (after payment of all transaction costs to be incurred in connection with such transaction, including, without limitation, all costs and expenses of any chapter 11 bankruptcy process required to consummate such sale, if applicable) (a "Sale Transaction"), in each case, on terms and conditions satisfactory to the Agent; and Borrower shall comply with each of the following milestone events relative to such Capital Transaction or Sale Transaction by the applicable date set forth below:

(i)    Indications of Interest.  No later than May 15, 2015, the Borrower shall have received multiple indications of interest from potential investors for a Capital Transaction or a Sale Transaction;

(ii)    Executed Letter of Intent.   No later than June 2, 2015, the Borrower shall have received at least one executed letter of intent from a potential investor for a Capital Transaction or a Sale Transaction, in either case for a consideration in an amount not less than the respective amount set forth in Section 3(a)(i) above; and

(iii)    Consummation of Capital Transaction or Sale Transaction.   No later than June 30, 2015, the Borrower shall close a Capital Transaction or a Sale Transaction with an investor and pursuant to an agreement, which investor, agreement and proposed transaction shall in all respects be acceptable to the Agent, and resulting in net cash proceeds received by the Borrower, in either case in an amount not less than the respective amount set forth in Section 3(a)(i) above, or such other amount otherwise mutually acceptable to the Agent and Borrower.  Unless otherwise agreed by the Agent and Required Lenders, all net proceeds arising from any Capital Transaction or Sale Transaction shall be paid directly to the Agent for application to the outstanding Obligations.

(b)    Conversion of Vendor Trade Payables.   The Borrower has informed the Agent, Tranche A-1 Agent and Lenders that Borrower has solicited certain of Borrower's trade vendors to enter into that certain Agreement For Conversion of Vendor Trade Payables To Subordinated Secured Notes in substantially the form attached hereto as **Exhibit B** (the "Conversion Agreement"), pursuant to which the trade payables owing to vendors party thereto shall be converted to junior, fully subordinated secured subordinated promissory notes of the Borrower ("Junior Subordinated Notes").  Borrower shall, no later than May 15, 2015 achieve (i) acceptance by trade creditors to the terms of the Conversion Agreement resulting in conversion of not less than $5,000,000 of outstanding trade payables into Junior Subordinated Notes or other unsecured promissory notes of the Borrower (which Junior Subordinated Notes or other promissory notes shall in all respects be satisfactory to the Agent in form and substance) and (ii) enhanced liquidity to the Borrower of no less than $1,000,000 (as determined by the Agent in its reasonable discretion) through other accommodations by Borrower's vendors (i.e., the provision of extended trade terms).

(c)    Engagement of Consultant.   The Agent has engaged 360 Merchant Solutions (the "Consultant") to assist with matters relating to the Borrower, including with respect to any Liquidation Sales (as defined below), which previously provided consulting services to the Borrower.  The Consultant's engagement with the Borrower has concluded and the Borrower consents to the engagement and agrees not to raise any objection to such engagement, including in any bankruptcy case involving the Borrower. Notwithstanding the foregoing, nothing set forth herein shall be deemed to be a waiver of any confidentiality agreements as between the Borrower and 360 Merchant Solutions, which shall remain in full force and effect in according with their terms.

(d)    Sale Proposals.   The Borrower agrees to commence a process to solicit bids for the conduct of "going out of business" or similar theme sales at all of the Borrower's retail store locations ("Sales"), as follows:

(i)    Maintenance of Dataroom.  Borrower, in conjunction with the Consultant, shall continue to maintain and update the Borrower's online data room to ensure that such data room contains information relating to Borrower's inventory and retail stores sufficient to allow prospective bidders to formulate bids to conduct the Sales.

(ii)    Receipt of Sale Proposals.  No later than May 15, 2015, Borrower shall have received executed proposals, letters of intent or other written bids setting forth terms of the proposed Sales from at least one nationally known firm specializing in the disposition of retail assets such as those of the Borrower.

(iii)    Selection of Sales Agent.  No later than May 29, 2015, Borrower shall select the highest and best proposal received from prospective bidders for the right to conduct the Sales (a "Sales Agent"), and shall have entered into an Agency Agreement with such prospective Sales Agent in form and substances satisfactory to the Agent, which bid will serve as a stalking horse bid in an auction among parties desiring to conduct the Sales.

(iv)    Conduct of Auction For Right to Conduct the Sales.  In the event that (x) Borrower has failed to meet the milestone set forth in Section 3(b) above, then no later than June 3, 2015, or (y) Borrower has failed to meet the milestones set forth in Section 3(a)(ii) or 3(a)(iii), then no later than two (2) Business Days following the earlier of the failure to satisfy the milestone set forth in Section 3(a)(ii) or 3(a)(iii), as applicable, Borrower shall have conducted an auction for the right to conduct the Sales and, in consultation with the Agent, selected the highest and best bid submitted at such auction as the winning bid.

(e)    Bankruptcy Preparation.  Borrower shall cause its bankruptcy counsel to commence preparations for the Borrower to file a petition under chapter 11 of the United States Bankruptcy Code, including drafting customary "first day" pleadings and negotiation with Agent of the terms and documentation relative to debtor-in-possession financing.

(f)    Events of Default.  The Borrower acknowledges and agrees that the failure of the Borrower to comply with the terms and conditions set forth in this Section 3 shall constitute an immediate Event of Default (without need for notice of any kind or any passage of time).

4.    Payment of Deferred Origination Fees.  The Borrower acknowledges that as a result of the occurrence of the Specified Defaults, the deferred portion of the Tranche A Origination Fee and Tranche A-1 Origination Fee are due and payable to Agent, for the benefit of the Lenders pursuant to the terms of the Fee Letter.  Consequently, as required by the terms of the Fee Letter and in consideration of the waiver of the Specified Defaults and the agreement of the Agent and Lenders to continue to lend to the Borrower pursuant to the Credit Agreement, concurrently with the execution of this Amendment the Borrower shall (i) pay to the Agent, for the benefit of the Tranche A Lenders, the balance of the Tranche A Origination Fee (as defined in the Fee Letter), and (ii) to the Agent, for the benefit of the Tranche A-1 Lenders, the balance

of the Tranche A-1 Origination Fee (as defined in the Fee Letter) pursuant to the terms of the Fee Letter, by the Agent initiating a Loan in the aggregate amount of $850,000. No portion of such deferred Origination Fees shall be subject to refund, rebate or abatement in whole or part.

5.      Conditions Precedent.  The effectiveness of this Amendment is subject to the following conditions precedent (all documents to be in form and substance satisfactory to Agent):

(a)      Agent shall have received this Amendment duly executed by the Borrower;

(b)      The Agent shall have received and approved the Budget;

(c)      Concurrently with the execution and delivery of this Amendment the Borrower shall have paid to the Agent the deferred Origination Fees referred to in Section 4 above;

(d)      Agent shall have received a certificate from the Borrower stating that there have been no changes in incumbency and attaching resolutions authorizing this Amendment and the transactions contemplated hereby and that there have been either (i) no changes to the Constituent Documents since those delivered on the Closing Date or (ii) true and accurate copies of the amended Organizational Documents in effect as of the date of this Amendment are attached to such certificate; and

(e)      After giving effect to this Amendment (i) all representations and warranties of the Borrower set forth herein and in the Loan Documents shall be true and correct in all material respects, (ii) no Event of Default or any other event which, upon the lapse of time, service of notice, or both, which would constitute an Event of Default under any of the Loan Documents, shall have occurred and be continuing, and (iii) Borrower shall be in compliance with the Credit Agreement and the other Loan Documents.

6.      Representations, Warranties.  Borrower represents that, after giving effect to this Amendment:

(a)      No consent or approval of, or exemption by any Person is required to authorize, or is otherwise required in connection with the execution and delivery of this Amendment which has not been obtained and which remains in full force and effect; and

(b)      As of the date hereof, each of the representations and warranties of the Borrower set forth in the Credit Agreement and the other Loan Documents are true, correct and complete in all material respects, except to the extent such representations and warranties speak as to an earlier date, in which case the same are true, correct and complete as to such earlier date; and no Default or Event of Default exists under the Credit Agreement.

7.      Confirmation of Security Interests.  Borrower hereby confirms the security interests and liens granted by Borrower to Agent, in and to the Collateral in accordance with the

Credit Agreement and other Loan Documents as security for the Obligations.

