DAVID B. GOLUBCHIK (SBN 185520)
EVE H. KARASIK (SBN 155356)
JULIET Y. OH (SBN 211414)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: DBG@LNBYB.COM, EHK@LNBYB.COM,
        JYO@LNBYB.COM, JPF@LNBYB.COM

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>ANNA'S LINENS, INC.,<br><br>    Debtor. | Case No. 8:15-bk-13008-TA_____<br><br>Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION TAXES AND CUSTOMS DUTIES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF J.E. RICK BUNKA IN SUPPORT**<br><br>DATE:  June 24, 2015<br>TIME:  2:00 p.m.<br>PLACE: Courtroom 5B<br>     411 West Fourth Street<br>     Santa Ana, California |

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, SALUS CAPITAL CREDITORS, THE DEBTORS' TWENTY LARGEST UNSECURED CREDITORS AND OTHER PARTIES**

### SUMMARY

Anna's Linens, Inc., the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (collectively referred to herein as the "Debtor"), hereby moves, on an emergency basis by this motion (the "Motion") under Local Bankruptcy Rule 9075-1, and pursuant to sections 105(a), 507(a)(8), 541, and 549 of chapter 11 of title 11 of the United States Code §§ 101, et seq. (the "Bankruptcy Code") for the entry of an order authorizing, in the Debtor's discretion: (i) the payment of prepetition sales, use, and other similar taxes;  (ii) payment of prepetition business and regulatory fees; (iii) payment of prepetition customs duties; and (iv) other taxes or fees that may be imposed by various state and local authorities (collectively, with (i), (ii), and (iii) the "Taxes") that are payable to various governmental taxing and licensing authorities (the "Taxing Authorities"); and (v) to issue postpetition replacement checks to those persons or entities that received prepetition checks on account of Taxes that had not been presented or cleared before the Petition Date.

The Debtor submits that the discretion to honor prepetition Taxes is essential to the Debtors' ongoing business operations and successful reorganization.  Timely payment of the Taxes in the ordinary course of business is necessary to allow the Debtor to continue to operations during the bankruptcy cases and to avoid the imposition of unnecessary interest or penalties. Moreover, many of these Taxes are trust fund taxes and are not property of the estate. There is also a risk that the Debtor may be audited if the Taxes are not paid promptly.  In addition, many Taxing Authorities and State agencies impose personal liability on the officers and directors of collecting entities, such as the Debtor, for Taxes collected by those entities that are not paid to the appropriate Taxing Authority.  Such proceedings obviously would constitute a significant distraction for these officers and directors at a time when they should be focused on

1

the Debtor's efforts to stabilize postpetition business operations and to develop and implement a successful reorganization strategy.

This Motion is based on the Memorandum of Points and Authorities and the Declaration of J.E. Rick Bunka filed in support of the Motion, the statements, arguments and representations of counsel to be made at the hearing on the Motion, if any, and any other evidence properly presented to the Court.  The Debtor submits that the setting of this hearing on an emergency basis is warranted because the Debtor requires the authority to make payments to taxing authorities in its discretion as soon as possible after the commencement of the chapter 11 case (the "Case") so as to ensure the Debtor can maximize value for the estate and its creditors by continuing to operate its business and engage successfully in its restructuring efforts.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order:

1. granting the Motion in its entirety;

2. authorizing, but not directing, the Debtor in its sole discretion, to pay the Taxes to the appropriate Taxing Authorities in the ordinary course of its business;

3. authorizing the Debtor in its sole discretion to issue postpetition checks to Taxing Authorities that  received prepetition checks on account of Taxes that had not been presented or cleared before the Petition Date; and

4. granting such other and further relief as the Court deems just and proper.


Dated: June_18, 2015                    ANNA'S LINENS, INC.


By:___ */s/ Juliet Y. Oh*_____
                                        DAVID B, GOLUBCHIK
                                        EVE H. KARASIK
                                        JULIET Y. OH
                                        JOHN-PATRICK M. FRITZ
                                        LEVENE, NEALE, BENDER,
                                            YOO & BRILL L.L.P.
                                        Proposed Attorneys for
                                        Chapter 11 Debtors and Debtors in
                                        Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

**A.    General Background.**

Anna's Linens, Inc., a Delaware corporation and the debtor and debtor-in-possession herein (the "Debtor"), filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on June 14, 2015 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a leading specialty retailer offering high quality and stylish home textiles, furnishings, and décor at attractive prices.  The Debtor is headquartered in Costa Mesa, California, operates a chain of 261 company owned retail stores throughout 19 states in the United States (including Puerto Rico and Washington, D.C.), generates over $300 million in annual revenue, and employs a workforce of over 2,500.

