DAVID B. GOLUBCHIK (SBN 185520)
EVE H. KARASIK (SBN 155356)
JULIET Y. OH (SBN 211414)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: dbg@lnbyb.com, ehk@lnbyb.com, jyo@lnbyb.com; lls@lnbyb.com
Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

In re

ANNA'S LINENS, INC.,

Debtor.

Case No. 8:15-bk-13008-TA
Chapter 11

**SUPPLEMENTAL DECLARATION OF J.E. RICK BUNKA IN SUPPORT OF DEBTOR'S EMERGENCY MOTION BY DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS: (A) AUTHORIZING ASSUMPTION OF AGENCY AGREEMENT; (B) AUTHORIZING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO BANKRUPTCY CODE SECTIONS 363(B) AND (F); (C) APPROVING THE STORE CLOSING SALE GUIDELINES; (D) AUTHORIZING THE DEBTOR TO ABANDON; AND (E) AUTHORIZING LEASE REJECTION PROCEDURES WITH RESPECT TO THE CLOSING STORES PURSUANT TO SECTION 365 [INSERT TITLE OF GOB MOTION]**

DATE: July 2, 2015
TIME: 10:00 a.m.
PLACE: Courtroom 5B
411 West Fourth Street
Santa Ana, California

I, J.E. Rick Bunka, hereby declare as follows:

1. I am over 18 years of age. I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2. I am the sole member of Point North, LLC, a financial advisory services firm that specialize in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. In my capacity as the sole member of Point North, LLC, I have been engaged as the Chief Financial Officer Anna's Linens, Inc., the debtor and debtor in possession in the above-captioned bankruptcy case (the "Debtor" or "Anna's"), and am therefore familiar with the business operations and financial books and records of the Debtor. I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

3. Prior to joining the Company, I served in various senior executive roles in all aspects of retail and financial management. My most recent position was Chief Restructuring Officer for Love Culture, a California based specialty apparel chain with 85 stores across the United States. The Love Culture case involved a liquidation of certain of the Love Culture assets through a liquidation sale conducted by a national recognized liquidation firm, as well as a sale of intellectual property and lease designation rights to a third party. Love Culture emerged with 57 stores and an active E-commerce site retaining its core customers, and store and support center personnel. Previously, I was President and Chief Executive Officer of Dots, a women's specialty retail apparel chain that operated 420 stores in 28 states and employed over 4,000 associates. Prior to serving in this role, I served as president from 2006 to 2010 and the Chief Financial Officer from 1997 to 2006. Prior to joining the Dots organization, from 1987 to 1996 I was Chief Financial Officer of Gantos, a $200 million national woman's specialty retailer that operated 160 stores in 25 states.

4. I have access to the Debtor's books and records. I am familiar with the history, organization, operations and financial condition of the Debtor.[1] The records and documents referred

---

[1] Capitalized terms used herein without definition shall have the meanings provided for such terms in the First Day Declaration (defined below).

to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents. The statements set forth in this declaration are based upon my own personal knowledge and my knowledge of the Debtor's books and records.

**Background**

5. This Declaration incorporates my Declaration in support of first day motion filed on June 15, 2015 (the "First Day Declaration") [ECF No. 22]. The First Day Declaration sets forth, among other things, information regarding the business, operational and liquidity issues that led to the filings of the Chapter 11 Case and the efforts by the Debtor to maximize value through either pursuit of a Going Concern Transaction or through the Agency Agreement.

**The Debtor's Pre-Petition Marketing Efforts**

6. Prepetition, the Debtor determined that it could not effect an internal restructuring and therefore explored alternatives to maximize value. That effort involved evaluating and pursuing the possibility of potential going concern transactions and as well as liquidation through an agency agreement on a parallel track.

7. The Debtor was pursuing a turnaround strategy to improve operating performance by increasing comparable store sales, closing stores and reducing operating expenses but faced a future seasonal period of tight liquidity through the summer months of 2015. In order to obtain the necessary liquidity the Debtor determined it needed to raise $10 million in capital. Consistent with prior practices, the Debtor historically has worked with vendors to obtain additional dating and vendor notes to get the Debtor through the slower summer season. The Debtor believed that if it could obtain the full $10 million conversion and sustain delivery of goods at required levels that it could avoid its liquidity crisis and avoid bankruptcy. The Debtor was only able to convert approximately $7 million in vendor debt into a combination of Junior Subordinated Secured Notes, simple Promissory Notes, and increased dating. And through the weeks that followed, vendor shipments fell significantly below forecast levels resulting in reduced availability under the bank credit facility.