8.    <u>Limited Waiver</u>.    Except as expressly provided in <u>Section 1</u> hereof, this Amendment shall not constitute a waiver of any Event of Default or any other event which, upon the lapse of time, giving of notice, or both, which would constitute an Event of Default, which may exist under the Credit Agreement, or a waiver or modification of any of the Agent's or any Lender's rights and remedies or of any of the terms, conditions, warranties, representations, or covenants contained in the Credit Agreement.    Except as expressly provided in <u>Section 1</u> hereof, the Agent and each Lender hereby reserves all of its rights and remedies pursuant to the Credit Agreement and the other Loan Documents and applicable law.

9.    <u>No Other Modifications, Conflicts with Loan Documents, etc</u>.    This Amendment is intended to supplement and modify the Credit Agreement and the rights and obligations of the parties under the Credit Agreement shall not in any way be vacated, modified or terminated except as herein provided.    All terms and conditions contained in each and every agreement or promissory note or other evidence of indebtedness of Borrower to the Lenders are incorporated herein by reference.    If there is a conflict between any of the provisions of the Credit Agreement and the provisions of this Amendment, then the provisions of this Amendment shall govern.

10.    <u>Governing Law</u>.    This Amendment shall be construed in accordance with the substantive laws (other than conflict laws) of the State of New York.

11.    <u>Full Force and Effect</u>.    Except as expressly amended hereby, all terms and conditions of the Credit Agreement, and any and all exhibits annexed thereto and all other writings submitted by the Borrower to the Agent pursuant thereto, shall remain unchanged and in full force and effect.

12.    <u>Counterparts</u>.    This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall be considered one and the same document.    Delivery of an executed counterpart of a signature page of this document by facsimile or by electronic mail or e-mail file attachment shall be effective as delivery of a manually executed counterpart of this document.

13.    <u>RELEASE</u>.    ON AND PRIOR TO THE EFFECTIVE DATE OF THIS AMENDMENT, BORROWER, TOGETHER WITH ITS SUCCESSORS AND ASSIGNS, HEREBY ACKNOWLEDGES THAT IT HAS NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS-COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR ELIMINATE ALL OR ANY PART OF ITS LIABILITY TO REPAY THE INDEBTEDNESS OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM AGENT, TRANCHE A-1 AGENT OR ANY LENDER. BORROWER HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER DISCHARGES AGENT, TRANCHE A-1 LENDER AND EACH LENDER, ITS PREDECESSORS, AGENTS, EMPLOYEES, AFFILIATES SUCCESSORS AND ASSIGNS, FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, AND LIABILITIES WHATSOEVER, KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, ASSERTED OR UNASSERTED, FIXED, CONTINGENT, OR

CONDITIONAL, AT LAW OR IN EQUITY, IN EACH CASE ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AMENDMENT IS EXECUTED, WHICH BORROWER MAY NOW OR HEREAFTER (WHETHER OR NOT PRESENTLY SUSPECTED, CONTEMPLATED OR ANTICIPATED) HAVE (ON OR PRIOR TO THE DATE OF THE AMENDMENT) AGAINST AGENT, TRANCHE A-1 AGENT, ANY LENDER, THEIR PREDECESSORS, AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS, IF ANY, AND IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, AND ARISING FROM ANY LOAN OR ADVANCE, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE CREDIT AGREEMENT OR OTHER LOAN DOCUMENTS, AND NEGOTIATION FOR AND EXECUTION OF THIS AMENDMENT.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the parties hereto have caused this First Amendment and Waiver to Credit Agreement to be executed and delivered as of the day and year first above written.

ANNA'S LINENS, INC.,
as Borrower

By: _____
Name: SCOTT GLADSTONE
Title: PRESIDENT & CEO

**SALUS CAPITAL PARTNERS, LLC,**
as Agent, Co-Tranche A-1 Agent and Lender

By: _____
Name:   Kyle C. Shonak
Title:    Co-President

By: _____
Name:   Brian T. Kennedy
Title:    Senior Vice President


**SALUS CLO 2012-1, LTD.,**
as Lender

By:  Salus Capital Partners II, LLC,
Its:  Collateral Manager

By: _____
    Name:  Kyle C. Shonak
    Title:    Co-President

By: _____
    Name:  Macy L. Kiley
    Title:    Executive Vice President


**DCP LINENS LENDER, LLC,**
as Co-Tranche A-1 Agent and Lender

By: _____
    Name:
    Title:

**SALUS CAPITAL PARTNERS, LLC,**
as Agent, Co-Tranche A-1 Agent and Lender

By: _____
Name:
Title:

By: _____
Name:
Title:

**SALUS CLO 2012-1, LTD.,**
as Lender

By:  Salus Capital Partners II, LLC,
Its:  Collateral Manager

By: _____
Name:
Title:

By: _____
Name:
Title:

**DCP LINENS LENDER, LLC,**
as Co-Tranche A-1 Agent and Lender

By: _____
Name: _____
Title: _____
President

*[First Amendment and Waiver to Credit Agreement]*

**Schedule I**

Specified Defaults

1. The Borrower failed to deliver a consolidated balance sheet, related consolidated statements of income or operations, Shareholders' Equity and cash flows of the Borrower and its Subsidiaries for the Fiscal Month ended February 1, 2015 within thirty (30) days of such Fiscal Month end, as required by Section 6.01(b) of the Credit Agreement.

2. The Borrower failed to maintain the required Operating Expenditures to Gross Margin Dollars Ratio of 0.95 for the period ending February 1, 2015 as required by Section 7.15(c) of the Credit Agreement.

3. The Borrower failed to maintain the required Operating Expenditures to Gross Margin Dollars Ratio of 0.95 for the period ending March 1, 2015 as required by Section 7.15(c) of the Credit Agreement.

4. The Borrower failed to maintain the required Operating Expenditures to Gross Margin Dollars Ratio of 0.95 for the period ending April 5, 2015 as required by Section 7.15(c) of the Credit Agreement.

5. The Borrower failed to maintain the required Operating Expenditures to Gross Margin Dollars Ratio of 0.95 for the period ending May 3, 2015 as required by Section 7.15(c) of the Credit Agreement.