Over the last 25 years, the Debtor has built its store base through a clustering approach in key markets, including Los Angeles, Dallas, Chicago, Miami and Houston.  The Debtor has three distribution centers to support its nationwide presence in Fontana, California, Coppell, Texas, and Charlotte, North Carolina.  The Debtor leases its distribution centers, which are operated by third-party logistics providers.

The Debtor employs a flexible small-box retail strategy with approximately 9,500 square foot stores with a focus on price, value, and expert customer service.  The Debtor's stores are typically located in high traffic strip centers in the heart of local neighborhoods that the stores are servicing. The Debtor also has developed an e-commerce platform that provides customers across the country with access to the Debtor's full merchandise assortment. The Debtor's model enables it to compete well with traditional self-service big box home retailers and discounters.

The Debtor targets a large and growing segment of the United States population that values fashion, brand names and customer service, but is seeking high value and attractive price points. Merchandise is selected to appeal to its core customer base and is focused on domestic items such

as bed linens, bath items, kitchen textiles, window drapes, and furniture covers, and certain home furnishing categories.

**B.    Events Leading to the Filing of the Debtor's Chapter 11 Bankruptcy Case and Anticipated Exit Strategy.**

The Debtor opened its first store in 1987, and by 2013, it had 309 stores.  Beginning in 2011, the Debtor started experiencing significant financial and operational challenges.  The Debtor was unsuccessful in some of its new markets such as Puerto Rico and St. Louis, and overbuilt otherwise healthy markets in response to its new television marketing.  In addition, the Debtor's core demographic changed as Generation X and Millennials replaced Baby Boomers as the primary home furnishing shoppers.  Merchandise did not resonate with the new shoppers, and aged and unfashionable inventory remained in the stores reaching a high of $380,000 per store by fiscal year 2013.  The Debtor's shift to "Every Day Low Prices" from promotions and in-store discounts as well as new expensive television advertising strategy did not attract customers.

The over expansion and excess inventory led to increased indebtedness and, ultimately, a default with the Debtor's long-time lender, Union Bank.  In order to refinance the Debtor's obligations to Union Bank, the Debtor entered into a Credit Agreement with Salus Capital Partners, LLC, as Administrative Agent (in such capacity, the "Administrative Agent") and the lenders party thereto (the "Lenders" and together with Salus, the "Secured Parties") for an $80 million line of credit on July 18, 2014 (the "Credit Agreement").

On March 30, 2015 the Debtor notified the Administrative Agent of a Default or Event of Default for failure to maintain a specified Operating Expenditures to Gross Margin Dollars Ratio associated with the Credit Agreement.  On April 29, 2015, the Administrative Agent delivered to the Debtor a notice of Events of Default and Reservations of Rights based on the existing defaults under the Credit Agreement.   After negotiation between the Debtor and the Administrative Agent, the Administrative Agent and Lenders agreed to waive such Events of Default and, on May 13, 2015, Administrative Agent delivered to the Debtor the "First Amendment and Waiver to the Credit Agreement" (the "First Amendment"). The First Amendment provided   a waiver of the Specific Defaults (as defined therein)   and provided

certain consents under amendments to the Credit Agreement including, without limitation, (i) increased availability through removal of an availability block, (ii) a requirement for the Debtor to deliver and abide by a Cash Flow Budget, (iii) an agreement by the Debtor to place specific milestones on activities with several projects that were already underway  and (iv) payment of certain fees and expenses.

Over the resulting weeks, the Debtor's merchandise vendors significantly reduced delivery of anticipated merchandise resulting in an additional default of the Credit Agreement. As a result of the Credit Agreement defaults, and the inability of the Debtor to affect the Capital Transaction prepetition, the Debtor determined it was necessary to commence the Chapter 11 Case.