8. As set forth in the First Day Declaration, prior to the Petition Date the Debtor negotiated to restructure certain of its obligations while Wunderlich Securities, Inc. ("Wunderlich"), the Debtor's investment banker, undertook a broad process in search of additional capital that included contacting over 200 investors and institutions. Wunderlich's efforts resulted in the receipt of multiple written indications of interest from potential acquirers and investors, including an LOI with DW Partners. The LOI proposed a Going Concern Transaction that the Debtor believed would provide the maximum value for the Debtor and its stakeholders. Although the Agency Agreement was structured to allow for the possibility of the Going Concern Transaction, DW Partners ultimately informed the Debtor that it did not intend to proceed with the Going Concern Transaction.

9. As required by the First Amendment, at the same as the Debtor was pursuing the Going Concern Transaction, the Debtor also engaged in a process to identify and select a stalking horse bidder for the liquidation of the Debtor's inventory and owned furniture, fixtures and equipment (the "Owned FF&E" and collectively, with the inventory, the "Merchandise") by a national liquidation firm as an alternative if the Debtor could not effect the Going Concern Transaction.

10. In order to obtain the best bid from the national liquidation firms, the Debtor distributed a request for proposal to each such firm, pursuant to which the Debtor solicited bids to serve as the Debtor's agent to conduct a "going out of business", "store closing' or similar themed sale at the Debtor's retail store locations, with each such bid to be submitted based upon a form agency agreement that was acceptable to the Debtor, the Administrative Agent and the Lenders (the "Request for Proposal"). The Request for Proposal was sent to three (3) liquidation firms which were the Tiger/Yellen Stalking Horse, the Hilco/GB joint venture and Great American Group. It is my understanding that these three bidding groups are the nationally recognized liquidation firms with the size and scope to handle a transaction such as the one being considered.

11. The Debtor received bids from the Tiger/Yellen Stalking Horse, Great American and GB/Hilco in response to its Request for Proposal. After evaluating all of the bids,the Debtor, in consultation with the Administrative Agent and the Lenders, negotiated the terms of an Agency Agreement, dated June 5, 2015, with the Tiger/Yellen Stalking Horse which Agency Agreement

served as the "stalking horse" against which all bids submitted at the subsequent auction would be measured (the "Stalking Horse Agency Agreement"). The Stalking Horse Agency Agreement provided for (i) a guaranteed recovery of 93.5% of the aggregate Cost Value of the Merchandise (the "Stalking Horse Guaranteed Amount'), with a Merchandise Threshold of not less than $61.5 million (terms as defined in the Agency Agreement), subject to certain adjustments; plus (ii) a potential sharing recovery from the Proceeds of the Sale of Merchandise and Additional Agent Merchandise, pursuant to a sharing formula set forth in the Stalking Horse Agency Agreement, after recovery by the Agent of the Guaranteed Amount, Expenses, and the Agent's Fee (as each such term is defined in the Stalking Horse Agency Agreement; plus (iii) 80% of the proceeds from the sale of Owned FF&E (net of sales taxes); plus (iv) 80% of the sale proceeds from the sale of certain of the Debtor's owned inventory (defined in the Stalking Horse Agency Agreement as "Merchant Consignment Goods") that does not otherwise constitute "Merchandise" under the Agency Agreement.

12. In addition to the value provided, the Debtor believed the Stalking Horse Agency Agreement was advantageous because it was structured with a guaranteed return (calculated as a percentage of the cost value of the Merchandise), included a potential sharing mechanism and shifted the responsibility for a substantial portion of the store-level expenses to the Tiger/Yellen Stalking Horse. The Debtor concluded that this structure was preferable to one that left the risk of the liquidation to the Debtor or the estate.