**EXHIBIT A**

Budget

Attached

DRAFT - SUBJECT TO REVIEW

## Anna's Linens, Inc.
### Cash Flow Forecast
$000's

| | Week 1 Wk Ended 5/3 | Week 2 Wk Ended 5/10 | Week 3 Wk Ended 5/17 | Week 4 Wk Ended 5/24 | Week 5 Wk Ended 5/31 | Week 6 Wk Ended 6/7 | Week 7 Wk Ended 6/14 | Week 8 Wk Ended 6/21 | Week 9 Wk Ended 6/28 | Week 10 Wk Ended 7/5 | Week 11 Wk Ended 7/12 | Week 12 Wk Ended 7/19 | Week 13 Wk Ended 7/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Receipts | $ 1,813 | $ 2,390 | $ 2,096 | $ 2,143 | $ 2,076 | $ 1,969 | $ 1,967 | $ 1,809 | $ 1,749 | $ 1,904 | $ 2,410 | $ 2,167 | $ 1,993 |
| Credit Card Receipts | 4,432 | 4,981 | 4,363 | 4,461 | 4,320 | 4,041 | 4,156 | 3,759 | 3,633 | 3,904 | 4,851 | 4,341 | 3,975 |
| **Total Operating Receipts** | **6,245** | **7,371** | **6,459** | **6,604** | **6,396** | **6,010** | **6,183** | **5,567** | **5,382** | **5,808** | **7,260** | **6,508** | **5,968** |
| Trade Disbursements (Check) | (2,081) | (1,158) | (1,172) | (2,761) | (2,831) | (2,550) | (2,368) | (2,504) | (2,291) | (2,436) | (2,219) | (4,923) | (3,391) |
| Trade Disbursement (Wire) | (690) | (809) | (104) | (355) | (549) | (380) | (324) | (89) | (493) | (1,066) | (229) | (532) | (785) |
| Freight and DC Costs | (513) | (433) | (433) | (582) | (433) | (329) | (329) | (329) | (455) | (329) | (286) | (286) | (457) |
| Customs Fees | - | - | - | (205) | - | - | - | - | (198) | - | - | - | (107) |
| DC Rents | (410) | | | | (317) | (317) | | | (317) | (317) | | | |
| **Total Trade & Freight Disbursements** | **(3,694)** | **(2,401)** | **(1,710)** | **(3,903)** | **(3,874)** | **(3,576)** | **(3,020)** | **(2,922)** | **(3,437)** | **(4,147)** | **(2,750)** | **(5,740)** | **(4,739)** |
| Store Payroll | (15) | (1,518) | (15) | (1,501) | (15) | (1,475) | (15) | (1,671) | (15) | (1,475) | (15) | (1,464) | (15) |
| G&A Payroll | (54) | (426) | (45) | (426) | (85) | (425) | (45) | (426) | (85) | (425) | (45) | (428) | (265) |
| Benefits | (98) | (171) | (66) | (288) | (100) | (76) | (66) | (300) | (100) | (53) | (66) | (78) | (80) |
| **Payroll & Benefits Disbursements** | **(2,115)** | **(2,115)** | **(664)** | **(2,225)** | **(100)** | **(1,977)** | **(64)** | **(2,397)** | **(100)** | **(1,933)** | **(66)** | **(1,969)** | **(360)** |
| Store Rents | (3,542) | | (50) | | (3,550) | (83) | | (50) | | (3,478) | | (50) | |
| Sales Taxes | (963) | (14) | (58) | (1,114) | (554) | (250) | (62) | (46) | (1,568) | (87) | (10) | (17) | (1,209) |
| Credit Card Fees | (0) | (242) | (0) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (214) | (3) | (3) |
| Advertising | (359) | (494) | (494) | (494) | (320) | (320) | (320) | (320) | (237) | (237) | (237) | (257) | (270) |
| **Store Operating Disbursements** | **(4,868)** | **(749)** | **(604)** | **(1,611)** | **(877)** | **(4,203)** | **(385)** | **(419)** | **(1,827)** | **(3,834)** | **(481)** | **(328)** | **(1,406)** |
| Corporate Rent | (70) | (69) | (127) | (156) | (244) | (66) | (106) | (160) | (148) | (66) | (130) | (222) | (183) |
| Utilities | (172) | (372) | (419) | (207) | (347) | (105) | (239) | (229) | (229) | (179) | (388) | (388) | (389) |
| Other | (332) | (441) | (547) | (363) | (992) | (458) | (346) | (419) | (388) | (531) | (618) | (610) | (551) |
| **Other Operating Disbursements** | **(574)** | | | | | | | | | | | | |
| **Net Operating Cash Flow** | **(2,948)** | **1,666** | **3,538** | **(1,498)** | **954** | **(4,284)** | **2,344** | **(549)** | **(379)** | **(4,827)** | **3,471** | **(2,137)** | **(1,692)** |
| Non-Operating Cash Flow | | | | | | | | | | | | | |
| Interest & Fees | (430) | (860) | (10) | (10) | (10) | (651) | (10) | (10) | (10) | (463) | (10) | (10) | (10) |
| CAPEX | (7) | (17) | (78) | (17) | (17) | (11) | (11) | (11) | (11) | (11) | (164) | (164) | (164) |
| Other Receipts (Disbursements) | (606) | 90 | | | | | | | | | | | |
| **Total Non-Operating Disbursements** | **(1,042)** | **(787)** | **(85)** | **(27)** | **(27)** | **(462)** | **(21)** | **(21)** | **(21)** | **(474)** | **(174)** | **(174)** | **(174)** |
| **Net Receipts (Disbursements)- Book** | **$ (4,330)** | **$ 879** | **$ 3,450** | **$ (1,526)** | **$ 927** | **$ (4,666)** | **$ 2,323** | **$ (610)** | **$ (390)** | **$ (6,101)** | **$ 3,297** | **$ (2,319)** | **$ (1,265)** |
| Incr. (Decr.) in Outstanding Checks | 5,062 | (3,178) | (3,743) | 1,100 | 172 | 3,246 | (3,312) | (292) | (541) | 3,744 | (2,941) | 2,120 | 103 |
| **Net Receipts (Disbursements)- Bank** | **$ 1,032** | **$ (2,300)** | **$ (293)** | **$ (355)** | **$ 1,099** | **$ (1,420)** | **$ (990)** | **$ (903)** | **$ (931)** | **$ (1,357)** | **$ 357** | **$ (190)** | **$ (1,162)** |
| Beginning Revolver Availability | 2,710 | 4,497 | 2,990 | 2,777 | 3,112 | 5,159 | 5,073 | 4,910 | 5,090 | 5,171 | 4,772 | 5,076 | 4,611 |
| (Borrowings)/ Repayments | 1,032 | (2,300) | (250) | (335) | 1,099 | (1,420) | (990) | (903) | (931) | (1,357) | 357 | (190) | (1,162) |
| Increase/ (Decrease) in Borrowing Base | 755 | 793 | 79 | 670 | 949 | 1,333 | 827 | 1,083 | 1,013 | 958 | (53) | (275) | 390 |
| (Increase)/ Decrease in LCs | | | | | | | | | | | | | |
| **Ending Unused Revolver Availability** | **$ 4,497** | **$ 2,990** | **$ 2,777** | **$ 3,112** | **$ 5,159** | **$ 5,073** | **$ 4,910** | **$ 5,090** | **$ 5,171** | **$ 4,772** | **$ 5,076** | **$ 4,611** | **$ 3,839** |