Prepetition, the Debtor engaged in a process whereby simultaneously the Debtor negotiated with its largest vendors to convert certain trade payables into long term Junior Secured Notes Payables to create additional long term liquidity and, through its investment banker Wunderlich Securities, Inc. ("Wunderlich"), it pursued additional outside investments to recapitalize its balance sheet.  Wunderlich undertook a broad process in search of additional capital that included contacting over 200 investors and institutions. Wunderlich's efforts resulted in the receipt of multiple written indications of interest from potential acquirers and investors, including a Letter of Intent (the "LOI") from DW Partners, LP ("DW Partners"). The Debtor, in consultation with its advisers, determined that the DW Partners' LOI was the highest and best received. The Debtor and DW Partners are currently in the process of negotiating a definitive asset purchase agreement for a going concern transaction (the "Going Concern Transaction" and the "Going Concern APA").  Under the terms of the Agency Agreement executed by the Debtor on June 11, 2015, the Debtor has until Friday, June 19, 2015 to execute the Going Concern APA. If the Debtor enters into the Going Concern Transaction by the deadline, then the Debtor intends to go forward with a Bankruptcy Code section 363 sale and auction process with DW Partners as the stalking horse purchaser. The Debtor is using best efforts to achieve a transaction that will preserve the Debtor's business operations, which will preserve jobs of thousands of employees, going forward customer for the Debtor's vendors and the Debtor's continuing support of the local communities in which the Debtor's stores operate.

As required by the First Amendment, the Debtor has also engaged in a process to identify and select a stalking horse bidder for the possible sale and/or liquidation of the business should the Going Concern Transaction fail.   The Debtor's efforts to retain a liquidator resulted in the execution of the Stalking Horse Agency Agreement with a joint venture comprised of Tiger Capital Group ("Tiger") and Yellen Partners, LLC ("Yellen" together with Tiger, "Tiger/Yellen Stalking Horse"), which included a guarantee from Tiger/Yellen Stalking Horse that the Debtor would receive 93.5% of the aggregate Cost Value of the Merchandise (terms as defined in the Stalking Horse Agency Agreement), subject to certain adjustments, Further, as a result of the default, an auction was held on June 9, 2015 and June 10, 2015 at which the Tiger/Yellen Stalking Horse was outbid by a group formed by Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Agent" or "Hilco/GB"), which included an increase in the guarantee to 111% of the Cost Value of the Merchandise with a Merchandise Threshold (terms as defined in the Agency Agreement, defined below) of not less than $61.5 million and not more than $67 million, subject to certain adjustments. The Debtor and the Agent, with the approval of the Administrative Agent, signed the Agency Agreement (the "Agency Agreement") on June 11, 2015.

The Debtor and the Agent agreed that if the Going Concern APA is executed, the Agency Agreement will convert to an equity transaction for a lesser number of stores, allowing the company to pursue an alternative exit strategy for the Chapter 11 Case. If the Debtor enters into the Going Concern Transaction by the deadline, then the Debtor will pursue a sale of substantially all of its assets pursuant to Bankruptcy Code section 363. If the Debtor does not enter into the Going Concern Transaction, then the Debtor will conduct store closing sales pursuant to the Agency Agreement.

## II.      DISCUSSION

### A.      The Taxes.

In the ordinary course of their business, the Debtor collects, withholds and incurs Taxes that include sales and use, business and regulatory fees, and other taxes and fees. The Debtor is required to remit the sales and use taxes collected in connection with the sale of goods at its

stores to the applicable Taxing Authorities on a periodic basis, usually monthly in arrears for the prior month.  Many governmental authorities where the Debtor operates its business require that the Debtor obtain a business license and pay corresponding occupational fees and/or fees associated with the filing of an annual report with such jurisdictions.  Taxing authorities also impose custom duties for the importation of goods.  The requirement for a company to obtain a business license varies according to the tax law of the jurisdictions, and depends on many factors, including gross receipts.

The Debtor imports goods from overseas for sales.  The Debtor operates in 19 states (including Washington D.C. and Puerto Rico), which each impose different tax obligations on the Debtor in connection with its business and operations. The Debtor remits the Taxes[1] to various federal, state and local government authorities in the ordinary course of business. Taxes are remitted by the Debtor through checks and electronic transfers that are processed through its banks and other financial institutions.

Since the Taxes generally are paid in arrears, the Debtor holds the Taxes for a period of time before remitting them to the appropriate Taxing Authorities.  As such, some of the Taxing Authorities were not paid for all prepetition Taxes prior to the Petition Date.  As of the Petition Date, the Debtor had collected and retained approximately $3,311,948.75 in prepetition Taxes for which payment is due in the ordinary course of business.

Other Taxing Authorities may have been sent checks with respect to Taxes that may or may not have been presented or cleared as of the Petition Date.  With respect to this category, the Debtor requests authority, in its discretion and to the extent applicable, to issue postpetition replacement checks to those Taxing Authorities that have not presented or cleared prepetition checks issued on account of Taxes.

---

[1] Capitalized terms not defined herein have the meaning set forth in the preceding Motion.