13. A two-day auction for the right to liquidate the assets was held on June 9 and 10, 2015 (the "Auction") at which all of the bidders and SB Capital, another nationally recognized liquidation firm, participated. After multiple rounds of bidding, the joint venture comprising the Agent was the successful bidder, with a final bid of (i) a guaranteed recovery of 111% of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount") with a Merchandise Threshold of not less than $61.5 million (terms as defined in the Agency Agreement), subject to certain adjustments; plus (ii) the same potential sharing recovery from the Proceeds of the Sale of Merchandise and Additional Agent Merchandise as provided for in the Stalking Horse Agency Agreement; plus (iii) the same 80% share of the sale proceeds from the sale of Merchant Consignment Goods; plus (iv) the Agent retained the

right to sell the Owned FF&E in the Stores, Distribution Centers and the Corporate Office, bore all of the expenses in connection with such disposition and retained all of the proceeds from the sale of the Owned FF&E.

14. The Debtor and the Agent with approval of Administrative Agent and the Secured Parties signed the Agency Agreement on June 11, 2015.

15. The liquidation contemplated by the Agency Agreement began on June 12, 2015 and has been on-going since that time.

**Assumption of the Agency Agreement and the Resulting Sale of Merchandise will Maximize Value for the Estate**

16. I, in the exercise of my sound business judgment and in consultation with the Debtor's advisors and Secured Parties, have determined that assumption of the Agency Agreement, on a final basis is in the best interests of the Debtor and its estate because it will maximize the value in the Debtor's estate for the benefits of all stakeholders. The Agency Agreement will allow the Debtor to complete the Sale of the Merchandise, the Merchant Consignment Goods, the Owned FF&E, and the Additional Agent Merchandise (as defined in the Agency Agreement) in an orderly fashion. The sale has commenced and, in order to maximize the return, I believe that the sale must continue uninterrupted.

17. Based on the Guaranteed Amount of 111% of the Cost Value of the Merchandise and a Merchandise Threshold of $61.5 to $67 million, I also believe that there should be substantial recoveries from the liquidation process contemplated by the Agency Agreement. I also believe that the Debtor and its estate benefit from the Agent paying the majority of the expenses incurred in connection with the sale. The Debtor and its estate also benefit because the risk of the sale is borne by the Agent as it is the Agent that bears the loss if the Sale does produce less than projected. In addition to the Guaranteed Amount, the Debtor also may receive recoveries under the sharing formula in the Agency Agreement that provides that once the Agent recovers the guarantee amount from the sale plus all sale expenses, 5% of the Cost Value of the Merchandise and 5% of the aggregate Proceeds attributable to the Additional Agent Merchandise, then the Agent and the Debtor share 50/50 in all remaining sale proceeds (the "Sharing").

18. It is my business judgment that the assumption of the Agency Agreement and the continued Sale effort will maximize value for the estate and all creditors.

19. Moreover, I submit that the Auction, through its highly competitive bidding process, ensured that the Agent was chosen in good faith and that the terms and conditions of the Agency Agreement are fair and reasonable, and represents the highest and best offer for the Merchandise and Owned FF&E. As set forth above, the Debtor solicited bids from all of the major national liquidation firms and these firms participated in either or both of the stalking horse auction and the actual action. I believe that the fact the auction was conduced prepetition had no negative effects on the results of the auction. Indeed, the results of the auction were extremely favorable resulting in an increase in the guarantee from 93.5% to 111%. In light of the foregoing, I submit that the assumption of the Agency Agreement represents a reasonable exercise of the Debtor's business judgment, is in the best interest of its estate, and should be approved.

**The Decision to Enter Into the DIP Financing with the Lender**

20. The Debtor modeled and analyzed whether it could operate on cash collateral alone without the debtor in possession financing and conduct the sale through the Agency Agreement. The Debtor determined that it could not operate solely on cash collateral. . Among other things, the Debtor determined that it could not bear the costs of the liquidation to complete the liquidation sale, the Debtor could not adequately protect the Administrative Agent and the Lenders as any equity cushion would quickly deteriorate and the cost and delay of a priming fight would have costs the Debtor substantial resources. .

**Alternatives to the Agency Agreement and Sale Process**

21. At this point in time, the only alternative to conducting the sale process in accordance with the Agency Agreement would be conversion to a case under chapter 7 case of the Bankruptcy Code. As noted above, the Debtor cannot effect aninternal restructuring and was unsuccessful in achieving a Going Concern Transaction. Given the status of the liquidation, it is also unlikely that the Trustee could pursue any kind of going concern transaction. Therefore, other than a chapter 7 conversion, the only option for the Debtor is liquidation through the ongoing Agency Agreement sale process.