5/2/2015, 1:19 PM

DRAFT- SUBJECT TO REVIEW

| Borrowing Base Week Ending | | 4/26 | 5/3 | 5/10 | 5/17 | 5/24 | 5/31 | 6/7 | 6/14 | 6/21 | 6/28 | 7/5 | 7/12 | 7/19 |
| Liquidity Impact Week Ending | | 5/3 | 5/10 | 5/17 | 5/24 | 5/31 | 6/7 | 6/14 | 6/21 | 6/28 | 7/5 | 7/12 | 7/19 | 7/26 |
| | Primary Lender | Sales | Sales | Sales | Sales | Sales | Sales | Sales | Sales | Sales | Sales | Sales | Sales | Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Credit Card Receivables** | | | | | | | | | | | | | | |
| Total Credit Card Receivables | Weekly | 3,335 | 3,988 | 3,394 | 3,500 | 3,435 | 3,127 | 3,314 | 2,864 | 2,835 | 2,875 | 3,871 | 3,447 | 3,164 |
| Less: Outstanding Fees | Weekly | (173) | (173) | (40) | (90) | (121) | (161) | (102) | (102) | (153) | (204) | (255) | (66) | (132) |
| Less: Older than 5 days | Monthly | | | | | | | | | | | | | |
| Eligible Credit Card Receivables | | 3,182 | 3,816 | 3,354 | 3,422 | 3,314 | 2,966 | 3,263 | 2,882 | 2,682 | 2,671 | 3,616 | 3,381 | 3,033 |
| | | | | | | | | | | | | | | |
| Credit Card Receivable Advance Rate | Weekly | 97.0% | 97.0% | 97.0% | 97.0% | 97.0% | 97.0% | 97.0% | 97.0% | 97.0% | 97.0% | 97.0% | 97.0% | 97.0% |
| Credit Card Receivable Availability | | 3,086 | 3,701 | 3,253 | 3,320 | 3,215 | 2,877 | 3,185 | 2,776 | 2,601 | 2,591 | 3,507 | 3,280 | 2,942 |
| | | | | | | | | | | | | | | |
| **Inventory** | | | | | | | | | | | | | | |
| Beginning Perpetual & Between Stores | Weekly | 63,414 | 64,263 | 65,495 | 66,074 | 66,661 | 68,661 | 70,668 | 71,206 | 72,630 | 74,059 | 75,059 | 74,385 | 74,369 |
| Plus: Inventory Purchases | Weekly | 3,742 | 4,735 | 3,523 | 3,971 | 4,759 | 4,607 | 3,467 | 4,221 | 3,872 | 3,447 | 2,874 | 3,005 | 3,404 |
| Less: COGS, Damage & Shrink | Weekly | (2,893) | (3,505) | (3,044) | (3,132) | (3,011) | (2,951) | (2,956) | (2,590) | (2,452) | (2,448) | (3,348) | (3,020) | (2,662) |
| Ending Perpetual & Between Stores | Weekly | 64,263 | 65,495 | 66,074 | 66,913 | 68,481 | 70,668 | 71,206 | 72,839 | 74,069 | 73,059 | 74,385 | 74,369 | 75,111 |
| | | | | | | | | | | | | | | |
| Beginning In-Transit From Vendors | Weekly | 7,278 | 7,478 | 5,023 | 4,968 | 4,583 | 3,694 | 3,363 | 3,335 | 3,135 | 3,135 | 3,135 | 2,735 | 2,835 |
| Plus/Less: Change In-Transit | Weekly | 200 | (2,445) | (55) | (385) | (989) | (311) | (48) | (200) | - | - | (400) | (100) | - |
| Less: Transpland >60 Day on Water | Weekly | | | | | | | | | | | | | |
| Ending In-Transit From Vendors | Weekly | 7,478 | 5,033 | 4,968 | 4,583 | 3,694 | 3,383 | 3,335 | 3,135 | 3,135 | 3,135 | 2,735 | 2,635 | 2,835 |
| | | | | | | | | | | | | | | |
| Total Inventory | | 71,740 | 70,528 | 71,042 | 71,496 | 72,355 | 73,961 | 74,543 | 75,974 | 77,184 | 78,184 | 77,120 | 77,004 | 77,746 |
| | | | | | | | | | | | | | | |
| Less: Shrink Ineligibles | Monthly 2.1% | (1,479) | (1,501) | (1,101) | (1,028) | (1,028) | (1,028) | (1,028) | (1,003) | (1,003) | (1,003) | (1,003) | (969) | (969) |
| Less: Drop Ship Ineligibles | Weekly 0.0% | (23) | (24) | (34) | (33) | (35) | (30) | (26) | (37) | (37) | (38) | (37) | (37) | (38) |
| Less: Damaged Ineligibles | Weekly 0.0% | | | | | | | | | | | | | |
| Less: Miscellaneous | Weekly 0.0% | (2) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) |
| Less: Packaways | Weekly 0.1% | | | | | | | | | | | | | |
| Less: Closed Store Ineligibles | Weekly 0.1% | (1) | (47) | (47) | (47) | (48) | (49) | (49) | (50) | (51) | (52) | (51) | (51) | (51) |
| | | | | | | | | | | | | | | |
| Less: DI Ineligibles | Weekly 2.0% | (1,501) | (703) | (697) | (650) | (569) | (538) | (534) | (514) | (514) | (514) | (474) | (454) | (454) |
| Eligible Inventory | | 68,827 | 68,843 | 69,163 | 69,728 | 70,675 | 72,339 | 72,896 | 74,371 | 75,590 | 76,548 | 75,509 | 73,484 | 76,225 |
| Inventory Advance Rate | Weekly | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Inventory Availability | | 68,827 | 68,843 | 69,163 | 69,728 | 70,675 | 72,339 | 72,896 | 74,371 | 75,590 | 76,548 | 75,555 | 75,484 | 76,225 |
| | | | | | | | | | | | | | | |
| Facility Limit | | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| Total Revolver Availability | | 71,723 | 72,245 | 72,416 | 73,048 | 73,890 | 75,217 | 76,062 | 77,147 | 78,191 | 78,179 | 79,063 | 78,764 | 79,166 |
| | | | | | | | | | | | | | | |
| Less: Availability Block | HA 3.0% | (2,152) | (2,170) | (2,172) | (2,191) | (2,217) | (2,250) | (2,282) | (2,314) | (2,346) | (2,375) | (3,372) | (3,363) | (3,375) |
| Less: Customer Credits Reserve | Monthly | (195) | (212) | (212) | (212) | (212) | (212) | (212) | (212) | (212) | (212) | (212) | (212) | (212) |
| Less: Giftcard Reserve | Monthly | (64) | (60) | (60) | (60) | (63) | (63) | (60) | (60) | (60) | (60) | (60) | (60) | (60) |
| Less: Landlord Lien Reserve (PA & VA) | Monthly | (172) | (215) | (215) | (215) | (215) | (215) | (215) | (215) | (215) | (215) | (215) | (215) | (215) |
| Less: DC Warehouse | Weekly | | | | | | | | | | | | | |
| Less: Texas Ad Valorem Tax Reserve | Annually | (124) | (127) | (127) | (127) | (127) | (127) | (127) | (127) | (127) | (127) | (127) | (127) | (127) |
| Less: Expedco Outstanding Fees | Annually | (2) | | | | | | | | | | | | |
| Less: Landed Cost Reserve | Weekly 16.5% | (970) | (714) | (705) | (648) | (518) | (469) | (462) | (433) | (433) | (433) | (373) | (350) | (350) |
| Total Reserves | | (4,678) | (4,507) | (4,499) | (4,461) | (4,355) | (4,348) | (4,364) | (4,364) | (4,401) | (4,430) | (4,387) | (4,343) | (4,356) |
| | | | | | | | | | | | | | | |
| Net Revolver Availability | | 67,045 | 67,838 | 67,917 | 68,586 | 69,535 | 70,869 | 71,695 | 72,778 | 73,791 | 74,749 | 74,695 | 74,420 | 74,811 |
| | | | | | | | | | | | | | | |
| LCs & Reserves | | | | | | | | | | | | | | |
| Revolver Borrowings | | (62,547) | (64,847) | (65,140) | (65,475) | (64,376) | (65,790) | (66,786) | (67,688) | (68,619) | (69,977) | (69,620) | (69,810) | (70,072) |
| Ending Unused Revolver Availability | | 4,497 | 2,990 | 2,777 | 3,112 | 5,159 | 5,073 | 4,910 | 5,090 | 5,171 | 4,772 | 5,076 | 4,611 | 4,739 |

**EXHIBIT B**

Agreement For Conversion of Vendor Trade Payables
To Subordinated Secured Notes

Attached

**THE OBLIGATIONS CREATED PURSUANT TO THIS AGREEMENT, PAYMENTS ON ACCOUNT OF SUCH OBLIGATIONS, THE LIENS AND SECURITY INTERESTS SECURING SUCH OBLIGATIONS, THE EXERCISE OF ANY RIGHT OR REMEDY WITH RESPECT THERETO, AND CERTAIN OF THE RIGHTS OF THE HOLDERS OF SUCH OBLIGATIONS ARE LIMITED AND SUBJECT TO SUBORDINATION AS PROVIDED HEREIN.**

## ANNA'S LINENS, INC.

### AGREEMENT FOR CONVERSION OF VENDOR TRADE PAYABLES TO JUNIOR SUBORDINATED SECURED NOTES

THIS AGREEMENT FOR CONVERSION OF VENDOR TRADE PAYABLES TO JUNIOR SUBORDINATED SECURED NOTES ("**Agreement**") is made and entered into as of May 5, 2015, by and between Anna's Linens, Inc., a Delaware corporation (the "**Company**"), each of the vendors of the Company whose name and signature appears at the end of this Agreement, (collectively "**Vendors**"), and _____("Collateral Agent"), in its capacity as collateral agent for the Vendors. The undersigned parties to this Agreement are referred to hereinafter each as a "**Party**" and collectively as the "**Parties.**"

### RECITALS

A.      Vendors are current suppliers of the Company and hold outstanding indebtedness from the Company consisting of trade payables for goods supplied (the "**Existing Trade Payables**").

B.      Vendors and the Company have discussed the conversion of a portion of the Existing Trade Payables into junior subordinated secured notes, (i) which junior subordinated secured notes shall be junior in right of payment and subordinated to the prior payment of existing and future secured debt issued to certain lenders, institutional investors, or qualified institutional buyers and as set forth herein (as further described herein, "**Senior Debt**"), and (ii) any lien on the assets of the Company securing any such junior subordinated secured notes shall be junior in all respects to any lien on the assets of the Company securing any Senior Debt.   Any issuance of junior subordinated secured notes shall be accompanied by a commitment by the Vendors to continue to provide goods to the Company, and limited to an aggregate amount of $10,000,000 but subject to the Company obtaining the agreement of Vendors to conversion of a minimum amount of Existing Trade Payables acceptable to the Company.

C.      The Company has discussed the proposed conversion of Existing Trade Payables and issuance of junior subordinated secured notes with its current senior secured lenders (collectively, the "**Senior Lenders**") and Salus Capital Partners, LLC, agent for the Senior Lenders (the "**Senior Lender Agent**"). The Company anticipates receiving the consent of the Senior Lenders and Senior Lender Agent to the issuance of the junior subordinated secured notes provided that certain conditions are satisfied.

1

D.     The Parties are willing to enter into this Agreement upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and the payment of the sum set forth below, the Parties hereby agree as follows:

AGREEMENT

1.  **Conversion of Trade Payables and Issuance of Notes.**

1.1    **Qualifying Payables.** The Company and each individual Vendor shall agree on the amount of Trade Payables owing to such Vendor which shall be eligible for conversion on the terms described in this Agreement, with the specific Trade Payables to be converted as to each Vendor determined, unless otherwise agreed by the Company in its sole discretion, by first converting the oldest Trade Payables owing to such Vendor as of the Conversion Date (as defined below), and continuing with the next oldest Trade Payables owing to such Vendor, up to the aggregate amount of Trade Payables of such Vendor to be converted as so agreed (the "**Qualified Payables**"). Unless otherwise agreed by the Company, the minimum amount of Qualified Payables to be converted for each Vendor shall be $100,000.