**B.      To the Extent They Are "Trust Fund" Taxes, the Taxes Likely Are Not Property of the Estate.**

To the extent that the Debtor has collected Taxes prepetition that must be remitted to the Taxing Authorities, such funds may be viewed as being held in trust by the Debtor for the benefit of the Taxing Authorities, and not as constituting property of the Debtor's estate.  Section 541(d) of the Bankruptcy Code provides, in pertinent part:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

Because the Taxes may be considered so-called "trust fund" amounts, these funds may be viewed as being held in trust for the Taxing Authorities.  *See, e.g., Begier v. Internal Revenue Serv.*, 496 U.S. 53  (1990); *Rosenow v. Illinois Dept. of Revenue (In re Rosenow)*, 715 F.2d 277, 282 (7th Cir. 1983) (sales tax required by state law to be collected by sellers from their customers is "trust fund" tax); *Shank v. Washington State Dep't of Revenue (In re Shank)*, 792 F.2d 829, 830 (9th Cir. 1986) (sales tax required by state law to be collected by sellers from their customers is a "trust fund" tax); *DeChiaro v. New York State Tax Comm'n*, 760 F.2d 432, 433-34 (2d Cir. 1985) (same); *In re Al Copeland Enters., Inc.*, 133 B.R. 837 (Bankr. W.D. Tex. 1991), *aff'd*, 991 F.2d 233 (5th Cir. 1993) (same); *In re American Int'l Airways, Inc.*, 70 B.R. 102, 103 (Bankr. E.D. Pa. 1987) (excise and withholding taxes).  Thus, the Debtor likely has no equitable interest in such amounts and should be permitted to pay the Taxes to the Taxing Authorities to which they are owed as they become due.

**C.      The Taxes Are Entitled to Priority.**

Section 507(a)(8) of the Bankruptcy Code gives priority to the Taxing Authorities' claims for sales, use, and excise taxes and customs duty.  11 U.S.C. § 507(a)(8).  To the extent they are priority claims, the prepetition obligations to the Taxing Authorities must ultimately be paid in

full (either immediately or over time) under any plan of reorganization.  *See* 11 U.S.C. § 1129(a)(9)(C).  Thus, the payment of prepetition priority Taxes at this time would not prejudice the rights of other creditors, but would merely accelerate payments that would otherwise become due as part of the Debtor's reorganization.  At the same time, such payment would avoid the significant problems and issues, described herein, that could arise if the unpaid Taxes were not paid at this time.

**D.    Payment of the Taxes Is Necessary to Preserve the Debtor's Business.**

Paying the prepetition Taxes is essential to the Debtors' ongoing business operations and successful reorganization. If the Debtor's fail to pay Taxes, the Taking Authorities may take actions that could impact the Debtor's ability to operate without interruption. The Debtors also may incur, and would be obligated to pay, increased interest and significant penalties if the estate does not timely satisfy its ongoing tax obligations for the prepetition period or thereafter.

The Debtor also believes that some of the Taxing Authorities may cause the Debtor to be audited if the Taxes are not paid promptly.  Such audits would further divert attention from the reorganization process and increase the costs of administering this estate.

In addition, many Taxing Authorities and State agencies impose personal liability on the officers and directors of collecting entities, such as the Debtor, for Taxes collected by those entities that are not paid to the appropriate Taxing Authority.  Thus, to the extent that any prepetition Taxes are unpaid, the Debtor's officers and directors may be subject to audits and/or lawsuits on account of nonpayment during the pendency of these chapter 11 cases.  Such proceedings obviously would constitute a significant distraction for these officers and directors at a time when they should be focused on the Debtor's efforts to stabilize postpetition business operations and to develop and implement a successful reorganization strategy.  This problem could be compounded if the affected individuals assert rights of indemnity against the Debtor for any costs incurred in defending against or otherwise responding to claims which Taxing Authorities and/or State agencies might assert against them on account of the Debtor's nonpayment of Taxes.

1    There is ample precedent authorizing the Debtor to honor the prepetition Taxes.

2    Authority for such payments is found in sections 1107(a) and 1108 of the Bankruptcy Code,

3    which vest a debtor in possession with authority to continue operating its business. 11 U.S.C. §

4    1107(a) and 1108.    Sometimes this duty and the duty to maximize estate value can only be

5    achieved through the payment of prepetition plans. *See, e.g. In re Mirant Corp.*, 296 B.R. 427,

6    429 (Bankr. N.D. Tex. 2003*); In re Coserv. L.L.C.*, 273 B.R. 487, 498 (Bankr. N.D. Tex. 2003).