22. In my view, converting the case would not benefit the Debtor or any of its stakeholders. The liquidation sale is currently in full operational mode and would come to a crashing halt upon a conversion while the Trustee is appointed and familiarizes his or her self with the Debtor, the Debtor's business, the sales process and a host of other issues. This delay in the sale momentum would cripple the projected recoveries. In addition, the Trustee would lose the benefit of the favorable terms and structure of the Agency Agreement. In addition, if the sales are stopped suddenly, the Debtor will need to terminate its over 2,000 employees who were at least assured employment for all or a portion of the sale term.. These employee terminations would also be effected without the requisite notice to avoid liability under State and Federal WARN Act requirements, which is likely to result in the creation of additional significant administrative claims. It is also likely that the Agent would assert material administrative damage claims for failure to assume the Agency Agreement.

23. A chapter 7 conversion jeopardizes recoveries for all parties in interest. In addition to the obligations to the secured creditors, there are myriad other creditor constituencies who benefit from the chapter 11 sale process under the Agency Agreement. These creditors include the employees who are owed prepetition payroll, vacation pay and other benefit amounts to be paid during the Case, landlords that are owed stub rent and other rent to paid by the Agent under the Agency Agreement, customers whose gift cards and merchandise credits will be honored for 30 days post-petition,s hipper and warehouse vendors who will be paid sizable prepetition claim amounts, and priority and administrative creditors, such as Bankruptcy Code section 503(b)(9) creditors, who are likely to have a recovery as a result of the chapter 11 liquidation process. Each of these constituencies would be harmed by conversion to a chapter 7.

24. Timing is also a critical issue to the maximization of value under the Agency Agreement. If the final hearing on the Agency Agreement is not held by July 2, 2105 or the Agency Agreement is not assumed pursuant to an order entered by this Court no later than July 6, 2014 (which dates were extended from June 30, 2015 by agreement of the Agent), the Agency Agreement may convert from a guaranteed recovery transaction to a fee-based transaction whereunder the Agent receives consulting fees of 2.5% of the sale Procedures excluding Additional Agent Merchandise and 5.0% of the sales from the Additional Agent Merchandise, and reimbursement of the Agent's out of pocket Expenses since the sale commencement date. The Agent will no longer pay for the expenses of the sale or bear the risk of the sale. Furthermore, the estate no

longer receives the benefit of the proceeds from the Sharing formula. In my view, such a structure is less favorable to the Debtor that the existing Agency Agreement.

**Sources of Recovery**

25. In addition to the recovery to be received through the Agency Agreement and sale process, there are other sources of recovery for the Debtor's creditors. These sources include: (i) the Sharing of proceeds pursuant to the formula in the Agency Agreement, (ii) the Debtor's intellectual property assets, which the Debtor has been advised has significant value, (iii) the Debtor's lease designation rights, and (iv) avoiding power and other causes of action. The Debtor has received expressions of interest for the acquisition of the intellectual property assets and lease designation rights with the goal of creating a smaller chain of Anna's Linens stores. Furthermore, although the Debtor has not performed an in depth analysis of the transfers made 90 days prior to the Petition Date, the Debtor was making payments of approximately $2.5 million per week for a total of approximately $33 million during the 90-day period. Given the Debtor's financial performance and challenges during that period, a significant portion of these transfers are likely to be recoverable as avoidable preferential transfers. The Debtor does not have appraisals or valuations of these assets, but they are certain to generate at least some return for creditors other than the secured lenders.

26. The DIP Budget attached to the interim DIP Order provides a value of $500,000 to the Debtor's intellectual property. This amount was used as a placeholder only. As the Committee has noted in its Objection, the Debtor has been advised that the intellectual property may be valued at $4 million.

27. Furthermore, the Committee will be investigating and potentially challenging the liens and claims of the secured lenders. It is possible that the Committee will uncover factual or legal issues that will result in a reduced claim for the secured lenders. If the Committee is able to achieve such a result, then the creditor groups will receive an even greater return that likely will include a portion of the guarantee amount paid by the Agent as well as the other sources of recovery described above.

28. Furthermore, the amount of Bankruptcy Code section 503(b)(9) claims will be reduced by offsets for the receipts of amount that are avoidable preferential transfers. These

reductions will reduce the administrative claims and increase the likelihood of recovery for other claimants.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this 1 day of July, 2015, at Costa Mesa, California.

J.E. RICK BUNKA