1.2    **Issuance of Notes.** As of the date which is five (5) business days following the execution of this Agreement by all of the Parties (the "**Conversion Date**"), the Company shall issue a promissory note substantially in the form of <u>Exhibit A</u> hereto (the "**Junior Subordinated Secured Note**") to each of the Vendors, in exchange for the Qualified Payables of such Vendor, and the books and accounts of the Company and each Vendor shall be adjusted accordingly as of the Conversion Date; provided that (a) the issuance of Junior Subordinated Secured Notes is subject to the agreement of the Vendors to convert an aggregate amount of Qualifying Payables acceptable to the Company, in its sole discretion; and (b) the aggregate amount of Junior Subordinated Secured Notes issued shall not exceed $10,000,000. On the Conversion Date, the Company shall advise the Collateral Agent and each of the Vendors of the aggregate amount of Junior Subordinated Secured Notes issued.

1.3    **Interest.** Interest shall accrue on the outstanding principal amount of each Junior Subordinated Secured Note at the rate of five percent (5%) per annum, compounded annually, based on a 365 day year and added to the principal of such Junior Subordinated Secured Note on each anniversary date of such Junior Secured Promissory Note.

1.4    **Maturity Date.** Each Junior Subordinated Secured Note shall be payable in full, interest and principal, on the date which is thirty (30) months after the Conversion Date (the "**Maturity Date**").

1.5    **Pre-payment Rights.** So long as all Senior Debt has been indefeasibly paid in full, the Company may pre-pay any Junior Subordinated Secured Note, in whole or in part, without premium or penalty, at any time or from time to time prior to the Maturity Date, in its sole discretion and without consent of the then holder of the Note (a "**Holder**").

2

1.6    **Subordination.** The Junior Subordinated Secured Notes shall be junior in right of payment and subordinated as to repayment of all existing and future indebtedness of the Company in favor of other lenders, institutional investors, or qualified institutional buyers as provided herein for borrowed money, including all existing and future indebtedness in favor of the Senior Agent and Senior Lenders (collectively, "**Senior Debt**". Each Junior Subordinated Secured Note shall in all respects rank *pari passu* in right of payment with each other Junior Subordinated Secured Note.

1.7    **Secured Priority.** The Junior Subordinated Secured Notes shall be secured, as provided herein, by a security interest in certain assets of the Company, and such security interest shall be junior in all respects to any lien on the assets of the Company securing any Senior Debt.

1.8    **Assignment.** The Junior Subordinated Secured Notes shall be transferable with the written consent of the Company; provided however, (i) that any such assignee shall expressly agree in writing to abide by the terms of this Agreement and of the Collateral Agency and Intercreditor Agreement executed by the Parties with respect to this Agreement, (ii) that any information rights provided under this agreement or in connection with the Notes shall terminate upon such transfer and (iii) upon request by any holder of Senior Debt such assignee shall execute all documents, instruments or agreements reasonably required by such holder to acknowledge such assignee's agreement to the subordination terms contained herein and/or more fully evidence the subordination of the Junior Subordinated Secured Notes to all Senior Debt contemplated hereby.

2.    **Waiver of Existing Defaults and Charges.**

2.1    As of the Conversion Date, each Vendor waives and shall be deemed to have waived any existing fees or charges (including, but not limited to late payments, fees, costs, or other charges) related to the Qualifying Payables of such Vendor and to any other payables existing and outstanding from the Company to such Vendor on the Conversion Date, whether or not due as of the Conversion Date (the "Waived Amounts"). In the event that the security interest granted herein is avoided or otherwise lost through no fault of Vendor, including as a result of a preference action or a sale of assets where the sale price is less than Vendor's traunch of the secured debt, then all such Waived Amounts shall be reinstated and added to the obligation owed to Vendor, which will be a general unsecured obligation.

2.2    The Company and Vendor expressly agree that notwithstanding any other clause in this Agreement as well as the associated Junior Subordinated Secured Note and the Collateral Agency and Intercreditor Agreement, invoices not selected as Qualifying Payables shall be paid in the ordinary course of business and are not subject to the any of the terms and conditions of this Agreement or the Junior Subordinated Secured Notes and the Collateral Agency and Intercreditor Agreement.

3. **Covenant and Agreement Regarding Future Goods and Terms.**

    3.1.   **Commitment to Provide Product and Credit Terms.**  In consideration of this Agreement and the issuance of the Junior Subordinated Secured Notes and the conversion of the Qualified Payables, each of the Vendors covenants and agrees to provide product to the Company as requested, in quantities at least consistent with quantities provided over the twelve (12) months prior to the date of this Agreement, through the original Maturity Date, upon commercially reasonable terms, including 90-day credit terms.

    3.2.   **Vendor Failure to Comply with Commitment.**  If at any time prior to the due date of the Junior Subordinated Secured Note, and while any Holder has a Junior Subordinated Secured Note outstanding, the Vendor to whom the Junior Subordinated Secured Note was issued fails to honor its commitment to provide product in accordance with the terms of Section 3.1 above, then the Company may by written notice to such Vendor demand that the Vendor honor and perform its commitment, and, if the Vendor shall fail to do so within five (5) business days of the sending of such notice (the "**Notice Date**"), all interest accruals under the Note shall cease as of the Notice Date and the principal amount of the Note shall be deemed to be reduced by the amount of $250 per day for each day following the Notice date for which the Vendor's failure to honor its commitment continues.

4. **Information Rights.**

    4.1   **Provision of Financial Information.**  So long as a Junior Subordinated Secured Note is outstanding and the Vendor to which the Junior Subordinated Secured Note was issued continues to be the Holder of such Junior Subordinated Secured Note, the Company shall deliver to such Holder (a) audited annual financial statements of the Company, within one hundred twenty (120) days following the fiscal year end of the Company; and (b) quarterly unaudited financial statements of the Company, within sixty (60) days following the end of each fiscal quarter of the Company.

    4.2   **Confidentiality of Financial Information.**  Each Vendor agrees to keep any financial information of the Company provided to it under this Agreement or in connection with the Junior Subordinated Secured Notes confidential and shall not: (a) distribute or disclose to any third party any such information; (b) permit any third party to have access to such information; or (c) use such information for any purpose other than for the purpose of its relationship with the Company. If any Vendor is required by applicable law or regulation or pursuant to the rules of, or a listing agreement with, any national securities exchange or governmental, banking, taxation or other regulatory authority or similar entity, or is requested in any judicial or administrative proceeding, to disclose any such information, then such Vendor shall use commercially reasonable efforts to avoid and, if not avoidable, to minimize disclosure of such information, and to the extent not prohibited by law, give the Company prompt notice of such requirement or request so that the Company may seek an appropriate protective order.

4

4.3    **Termination of Right to Financial Information.** All information rights provided under this Agreement or in connection with the Junior Subordinated Secured Notes shall terminate as to each Junior Subordinated Secured Note when such Junior Subordinated Secured Note is paid in full, or upon the transfer of such Junior Subordinated Secured Note to a new Holder.

5.   **Collateral Security.**

5.1    **Grant of Security Interest in Personal Property.** As security for the payment and performance of each Junior Subordinated Secured Note, the Company hereby grants to the Collateral Agent, for itself and for the ratable benefit of each Holder of a Junior Subordinated Secured Note, a security interest in all of the Company's right, title and interest in, to and under all of its personal property, wherever located and whether now existing or owned or hereafter acquired or arising, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment (including all fixtures), general intangibles, instruments, inventory, investment property, letter-of-credit rights, money and all products, proceeds and supporting obligations of any and all of the foregoing (collectively, the "**Collateral**").

5.2.    **Limitation on Grant of Security Interest.** Notwithstanding the foregoing, except for fixtures (to the extent covered by Article 9 of the Uniform Commercial Code), such grant of a security interest shall not extend to, and the term "Collateral" shall not include, (a) any asset which would be real property under the law of the jurisdiction in which it is located, and (b) any property to the extent that the grant of a security interest therein is prohibited by any applicable law or regulation, requires a consent not obtained of any governmental authority pursuant to any applicable law or regulation, or is prohibited by, or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except to the extent that such law or regulation or the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law.

5.3.    **Obligation under Contracts**. Anything herein to the contrary notwithstanding, (a) the Company shall  remain liable under any contracts, agreements and other documents included in the Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Collateral Agent of any of the rights hereunder shall not release the Company from any of its duties or obligations under such contracts, agreements and other documents included in the Collateral, and (c) the Collateral Agent shall not have any obligation or liability under any contracts, agreements and other documents included in the Collateral by reason of this Agreement, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of the Company thereunder or to take any action to collect or enforce any such contract, agreement or other document included in the Collateral hereunder.