7    Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process,

8    or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy

9    Code]." 11 U.S.C. 105(a).  The purpose of section 105(a) is to ensure a bankruptcy court's

10    power to take whatever action "is appropriate or necessary in aid of the exercise of its

11    jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01, at 105-6 (Alan N. Resnick & Henry J.

12    Sommer eds., 16th ed.).

13    Using their equitable powers, bankruptcy courts have repeatedly permitted postpetition

14    payment of prepetition obligations when those payments are necessary to preserve the going

15    concern value of a debtor's business. *See, e.g., In re Payless Cashways, Inc.*, 268 B.R. 543, 546

16    (Bankr. W.D. Mo. 2001); *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 312 (1882)

17    (authorizing payment of pre-receivership claim prior to reorganization to prevent "stoppage of . .

18    . [indispensable] business relations"); *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 855 (Bankr.

19    S.D.N.Y. 1989 (payment of prepetition claim is appropriate if it "confers a benefit on the estate

20    and not merely on the payee").

21    The Debtor submits that authorizing the payment of the Taxes is a proper exercise of the

22    Court's equitable powers under the circumstances. Payment of the Debtor's Taxes is necessary to

23    allow the Debtor to continue to operate its business and engage in successful restructuring

24    efforts.

25

26

27

28

**E.    Section 549 of the Bankruptcy Code  Grants Implied Authority to Pay the Taxes.**

Finally, Bankruptcy Code section 549(a)(2)(B), which governs most postpetition transfers, provides in part that "the trustee may avoid a transfer of property of the estate (1) made after the commencement of the case and, . . .  that is not authorized under this title or by the court."  11 U.S.C. § 549(a)(2)(B) (emphasis added).  It follows that the Court may authorize certain postpetition payments to satisfy prepetition debts, including the prepetition Taxes. The statute grants the Court, faced with the intricate facts and circumstances of each case, the discretion to ascertain whether a debtor's business judgment to make a postpetition transfer inures to the benefit of the estate in the particular case, and, if so, to authorize the transfer.  *See Dubuque Packing Co. v. Stonitsch (In re Isis Foods, Inc.)*, 37 B.R. 334, 336 n.3 (W.D. Mo.), *appeal dismissed*, 738 F.2d 445 (8th Cir. 1984) ("It would appear proposed transfers could be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack under section 549 . . . "). As demonstrated above, the payment of prepetition Taxes is vital to the Debtor's reorganization.

For all of these reasons, timely payment of the Taxes is in the estate's best interest and essential to the Debtor's continued operations and reorganization efforts.  The Court should authorize the postpetition transfer of assets of the estate to satisfy these obligations, regardless of whether they arose before or after the Petition Date.

**F.    Necessity for Immediate Relief and Effectiveness of the Order.**

Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition grant  . . . (b) a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." FED.R.BANKR.P. 6003.  For the reasons discussed herein, if the Debtor is not able to pay its Taxes in its discretion, it would cause immediate and irreparable harm to the Debtor and its business operations. The Debtor may be burdened with significant interest and penalties as well as operational obstacles that may impact the Debtor's ability to maximize value

and reorganize.  Accordingly, the relief requested herein is consistent with Bankruptcy Rule 6003.

Further, to implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing use sale, or lease of property under Bankruptcy Rule 6004(h), to the extent those rules are applicable.

## III.    CONCLUSION

For all of the reasons set forth above, the Debtor respectfully requests that the Court enter an order:

1.  granting the Motion in its entirety;

2.  authorizing, but not directing, the Debtor in its sole discretion, to pay the Taxes to the appropriate Taxing Authorities in the ordinary course of its business;

3.  authorizing the Debtor in its sole discretion to issue postpetition checks to Taxing Authorities that  received prepetition checks on account of Taxes that had not been presented or cleared before the Petition Date; and

4.  granting such other and further relief as the Court deems just and proper.

Dated: June 18, 2015                    ANNA'S LINENS, INC.


                                        By:___/s/ Juliet Y. Oh_____
                                            DAVID B. GOLUBCHIK
                                            EVE H. KARASIK
                                            JULIET Y. OH
                                            JOHN-PATRICK M. FRITZ
                                            LEVENE, NEALE, BENDER,
                                                YOO & BRILL L.L.P.
                                            Proposed Attorneys for Debtor and
                                            Debtor in Possession

# DECLARATION OF J.E. RICK BUNKA

I, J.E. Rick Bunka, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.      I am the sole member of Point North, LLC, a financial advisory services firm that specialize in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. In my capacity as the sole member of Point North, LLC, I have been engaged as the Chief Financial Officer Anna's Linen's, Inc., the debtor and debtor in possession in the above-captioned bankruptcy case (the "Debtor" or "Anna's"), and am therefore familiar with the business operations and financial books and records of the Debtor.  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

3.      I have access to the Debtor's books and records.  I am familiar with the history, organization, operations and financial condition of the Debtor.   The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own personal knowledge and my knowledge of the Debtor's books and records.