5.4    **Perfection.** The Company hereby authorizes the Collateral Agent to file, at any time and from time to time thereafter, all financing statements, assignments, continuation financing

5

statements, termination statements, and other documents and instruments, and take all other action, as the Collateral Agent may reasonably require, to perfect and continue perfected, maintain the priority of or provide notice of the security interest of the Collateral Agent in the Collateral and to accomplish the purposes of this Agreement. The Company authorizes the Collateral Agent to file at any time financing statements, continuation statements, and amendments thereto that either specifically describe the Collateral or describe the Collateral as "all assets" or "all personal property" of the Company or words of similar effect.

5.5    **Termination.** This Section 5 shall create a continuing security interest in the Collateral which shall remain in effect until payment and performance in full of all of the obligations under the Junior Subordinated Secured Notes, whereupon the security interest created under this Section 5 in respect of the Collateral shall terminate and the Collateral Agent shall promptly execute and/or deliver to the Company such documents and instruments reasonably requested by the Company as shall be necessary to evidence termination of all security interests given by the Company to the Collateral Agent hereunder.

5.6    **Release of Liens Upon Sale of Collateral.** On the effective date of any sale or other conveyance of any portion of the Collateral by the Senior Agent or Senior Lenders, or for which the consent of the Senior Agent and Senior Lenders has been obtained, or otherwise permitted under the loan documents evidencing the Senior Debt, (a) the security interest granted herein shall be deemed to be automatically released on the Collateral so sold or conveyed with no further action on the part of the Holders of Junior Subordinated Secured Notes or any other person, and (b) upon the request of the Company or Senior Agent, at the expense of the Company, the Collateral Agent will execute and deliver to the Company or Senior Agent such instruments and documents as the Company or Senior Agent reasonably requests to evidence the release of the security interests created by this Agreement on such Collateral. The Collateral Agent agrees that within five (5) days following such request therefor, it will execute, deliver and file any and all such termination statements, lien releases and other agreements and instruments as the Company or Senior Agent deems necessary or appropriate in order to release the Collateral Agent's security interest. The Collateral Agent hereby irrevocably appoints Senior Agent the true and lawful attorney of the Collateral Agent for the purpose of effecting any such executions, deliveries and filings to the extent the Collateral Agent shall fail to do so.

6.    **Subordination.**

6.1    **Agreement to Subordinate; Agreement to Hold in Trust.** The Company agrees, and each Holder by accepting a Junior Subordinated Secured Note agrees, that the payment of all Obligations owing in respect of such Junior Subordinated Secured Note is subordinated in right of payment, to the extent and in the manner provided in this Section 6, to the prior payment in full of all existing and future Senior Debt. The subordination is for the benefit of and enforceable by the holders of such Senior Debt. If any Holder of a Junior Subordinated Secured Note shall receive any payment on account of such Junior Subordinated Secured Note in violation of this Agreement, it shall hold such payment in trust for the benefit of the holders of the Senior Debt and, promptly upon

6

discovery or notice of such violation, pay such amount over to Senior Agent for application in payment of the Senior Debt.

6.2      **Limitation on Remedies.** Each Holder of a Junior Subordinated Secured Note, for itself and its successors and assigns, agrees for the benefit of the holders of Senior Debt that so long as the Senior Debt remains outstanding or committed to be advanced, such Holder of a Junior Subordinated Secured Note will not, directly or indirectly, take any action to accelerate or demand payment of such Junior Subordinated Secured Note, to collect or receive any direct or indirect payment or distribution of assets of any kind or character, whether in cash, properties or securities, by setoff or otherwise, on or with respect to such Junior Subordinated Secured Note, to exercise any of its remedies in respect of such Junior Subordinated Secured Note, or, in its capacity as Holder of the Junior Subordinated Secured Note initiate or join with any other creditor in initiating any Insolvency Proceeding (as hereinafter defined) of, or litigation against, the Company, or to foreclose or otherwise realize on any security given by the Company, in each case prior to the indefeasible payment in full of all Senior Debt.

6.3      **Further Subordination Agreements; No Marshalling.** Upon request and at the expense of the Company, the Vendors and the Collateral Agent agree that they shall hereafter promptly execute and deliver to the Company or any holder of Senior Debt such documents and instruments reasonably requested by the Company or any holder of Senior Debt to confirm or more fully evidence and provide for the subordination of the Junior Subordinated Secured Notes, in connection with the obtaining or maintaining of any Senior Debt by the Company. The Collateral Agent, and each Holder of a Junior Subordinated Secured Note, for itself and its successors and assigns, hereby expressly waives any right that it otherwise might have to require the holders of Senior Debt to marshal any of the property of the Company, to resort to Collateral in any particular order or manner, whether provided for by common law or statute, or to enforce any guaranty or any Lien given by the Company as a condition precedent or concurrent to the exercise of any of their remedies.

7.      **Insolvency Proceeding.**

7.1      The term "Insolvency Proceeding" shall mean any voluntary or involuntary dissolution, winding-up, total or partial liquidation, reorganization or bankruptcy, insolvency, receivership or other statutory or common law proceedings or arrangements involving any of the Company, or the readjustment of the liabilities of the Company or any assignment for the benefit of creditors or any marshalling of the assets or liabilities of any of the Company.

7.2      In the event of any Insolvency Proceeding relative to the Company, the payment in full of all of the Senior Debt owed by the Company shall first be made before any payment on account of principal, premium or interest or otherwise is made upon or in respect of the Junior Subordinated Secured Notes, and in any such proceedings any payment or distribution of any kind or character, whether in cash or property or securities which may be payable or deliverable in respect of the Junior Subordinated Secured Notes shall be paid or delivered directly to Senior Agent for application in payment of the Senior Debt, unless and until the indefeasible payment in full of all

7

such Senior Debt. In the event that, notwithstanding the foregoing, upon any such Insolvency Proceeding, any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, shall be received by any Holder of Junior Subordinated Notes before payment in full of all Senior Debt, such payment or distribution shall be immediately paid over to Senior Agent for the benefit of the holders of the Senior Debt, for application to the payment of all Senior Debt remaining unpaid until the final payment in full of all such Senior Debt, after giving effect to any concurrent payment or distribution to the holders of such Senior Debt.

7.3     Each Holder of a Junior Subordinated Secured Note, for itself and its successors and assigns, hereby irrevocably authorizes and directs Senior Agent, and any trustee in bankruptcy, receiver, custodian or assignee for the benefit of creditors of the Company in any Insolvency Proceeding, on such Holder's behalf, to take such action as may be necessary or appropriate to effectuate the subordination provided for in this Agreement and irrevocably appoints, which appointment is coupled with an interest, upon any failure to comply with the terms of this Agreement, Senior Agent, or any such trustee, receiver, custodian or assignee, its attorneys-in-fact for such purpose with full powers of substitution and revocation.

7.4     Each Holder of a Junior Subordinated Secured Note agrees that it will not take any action as the Holder of such Junior Subordinated Secured Note that will impede, interfere with or restrict or restrain the exercise by Senior Agent of its rights and remedies with respect to the Senior Debt, and, upon the commencement of any Insolvency Proceeding, will take such commercially reasonable actions as the Senior Agent may deem reasonably necessary or appropriate to effectuate the subordination provided hereby. In furtherance thereof, each Holder of a Junior Subordinated Secured Note, in its capacity as a Holder of a Junior Subordinated Secured Note, hereby agrees not to oppose any motion filed or supported by Senior Agent or Senior Lenders for relief from stay, or for adequate protection in respect of the Senior Debt and not to oppose any motions supported by Senior Agent and Senior Lenders to approve the Company's use of cash collateral or post-petition borrowing from Senior Agent and Senior Lender or adequate protection in favor of Senior Agent or Senior Lenders.

7.5     This Agreement is intended to be enforceable as a subordination agreement under Bankruptcy Code Section 510 notwithstanding the commencement of any bankruptcy or other Insolvency Proceeding by or against the Company and, to the full extent permitted by law, shall apply with full force and effect to any indebtedness arising pursuant to debtor-in-possession financing arrangements or pursuant to financing arrangements entered into in connection with the confirmation of a plan of reorganization under Chapter 11 of the Bankruptcy Code. Each Holder of a Junior Subordinated Secured Note acknowledges and consents that, to the extent that Senior Agent and Senior Lenders elect at their option to provide to the Company additional financing upon terms and conditions satisfactory to Senior Agent and Senior Lender and the Company, whether prior to, during, or after an Insolvency Proceeding, or at any other time prior to the final payment in full of all Senior Debt, such additional indebtedness (represented by such additional financing), together with any and all interest or fees thereon (collectively, the "Additional Financing"), shall become a part of the Senior Debt, and shall be treated as provided under this Agreement. Further, each Holder of a Junior Subordinated Secured Note acknowledges and agrees that it shall not object to any terms or

8

conditions of the Additional Financing, whether in the form of debtor-in-possession financing or cash collateral use, as may be agreed to by Senior Agent and Senior Lenders and the Company, and each Holder of a Junior Subordinated Secured Note acknowledges and agrees that it shall not be entitled to any adequate protection under the Bankruptcy Code (whether in the form of replacement liens or adequate protection payments) until the payment in full of all Senior Debt.