4.      I make this declaration in support of the Motion to which it is attached.  Capitalized, defined terms used in this declaration have the same meanings as ascribed to them in the Motion unless otherwise indicated with specificity or implied by context.

5.      The Debtor, a Delaware corporation, filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on June 14, 2015 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.      The Debtor is a leading specialty retailer offering high quality and stylish home textiles, furnishings, and décor at attractive prices.  The Debtor is headquartered in Costa Mesa, California, operates a chain of 261 company owned retail stores (the "Retail Stores") throughout 19 states in the United States (including Puerto Rico and Washington, D.C.), generates over $300 million in annual revenue, and employs a workforce of over 2,500.

7.      Over the last 25 years, the Debtor has built its store base through a clustering approach in key markets, including Los Angeles, Dallas, Chicago, Miami and Houston.  The Debtor has three distribution centers to support its nationwide presence in Fontana, California, Coppell, Texas, and Charlotte, North Carolina.  The Debtor leases its distribution centers, which are operated by third-party logistics providers.

8.      The Debtor employs a flexible small-box retail strategy with approximately 9,500 square foot stores with a focus on price, value, and expert customer service.  The Debtor's stores are typically located in high traffic strip centers in the heart of local neighborhoods that the stores are servicing. The Debtor also has developed an e-commerce platform that provides customers across the country with access to the Debtor's full merchandise assortment. The Debtor's model enables it to compete well with traditional self-service big box home retailers and discounters.

9.      The Debtor targets a large and growing segment of the United States population that values fashion, brand names and customer service, but is seeking high value and attractive price points. Merchandise is selected to appeal to its core customer base and is focused on domestic items such as bed linens, bath items, kitchen textiles, window drapes, and furniture covers, and certain home furnishing categories.

10.      The Debtor opened its first store in 1987, and by 2013, it had 309 stores.  Beginning in 2011, the Debtor started experiencing significant financial and operational challenges.  The Debtor was unsuccessful in some of its new markets such as Puerto Rico and St. Louis, and overbuilt otherwise healthy markets in response to its new television marketing.  In addition, the Debtor's core demographic changed as Generation X and Millennials replaced Baby Boomers as the primary home furnishing shoppers.  Merchandise did not resonate with the new shoppers, and

aged and unfashionable inventory remained in the stores reaching a high of $380,000 per store by fiscal year 2013.  The Debtor's shift to "Every Day Low Prices" from promotions and in-store discounts as well as new expensive television advertising strategy did not attract customers.

11.    The over expansion and excess inventory led to increased indebtedness and, ultimately, a default with the Debtor's long-time lender, Union Bank.  In order to refinance the Debtor's obligations to Union Bank, the Debtor entered into a Credit Agreement with Salus Capital Partners, LLC, as Administrative Agent (in such capacity, the "Administrative Agent") and the lenders party thereto (the "Lenders" and together with Salus, the "Secured Parties") for an $80 million line of credit on July 18, 2014 (the "Credit Agreement").

12.    On March 30, 2015 the Debtor notified the Administrative Agent of a Default or Event of Default for failure to maintain a specified Operating Expenditures to Gross Margin Dollars Ratio under the Credit Agreement.  On April 29, 2015, the Administrative Agent delivered to the Debtor a notice of Events of Default and Reservations of Rights based on the existing defaults under the Credit Agreement.  After negotiation between the Debtor and the Administrative Agent, the Administrative Agent and Lenders agreed to waive such Events of Default and, on May 13, 2015, the Administrative Agent delivered to the Debtor the "First Amendment and Waiver to the Credit Agreement" (the "First Amendment"). The First Amendment provided  a waiver of the Specific Defaults (as defined therein)  and provided certain consents under amendments to the Credit Agreement including, without limitation, (i) increased availability through removal of an availability block, (ii) a requirement for the Debtor to deliver and abide by a Cash Flow Budget, (iii) an agreement by the Debtor to place specific milestones on activities with several projects that were already underway  and (iv) payment of certain fees and expenses.

13.    Over the resulting weeks, the Debtor's merchandise vendors significantly reduced delivery of anticipated merchandise resulting in an additional default of the Credit Agreement. As a result of the Credit Agreement defaults, and the inability of the Debtor to affect the Capital Transaction prepetition, the Debtor determined it was necessary to commence the Chapter 11 Case.