8.  **Representations**.

8.1    **Representations of the Company.** All corporate action on the part of the Company necessary for the authorization, execution and delivery of this Agreement and the Junior Subordinated Secured Notes and the performance of its obligations hereunder and thereunder has been taken or will be taken prior to the Conversion Date. This Agreement and the Junior Subordinated Secured Notes, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

8.2    **Representations of the Vendors.** Each of the undersigned individuals signing on behalf of the Vendors who are Parties hereto warrant and represent that they are duly authorized to execute this Agreement on behalf of each Party for which he or she has signed, and that such authority has been granted by the articles, by-laws, partnership agreement, board of directors, or other governing instruments or bodies of each Party under the laws of the state, province or county governing such acts of each such Party. This Agreement shall constitute a valid and legally binding obligation of each such Vendor, enforceable against the Vendor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability. Each Vendor further warrants and represents that (a) as of the Conversion Date it shall be the sole owner of the Qualified Payables to be converted to any Junior Subordinated Secured Note issued to such Vendor pursuant to this Agreement; (b) except for any security interest that may have been provided to a consensual lender, such Vendor has not previously pledged, encumbered, sold, conveyed or assigned any interest in such Qualified Payables; and (c) such Vendor's interest in such Qualified Payables is free and clear from any liens, claims, encumbrances and/or contract rights other than those held by, or made in favor of, a consensual lender to such Vendor, as to which the conversion of such Qualified Payables pursuant to this Agreement is either permitted or has been consented to by such Lender, such that the conversion of such Qualified Payables pursuant to this Agreement will be valid and enforceable as to such lender and such Vendor.

8.3    **Representations of Collateral Agent.** All corporate action on the part of the Collateral Agent necessary for the authorization, execution and delivery of this Agreement and the performance of its obligations hereunder and thereunder has been taken. This Agreement, when executed and delivered by the Collateral Agent, shall constitute valid and legally binding obligations of the Collateral Agent, enforceable against the Collateral Agent in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar

9

laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

8.4    **Survival**. The representations and warranties set forth in this Section 7 shall survive the Conversion Date and each of the Collateral Agent, the Vendors and the Company shall be liable to the other for any inaccuracy or any breach thereof.

9. **Events of Default; Remedies.**

9.1    **Events of Default**. The occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

(a)    the Company fails to make any payment of principal, interest or any other amount payable under a Junior Subordinated Secured Note when due, and such failure continues for ten (10) days after written notice of such failure is provided to the Company by the Holder of such Junior Subordinated Secured Note;

(b)    any representation or warranty made by the Company herein is incorrect in any material respect on or as of the date made;

(c)    the Company fails to perform or observe any other term or covenant contained in this Agreement or in any Junior Subordinated Secured Note on its part to be performed or observed, and such default shall continue unremedied for a period of thirty (30) days after the date upon which written notice thereof is given to the Company by the Holder of the Junior Subordinated Secured Note asserting such default; provided that, if (i) such default cannot be cured within such 30-day period, (ii) such default is reasonably susceptible of cure within ninety (90) days, (iii) the Company is proceeding with reasonable efforts to cure such default, and (iv) such Holder shall have received a certificate of an officer of the Company to the effect of clauses (i), (ii), and (iii) above and stating what action the Company is taking to cure such default, then such 30-day cure period shall be extended to such date, not to exceed a total of ninety (90) days, as shall be necessary for the Company diligently to cure such default; or

(d)    the filing of a petition by or entry of an order for relief against the Company under any provision of Title 11 of the United States Code, as amended or recodified from time to time, or under any similar law relating to bankruptcy, insolvency or other relief for debtors; or appointment of a receiver, trustee, custodian or liquidator of or for all or any significant part of the assets or property of the Company; or the making of a general assignment for the benefit of creditors by the Company.

9.2    **Remedies.** Subject to any limitation imposed by the subordination provisions of Section 6 of this Agreement, upon the occurrence and during the continuance of any Event of Default in respect of a Junior Subordinated Secured Note the Holder of such Junior Subordinated Secured Note, at its option, may (a) by notice to the Company, declare the unpaid principal amount of its Junior Subordinated Secured Note and all interest accrued and unpaid thereon to be immediately due and payable, whereupon the unpaid principal amount of such Junior Subordinated Secured Note and

all such interest shall become immediately due and payable, without presentment, demand, protest or further notice of any kind; provided, that if an event described in Section 8.1(d) above shall occur, the result which would otherwise occur only upon giving of notice by such Holder to the Company as specified above shall occur automatically, without the giving of any such notice; (b) whether or not the actions referred to in clause (a) have been taken, exercise any or all of such Holder's rights and remedies under this Agreement and applicable law. No single or partial exercise of any power under this Agreement shall preclude any other or further exercise of such power or exercise of any other power. No delay or omission on the part of any Holder in exercising any right under this Agreement shall operate as a waiver of such right or any other right hereunder.

9.3    **Application of Proceeds.** All proceeds received by the Collateral Agent from the realization upon any Collateral in connection with the exercise of remedies during the continuance of an Event of Default, shall be applied in the following order:

(a)    *first*, to payment or reimbursement of fees, expenses and indemnities payable under this Agreement to the Collateral Agent in its capacity as such;

(b)    *second*, pro rata to payment of accrued and unpaid interest on the Junior Subordinated Secured Notes in proportion to the relative amounts of accrued and unpaid interest owing under each Junior Subordinated Secured Note (excluding capitalized interest);

(c)    *third*, pro rata to the payment of principal outstanding under the Junior Subordinated Secured Notes in proportion to the relative principal amounts outstanding under each Note; and

(d)    *fourth*, to the extent that any proceeds remain after the payment of the amounts set forth in clauses (a) through (c) above, to the Company or as otherwise required by applicable law.

10. **Miscellaneous.**

10.1    **Binding Agreement; Third Party Beneficiaries**. This Agreement shall be binding upon and inure to the benefit of the Parties, their legal representatives, successors and permitted assigns. There shall be no third-party beneficiaries of this Agreement, other than the Senior Agent and Senior Lenders for whose benefit this Agreement is expressly intended to benefit and without whose consent the Company would not be permitted to enter into under the loan documents evidencing the Senior Debt.

10.2    **Costs and Attorneys' Fees**. Each Party shall be responsible for its own costs and expenses incurred in connection with the transactions contemplated hereby. If any action or proceeding is brought by any Party against any other Party to interpret the provisions hereof or to enforce such Party's respective rights or obligations hereunder, the prevailing Party shall be entitled to recover from the unsuccessful Party therein all costs incurred by the prevailing Party in such action or proceeding, including reasonable attorneys' fees to be fixed by the court having jurisdiction thereof.

11

10.3   **Entire Agreement**.  All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties are contained herein.   All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties by and between the Parties concerning the subject matter hereof other than those referred to herein are merged herein.  This Agreement, including the Schedules and Exhibits hereto, is an integrated agreement.

10.4   **Further Assurances.**  In addition to the acts recited in this Agreement to be performed by each of the Parties hereto, each Party agrees to perform, or cause to be performed, all further acts and to execute or cause to be executed promptly all documents and instruments necessary to give effect to each term of this Agreement.

10.5   **Notices.**  Any notice under this Agreement shall be given in writing to the address set forth under the signature of the Party at the end of this Agreement, or to any other address which such Party has provided to the other Party for purposes of this Section 9.5.  Notice to a Party shall be deemed duly given upon the earliest to occur of the following: (a) personal delivery to such Party, to such address; or (b) 6:00 p.m. (California time) on the first business day after being deposited in the United States with a nationally recognized overnight delivery service, with delivery charges prepaid, addressed as provided in the preceding clause, and marked for next business day delivery.

10.6   **Independent Advice of Counsel**.  The Parties represent and declare that in executing this Agreement they relied solely upon their own judgment, belief and knowledge, and the advice and recommendations of their own independently selected counsel, concerning the nature, extent and duration of their rights and claims, and that they have not been influenced to any extent whatsoever in executing the same by any representations or statements by one Party to any other Party not expressly contained or referred to in this Agreement.