14.    Prepetition, the Debtor engaged in a process whereby simultaneously the Debtor negotiated with its largest vendors to convert certain trade payables into long term Junior Secured Notes Payables to create additional long term liquidity and, through its investment banker Wunderlich Securities, Inc. ("Wunderlich"), it pursued additional outside investments to recapitalize its balance sheet.  Wunderlich undertook a broad process in search of additional capital that included contacting over 200 investors and institutions. Wunderlich's efforts resulted in the receipt of multiple written indications of interest from potential acquirers and investors, including a Letter of Intent (the "LOI") from DW Partners, LP ("DW Partners"). The Debtor, in consultation with its advisers, determined that the DW Partners' LOI was the highest and best received. The Debtor and DW Partners are currently in the process of negotiating a definitive asset purchase agreement for a going concern transaction (the "Going Concern Transaction" and the "Going Concern APA").  The Debtor is using best efforts to achieve a transaction that will preserve the Debtor's business operations, which will preserve jobs of thousands of employees, going forward customer for the Debtor's vendors and the Debtor's continuing support of the local communities in which the Debtor's stores operate. The Debtor believes that it has until Friday, June 19, 2015 to execute the Going Concern APA. Any such Going Concern APA would require the consent of the Administrative Agent.  If the Debtor enters into the Going Concern Transaction by such date and Administrative Agent consent is received, then Debtor intends to go forward with a Bankruptcy Code section 363 sale and auction process with DW Partners as the stalking horse purchaser.

15.    As required by the First Amendment, the Debtor has also engaged in a process to identify and select a stalking horse bidder for the possible sale and/or liquidation of the business as an alternative to the Going Concern Transaction. The Debtor's efforts to retain a liquidator resulted in the execution of the Stalking Horse Agency Agreement with a joint venture comprised of Tiger Capital Group ("Tiger") and Yellen Partners, LLC ("Yellen" together with Tiger, "Tiger/Yellen Stalking Horse"), which included a guarantee from Tiger/Yellen Stalking Horse that the Debtor would receive 93.5% of the aggregate Cost Value of the Merchandise (terms as defined in the Stalking Horse Agency Agreement), subject to certain adjustments, Further, as a result of the

default, an auction was held on June 9, 2015 and June 10, 2015 at which the Tiger/Yellen Stalking Horse was outbid by a group formed by Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Agent" or "Hilco/GB"), which included an increase in the guarantee to 111% of the Cost Value of the Merchandise with a Merchandise Threshold (terms as defined in the Agency Agreement, defined below) of not less than $61.5 million and not more than $67 million, subject to certain adjustments. The Debtor and the Agent, with the approval of the Administrative Agent, signed the Agency Agreement (the "Agency Agreement") on June 11, 2015.

16.    The Debtor and the Administrative Agent agreed that if the Going Concern APA is executed and Administrative Agent consent to such Going Concern APA is received, the Agency Agreement will convert to an equity transaction for a lesser number of stores, allowing the Debtor to pursue an alternative exit strategy for the Chapter 11 Case. If the Debtor enters into the Going Concern Transaction by the deadline that is acceptable to the Administrative Agent, then the Debtor will pursue a sale of substantially all of its assets pursuant to Bankruptcy Code section 363. If the Debtor does not enter into such a Going Concern Transaction, then the Debtor will conduct store closing sales pursuant to the Agency Agreement.

17.    In the ordinary course of their business, the Debtor collects, withholds and incurs Taxes that include sales and use, business and regulatory fees, and other taxes and fees. The Debtor is required to remit the sales and use taxes collected in connection with the sale of goods at its stores to the applicable Taxing Authorities on a periodic basis, usually monthly in arrears for the prior month.  Many governmental authorities where the Debtor operates its business require that the Debtor obtain a business license and pay corresponding occupational fees and/or fees associated with the filing of an annual report with such jurisdictions.  Taxing authorities also impose custom duties for the importation of goods.  The requirement for a company to obtain a business license varies according to the tax law of the jurisdictions, but is generally based on gross receipts.

18.    The Debtor imports goods from overseas for sales.  The Debtor operates in 19 states (including Washington D.C. and Puerto Rico), which each impose different tax obligations

1   on the Debtor in connection with its business and operations. The Debtor remits the Taxes to
2   various federal, state and local government authorities in the ordinary course of business. Taxes
3   are remitted by the Debtor through checks and electronic transfers that are processed through its
4   banks and other financial institutions.