10.7   **Effect of Partial Invalidity**.  If any of the provisions of this Agreement are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remaining provisions shall nonetheless continue in full force and effect so long as the essential terms of agreement between the Parties can be preserved.

10.8   **Titles and Subtitles**.  The titles and subtitles used in this Agreement are used for the convenience only and are not to be considered in construing or interpreting this Agreement.

10.9   **Amendments**.  This Agreement may be amended only by an agreement in writing that is signed by all of the Parties and consented to by the Senior Agent and Senior Lenders.

10.10   **Counterparts**.  This Agreement may be executed in one or more counterparts, and each set of duly delivered identical counterparts which includes all signatories shall be deemed to be one original document.  Electronic or facsimile signature shall be valid as originals.

10.11   **Governing Law**.  This Agreement shall be governed by, interpreted and construed in accordance with the laws of the State of California.

12

[THE REST OF THIS PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

COLLATERAL AGENT:


By: _____
     Name:
     Title:


ADDRESS FOR NOTICE:




COMPANY:

ANNA'S LINENS, INC.,
a Delaware corporation



By: _____
     Name:  Scott Gladstone
     Title:    Chief Executive Officer

ADDRESS FOR NOTICE

3560 Hyland Avenue
Costa Mesa, CA 92626
Attention: Scott Gladstone

VENDORS:

By: _____
    Name:
    Title:

<u>ADDRESS FOR NOTICE</u>

**EXHIBIT A**

**FORM OF NOTE**

**THE OBLIGATIONS EVIDENCED BY THIS INSTRUMENT, PAYMENTS ON ACCOUNT OF SUCH OBLIGATIONS, THE LIENS AND SECURITY INTERESTS SECURING SUCH OBLIGATIONS, THE EXERCISE OF ANY RIGHT OR REMEDY WITH RESPECT THERETO, AND CERTAIN OF THE RIGHTS OF THE HOLDERS OF SUCH OBLIGATIONS ARE LIMITED AND SUBJECT TO SUBORDINATION AS PROVIDED HEREIN.**

## JUNIOR SUBORDINATED SECURED NOTE

U.S. $000,000.00                                                      May 5, 2015

FOR VALUE RECEIVED, the undersigned, Anna's Linens, Inc., a Delaware Corporation (the "Company") promises to pay to the order of Vendor Name ("**Creditor**"), or its designee or assignee, the principal sum of Amount Thousand United States Dollars (U.S. $000,000.00), together with interest on the outstanding balance of said sum at a per annum rate equal to five percent (5%) per annum compounded annually. All computations of interest under this promissory note shall be made on the basis of a year of 365 days, for actual days elapsed. The principle sum and all interest accrued hereunder shall be payable in one lump sum on the date which is thirty (30) months from the date of this Promissory Note (the "**Maturity Date**").

All payments hereunder shall be made in lawful money of the United States of America and in same day or immediately available funds, to the Creditor [or Agent for the account of the Creditor], at vendor address, or at such other place or to such account as the Creditor [Agent] from time to time shall designate in a written notice to the Company.

Whenever any payment hereunder shall be stated to be due or any other date specified hereunder would otherwise occur, on a day other than a Business Day (as defined below), then such payment shall be made, and such interest payment date or other date shall occur, on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest hereunder. As used herein, "**Business Day**" means a day (i) other than Saturday or Sunday, and (ii) on which commercial banks are open for business in Los Angeles, California.

This promissory note is one of the Junior Subordinated Secured Notes referred to in the Agreement for Conversion of Vendor Trade Payables to Junior Subordinated Secured Notes dated as of May 5, 2015, by and among the Company, Creditor and certain other parties (the "**Vendor Agreement**"). Capitalized terms used herein shall have the respective meanings assigned to them in the Vendor Agreement.

The Company may pre-pay this Junior Subordinated Secured Note, in whole or in part, without premium or penalty, at any time or from time to time prior to the Maturity Date, in its sole discretion and without the consent of the Creditor or of any then holder of this Junior Subordinated Secured Note.

This Junior Subordinated Secured Note is secured by certain collateral more specifically described in the Vendor Agreement. The indebtedness of the Company pursuant to this Junior Subordinated Secured Note, and the liens and security interests securing this Junior Subordinated

1

Secured Note, are subordinated and subject to further subordination as provided in the Vendor Agreement.

The obligations of the Company under this Junior Subordinated Secured Note are subject to adjustment as provided in the Vendor Agreement in the event that Creditor fails to honor its commitment to provide product to the Company as provided in the Vendor Agreement.

This Junior Subordinated Secured Note is subject to acceleration (which in certain cases shall be automatic) of the Maturity Date hereof upon the occurrence of certain Events of Default stated in the Vendor Agreement, in each case without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived.

Notwithstanding anything in this Junior Subordinated Secured Note to the contrary, nothing contained in this Junior Subordinated Secured Note or in any other agreement deemed to pertain to this Junior Subordinated Secured Note shall be deemed to require the payment by the Company of interest on the indebtedness evidenced on this Junior Subordinated Secured Note in excess of the amount which Creditor may lawfully contract to charge under applicable usury and other laws as determined by a court of competent jurisdiction (the "**Maximum Legal Rate**"). All agreements between the Company and Creditor with respect to this Junior Subordinated Secured Note are expressly limited so that in no event or contingency shall the amount paid or agreed to be paid by the Company hereunder exceed the Maximum Legal Rate. If, under any circumstance whatsoever, the fulfillment of any obligation under this Junior Subordinated Secured Note or any other agreement deemed to pertain to this Junior Subordinated Secured Note shall involve exceeding the Maximum Legal Rate, the obligation to be fulfilled by the Company shall be reduced to the minimum amount required so that such obligation shall not exceed the Maximum Legal Rate. This section shall control every other provision of this Junior Subordinated Secured Note and all other agreements deemed to be related to this Junior Subordinated Secured Note.

This Junior Subordinated Secured Note shall be transferable by Creditor only with the written consent of the Company; provided however, that any information rights provided under the Vendor Agreement or in connection with this Junior Subordinated Secured Note shall terminate upon such transfer. The terms and conditions of this Junior Subordinated Secured Note shall inure to the benefit of and be binding upon the respective successors and assigns of Creditor.

This Junior Subordinated Secured Note shall be governed by and construed in accordance with the laws of the State of California, without giving effect to principles of conflicts of law.

Any notice required or permitted by this Junior Subordinated Secured Note shall be in writing and shall be given in accord with the notice provisions of the Vendor Agreement.

Upon receipt by the Company of evidence of the loss, theft, destruction or mutilation of this Junior Subordinated Secured Note or any note exchanged for it, and indemnity reasonably satisfactory to the Company (in case of loss, theft or destruction) or surrender and cancellation of such note (in the case of mutilation), the Company will make and deliver in lieu of such note a new note of like tenor.

2

**IN WITNESS WHEREOF**, the Company has caused this Junior Subordinated Secured Note to be executed and delivered by its duly authorized officer on the date first above written.

**ANNA'S LINENS, INC.,**
a Delaware corporation


By: _____
     Name:  Scott Gladstone
     Title:  Chief Executive Officer

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **APPENDIX OF SUPPLEMENTAL EXHIBITS IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:  (I) AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d)(1) AND 364(e), AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;  (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364;  (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (IV) GRANTING RELATED RELIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 15, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Todd M Arnold     tma@lnbyb.com
- Dustin P Branch     dustin.branch@kattenlaw.com, jessica.mickelsen@kattenlaw.com;brian.huben@kattenlaw.com;adelle.shafer@kattenlaw.com;donna.carolo@kattenlaw.com
- John-Patrick M Fritz     jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com
- David B Golubchik     dbg@lnbyb.com, dbg@ecf.inforuptcy.com
- Michael J Hauser     michael.hauser@usdoj.gov
- Eve H Karasik     ehk@lnbyb.com
- Mette H Kurth     mkurth@foxrothschild.com, vcordi@foxrothschild.com;pchlum@foxrothschild.com
- Juliet Y Oh     jyo@lnbrb.com, jyo@lnbrb.com
- Lindsey L Smith     lls@lnbyb.com, lls@ecf.inforuptcy.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov

**2.  SERVED BY UNITED STATES MAIL**: On **June 15, 2015**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 15, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                              **F 9013-3.1.PROOF.SERVICE**

1

***Served via Attorney Service***

2

Hon. Theodor C. Albert
United States Bankruptcy Court

3

Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5085 / Courtroom 5B
Santa Ana, CA 92701-4593

4

5

I declare under penalty of perjury under the laws of the United States of America that the foregoing is
true and correct.

6

| June 15, 2015 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| Date | Type Name | Signature |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**