5        19.    Since the Taxes generally are paid in arrears, the Debtor holds the Taxes for a
6   period of time before remitting them to the appropriate Taxing Authorities. As such, some of the
7   Taxing Authorities were not paid for all prepetition Taxes prior to the Petition Date. As of the
8   Petition Date, the Debtor had collected and retained approximately $3,311,948.75 in prepetition
9   Taxes for which payment is due in the ordinary course of business.

10       20.    Other Taxing Authorities may have been sent checks with respect to Taxes that
11   may or may not have been presented or cleared as of the Petition Date. With respect to this
12   category, the Debtor requests authority, in its discretion and to the extent applicable, to issue
13   postpetition replacement checks to those Taxing Authorities that have not presented or cleared
14   prepetition checks issued on account of Taxes.

15       I declare under penalty of perjury that the foregoing is true and correct to the best of my
16   knowledge. Executed on this 18th day of June, 2015, at Costa Mesa, California.

J.E. RICK BUNKA

18

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION TAXES AND CUSTOMS DUTIES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF J.E. RICK BUNKA IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 18, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Todd M Arnold    tma@lnbyb.com
- Michael Avanesian    michael@avanesianlaw.com, michael@ecf.inforuptcy.com
- Karen C Bifferato    kbifferato@connollygallagher.com, kbifferato@connollygallagher.com
- Wanda Borges    ecfcases@borgeslawllc.com
- Dustin P Branch    dustin.branch@kattenlaw.com, jessica.mickelsen@kattenlaw.com;brian.huben@kattenlaw.com;adelle.shafer@kattenlaw.com;donna.carolo@kattenlaw.com
- Heather D Brown    heather@hdbrownlaw.com
- Leslie A Cohen    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;Brian@lesliecohenlaw.com
- Gary B Elmer    gelmer@ciardilaw.com
- John-Patrick M Fritz    jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com
- David B Golubchik    dbg@lnbyb.com, dbg@ecf.inforuptcy.com
- Andrew A Goodman    agoodman@greenbass.com, ksopky@greenbass.com
- Steven T Gubner    sgubner@ebg-law.com, ecf@ebg-law.com
- Michael J Hauser    michael.hauser@usdoj.gov
- Eve H Karasik    ehk@lnbyb.com
- Mette H Kurth    mkurth@foxrothschild.com, vcordi@foxrothschild.com;pchlum@foxrothschild.com
- Steven N Kurtz    nlessard@laklawyers.com, rfeldon@laklawyers.com;lkaplan@laklawyers.com
- Ian Landsberg    ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;cdonoyan@landsberg-law.com;dzuniga@landsberg-law.com;yalarcon@landsberg-law.com;ilandsberg@ecf.inforuptcy.com
- James V Lombardi    jlombardi@rossbanks.com, kjohnson@rossbanks.com
- Robert S Marticello    Rmarticello@swelawfirm.com, csheets@swelawfirm.com
- Kevin M Newman    knewman@menterlaw.com, kmnbk@menterlaw.com
- William Novotny    william.novotny@mwmf.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Ernie Zachary Park    ernie.park@bewleylaw.com
- Christopher J Petersen    cjpetersen@blankrome.com, arc@blankrome.com
- David M Poitras    dpoitras@jmbm.com, bt@jmbm.com;vr@jmbm.com;dmp@ecf.inforuptcy.com
- David L Pollack    pollack@ballardspahr.com, petlaka@ballardspahr.com
- Jennifer Pruski    jpruski@trainorfairbrook.com
- Scott H Siegel    ssiegel@laklawyers.com, aaguirre@laklawyers.com
- Evan D Smiley    esmiley@swelawfirm.com, gcruz@swelawfirm.com
- Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com
- Rick A Steinberg    rsteinberg@nakblaw.com
- Ronald M Tucker    rtucker@simon.com, cmartin@simon.com;psummers@simon.com;Bankruptcy@simon.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                        **F 9013-3.1.PROOF.SERVICE**

- Daniel R Utain    dutain@kaplaw.com, kcoughlin@kaplaw.com
- Kimberly Walsh    bk-kwalsh@texasattorneygeneral.gov
- Elizabeth Weller    dallas.bankruptcy@publicans.com
- Barouir B Yeretzian    byeretzian@jhindslaw.com, yeretzian@gmail.com

**2. SERVED BY UNITED STATES MAIL**: On **June 18, 2015**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 18, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Theodor C. Albert
United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5085 / Courtroom 5B
Santa Ana, CA 92701-4593

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 18, 2015 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**